1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4

5   UNITED STATES OF AMERICA,      )  CR-18-00172 BLF
                                   )
6                  PLAINTIFF,      )  SAN JOSE, CALIFORNIA
                                   )
7             VS.                  )  APRIL 9, 2021
                                   )
8   MICHAEL KAIL,                  )  VOLUME 2
                                   )
9                  DEFENDANT.      )  PAGES 181-433
    _____)

10

11              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE BETH LABSON FREEMAN
12              UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  COLIN C. SAMPSON
15                              DANIEL KALEBA
                           450 GOLDEN GATE AVENUE, BOX 36055
16                         SAN FRANCISCO, CALIFORNIA  94102

17   FOR THE DEFENDANT:    JAYNE LAW GROUP
                           BY:  JULIA M. JAYNE
18                         483 9TH STREET, SUITE 200
                           OAKLAND, CALIFORNIA  94607

19

20   ALSO PRESENT:         FRANCHESCA CHELI
                           LAURIE WORTHEN
21                         BALJINDER HEER

22

23   OFFICIAL COURT REPORTER:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595

24

25         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

INDEX OF PROCEEDINGS

OPENING STATEMENT BY MR. KALEBA                P. 197

OPENING STATEMENT BY MS. JAYNE                 P. 211


INDEX OF WITNESSES

GOVERNMENT'S

**ANTHONY RALPH**
     DIRECT EXAM BY MR. SAMPSON              P. 229
     CROSS-EXAM BY MS. JAYNE                 P. 285
     REDIRECT EXAM BY MR. SAMPSON            P. 321
     RECROSS-EXAM BY MS. JAYNE               P. 323


**YINGKUAN LIU**
     DIRECT EXAM BY MR. KALEBA               P. 325
     CROSS-EXAM BY MS. JAYNE                 P. 356
     REDIRECT EXAM BY MR. KALEBA             P. 375
     RECROSS-EXAM BY MS. JAYNE               P. 379


**KURT BROWN**
     DIRECT EXAM BY MR. SAMPSON              P. 382
     CROSS-EXAM BY MS. JAYNE                 P. 402


**MICHAEL ASHER**
     DIRECT EXAM BY MR. SAMPSON              P. 413

<table>
<tr><td>1</td><td></td></tr>
</table>

INDEX OF EXHIBITS

|  | MARKED | ADMITTED |
|---|---|---|

GOVERNMENT'S

| | | |
|---|---|---|
| 304 | | 242 |
| 305 | | 245 |
| 311 | | 254 |
| 320 | | 260 |
| 323 | | 264 |
| 338 | | 274 |
| 339 | | 277 |
| 9 | | 281 |
| 224 | | 302 |
| 629 | | 333 |
| 337 | | 341 |
| 347 | | 348 |
| 11, PAGE 1 | | 371 |
| 340 | | 393 |
| 343 | | 398 |
| 307 | | 421 |
| 312 | | 424 |

DEFENDANT'S

| | | |
|---|---|---|
| 1101, PAGE 1 | | 295 |
| 1100 | | 307 |
| 1105 | | 308 |
| 1107 | | 343 |
| 1153 | | 348 |
| 1108 | | 368 |

```
 1      SAN JOSE, CALIFORNIA                    APRIL 9, 2021

 2                     P R O C E E D I N G S

 3           (JURY IN AT 9:10 A.M.)

 4               THE COURT:  HELLO, EVERYONE.  PLEASE BE SEATED.

 5      WELCOME.

 6           ALL RIGHT.  THANK YOU ALL FOR YOUR FLEXIBILITY.  YOU'RE

 7      GOING TO END UP WITH A TOUR OF OUR COURTHOUSE BECAUSE WE'RE

 8      JUST TRYING TO FIND COURTROOMS THAT ARE GOING TO WORK.  WE HAD

 9      A GLITCH IN THE AUDIO AND VIDEO EQUIPMENT DOWNSTAIRS, SO THAT

10      COURTROOM JUST -- WE'VE BEEN WORKING ON IT FOR A WEEK AND IT

11      JUST DIDN'T GET FIXED.

12           AND AS SOON AS THE TRIAL DOWN AT THE OTHER END OF THE HALL

13      FINISHES, WE'RE ACTUALLY GOING TO MOVE DOWN THERE BECAUSE IT'S

14      BIGGER AND MORE COMFORTABLE.  SO THANK YOU FOR THAT.

15           I DON'T THINK YOU'LL BOND TO THIS COURTROOM PARTICULARLY,

16      BUT WE WILL BE MOVING AND WE'LL LET YOU KNOW ABOUT THAT.

17           WE ARE BACK ON THE RECORD IN THE UNITED STATES VERSUS

18      MICHAEL KAIL, AND ALL COUNSEL AND PARTIES ARE PRESENT.

19           GOOD MORNING, EVERYONE.

20           ALL OF OUR JURORS ARE HERE.

21           THIS MORNING WE ARE GOING TO GET DOWN TO THE BUSINESS OF

22      THE TRIAL.  I KNOW YOU'RE ALL SCATTERED IN THE COURTROOM, SO I

23      WANT TO MAKE SURE THAT IF YOU HAVE DIFFICULTY SEEING OR

24      HEARING, THAT YOU WILL WAIVE YOUR ARM AND I'LL EVENTUALLY SEE

25      YOU OR MS. SALINAS-HARWELL WILL AND WE'LL MAKE SURE THAT WE
```

1    CORRECT WHATEVER THE PROBLEM IS.

2        WITH ALL OF THIS PLEXIGLAS AROUND ME, I FEEL LIKE THEY

3    GAVE ME THE CHEAP SEAT AT THE BALLPARK AND I HAVE A POST RIGHT

4    IN FRONT OF MY VIEW OF THE FIELD.  SO YOU MAY SEE ME LURCHING

5    AROUND A LITTLE BIT BECAUSE I'VE GOT THESE THINGS HERE THAT

6    MAKE IT HARD FOR ME TO SEE.

7        BUT ONCE THE TRIAL IS STARTED, I'M ACTUALLY LESS IMPORTANT

8    THAN THE OTHER THINGS THAT ARE GOING ON.  I DON'T PRESENT

9    EVIDENCE.  I DON'T TESTIFY, OBVIOUSLY.  SO THE FACT THAT I MAY

10   BE OBSCURED FROM YOU SHOULDN'T BE THAT IMPORTANT IF THE BARS

11   ARE IN YOUR WAY.

12       SO THIS MORNING I'M GOING TO READ TO YOU SOME OF THE

13   INTRODUCTORY JURY INSTRUCTIONS.  THESE INSTRUCTIONS ARE MEANT

14   TO HELP ORIENT YOU ABOUT JURY DUTY, BUT THEY'RE NOT THE

15   INSTRUCTIONS ON THE LAW THAT YOU'LL APPLY.  THOSE I'LL GIVE YOU

16   AT THE END OF THE PRESENTATION OF THE CASE.

17       I FIND THAT WHEN THERE'S NO CONTEXT FOR THE EVIDENCE IN

18   THE CASE, IT'S VERY HARD TO UNDERSTAND WHAT THOSE INSTRUCTIONS

19   MEAN, AND SO I'M GOING TO WAIT AND READ THOSE TO YOU RIGHT

20   BEFORE THE CLOSING ARGUMENTS IN THE CASE.

21       BUT THESE INSTRUCTIONS THAT I'M GOING TO READ TO YOU NOW

22   ARE VERY IMPORTANT AS WELL, AND THEY WILL HELP GUIDE YOU IN

23   YOUR ROLE AS JURORS.

24       AND SO I WISH I COULD JUST TALK TO YOU ABOUT THEM RATHER

25   THAN READING THEM TO YOU, BUT I AM REQUIRED TO READ THEM.

 1          YOU WILL GET A COPY OF THE WRITTEN INSTRUCTIONS WHEN YOU

 2     DELIBERATE, AND SO ALTHOUGH I KNOW YOU ALL HAVE NOTEBOOKS AND

 3     YOU'RE WELCOME TO TAKE NOTES ON ANYTHING, THE JURY INSTRUCTIONS

 4     CAN FEEL LIKE THEY GO BY PRETTY FAST, BUT YOU'LL HAVE THEM IN

 5     WRITING, SO YOU DON'T NEED TO WORRY ABOUT THAT.

 6          AND AS I MENTIONED TO YOU THE OTHER DAY, TALKING WITH A

 7     MASK ON IS HARDER THAN I THOUGHT IT WAS GOING TO BE, SO

 8     YOU'LL -- YOU MAY SEE ME PAUSE FOR A MOMENT JUST TO BREATHE A

 9     LITTLE BIT.  IT'S HARD TO TAKE A DEEP BREATH WITH A MASK ON

10     WHILE YOU'RE TALKING, AND I KNOW ALL OF YOU WILL BE WEARING

11     YOURS ALL DAY, AS I WILL.  AND FOR MOST OF US, WE ZIP AROUND

12     THE GROCERY STORE FOR TEN MINUTES AND THEN GET HOME AND TAKE IT

13     OFF.  SO IT'S A DIFFERENT EXPERIENCE AND WE'LL ALL JUST GET

14     USED TO IT.

15          SO WE'LL TAKE BREAKS.  WE'LL TAKE OUR -- WE'LL TAKE ONE

16     MORNING BREAK, AND THEN WE'LL TAKE PROBABLY TWO AFTERNOON

17     BREAKS, AND THAT'LL GIVE YOU A CHANCE JUST TO BREATHE A LITTLE

18     BIT AS WELL, AND OF COURSE WE TAKE OUR LUNCH BREAK AND THEN

19     YOU'LL HAVE AN HOUR IF YOU ACTUALLY WANT TO GO OUTSIDE AND

20     ACTUALLY DO DEEP BREATHING OUTDOORS, SO YOU'LL HAVE THAT

21     OPPORTUNITY AS WELL.

22          SO WHAT I WANT TO DO IS GET -- I REALLY WANT TO LAUNCH

23     THIS TRIAL AND GET STARTED BECAUSE MY GOAL IS TO MOVE IT ALONG

24     AS EFFICIENTLY AS WE CAN IN RESPECT TO YOUR TIME TO GET YOU

25     BACK HOME TO WHAT YOU NORMALLY DO AS QUICKLY AS WE CAN, BUT I

1    CAN'T RUSH THINGS AND I NEED TO MAKE SURE THAT BOTH SIDES HAVE

2    A FULL OPPORTUNITY TO MAKE THE PRESENTATION TO YOU.

3         AND SO WE WILL -- I SORT OF HAVE A CATTLE PROD THAT I

4    GENTLY USE WITH ATTORNEYS TO KEEP THINGS MOVING, BUT THEY'RE

5    HIGHLY PROFESSIONAL AND I KNOW THEY HAVE AS MUCH OF A DESIRE TO

6    MOVE THIS CASE ALONG AS YOU DO.  SO I THINK WE'RE ALL WORKING

7    TO THE SAME THING.

8         SO I'M GOING TO READ THESE JURY INSTRUCTIONS AND THEN I

9    WILL TURN IT OVER TO THE ATTORNEYS.

10        LADIES AND GENTLEMEN, YOU ARE NOW THE JURY IN THIS CASE.

11   I WANT TO TAKE A FEW MINUTES TO TELL YOU SOMETHING ABOUT YOUR

12   DUTIES AS JURORS AND TO GIVE YOU SOME PRELIMINARY INSTRUCTIONS.

13        AT THE END OF THE TRIAL, I WILL GIVE YOU MORE DETAILED

14   WRITTEN INSTRUCTIONS THAT WILL CONTROL YOUR DELIBERATIONS.

15        WHEN YOU DELIBERATE, IT WILL BE YOUR DUTY TO WEIGH AND

16   EVALUATE ALL THE EVIDENCE RECEIVED IN THE CASE, AND IN THAT

17   PROCESS, TO DECIDE THE FACTS.  TO THE FACTS AS YOU FIND THEM,

18   YOU WILL APPLY THE LAW AS I GIVE IT TO YOU, WHETHER YOU AGREE

19   WITH THE LAW OR NOT.  YOU MUST DECIDE THE CASE SOLELY ON THE

20   EVIDENCE AND THE LAW BEFORE YOU.

21        PERFORM THESE DUTIES FAIRLY AND IMPARTIALLY.  YOU SHOULD

22   NOT BE INFLUENCED BY ANY PERSON'S RACE, COLOR, RELIGIOUS

23   BELIEFS, NATIONAL ANCESTRY, SEXUAL ORIENTATION, GENDER

24   IDENTITY, GENDER, OR ECONOMIC CIRCUMSTANCES.

25        ALSO, DO NOT ALLOW YOURSELF TO BE INFLUENCED BY PERSONAL

1    LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, PUBLIC OPINION,

2    OR BIASES, INCLUDING UNCONSCIOUS BIASES.

3        UNCONSCIOUS BIASES ARE STEREOTYPES AND ATTITUDES OR

4    PREFERENCES THAT PEOPLE MAY CONSCIOUSLY REJECT, BUT THEY MAY BE

5    EXPRESSED WITHOUT CONSCIOUS AWARENESS, CONTROL, OR INTENTION.

6    LIKE CONSCIOUS BIAS, UNCONSCIOUS BIAS CAN AFFECT HOW WE

7    EVALUATE INFORMATION AND MAKE DECISIONS.

8        THIS IS A CRIMINAL CASE BROUGHT BY THE UNITED STATES

9    GOVERNMENT.  IN COUNTS ONE THROUGH NINETEEN, THE GOVERNMENT

10   CHARGES MICHAEL KAIL WITH WIRE FRAUD IN VIOLATION OF 18 U.S.

11   CODE, SECTION 1343, AND HONEST SERVICES WIRE FRAUD IN VIOLATION

12   OF 18 U.S. CODE, SECTIONS 1343 AND 1346.

13       IN COUNTS TWENTY TO TWENTY-TWO, THE GOVERNMENT CHARGES

14   MR. KAIL WITH MAIL FRAUD IN VIOLATION OF 18 U.S. CODE, SECTION

15   1341, AND HONEST SERVICES MAIL FRAUD IN VIOLATION OF 18 U.S.

16   CODE, SECTION 1341 AND 1346.

17       IN COUNTS TWENTY-THREE THROUGH TWENTY-NINE, THE GOVERNMENT

18   CHARGES MR. KAIL WITH LAUNDERING THE PROCEEDS OF A SPECIFIED

19   UNLAWFUL ACTIVITY IN VIOLATION OF 18 U.S. CODE, SECTION 1957.

20       THE CHARGES ARE NOT EVIDENCE AND DO NOT PROVE ANYTHING.

21       MR. KAIL HAS PLEADED NOT GUILTY TO THE CHARGES AND IS

22   PRESUMED INNOCENT UNLESS AND UNTIL THE GOVERNMENT PROVES THE

23   DEFENDANT GUILTY BEYOND A REASONABLE DOUBT.

24       IN ADDITION, MR. KAIL HAS THE RIGHT TO REMAIN SILENT AND

25   NEVER HAS TO PROVE INNOCENCE OR PRESENT ANY EVIDENCE.

1    THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

2  FACTS ARE CONSISTS OF:

3    THE SWORN TESTIMONY OF ANY WITNESS;

4    THE EXHIBITS WHICH ARE RECEIVED IN EVIDENCE; AND,

5    ANY FACTS TO WHICH THE PARTIES AGREE.

6    THE FOLLOWING THINGS ARE NOT EVIDENCE AND YOU MUST NOT

7  CONSIDER THEM AS EVIDENCE IN DECIDING THE CASE:

8    STATEMENTS AND ARGUMENTS OF THE ATTORNEYS;

9    QUESTIONS AND OBJECTIONS OF THE ATTORNEYS;

10    TESTIMONY I INSTRUCT YOU TO DISREGARD; AND,

11    ANYTHING YOU MAY SEE OR HEAR WHEN THE COURT IS NOT IN

12  SESSION, EVEN IF WHAT YOU SEE OR HEAR IS DONE OR SAID BY ONE OF

13  THE PARTIES OR ONE OF THE WITNESSES.

14    EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

15  IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS ABOUT

16  WHAT THE WITNESS PERSONALLY SAW OR HEARD OR DID.

17  CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE, THAT IS, IT IS

18  PROOF OF ONE OR MORE FACTS FROM WHICH YOU CAN FIND ANOTHER

19  FACT.

20    YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

21  EVIDENCE.  EITHER CAN BE USED TO PROVE ANY FACT.  THE LAW MAKES

22  NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT

23  OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH

24  WEIGHT TO GIVE TO ANY EVIDENCE.

25    BY WAY OF EXAMPLE, IF YOU WAKE UP IN THE MORNING AND SEE

1    THE SIDEWALK IS WET, YOU MAY FIND FROM THAT FACT THAT IT RAINED

2    DURING THE NIGHT.  HOWEVER, OTHER EVIDENCE, SUCH AS A TURNED ON

3    GARDEN HOSE, MAY PROVIDE AN EXPLANATION FOR THE WATER ON THE

4    SIDEWALK.

5         THEREFORE, BEFORE YOU DECIDE THAT A FACT HAS BEEN PROVEN

6    BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL THE EVIDENCE

7    IN LIGHT OF REASON, EXPERIENCE, AND COMMON SENSE.

8         THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT CAN BE

9    RECEIVED IN EVIDENCE.  WHEN A LAWYER ASKS A QUESTION OR OFFERS

10   AN EXHIBIT IN EVIDENCE, A LAWYER ON THE OTHER SIDE -- AND THE

11   LAWYER ON THE OTHER SIDE THINKS THAT IT IS NOT PERMITTED BY THE

12   RULES OF EVIDENCE, THE LAWYER MAY OBJECT.  IF I OVERRULE THE

13   OBJECTION, THE QUESTION MAY BE ANSWERED OR THE EXHIBIT

14   RECEIVED.  IF I SUSTAIN THE OBJECTION, THE QUESTION CANNOT BE

15   ANSWERED OR THE EXHIBIT CANNOT BE RECEIVED.

16        WHENEVER I SUSTAIN AN OBJECTION TO A QUESTION, YOU MUST

17   IGNORE THE QUESTION AND MUST NOT GUESS WHAT THE ANSWER WOULD

18   HAVE BEEN.

19        SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN FROM THE

20   RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

21   MEANS WHEN YOU'RE DECIDING THE CASE, YOU MUST NOT CONSIDER THE

22   EVIDENCE THAT I TOLD YOU TO DISREGARD.

23        IN DECIDING THE FACTS IN THE CASE, YOU MAY HAVE TO DECIDE

24   WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

25   YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

1    NONE OF IT.

2          IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

3    INTO ACCOUNT:

4          THE WITNESS'S OPPORTUNITY AND ABILITY TO SEE OR HEAR OR

5    KNOW THE THINGS TESTIFIED TO;

6          THE WITNESS'S MEMORY;

7          THE WITNESS'S MANNER WHILE TESTIFYING;

8          THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, IF ANY;

9          THE WITNESS'S BIAS OR PREJUDICE, IF ANY;

10         WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S

11   TESTIMONY;

12         THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT OF

13   ALL THE EVIDENCE; AND,

14         ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

15         YOU MUST AVOID BIAS, CONSCIOUS OR UNCONSCIOUS, BASED ON A

16   WITNESS'S RACE, COLOR, RELIGION, RELIGIOUS BELIEFS, NATIONAL

17   ANCESTRY, SEXUAL ORIENTATION, GENDER IDENTITY, GENDER, OR

18   ECONOMIC CIRCUMSTANCES IN YOUR DETERMINATION OF CREDIBILITY.

19         THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

20   NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT

21   IT.  WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES ARE AND

22   HOW MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

23         I WILL NOW SAY A FEW WORDS ABOUT YOUR CONDUCT AS JURORS.

24         FIRST, KEEP AN OPEN MIND THROUGHOUT THE TRIAL AND DO NOT

25   DECIDE WHAT THE VERDICT SHOULD BE UNTIL YOU AND YOUR FELLOW

JURORS HAVE COMPLETED YOUR DELIBERATIONS AT THE END OF THE

CASE.

SECOND, BECAUSE YOU MUST DECIDE THIS CASE BASED ONLY ON

THE EVIDENCE RECEIVED IN THE CASE AND ON MY INSTRUCTIONS AS TO

THE LAW THAT APPLIES, YOU MUST NOT BE EXPOSED TO ANY OTHER

INFORMATION ABOUT THE CASE OR THE ISSUES IT INVOLVES DURING THE

COURSE OF YOUR JURY DUTY.

THUS, UNTIL THE END OF THE CASE OR UNLESS I TELL YOU

OTHERWISE:

DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET

ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF

THE CASE OR ANYTHING TO DO WITH IT.

THIS RESTRICTION INCLUDES DISCUSSING THE CASE IN PERSON,

IN WRITING, BY PHONE OR ELECTRONIC MEANS, VIA E-MAIL, TEXT

MESSAGING, OR ANY INTERNET CHAT ROOM, BLOG, WEBSITE, OR

APPLICATION, INCLUDING BUT NOT LIMITED TO FACEBOOK, YOUTUBE,

TWITTER, INSTAGRAM, LINKEDIN, SNAPCHAT, OR ANY OTHER FORM OF

SOCIAL MEDIA.

THIS RESTRICTION ALSO APPLIES TO COMMUNICATING WITH YOUR

FELLOW JURORS UNTIL I GIVE YOU THE CASE FOR DELIBERATION, AND

IT APPLIES TO YOUR COMMUNICATING WITH EVERYONE ELSE, INCLUDING

YOUR FAMILY MEMBERS, YOUR EMPLOYER, THE MEDIA OR THE PRESS, AND

THE PEOPLE INVOLVED IN THE TRIAL, ALTHOUGH YOU MAY NOTIFY YOUR

FAMILY AND YOUR EMPLOYER THAT YOU'VE BEEN SEATED AS A JUROR IN

THE CASE AND HOW LONG YOU EXPECT THE TRIAL TO LAST.

1    BUT IF YOU'RE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR

2  JURY SERVICE OR ANYTHING ABOUT THE CASE, YOU MUST RESPOND THAT

3  YOU HAVE BEEN ORDERED NOT TO DISCUSS THE MATTER.

4    IN ADDITION, YOU MUST REPORT THE CONTACT TO THE COURT.

5    BECAUSE YOU WILL RECEIVE ALL THE EVIDENCE AND LEGAL

6  INSTRUCTION YOU PROPERLY MAY CONSIDER TO RETURN A VERDICT:  DO

7  NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR

8  COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT, ALTHOUGH I

9  HAVE NO INFORMATION THERE WILL BE NEWS REPORTS IN THIS CASE;

10  BUT DO NOT DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES,

11  SEARCHING THE INTERNET, OR USING OTHER REFERENCE MATERIALS; AND

12  DO NOT MAKE ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN

13  ABOUT THE CASE ON YOUR OWN.

14    DO NOT VISIT OR VIEW ANY PLACE DISCUSSED IN THE CASE, AND

15  DO NOT USE INTERNET PROGRAMS OR OTHER DEVICES TO SEARCH FOR OR

16  VIEW ANY PLACE DISCUSSED DURING THE TRIAL.

17    ALSO, DO NOT DO ANY RESEARCH ABOUT THE CASE, THE LAW, OR

18  THE PEOPLE INVOLVED, INCLUDING THE PARTIES, THE WITNESSES, OR

19  THE LAWYERS, UNTIL YOU HAVE BEEN EXCUSED AS JURORS.

20    IF YOU HAPPEN TO READ OR HEAR ANYTHING TOUCHING ON THE

21  CASE IN THE MEDIA, TURN AWAY AND REPORT IT TO ME AS SOON AS

22  POSSIBLE.

23    THESE RULES PROTECT EACH PARTY'S RIGHT TO HAVE THIS CASE

24  DECIDED ONLY ON THE EVIDENCE THAT HAS BEEN PRESENTED HERE IN

25  COURT.  WITNESSES HERE IN COURT TAKE AN OATH TO TELL THE TRUTH

1    AND THE ACCURACY OF THEIR TESTIMONY IS TESTED THROUGH THE TRIAL

2    PROCESS.

3        IF YOU DO ANY RESEARCH OR INVESTIGATION OUTSIDE THE

4    COURTROOM OR GAIN ANY INFORMATION THROUGH IMPROPER

5    COMMUNICATIONS, THEN YOUR VERDICT MAY BE INFLUENCED BY

6    INACCURATE, INCOMPLETE, OR MISLEADING INFORMATION THAT HAS NOT

7    BEEN TESTED BY THE TRIAL PROCESS.

8        EACH OF THE PARTIES IS ENTITLED TO A FAIR TRIAL BY AN

9    IMPARTIAL JURY, AND IF YOU DECIDE THE CASE BASED ON INFORMATION

10   NOT PRESENTED IN COURT, YOU WILL HAVE DENIED THE PARTIES A FAIR

11   TRIAL.  REMEMBER, YOU HAVE TAKEN AN OATH TO FOLLOW THE RULES,

12   AND IT IS VERY IMPORTANT THAT YOU FOLLOW THESE RULES.  A JUROR

13   WHO VIOLATES THESE RESTRICTIONS JEOPARDIZES THE FAIRNESS OF

14   THESE PROCEEDINGS.

15       IF ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE

16   NOTIFY THE COURT IMMEDIATELY.

17       AT THE END OF THE TRIAL, YOU WILL HAVE TO MAKE YOUR

18   DECISION BASED ON WHAT YOU RECALL OF THE EVIDENCE.  YOU WILL

19   NOT HAVE A WRITTEN TRANSCRIPT OF THE TRIAL.  I URGE YOU TO PAY

20   CLOSE ATTENTION TO THE TESTIMONY AS IT IS GIVEN.

21       IF YOU WISH, YOU MAY TAKE NOTES TO HELP YOU REMEMBER THE

22   EVIDENCE.  IF YOU DO TAKE NOTES, PLEASE KEEP THEM TO YOURSELF

23   UNTIL YOU AND YOUR FELLOW JURORS GO TO THE JURY ROOM TO DECIDE

24   THE CASE.  DO NOT LET NOTE-TAKING DISTRACT YOU FROM BEING

25   ATTENTIVE.

1       WHEN YOU LEAVE THE COURT FOR RECESSES, YOUR NOTES WILL BE

2   LEFT IN THE COURTROOM.  NO ONE WILL READ YOUR NOTES.

3       WHETHER YOU TAKE NOTES OR NOT, YOU SHOULD RELY ON YOUR OWN

4   MEMORY OF THE EVIDENCE.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.

5   YOU SHOULD NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF

6   YOUR FELLOW JURORS.

7       THE NEXT PHASE OF THE TRIAL WILL NOW BEGIN.  FIRST, EACH

8   SIDE MAY MAKE AN OPENING STATEMENT.  AN OPENING STATEMENT IS

9   NOT EVIDENCE.  IT IS SIMPLY AN OUTLINE TO HELP YOU UNDERSTAND

10  WHAT THE PARTIES EXPECT THE EVIDENCE WILL SHOW.  A PARTY IS NOT

11  REQUIRED TO MAKE AN OPENING STATEMENT.

12      THE GOVERNMENT WILL THEN PRESENT EVIDENCE AND COUNSEL FOR

13  THE DEFENDANT MAY CROSS-EXAMINE.  THEN, IF MR. KAIL CHOOSES TO

14  OFFER EVIDENCE, COUNSEL FOR THE GOVERNMENT MAY CROSS-EXAMINE.

15      AFTER THE EVIDENCE HAS BEEN PRESENTED, I WILL INSTRUCT YOU

16  ON THE LAW THAT APPLIES TO THE CASE AND THE ATTORNEYS WILL MAKE

17  CLOSING ARGUMENTS.

18      AFTER THAT, YOU WILL GO TO THE JURY ROOM TO DELIBERATE ON

19  YOUR VERDICT.

20      DURING THE TRIAL, I MAY NEED TO TAKE UP LEGAL MATTERS WITH

21  THE ATTORNEYS PRIVATELY, EITHER BY HAVING A CONFERENCE AT THE

22  BENCH WHEN THE JURY IS PRESENT IN THE COURTROOM, OR BY CALLING

23  A RECESS.  PLEASE UNDERSTAND THAT WHILE YOU ARE WAITING, WE ARE

24  WORKING.

25      THE PURPOSE OF THESE CONFERENCES IS NOT TO KEEP RELEVANT

1    INFORMATION FROM YOU, BUT TO DECIDE HOW CERTAIN EVIDENCE IS TO

2    BE TREATED UNDER THE RULES OF EVIDENCE AND TO AVOID CONFUSION

3    AND ERROR.

4         OF COURSE, WE WILL DO WHAT WE CAN TO KEEP THE NUMBER AND

5    LENGTH OF THESE CONFERENCES TO A MINIMUM.

6         I MAY NOT ALWAYS GRANT AN ATTORNEY'S REQUEST FOR A

7    CONFERENCE.  DO NOT CONSIDER MY GRANTING OR DENYING A REQUEST

8    FOR A CONFERENCE AS ANY INDICATION OF MY OPINION OF THE CASE OR

9    WHAT YOUR VERDICT SHOULD BE.

10        WE ARE NOW ABOUT TO BEGIN THE TRIAL.  REMEMBER, UNTIL THE

11   TRIAL IS OVER, DO NOT DISCUSS THE CASE WITH ANYONE, INCLUDING

12   YOUR FELLOW JURORS, MEMBERS OF YOUR FAMILY, PEOPLE INVOLVED IN

13   THE TRIAL, OR ANYONE ELSE, AND DO NOT ALLOW OTHERS TO DISCUSS

14   THE CASE WITH YOU.  THIS INCLUDES DISCUSSING THE CASE IN

15   PERSON, IN WRITING, BY PHONE OR ELECTRONIC MEANS, VIA E-MAIL,

16   TEXT MESSAGING, OR ANY INTERNET CHAT ROOM, BLOG, WEBSITE, OR

17   APPLICATION, INCLUDING BUT NOT LIMITED TO FACEBOOK, YOUTUBE,

18   TWITTER, INSTAGRAM, LINKEDIN, SNAPCHAT, OR ANY OTHER FORM OF

19   SOCIAL MEDIA.

20        IF ANYONE TRIES TO COMMUNICATE WITH YOU ABOUT THE CASE,

21   PLEASE LET ME KNOW ABOUT IT IMMEDIATELY.

22        DO NOT READ, WATCH, OR LISTEN TO ANY NEWS REPORTS OR OTHER

23   ACCOUNTS ABOUT THE TRIAL OR ANYONE ASSOCIATED WITH IT,

24   INCLUDING ANY ONLINE INFORMATION.

25        DO NOT DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES,

1    SEARCHING THE INTERNET, OR USING OTHER REFERENCE MATERIALS, AND

2    DO NOT MAKE ANY INVESTIGATION ABOUT THE CASE ON YOUR OWN.

3         FINALLY, KEEP AN OPEN MIND UNTIL ALL THE EVIDENCE HAS BEEN

4    PRESENTED AND YOU HAVE HEARD THE ARGUMENTS OF COUNSEL, MY

5    INSTRUCTIONS ON THE LAW, AND THE VIEWS OF YOUR FELLOW JURORS.

6         IF YOU NEED TO SPEAK WITH ME ABOUT ANYTHING, SIMPLY GIVE A

7    SIGNED NOTE TO MY COURTROOM DEPUTY AND SHE WILL GIVE IT TO ME.

8         ALL RIGHT.  THAT CONCLUDES THE OPENING INSTRUCTIONS.

9         AS I TOLD YOU, THERE ARE MANY MORE THAT I WILL GIVE YOU AT

10    THE END OF THE CASE.

11         AND SO NOW I AM PREPARED TO TURN THIS OVER TO THE

12    ATTORNEYS AND WE WILL START WITH THE UNITED STATES.

13         WHO WILL BE MAKING THE OPENING STATEMENT?  MR. KALEBA.

14         MR. KALEBA:  THANK YOU, YOUR HONOR.

15         **(MR. KALEBA GAVE HIS OPENING STATEMENT ON BEHALF OF THE**

16    **GOVERNMENT.)**

17         MR. KALEBA:  GOOD MORNING, LADIES AND GENTLEMEN OF

18    THE JURY.  MY NAME IS DAN KALEBA AND I REPRESENT THE

19    UNITED STATES.

20         THIS IS A CASE ABOUT CHEATING AND THIS IS A CASE ABOUT

21    LYING.

22         THE DEFENDANT, MICHAEL KAIL, WORKED AT NETFLIX.  HE WAS

23    THE VICE PRESIDENT OF INFORMATION TECHNOLOGY.  HE HAD THE POWER

24    AND THE AUTHORITY AT NETFLIX TO AWARD CONTRACTS TO OTHER

25    COMPANIES HOPING TO DO BUSINESS AT NETFLIX.

1          THE DEFENDANT TOOK BRIBES AND KICKBACKS FROM THOSE

2    COMPANIES HOPING TO DO BUSINESS AT NETFLIX.

3          THIS PAY-TO-PLAY SCHEME WAS A CLEAR CONFLICT OF INTEREST.

4          BUT THIS CASE IS ABOUT MUCH MORE THAN CONFLICTS OF

5    INTEREST.  WE'RE HERE TODAY BECAUSE THE DEFENDANT CREATED A

6    QUID PRO QUO SCHEME.  THE DEFENDANT USED HIS POSITION OF TRUST

7    TO TRADE COMPENSATION FROM THESE COMPANIES IN EXCHANGE FOR

8    CONTRACTS WITH NETFLIX.

9          THESE DISHONEST QUID PRO QUOS ARE UNETHICAL.  THEY ARE

10   AGAINST THE GENERAL PRINCIPLES OF FAIRNESS AND HONEST DEALING.

11   PEOPLE IN POSITIONS OF AUTHORITY, LIKE THE DEFENDANT, ARE NOT

12   SUPPOSED TO HOLD PERSONAL FINANCIAL INTERESTS THAT CONFLICT

13   WITH CONSCIENTIOUS PERFORMANCE OF THEIR DUTIES.

14         AND THESE PRIVATE COMPANIES, HOPING TO DO BUSINESS WITH

15   NETFLIX, ARE NOT SUPPOSED TO CUT IN LINE FOR THEIR COMPETITORS

16   TO SEEK AN UNFAIR COMPETITIVE ADVANTAGE BY PAYING OFF INSIDERS

17   AT A CUSTOMER IN HOPES OF SCORING A SALE.

18         BUSINESS IS A COMPETITION.  AT TIMES IT'S RUTHLESS.  BUT

19   WE EXPECT A LEVEL PLAYING FIELD IN BUSINESS, JUST LIKE WE

20   EXPECT A LEVEL PLAYING FIELD IN SPORTS, IN COLLEGE ADMISSIONS,

21   EVEN IN DOG SHOW COMPETITIONS.  WHEN TWO COMPANIES ARE

22   COMPETING FOR THE PRIZE OF A NETFLIX CONTRACT, BOTH COMPANIES

23   SHOULD HAVE THE SAME FAIR SHOT OF EARNING THAT BUSINESS.

24         IMAGINE IF THE GOLDEN STATE WARRIORS WERE PLAYING AGAINST

25   LEBRON JAMES AND THE LOS ANGELES LAKERS.  WE WOULD NEVER ACCEPT

1     LEBRON JAMES'S AGENT AND HIS BUSINESS PARTNER TO ALSO BE THE

2     REFEREE OF THE GAME.  WHY?  BECAUSE THE AGENT IS BIASED.  HE

3     HAS A PERSONAL AND HE HAS A FINANCIAL STAKE IN THE OUTCOME OF

4     THE GAME.  HE HAS AN INTEREST IN THE SUCCESS OF LEBRON'S

5     CAREER.

6          OUR SHARED VALUES OF FAIRNESS DEMAND THAT THE OUTCOME OF

7     ANY COMPETITION BE DECIDED ON THE MERITS OVER A LEVEL PLAYING

8     FIELD AND NOT INFLUENCED BY PERSONAL AND FINANCIAL CONFLICTS OF

9     INTEREST, AND DEFINITELY NOT THE PRODUCT OF BRIBES OR

10    KICKBACKS.

11         THIS PAY-TO-PLAY SCHEME ORCHESTRATED BY THE DEFENDANT WAS

12    UNETHICAL, IT WAS AGAINST COMPANY POLICIES, AND IT'S ILLEGAL

13    UNDER FEDERAL LAW.

14         IN THIS TRIAL, WE WILL PROVE TO YOU THE DISHONEST NATURE

15    OF THE DEFENDANT'S BRIBERY AND KICKBACK SCHEME.  OVER THE

16    COURSE OF THIS TRIAL, WE WILL SHOW TO YOU THAT MR. KAIL SIGNED

17    PAID AGREEMENTS WITH COMPANIES HOPING TO DO BUSINESS WITH

18    NETFLIX.  YOU WILL SEE THAT MR. KAIL SIGNED UP TO BE A PAID

19    ADVISOR, LIKE A CONSULTANT, TO THESE COMPANIES.  YOU WILL SEE

20    THAT HE RECEIVED SUBSTANTIAL SUMS OF MONEY FROM THESE

21    COMPANIES, TYPICALLY IN THE FORM OF STOCK OPTIONS, BUT ALSO IN

22    THE FORM OF SALES COMMISSIONS.  AND BY THAT, I MEAN CASH PAID

23    INTO BANK ACCOUNTS OF HIS PRIVATE COMPANY WHICH WAS KNOWN AS

24    UNIX MERCENARY.

25         AFTER GETTING PAID BY THESE PRIVATE COMPANIES, WE WILL

1    ALSO SHOW YOU THE CONTRACTS THAT MR. KAIL SIGNED AS A NETFLIX

2    EXECUTIVE WITH THESE COMPANIES.  MR. KAIL AND THESE COMPANIES

3    ATTEMPTED TO NORMALIZE THIS QUID PRO QUO BY CALLING THE

4    ARRANGEMENTS MERELY ADVISORY.  THE DEFENDANT ATTEMPTED TO

5    CREATE A SUNNY PICTURE THAT STARTUPS REGULARLY HIRE ADVISORS,

6    THAT HIS CONDUCT WAS TOTALLY IN LINE WITH STANDARD BUSINESS

7    PRACTICE.

8         BUT THE EVIDENCE WILL SHOW THERE IS A TENSION BETWEEN THE

9    DEFENDANT'S FICTION AS A LEGITIMATE ADVISOR AND THE GRIM

10   REALITY BEHIND THE PAYMENTS FROM THESE COMPANIES TO THE

11   DEFENDANT.

12        THERE'S A TENSION BETWEEN THE DEFENDANT'S CONDUCT AND THE

13   CONDUCT OF HIS COLLEAGUES AT NETFLIX WHO TRIED TO DO THE RIGHT

14   THING.

15        THERE'S EVEN TENSION WITH OTHER COMPANIES WHO REFUSED TO

16   PAY OFF THE DEFENDANT WHEN HE DEMANDED A BRIBE.

17        AND THIS, LADIES AND GENTLEMEN, IS THE HEART OF THE QUID

18   PRO QUO SCHEME.  THE DEFENDANT SOLD ACCESS TO NETFLIX AND THESE

19   COMPANIES PAID FOR IT.

20        THE DISHONEST NATURE OF THIS FRAUD SCHEME WILL ALSO BE

21   PROVEN THROUGH THE EFFORTS THAT THE DEFENDANT TOOK TO CONCEAL

22   THESE PERSONAL SIDE DEALS FROM NETFLIX.  FROM TESTIMONY OF HIS

23   FORMER TEAMMATES AND THROUGH DOCUMENTS, WE WILL SHOW TO YOU

24   THAT THE DEFENDANT DID NOT LET HIS TEAMMATES KNOW ABOUT THESE

25   SIDE DEALS.  HE NEVER DISCLOSED TO NETFLIX THAT HE WAS GETTING

1    PAID.

2          THE EVIDENCE WILL SHOW THAT WHEN HIS TEAMMATES AT NETFLIX

3    ASKED HIM ABOUT IT, HE LIED TO THEM.

4          NETFLIX DID NOT KNOW ABOUT THESE SIDE DEALS, AND THEY WERE

5    DEFINITELY NOT OKAY WITH THESE SIDE DEALS.

6          MORE GRIM REALITY.

7          THE EVIDENCE WILL ALSO SHOW THAT SOME OF THESE CONTRACTS

8    WERE NOT GOOD FOR NETFLIX.  THE DEFENDANT COMMITTED HIS COMPANY

9    TO PAY FOR PRODUCTS AND SERVICES, SOME FOR MULTIPLE YEARS, THAT

10   THE COMPANY DID NOT USE OR DID NOT NEED.  THE EVIDENCE WILL

11   SHOW THAT THE DEFENDANT WENT AGAINST THE ADVICE OF HIS

12   TEAMMATES IN COMMITTING TO SOME OF THESE CONTRACTS.

13         BUT HE WENT AHEAD WITH THEM ANYWAY, AND WE ARE PREPARED TO

14   PROVE THAT HE DID SO BECAUSE HE ACCEPTED COMPENSATION FROM

15   THESE COMPANIES IN THE FORM OF BRIBES AND KICKBACKS.

16         LET ME TURN TO THE BEGINNING OF THIS SCHEME AND START WITH

17   MR. KAIL'S FORMER EMPLOYER, NETFLIX.

18         IN 2012, NETFLIX HAD A REPUTATION AS A LEADING COMPANY, AS

19   IT DOES TODAY, LEADING TECHNOLOGY COMPANY.  IT WAS ONE OF THE

20   FIRST MAJOR COMPANIES TO EMBRACE CLOUD COMPUTING, MAKE

21   RESOURCES AVAILABLE ONLINE AND ON DEMAND, WHETHER THAT IS

22   INTERNAL COMPANY BUSINESS RECORDS ACCESSIBLE ON THE CLOUD OR

23   ALLOWING CONSUMERS TO STREAM MOVIES AND SHOWS, AND ENABLING

24   MILLIONS OF AMERICANS TO BINGE WATCH THEIR FAVORITE EPISODES OF

25   *BREAKING BAD* OR *THE GREAT BRITISH BAKING SHOW*.  IT WAS A

1      REVOLUTIONARY BUSINESS DECISION AT THE TIME.

2            IT WAS ALSO VERY CONTROVERSIAL.

3            BUT THE PASSAGE OF TIME HAS PROVEN IT TO BE BOTH SHREWD

4      AND CORRECT.  IT PROVED THE COMPANY WAS ON THE LEADING EDGE OF

5      TECHNOLOGY.

6            NETFLIX, THEN AND NOW, HAD COMPLEX TECHNOLOGICAL NEEDS.

7      IT HAD A WELL EARNED REPUTATION OF BEING AHEAD OF THE CURVE,

8      EVEN IN SILICON VALLEY.  THEY WERE, BY ALL ACCOUNTS, AN

9      ESTABLISHED HOUSEHOLD NAME.

10           I SAID AT THE BEGINNING THAT THIS CASE IS ABOUT CHEATING

11     AND ABOUT LYING, BUT THIS CASE IS ALSO ABOUT POWER.

12           MR. KAIL HELD A SENIOR POSITION AT NETFLIX.  HE WAS THE

13     BOSS OF MANY PEOPLE.  HE WAS IN A POSITION OF POWER AND

14     AUTHORITY OVER THOSE NETFLIX EMPLOYEES.  IN HIS ROLE AT

15     NETFLIX, HE DECIDED WHAT PROJECTS HIS TEAM WOULD WORK ON.  IN

16     HIS ROLE AT NETFLIX, HE HAD THE POWER TO DECIDE WHICH COMPANIES

17     SHOULD RECEIVE TECHNOLOGY CONTRACTS WITH NETFLIX.

18           THE DEFENDANT WAS ABLE TO COMMIT THESE CRIMES BECAUSE OF

19     THE POWER, THE PRESTIGE, AND THE AUTHORITY HE HAD AS THE VICE

20     PRESIDENT OF I.T. AT NETFLIX.

21           THE EVIDENCE WILL SHOW THAT THE DEFENDANT MISUSED THIS

22     POWER.  HE HAD TREMENDOUS LEVERAGE OVER OUTSIDE COMPANIES BASED

23     ON HIS POSITION OF POWER AT NETFLIX.  HE COULD DEMAND A BRIBE

24     OR A KICKBACK FROM THESE COMPANIES BECAUSE HE WAS IN A POSITION

25     TO DETERMINE THE WINNERS AND THE LOSERS.

1        THE DEFENDANT TRADED ON NETFLIX'S ELITE STATUS AND

2   REPUTATION AS A PREEMINENT TECHNOLOGY COMPANY TO LINE HIS OWN

3   POCKETS AT THE COST OF HIS EMPLOYER.  HE PLACED HIS PERSONAL

4   INTERESTS AHEAD OF NETFLIX.  HE DID NOT CREATE A LEVEL PLAYING

5   FIELD.  HE CHOSE THE WINNERS BASED ON HIS PERSONAL FINANCIAL

6   INTEREST IN THOSE COMPANIES, AND THE PLAYING FIELD WAS TILTED

7   IN FAVOR OF THOSE COMPANIES WHO PAID HIM OFF.

8        LET ME EXPLAIN HOW MR. KAIL CHEATED AND LIED.  LET ME

9   EXPLAIN HOW HE MISUSED HIS POWER.

10       A LOT OF THESE COMPANIES WERE JUST STARTING OUT.  THEY DID

11  NOT HAVE A FAMOUS CUSTOMER LIKE NETFLIX YET.  MANY OF THESE

12  COMPANIES DID NOT HAVE MUCH REVENUE YET.

13       NETFLIX WAS A BIG CUSTOMER.  IT WAS A BIG PRIZE.  IT HAD A

14  BIG TECHNOLOGY BUDGET.  NETFLIX WOULD PAY ITS BILLS.  A PAID

15  CONTRACT WITH NETFLIX WAS AN OBVIOUS ECONOMIC BENEFIT TO A

16  COMPANY JUST STARTING OUT.

17       BUT THERE WERE OTHER ECONOMIC BENEFITS THE COMPANY SOUGHT.

18  THESE COMPANIES KNEW THAT LANDING A CONTRACT WITH NETFLIX WAS A

19  BIG DEAL FROM A MARKETING PERSPECTIVE.  NETFLIX WAS WIDELY

20  RESPECTED FOR BEING A SMART TECHNOLOGY COMPANY, ESPECIALLY IN

21  CLOUD COMPUTING.  IF NETFLIX WAS USING YOUR TECH, IT VALIDATES

22  YOUR TECH.  IT MUST BE GOOD.

23       THESE COMPANIES WANT TO USE THE NETFLIX LOGO IN THEIR

24  MARKETING MATERIALS TO OTHER CUSTOMERS, TO OTHER INVESTORS.

25  SEE, IF IT'S GOOD ENOUGH FOR NETFLIX, IT MUST BE GOOD ENOUGH

1    FOR US, OR YOU, TOO.

2         THESE COMPANIES WANTED A SENIOR NETFLIX EXECUTIVE TO

3    ENDORSE THEIR PRODUCT, A SENIOR NETFLIX EXECUTIVE WHO COULD

4    SPEAK TO OTHER POTENTIAL CUSTOMERS AND INVESTORS AT ROAD SHOWS

5    ABOUT HOW SUCCESSFUL THE PRODUCT AT NETFLIX WAS, AND A V.P.

6    LIKE MR. KAIL WAS PERFECT FOR THIS AND HE KNEW IT.

7         THESE COMPANIES WANTED MORE, TOO, AND THEY GOT MORE.  THEY

8    HAD ACCESS TO THE NETFLIX ENGINEERS.  A LOT OF THESE PRODUCTS

9    WERE IN EARLY STAGES.  NETFLIX ENGINEERS TESTED THESE PRODUCTS,

10   WORKED ON THEM FOR HOURS, FINDING WHAT WORKED AND WHAT DID NOT

11   WORK.

12        MR. KAIL HAD THE POWER OVER THE I.T. GROUP.  HE DECIDED

13   WHAT PROJECTS THEY WORKED ON.  HE COULD MAKE THEM TEST THESE

14   PRODUCTS IN A REAL LIFE ENVIRONMENT.

15        THIS REALTIME FEEDBACK THAT NETFLIX ENGINEERS WOULD GIVE

16   BACK TO THESE COMPANIES WAS INCREDIBLY VALUABLE.  IT

17   ACCELERATED THE DEVELOPMENT OF THEIR TECHNOLOGY.  IT HELPED

18   THEM BUILD A BETTER MOUSE TRAP.

19        THE DEFENDANT GAVE THESE THINGS TO THESE COMPANIES BECAUSE

20   THEY PAID HIM PERSONALLY FOR IT.  THE DEFENDANT PLACED HIS

21   PRIVATE ECONOMIC GAIN AHEAD OF HIS LOYALTY TO HIS TEAMMATES AT

22   NETFLIX.  HE HELD FINANCIAL INTERESTS THAT CONFLICTED WITH THE

23   CONSCIENTIOUS PERFORMANCE OF HIS DUTY AS THE V.P. OF I.T. AT

24   NETFLIX.

25        LET ME GIVE YOU A FEW EXAMPLES OF THE QUID PRO QUOS YOU

1    WILL SEE IN THIS CASE.

2        YOU'LL BE ABLE TO SEE THE PAY-TO-PLAY NATURE OF THESE

3    DEALS IF YOU FOLLOW THEM.

4        THE FIRST IS A TECHNOLOGY STARTUP CALLED PLATFORA.  IN

5    JUNE OF 2013, PLATFORA WAS A STARTUP TECHNOLOGY COMPANY HOPING

6    TO LAND ITS FIRST BIG CUSTOMER.  PLATFORA ENTERED INTO AN

7    UNPAID CONTRACT WITH NETFLIX UNDER MICHAEL KAIL TO TEST OUT THE

8    TECHNOLOGY, TO SEE IF THIS WAS SOMETHING NETFLIX MAY BE

9    INTERESTED IN USING.

10       THIS WAS A SHORT-TERM AGREEMENT.  NO MONEY WAS INVOLVED.

11   IT WAS GOOD FOR ONLY 30 DAYS.  OR EXCUSE ME, 60 DAYS.

12       THIS FIRST CONTRACT WAS A PROOF OF CONCEPT.  THE GOAL FROM

13   PLATFORA WAS TO GET FROM AN UNPAID CONTRACT INTO A PAID

14   CONTRACT.

15       IN AUGUST OF THAT SUMMER, DURING THE UNPAID PART OF THE

16   CONTRACT, MR. KAIL AGREED TO BE A PAID ADVISOR TO PLATFORA.  HE

17   RECEIVED THE OPTION TO PURCHASE 75,000 SHARES IN PLATFORA.

18   PLATFORA NOW IS PAYING MICHAEL KAIL.

19       THE NEXT MONTH, WHAT HAPPENS?  SEPTEMBER OF THAT YEAR,

20   MR. KAIL SIGNED A PAID CONTRACT WITH PLATFORA IN THE AMOUNT OF

21   $250,000 PER YEAR FOR THREE YEARS.  MONIES PAID BY NETFLIX NOW

22   TO PLATFORA.

23       LADIES AND GENTLEMEN, THERE ARE NO COINCIDENCES.  PLATFORA

24   PAID MICHAEL KAIL, AND THEN MICHAEL KAIL MADE SURE NETFLIX THEN

25   PAID PLATFORA.

1          THE STORY REPEATS ITSELF.

2          THE NEXT COMPANY I'D LIKE TO RAISE FOR YOU IS SUMO LOGIC.

3   JUST LIKE PLATFORA, SUMO WAS ALSO AN EARLY STAGE TECHNOLOGY

4   COMPANY HOPING TO LAND A BIG CONTRACT.

5          IN JUNE OF 2012, MR. KAIL MET WITH THE CEO OF SUMO.  THE

6   CEO ASKED HIM TO BE ON THE COMPANY'S CUSTOMER ADVISORY BOARD,

7   WHICH IS CURIOUS BECAUSE NETFLIX WASN'T A CUSTOMER YET.

8          THE NEXT MONTH, MR. KAIL SIGNED A $300,000 ONE-YEAR

9   CONTRACT BETWEEN NETFLIX AND SUMO.

10         AND DAYS LATER, MR. KAIL SIGNS A PAID ADVISOR AGREEMENT

11  WITH SUMO WHERE, AGAIN, HE RECEIVES THE OPTION TO RECEIVE

12  30,000 SHARES.  JUST FOLLOW THE MONEY.

13         IN JUNE, HE'S ASKED BY THE CEO TO BE A CUSTOMER ADVISOR.

14         IN JULY, HE SIGNS THE NETFLIX CONTRACT FOR $300,000.

15         IN AUGUST, HE GETS STOCK OPTIONS.

16         THIS IS NOT A COINCIDENCE.  THERE ARE NOT COINCIDENCES IN

17  THIS CASE.

18         BUT THE SUMO LOGIC STORY DOES NOT END THERE.  MR. KAIL

19  ONLY SIGNED A ONE-YEAR CONTRACT WITH SUMO.  IT WAS GOOD TO

20  EXPIRE IN JULY OF THE NEXT YEAR.

21         THE EVIDENCE WILL SHOW IN MAY, BEFORE THAT CONTRACT

22  EXPIRED AND WITH THE HOPES OF SIGNING A MULTIYEAR EXTENSION,

23  THE SUMO CEO THANKS MR. KAIL FOR BEING SUCH A VALUABLE ADVISOR,

24  CONGRATULATES HIM WITH THE HAPPY NEWS THAT THE BOARD HAS JUST

25  GRANTED HIM ANOTHER 20,000 OPTIONS IN SUMO.

1      WHAT HAPPENS NEXT?  THE EVIDENCE WILL SHOW BEFORE THE

2   EXPIRATION OF THAT FIRST CONTRACT, MR. KAIL SIGNS AN EVEN

3   BIGGER CONTRACT WITH SUMO, THIS TIME A TWO-YEAR CONTRACT FOR

4   $800,000.

5      DAYS LATER, MR. KAIL RECEIVES FROM SUMO THE OPTION

6   PAPERWORK FOR HIS $20,000 SHARES -- 20,000 SHARES.

7      THERE ARE OTHER EXAMPLES, AND IN THIS TRIAL, WE WILL

8   PRESENT EVIDENCE OF AT LEAST NINE COMPANIES THAT FOLLOWED THE

9   SAME GENERAL PAY-TO-PLAY PATTERN.  SOME COMPANIES GIVE CASH,

10   SOME GIVE STOCK, SOME GIVE BOTH.  BUT THE DEFENDANT MADE SURE

11   THE COMPANY GETS A CONTRACT WITH NETFLIX.

12      SO WHY DO THIS?

13      AS YOU LISTEN TO THE TESTIMONY AND AS YOU CONSIDER THE

14   EVIDENCE, I ASK YOU TO CONSIDER THIS QUESTION:  WHAT MOTIVATES

15   THESE COMPANIES TO GIVE AWAY VALUABLE STOCK, OR EVEN CASH, TO

16   SOMEONE LIKE THE DEFENDANT?  THEY'RE NOT LIKELY TO TELL YOU

17   THAT THEY WERE PAYING BRIBES.

18      SO HOW DO YOU KNOW THIS WAS AN ILLEGAL KICKBACK?  JUST

19   WHAT WERE THESE COMPANIES PAYING FOR?  WERE THESE COMPANIES

20   PAYING FOR MICHAEL KAIL, I.T. ENGINEER EXTRAORDINAIRE?  OR WERE

21   THEY PAYING FOR SOMETHING ELSE?  WERE THEY PAYING FOR

22   MICHAEL KAIL, VICE PRESIDENT OF I.T. AT NETFLIX?

23      AS THE COMPANY WITNESSES ARE TESTIFYING, CONSIDER WHETHER,

24   IF MR. KAIL WAS NOT A BOSS AT NETFLIX, WOULD ANY OF THESE

25   COMPANIES PAY MR. KAIL FOR ANYTHING?  IF MR. KAIL LACKED THE

1    POWER AND THE AUTHORITY TO SIGN OFF ON THESE CONTRACTS, WOULD

2    ANY OF THESE COMPANIES BE DEALING WITH MR. KAIL?  OR WAS IT

3    BECAUSE HE HAD THE POWER AND AUTHORITY TO SIGN THOSE CONTRACTS

4    THAT THEY WERE TALKING TO HIM AND THEY WERE PAYING HIM AND THAT

5    MADE THE PAYOFF WORTH IT?

6        ALSO CONSIDER THIS QUESTION:  IF MR. KAIL DID NOT WORK FOR

7    A FAMOUS COMPANY LIKE NETFLIX, IF HE WORKED AS THE V.P. OF A

8    SMALL STARTUP, WOULD THESE COMPANIES EVEN BOTHER SIGNING UP

9    MR. KAIL TO BE AN ADVISOR?  IF HE WAS THE VICE PRESIDENT AT A

10   PAPERCLIP COMPANY AND NOT NETFLIX, WOULD THESE COMPANIES AGREE

11   TO PAY VALUABLE STOCK OPTIONS TO MR. KAIL?

12       OR WAS IT BECAUSE HE WAS AT SUCH A HIGH PROFILE COMPANY

13   THAT MADE THE PAYOFF WORTH IT?

14       AS YOU SEE THE EVIDENCE COME INTO TRIAL, CONSIDER THE

15   THINGS OF VALUE THAT THESE COMPANIES RECEIVED FROM NETFLIX.

16   CONSIDER WHAT WAS ON EACH SIDE OF THE QUID PRO QUO.

17       NOW, ON THE COMPANIES' SIDE, THEY WERE PAYING FOR, NUMBER

18   1, A PAID CONTRACT WITH NETFLIX; NUMBER 2, THE NETFLIX LOGO TO

19   MARKET TO CUSTOMERS AND INVESTORS; NUMBER 3, A CUSTOMER QUOTE

20   FROM A NETFLIX V.P.; NUMBER 4, CUSTOMER CALLS AND INTRODUCTIONS

21   BY A NETFLIX V.P.; 5, ACCESS TO THE TALENTED ENGINEERS AT

22   NETFLIX WHO WOULD TEST THESE PRODUCTS AND GIVE VALUABLE INSIGHT

23   TO THE COMPANY ENGINEERS TO IMPROVE IT; NUMBER 6, THEY WERE

24   PAYING FOR AN INTERNAL ADVOCATE, A CHAMPION AT THE COMPANY, AN

25   INFLUENCER WHO COULD SMOOTH THINGS OUT WHEN THESE PRODUCTS

1    DIDN'T WORK OUT; AND NUMBER 7, THEY WERE MAKING A DOWN PAYMENT

2    ON A FUTURE CONTRACT.  THEY HOPED THIS WAS JUST THE BEGINNING

3    OF A LONG AND PROFITABLE CONTRACT WITH NETFLIX.

4         BUT ALSO CONSIDER THIS:  WHO WAS PAYING FOR ALL THESE

5    THINGS?  WHO PAID FOR ALL OF THAT?  DID MICHAEL KAIL PAID FOR

6    ANY OF THAT?

7         NO, THE CONSIDERATION DIDN'T COME OUT OF MICHAEL KAIL'S

8    POCKET.  IT CAME OUT OF NETFLIX'S POCKET.

9         BUT ALSO CONSIDER THIS QUESTION:  WHAT WOULD MOTIVATE

10   SOMEONE LIKE THE DEFENDANT TO RISK SO MUCH?  TO BREAK THE LAW?

11   TO EVEN ASK FOR BRIBES AND KICKBACKS?

12        I SUBMIT THE EVIDENCE WILL SHOW THAT IT WAS GREED.  IT WAS

13   ENVY.  HE KNEW HE HELD A KEY POSITION AT NETFLIX.  HE KNEW HE

14   WAS A BIG SHOT.  HE COULD MAKE A STARTUP COMPANY INCREDIBLY

15   VALUABLE BY THE SIMPLE ACT OF SIGNING OFF ON THAT CONTRACT, BY

16   THROWING THE WEIGHT OF NETFLIX BEHIND THE COMPANY, THE PRESTIGE

17   OF NETFLIX BEHIND THAT COMPANY.

18        HE WANTED A PIECE OF THE ACTION.

19        MR. KAIL IS CHARGED WITH FRAUD.  CONSIDER THIS QUESTION:

20   IF THE DEFENDANT WAS ACTING IN NETFLIX'S BEST INTEREST, WHY DID

21   HE HIDE THESE PAID DEALS FROM HIS TEAMMATES?  WHY DID HE HIDE

22   THE FINANCIAL RELATIONSHIP HE HAD WITH THESE COMPANIES?  IF HE

23   WAS ACTING IN THE BEST INTERESTS OF NETFLIX, WHY NOT DISCLOSE

24   HIS FINANCIAL CONFLICTS OF INTEREST TO H.R. AND TELL HIS

25   COLLEAGUES OR EVEN HIS BOSS AT NETFLIX?  IF HE WAS ACTING IN

1    THE BEST INTEREST OF NETFLIX, WHY DID HE PUSH TECHNOLOGY, MUCH

2    OF IT NEW AND UNPROVEN, ON HIS TEAMMATES AT NETFLIX?

3          IF HE WAS ACTING IN THE BEST INTERESTS OF NETFLIX, WHY DID

4    HE COMMIT NETFLIX TO PAY FOR TECHNOLOGY THAT HIS PEOPLE DIDN'T

5    REALLY USE?  DIDN'T THINK IT WAS VERY GOOD?

6          THE GRIM REALITY IS THAT MR. KAIL HID THESE SIDE DEALS.

7    HE MISLED HIS TEAMMATES BY RECEIVING MONEY FROM THESE COMPANIES

8    BECAUSE THIS WAS A FRAUD.

9          AND THAT, LADIES AND GENTLEMEN OF THE JURY, IS WHAT WE

10   EXPECT THE EVIDENCE TO SHOW.  WE WILL PROVE THAT THE DEFENDANT,

11   MICHAEL KAIL, MISUSED HIS POWER AT NETFLIX TO ENTER INTO

12   CONTRACTS WITH COMPANIES THAT HE HAD A PERSONAL FINANCIAL

13   INTEREST IN, THAT THE FINANCIAL INTEREST DIRECTLY CONFLICTED

14   WITH HIS DUTIES AT NETFLIX, AND THAT BY ENGAGING IN THIS

15   KICKBACK SCHEME, THE DEFENDANT DEFRAUDED NETFLIX OF ITS RIGHT

16   TO HIS HONEST SERVICES.

17         WE EXPECT THE EVIDENCE WILL ALSO SHOW THAT THE DEFENDANT

18   DEFRAUDED NETFLIX OF MONEY AND PROPERTY BY COMMITTING NETFLIX

19   TO PAY FOR TECHNOLOGY THAT IT DID NOT USE OR DID NOT WORK WELL

20   BASED ON HIS PERSONAL FINANCIAL INTERESTS WITH THE COMPANY.

21         AND WE EXPECT THE EVIDENCE WILL SHOW THAT HE TRANSFERRED

22   COMPENSATION THAT HE RECEIVED FROM HIS COMPANIES INTO ACCOUNTS

23   AND OTHER ASSETS THAT HE CONTROLLED, AND THEREBY HE COMMITTED

24   THE CRIME OF MONEY LAUNDERING.

25         AT THE CLOSE OF ALL THE EVIDENCE, WE WILL ASK YOU TO FIND

1      THE DEFENDANT, MICHAEL KAIL, GUILTY OF THE CRIMES OF FRAUD AND

2      MONEY LAUNDERING AS CHARGED IN THE INDICTMENT.

3            THANK YOU.

4                THE COURT:  THANK YOU, MR. KALEBA.

5            MS. JAYNE, WOULD YOU LIKE TO MAKE AN OPENING STATEMENT AT

6      THIS TIME?

7                MS. JAYNE:  YES, YOUR HONOR.

8                THE COURT:  GO AHEAD, PLEASE.

9                MS. JAYNE:  CAN I ASK FOR THE SCREEN?

10               THE COURT:  YES.

11           **(MS. JAYNE GAVE HER OPENING STATEMENT ON BEHALF OF THE**

12     **DEFENDANT.)**

13               MS. JAYNE:  GOOD MORNING, LADIES AND GENTLEMEN.

14         "IT WAS NOT OBVIOUS AT THE TIME, EVEN TO ME, BUT WE HAD

15     ONE THING THAT BLOCKBUSTER DID NOT:  A CULTURE THAT VALUED

16     PEOPLE OVER PROCESS, EMPHASIZED INNOVATION OVER EFFICIENCY, AND

17     HAD VERY FEW CONTROLS.  OUR CULTURE, WHICH FOCUSSED ON

18     ACHIEVING TOP PERFORMANCE WITH TALENT DENSITY AND LEADING

19     EMPLOYEES WITH CONTEXT NOT CONTROL, HAS ALLOWED US TO

20     CONTINUALLY GROW AND CHANGE AS THE WORLD, AND OUR MEMBERS'

21     NEEDS, HAVE LIKEWISE MORPHED AROUND US.  NETFLIX IS DIFFERENT.

22     WE HAVE A CULTURE WHERE NO RULES RULES."

23         NO RULES RULES.  THIS IS NOT ONLY A DIRECT QUOTE FROM THE

24     CEO OF NETFLIX, REED HASTINGS, BUT IT'S ALSO THE TITLE OF HIS

25     BOOK.  NO RULES IS WHAT MAKES NETFLIX A VERY UNIQUE COMPANY TO

1      WORK FOR.  THIS UNCONVENTIONAL PRINCIPLE, CREATED BY ITS

2      FOUNDERS ABOUT 17 YEARS AGO, LAID THE FRAMEWORK FOR THE FUTURE

3      SUCCESS OF THIS COMPANY.  AND OBVIOUSLY IT WORKED BECAUSE

4      NETFLIX, AS WE KNOW, IS ONE OF THE MOST DOMINANT STREAMING

5      SERVICES OF THE DAY, WHILE THERE'S ONLY ONE BLOCKBUSTER LEFT IN

6      THE WORLD.

7           THE MESSAGE PROMOTED BY NETFLIX WAS THAT IN ORDER TO

8      INCREASE THEIR TALENT DENSITY, THEY WANTED TO HIRE AND KEEP THE

9      VERY, VERY BEST AND BRIGHTEST EMPLOYEES WHO ARE RISK TAKERS,

10     WHO WILL NOT TRY TO PLEASE THE BOSS, AND TO ACCOMPLISH THESE

11     GOALS, NETFLIX ELIMINATED RULES, HANDBOOKS, AND PROCEDURES, AND

12     INSTEAD GAVE EMPLOYEES THE FREEDOM TO MAKE INDEPENDENT

13     DECISIONS SO LONG AS THEY'RE DRIVEN BY THE DESIRE TO MAKE

14     NETFLIX SUCCEED.

15          THE LEADERSHIP AT NETFLIX BELIEVED THIS FREEDOM AND

16     RESPONSIBILITY CULTURE INSPIRES PEOPLE TO BE CREATIVE AND THINK

17     OUTSIDE THE BOX.

18          IT'S ALL IN THIS BOOK (INDICATING).

19          AND MICHAEL KAIL LIVED AND BREATHED THESE PRINCIPLES.  HE

20     WORKED INCREDIBLY HARD AT NETFLIX FOR NEARLY THREE YEARS TO

21     TAKE THE COMPANY TO A SUPERIOR LEVEL OF PRODUCTIVITY AND

22     INNOVATION IN THE I.T. DEPARTMENT.

23          AND WHILE DOING SO, HE EARNED THE RESPECT AND ADMIRATION

24     OF THOSE BELOW AND ABOVE HIM.  MICHAEL KAIL, THE MAN SITTING

25     RIGHT HERE, WAS THE V.P. OF I.T. OPERATIONS AT NETFLIX FROM

OPENING STATEMENT BY MS. JAYNE

1    2011 TO 2014.  AFTER JUST FOUR MONTHS AT NETFLIX, HE WAS

2    PROMOTED TO THIS V.P. POSITION BECAUSE HE HELD A LEADERSHIP

3    QUALITIES HIS BOSS, REED HASTINGS, WAS LOOKING FOR.

4         AS DESCRIBED IN THIS E-MAIL BY MR. HASTINGS, MR. KAIL WAS

5    DOING AN AMAZING JOB BUILDING HIS TEAM AND STRENGTHENING I.T.

6         AND ONCE PROMOTED, HE HELD TRUE TO THE VALUES AT NETFLIX:

7    DO WHAT IS BEST FOR THE COMPANY.  TAKE RISKS AND BE INNOVATIVE.

8         INTRODUCING NEW TECHNOLOGY TO NETFLIX WAS NOT ONLY PART OF

9    HIS JOB, IT WAS ONE OF THOSE RISKS THAT WAS VALUED AND PRAISED.

10        BUT YOU DON'T HAVE TO TAKE MY WORD FOR IT.

11        IN THIS TRIAL, YOU'LL SEE WHAT NETFLIX EMPLOYEES WROTE

12   EVERY YEAR ABOUT HIS MANAGEMENT.  NETFLIX HAS A PROCESS WHERE

13   INSTEAD OF FORMAL EVALUATIONS, THEY HAVE SOMETHING CALLED A

14   360 REVIEW.  AN EMPLOYEE REVIEWS OTHER EMPLOYEES WITH HONEST

15   COMMENTARY ON WHAT TO START, CONTINUE, AND STOP DOING.

16        HERE ARE JUST A FEW OF THE COMMENTS MR. KAIL RECEIVED IN

17   HIS REVIEWS, AND YOU'LL SEE MORE IN EVIDENCE.

18        A LEADER WHO FORCES OUTSIDE OUR COMFORT ZONE, REMINDS US

19   THAT INNOVATION THAT'S GOING ON IN OUR SPACE OUTSIDE OF

20   NETFLIX.

21        IN MY SIX YEARS AT NETFLIX, THE BEST LEADERSHIP I'VE SEEN

22   IN OUR I.T. OPS ORG.

23        GIVING US VISIBILITY INTO CUTTING EDGE TECHNOLOGIES.

24        I HAVE NOT WORKED FOR A BETTER I.T. LEADER.  YOU HAVE BEEN

25   TRULY INSPIRATIONAL.  I GOT TO WORK WITH CUTTING EDGE

1    TECHNOLOGY.

2         THIS PAST YEAR HAS BEEN EXTREMELY REFRESHING TO HAVE

3    SOMEONE THAT NOT ONLY UNDERSTANDS THE WORK MY TEAM DOES --

4    OOPS, SORRY -- BUT CHALLENGES THE EXCITEMENT ABOUT IT.

5         I BELIEVE YOU GIVE GREAT DIRECTION WITH PASSION AND

6    HONESTY WHICH MAKES YOU A GREAT LEADER.  ASHLEY SPRAGUE.

7         YOU'VE BROUGHT AN EMPOWERING CHANGE TO I.T. OPS WITH NEW

8    TECHNOLOGY.  ASHLEY SPRAGUE.

9         YOU DO AN AMAZING JOB AT STAYING CURRENT AND IN TOUCH WITH

10   BOTH THE TECHNOLOGY AND POTENTIAL LEADERS IN THIS SPACE.  I'M

11   QUITE AMAZED IN THE WAY YOU WERE ABLE TO PROVIDE CONTEXT.  A

12   GREAT LEADER.

13        YOU'RE ONE OF THE HARDEST WORKING PEOPLE AT NETFLIX.

14   YOU'VE HAD A HUGE IMPACT ON THE NETFLIX INFRASTRUCTURE.  IT'S

15   GREAT TO BE IN THE PRESENCE OF SOMEONE THAT'S BLAZING TRAILS

16   LIKE YOU.  I LOVE HOW CONNECTED YOU ARE TO THE TECH WORLD.

17        THE COMPANIES AND PRODUCTS YOU INTRODUCE US TO ARE CUTTING

18   EDGE.

19        AND IT TOOK ME A LITTLE BIT TO REALLY GET IT, BUT I KNOW

20   YOU DON'T EXPECT EVERY COMPANY YOU INTRODUCE US TO TO HAVE A

21   ROLE AT NETFLIX.  I NEVER FEEL PRESSURED.  JUSTIN SLATEN.

22        AND FROM REED HASTINGS:  IF YOU CAN MAKE THE SOON-2000

23   STREAMING EMPLOYEES THE MOST PRODUCTIVE ON THE PLANET, THEN

24   NETFLIX CAN AND WILL WIN.

25        ALSO REED HASTINGS:  MIKE HAS MADE GREAT PROGRESS THIS

1    YEAR IN SHIFTING HIS TEAM FROM SYSTEMS TO APPS.

2         THESE, AMONG OTHERS, WERE THE ACTUAL REVIEWS MR. KAIL

3    RECEIVED DURING THE TIME PERIOD THE GOVERNMENT ALLEGES HE WAS

4    DEFRAUDING NETFLIX.

5         BUT THE TRUTH OF THE MATTER IS, HE NEVER DID DEFRAUD OR

6    INTEND TO DEFRAUD NETFLIX.  MR. KAIL COMMITTED ABSOLUTELY NO

7    CRIME, AND THE GOVERNMENT FOR MANY REASONS IS WRONG IN THIS

8    CASE.

9         OUR CONSTITUTION GUARANTEES TO DEFENDANTS THE RIGHT TO A

10   JURY TRIAL, AND THAT'S WHY YOU'RE HERE, AS A CHECK AGAINST THE

11   ABUSIVE GOVERNMENT POWER, AND FOR SERVING, MR. KAIL AND I THANK

12   YOU AND APPRECIATE YOUR TIME.

13        THE PROSECUTION OF MR. KAIL IS AN EXAMPLE OF ABUSE OF

14   GOVERNMENT POWER BECAUSE THE LAW PUNISHES A VERY NARROW SCOPE

15   OF CONDUCT, AND NOT JUST THINGS THAT APPEAR UNETHICAL,

16   INAPPROPRIATE, OR EVEN IMMORAL.  YOU ARE NOT HERE TO JUDGE

17   MORALITY.

18        CONTRARY TO HOW THE GOVERNMENT MIGHT SPIN THE FACTS TO

19   SUIT THEIR NARRATIVE, WHAT WILL BE CLEAR IN THIS CASE IS THAT

20   MR. KAIL CONSIDERED NETFLIX'S BEST INTERESTS IN ALL OF HIS

21   BUSINESS DECISIONS, WHICH WERE AIMED AT EFFICIENCY AND

22   STREAMLINING BY MOVING EMPLOYEES INTO THE CLOUD, WHICH

23   BASICALLY MEANS STORING THINGS ONLINE TO BE ACCESSED FROM

24   ANYWHERE INSTEAD OF ON HARDWARE.

25        IN 2011/2012, THIS AMBITION WAS BOLD AND CHALLENGING.  IF

1    MR. KAIL FAILED, HIS ENTIRE DEPARTMENT AND HIS STELLAR

2    REPUTATION FAILED.

3         IN FACT, THE GOVERNMENT'S ALLEGATIONS OF FRAUD ARE THE

4    POLAR OPPOSITE OF MR. KAIL'S INTENTIONS.

5         IT WILL BE NO SECRET -- IT NEVER WAS A SECRET -- THAT

6    MR. KAIL WAS A PROFESSIONAL ADVISOR TO A NUMBER OF TECHNOLOGY

7    COMPANIES THAT DID BUSINESS WITH NETFLIX.

8         HE WAS ALSO AN ADVISOR TO MANY COMPANIES WHO DID NOT DO

9    BUSINESS WITH NETFLIX OR SEEK TO.

10        AND HE WAS VERY PUBLIC ABOUT THESE ROLES.  HE POSTED THEM

11   ON LINKEDIN, HIS ROLE APPEARED ON THE COMPANY'S WEBSITES, AND

12   HE SPOKE OPENLY ABOUT HIS ADVISOR ROLES.  ANYONE WHO CARED TO

13   KNOW COULD EASILY FIND OUT.

14        YOU'LL LEARN DURING THIS TRIAL, IF YOU DON'T ALREADY KNOW,

15   ADVISORY BOARDS ARE VERY COMMON IN SILICON VALLEY AND BEYOND.

16   FOR A TECH STARTUP, HAVING THOSE CONNECTIONS TO OTHER I.T.

17   LEADERS, TO VENTURE CAPITAL FUNDS, AND HAVING YOUR EAR TO THE

18   GROUND IS HOW A STARTUP CAN GET NOTICED.

19        AND THE CROSSOVER ROLES BETWEEN COMPANIES WHO DO BUSINESS

20   IS SO COMMON THAT EVEN THE CEO OF NETFLIX, REED HASTINGS, SAT

21   ON THE BOARDS OF COMPANIES THAT NETFLIX DID BUSINESS WITH.

22        THIS IS PERFECTLY NORMAL, LEGAL, AND SOMETHING TO BE PROUD

23   OF, NOT ASHAMED OF OR HIDE.

24        YOU'LL ALSO HEAR THAT ADVISOR ROLES COME WITH

25   COMPENSATION.  EXPERIENCED PROFESSIONALS DON'T VOLUNTEER AT

1      TECH STARTUPS THAT AREN'T NONPROFITS.  THAT'S WHY ADVISOR

2      POSITIONS OFTEN COME WITH STOCK OPTIONS THAT CAN TAKE YEARS TO

3      VEST, OR SHARES OF THE COMPANY.  THESE POTENTIAL BENEFITS ARE

4      FOR THE TECHNOLOGY FEEDBACK, THE CUSTOMER CONNECTIONS, AND THE

5      INSIGHTS THAT THE ADVISOR PROVIDES.

6           WE WON'T DISPUTE THAT MR. KAIL MADE SOME MONEY OUTSIDE OF

7      HIS SALARY AT NETFLIX.  HE DID.  BUT NOT ILLEGALLY.

8           I HOPE YOU'LL COME TO UNDERSTAND DURING THIS TRIAL THAT HE

9      DID EVERYTHING WITHIN THE BOUNDS OF THE LAW AND HE DIDN'T

10     COMMIT ANY CRIME.

11          MR. KAIL WAS AND IS KNOWN, VERY WELL KNOWN IN SILICON

12     VALLEY FOR BEING ONE OF THE BRIGHTEST MINDS IN TECHNOLOGY.  IN

13     THE YEARS AT ISSUE IN THIS TRIAL, HE WAS REGULARLY ASKED TO

14     SPEAK AT CONFERENCES, WAS SOUGHT OUT AS AN ADVISOR, AND WAS

15     ABLE TO PROVIDE THE CRITICAL CONNECTIONS AND TECHNICAL FEEDBACK

16     THAT SO MANY NEW TECHNOLOGIES CRAVE.  HE WAS OFTEN REFERRED TO

17     AS A THOUGHT LEADER BECAUSE HE WAS SO FORWARD THINKING ABOUT

18     THE FUTURE OF I.T.

19          THAT MEANS THAT STARTUPS WANTED TO BE ASSOCIATED WITH HIM

20     BECAUSE, BEING AN ENGINEER HIMSELF, HE UNDERSTOOD TECHNOLOGY

21     AND WAS A VISIONARY WHEN IT CAME TO THE FUTURE OF I.T.  THEY

22     WANTED HIM ON THE ROSTER FOR HIS ENGINEERING BRAIN, FOR HIS

23     CONNECTIONS TO OTHER PEOPLE IN SILICON VALLEY, HIS CREATIVE

24     IDEAS, NOT TO GET A CONTRACT WITH NETFLIX.  THEY WOULD HAVE TO

25     EARN THAT ON THE MERITS OF THEIR PRODUCT, WHICH THEY DID.

1          WITNESSES IN THIS COURTROOM WILL TELL YOU THAT MR. KAIL

2     WAS NOT ONLY AN INSPIRATIONAL LEADER AT NETFLIX, HE WAS A

3     TREMENDOUS ADVISOR.  HE GAVE HIS OPINIONS ON THE PRODUCT

4     IMPROVEMENT.  HE INTRODUCED CEO'S TO ONE ANOTHER SO THEY COULD

5     GROW THEIR RESPECTIVE BUSINESSES.  AND HE MADE INTRODUCTIONS TO

6     FUNDING SOURCES.  THIS WAS ALL NORMAL, PROPER, AND CERTAINLY

7     NOT CRIMINAL.

8          AND IMPORTANTLY, YOU'LL HEAR THAT MR. KAIL WAS A VERY

9     HARSH CRITIC.  WHETHER A PRODUCT WAS BEING USED AT NETFLIX OR

10    ELSEWHERE, HE NEVER HESITATED TO CRITICIZE SHORTCOMINGS.

11         AND IT SHOULD COME AS NO SURPRISE THAT A NEW TECHNOLOGY

12    WILL HAVE SHORTCOMINGS.  TECHNOLOGY'S ALWAYS IMPROVING AND

13    DEVELOPING, SO CONSTRUCTIVE CRITICISM IS KEY.  IT DOESN'T

14    INDICATE A PRODUCT IS USELESS, BUT IT CAN HELP IMPROVE THE

15    INEVITABLE BUGS, AND NETFLIX LOVED GETTING IN ON THE ACTION OF

16    NEW TECHNOLOGY.

17         AND BECAUSE OF MR. KAIL'S STRINGENT DEMANDS AND HIGH

18    EXPECTATIONS, THE TECHNOLOGY COMPANIES WHO DID WORK WITH

19    NETFLIX REPORTED IT TO BE THEIR TOUGHEST CUSTOMER.

20         THE GOVERNMENT MENTIONED NINE VENDORS AS PART OF THEIR

21    ALLEGATIONS OF WRONGDOING.  THESE VENDORS WILL TELL YOU THAT

22    MR. KAIL NEVER MADE ANY PROMISES, NEVER CUT THEM ANY SLACK, AND

23    MOST IMPORTANTLY, NEVER CONDITIONED HIS ROLE AS AN ADVISOR ON

24    THEM GETTING A CONTRACT WITH NETFLIX.  HE NEVER BRIBED THEM OR

25    GOT KICKBACKS IN EXCHANGE FOR CONTRACTS OR FAVORABLE TREATMENT.

1      AND THE VENDORS PROVIDED LEGITIMATE, COST EFFECTIVE, AND

2   VALUABLE SERVICES AND TECHNOLOGY TO NETFLIX.

3      THIS IS NOT A CASE OF SHAM CONTRACTS OR FAKE INVOICES LIKE

4   YOU MAY HAVE IMAGINED WHEN YOU HEAR THE WORDS "BRIBE" AND

5   "KICKBACKS."

6      THIS ISN'T A CASE OF SOMEONE SNEAKING IN A VENDOR WHO DOES

7   NO WORK WHILE BRIBING THE EMPLOYEE.

8      AND THIS ISN'T A CASE OF BIDDING FOR A PUBLIC CONTRACT IN

9   A VERY REGULATED INDUSTRY LIKE HEALTHCARE, NOT EVEN CLOSE.

10     AN IMPORTANT AND UN -- SHOULD BE UNDISPUTED FACT IN THIS

11  CASE IS THAT MICHAEL KAIL'S MISSION AND DIRECTIVE FROM THE TOP

12  WHEN HE WORKED AT NETFLIX WAS TO BRING THE I.T. ORGANIZATION

13  100 PERCENT INTO THE CLOUD WHICH, AGAIN, MEANS AWAY FROM

14  HARDWARE AND TOWARDS ONLINE.  HE HAD TO DO IT, REED HASTINGS

15  WANTED HIM TO DO IT, AND FAST.

16     THE OTHER ROLE HE HAD FOR I.T. WAS SOMETHING CALLED ZERO

17  TRUST SECURITY.  YOU'LL HEAR THAT WORD MORE DURING THIS TRIAL,

18  BUT TO GIVE YOU AN IDEA, IT'S A SECURITY CONCEPT THAT REQUIRES

19  ALL USERS, EVEN THOSE INSIDE THE COMPANY, TO BE AUTHENTICATED

20  AND VALIDATED BEFORE THEY CAN GET ACCESS TO APPLICATIONS AND

21  DATA.

22     TO THOSE OF YOU WHO HAVE A SOFTWARE BACKGROUND, THESE

23  CONCEPTS MAY SOUND LIKE OLD NEWS TODAY.

24     BUT REMEMBER, TEN YEARS AGO, THEY WERE VERY AMBITIOUS.

25     AND MR. KAIL SPOKE VERY OPENLY ABOUT THOSE TWO GOALS HE

1    HAD INSIDE NETFLIX AND OUT, EXTERNALLY TO THE TECH COMMUNITY.

2    THIS IS WHAT HE SOUGHT TO ACHIEVE IN HIS TIME AT NETFLIX, AND

3    THE VENDORS HE WORKED WITH WERE ALL AIMED AT MEETING THOSE TWO

4    GOALS, I.T. IN THE CLOUD, ZERO TRUST SECURITY.

5         YOU'LL HEAR THAT EACH VENDOR HAD A PRODUCT THAT FURTHERED

6    THESE GOALS AND FIT INTO WHAT REED HASTINGS DIRECTED MIKE KAIL

7    TO ACCOMPLISH AT NETFLIX.

8         TO GIVE YOU A PREVIEW INTO THE WORK THESE KIND OF VENDORS

9    DO, I PREPARED A CHART, AND I'M NOT GOING TO GET INTO ALL THE

10   MINUTIA OF THE SPECIFIC TECHNOLOGY RIGHT NOW, BUT I JUST WANT

11   TO GIVE YOU A BRIEF OVERVIEW.  AND YOU HEARD THE GOVERNMENT

12   MENTION SOME OF THESE COMPANIES BY NAME.

13        EACH OF THESE COMPANIES PROVIDED VALUE TO NETFLIX.  YOU'LL

14   HEAR MORE ABOUT WHAT THEY DID FROM THEIR FOUNDERS OR CEO'S, BUT

15   HERE'S A SMALL PREVIEW.

16        DOCURATED -- I'M JUST GOING TO GO CLOCKWISE.  THEY USED IT

17   TO STORE MARKETING MATERIALS, LIKE ARTWORK, LOGOS AND IMAGES IN

18   ONE PLACE.  IT WAS BEING INTEGRATED INTO A DIGITAL ASSET

19   MANAGEMENT SOFTWARE PLATFORM AT NETFLIX.

20        ELASTICBOX.  NETFLIX USED IT TO DEVELOP AND LAUNCH APPS

21   FOR DIFFERENT CLOUD SITES.  THE SELF-SERVE CATALOG, KNOWN AS

22   BOXES, MEANT THAT THE I.T. ORGANIZATION COULD SPEND LESS TIME

23   LAUNCHING AND MORE TIME DEVELOPING FEATURES AND TESTING FOR

24   NETFLIX.

25        MAGINATICS REPLACED EXPENSIVE HARDWARE WITH A SECURE

1    PLATFORM THAT EMPLOYEES COULD USE TO ACCESS CONFIDENTIAL FILES

2    AND DATA FROM ANYWHERE INSTEAD OF HAVING TO BE CONNECTED TO THE

3    CORPORATE VPN, OR VIRTUAL PRIVATE NETWORK.

4         NETENRICH PROVIDED MUCH NEEDED CONTRACT ENGINEERS IN

5    SPECIALIZED AREAS LIKE NETWORKING AND DATABASE ADMINISTRATION.

6         NETSKOPE WAS AN ONLINE CLOUD SECURITY COMPANY THAT ENSURED

7    NETFLIX WAS IN COMPLIANCE WITH SOFTWARE LICENSES.  USING

8    NETSKOPE, NETFLIX COULD REVIEW EMPLOYEES' USE AND ACCESS TO

9    SENSITIVE DATA, ALMOST LIKE AN AUDIT.

10        NUMERIFY HELPED APPROVE INTERNAL TROUBLE TICKETS AND GAVE

11   THE HELP DESK AN OVERALL VIEW INTO I.T. PERFORMANCE AND QUICKLY

12   ADDRESSED ANY SHORTCOMINGS.

13        PLATFORA, THIS WOULD ALLOW THE ADVERTISING TEAM AT NETFLIX

14   TO ANALYZE LARGE AMOUNTS OF DATA.  AS A RESULT, PROJECTS THAT

15   WOULD TAKE 12 TO 18 MONTHS COULD BE FINISHED IN HOURS.  THE

16   GOAL WAS TO BETTER TRACK RETURN ON INVESTMENT OF ONLINE

17   ADVERTISING PURCHASES.  THERE'S SOMETHING CALLED REALTIME

18   BIDDING.

19        SUMO LOGIC OFFERED ANALYTICS AS A SERVICE, AND WAS ONE OF

20   THE FIRST COMPANIES TO COLLECT AND COMPRESS DATA AND SEND IT TO

21   AMAZON WEB SERVICES, WHICH IS SOMETHING THAT NETFLIX USED,

22   WHERE IT WAS CONVERTED AND COULD BE USED EASILY.  ITS

23   COMPETITORS AT THE TIME COULDN'T DO THIS.

24        FOR VISTARA, THEIR CLOUD-BASED PLATFORM PROVIDED A

25   CENTRALIZED DASHBOARD OF ALL THE VIRTUAL MACHINES AND NETWORK

1    DEVICES.  IT WAS ONE OF THE FIRST COMPANIES TO USE SOMETHING

2    CALLED SINGLE PANE OF GLASS THAT I BASICALLY LEARNED

3    CONSOLIDATED ALERTS IN A CENTRALIZED PORTAL INTERFACE.

4         AND THIS IS FAR MORE COMMON TODAY, I'VE LEARNED, AND A LOT

5    OF DIFFERENT COMPANIES OFFER THIS SERVICE.  BUT NOT BACK THEN.

6         AND I KNOW THESE DEFINITIONS MAY SOUND COMPLICATED,

7    CONVOLUTED, ESPECIALLY IF YOU'RE LIKE ME, NOT A TECH PERSON.

8         BUT YOU'LL LEARN DURING THE TRIAL THEY WERE KEY TO

9    MR. KAIL'S GOAL OF TRANSITIONING EVERYTHING TO THE CLOUD.  AND

10   EACH COMPANY ONLY GOT A CONTRACT AFTER IT WAS TESTED AND GOT

11   THE THUMBS UP, AND IT WASN'T A UNILATERAL DECISION.

12        TWO OF THESE VENDORS THAT YOU HEARD ABOUT, NETENRICH AND

13   VISTARA, THEY WERE CREATED WITH A DIFFERENT SALES MODEL.  THEY

14   OPERATED ON A REFERRAL BASIS INSTEAD OF RELYING ON A SALES

15   TEAM.

16        BECAUSE OF THAT, THEY GAVE COMMISSIONS TO ANY COMPANY THAT

17   REFERRED A POTENTIAL CLIENT.  THE COMMISSIONS OF CASH YOU MAY

18   HAVE HEARD ABOUT IN OPENING TO MR. KAIL'S LLC, UNIX MERCENARY,

19   WAS A REGULAR PART OF THEIR BUSINESS MODEL RATHER THAN A

20   VEHICLE FOR FRAUD AND MONEY LAUNDERING.

21        IN FACT, YOU'LL HEAR THAT UNIX WAS A SIDE GIG FOR MR. KAIL

22   THAT EXISTED LONG BEFORE HE WORKED AT NETFLIX.  IT WAS A BASIC

23   ENTITY THAT HE USED TO CONSULT, TO MAKE REFERRALS TO COMPANIES,

24   AND AS SUCH, RECEIVED PAYMENT FOR HIS SERVICES THROUGH THE LLC.

25   IT WASN'T A SECRET AND, IN FACT, YOU'LL SEE THAT WHEN HE WAS

1    INTERVIEWING FOR HIS JOB AT NETFLIX, THE E-MAIL HE USED TO

2    COMMUNICATE WITH REED HASTINGS CAME FROM HIS UNIX BUSINESS

3    E-MAIL ACCOUNT.

4         I'D LIKE TO TAKE A FEW MOMENTS TO TALK ABOUT THE

5    GOVERNMENT'S BURDEN OF PROOF BECAUSE MR. KAIL, AS YOU KNOW --

6    WE DISCUSSED A LOT IN JURY SELECTION -- IS PRESUMED INNOCENT.

7    RIGHT NOW YOU'VE SEEN NO EVIDENCE, THE GOVERNMENT HAS PROVEN

8    NOTHING, AND THAT'S WHY THE LAW REQUIRES YOU, IN THIS VERY

9    MOMENT, TO UNDERSTAND THAT HE IS INNOCENT.

10        YOU KNOW WHAT?  I THINK AFTER YOU'VE HEARD FROM ALL THE

11   WITNESSES AND IT'S TIME FOR YOU TO DELIBERATE, YOU'LL FIND THAT

12   THE GOVERNMENT HAS NOT OVERCOME THE PRESUMPTION OF INNOCENCE.

13   I'M CONFIDENT THAT IN THIS CASE, THE TRUTH WILL PREVAIL AND YOU

14   WILL NOT HESITATE TO TELL THE GOVERNMENT, YOU GOT IT WRONG.

15        BUT NO MATTER WHAT I DO HERE, MR. KAIL HAS NO BURDEN OF

16   PROOF.  IT'S ON THESE FEDERAL PROSECUTORS TO PROVE HE HAD THE

17   INTENT TO DEFRAUD NETFLIX.  NOT THAT HE VIOLATED A POLICY, NOT

18   EVEN THAT HE HAD A CONFLICT OF INTEREST.  THIS IS NOT A CIVIL

19   EMPLOYMENT DISPUTE OR A CONTRACT DISPUTE.

20        THIS MAKES YOUR JOB ABSOLUTELY CONSEQUENTIAL.  TO CONVICT

21   SOMEONE OF A CRIME, YOU CAN'T GUESS OR HAVE DOUBTS ABOUT WHAT

22   HAPPENED.

23        IN THIS CASE, THE GOVERNMENT WILL HAVE TO PROVE THAT

24   MR. KAIL WAS ENGAGED IN A SCHEME TO DEFRAUD NETFLIX OF HIS

25   HONEST SERVICES.

1        WHAT DOES THAT MEAN?  UNDER THE LAW, IT MEANS THEY HAVE TO

2   PROVE HE WAS ENGAGED IN QUID PRO QUO, WHICH YOU HEARD

3   MR. KALEBA MENTION.  YOU MAY HAVE HEARD THIS WORD ON THE NEWS

4   IN YOUR DAILY LIFE.  LITERALLY, IT MEANS THIS FOR THAT.  I'LL

5   GIVE YOU THIS IN EXCHANGE FOR THAT.

6        THE GOVERNMENT WILL HAVE TO PROVE THAT A PARTICULAR VENDOR

7   GAVE MR. KAIL MONEY, SHARES, OR A GIFT IN EXCHANGE FOR GETTING

8   A CONTRACT AT NETFLIX, GETTING BUSINESS AT NETFLIX.

9        AND THERE'S A VERY IMPORTANT PART OF A JURY INSTRUCTION I

10  WANT TO PREVIEW TO YOU SO YOU CAN KEEP IT IN MIND AS YOU LISTEN

11  TO THE EVIDENCE AND THE WITNESSES.

12       CONFLICT OF INTEREST, BY ITSELF, IS NOT HONEST SERVICES

13  FRAUD.

14       UNDISCLOSED SELF-DEALING, MEANING EVEN PROFITING OFF YOUR

15  EMPLOYER, BY ITSELF, NOT A CRIME.

16       SECRET PAYMENTS, BY THEMSELVES, NOT HONEST SERVICES FRAUD.

17       WE DENY THAT MR. KAIL HAD CONFLICTS OF INTEREST, BUT YOU

18  SHOULD KNOW THAT WITHOUT THE EXCHANGE, IT IS NOT FRAUD.

19       THE GOVERNMENT WILL NEVER BE ABLE TO PROVE BEYOND A

20  REASONABLE DOUBT THAT ANY COMPENSATION MR. KAIL RECEIVED WAS IN

21  EXCHANGE FOR IMPROPERLY GIVING THOSE VENDORS BUSINESS, OR THAT

22  MR. KAIL HATCHED A SCHEME TO DEFRAUD NETFLIX.

23       AND TO PROVE MAIL AND WIRE FRAUD, THEY WILL HAVE TO

24  DEMONSTRATE NOT JUST THAT NETFLIX PURCHASED A CONTRACT THEY

25  SHOULDN'T HAVE OR DIDN'T LIKE IT, BUT THAT HE SPECIFICALLY

1      INTENDED TO DECEIVE AND CHEAT NETFLIX.

2           AND YOU'LL HEAR FROM REPRESENTATIVES FROM THESE COMPANIES,

3      AND THEY'LL TELL YOU, THEY WENT THROUGH RIGOROUS TESTING AT

4      NETFLIX.  THEY REALLY HAD TO PROVE THEMSELVES AND WORK VERY

5      HARD TO EARN AND KEEP THE NETFLIX BUSINESS.

6           THEY'LL TELL YOU THEY WORKED WITH NETFLIX ENGINEERS, THEY

7      GOT FEEDBACK FROM THE ENGINEERS, THEY MADE IMPROVEMENTS.  THEY

8      GOT POSITIVE FEEDBACK, WE LOVE IT; AND NEGATIVE FEEDBACK, WHY

9      IS THIS SO SLOW?  FIX IT.  AND IT LED THEM TO IMPROVE BECAUSE,

10     AGAIN, WITH NEW TECHNOLOGY, THAT'S WHAT HAPPENS.

11          AND, YES, SOME EMPLOYEES WERE THRILLED ABOUT PARTICULAR

12     TECHNOLOGY.  SOME WEREN'T.  SOME COULD SEE THE FUTURE

13     POTENTIAL.  OTHERS LESS SO.  OTHERS LESS VISIONARY.  OTHERS

14     MAYBE DIDN'T UNDERSTAND.

15          BUT THAT'S THE NATURE OF ANY BUSINESS THAT WORKS WITH NEW

16     TECHNOLOGY.

17          AND NONE OF THESE CONTRACTS WERE SECRET, BY THE WAY.  THEY

18     WERE ALL APPROVED BY STAFF AT NETFLIX.

19          AND MR. KAIL'S GOAL THROUGH IT ALL, AS I ANTICIPATE YOU'LL

20     COME TO SEE, WAS TO MAKE NETFLIX THE BEST ONLINE STREAMING

21     COMPANY POSSIBLE.  AND HE UTILIZED THIS CUTTING EDGE TECHNOLOGY

22     AND TOOLS DEVELOPED BY THESE COMPANIES BECAUSE HE BELIEVED AT

23     HEART THESE WERE THE BEST OPTIONS AVAILABLE AT THE TIME TO MAKE

24     THE NETFLIX GOAL OF I.T. IN THE CLOUD A REALITY, AND IT GAVE

25     NETFLIX A COMPETITIVE EDGE.

1          AND OBVIOUSLY HE WAS CORRECT IN HIS FORESIGHT BECAUSE THE

2     TECHNOLOGY YOU'RE GOING TO HEAR ABOUT IN THIS TRIAL, WHERE

3     EVENTS TOOK PLACE SEVEN TO TEN YEARS AGO, ARE IN COMMON USE

4     TODAY THROUGH A VAST ARRAY OF COMPANY THAT IS WORK IN THE

5     CLOUD.  OUR CURRENT REMOTE LIFESTYLES WOULD NOT BE POSSIBLE

6     WITHOUT THESE TECHNOLOGIES THAT, TO SOME BACK THEN, MAY HAVE

7     SEEMED AMBITIOUS.  BUT IT WAS LIKE HE WAS LOOKING INTO THE

8     FUTURE.

9          SO I'LL ASK YOU TO STEP BACK IN TIME AS YOU CONSIDER THE

10    EVIDENCE, AND THE GOVERNMENT WON'T BE ABLE TO PROVE FRAUD IN

11    THIS CASE BECAUSE MICHAEL KAIL ALWAYS HAD NETFLIX'S BEST

12    INTEREST AND SUCCESS AT THE FOREFRONT OF HIS DECISIONS.

13         THE PROSECUTORS MAY ATTEMPT TO PROVE, AS YOU HEARD, THAT

14    MR. KAIL LIED TO, CHEATED AND DECEIVED HIS EMPLOYER, A LARGE

15    AND PUBLIC TECHNOLOGY COMPANY THAT PRIDED ITSELF ON NO RULES.

16         AND THE IMPORTANCE OF THE NO RULES CULTURE IS NOT THAT IT

17    MEANT EMPLOYEES COULD RUN AMOK AND DO WHATEVER THEY WANTED.

18    THAT'S NOT WHAT I'M SUGGESTING.

19         IT MEANT THAT NETFLIX DID NOT HAVE RIGID RULES IN PLACE,

20    THEY DIDN'T HAVE OLD SCHOOL COMPANY POLICIES, AND THEY DIDN'T

21    HAVE SOMETHING IN WRITING REQUIRING MR. KAIL TO DISCLOSE OR GET

22    COMMISSION -- PERMISSION FOR HIS ADVISORY POSITIONS.  NONE OF

23    THE FEW POLICIES THEY HAD IN PLACE WHEN HE WORKED THERE, MOST

24    OF WHICH WERE REGULATORY, REQUIRED HIM TO DO ANYTHING DIFFERENT

25    THAT HE DID -- THAN HE DID.

1           BUT AS I MENTIONED, HIS POSITIONS WERE NOT SECRET.

2           YOU'LL LEARN THAT MR. KAIL IS A DEVOTED AND HARD WORKING

3     FATHER OF TWO BOYS.  HE'S A WIDELY RESPECTED MENTOR AND ADVISOR

4     IN SILICON VALLEY, RESPECTED FOR BOTH HIS CRITICISM AND HIS

5     VISION FOR FUTURE TECHNOLOGY.  HE WENT OUT OF HIS WAY TO BRING

6     HIS ACUMEN NOT ONLY TO NETFLIX, BUT TO THE TECH COMMUNITY

7     AROUND HIM, TO HAVE EVERYBODY IMPROVE AT THE SAME TIME.

8           HAVING GROWN UP IN A FARM COMMUNITY IN THE MIDWEST, HIS

9     REPUTATION AND CONNECTIONS WERE ALL SELF-MADE.  HE'S SMART AND

10    CREATIVE AND EXCELLED AT HIS JOB AT NETFLIX, WHICH HE ONLY LEFT

11    FOR A BIGGER OPPORTUNITY.

12          THE GOVERNMENT'S ENTIRE CASE WILL BE BUILT AROUND A FALSE

13    NARRATIVE OF WHO HE IS AND WHAT HIS INTENTIONS WERE.

14          AND AS YOU SIT HERE AS JURORS DURING THIS TRIAL, I

15    ENCOURAGE YOU TO DO THIS:  CHALLENGE THE GOVERNMENT'S

16    ASSUMPTIONS.  DON'T BRUSH ASIDE FACTS AND ARGUMENTS WHICH DON'T

17    FIT THEIR NARRATIVE.

18          EVEN THOUGH THEY'LL BE DEALING WITH PERHAPS TECHNICAL

19    SUBJECT MATTER, THEIR STORY WILL BE CONTRADICTED BY THE TRUTH,

20    WHICH IS THAT MR. KAIL WORKED HIS TAIL OFF TO DELIVER WHAT

21    NETFLIX WANTED AND HE WAS REVERED FROM HIS EMPLOYEES FOR GREAT

22    LEADERSHIP.  HE DIDN'T BRIBE ANYONE, HE DIDN'T ARRANGE FOR

23    KICKBACKS, AND HE WAS PUBLIC ABOUT HIS ADVISOR POSITIONS.

24          I BELIEVE YOU WILL COME TO SEE THAT MR. KAIL HAD NETFLIX'S

25    BEST INTERESTS AT HEART.

1          AND REMEMBER, IN AN ENVIRONMENT WHERE EMPLOYEES ARE GIVEN

2     THE FREEDOM TO BE CREATIVE, TO TAKE RISKS, AND NOT BE

3     CONSTRAINED BY TRADITIONAL POLICIES, NO RULES RULE.

4          AT THE END OF THIS TRIAL, I'M CONFIDENT THAT IF YOU TAKE

5     THE BURDEN OF PROOF SERIOUSLY, JUSTICE WILL REQUIRE YOU,

6     REQUIRE YOU TO FIND MR. KAIL NOT GUILTY.

7          THANK YOU.

8              THE COURT:  THANK YOU, MS. JAYNE.

9          I THINK WE SHOULD TAKE OUR MORNING BREAK NOW BEFORE WE

10    BEGIN THE PRESENTATION OF EVIDENCE, SO LET'S TAKE A 15 MINUTE

11    BREAK AND WE'LL COME BACK AT 20 MINUTES TO 11:00.

12             THE CLERK:  COURT'S IN RECESS.

13         (RECESS FROM 10:23 A.M. UNTIL 10:43 A.M.)

14         (JURY IN AT 10:43 A.M.)

15             THE COURT:  PLEASE BE SEATED, EVERYONE.  ALL COUNSEL

16    AND PARTIES ARE HERE AND ALL OF OUR JURORS ARE HERE.

17         AS I TOLD YOU LADIES AND GENTLEMEN, WE'RE NOW GOING TO

18    TURN TO THE PRESENTATION OF EVIDENCE, AND THE GOVERNMENT WILL

19    BEGIN WITH ITS CASE.

20         MR. SAMPSON, WOULD YOU LIKE TO CALL YOUR FIRST WITNESS?

21             MR. SAMPSON:  THANK YOU, YOUR HONOR.

22    THE UNITED STATES CALLS TONY RALPH.

23             THE COURT:  MR. RALPH, WOULD YOU COME FORWARD TO THE

24    WITNESS STAND, PLEASE, AND STAND TO BE SWORN.

25         ALL THE WAY UP HERE, YES, SIR.

1          THE CLERK:  WILL YOU PLEASE RAISE YOUR RIGHT HAND.

2          **(GOVERNMENT'S WITNESS, ANTHONY RALPH, WAS SWORN.)**

3          THE WITNESS:  YES.

4          THE CLERK:  THANK YOU, SIR.  PLEASE BE SEATED.

5      AND TO BEGIN, IF YOU WOULD PLEASE STATE YOUR NAME AND

6  SPELL YOUR LAST NAME FOR THE RECORD.

7          PROSPECTIVE JUROR:  TONY RALPH, ANTHONY RALPH.  LAST

8  NAME IS R-A-L-P-H.

9                         **DIRECT EXAMINATION**

10  BY MR. SAMPSON:

11  Q.   GOOD MORNING, MR. RALPH.  HOW ARE YOU?

12  A.   I'M GOOD, THANK YOU.

13  Q.   PLEASE LET ME KNOW IF YOU CAN'T HEAR ME WITH THE MASKS OR

14  ANYTHING LIKE THAT.

15      AND WHEN I GUIDE YOU TO AN EXHIBIT, IT MAY EITHER BE ON

16  THE SCREEN OR THERE'S A BINDER TO YOUR LEFT, WHATEVER YOU NEED.

17  A.   THANK YOU.

18  Q.   MR. RALPH, COULD YOU PLEASE TELL US WHERE YOU CURRENTLY

19  WORK, IF YOU'RE WORKING?

20  A.   I CURRENTLY WORK WITH THE PEPSICO CORPORATION.

21  Q.   AND HOW LONG HAVE YOU WORKED THERE?

22  A.   APPROXIMATELY TWO MONTHS.

23  Q.   AND WHAT IS YOUR TITLE?

24  A.   I'M THE SENIOR VICE PRESIDENT OF PRODUCT MANAGEMENT FOR

25  THEIR DATA PLATFORM.

1    Q.   AND LET'S GO BACK IN TIME A LITTLE BIT.

2         WHERE DID YOU WORK BEFORE THAT?

3    A.   BEFORE THAT, I WAS WORKING AT WAL-MART.

4    Q.   AND DID YOU HAVE THE SAME TITLE?

5    A.   NO.  I WAS THE VICE PRESIDENT OF PRODUCT MANAGEMENT THERE.

6    Q.   AND HAVE YOU EVER WORKED FOR A COMPANY CALLED NETFLIX?

7    A.   YES.

8    Q.   AND APPROXIMATELY WHEN DID YOU WORK FOR NETFLIX?

9    A.   IT WAS APPROXIMATELY IN THE THREE AND A HALF YEARS FROM

10   2013 TO 2016 TIMEFRAME.

11   Q.   AND DID YOU HAVE ONE TITLE THE ENTIRE TIME YOU WERE AT

12   NETFLIX?

13   A.   YES, TO THE BEST OF MY RECOLLECTION, ONE TITLE.

14   Q.   AND WHAT WAS THAT TITLE?

15   A.   DIRECTOR OF ADVERTISING TECHNOLOGY -- DIRECTOR OF

16   ADVERTISING TECHNOLOGY, TO THE BEST OF MY RECOLLECTION.

17   Q.   AND DID YOU SOMETIMES REFER TO THAT AS AD TECH?

18   A.   YES, THAT WOULD HAVE BEEN A SHORTHAND FOR THAT.

19   Q.   OKAY.  AND LET'S JUST BACK UP A LITTLE BIT.

20        CAN YOU DESCRIBE FOR THE JURY, FOR THOSE WHO YOU MAY NOT

21   KNOW WHAT NETFLIX IS OR WHAT ITS BUSINESS IS, CAN YOU GIVE A

22   BRIEF DESCRIPTION OF WHAT NETFLIX IS AND WHAT SERVICE IT

23   DELIVERS?

24   A.   IN ITS CURRENT FORMAT, IT'S A STREAMING SERVICE FOR MOVIES

25   AND OTHER FORMS OF ENTERTAINMENT.

1    Q.   AND IT HAS A SUBSCRIBER BASE IN THE UNITED STATES AND

2    ELSEWHERE?

3    A.   THAT'S CORRECT.

4    Q.   AND IN ADDITION TO BEING A STREAMING SERVICE, DOES IT ALSO

5    OFFER ANOTHER SERVICE?

6    A.   I -- I -- I WOULD REFER TO IT AS A STREAMING SERVICE, SO

7    I'M NOT SURE TO WHAT YOU'RE REFERRING.

8    Q.   DID IT SEND ANYTHING BY MAIL?

9    A.   HISTORICALLY, IT DID, AND THAT BUSINESS WAS WANING WHEN I

10   WAS STILL THERE.  I'M NOT SURE IF THAT STILL EXISTS OR NOT.

11   BUT HISTORICALLY THEY SENT DVD'S VIA REGULAR U.S. POSTAL

12   SERVICE.

13   Q.   AND WHERE IS NETFLIX HEADQUARTERED?

14   A.   LOS GATOS.

15   Q.   AND THAT WAS TRUE IN 2013/2014?

16   A.   YES.

17   Q.   IS THAT WHERE YOU WORKED AT NETFLIX?

18   A.   YES, I WAS OUT OF THE LOS GATOS OFFICE.

19   Q.   AND WHAT WERE YOUR DUTIES AS A DIRECTOR OF ADVERTISING

20   TECHNOLOGY?

21   A.   WE WERE PROVIDING FOR NETFLIX THE TOOLS AND INFRASTRUCTURE

22   TO PERSONALIZE AND MAKE RELEVANT THE ADVERTISING OF THE NETFLIX

23   PRODUCT AND HELP IT GROW IN THAT REGARD.

24   Q.   AND SO DID YOU REQUIRE ANY TECHNOLOGY TOOLS AS PART OF

25   THAT ROLE?

1    A.   YES.  THE TECHNOLOGY WOULD HAVE BEEN FUNDAMENTAL TO THE

2    ROLE.

3    Q.   WHAT KIND OF INSIGHTS DID YOU NEED TO DO YOUR JOB AS A

4    DIRECTOR OF ADVERTISING TECHNOLOGY?

5    A.   WE WERE TRYING TO UNDERSTAND BOTH OUR CUSTOMERS AND

6    PROSPECTIVE CUSTOMERS IN TERMS OF THEIR BEHAVIORS AND HOW TO

7    GET MESSAGES TO THEM OPTIMALLY TO HELP THEM UNDERSTAND WHAT

8    NETFLIX WAS AND HOPEFULLY SUBSCRIBE TO THE SERVICE.

9    Q.   AND AT THE TIME, IS IT FAIR TO SAY THERE WERE MILLIONS OF

10   SUBSCRIBERS?

11   A.   TENS OF MILLIONS, YES, AT THAT TIME.

12   Q.   AND SO DID THAT INVOLVE A LOT OF DATA?

13   A.   YES.

14   Q.   AND WHO HIRED YOU AS DIRECTOR OF ADVERTISING TECHNOLOGY?

15   A.   WHILE I WAS EMPLOYED AT NETFLIX, MY DIRECT MANAGER WAS

16   MIKE KAIL.

17   Q.   OKAY.  IS HE IN THE COURTROOM TODAY?

18   A.   YES, I BELIEVE THAT'S HIM.

19        MR. SAMPSON:  YOUR HONOR, WILL THE RECORD REFLECT

20   THAT THE WITNESS HAS IDENTIFIED THE DEFENDANT?

21        THE COURT:  YES, THE RECORD WILL SO REFLECT.

22   BY MR. SAMPSON:

23   Q.   AND APPROXIMATELY WHEN WAS -- WHEN WERE YOU HIRED?

24   A.   IT WOULD HAVE BEEN IN THE YEAR OF 2013.  I DON'T RECALL

25   THE MONTH.

```
1     Q.   OKAY.  AS -- AND SO WHAT WAS MR. KAIL'S TITLE AT NETFLIX

2     AT THE TIME?

3     A.   I BELIEVE HE WAS THE VICE PRESIDENT OF I.T.

4     Q.   AND APPROXIMATELY HOW MANY PEOPLE WORKED UNDER MR. KAIL AT

5     NETFLIX?

6     A.   WELL, I WAS ONE OF HIS DIRECT REPORTS, AND THERE WAS A

7     STAFF OF SIX TO EIGHT DIRECT REPORTS, SOMEWHERE IN THAT RANGE.

8     I DON'T RECALL THE TOTALITY OF HIS TOTAL TEAM SIZE.

9     Q.   IS IT FAIR TO SAY THERE WERE A NUMBER OF PEOPLE UNDER THE

10    DIRECT REPORTS?

11    A.   YES.

12    Q.   OKAY.  WERE THERE ENGINEERS THAT MR. KAIL SUPERVISED?

13    A.   YES, THERE WOULD HAVE BEEN A NUMBER OF TECHNICAL

14    PROFESSIONALS.  SOME COULD HAVE BEEN CATEGORIZED AS SOFTWARE

15    ENGINEERS.

16    Q.   AND ARE YOU -- DO YOU HAVE AN ENGINEERING BACKGROUND?

17    A.   YES, I DO.

18    Q.   IS THAT A DEGREE IN ENGINEERING?

19    A.   WELL, I CAME A FEW CLASSES SHORT OF MY MASTER'S CLASS AND

20    WAS RECRUITED OUT TO WORK IN INDUSTRY AND NEVER FINISHED MY

21    DEGREE.  SO I HAVE MUCH OF A DEGREE, BUT NOT COMPLETE.

22    Q.   WHEN NETFLIX NEEDS TO SOLVE A TECHNOLOGY PROBLEM, DOES

23    IT -- TO YOUR KNOWLEDGE, DOES IT ALWAYS GO OUT AND BUY THIRD

24    PARTY SOLUTIONS FROM VENDORS?

25    A.   IT'S CERTAINLY NOT THE CASE THAT THEY ALWAYS BUY.  THEY
```

1    WILL SOMETIMES BUY AND SOMETIMES BUILD THINGS INTERNALLY,

2    DEVELOP THEM INTERNALLY.

3    Q.   SO DOES THAT MEAN THAT ENGINEERS AT NETFLIX WORK ON THEIR

4    OWN CUSTOM SOLUTIONS?

5    A.   IN MANY CASES THERE'S CUSTOM SOLUTIONS.  IN SOME CASES

6    THERE'S THIRD PARTY SOLUTIONS.  IN OTHER CASES THERE WOULD BE A

7    COMBINATION OF BOTH.

8    Q.   WHEN NETFLIX IS EVALUATING WHETHER A THIRD PARTY'S

9    TECHNOLOGY OR SOFTWARE WORKS FOR THE COMPANY, DOES IT TEST IT

10   FIRST TYPICALLY?

11   A.   THAT WOULD BE -- THAT WOULD BE COMMON, YES.  THAT WOULD BE

12   COMMON.

13   Q.   IS THAT KNOWN AS A PROOF OF CONCEPT?

14   A.   YEAH.  IT CAN BE REFERRED TO AS MANY THINGS, BUT, YES,

15   OFTEN TIMES PROOF OF CONCEPT WOULD REFER TO THAT TYPE OF THING.

16   Q.   AND HAVE YOU BEEN INVOLVED IN PROOF OF CONCEPTS FOR

17   OUTSIDE TECHNOLOGY THAT NETFLIX WAS CONSIDERING?

18   A.   YES.  FOR THE DOMAIN THAT I WAS PART OF, I WOULD HAVE BEEN

19   PART OF THAT ASSESSMENT PROCESS.

20   Q.   AND THE DOMAIN IS ADVERTISING TECHNOLOGY?

21   A.   THAT'S RIGHT.

22   Q.   HAVE YOU, TO YOUR KNOWLEDGE, EVER AUTHORIZED PAYMENT TO A

23   VENDOR FOR A PROOF OF CONCEPT?

24   A.   AT TIMES THERE WOULD BE AN APPROPRIATE PAYMENT IF THE

25   PROOF OF CONCEPT PARTNER WAS -- HAD TO EXPEND RESOURCES FOR

1        THAT.  SO THAT COULD HAVE OCCURRED.

2        Q.   SO IS IT FAIR TO SAY COVERING SOME OF THE EXPENSES

3        INVOLVED IN PROVIDING THAT SOFTWARE TO TEST?

4        A.   I THINK -- YEAH, I THINK THAT WOULD BE A FAIR STATEMENT.

5        IT'S NOT ALWAYS THE CASE, BUT THAT COULD OCCUR AT TIMES, YES.

6        Q.   WERE THEY SOMETIMES UNPAID ENTIRELY?

7        A.   THAT'S WHAT WE WOULD STRIVE FOR AND THAT CAN HAPPEN FOR

8        SOME OF THE TIME AS WELL, YES.

9        Q.   AND IS THAT BECAUSE THE SOLUTION MAY NOT BE A GOOD FIT FOR

10       THE COMPANY?

11                 MS. JAYNE:  OBJECTION.  LEADING.

12                 THE COURT:  SUSTAINED.

13       BY MR. SAMPSON:

14       Q.   WERE THERE TIMES THAT PROOFS OF CONCEPT DID NOT RESULT IN

15       PAID CONTRACTS WITH NETFLIX?

16       A.   FOR SURE, ABSOLUTELY, YES.

17       Q.   IN YOUR TIME AT NETFLIX -- AND HOW -- LET ME GO BACK.

18            HOW LONG WERE YOU AT NETFLIX?

19       A.   APPROXIMATELY THREE AND A HALF YEARS.

20       Q.   THREE AND A HALF YEARS.

21            SO IN YOUR THREE AND A HALF YEARS AT NETFLIX, WAS THERE A

22       FOCUS ON MOVING TO THE CLOUD?

23       A.   YES, THERE WAS, YES.  WE WERE MOVING TO A PUBLIC CLOUD

24       ALMOST ENTIRELY AS I RECALL.

25       Q.   OKAY.  AND COULD YOU JUST DESCRIBE, AS GENERALLY AS YOU

1    CAN, WHAT THAT INVOLVED, MOVING TO THE CLOUD.

2    A.    WELL, IT INVOLVES MIGRATING SOFTWARE APPLICATIONS THAT

3    WOULD HAVE BEEN RUN, WHAT THEY SOMETIMES CALL ON PREM OR ON

4    PREMISES, TO RUN IN AN ENVIRONMENT, A CLOUD ENVIRONMENT, IN

5    THIS CASE AMAZON, AWS, AMAZON WEB SERVICES.

6          AND SO IT WAS EFFECTIVELY MOVING OUR SOFTWARE ONTO

7    HARDWARE OWNED BY THE CLOUD ENTITY.

8    Q.    AND WHEN YOU SAY "ON PREMISES," IS THAT AT A -- ON SERVERS

9    THAT NETFLIX PHYSICALLY OWNS?

10   A.    IN MANY CASES, YES.

11   Q.    OKAY.  AND MOVING TO THE CLOUD MEANS MOVING SOFTWARE OFF

12   OF THOSE SERVERS THAT NETFLIX OWNS AND ONTO CLOUD SERVERS AT

13   AMAZON?

14   A.    CORRECT.

15   Q.    OKAY.  HAVE YOU EVER -- WELL, IN YOUR EXPERIENCE, WAS

16   THAT -- WAS THAT CUTTING EDGE AT THE TIME?

17   A.    I -- IT DEPENDS ON HOW YOU DEFINE CUTTING EDGE.  BUT I

18   THINK IT WAS PROGRESSIVE IN TERMS OF MOVING THE TOTALITY OF OUR

19   APPLICATIONS TO AWS.  I WOULD CALL IT CUTTING EDGE IN THAT

20   REGARD.

21   Q.    HAVE YOU EVER HEARD OF A COMPANY OR A SERVICE CALLED

22   PLATFORA?

23   A.    YES.

24   Q.    WHEN DID YOU FIRST HEAR ABOUT PLATFORA?

25   A.    IT WAS IN MY -- IN THE EARLY PORTION OF MY TENURE AT

1    NETFLIX, IT WAS BROUGHT UP AS A SOLUTION THAT COULD SOLVE,

2    POTENTIALLY SOLVE SOME SPECIFIC PROBLEMS FOR US.

3    Q.   WHAT WERE THOSE SPECIFIC PROBLEMS?

4    A.   ANALYSIS QUERY AND VISUALIZATION OF LARGE DATA SETS.

5    Q.   WHEN YOU SAY "VISUALIZATION," WHAT EXACTLY DOES THAT MEAN?

6    A.   IT MEANS THROUGH GRAPHICAL MEANS LIKE CHARTS, SCHEMATICS,

7    LOOKING FOR TRENDS AND INSIGHTS IN DATA.

8    Q.   SO IS IT FAIR TO SAY THAT GIVEN THE LARGE AMOUNT OF DATA

9    THAT YOU NEEDED TO EVALUATE AS A DIRECTOR OF ADVERTISING

10   TECHNOLOGY, YOU NEEDED A WAY TO VISUALIZE THAT DATA?

11   A.   YEAH, I THINK THAT'S FAIR TO SAY THAT THERE ARE ADVANTAGES

12   TO THAT, CORRECT.

13   Q.   AND IS -- AND PLATFORA WAS A POTENTIAL SOLUTION FOR A

14   VISUALIZATION PROBLEM?

15   A.   CORRECT.

16   Q.   AND DID YOU HEAR -- DID YOU FIRST HEAR ABOUT PLATFORA FROM

17   ANYONE IN PARTICULAR?

18   A.   MY BEST RECOLLECTION IS I HEARD IT THROUGH MY BOSS,

19   MR. KAIL.

20   Q.   AND DID YOU -- DID YOU EVER MEET WITH ANY OF PLATFORA'S

21   EMPLOYEES OR SALES PEOPLE?

22   A.   YES.

23   Q.   AND THAT WAS SHORTLY AFTER YOUR TENURE BEGAN AT NETFLIX?

24   A.   CORRECT, YES.

25   Q.   WERE THERE OTHER PRODUCTS THAT SOLVED VISUALIZATION NEEDS

1    THAT YOU HAD AS DIRECTOR OF ADVERTISING TECHNOLOGY?

2    A.   THE SHORT ANSWER IS YES.

3    Q.   WERE THERE SPECIFIC -- WAS THERE SPECIFIC SOFTWARE IN

4    PARTICULAR THAT YOU'RE THINKING OF THAT POTENTIALLY SOLVED THAT

5    PROBLEM?

6    A.   WELL, I THINK PLATFORA PACKAGED TOGETHER A NUMBER OF

7    SOLUTIONS, OR AT LEAST THAT WAS THEIR INTENT.  WE WOULD HAVE

8    SOLVED IT THROUGH A NUMBER OF DIFFERENT TOOLS.

9    Q.   WHAT WERE THE NAMES OF SOME OF THOSE DIFFERENT TOOLS?

10   A.   OH, I RECALL SPOTFIRE COMING UP AS ONE, VISUALIZATION

11   SOLUTIONS LIKE TABLEAU, AND OTHER CLOUD-BASED QUERYING TOOLS,

12   SCRIPTING LANGUAGES LIKE PIG OR PYTHON, ET CETERA.

13   Q.   PIG, IS THAT -- DO YOU HAVE TO PAY FOR PIG?

14   A.   WELL, I -- IT MAY BE OPEN SOURCE, BUT I -- I DON'T RECALL.

15   I HAVEN'T USED IT IN A LONG TIME.

16   Q.   WHAT DOES "OPEN SOURCE" MEAN?

17   A.   OPEN SOURCE MEANS SOFTWARE THAT IS PUBLICLY AVAILABLE

18   TO -- FOR ENTITIES TO USE FOR FREE.

19   Q.   YOU MENTIONED ONE CALLED TABLEAU.  IS THAT A -- IS THAT

20   FROM A THIRD PARTY VENDOR?

21   A.   YES.

22   Q.   AND WAS NETFLIX USING TABLEAU AT THE TIME THAT YOU HEARD

23   ABOUT PLATFORA?

24   A.   I DON'T RECALL THE SPECIFIC TABLEAU LICENSE WE DID OR DID

25   NOT HAVE.  I BELIEVE IT WAS, BUT I -- I CAN'T SAY THAT WITH

1    100 PERCENT CERTAINTY.

2    Q.   HAVE YOU USED TABLEAU BEFORE?

3    A.   YES.

4         MR. SAMPSON:  YOUR HONOR --

5    Q.   WELL, MR. RALPH, PLEASE LOOK AT THE BINDER OR AT THE

6    SCREEN AT EXHIBIT 304, WHICH SHOULD JUST BE SHOWN TO THE

7    WITNESS.

8         MR. RALPH, I'M GOING TO ASK YOU A FEW QUESTIONS ABOUT THIS

9    DOCUMENT.

10   A.   OKAY.  I DON'T SEE IT HERE ON THE SCREEN.  SHOULD I?

11        THE COURT:  LET'S SEE IF WE CAN GET THAT TURNED ON.

12        THE CLERK:  OR IT COULD HAVE GOTTEN TURNED OFF.

13   THERE'S A LITTLE BUTTON UNDERNEATH.  TO THE VERY FAR LEFT,

14   UNDER THE SCREEN.  SORRY.

15        (PAUSE IN PROCEEDINGS.)

16        THE COURT:  DOES HE HAVE IT IN THE BINDER?

17        MR. SAMPSON:  IT IS.

18   Q.   IT'S AT TAB 304, MR. RALPH.

19        THE COURT:  AND IF YOU CAN LOOK AT THE TABS, IF YOU

20   CAN JUST FIND 304.

21        (PAUSE IN PROCEEDINGS.)

22        THE WITNESS:  I DID HAVE THE BINDER UP IF YOU WANT TO

23   PROCEED.

24        MR. SAMPSON:  YOUR HONOR, MAY WE PROCEED WHILE WE'RE

25   WORKING --

1          THE COURT:  LET'S SEE IF -- THE WITNESS HAS A COPY.

2          MR. SAMPSON:  GOOD THING WE HAVE PAPER.

3          THE COURT:  YES.

4     BY MR. SAMPSON:

5     Q.   MR. RALPH, DO YOU SEE THE DOCUMENT AT EXHIBIT 304?

6     A.   YES.

7     Q.   ALL RIGHT.  AND IS TRALPH@NETFLIX.COM, WAS THAT YOUR

8     NETFLIX E-MAIL?

9     A.   THAT'S CORRECT.

10    Q.   AND IS -- DO YOU RECOGNIZE THIS E-MAIL?

11    A.   YES.  I MEAN, IT'S OBVIOUSLY BEEN SEVEN OR EIGHT YEARS

12    AGO, BUT THE CONTEXT, I DO RECOGNIZE IT, YES.

13    Q.   AND IS THIS AN E-MAIL FROM MR. KAIL TO YOU, BOTH USING

14    YOUR NETFLIX E-MAIL ADDRESSES?

15    A.   YES.

16    Q.   AND IT'S DATED MAY 10TH, 2013?

17    A.   CORRECT.

18    Q.   AND SO YOU -- IS IT FAIR TO SAY YOU STARTED AT NETFLIX

19    SOMETIME BEFORE MAY 10, 2013?

20    A.   YES.

21    Q.   AND WHAT IS MR. KAIL ASKING YOU TO DO?

22    A.    IT -- THIS IS WHERE HE -- IT LOOKS LIKE HE INTRODUCED

23    PLATFORA AS A SOLUTION TO SOLVE SOME OF THE CHALLENGES WE WERE

24    FACING.

25    Q.   SOME OF THE CHALLENGES YOU WERE FACING IN AD TECH?

1    A.   CORRECT.

2    Q.   AND WAS IT A REGULAR PART OF YOUR JOB TO COMMUNICATE WITH

3    COLLEAGUES OR YOUR SUPERVISOR BY E-MAIL?

4    A.   YES.

5    Q.   AND YOU BOTH HAD NETFLIX E-MAIL ADDRESSES TO DO THAT;

6    CORRECT?

7    A.   CORRECT.

8    Q.   AND DO YOU KNOW WHO WAS HOSTING NETFLIX E-MAIL AT THE

9    TIME?

10   A.   I DO NOT KNOW WHO WAS HOSTING NETFLIX E-MAIL.  I MEAN,

11   ACTUALLY, WE HAD MOVED TO GMAIL AS I RECALL, BUT -- SO IT MAY

12   HAVE BEEN GOOGLE IS MY BEST GUESS.  BUT I DEFER TO MR. KAIL ON

13   THAT.

14   Q.   IS THAT YOUR BEST RECOLLECTION?

15   A.   THAT'S MY BEST RECOLLECTION.

16   Q.   AND DID YOU RESPOND TO MR. KAIL'S REQUEST THAT YOU LOOK AT

17   PLATFORA?

18   A.   YES.

19   Q.   AND DID YOU SUGGEST A DIFFERENT POTENTIAL SOLUTION?

20   A.   I THINK I WAS POINTING TO A SOLUTION ONE OF OUR PARTNERS

21   USED AS ANOTHER OPTION TO EXPLORE.

22   Q.   AND WHAT WAS THAT CALLED?

23   A.   SPOTFIRE.

24        MR. SAMPSON:  YOUR HONOR, I MOVE TO ADMIT

25   EXHIBIT 304.

1              THE COURT:  ANY OBJECTION?

2              MS. JAYNE:  NO.

3              THE COURT:  IT WILL BE ADMITTED.

4         (GOVERNMENT'S EXHIBIT 304 WAS ADMITTED IN EVIDENCE.)

5              MR. SAMPSON:  MAY I PUBLISH?

6              THE COURT:  YES.  LET'S SEE IF IT SHOWS UP.

7    BY MR. SAMPSON:

8    Q.   IS YOUR SCREEN WORKING?

9    A.   IT IS NOT.

10             THE COURT:  IT IS NOT.

11        ARE THE JURORS SEEING THE EXHIBIT?

12             JUROR:  (NODS HEAD UP AND DOWN.)

13             THE COURT:  GOOD.  THANK YOU.

14   BY MR. SAMPSON:

15   Q.   DO YOU RECALL HEARING ABOUT PLATFORA AS A POTENTIAL

16   SOLUTION FOR ADVERTISING TECHNOLOGY BEFORE MAY 10TH, 2013?

17   A.   I DO NOT RECALL HEARING ABOUT IT BEFORE THAT, NO.

18   Q.   OKAY.  AND SO YOUR KNOWLEDGE OF PLATFORA CAME FROM

19   MR. KAIL?

20   A.   TO THE BEST OF MY RECOLLECTION, YES.

21   Q.   AT SOME TIME LATER, DID ANYONE SUGGEST A PROOF OF CONCEPT

22   BE RUN FOR PLATFORA AT NETFLIX?

23   A.   I DON'T REMEMBER THAT IT WAS SUGGESTED, BUT I DO REMEMBER

24   WE GOT TO A POINT WHERE THAT WAS THE COURSE THAT WE DID CHOOSE.

25   Q.   AND ACCORDING TO THIS E-MAIL, MR. KAIL IS DIRECTING YOU TO

1    CHECK OUT PLATFORA.  DID YOU DO SO?

2    A.   YES.

3    Q.   AND WHAT WERE YOUR -- WHAT WERE YOUR IMPRESSIONS AFTER

4    LOOKING AT THE PLATFORA.COM WEBSITE?

5    A.   WELL, I THINK MY INITIAL IMPRESSION WAS THAT IT WAS IN THE

6    SPHERE OF THINGS THAT MIGHT SOLVE THE PROBLEMS WE WERE SEEKING,

7    SO SOMETHING THAT NEEDED MORE INVESTIGATION.

8    Q.   DID YOU KNOW ANYTHING ABOUT PLATFORA AS A COMPANY?

9    A.   I DIDN'T HAVE ANY DETAILED KNOWLEDGE OF THE INTERNALS OF

10   THE COMPANY.

11   Q.   WERE YOU AWARE OF WHETHER THEY WERE A NEW COMPANY OR HAD

12   BEEN AROUND FOR A LONG TIME?

13   A.   I THINK I WAS -- I WOULD HAVE BEEN AWARE THAT THEY WERE

14   RELATIVELY NEW.

15   Q.   PLEASE LOOK AT TAB 305 IN YOUR BINDER.

16        MR. RALPH, IS YOUR NETFLIX.COM E-MAIL ADDRESS ON -- OH.

17        ON THE -- IN YOUR BINDER AT EXHIBIT 305 ON THE FIRST PAGE,

18   ARE YOU CC'D ON THIS PARTICULAR COMMUNICATION?

19   A.   YES.

20   Q.   AND CC MEANS YOU'RE ONE OF A NUMBER OF PEOPLE WHO RECEIVE

21   THE E-MAIL?

22   A.   CORRECT.

23   Q.   AND MR. KAIL IS ALSO ON IT?

24   A.   YES.

25   Q.   AND DO YOU KNOW ANY OF THE OTHER INDIVIDUALS ON THIS

1      E-MAIL?

2      A.   YES.  I WOULD HAVE MET SPECIFICALLY MARK AT SOME POINT IN

3      THE FUTURE.  I'M NOT SURE WHAT MY -- WHETHER I KNEW HIM ON THIS

4      DATE.

5      Q.   OKAY.  AND THE -- THE DOCUMENT INDICATES THERE'S AN

6      ATTACHMENT, NETFLIX NDA, AND IT GOES ON.

7           DO YOU SEE THAT?

8      A.   YES.

9      Q.   DO YOU KNOW WHAT AN NDA IS?

10     A.   YES, IN THIS CONTEXT.  IT'S A NON -- THE ACRONYM STANDS

11     FOR NON-DISCLOSURE AGREEMENT, AND IT WOULD BE -- IT'S USUALLY A

12     CONTRACT THAT'S PRELIMINARILY SIGNED BEFORE COMPANIES EXCHANGE

13     SENSITIVE INFORMATION TO ENSURE THAT INFORMATION ISN'T SHARED

14     OUT OF CONTEXT OR INAPPROPRIATELY.

15     Q.   WHAT KIND OF INFORMATION IS SENSITIVE TO SHARE BETWEEN TWO

16     COMPANIES?

17     A.    IT COULD RANGE FROM INTELLECTUAL PROPERTY, TRADE SECRETS,

18     CONTRACTUAL, OR DETAILS OF RATE CARDS OR, YOU KNOW, THE RATE

19     THAT THEY WOULD CHARGE FOR SERVICES, THINGS OF THAT NATURE.

20     Q.   AND IS IT COMMON IN YOUR EXPERIENCE TO HAVE SIGNED NDA

21     AGREEMENTS BETWEEN TWO COMPANIES BEFORE PROOF OF CONCEPT

22     BEGINS?

23     A.   YES, IT'S QUITE COMMON EVEN BEFORE A PROOF OF CONCEPT

24     STAGE TO SIGN NDA'S, OR MUTUAL NDA'S.

25              MR. SAMPSON:  AND, YOUR HONOR, I MOVE FOR ADMISSION

1      OF EXHIBIT 305.

2              THE COURT:  ANY OBJECTION?

3              MS. JAYNE:  NO.

4              THE COURT:  IT WILL BE ADMITTED.

5          (GOVERNMENT'S EXHIBIT 305 WAS ADMITTED IN EVIDENCE.)

6              MR. SAMPSON:  MAY I PUBLISH?

7              THE COURT:  YES.

8              MR. SAMPSON:  DO I NEED TO ASK THE COURT EACH TIME,

9      OR CAN WE PUBLISH?

10             THE COURT:  NO.  AS SOON AS IT'S ADMITTED, YOU MAY

11     PUBLISH.  THANK YOU.

12             MR. SAMPSON:  THANK YOU.

13     Q.  SO ON THE FIRST PAGE, THIS IS THE E-MAIL THAT YOU'RE

14     RECEIVING AND IT INDICATES THERE'S AN ATTACHED NDA; IS THAT

15     CORRECT?

16     A.  THAT'S CORRECT.

17     Q.  AND MARK FLEMING, IS THAT SOMEONE THAT YOU EVER MET WITH?

18     A.  YES, I RECALL MEETING WITH HIM THROUGHOUT OUR ENGAGEMENT

19     WITH PLATFORA.

20     Q.  OKAY.  WHEN YOU SAY "ENGAGEMENT," DOES THAT MEAN THE PROOF

21     OF CONCEPT AND ANYTHING ELSE THAT HAPPENED BETWEEN THE TWO

22     COMPANIES?

23             MS. JAYNE:  OBJECTION.  LEADING.

24             THE COURT:  SUSTAINED.

25     BY MR. SAMPSON:

1    Q.   WHAT DOES "ENGAGEMENT" MEAN?

2    A.   ENGAGEMENT WOULD HAVE BEEN PRELIMINARY CONVERSATIONS,

3    EXPLORATIONS, PRESENTATIONS.  ALL OF THAT WOULD PRECEDE AND

4    LEAD UP TO A MORE SIGNIFICANT ENGAGEMENT.

5    Q.   WHAT IS MORE SIGNIFICANT?  WHAT DO YOU MEAN BY "MORE

6    SIGNIFICANT"?

7    A.   WELL, IT COULD MANIFEST AS A CONTRACT OR, AS WE'RE CALLING

8    IT HERE, PROOF OF CONCEPT OR THE COMPANIES WORKING TOGETHER.

9    Q.   DO YOU RECALL WHETHER THERE WAS A SPECIFIC TERM FOR ANY

10   PROOF OF CONCEPT BETWEEN PLATFORA AND NETFLIX?

11   A.   COULD YOU -- YOU MEAN -- WHAT DO YOU MEAN BY "TERM"?

12   Q.   A DURATION.

13   A.   I DIDN'T -- THERE WERE VARIOUS TIMELINES AND ACCEPTANCE

14   CRITERIA DEFINED, BUT I DON'T RECALL WHAT THAT TIMELINE WAS.

15   Q.   OKAY.  WHAT DOES "ACCEPTANCE CRITERIA" MEAN?

16   A.   WELL, IF YOU'RE SEEKING SERVICES AS A PRODUCT, YOU WANT TO

17   KNOW THAT THE PRODUCT IS ACTUALLY PERFORMING THOSE SERVICES FOR

18   YOU.

19   Q.   AND WERE YOU INVOLVED IN THE EVALUATION OF WHETHER

20   PLATFORA'S PRODUCT WAS DOING THE SERVICES THAT NETFLIX

21   REQUIRED?

22   A.   YES, I WOULD HAVE BEEN DIRECTLY INVOLVED.

23   Q.   AND WHAT -- WHAT DOES DIRECT INVOLVEMENT MEAN?  DID YOU

24   OPEN UP THE SOFTWARE AND LOG IN, FOR EXAMPLE?

25   A.   YES, THAT'S A GOOD DISTINCTION.  WE HAD SOFTWARE ENGINEERS

1    WORKING AT A DEEPER LEVEL.

2         BUT IN TERMS OF THE CRITERIA, ENGAGING WITH THEIR ACCOUNT

3    MANAGEMENT TEAM, SETTING UP THE DATES, EXPECTATIONS,

4    COMMUNICATING.  I WOULD HAVE BEEN DOING ALL OF THE LATTER.

5    Q.  WERE YOU INVOLVED AT ALL IN DISCUSSIONS OVER PRICING WITH

6    RESPECT TO PLATFORA?

7    A.  WITH RESPECT TO PLATFORA, I WAS LESS INVOLVED IN THE

8    PRICING DISCUSSIONS, ALTHOUGH PROBABLY PERIPHERALLY INVOLVED,

9    ON THE PERIPHERY.

10   Q.  IF YOU KNOW, WHO WAS INVOLVED IN ANY DISCUSSIONS ABOUT

11   PRICING FOR PLATFORA?

12   A.  WELL, I DO THINK MR. KAIL WOULD HAVE BEEN CERTAINLY IN

13   THIS CASE.

14        MS. JAYNE:  OBJECTION.  NOT SURE IF THE QUESTION

15   CALLED FOR SPECULATION.

16        THE COURT:  OVERRULED.

17   BY MR. SAMPSON:

18   Q.  SO WHAT -- WHAT DID YOU DO IN TERMS OF YOUR EVALUATION OF

19   WHETHER THE PLATFORA SOLUTION WAS APPROPRIATE FOR NETFLIX'S

20   NEEDS FOR YOUR AD TECH ROLE?

21   A.  COULD YOU MAYBE REPEAT THE QUESTION?  YOU MEAN MY SPECIFIC

22   ROLE IN THE LARGER EXAMINATION?

23   Q.  ESSENTIALLY, YES.  WHAT WAS YOUR -- WHAT DID YOU DO IN

24   TERMS OF EVALUATING PLATFORA AS A SOLUTION TO NETFLIX'S NEEDS?

25   A.  WE WERE ALLOCATING RESOURCES TO STAND UP AND TEST THE

1     SOLUTION.  WE WERE EXPOSING IT TO ENGINEERS AND OTHER MEMBERS

2     OF THE TEAM TO HELP WITH ASSESSMENTS, AND YOU COULD SAY

3     COORDINATING THE EVALUATION IN A SENSE.

4     Q.   AND DO YOU RECALL THE NAMES OF ANY OTHER PEOPLE THAT WERE

5     INVOLVED IN THAT TESTING?

6     A.   YES, I DO.

7     Q.   AND WHAT ARE THEIR NAMES?

8     A.   WE HAD ENGINEERS FROM MIKE'S BROADER TEAM, YINGKUAN AND

9     JAN; AND THEN WE HAD SOME ENGINEERS FROM ANOTHER ENGINEERING

10    ORGANIZATION, I THINK PRIYANK WAS ONE AND KAUSHIK WAS ANOTHER

11    NAME THAT WAS INVOLVED; AND THEN GAGAN HASTEER, WHO WOULD HAVE

12    BEEN A PEER OF MINE ON THE ENGINEERING SIDE AS WELL WAS

13    INVOLVED AT SOME POINT.

14    Q.   NOW, UNDERSTANDING THAT PEOPLE FREQUENTLY USE FIRST NAMES

15    IN BUSINESS, YINGKUAN, DO YOU KNOW YINGKUAN'S LAST NAME?

16    A.   I DON'T RECALL IT SPECIFICALLY, NO.

17    Q.   OKAY.  AND HOW ABOUT JAN?

18    A.   JAN HAS A LAST NAME THAT STARTS WITH A K AND IT'S VERY

19    LONG AND I COULDN'T SPELL IT FOR YOU OR PRONOUNCE IT.

20    Q.   AND DID THOSE -- WERE THOSE BOTH ENGINEERS, JAN AND

21    YINGKUAN?

22    A.   I -- IN THIS CONTEXT, WE WOULD CALL THEM ENGINEERS.  THEY

23    WEREN'T IN THE PROPER SOFTWARE ENGINEERING DEPARTMENT, BUT THEY

24    WERE ENGINEERS, YES.

25    Q.   ENGINEERS BY TRADE?

1    A.   THAT'S FAIR, YES.

2    Q.   AND DID YOU SOLICIT ANY FEEDBACK FROM THEM ABOUT THE

3    PRODUCT?

4    A.   YES.

5    Q.   AND DID YOU RUN ANY NETFLIX DATA SETS THROUGH PLATFORA TO

6    SEE IF IT FUNCTIONED PROPERLY?

7    A.   THAT -- YES, THAT WAS CENTRAL TO THE ENDEAVOR.

8    Q.   OKAY.  AND DID YOU ULTIMATELY MAKE A RECOMMENDATION TO

9    ANYONE ABOUT WHETHER PLATFORA WAS PROPERLY SUITED TO NETFLIX'S

10   NEEDS SUCH THAT IT SHOULD GO FORWARD?

11   A.   THE SHORT ANSWER IS YES.  WE WENT THROUGH VARIOUS LABORS

12   ABOUT RECOMMENDATIONS, YES.

13   Q.   AND WHO DID YOU MAKE THOSE RECOMMENDATIONS TO?

14   A.   WELL, THERE WERE A LOT OF EXTERNAL DISCUSSIONS, AND

15   ULTIMATELY I PORTRAYED MY FEEDBACK DIRECTLY TO PLATFORA AT A

16   SPECIFIC POINT IN THE PROCESS TOWARD THE END.

17   Q.   AND WAS MR. KAIL PRESENT FOR THAT CONVEYANCE OF YOUR

18   VIEWS?

19   A.   WHAT I WOULD CONSIDER THE INITIAL CONVEYANCE WHERE I GAVE

20   PLATFORA THE BULK OF MY FEEDBACK, LIKE MARK FLEMING WOULD HAVE

21   BEEN THERE, THAT NAME, AND MR. KAIL WOULD NOT HAVE BEEN IN THAT

22   PARTICULAR MEETING.

23   Q.   WAS MR. KAIL EVER IN A MEETING IN WHICH YOU TOLD PLATFORA

24   THAT YOU WERE NOT IN FAVOR OF GOING FORWARD WITH THEM?

25        MS. JAYNE:  OBJECTION.  MISSTATES TESTIMONY, ASSUMES

1    FACTS NOT IN EVIDENCE.

2            THE COURT:  SUSTAINED.

3    BY MR. SAMPSON:

4    Q.   WHAT WAS YOUR RECOMMENDED -- WHAT WAS YOUR FEEDBACK IN THE

5    MEETING WITH PLATFORA?

6    A.   THAT -- THAT THE SOLUTION DIDN'T MEET OUR NEEDS, IT WAS --

7    REQUIRED TOO MUCH MAINTENANCE, AND THAT I WOULD LOVE TO

8    REENGAGE DOWN THE LINE IF IT EVER FULFILLED THE PROMISE.  BUT

9    IT WASN'T RIGHT FOR US AT THAT TIME.

10   Q.   WAS THE -- DID THE PLATFORA SOFTWARE FUNCTION PROPERLY IN

11   YOUR -- IN TERMS OF YOUR ASSESSMENT?

12   A.   I -- I MEAN, THE GENERAL ANSWER WOULD BE NO.

13   Q.   AND YOU CONVEYED THAT TO PEOPLE -- TO EMPLOYEES OF

14   PLATFORA?

15   A.   YES, AND I -- WE PORTRAYED THAT IN GREAT DETAIL IN WRITTEN

16   FORMAT SO THAT, AS A GESTURE OF THE RELATIONSHIP WE HAD, TO

17   GIVE THEM FEEDBACK THAT WOULD BE USEFUL AS THEY DEVELOPED THE

18   PRODUCT.

19   Q.   AND IS FEEDBACK TO A THIRD PARTY VENDOR A TYPICAL PART OF

20   AN ASSESSMENT OF A VENDOR'S PRODUCT?

21   A.   I DON'T KNOW IF I'D CALL IT TYPICAL.  I GENERALLY TRY TO

22   DO THAT AS A GOOD GESTURE AND A GESTURE OF THE RELATIONSHIP.

23        BUT IT'S -- I WOULD REFRAIN FROM CALLING IT TYPICAL.

24   Q.   AND WHETHER OR NOT PLATFORA EMPLOYEES WERE PRESENT, DID

25   YOU CONVEY YOUR VIEWS ABOUT PLATFORA'S FIT AT NETFLIX DIRECTLY

1    TO MR. KAIL?

2    A.   YES, I THINK THAT WOULD HAVE -- WE WOULD HAVE, YOU KNOW,

3    DISCUSSIONS AND DEBATES AND VARIOUS FORUMS, YES.  I THINK IT

4    CAME UP MANY TIMES.  IT WAS A LONG DISCUSSION.

5    Q.   YOU HAD DISCUSSIONS WITH HIM ABOUT WHETHER PLATFORA WAS A

6    GOOD FIT AT NETFLIX?  IS THAT A FAIR CHARACTERIZATION?

7    A.   YES, ABSOLUTELY, ON MULTIPLE OCCASIONS THAT WAS A TOPIC,

8    ALONG WITH OTHER SOFTWARE.  BUT YES, CERTAINLY PLATFORA.

9    Q.   WHAT DID MR. KAIL SAY IN THESE MEETINGS?  WHAT WAS HIS --

10   WHAT WAS HIS VIEW?

11   A.   I -- I THINK IT'S HARD FOR -- I MEAN, I DON'T WANT TO

12   SPEAK FOR HIM.

13        I THINK IN GENERAL, I WAS MORE -- I WOULD SAY I WAS MORE

14   PESSIMISTIC THAN HE WAS ABOUT WHAT IT WAS OR COULD BE.

15   Q.   I UNDERSTAND YOU DON'T WANT TO SPEAK FOR HIM, BUT WHAT DO

16   YOU RECALL HIM SAYING ABOUT WHETHER OR NOT NETFLIX SHOULD

17   CONTINUE THE ENGAGEMENT WITH PLATFORA?

18   A.   I THINK HE SAID IT COULD BE A PROMISE IF THEY MEET CERTAIN

19   DELIVERY CRITERIA DOWN THE ROAD.

20   Q.   WHAT IS A DELIVERY CRITERIA?  WHAT WOULD THAT INVOLVE?

21   A.   WELL, I MEAN, EFFECTIVELY MAKING IT, THE PRODUCT FUNCTION

22   MORE EFFICIENTLY FOR OUR PURPOSES.

23   Q.   WERE THERE EFFICIENCY PROBLEMS WITH THE PLATFORA PRODUCT?

24   A.   I THINK THAT'S FAIR TO SAY, YES.

25   Q.   HOW DID THAT MANIFEST?

1    A.   IT MANIFEST ITSELF IN THE TIME IT TOOK TO PROCESS DATA,

2    THE INTUITIVE OR LACK OF INTUITIVE NATURE OF THE USER

3    INTERFACE, AND ULTIMATELY THE ABILITY TO MAKE WORK EASIER.

4    Q.   AND JUST TO BE CLEAR, USER INTERFACE, IS THAT WHEN -- IS

5    THAT WHAT A PERSON SEES ON THE SCREEN WITH RESPECT TO A

6    SOFTWARE PRODUCT?

7    A.   CORRECT.

8    Q.   OKAY.  AND WHEN YOU SAID TIME IT TAKES TO PROCESS DATA,

9    WERE THERE SPECIFIC -- DID PLATFORA PROMISE SPECIFIC TURNAROUND

10   TIMES FOR THE PROCESSING OF DATA, OR DID YOU -- DID NETFLIX

11   HAVE SPECIFIC EXPECTATIONS?

12   A.   WELL, WE CERTAINLY HAD EXPECTATIONS THAT THERE WOULD BE

13   INCREASES OF EFFICIENCY AND OPTIMIZED RESULTS, AND OFTENTIMES

14   THOSE -- THAT DIDN'T HAPPEN IN THIS CASE.

15   Q.   DID IT HAPPEN SLOWER THAN EXPECTED OR DID IT NOT HAPPEN AT

16   ALL?

17   A.   BOTH.

18   Q.   OKAY.  IS IT A COMMON TERM TO CALL SOMETHING BUGGY?

19   A.   THAT WOULD BE SLANG IN THE KIND OF SOFTWARE DEVELOPMENT

20   COMMUNITY, CERTAINLY.

21   Q.   OKAY.  DID YOU CONSIDER PLATFORA, AS YOU TESTED IT, TO BE

22   BUGGY?

23   A.   I -- I THINK THAT'S A FAIR STATEMENT.

24   Q.   PLEASE TAKE A LOOK, EITHER IN YOUR BINDER -- I GUESS IN

25   YOUR BINDER AT EXHIBIT 311.

```
 1              IS THIS AN E-MAIL BETWEEN YOU AND MR. KAIL?

 2    A.   YES, IT IS.

 3    Q.   AND IT'S DATED --

 4              MS. JAYNE:  EXCUSE ME, YOUR HONOR.  MY SCREEN --

 5              THE COURT:  MINE ISN'T ON.

 6              MR. SAMPSON:  THERE IT IS.

 7              MS. JAYNE:  YES, THANK YOU.

 8              THE CLERK:  I THINK IT JUST TAKES A MOMENT.

 9    BY MR. SAMPSON:

10    Q.   AND IT'S BOTH USING YOUR TRALPH@NETFLIX.COM AND MR. KAIL'S

11    NETFLIX.COM E-MAIL ADDRESS?

12    A.   YES.

13    Q.   AND WAS MR. KAIL'S NETFLIX.COM E-MAIL ADDRESS

14    MDKAIL@NETFLIX.COM?

15    A.   I WOULDN'T HAVE REMEMBERED THAT, BUT SEEING THIS, I

16    BELIEVE THAT TO BE THE CASE, YES.

17    Q.   THAT'S CONSISTENT WITH YOUR MEMORY?

18    A.   YES.

19    Q.   OKAY.  AND WHAT ARE YOU DISCUSSING IN THIS, IN THIS

20    E-MAIL?

21    A.   COULD YOU BE MORE SPECIFIC?  SHOULD I START AT THE BOTTOM?

22    Q.   WELL, IS PLATFORA A SUBJECT OF THIS CONVERSATION IN THIS

23    E-MAIL?

24    A.   I'M READING IT.

25         (PAUSE IN PROCEEDINGS.)
```

1          THE WITNESS:  YES, I DO SEE PLATFORA MENTIONED AT THE

2     TOP OF THE E-MAIL.  I WAS READING IT FROM THE BOTTOM, YES.

3     BY MR. SAMPSON:

4     Q.   AND E-MAILS WHEN PRINTED TYPICALLY ARE BACKWARDS, SO I

5     APOLOGIZE FOR THAT.

6     A.   YEAH, NO.

7          MR. SAMPSON:  YOUR HONOR, I MOVE FOR ADMISSION OF

8     EXHIBIT 311.

9          THE COURT:  ANY OBJECTION?

10          MS. JAYNE:  NO.

11          THE COURT:  IT WILL BE ADMITTED.

12     (GOVERNMENT'S EXHIBIT 311 WAS ADMITTED IN EVIDENCE.)

13     BY MR. SAMPSON:

14     Q.   SO ALTHOUGH PLATFORA DOESN'T COME UP IN THE E-MAIL FROM

15     MR. KAIL TO YOU -- WELL, PLATFORA ACTUALLY COMES UP AT THE TOP,

16     SO LET ME ASK YOU ABOUT YOUR E-MAIL TO MR. KAIL FROM 4:49 P.M.

17     ON AUGUST 1ST.

18          YOU MENTIONED OVERALL FEEDBACK THAT YOU RECEIVED.

19          IS THAT FEEDBACK ABOUT PLATFORA?

20     A.   THAT WOULD BE MY -- I WOULD SURMISE THAT.  BUT -- I

21     BELIEVE IT IS, YES.  I BELIEVE IT IS NOW THAT I REREAD IT.

22     Q.   AND MR. KAIL'S RESPONSE SPECIFICALLY NAMES PLATFORA;

23     CORRECT?

24     A.   CORRECT.

25     Q.   OKAY.  SO IS IT -- AND TELL ME IF I'M WRONG -- IS IT A

1    FAIR CHARACTERIZATION THAT YOU INDICATED TO MR. KAIL IN THIS

2    E-MAIL THAT YOU WOULD PREFER OTHER OPTIONS TO PLATFORA?

3              MS. JAYNE:  OBJECTION.  MISSTATES THE E-MAIL,

4    MISSTATES EVIDENCE.

5              THE COURT:  OVERRULED.

6              THE WITNESS:  COULD YOU REPEAT THE QUESTION, PLEASE?

7    BY MR. SAMPSON:

8    Q.  IS IT A FAIR CHARACTERIZATION OF YOUR E-MAIL FROM

9    4:49 P.M. THAT YOU ARE TELLING MR. KAIL THAT YOU WOULD PREFER

10   OTHER OPTIONS TO PLATFORA?

11             MS. JAYNE:  OBJECTION.  MISSTATES THE E-MAIL'S --

12             THE COURT:  OVERRULED.

13   BY MR. SAMPSON:

14   Q.  YOU CAN ANSWER.

15   A.  I'M STATING THAT THE FEEDBACK FROM THE GROUP OF

16   INDIVIDUALS THAT I HAD MENTIONED PREVIOUSLY WAS POINTING TOWARD

17   SUGGESTING THAT IT WASN'T AN OPTIMAL SOLUTION FOR US.

18   Q.  DID YOU AGREE WITH THAT FEEDBACK?

19   A.  YES.

20   Q.  AND WHAT WAS MR. KAIL'S RESPONSE TO YOU REGARDING

21   PLATFORA?

22   A.  WELL, THERE'S THREE SENTENCES THAT I THINK SAY THAT

23   EXPLICITLY.  DO YOU WANT ME TO READ THEM?

24   Q.  YES, PLEASE.

25   A.  "ON PLATFORA, I THINK WE SHOULD CONTINUE WITH THEM.  I'VE

1     CHATTED WITH YING AND JAN, THEY ARE BULLISH AND I HAVE A FULL

2     COMMIT FROM PLATFORA CEO AND INVESTORS.  I'LL TALK LIVE ABOUT

3     SOME OTHER DRIVING FACTORS."

4     Q.   AND WHAT IS OKOBOJI?

5     A.   OKOBOJI IS A -- MIKE AND I ARE BOTH FROM IOWA.  IT'S A

6     SMALL, I GUESS YOU'D CALL IT A RESORT COMMUNITY.  IT'S NOT

7     QUITE LAKE TAHOE, BUT IT'S IN NORTHWEST IOWA.

8     Q.   DID YOU END UP TALKING TO MR. KAIL ABOUT THESE OTHER

9     DRIVING FACTORS?

10    A.   I DON'T RECALL SPECIFICALLY WHAT THOSE DRIVING FACTORS

11    WOULD BE AND IF WE TALKED ABOUT THEM.

12    Q.   AND YING AND JAN, IS YING YINGKUAN?

13    A.   THAT WOULD -- I BELIEVE SO, YES.

14    Q.   AND I'M SORRY, JAN?

15    A.   I DON'T RECALL.  I WOULD SAY JAN, BUT IT -- BUT I'M -- I

16    CAN'T REMEMBER HOW TO PRONOUNCE HIS NAME.  I WOULD DEFER TO HIM

17    AS TO HOW HE PRONOUNCES HIS NAME.

18    Q.   DID MR. KAIL EVER TELL YOU ANYTHING ABOUT HIS

19    CONVERSATIONS WITH THE PLATFORA CEO AND INVESTORS, OTHER THAN

20    THIS DATA?

21    A.   IN -- YES.

22    Q.   WHAT DID HE SAY?

23    A.   WELL, I KNEW THAT THEY HAD ENGAGED IN A CONVERSATION OR

24    TWO.  I THINK THEY HAD -- I WAS INFORMED THAT THEY HAD GONE TO

25    DINNER AT SOME POINT.  SO I WAS INFORMED OF ENGAGEMENTS SUCH AS

1    THAT.

2    Q.   YOU WERE INFORMED BY WHOM?

3    A.   MIKE.

4    Q.   MR. KAIL?

5    A.   YES.

6    Q.   OKAY.  SO MR. KAIL HAD SOME MEETINGS WITH PLATFORA THAT

7    YOU WERE NOT PRESENT FOR?  IS THAT YOUR UNDERSTANDING?

8    A.   THAT'S MY BELIEF, YES.

9    Q.   OKAY.  OTHER THAN INDICATING TO MR. KAIL THAT THE FEEDBACK

10   YOU RECEIVED POINTED TO OTHER OPTIONS, DID YOU CONVEY DIRECTLY

11   TO MR. KAIL YOUR VIEW ABOUT WHETHER PLATFORA WAS A GOOD FIT FOR

12   NETFLIX?

13   A.   TO THE BEST OF MY RECOLLECTION, YEAH, THAT WOULD HAVE BEEN

14   CONVEYED.

15   Q.   WOULD THAT HAVE BEEN IN ONE OF THE MANY CONVERSATIONS THAT

16   YOU HAD WITH MR. KAIL ABOUT PLATFORA?

17   A.   YES, AND PROBABLY IT WAS NUMEROUS ONES.

18   Q.   DID YOU FEEL PRESSURE FROM MR. KAIL TO FIND A USE FOR

19   PLATFORA IN ADVERTISING TECHNOLOGY?

20   A.   I WOULDN'T DESCRIBE MYSELF AS FEELING PRESSURED TO, NO.

21   Q.   DID -- WHO -- DID NETFLIX CONTINUE THE ENGAGEMENT AFTER

22   YOUR RECOMMENDATION TO MR. KAIL, DID NETFLIX CONTINUE THE

23   ENGAGEMENT WITH PLATFORA?

24   A.   THAT -- THAT'S WHAT I BELIEVE TO BE THE CASE, YES, THAT

25   THEY DID CONTINUE.

1     Q.   AND WHO APPROVED IT?

2     A.   IT DEPENDS WHAT YOU MEAN BY APPROVAL.  I'M NOT PRIVY TO

3     WHO SIGNED CONTRACTS AND THINGS OF THAT NATURE.  I DON'T

4     BELIEVE IT WAS ME.

5     Q.   OKAY.  DO YOU BELIEVE IT WOULD HAVE BEEN ANYBODY AT A, AT

6     A LOWER LEVEL IN AD TECH OR I.T. THAN YOU?

7     A.   THAT'S UNLIKELY.

8     Q.   AND IS IT CORRECT THAT YOU DID NOT SEE ANY CONTRACTS THAT

9     NETFLIX, ANYONE AT NETFLIX SIGNED WITH PLATFORA?

10    A.   I DON'T RECALL IF I SAW THEM, AND I DON'T BELIEVE I DID.

11    I CERTAINLY DON'T BELIEVE I EXECUTED ANY OF THEM, MEANING

12    SIGNED THEM MYSELF.

13    Q.   THANK YOU.

14         WAS THERE EVER -- DID MR. KAIL EVER CALL FOR A MEETING TO

15    BE HAD BETWEEN PEOPLE AT NETFLIX THAT WERE EVALUATING PLATFORA

16    AND PLATFORA EMPLOYEES OR OFFICERS?

17    A.   YES.

18    Q.   PLEASE LOOK AT TAB 323.

19    A.   OKAY.

20    Q.   ACTUALLY, BEFORE WE GO TO 323, I'D LIKE TO GO TO 320.  I

21    APOLOGIZE.

22         AND PLEASE START AT THE END BECAUSE IT'S AN E-MAIL.

23         DO YOU SEE YOUR E-MAIL ADDRESS ON THE DOCUMENT?

24    A.   YES, I DO.

25    Q.   AND THERE'S A JAN KRIVOCHEIA.  IS THAT THE JAN YOU

1    TESTIFIED ABOUT?

2    A.   YES.

3    Q.   AND IS -- THERE'S A YINGKUAN LIU, L-I-U.  IS THAT THE

4    YINGKUAN YOU WERE TESTIFYING ABOUT?

5    A.   YES.

6    Q.   OKAY.  SO BEGINNING AT THE BOTTOM OF THIS DOCUMENT, OR

7    FIRST IN TIME, IT APPEARS TO BE DATED SEPTEMBER 4TH, 2013 AT

8    8:00 IN THE MORNING.

9         DO YOU SEE THAT?

10   A.   8:37, YES.

11   Q.   AND IT'S FROM MR. KAIL AT HIS NETFLIX.COM E-MAIL ADDRESS?

12   A.   CORRECT.

13   Q.   AND WHAT IS MR. KAIL ASKING TO BE DONE?

14   A.   WELL, JUST READING IT, ASKING FOR FEEDBACK ON WHERE WE

15   FEEL PLATFORA IS WITH RESPECT TO BEING A VIABLE SOLUTION.

16   Q.   AND AFTER THAT, THERE IS -- IS IT FAIR TO SAY THERE'S

17   CONVERSATION INVOLVING JAN KRIVOCHEIA, YINGKUAN LIU, AND

18   YOURSELF?

19   A.   CORRECT.

20   Q.   AND THE SUBJECT IS "PLATFORA STATUS," QUESTION MARK?

21   A.   THAT'S THE SUBJECT OF THE E-MAIL THREAD, CORRECT.

22        MR. SAMPSON:  OKAY.

23        YOUR HONOR, I'D MOVE FOR ADMISSION OF EXHIBIT 320.

24        THE COURT:  ANY OBJECTION?

25        MS. JAYNE:  NO.

1          THE COURT:  IT WILL BE ADMITTED.

2          (GOVERNMENT'S EXHIBIT 320 WAS ADMITTED IN EVIDENCE.)

3          MR. SAMPSON:  CAN WE GO TO PAGE 4.

4   Q.   SO TO BEGIN WITH IN THIS E-MAIL, MR. KAIL ASKS YINGKUAN

5   AND JAN TO PROVIDE HIM AND TONY -- IS THAT YOU?

6   A.   CORRECT.

7   Q.   MR. KAIL ASKS YINGKUAN AND JAN TO PROVIDE HIM AND YOU

8   WITH, QUOTE, "CANDID FEEDBACK ON WHERE YOU FEEL PLATFORA IS

9   WITH RESPECT TO BEING A VIABLE SOLUTION TO BUILD LENSES AGAINST

10  OUR AD DATA AND THEN DOING REASONABLY RICH VISUALIZATION."

11         IS THAT CORRECT?

12  A.   THAT'S HOW I READ IT, YES.

13  Q.   OKAY.  AND GO TO PAGE 3.

14         THERE IS A LENGTHY RESPONSE FROM JAN, INCLUDING PROS AND

15  CONS; CORRECT?

16  A.   YES, I SEE THAT.

17  Q.   BUT JAN'S -- JAN'S ANSWER AT THE BOTTOM IS -- IT SAYS YAY;

18  CORRECT?

19  A.   YES.

20  Q.   AND THEN YINGKUAN PROVIDES A LENGTHY RESPONSE A LITTLE

21  LATER IN THE AFTERNOON; CORRECT?

22  A.   IT LOOKS LIKE HE RESPONDED ON SEPTEMBER 4TH AT 12:30 P.M.

23  TO ANSWER LITERALLY.

24  Q.   AND IF MR. LIU'S VIEW WAS THAT IT WAS NOT QUITE THERE YET,

25  IS THAT CONSISTENT WITH YOUR CONVERSATIONS WITH MR. LIU?

1          MS. JAYNE:  OBJECTION.  MISSTATES TESTIMONY --

2    EVIDENCE.

3          THE CLERK:  COUNSEL, I NEED YOU TO SPEAK INTO THE

4    MICROPHONE.  THE COURT REPORTER CAN'T HEAR.

5          THE COURT:  YOU ACTUALLY DON'T KNOW IF THE WITNESS IS

6    LOOKING AT THE SAME THING I'M LOOKING AT.

7    BY MR. SAMPSON:

8    Q.  MR. RALPH, ARE YOU LOOKING AT AN E-MAIL CHAIN DATED

9    BETWEEN SEPTEMBER -- ALL DATED ON SEPTEMBER 4TH, 2013, SUBJECT,

10   "PLATFORA STATUS"?

11   A.  YES.  YES, I AM.

12   Q.  TAB 320.

13   A.  YES, I AM LOOKING AT THE FOURTH AND THIRD PAGES.

14   Q.  OKAY.  OKAY.  LET'S GO TO THE FIRST PAGE.

15          THE COURT:  I DON'T KNOW THE EXHIBIT FIRST PAGE.  IS

16   THAT --

17          MR. SAMPSON:  320-1.

18          THE COURT:  THANK YOU.

19   BY MR. SAMPSON:

20   Q.  AT THE BOTTOM, IS THAT YOUR FIRST RESPONSE TO THESE

21   E-MAILS?

22   A.  YES, THAT LOOKS TO BE MY FIRST RESPONSE TO THIS, WITHIN

23   THIS THREAD.

24   Q.  AND THE LAST PARAGRAPH STATES THAT GIVEN PLATFORA'S --

25   QUOTE, "GIVEN PLATFORA WILL NEVER CATCH UP TO SPOTFIRE/TABLEAU

1     FROM A UI PERSPECTIVE AND WE ALREADY HAVE A TABLEAU LICENSE, IT

2     IS HARD FOR ME TO JUSTIFY PLATFORA IN ITS PRESENT STATE."

3          IS THAT WHAT YOU STATE TO MR. KAIL AND OTHERS?

4     A.   THAT'S HOW I LITERALLY READ IT, YES, AND THAT WOULD BE

5     WHAT I WOULD HAVE TYPED.  AND THAT ALL SOUNDS FROM THE PREVIOUS

6     QUESTION OF WHETHER WE HAVE A TABLEAU LICENSE.

7     Q.   DOES THAT REFRESH YOUR RECOLLECTION AS TO WHETHER PLATFORA

8     HAD A TABLEAU LICENSE?

9     A.   YES.

10    Q.   I'M SORRY.  WHETHER NETFLIX HAD A TABLEAU LICENSE?

11    A.   YES.  AS I READ IT, I WOULD HAVE BEEN AUTHORITATIVELY

12    AWARE OF THAT AT THAT TIME.

13          MS. JAYNE:  I'M SORRY, COUNSEL.  WHAT PAGE ARE YOU

14    ON?

15          THE COURT:  WE'RE NOT SEEING WHAT THE WITNESS IS

16    SEEING.

17          MR. SAMPSON:  PAGE 2.

18    Q.   AND ON PAGE 2, THE STATEMENT I READ IS THE SECOND

19    PARAGRAPH FROM THE TOP; CORRECT?

20    A.   THAT'S RIGHT.

21    Q.   SO YOUR STATED VIEW TO MR. KAIL WAS THAT PLATFORA WOULD

22    NEVER CATCH UP TO SPOTFIRE OR TABLEAU; CORRECT?

23    A.   YES, AND THEN I SAY "IN ITS PRESENT STATE" IN ITALICS

24    THERE.

25    Q.   AND THAT WAS AS OF SEPTEMBER 2013?  SEPTEMBER 4TH, 2013?

1    A.   YES.

2    Q.   AND AT THE VERY TOP OF THE E-MAIL, DOES MR. KAIL RESPOND

3    TO ALL OF THESE E-MAILS?

4    A.   YES.

5    Q.   AND COULD YOU READ HIS STATEMENT?

6    A.   I THINK THE LAST RESPONSE I SEE IS "THE 3 OF US SHOULD

7    MEET FOR 5 MINUTES TO DISCUSS PLATFORA.  I HAD A VERY

8    PRODUCTIVE MEETING WITH THEM TONIGHT."

9    Q.   DID HE -- DID YOU HAVE THAT FIVE MINUTE MEETING?

10   A.   WE CERTAINLY FOLLOWED UP AND HAD DISCUSSIONS.  I DON'T

11   REMEMBER SPECIFICALLY A FIVE MINUTE MEETING.

12   Q.   OKAY.  DID HE TELL YOU -- DO YOU RECALL HIM SAYING WHAT

13   WAS PRODUCTIVE ABOUT HIS MEETING WITH THEM THAT NIGHT?

14   A.   I CAN -- I CAN ONLY SPEAK TO IT IN GENERALITIES.  I DON'T

15   REMEMBER THE SPECIFICS OF IT.

16   Q.   WHAT DO YOU RECALL MR. KAIL TELLING YOU ABOUT MEETINGS

17   THAT HE HAD WITH PLATFORA THAT YOU WERE NOT PRESENT FOR?

18   A.   I RECALL HIM BEING GENERALLY POSITIVE THAT THE VISION AND

19   EVOLUTION OF PLATFORA COULD EVENTUALLY BE WHERE WE WANTED IT TO

20   BE.

21   Q.   DID HE SAY ANYTHING ABOUT HOW FAR DOWN THE ROAD THAT WOULD

22   BE?

23   A.   I DON'T RECALL THE SPECIFICS OF THAT.

24   Q.   PLEASE LOOK AT TAB 323.  HOPEFULLY IT'S A ONE-PAGE E-MAIL.

25   A.   I HAVE IT.

1    Q.   OKAY.  AND ARE YOU INCLUDED IN THE TO COLUMN OF THE

2    E-MAIL?

3    A.   YES.

4    Q.   OKAY.  AS WELL AS MR. KAIL IS THE, IS THE WRITER OF THE

5    E-MAIL; IS THAT CORRECT?

6    A.   YES.

7    Q.   AND THE SUBJECT IS "PLATFORA AT NETFLIX"?

8    A.   CORRECT.

9         MR. SAMPSON:  YOUR HONOR, I MOVE FOR ADMISSION OF

10   EXHIBIT 323.

11        THE COURT:  ANY OBJECTION?

12        MS. JAYNE:  NO.

13        THE COURT:  IT WILL BE ADMITTED.

14   (GOVERNMENT'S EXHIBIT 323 WAS ADMITTED IN EVIDENCE.)

15   BY MR. SAMPSON:

16   Q.   IS THIS AN E-MAIL THAT MR. KAIL SENT TO YOU AND OTHERS

17   BOTH AT NETFLIX AND PLATFORA?

18   A.   YES.

19   Q.   WHO IS BEN WERTHER, IF YOU KNOW?

20   A.   I RECALL HIM TO BE EITHER THE FOUNDER OR CEO OF PLATFORA.

21   Q.   AND WHO IS MIKE ASHER, IF YOU KNOW?

22   A.   I DON'T REMEMBER MIKE'S SPECIFIC ROLE AT PLATFORA.

23   Q.   DID YOU -- HAVE YOU MET MR. ASHER?

24   A.   I -- I BELIEVE I DID, YES.

25   Q.   AND HAVE YOU MET MR. WERTHER IN PERSON?

1    A.   I -- AT LEAST ONE AND MAYBE ONLY ONE TIME.

2    Q.   AND COULD YOU READ -- COULD YOU PLEASE READ -- WELL, COULD

3    YOU ACTUALLY PLEASE FIRST JUST DESCRIBE WHAT MR. KAIL IS, IS

4    STATING OR DOING IN THIS E-MAIL.

5    A.   HE'S SUGGESTING THAT REPRESENTATIVES OF PLATFORA AND

6    NETFLIX CONVENE OR RECONVENE TO DISCUSS THE STATUS OF THE

7    PARTNERSHIP AND RELATED EXPECTATIONS.

8    Q.   SO THIS E-MAIL IS COMING AFTER MR. KAIL SOLICITED AND

9    RECEIVED SOME FEEDBACK FROM YOU AND JAN AND YINGKUAN AS WE SAW

10   IN EXHIBIT 320; CORRECT?

11   A.   WELL, CAN I LOOK AT THE DATE OF THE EXHIBIT ON 320 TO MAKE

12   SURE?

13   Q.   ABSOLUTELY.

14   A.   SO 320 WAS IN SEPTEMBER.  THAT WAS ON SEPTEMBER 4TH.

15        THIS IS SEPTEMBER 9TH, SO IT WOULD HAVE BEEN, YES,

16   APPROXIMATELY FIVE DAYS AFTER IT LOOKS LIKE.

17   Q.   OKAY.  AND IS MR. KAIL CALLING FOR A MEETING WITH BOTH

18   PLATFORA PEOPLE AND YOU AND OTHERS AT NETFLIX?

19   A.   YES, I SEE THAT LITERALLY IN THE LAST SENTENCE OF THE

20   E-MAIL.

21   Q.   OKAY.  AND IN THE SECOND TO THE LAST PARAGRAPH, MR. KAIL

22   STATES "TONY AND I CAUGHT UP EARLIER TODAY, AND, NOT TO SPEAK

23   DIRECTLY FOR HIM, BUT TO SUMMARIZE, IT DOESN'T PROVIDE HIM THE

24   INSIGHT THAT HE NEEDS VISUALLY, ESPECIALLY WHEN COMPARED TO

25   TABLEAU + REDSHIFT AND THE 'SHIELDING' OF HIM FROM THE DATA IS

1    ACTUALLY A MINUS, NOT A PLUS THAT IT IS IN MANY CASES."

2         AND HE SAYS, "TONY, PLEASE CORRECT ME IF I STATED THIS

3    INCORRECTLY."

4         DID HE CORRECTLY CHARACTERIZE YOUR FEEDBACK ON PLATFORA AT

5    THE TIME?

6    A.   YES, I WOULD -- THAT'S CORRECT.

7    Q.   AND AT THE LAST SENTENCE, IT LOOKS LIKE -- HE SAYS, "IT

8    WOULD PROBABLY BE MOST BENEFICIAL TO HAVE A GROUP MEETING (OR

9    CALL) TO FULLY DISCUSS THIS."

10        DID THAT MEETING HAPPEN?

11   A.   I BELIEVE THERE WERE MEETINGS SUBSEQUENT TO THIS.  I DON'T

12   KNOW THAT IT WAS SPECIFIC IN RELATION TO THIS THREAD WITH THESE

13   PEOPLE.  BUT THERE CERTAINLY WOULD HAVE BEEN FURTHER

14   CONVERSATION.

15   Q.   DO YOU RECALL IF IT WAS SHORTLY AFTER OR SOME LONGER TIME

16   AFTER SEPTEMBER 9TH, 2013?

17   A.   I DON'T RECALL SPECIFICALLY, NO.  I -- GIVEN THE CONTEXT,

18   IT WOULD HAVE BEEN RELATIVELY NEAR IN TIME.

19   Q.   DID MR. WERTHER ATTEND?

20   A.   THE ONLY SPECIFIC MEETING I RECALL WITH MR. WERTHER WAS ME

21   AND MR. WERTHER AND MR. KAIL.  HE MIGHT HAVE BEEN PRESENT IN

22   OTHER CASES, BUT I DON'T HAVE A SPECIFIC RECOLLECTION OF THAT.

23   Q.   AND WHO DO YOU RECALL -- WHAT SPECIFIC RECOLLECTION DO YOU

24   HAVE OF THE MEETING WITH MR. WERTHER, MR. KAIL, AND YOURSELF?

25   A.   IN THAT CASE, I REMEMBER MIKE, MR. KAIL, PROMPTING ME

1      SPECIFICALLY TO GIVE MY CANDID FEEDBACK ON WHAT WAS AND WAS NOT

2      WORKING FOR ME WITH THE TOOL, AND ALTHOUGH SLIGHTLY

3      UNCOMFORTABLE, I WAS HAPPY TO DO THAT.

4           AND THEN THE CONVERSATION PROCEEDED FROM THERE.

5      Q.   HOW DID IT PROCEED?  WAS THERE A RESULT?

6      A.   WELL, AFTER I GAVE MY FEEDBACK, THE CONVERSATION PROCEEDED

7      TO MORE OF AN INTERACTION WITH MR. KAIL AND MR. WERTHER AND I

8      WASN'T AS MUCH A PART OF THAT.

9      Q.   WHAT DID THEY DISCUSS?

10     A.   TO MY RECOLLECTION, THEY DISCUSSED THE -- TO THE BEST OF

11     MY RECOLLECTION, THEY DISCUSSED THE DETAILS OF A PREVIOUS

12     CONVERSATION AND, YOU KNOW, DEAL IN THE MAKING.

13     Q.   WHAT -- WHAT WAS THE DEAL IN THE MAKING?  WHAT DID THEY

14     SAY THAT YOU UNDERSTOOD IT TO BE?

15     A.   I DIDN'T HAVE FULL CONTEXT ON WHAT THAT WAS.

16     Q.   BUT WHAT DID THEY SAY?

17          MS. JAYNE:  OBJECTION.  CALLS FOR HEARSAY, ASKS TO --

18          THE COURT:  WHY DON'T YOU RESTATE THE QUESTION?

19     BY MR. SAMPSON:

20     Q.   WHAT WAS THE SUBJECT OF THE DISCUSSION THAT YOU WERE

21     PRESENT FOR BETWEEN MR. KAIL AND MR. WERTHER?

22          MS. JAYNE:  OBJECTION.  CALLS FOR HEARSAY.

23          THE COURT:  OVERRULED.

24          THE CLERK:  COUNSEL, I NEED YOU TO USE THE MICROPHONE

25     PLEASE.

1          THE COURT:  YOU NEED TO BRING IT CLOSER.

2          MS. JAYNE:  YEAH.

3     BY MR. SAMPSON:

4     Q.   YOU CAN ANSWER.

5     A.   OH.  COULD YOU PLEASE REPEAT THE QUESTION?

6     Q.   WHAT WAS THE SUBJECT OF THE DISCUSSION THAT MR. KAIL AND

7     MR. WERTHER WERE HAVING?

8     A.   IT SEEMED TO BE A CONTINUATION FROM A DISCUSSION OR

9     NEGOTIATION OF SOMETHING THAT HAD STARTED PREVIOUSLY, I THINK

10    OVER A DINNER THEY HAD HAD.

11    Q.   AND IT WAS A DISCUSSION AND NEGOTIATION OF WHAT

12    SPECIFICALLY?

13    A.   HOW TO PROCEED FORTH WITH A ONGOING ENGAGEMENT OF SOME

14    FORM OR FASHION.

15    Q.   DID YOU LEAVE THE MEETING WITH ANY IMPRESSION ABOUT

16    WHETHER PLATFORA WOULD BE GOING FORWARD AT NETFLIX?

17    A.   MY MOST DISTINCT RECOLLECTION WAS AN UNEASY FEELING IN MY

18    STOMACH AND BEING QUITE UPSET.

19    Q.   AND WHAT MADE -- WHAT ABOUT THAT CONVERSATION MADE YOU

20    UNEASY?

21    A.   IT FELT LIKE THE MERITS OF THE DEAL WEREN'T BASED ON THE

22    APPLICABILITY OF THE TOOL'S VALUE TO NETFLIX.

23    Q.   DID IT APPEAR TO YOU THAT THE MERITS OF THE DEAL WERE

24    BASED ON SOMETHING OTHER THAN THE MERITS -- THAT THE -- GOING

25    FORWARD WITH PLATFORA WAS BASED ON SOMETHING OTHER THAN THE

1      MERITS OF THE PRODUCT?

2                MS. JAYNE:  OBJECTION.  LEADING.

3                THE COURT:  OVERRULED.

4                THE WITNESS:  AND I SHOULD -- LET ME SAY, IT WASN'T

5      BASED ON THE IMMEDIATE MERITS OF THE TOOL AND TO WHAT EXTENT WE

6      WOULD BE INVOLVED IN, YOU KNOW, FIXING IT FOR THEM OR OUR

7      ABILITY TO USE IT WAS PART OF IT.

8           AND THEN IT JUST SEEMED LIKE WE WERE MAYBE MAKING A

9      DECISION FOR THE WRONG OR -- THE WRONG REASONS.

10     BY MR. SAMPSON:

11     Q.   WHAT IN YOUR MIND WOULD THE WRONG REASONS BE?

12     A.   FOR EXAMPLE, USING OUR RESOURCES TO HELP EVOLVE THAT

13     SOLUTION.

14     Q.   WAS THAT IN A WAY THAT YOU WOULD HAVE CONSIDERED

15     POTENTIALLY WASTEFUL TO NETFLIX?

16     A.   YES.

17     Q.   DID YOU -- DID YOU KNOW -- DID MR. KAIL EVER DISCUSS WITH

18     YOU WHETHER HE HAD ANY KIND OF INVOLVEMENT WITH PLATFORA,

19     OUTSIDE OF BEING INVOLVED IN --

20     A.   I -- NOT IN GREAT DETAIL.  I DID KNOW THAT HE HAD

21     PREVIOUS -- HE HAD WORKED WITH ONE OF THE TEAM MEMBERS OR BEEN

22     INVOLVED WITH THEM IN VARIOUS REGARDS.  BUT I WASN'T PRIVY TO

23     ALL OF THOSE DETAILS.

24     Q.   DO YOU KNOW WHICH TEAM MEMBER?

25     A.   I REMEMBER -- I THINK I REMEMBER A NAME OF THERESA

1    POSSIBLY, BUT I CAN'T BE SURE ABOUT THAT.

2    Q.   WITH RESPECT TO THE SOLUTION FOR AD TECH, WERE YOU THE

3    PRINCIPAL PERSON THAT THIS SOLUTION WOULD BE SERVING?

4    A.   WELL, IT WOULD HAVE BEEN MY TEAM MEMBERS AND THEN THE

5    MARKETERS THAT THEY WERE BUILDING SOLUTIONS FOR.  SO WE WERE

6    PROVIDING THE SOLUTION FOR OTHERS, BUT I WOULD HAVE BEEN

7    DIRECTLY INVOLVED.

8    Q.   AND WHEN YOU BEGAN THE DISCUSSION WITH PLATFORA, DID YOU

9    BELIEVE -- DID YOU KNOW WHO WAS IN CHARGE OF THAT -- DID YOU

10   HAVE ANY IMPRESSIONS ABOUT WHAT WAS IN CHARGE OF THAT

11   EVALUATION?

12   A.   I -- I SUPPOSE I WOULD HAVE BEEN THE DIRECT -- DIRECTLY

13   ACCOUNTABLE LEADER.

14   Q.   AND AFTER THIS CONVERSATION THAT -- BETWEEN MR. KAIL AND

15   MR. WERTHER WHERE YOU WERE PRESENT, DID YOU HAVE THAT SAME

16   IMPRESSION?

17   A.   I STILL WOULD HAVE CONSIDERED MYSELF THE ACCOUNTABLE

18   LEADER FOR DECISIONS IN THAT AREA KNOWING THAT, YOU KNOW, IN A

19   CHAIN OF COMMAND LIKE THAT, YOUR IMMEDIATE SUPERIOR CAN HAVE

20   OTHER -- CAN MAKE OTHER DECISIONS.  SO THERE'S ALWAYS THAT

21   CAVEAT I WOULD SAY.

22   Q.   DID YOU APPROVE A CONTRACT WITH PLATFORA?

23   A.   I DON'T BELIEVE I DID, NO.  I WOULDN'T HAVE RECOMMENDED

24   THAT.

25   Q.   DO YOU KNOW WHAT ULTIMATELY HAPPENED WITH THE ENGAGEMENT

1    BETWEEN PLATFORA AND NETFLIX?

2    A.   I ACTUALLY DON'T KNOW HOW LONG IT LASTED OR WHAT IT

3    ENTAILED.  OUR TEAM WASN'T -- DIDN'T END UP USING THAT

4    SOLUTION, AND I'M NOT SURE TO WHAT EXTENT OTHERS WOULD HAVE

5    BEEN INVOLVED OR WHAT EVENTUALLY CAME OF THE ENTAILMENTS OF ANY

6    DEAL.

7    Q.   SO AFTER SEPTEMBER OF 2013, AD TECH, AS FAR AS YOU KNEW,

8    DID NOT USE PLATFORA?

9    A.   I DON'T KNOW THAT IT -- THE SPECIFIC TIMELINES, BUT AT

10   SOME POINT IT WOULDN'T HAVE BEEN PART OF THE TOOL KIT WE USED

11   TO SOLVE THE PROBLEMS THAT WE WERE TRYING TO PROGRESS AGAINST.

12   Q.   WAS -- DID PLATFORA EVER LIST NETFLIX AS A CUSTOMER ON ITS

13   WEBSITE?

14   A.   I DO RECALL THAT COMING UP AS A TOPIC, AND THE WEBSITE

15   ALSO HAD SOME COLLATERAL --

16        MS. JAYNE:  OBJECTION.  THIS MAY CALL FOR SPECULATION

17   OR HEARSAY.

18        THE COURT:  WHY DON'T YOU LAY THE FOUNDATION?

19   BY MR. SAMPSON:

20   Q.   WELL, COULD YOU DEFINE SALES COLLATERAL, PLEASE?

21   A.   WELL, WHEN A SOFTWARE SALES TEAM GOES OUT TO SELL THEIR

22   PRODUCT, THEY WILL OFTEN TIMES ADVERTISE WHO THEY'RE PARTNERING

23   WITH TO BUILD THEIR CREDIBILITY.

24   Q.   DID IT COME TO YOUR ATTENTION AT SOME POINT THAT PLATFORA

25   WAS CLAIMING THAT NETFLIX WAS A CUSTOMER OF ITS, OF PLATFORA?

1      A.   YES.

2      Q.   AND DID THAT COME FROM SOMEONE ON -- ON YOUR TEAM?

3      A.   WELL, NOT -- I DON'T THINK IT CAME FROM ANYONE REPORTING

4      TO ME, BUT IT CAME FROM THE LARGER TEAM THAT I WAS ON.

5      Q.   DID YOU RAISE -- DID THAT CONCERN YOU AT THE TIME THAT YOU

6      HEARD IT?

7              MS. JAYNE:  OBJECTION.  IT'S ASSERTING HEARSAY.

8              THE COURT:  OVERRULED.

9      BY MR. SAMPSON:

10     Q.   YOU CAN ANSWER.

11     A.   IT WAS -- I WOULD HAVE PREFERRED IT NOT TO HAVE DONE THAT,

12     YES.

13     Q.   AND WHY WAS THAT?

14     A.   BECAUSE YOU WANT TO ASSOCIATE YOURSELF WITH THE BEST

15     COMPANIES AND YOU DON'T WANT TO LOOK LIKE YOU'RE RELYING UPON

16     CERTAIN SOLUTIONS WHERE, YOU KNOW, YOUR COMPANY WOULD DEEM TO

17     BE, YOU KNOW, DOMAIN EXPERTS, FOR EXAMPLE.

18     Q.   TO YOUR KNOWLEDGE, WAS NETFLIX RESTRICTIVE ABOUT WHEN

19     OTHER COMPANIES COULD USE ITS LOGO?

20     A.   I CAN'T STATE NETFLIX'S POLICY SPECIFICALLY THERE.

21          BUT MY OBLIGATION WAS TO BE CAREFUL WITH OUR BRAND IN

22     PUBLIC CONTEXTS OR OTHER CONTEXTS.

23     Q.   PLEASE LOOK AT EXHIBIT 338.  AND DON'T -- DO YOU HAVE IT

24     IN YOUR BINDER, SIR?

25     A.   YES, I DO.

1      Q.   AND -- IF YOU CAN PULL IT UP HERE.

2           AND IS THIS -- AT THE TOP, ARE YOU RESPONDING TO AN E-MAIL

3      THAT MR. KAIL SENT?

4      A.   YES, IT'S FROM ME TO MR. KAIL.

5      Q.   AND MR. KAIL, IS HE RESPONDING TO AN E-MAIL THAT

6      JAN KRIVOCHEIA SENT?

7      A.   YES.

8      Q.   AND IT'S -- AND THIS IS AN E-MAIL INVOLVING BOTH YOURS AND

9      MR. KAIL'S E-MAIL ADDRESSES AT NETFLIX?

10     A.   YES.

11     Q.   AND WHAT'S THE SUBJECT?

12     A.   "DID WE SIGNUP WITH PLATFORA," QUESTION MARK?

13     Q.   AND DO YOU RECALL THIS DISCUSSION?

14     A.   VAGUELY, AND NOW I DO SPECIFICALLY HAVING SEEN THIS.

15     Q.   OKAY.  IS THERE A DISCUSSION OF THE COLLATERAL, AS YOU

16     CALLED IT?

17     A.   YES.  THIS IS A SLIDE FROM PART OF PRESUMABLY A POWERPOINT

18     PRESENTATION, AND I DID GIVE IT THE TITLE OF COLLATERAL, YES.

19     Q.   AND IF IT WAS TRUE THAT PLATFORA WAS USING THE NETFLIX

20     LOGO, DID YOU FEEL WHETHER -- DID YOU FEEL THAT THAT WAS WRONG

21     AT THE TIME?

22     A.   I DON'T KNOW IF I'D USE THE PHRASE "WRONG," BUT I WOULD

23     HAVE PREFERRED THAT THAT DIDN'T HAPPEN AS I INDICATED IN THE

24     E-MAIL.

25     Q.   AND YOU STATED THAT TO MR. KAIL?

1    A.   CORRECT.

2              MR. SAMPSON:  YOUR HONOR, I MOVE FOR ADMISSION OF

3    EXHIBIT 338.

4              THE COURT:  ANY OBJECTION TO IT BEING ADMITTED.

5              MS. JAYNE:  THE LATTER PORTION DOES CONTAIN HEARSAY.

6              MR. SAMPSON:  IT'S NOT -- --

7              THE COURT:  OVERRULED.  IT'LL BE ADMITTED.

8         (GOVERNMENT'S EXHIBIT 338 WAS ADMITTED IN EVIDENCE.)

9    BY MR. SAMPSON:

10   Q.   OKAY.  SO THE SUBJECT IS "DID WE SIGNUP FOR PLATFORA,"

11   QUESTION MARK?

12   A.   CORRECT.

13   Q.   AND AT THE -- AT THE BOTTOM, MR. KRIVOCHEIA IS INDICATING

14   THAT HE WASN'T AWARE OF SWITCHING FROM POC TO PROD.

15        DO YOU SEE THAT?

16   A.   I DO SEE THAT, YES.

17   Q.   SO IS POC SHORT FOR PROOF OF CONCEPT?

18   A.   CORRECT.

19   Q.   WHAT IS PROD?

20   A.   A PRODUCTION ENVIRONMENT IN SOFTWARE IS WHERE YOU HAVE

21   HARDENED OR COMPLETE SOFTWARE.  OFTENTIMES YOU'LL BE DEVELOPING

22   AND STAGING A DEVELOPMENT ENVIRONMENT, AND WHEN THAT CODE IS

23   COMPLETE, YOU PUSH IT TO, QUOTE-UNQUOTE, PRODUCTION.

24   Q.   AND WHAT WAS MR. KAIL'S RESPONSE TO JAN KRIVOCHEIA'S

25   E-MAIL?

1    A.   IT SAYS, "THE POC TO PROD IS FULLY CONTINGENT UPON THEM

2    HITTING ALL OF THE 3.0 MILESTONES AND US GETTING VALUE FROM IT.

3    I'LL ADDRESS THE USAGE OF OUR LOGO WITH THEM."

4    Q.   AND WAS THAT NEWS TO YOU AT THE TIME IN OCTOBER 2013

5    REGARDING THE POC TO PROD BEING CONTINGENT UPON HITTING CERTAIN

6    MILESTONES?

7    A.   I DON'T -- I DON'T RECALL AT THAT TIME IF I HAD -- IF I

8    WOULD HAVE KNOWN THAT AT THIS SPECIFIC MOMENT.

9    Q.   OKAY.  AND WHAT WAS YOUR RESPONSE TO MR. KAIL?

10   A.   WELL, I -- MY -- I SAID I WOULD VOTE FOR TAKING IT DOWN,

11   MEANING I WOULD PREFER IT NOT TO BE THERE IF I HAD A VOTE OR

12   CHOICE IN THE MATTER.

13   Q.   AND YOU INDICATED WHY?

14   A.   I -- I DID, YES.

15   Q.   AND IT WAS BECAUSE IT, QUOTE, "ADDS NO VALUE FOR NETFLIX

16   AND POTENTIALLY HURTS OUR STREET CRED WITH ENGINEERS, INVESTORS

17   AND TECHNOLOGISTS"?

18   A.   THAT'S LITERALLY WHAT I SAID.  THAT'S PROBABLY BETTER

19   CALLED TECH CRED AS IT'S SOMETIMES KNOWN.  BUT, YES, THAT'S

20   WHAT I TYPED AT THE TIME.

21   Q.   AND YOU ADDED "SECONDARILY, NOT ALL INTERNAL TEAMS ARE ON

22   BOARD AND MIGHT BE SURPRISED TO SEE IT."

23        WAS THAT YOUR STATEMENT?

24   A.   THAT'S LITERALLY WHAT I WROTE, YES.

25   Q.   WHAT INTERNAL TEAMS WERE NOT ON BOARD?

1    A.   IT WOULD HAVE BEEN PRIMARILY, AS I RECALL, THE ENGINEERING

2    TEAMS THAT HAD BEEN INVOLVED IN THE ASSESSMENT.

3    Q.   AND AT THE TIME, WAS AD TECH GETTING ANY VALUE FROM

4    PLATFORA?

5    A.   I -- I DON'T BELIEVE WE EVER GOT VALUE FROM IT.

6         MS. JAYNE:  I'M SORRY.  I DIDN'T UNDERSTAND THE

7    ANSWER.

8         THE WITNESS:  I SAID I DON'T BELIEVE THAT WE EVER GOT

9    VALUE FROM IT, SO THE ANSWER WOULD BE NO.

10   BY MR. SAMPSON:

11   Q.   SO AFTER OCTOBER 16TH, 2013, DID YOU CHECK THE PLATFORA

12   WEBSITE TO SEE IF NETFLIX WAS LISTED AS A CUSTOMER ON

13   PLATFORA'S WEBSITE?

14   A.   I REMEMBER THAT COMING UP AS A TOPIC.  I DON'T REMEMBER IF

15   I SPECIFICALLY CHECKED.

16   Q.   PLEASE TAKE A LOOK AT EXHIBIT 339.  IS -- ARE YOU THERE,

17   SIR?

18   A.   YES.  YES, I AM.  I SEE IT.

19   Q.   AND THIS IS A ONE PAGE E-MAIL DATED NOVEMBER 8TH, 2013?

20   A.   YES.

21   Q.   AND DOES IT -- ARE YOU ON THE TO LINE OF THE E-MAIL?

22   A.   YES.

23   Q.   AND ARE MR. KRIVOCHEIA AND MR. LIU ON THE CC LINE?

24   A.   THAT'S CORRECT.

25   Q.   OKAY.  AND THE SENDER IS -- AND -- WELL, AND THIS IS AT

1    THE TOP, MR. KAIL IS RESPONDING TO AN E-MAIL THAT YOU SENT;

2    CORRECT?

3    A.   YES.

4    Q.   ALL USING YOUR NETFLIX E-MAIL ADDRESSES?

5    A.   YES.

6    Q.   AND THE SUBJECT IS "RE: PLATFORA CITING NETFLIX

7    PROMINENTLY AS A," QUOTE, "'CUSTOMER,'" END QUOTE?

8    A.   YES.

9         MR. SAMPSON:  YOUR HONOR, I MOVE FOR ADMISSION OF

10   339.

11        THE COURT:  ANY OBJECTION?

12        MS. JAYNE:  NO.

13        THE COURT:  IT WILL BE ADMITTED.

14   (GOVERNMENT'S EXHIBIT 339 WAS ADMITTED IN EVIDENCE.)

15   BY MR. SAMPSON:

16   Q.   DID YOU INCLUDE A SCREENSHOT OF PLATFORA'S WEBSITE IN YOUR

17   E-MAIL TO MR. KRIVOCHEIA, MR. LIU, AND MR. KAIL?

18   A.   YES, THAT LOOKS TO BE PRECISELY WHAT I DID.

19   Q.   OKAY.  AND SO IN ADDITION TO POTENTIALLY BEING ON, AS YOU

20   CALLED IT, COLLATERAL, YOU PERSONALLY LOOKED AT THE PLATFORA

21   WEBSITE AND SAW THAT NETFLIX WAS LISTED AS A CUSTOMER?

22   A.   THAT'S CORRECT.

23   Q.   OKAY.  AND YOU ASKED -- COULD YOU READ WHAT YOU SAID TO

24   MR. KAIL?

25   A.   I SAID, "MIKE, DID YOU ADDRESS THIS WITH THEM?  IT'S NOW

1    BEYOND A DECK AND IN THE SITE."

2         OKAY.  AND WHAT WAS MR. KAIL'S RESPONSE TO YOUR E-MAIL?

3    A.   "WILL ADDRESS NEXT WEEK, BIGGER ISSUES TO HANDLE."

4    Q.   DID YOU EVER TALK TO HIM ABOUT WHAT THE BIGGER ISSUES

5    WERE?

6    A.   NO, I DON'T RECALL HAVING CONTEXT ON WHAT THE BIGGER

7    ISSUES WOULD HAVE BEEN.

8    Q.   DID HE EVER CONFIRM TO YOU THAT HE TALKED TO PLATFORA

9    ABOUT THE USE OF THE NETFLIX LOGO ON PLATFORA'S SITE?

10   A.   I DON'T RECALL ME SEEKING FURTHER CONFIRMATION AND I DON'T

11   RECALL RECEIVING FURTHER CONFIRMATION.

12   Q.   MR. RALPH, WHAT IS A -- WELL, LET ME ASK IT THIS WAY:  DO

13   EMPLOYEES AT NETFLIX REVIEW EACH OTHER AS PART OF YOUR ROLES

14   AND YOUR WORK AT NETFLIX?

15   A.   YES.  IT'S THE KIND OF CULTURE WHERE THAT FEEDBACK IS

16   GIVEN ALL THE TIME, AND THEN THERE ARE SOME SPECIFIC MILESTONES

17   THROUGHOUT THE YEAR WHERE IT'S DONE MORE EXPLICITLY.

18   Q.   AND BY "MORE EXPLICITLY," IS THAT WRITTEN?

19   A.   YES, THERE IS A WRITTEN AND FORMAL PORTION TO IT.

20   Q.   OKAY.  AND DOES IT -- DOES IT INCLUDE FEEDBACK OF PEOPLE

21   WHO SUPERVISE YOU?

22   A.   IT WOULD INCLUDE ALL OF YOUR IMMEDIATE PEERS UP, DOWN,

23   HORIZONTALLY.  IT WAS QUITE OPEN AND INCLUSIVE IN THAT REGARD.

24   Q.   AND WERE EMPLOYEES ENCOURAGED TO BE HONEST IN THOSE

25   ASSESSMENTS?

1    A.   BEYOND HONEST, AND THE PHRASE OFTEN USED IS CANDID OR

2    CANDOR.  SO, YES, EVEN UNCOMFORTABLY SO, CORRECT.

3    Q.   AND IS THAT PART OF NETFLIX'S CULTURE, TO HAVE CANDOR WITH

4    YOUR COLLEAGUES?

5    A.   YES.

6    Q.   PLEASE TAKE A LOOK AT EXHIBIT 9, WHICH I HOPE IS THE FIRST

7    TAB IN YOUR BINDER.  I WANT TO DIRECT YOU TO A SPECIFIC PAGE IN

8    THAT EXHIBIT.

9    A.   UM-HUM.

10   Q.   PAGE 7.

11        DO YOU SEE YOUR NAME ON PAGE 7?

12   A.   I DO.

13   Q.   OKAY.  AND I BELIEVE IT CONTINUES ON TO -- IT DOES NOT.

14        COULD YOU JUST READ, NOT OUT LOUD, JUST LOOK AT THAT

15   STATEMENT AND TELL ME IF YOU ARE FAMILIAR WITH IT.

16        (PAUSE IN PROCEEDINGS.)

17            THE WITNESS:  YES, I AM FAMILIAR WITH THIS.

18   BY MR. SAMPSON:

19   Q.   AND SO WHAT -- IS THIS A STATEMENT THAT YOU MADE?

20   A.   YES.

21   Q.   AND WAS THIS YOUR STATEMENT WITH RESPECT TO MR. KAIL'S

22   REVIEW?

23   A.   IT WAS MY INPUT TOWARD THE REVIEW.  IT WASN'T A REFERENCE

24   TO ANOTHER REVIEW.  SO THIS WAS MY FEEDBACK TO HIM.

25   Q.   OKAY.  AND IS THIS -- THIS IS DONE ANNUALLY?

1    A.   IT WAS AT THAT TIME, YES.

2    Q.   OKAY.  AND WHAT WAS -- WAS THERE A NAME FOR THE REVIEW?

3    A.   I THINK -- I THINK THE PHRASE WE USED IS 360 DEGREE OR 360

4    FEEDBACK.

5    Q.   AND WHEN SOMEONE IS REVIEWED, ALL OF THE INDIVIDUALS, I

6    THINK YOU STATED ABOVE, BELOW, AND HORIZONTALLY, IS THAT ALL

7    COLLATED TOGETHER INTO ONE REPORT FOR AN EMPLOYEE?

8    A.   I WOULDN'T HAVE REMEMBERED THAT, BUT SEEING THIS, I'M NOW

9    REMINDED THAT, YEAH, THAT WOULD HAVE BEEN PART OF THE PROCESS.

10   Q.   AND SO YOU -- YOU WOULD BE REVIEWED AND YOU WOULD SEE THE

11   REVIEWS THAT PEOPLE GAVE OF YOUR PERFORMANCE; IS THAT CORRECT?

12   A.   ABSOLUTELY, YES.

13   Q.   AND YOU GAVE MR. KAIL A REVIEW IN 2014; IS THAT CORRECT?

14   A.   THIS IS MY REVIEW.  I'M NOT -- I CAN'T CONFIRM THAT THIS

15   IS 2014 UNLESS I FLIP THROUGH ANOTHER PAGE.  BUT --

16   Q.   OKAY.  BUT THIS IS A -- THIS IS A -- THIS IS YOUR

17   STATEMENT WITH RESPECT TO MR. KAIL'S 360 REVIEW?  IS THAT FAIR?

18   A.   THAT WOULD BE CORRECT, YES.

19        MR. SAMPSON:  OKAY.  YOUR HONOR, I WOULD MOVE TO

20   ADMIT PAGE 7 -- I WOULD MOVE TO ADMIT AT THIS TIME PAGE 7, THE

21   BOTTOM SECTION OF THIS DOCUMENT.

22        THE COURT:  ANY OBJECTION TO JUST THAT PORTION OF THE

23   DOCUMENT?

24        MS. JAYNE:  I DON'T HAVE AN OBJECTION TO THE ENTIRE

25   EXHIBIT.

1          MR. SAMPSON:  THEN MOVE FOR ADMISSION OF THE ENTIRE

2     EXHIBIT.

3          THE COURT:  OH.  THEN THE ENTIRE EXHIBIT WILL BE

4     ADMITTED.

5          (GOVERNMENT'S EXHIBIT 9 WAS ADMITTED IN EVIDENCE.)

6     BY MR. SAMPSON:

7     Q.   SO I THINK YOU'RE STILL WORKING ON PAPER, MR. RALPH.

8          DID -- THERE'S A SECOND BULLET POINT THAT I'D LIKE YOU TO

9     READ.  COULD YOU READ THAT ENTIRE SECOND BULLET POINT?

10    A.   YES, I CAN.  "LET'S ENSURE WE ARE IN COMMUNICATION

11    REGARDING EXPECTATIONS RELATIVE TO OUR VENDORS.  YOU SOMETIMES

12    HAVE PARALLEL CONVERSATION WITH," IT SHOULD BE CONVERSATIONS,

13    "WITH C-LEVEL EXECS OF OUR VENDORS AS THE TEAM IS HAVING

14    CONTRADICTORY CONVERSATIONS WITH OTHER CONTACTS.  IF WE REMAIN

15    IN SYNC WE PRESENT A CONSISTENT FRONT.  OF COURSE WE (THE TEAM)

16    OWE YOU THE SAME.  I BELIEVE WE (YOU AND I) HANDLED THIS RECENT

17    INTERACTION WITH METAMARKETS IN THIS FASHION."

18    Q.   SO WHEN YOU STATED THAT MR. KAIL SOMETIMES HAD PARALLEL

19    CONVERSATIONS WITH C-LEVEL EXECS OF OUR VENDORS, WAS PART OF

20    THIS FEEDBACK RELATED TO PLATFORA?

21          MS. JAYNE:  OBJECTION.  LEADING.

22          THE COURT:  OVERRULED.

23          THE WITNESS:  THAT WOULD HAVE BEEN INCLUDED IN THAT

24    TYPE OF BEHAVIOR, YES.  PLATFORA WOULD HAVE BEEN.

25

1      BY MR. SAMPSON:

2      Q.   AND THAT IS BECAUSE MR. KAIL HAD SOME MEETINGS WITH

3      PLATFORA THAT OTHER MEMBERS OF THE TEAM WERE NOT INVOLVED IN?

4               MS. JAYNE:  OBJECTION.  LEADING.

5               THE COURT:  OVERRULED.

6               THE WITNESS:  THAT WOULD HAVE BEEN ONE OF -- THAT

7      WOULD HAVE BEEN ONE MANIFESTATION, YES.

8      BY MR. SAMPSON:

9      Q.   AND SO OTHER PEOPLE, SUCH AS YOURSELF, WERE HAVING

10     POTENTIALLY CONTRADICTORY CONVERSATIONS WITH PLATFORA TO WHAT,

11     WHAT YOU BELIEVE MR. KAIL WAS HAVING WITH PLATFORA; IS THAT

12     CORRECT?

13     A.   YES, IN RETROSPECT, THAT WAS EVIDENT.

14     Q.   AND IN YOUR 360 REVIEW, THAT'S WHAT YOU REPORTED TO HIM;

15     CORRECT?

16     A.   THAT'S LITERALLY WHAT I SAID, YES.

17               THE COURT:  ARE YOU JUST ABOUT DONE WITH THIS

18     DOCUMENT?

19               MR. SAMPSON:  WE ARE JUST ABOUT DONE, YOUR HONOR.

20               THE COURT:  I NEED TO TAKE A LUNCH BREAK.

21               MR. SAMPSON:  CAN I JUST CONFER VERY BRIEFLY TO SEE

22     IF I HAVE ANY FURTHER QUESTIONS OF THIS WITNESS?

23               THE COURT:  OH, SURE.

24          (DISCUSSION OFF THE RECORD BETWEEN GOVERNMENT COUNSEL.)

25     BY MR. SAMPSON:

1    Q.   MR. RALPH, DID YOU KNOW WHETHER MR. KAIL WAS EVER A PAID

2    ADVISOR TO PLATFORA?

3    A.   I WAS NOT AWARE OF THAT AT THAT TIME.

4    Q.   WERE YOU AWARE OF THAT AT ANY TIME THAT MR. KAIL WORKED AT

5    NETFLIX?

6    A.   I DON'T -- WELL, POTENTIALLY.

7    Q.   DID THAT COME FROM MR. KAIL?

8    A.   NO.

9    Q.   WAS THAT FROM CONVERSATIONS WITH OTHER INDIVIDUALS AT

10   NETFLIX?

11   A.   NO.

12   Q.   WERE DID YOU LEARN THAT?

13   A.   IN SOME EARLY STAGES AFTER HE HAD LEFT NETFLIX, THERE WAS

14   SOME PRESS REGARDING CIRCUMSTANCES AND I WOULD HAVE LEARNED

15   ABOUT IT INDIRECTLY THROUGH THAT.

16   Q.   OKAY.  BUT THAT -- NOT WHILE MR. KAIL WORKED AT NETFLIX?

17   A.   CORRECT.  I WAS NOT AWARE OF, PRIVY TO THE PARTICULARS OF

18   THOSE SCENARIOS.

19            MR. SAMPSON:  NO FURTHER QUESTIONS.

20            THE COURT:  OKAY.  THIS IS A GOOD TIME FOR OUR BREAK

21   FOR LUNCH.  THEN WE'LL START THE CROSS-EXAMINATION AFTERWARDS.

22       ALL RIGHT.  LADIES AND GENTLEMEN, WE'RE GOING TO TAKE OUR

23   HOUR LONG LUNCH, AND LET'S COME BACK AT TEN MINUTES PAST 1:00,

24   AND TIFFANY WILL HELP YOU TO --

25            ARE THEY GOING TO GO BACK TO THE JURY ROOM?

RALPH DIRECT BY MR. SAMPSON                                    284

1              THE CLERK:  CORRECT, YOUR HONOR.

2              THE COURT:  OKAY.  LEAVE YOUR NOTEBOOKS ON YOUR

3    CHAIRS.  LET ME REMIND YOU YOU'RE NOT TO TALK ABOUT THE CASE

4    WITH EACH OTHER OR ANYONE ELSE.

5         IF YOU NEED TO CHECK E-MAILS OR DO ANYTHING ON YOUR OWN

6    DEVICES, THAT'S FINE.  JUST NOTHING ABOUT THE CASE, NO RESEARCH

7    OR INVESTIGATION.

8         HAVE A GOOD LUNCH AND I'LL SEE YOU IN AN HOUR.

9              THE CLERK:  COURT IS IN RECESS.

10        (THE LUNCH RECESS WAS TAKEN FROM 12:05 P.M. UNTIL

11   1:13 P.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **AFTERNOON SESSION**

2          (JURY IN AT 1:13 P.M.)

3               THE COURT:  GOOD AFTERNOON, EVERYONE.  PLEASE BE

4     SEATED.  WE ARE GOING TO GET BACK TO BUSINESS HERE.

5          OUR WITNESS HAS RETURNED.

6          AND, MR. RALPH, LET ME REMIND YOU YOU REMAIN UNDER OATH.

7          ALL OF OUR JURORS ARE PRESENT AND ALL COUNSEL AND PARTIES.

8          MS. JAYNE, WOULD YOU LIKE TO CROSS-EXAMINE THE WITNESS?

9               MS. JAYNE:  YES.  THANK YOU, YOUR HONOR.

10               THE COURT:  GO AHEAD, PLEASE.

11          **CROSS-EXAMINATION**

12     BY MS. JAYNE:

13     Q.  GOOD AFTERNOON, MR. RALPH.

14     A.  GOOD AFTERNOON.

15     Q.  WHEN YOU WORKED AT NETFLIX, YOU ALSO, I THINK, MANAGED A

16     NUMBER OF PEOPLE; CORRECT?

17     A.  WHEN I FIRST STARTED, I DIDN'T MANAGE ANYONE.  BUT WE DID

18     HIRE A NUMBER OF PEOPLE OVER TIME, YES.

19     Q.  AND YOU -- THOSE BECAME PEOPLE UNDER YOU; CORRECT?

20     A.  THAT'S CORRECT.

21     Q.  AND YOUR DIRECT REPORT WAS -- YOU DIRECTLY REPORTED TO

22     MR. KAIL?

23     A.  THAT'S CORRECT, WHILE MR. KAIL WAS THERE, YES.

24     Q.  OKAY.  AND DO YOU AGREE THAT WHEN YOU WORKED AT NETFLIX,

25     THE FREEDOM AND RESPONSIBILITY CULTURE WAS DIFFERENT THAN OTHER

1     COMPANIES YOU WORKED FOR?

2     A.   IT'S -- IT'S UNIQUE IN MANY REGARDS, CORRECT.

3     Q.   THERE AREN'T AS MANY RULES AND PROCEDURES AT NETFLIX?

4     A.   I WOULDN'T AGREE WITH THAT STATEMENT, BUT THEY'RE

5     IMPLEMENTED DIFFERENTLY AND THE DEBATE ABOUT THEM IS UNIQUE, I

6     WOULD SAY.

7     Q.   OKAY.  FOR EXAMPLE, ONE OF THOSE UNIQUE RULES IS THAT YOU

8     DON'T SEEK TO PLEASE YOUR BOSS; RIGHT?

9     A.   I DON'T REMEMBER THAT BEING EXPLICIT, BUT THAT WOULD BE

10    IMPLIED IN THE RULES AS I KNOW THEM, YES.

11    Q.   OKAY.  ANOTHER RULE, FOR EXAMPLE, IS FOR THOSE MANAGING,

12    TO MANAGE ON THE EDGE OF CHAOS; CORRECT?

13    A.   I DON'T RECALL THAT TENET.

14    Q.   OKAY.  DID YOU -- BY ANY CHANCE IN PREPARATION FOR YOUR

15    TESTIMONY, DID YOU REVIEW NETFLIX'S CULTURE DECK?

16    A.   I HAVE REVIEWED IT MANY TIMES OVER THE YEARS.  THERE WAS A

17    FEW SPECIFIC SLIDES I DID LOOK AT, YES.

18    Q.   OKAY.  BUT YOU DON'T RECALL THIS MANAGE ON THE EDGE OF

19    CHAOS PRINCIPLE?

20    A.   NO.  THERE WERE THINGS LIKE MANAGEMENT -- THE PHRASES I

21    REMEMBER ABOUT MANAGEMENT WERE CONTEXT, NOT CONTROL, MEANING

22    DON'T MICROMANAGE YOUR TEAM; AND THE KEEPER TEST, WHICH YOU

23    SHOULD EVALUATE YOUR EMPLOYEES, AND IF THEY WEREN'T WHO YOU

24    WANTED, YOU SHOULD GET RID OF THEM IMMEDIATELY, THINGS LIKE

25    THAT.  I DON'T REMEMBER THE CHAOS ELEMENT.

1    Q.   OKAY.  ACTUALLY, THE KEEPER ONE WAS ONE I WAS GOING TO

2    COVER.

3    A.   YES.

4    Q.   THAT MEANS AT NETFLIX, IT WAS VERY EASY AND COULD BE SWIFT

5    TO LOSE YOUR JOB?

6    A.   THAT'S A FAIR STATEMENT.

7    Q.   OKAY.  AND EMPLOYEES, AS YOU MENTIONED, WERE EXPECTED TO

8    GIVE HONEST AND CONSTRUCTIVE FEEDBACK?

9    A.   YES.  AS I MENTIONED BEFORE, CANDOR WAS THE WORD OFTEN

10   USED, OR BEING CANDID.

11        ARE YOU HEARING ME BETTER, BY THE WAY?

12             THE REPORTER:  YES.  THANK YOU.

13   BY MS. JAYNE:

14   Q.   AND YOU HAD DISCUSSED ON DIRECT EXAM THAT YOU UNDERSTOOD

15   NETFLIX WAS TRYING TO GET 100 PERCENT INTO THE CLOUD; RIGHT?

16   A.   THAT -- YES, THAT WAS HAPPENING WHILE I WAS THERE.

17   Q.   AND DO YOU AGREE THAT THAT WAS ONE OF MICHAEL KAIL'S

18   DIRECTIVES AND GOALS WAS TO GET THE I.T. DEPARTMENT 100 PERCENT

19   INTO THE CLOUD?

20   A.   I WOULD SAY THAT MY RECOLLECTION OF THAT WOULD HAVE BEEN

21   ONE OF HIS TOP PRIORITIES.

22   Q.   OKAY.  AND ARE YOU FAMILIAR WITH THE TERM ZERO TRUST

23   SECURITY?

24   A.   YES, BUT I'M NOT AN EXPERT IN THAT AREA.

25   Q.   OKAY.  DO YOU RECALL WHETHER THAT WAS ANOTHER ONE OF

1    MR. KAIL'S GOALS WHEN HE WORKED AT NETFLIX?

2    A.   I DON'T RECALL THAT SPECIFICALLY.

3    Q.   OKAY.  DO YOU AGREE THAT ANOTHER PRINCIPLE AT NETFLIX WAS

4    TO -- THAT NETFLIX ENCOURAGED PEOPLE TO TAKE RISKS AND BE BOLD?

5    A.   I DO REMEMBER THOSE ELEMENTS, YES.

6    Q.   AND, IN FACT, TRYING OUT NEW TECHNOLOGY CAN BE A FORM OF

7    TAKING A RISK; RIGHT?

8    A.   CERTAINLY.

9    Q.   OKAY.  SO LET'S GO TO SUMMER OF 2013.  YOU AGREE -- I

10   THINK YOU AGREE THAT YOU WERE LOOKING FOR SOLUTIONS TO GIVE THE

11   ADVERTISING TEAM A WAY TO HAVE INSIGHTS INTO THEIR PAID ONLINE

12   ADVERTISING; RIGHT?

13   A.   SPECIFICALLY THE DATA ASSOCIATED WITH THAT, YES.

14   Q.   RIGHT.  SO AT THE TIME NETFLIX WAS ACTUALLY ADVERTISING,

15   RIGHT, ONLINE?

16   A.   CORRECT.

17   Q.   AND SO IT WOULD BE -- IT WAS IMPORTANT FOR THEM TO KNOW

18   WHETHER IT WAS TURNING -- THE RETURN ON INVESTMENT, SO TO

19   SPEAK; RIGHT?

20   A.   THAT'S FAIR TO SAY.  THEY WERE SPENDING A LARGE AMOUNT OF

21   DOLLARS AND IT MADE SENSE TO OPTIMIZE THAT, THAT SPEND.

22   Q.   AND YOU NEEDED -- AND YOU NEEDED PRODUCT TO HELP -- A

23   SOLUTION, LET ME SAY, TO HELP THE ADVERTISING DEPARTMENT ASSESS

24   WHETHER -- THE PERFORMANCE OF THOSE ONLINE ADS; RIGHT?

25   A.   YES, PROBABLY AN ARRAY OF SOLUTIONS INDEED, YES.

1    Q.   OKAY.  SO THAT THEY KNOW NOT ONLY WHETHER SOMEONE CLICKED

2    AND PURCHASED, BUT, YOU KNOW, WHAT PLATFORMS WERE THE MOST

3    SUCCESSFUL FOR ADVERTISING; RIGHT?

4    A.   ALONG WITH A NUMBER OF OTHER REASONS, BUT THAT IS

5    ACCURATE, YES.

6    Q.   OKAY.  AND YOU UNDERSTOOD THAT PLATFORA WAS A SOLUTION TO

7    BEING ABLE TO PROCESS AND PRODUCE DATA ON THAT ADVERTISING --

8    ON THAT ONLINE ADVERTISING?

9    A.   YES.  PLATFORA WAS NOT AN ADVERTISING SPECIFIC TOOL, BUT

10   IT WORKED ON LARGE DATA SETS.  WE HAD A LARGE ADVERTISING DATA

11   SET, SO OSTENSIBLY IT COULD BE A FIT FOR WHAT WE WERE SEEKING.

12   Q.   AND THAT'S A FAIR POINT.  IT WASN'T LIMITED JUST TO

13   ADVERTISING.  IT COULD ANALYZE LARGE SETS OF DATA IN OTHER

14   CONTEXTS AS WELL; CORRECT?

15   A.   THAT WAS ITS INTENT AND PURPOSE, ABSOLUTELY.

16   Q.   AND WHAT WAS UNIQUE ABOUT IT WAS, DO YOU AGREE, THAT IT

17   WASN'T JUST SHOWING STATIC INFORMATION, LIKE HERE IS'S AN EXCEL

18   SPREADSHEET WITH THE DATA; RIGHT?  IT WAS ACTUALLY NOT JUST THE

19   VISUALIZATION, BUT THE ANALYSIS OF THAT DATA; CORRECT?

20   A.   YES.  I MIGHT RESTATE THAT SLIGHTLY AS THE VISUALIZATION

21   DID GIVE MAYBE THE NON-TECHNICAL PERSON SOME INSIGHTS.

22        BUT, YES, IT WAS LEADING YOU DOWN TO A PATH OF WHAT IS

23   WORKING, WHAT IS NOT WORKING, AND HOW DO WE OPTIMIZE, HOW DO

24   YOU LEARN WHAT'S GOING ON WITH THESE LARGE VOLUMES OF DATA.

25   Q.   OKAY.  AND DO YOU AGREE THAT MICHAEL KAIL WAS

1    KNOWLEDGEABLE AS AN ENGINEER?

2    A.   YES.

3    Q.   SO YOU BELIEVE THAT HE HAD ENOUGH OF A TECHNICAL

4    UNDERSTANDING TO ACTUALLY PERFORM AT HIS JOB?

5    A.   YES.

6    Q.   AND YOU UNDERSTOOD -- ACTUALLY, LET'S -- LET'S TURN TO

7    SOME OF THE EXHIBITS.  SOME OF THESE WE'VE ALREADY DISCUSSED.

8         SO IF WE COULD PLEASE GO TO EXHIBIT 304, WHICH HAS ALREADY

9    BEEN ADMITTED INTO EVIDENCE, SO IF WE COULD SHOW IT TO THE JURY

10   AND THE WITNESS, PLEASE.

11             THE CLERK:  DO YOU HAVE IT UP?

12             MS. HEER:  UM-HUM.

13             MS. JAYNE:  BEFORE I DO THAT, I SHOULD ASK A QUESTION

14   AND I'LL LET THAT GET SET UP.

15   Q.   IN THE FIRST PART OF YOUR TESTIMONY ON DIRECT EXAM, YOU

16   WEREN'T SURE IF NETFLIX WAS USING TABLEAU; CORRECT?

17   A.   THAT WAS MY INITIAL RESPONSE, AND I WAS REMINDED OF THAT

18   WHEN I SAW THAT E-MAIL WHERE IT TALKED ABOUT THE LICENSE,

19   CORRECT.

20   Q.   SO YOU HAD TO BE REMINDED THAT YOU WERE USING A PARTICULAR

21   PRODUCT WHEN THIS WAS A VERY REAL PROBLEM THAT NETFLIX WAS

22   HAVING; CORRECT?

23             MR. SAMPSON:  OBJECTION, YOUR HONOR.  ARGUMENTATIVE.

24             THE COURT:  SUSTAINED.

25             MS. JAYNE:  WERE WE ABLE TO GET THAT EXHIBIT?

1          THE CLERK:  I DON'T SHOW THAT IT --

2          MS. JAYNE:  I DON'T SEE IT.

3          THE CLERK:  YOU WANT TO MAYBE UNPLUG AND PLUG BACK

4     IN.

5          MS. HEER:  OKAY.

6          THE CLERK:  YEAH, THERE YOU GO.

7          MS. JAYNE:  THANK YOU.

8          THE WITNESS:  MY SCREEN IS NOW WORKING AS WELL.

9     BY MS. JAYNE:

10    Q.   IT IS WORKING?

11    A.   YES, IT IS.

12    Q.   I'M GOING TO ASK YOU TO DISREGARD THOSE BINDERS AND WE'RE

13    GOING TO GO WITH THE SCREEN HERE.

14    A.   FAIR ENOUGH.

15    Q.   OKAY.  SO THIS IS IN MAY 2013 IF WE GO TO THE BOTTOM OF

16    THE E-MAIL; RIGHT?

17    A.   YES, IT LOOKS LIKE MAY 10TH.

18    Q.   AND MIKE KAIL IS TELLING YOU, "CHECK OUT THIS OPTION" AND

19    GIVES YOU THE WEBSITE; RIGHT?

20    A.   ABSOLUTELY, YES.

21    Q.   AND THEN YOU RESPOND WITH A REFERENCE TO APPNEXUS USING

22    SPOTFIRE; CORRECT?

23    A.   YES.

24    Q.   AND THAT'S RELATED TO SOMETHING CALLED TIBCO; CORRECT?

25    A.   SPOTFIRE WOULD BE A PRODUCT OWNED BY TIBCO, CORRECT.

1    Q.   AND TIBCO WAS NOT A CLOUD COMPANY AT THAT TIME; CORRECT?

2    A.   I AGREE THAT THEY HAD A REPUTATION AS KIND OF A, WHAT YOU

3    CALL ENTERPRISE, IT'S KIND OF A -- IT'S NOT PROGRESSIVE IN THAT

4    REGARD, YES.

5    Q.   AND THEN MIKE RESPONDS, "TIBCO DOESN'T HAVE THE BEST

6    REPUTATION AS A COMPANY."  RIGHT?

7    A.   I SEE -- YES, THAT'S THE WAY I READ IT, YES.

8    Q.   AND YOU, YOU AGREE THAT YOU ACTUALLY JUST SAID A SIMILAR

9    THING, WHICH IS THEY DON'T HAVE THE BEST REPUTATION AS FAR AS

10   BEING PROGRESSIVE?

11   A.   I THINK THAT'S FAIR, YES.

12   Q.   OKAY.  AND BY THE WAY, WHEN YOU WERE ANSWERING QUESTIONS,

13   YOU ALSO SOMETIMES HAD CONVERSATIONS WITH MR. KAIL IN PERSON;

14   RIGHT?

15   A.   OF COURSE, YES.

16   Q.   THANK YOU FOR THE E-MAIL.

17        IS IT TRUE THAT HE DIDN'T HAVE AN OFFICE AT NETFLIX?

18   A.   NOT MANY PEOPLE DID.  I DON'T RECALL -- MY BEST

19   RECOLLECTION IS HE DID NOT.

20   Q.   OKAY.

21   A.   I DON'T THINK HARDLY ANYONE DID IN PRACTICE.

22   Q.   AND THE PURPOSE OF THAT IS TO ENCOURAGE PEOPLE TO WORK

23   TOGETHER, COLLABORATE, MOVE FROM ONE PLACE TO ANOTHER; CORRECT?

24   A.   AMONG OTHERS, YES, ABSOLUTELY.

25   Q.   OKAY.  IF WE COULD PLEASE TURN TO EXHIBIT 305, WHICH HAS

```
 1        ALREADY BEEN ADMITTED INTO EVIDENCE.

 2             AND YOU AGREE THAT THIS PARTICULAR NDA IN JUNE 2013 WAS

 3        DURING THE COURSE OF AN UNPAID PILOT; RIGHT?

 4        A.   I DON'T -- I DON'T -- I'M NOT AWARE OF THE FINANCIAL

 5        CIRCUMSTANCES OF THE SITUATION, SO I'M NOT SURE ABOUT THE

 6        UNPAID PART.

 7             BUT I DO -- THE REST I WOULD AGREE WITH.

 8        Q.   OKAY.  THEN WE'LL MOVE ON FROM THAT ONE.

 9             IF WE COULD PLEASE TURN TO EXHIBIT 311 THAT HAS ALREADY

10        BEEN ADMITTED INTO EVIDENCE.

11             IF WE COULD LOOK TO, PLEASE, YOUR COMMENT IN THE MIDDLE,

12        AUGUST 1ST.

13             WITH RESPECT TO PLATFORA, AT THIS POINT IN TIME, YOUR

14        RESPONSE, "WAS DEFINITELY NOT GOING TO GIVE A YES/NO.  JUST A

15        COUPLE BULLETS FROM THE TEAM."

16             CORRECT?

17        A.   THAT'S WHAT I APPEAR TO HAVE WRITTEN, CORRECT.

18        Q.   OKAY.  SO IT'S FAIR TO SAY THAT AT THIS POINT IN TIME, YOU

19        WEREN'T SURE?

20        A.   I THINK THAT WOULD BE A FAIR SUMMARY, OR AT LEAST THAT'S

21        WHAT WE WANTED TO CONVEY BACK TO PLATFORA.

22        Q.   OKAY.  IF WE COULD GO TO THE OTHER PART OF THAT E-MAIL, TO

23        THE TOP PART OF THE -- MICHAEL KAIL'S RESPONSE IN AUGUST OF

24        2013, HE SAYS HE THINKS THEY SHOULD CONTINUE WITH THEM;

25        CORRECT?
```

1    A.   I SEE THAT, YES.

2    Q.   AND HE REPORTS THAT -- THIS IS THE VERY BOTTOM -- HE'S

3    CHATTED WITH YING AND JAN AND THEY ARE BULLISH; CORRECT?

4    A.   I SEE THAT, YES.

5    Q.   AND BULLISH MEANS POSITIVE; RIGHT?

6    A.   CORRECT.

7    Q.   SO HE'S REPORTING TO YOU THAT FROM HIS CONVERSATIONS WITH

8    THESE OTHER ENGINEERS, THEY'RE POSITIVE ABOUT THE PRODUCT?

9    A.   THAT'S WHAT THIS INDICATES, YES.

10   Q.   OKAY.  AND THEN HE REPORTS THAT HE, HE HAS A COMMITMENT

11   FROM PLATFORA AND THAT HE'S GOING TO TALK MORE ABOUT IT;

12   CORRECT?

13   A.   YES, I SEE THAT.  THAT'S AT THE TOP LINE, YES.  I SEE THE

14   PART OF WHAT YOU'RE REFERRING TO.

15   Q.   OKAY.  CAN WE PLEASE ZOOM OUT OF THIS EXHIBIT.

16        AND THIS EXHIBIT, THIS E-MAIL THAT THE GOVERNMENT SHOWED

17   YOU, THE VERY TOP OF IT SAYS "RE: AD TECH."  CORRECT?  THAT'S

18   WHERE IT STARTS?

19   A.   CORRECT, YES, I SEE THAT.

20   Q.   OKAY.  MAY WE PLEASE JUST SHOW THE WITNESS AND THE PARTIES

21   EXHIBIT 1101.

22        DO YOU SEE THE PART OF THIS E-MAIL RIGHT IN THE MIDDLE

23   WHERE IT SAYS "RE: AD TECH"?

24   A.   YES, I DO.

25   Q.   DOES THIS APPEAR TO BE, FROM THAT PORTION DOWN, THE E-MAIL

1    THAT I HAD JUST SHOWN YOU IN EXHIBIT 311?

2    A.   I'D HAVE TO LOOK AT IT AGAIN.  I -- AS I LOOK AT IT

3    IMMEDIATELY, THERE ARE PORTIONS THAT APPEAR VERY SIMILAR.

4    Q.   FOR EXAMPLE, IT SAYS "ENJOY OKOBOJI."  RIGHT?

5    A.   IT DOES, YES.

6    Q.   THAT WAS HOW THAT OTHER CONVERSATION ENDED, CORRECT, IN

7    THE OTHER E-MAIL?

8    A.   I --

9    Q.   IN THE OTHER EXHIBIT, I SHOULD SAY.

10   A.   YES, CORRECT, I BELIEVE IT DID, YES.

11   Q.   OKAY.  AND DO YOU SEE THE TOP PORTION OF THE E-MAIL ON THE

12   RECIPIENTS?

13   A.   ON 101-1?

14   Q.   YES.

15   A.   I DO, YES.

16   Q.   AND DOES THIS APPEAR TO BE A RESPONSE FROM YOU TO THE "RE:

17   AD TECH" E-MAIL?

18   A.   IT DOES, YES.

19         MS. JAYNE:  YOUR HONOR, AT THIS TIME I WOULD ASK THAT

20   EXHIBIT 1101 BE ADMITTED INTO EVIDENCE.

21         THE COURT:  IS THERE ANY OBJECTION?

22         MR. SAMPSON:  NO OBJECTION.

23         THE COURT:  IT WILL BE ADMITTED.

24      (DEFENDANT'S EXHIBIT 1101, PAGE 1, WAS ADMITTED IN

25   EVIDENCE.)

1           MS. JAYNE:  THANK YOU.

2           AND, YOUR HONOR, MAY I HAVE THE SAME REQUEST NOT TO

3      REQUEST PERMISSION TO PUBLISH?

4           THE COURT:  YES.

5           MR. SAMPSON:  YOUR HONOR, I WOULD JUST NOTE THERE ARE

6      SEVERAL PAGES AND THERE APPEAR TO BE UNRELATED E-MAILS.  SO NO

7      OBJECTION TO THE FIRST PAGE.

8           THE COURT:  ONLY LIMITED TO THE FIRST PAGE,

9      MS. JAYNE?

10          MS. JAYNE:  THAT'S FINE.  THE FIRST PAGE IS JUST

11     FINE.

12          THE COURT:  OKAY.  PAGE 1 FROM THAT.  THANK YOU.

13          MS. JAYNE:  AND IF WE COULD HIGHLIGHT THE TOP

14     PORTION, PLEASE.

15     Q.   SO YOUR RESPONSE WAS, AT THIS TIME -- THIS IS TO MR. KAIL;

16     RIGHT?

17     A.   CORRECT.

18     Q.   AND YOU SAID, "DEFINITELY WORTH TALKING MORE ON PLATFORA

19     WHEN I GET BACK."  RIGHT?

20     A.   YES.

21     Q.   YOU SAID, "WE HAVE SEVERAL SOLUTIONS CONNECTED AT THIS

22     POINT SO WE CAN SEE WHERE THE TEAM GRAVITATES TO FIND ANSWERS."

23     RIGHT?

24     A.   YES.

25     Q.   SO FAIR TO SAY YOUR SENTIMENT AT THIS TIME IS THAT IT'S

1    WORTH HAVING A CONTINUED CONVERSATION WITH PLATFORA?

2    A.   IT IS, BUT I -- THE -- SEVERAL SOLUTIONS MEANS SEVERAL

3    COMPETITORS TO PLATFORA AND PLATFORA AND WE COULD JUST HAVE A

4    DIALLING IN COMPETITION TO SEE WHICH ONE IS PREFERRED.

5    Q.   WHAT YOU SAID HERE -- YOU DIDN'T NOTE, LET'S CUT OUT

6    PLATFORA, DID YOU?

7    A.   I'M SORRY?

8    Q.   YOU DIDN'T SAY, LET'S NOT LOOK AT PLATFORA, DID YOU?

9    A.   I SAID IT'S DEFINITELY WORTH CONTINUING TO EXAMINE, ALONG

10   WITH COMPETING SOLUTIONS.

11   Q.   RIGHT.  YOU DIDN'T SAY COMPETING.  "WE HAVE SEVERAL

12   SOLUTIONS CONNECTED AT THIS POINT, SO LET'S SEE WHERE THE TEAM

13   GRAVITATES."  RIGHT?

14   A.   THE SEVERAL SOLUTIONS IMPLIED COMPETING SOLUTIONS TO

15   PLATFORA.

16   Q.   YOU DIDN'T WRITE COMPETING SOLUTIONS.  YOU JUST SAID

17   SEVERAL SOLUTIONS WHERE THE TEAM CAN GRAVITATE; CORRECT?

18   A.   I DIDN'T USE THE WORD "COMPETING" IN THE E-MAIL, THAT'S

19   CORRECT.

20   Q.   OKAY.  THANK YOU.

21        IF WE COULD PLEASE TURN TO EXHIBIT 320, WHICH HAS BEEN

22   ALREADY ADMITTED INTO EVIDENCE.

23        BY THE WAY, MR. RALPH, BECAUSE OF THE CULTURE AT NETFLIX,

24   ANYONE CAN SIGN A CONTRACT; RIGHT?

25   A.   THERE'S BROAD AUTHORITY.  I WOULDN'T GO -- I MEAN, THERE

1     MIGHT BE A FEW THAT DON'T.  BUT THAT PURVIEW IS -- OF PEOPLE

2     BEING ABLE TO SIGN CONTRACTS IS QUITE BROAD.  I WOULD AGREE

3     WITH THE SENTIMENT THERE.

4     Q.   RIGHT.  SO MAYBE NOT, LIKE, THE COFFEE PERSON, BUT --

5     A.   THAT'S CORRECT, YES.  BUT ANYONE OF A CERTAIN STATURE,

6     YES.

7     Q.   AN ENGINEER, FOR EXAMPLE?

8     A.   LIKELY, YES.  YES, IF IT MADE SENSE.

9     Q.   OKAY.  AND YOU CERTAINLY HAD THE AUTHORITY AS WELL?

10    A.   CORRECT.

11    Q.   OKAY.  SO EXHIBIT 320, IF WE COULD PLEASE GO TO PAGE 4,

12    MS. HEER.

13         THIS CONVERSATION IN SEPTEMBER FROM MR. KAIL STARTS WITH

14    MR. KAIL SEEKING CANDID FEEDBACK FROM YOU -- OR ACTUALLY, I'M

15    SORRY, SEEKING CANDID FEEDBACK FROM YINGKUAN AND JAN TO PROVIDE

16    TO YOU AND HIM; CORRECT?

17    A.   PRECISELY, YES.

18    Q.   AND ACTUALLY, I THINK THROUGHOUT YOUR TESTIMONY, YOU

19    REFERENCE SEVERAL INSTANCES WHERE MR. KAIL CONTINUES TO SEEK

20    YOUR FEEDBACK; RIGHT?

21    A.   ABSOLUTELY IT'S COME UP SEVERAL TIMES IN THE DOCUMENTS

22    WE'VE SEEN TODAY.

23    Q.   OKAY.  IF WE COULD TURN FURTHER UP THE E-MAIL TO PAGE 3.

24         WOULD YOU AGREE THAT ON PAGE 3, JAN KRIVOCHEIA DOES HIS,

25    QUOTE, "USUAL PROS AND CONS"?  RIGHT?

1     A.    CORRECT.

2     Q.    AND THEN AT THE CONCLUSION, HIS CONCLUSION IS "YAY."

3     RIGHT?

4     A.    YES, I SEE THAT.

5     Q.    IF WE COULD TURN TO PAGE 2, PLEASE.

6           AT THE TOP OF THAT E-MAIL -- WELL, WE'LL HAVE TO TURN TO 1

7     TO SEE WHERE THE E-MAIL STARTS ACTUALLY.  I'M SORRY.  THE

8     BOTTOM OF PAGE 1.

9           AFTER YOU -- THEY GIVE THEIR FEEDBACK -- BOTTOM OF PAGE 1,

10    PLEASE, IF WE COULD HIGHLIGHT THAT OR ENHANCE IT.

11          YOU TELL JAN AND YINGKUAN, "GREAT INSIGHTS."  RIGHT?

12    A.    THAT -- YES, THAT'S THE FIRST TWO WORDS IN THIS FIRST

13    STATEMENT.

14    Q.    AND THEN YOU SAY, FROM YOUR PERSPECTIVE, YOU'RE CONVINCED

15    A SOLUTION YOU'RE LOOKING FOR DOESN'T EXIST IN A MATURE STATE;

16    CORRECT?

17    A.    THAT'S PRECISELY WHAT THAT SAYS, YES.

18    Q.    AND WHAT THAT MEANS IS ADVERTISING HAS A PROBLEM.  THERE'S

19    NOT A MATURE SOLUTION TO GIVE THEM THE DATA THAT THEY NEED AT

20    THIS POINT IN TIME; CORRECT?

21    A.    NOT IN A SINGLE PRODUCT, THAT'S CORRECT.

22    Q.    AND YOU SAY, WHATEVER PATH WE CHOOSE, IT'S GOING TO TAKE

23    EFFORT; RIGHT?

24    A.    THAT'S LITERALLY WHAT IT SAYS, YES.

25    Q.    IF WE COULD TURN TO THE TOP OF PAGE 2, PLEASE.

1           AND THEN YOU SAY, AT THE TOP OF PAGE 2, PLEASE, "PLATFORA

2    WILL NEVER CATCH UP TO SPOTFIRE/TABLEAU FROM A UI PERSPECTIVE."

3    RIGHT?  YOU SAID THAT?

4    A.   I'M LOOKING HERE.

5    Q.   SECOND PARAGRAPH.

6    A.   THAT'S A STATEMENT I MADE IN THE SECOND PARAGRAPH.  I SEE

7    IT, YES.

8    Q.   AND UI PERSPECTIVE IS USER INTERFACE; CORRECT?

9    A.   YES.

10   Q.   ISN'T IT TRUE THAT SPOTFIRE AND TABLEAU WERE ONLY DOING

11   VISUALIZATIONS AT THAT TIME, NOT DATA ANALYTICS?

12   A.   THAT'S CORRECT.  THEY'RE MORE OF WHAT YOU MIGHT CALL THE

13   PRESENTATION LAYER, YES.

14   Q.   RIGHT.  LIKE HERE'S THE INTEL SPREADSHEET, HAVE AT IT?

15   A.   DIRECTIONALLY, YEAH, I WOULD AGREE WITH THAT, YES.

16   Q.   OKAY.  AND THE COMMENT ON UI PERSPECTIVE JUST HAD TO DO

17   WITH THE USER INTERFACE, NOT TO DO WITH DATA ANALYTICS, WHICH

18   IS WHAT PLATFORA WAS PROVIDING; CORRECT?

19   A.   I'M NOT SURE I FOLLOW.  THE VALUE OF PLATFORA WAS ITS RICH

20   VISUALIZATION.  THEY ALSO DID SOME NUMBER CRUNCHING BEHIND THE

21   SCENES, BUT IF IT'S FAILING FROM THE UI PERSPECTIVE, THAT'S

22   KIND OF A SIGNIFICANT GAP.

23   Q.   BUT IT WAS AIMING TO PROVIDE SOMETHING FAR MORE THAN

24   TABLEAU COULD PROVIDE; CORRECT?

25   A.   YES, IT'S A DIFFERENT PRODUCT AND HAD A DIFFERENT END DATE

1      CAPABILITIES, OR ATTEMPTED TO, YES.

2      Q.   OKAY.  AND ISN'T IT TRUE THAT TABLEAU'S 3.0, THAT WAS THE

3      PRODUCT THEY WERE AIMING TO RELEASE, 3.0 WAS GOING TO BE THE

4      MORE MATURE VERSION THAT WOULD RELEASE --

5      A.   I THINK YOU MEAN PLATFORA 3.0.

6      Q.   PLATFORA.  WHAT DID I SAY?

7      A.   TABLEAU.

8      Q.   OH, SORRY.  YEP.  THANK YOU.

9      A.   YES, EXACTLY.  WE WERE -- WE WOULD HAVE HOPED FOR THAT

10     THAT NEXT RELEASE COULD HAVE DONE EVERYTHING WE WOULD HAVE

11     WISHED, CORRECT.

12     Q.   SO IN THIS TIME PERIOD OF FALL 2013, THEY'RE STILL WORKING

13     OUT THE BUGS; RIGHT?

14     A.   PLATFORA?

15     Q.   YEAH, PLATFORA.

16     A.   IT WAS A STARTUP AND IT WAS SCRAPPY AND THEY WERE PUSHING

17     A PRODUCT FORWARD, THAT'S FAIR TO SAY.

18     Q.   OKAY.  IF WE COULD NOW TURN TO EXHIBIT 224, WHICH HAS NOT

19     BEEN ADMITTED, SO I WOULD ASK THAT IT PLEASE BE SHOWN TO THE

20     WITNESS ONLY.

21          AND MR. RALPH, IF YOU COULD TURN TO PAGE 3, 3 TO 4 AND LET

22     ME KNOW IF THIS IS STILL ALONG THE SAME E-MAIL CHAIN THAT WE

23     JUST COVERED IN EXHIBIT 320.

24     A.   I'M LOOKING AT 224-3.  WHAT'S --

25     Q.   YEP.  IF YOU COULD JUST SCROLL DOWN AND LET ME KNOW IF

1      THIS LOOKS LIKE BASICALLY THE SAME DISCUSSION.  IT'S JUST A

2      DIFFERENT EXHIBIT NUMBER.

3      A.   IT LOOKS -- FROM WHAT I CAN SEE, THE BULK OF IT LOOKS TO

4      BE THAT SAME CONVERSATION.  THERE MAY BE SOME MORE INFORMATION

5      AT THE BEGINNING OR END.

6      Q.   OKAY.  SO CAN YOU TAKE A LOOK AT THE FIRST TWO PAGES AND

7      LET ME KNOW IF THAT LOOKS LIKE AN ACCURATE -- AN ACCURATE COPY

8      OF THE CONTINUED CONVERSATION ON THIS TOPIC?

9      A.   AT LEAST FROM CURSORY EXAMINATION, IT APPEARS TO BE THE

10     SAME E-MAIL THREAD.

11     Q.   WITH YOU, MR. KAIL, YINGKUAN, AND JAN?

12     A.   THAT'S CORRECT.

13          MS. JAYNE:  I WOULD ASK AT THIS TIME THAT EXHIBIT 224

14     BE ADMITTED INTO EVIDENCE.

15          THE COURT:  ANY OBJECTION?

16          MR. SAMPSON:  NO OBJECTION.

17          THE COURT:  IT WILL BE ADMITTED.

18     (GOVERNMENT'S EXHIBIT 224 WAS ADMITTED IN EVIDENCE.)

19          MS. JAYNE:  THANK YOU.

20     Q.   LET'S START AT THE BOTTOM OF THAT E-MAIL CHAIN ON PAGE --

21     NO, I'M SORRY.

22          ON PAGE 2, LET'S START SEPTEMBER 4TH AT 2:50 P.M.

23          MS. HEER, COULD YOU PLEASE HIGHLIGHT THAT.  ALL THE WAY

24     DOWN TO THE BOTTOM.  ALL THE WAY DOWN TO THE BOTTOM, PLEASE.

25          SO HERE JAN, ONE OF THE ENGINEERS, SAYS, "TONY, MIKE, DO

1    YOU WANT US TO SWITCH FOCUS IN LEARNING PIG?"  CORRECT?

2    A.   YES, HE DOES.

3    Q.   AND BY THE WAY, YOU MENTIONED OPEN SOURCE EARLIER; RIGHT?

4    YOU SAID THAT WAS SOMETHING PUBLICLY AVAILABLE; RIGHT?

5    A.   THAT'S CORRECT.  I BELIEVE THAT'S WHAT I SAID, YES.

6    Q.   BUT WHEN SOMETHING IS OPEN SOURCE, IF YOU USE IT, IT'S A

7    LOT OF WORK; RIGHT?

8    A.   IT CAN BE.  ABSOLUTELY, IT CAN BE.

9    Q.   IT'S NOT LIKE YOU GRAB A PRODUCT FOR FREE AND THERE YOU

10   GO, PUT IT IN AND IT WORKS?

11   A.   SOME WOULD WORK OFF THE SHELF, BUT MANY REQUIRE WORK,

12   THAT'S FAIR TO SAY.

13   Q.   OKAY.  AND IN YOUR RESPONSE TO JAN, WHO'S ASKING -- YOU

14   KNOW, LOOKING FOR SOME DIRECTION, YOU TELL HIM, "I'M NOT ASKING

15   YOU TO CHANGE COURSE AT THIS POINT -- JUST WANTED TO PROVIDE MY

16   PERSPECTIVE."  RIGHT?

17   A.   I LITERALLY SAY THAT, YES.

18   Q.   AND THEN YOU SAY, "I DON'T THINK LEARNING A NEW LANGUAGE

19   IS BAD, BUT I'D SUGGEST CONTINUING TO KEEP PLATFORA MOVING

20   FORWARD."  RIGHT?

21   A.   THAT'S EXACTLY WHAT I SAID, YES.

22   Q.   SO YOU'RE TELLING JAN, LET'S KEEP WORKING WITH PLATFORA;

23   RIGHT?

24   A.   THAT'S CORRECT.

25   Q.   OKAY.  AND THEN IF WE TURN TO PAGE 1, PLEASE.

1          MR. KAIL TRIES TO SUMMARIZE EVERYONE'S THOUGHTS; RIGHT?

2     HE SAYS TONY DOESN'T SEE THE VALUE BEYOND WHAT WE CAN DO WITH

3     EXISTING TOOLS, WHAT I'M TRYING TO TRIANGULATE REALLY IS DO WE

4     KEEP THEM ENGAGED OR REVISIT; RIGHT?

5     A.   CORRECT.  THE FIRST PART, YES.  I'M NOT SURE ABOUT THE --

6     I'M NOT SEEING THE SECOND PART.

7     Q.   OH, IT'S JUST THE LAST PART OF THE E-MAIL.

8     A.   RIGHT, OKAY.  RIGHT, OKAY, YES, I SEE THAT AT THE BOTTOM,

9     YES.

10    Q.   SO WOULD YOU AGREE, AGAIN, MR. KAIL IS TRYING TO GET THE

11    INPUT OF THE TEAM, WHAT DO YOU GUYS WANT TO DO?  RIGHT?

12    A.   THAT'S CORRECT.

13    Q.   OKAY.  AND THEN YOU SAY, IF WE COULD JUST COME UP TO "MY 2

14    CENTS."  RIGHT?  "SLIGHT REFERENCE FOR REVISITING NEXT YEAR,

15    BUT AM FINE WITH CONTINUED ENGAGEMENT (WHILE KEEPING

16    TRANSPARENT WE ARE WORKING WITH ALTERNATE SOLUTIONS IN

17    PARALLEL)"?  RIGHT?

18    A.   CORRECT.

19    Q.   NOW, THIS IS WHEN YOU WORKED FOR NETFLIX, A COMPANY THAT

20    DEMANDS CANDOR; RIGHT?

21    A.   THAT'S CORRECT.

22    Q.   AND YOU SAID SLIGHT PREFERENCE.  YOU DIDN'T SAY WE SHOULD

23    NOT MOVE FORWARD WITH PLATFORA, DID YOU?

24    A.   YOU'RE READING IT LITERALLY THERE AND THAT'S ABSOLUTELY

25    TRUE.

1     Q.   OKAY.  AND THEN MR. KAIL RESPONDS AT THE TOP, "TONY, THIS

2     SHOULD BE A PART OF THE ROLE OF YOUR NEW HIRE.  CORRECT?

3     A.   YES.

4     Q.   HE SAYS, I'D LIKE TO CONTINUE ENGAGEMENT AFTER GETTING

5     YOUR FEEDBACK?

6     A.   HE -- YES, HE SAYS, I'D LIKE TO CONTINUE ENGAGEMENT.

7     Q.   AND THAT NEW HIRE WAS A PERSON NAMED MICHAEL POW; CORRECT?

8     A.   I BELIEVE THAT MIKE POW WOULD HAVE BEEN MY FIRST HIRE, AND

9     I THINK THAT HE WOULD HAVE BEEN REFERRING TO MIKE POW AT THIS

10    POINT, CORRECT.

11    Q.   AND THEN IS IT TRUE THAT MIKE POW ACTUALLY DID CONTINUE TO

12    WORK ON PLATFORA?

13    A.   HE WOULD HAVE WORKED ON IT FOR SOME AMOUNT OF TIME.  I

14    DON'T KNOW THE PRECISE POINT WHERE HE WOULD HAVE STOPPED.

15    Q.   OKAY.  IF WE COULD PLEASE TURN TO EXHIBIT -- THAT'S

16    FINE -- 323, WHICH IS ALSO IN EVIDENCE.

17         IN THIS PARTICULAR DISCUSSION ABOUT PLATFORA, MR. KAIL

18    SAYS, I'M TRYING TO SEND AN INCLUSIVE MESSAGE SO EVERYONE IS

19    ALIGNED AND CAN PROVIDE FEEDBACK; CORRECT?

20    A.   I SEE THAT IN THE FIRST LINE, YES.

21    Q.   DO YOU AGREE THAT THIS IS AN EXAMPLE OF NOT MICROMANAGING

22    AND LEADING WITH CONTEXT?

23    A.   I'M JUST READING THE REST OF THAT.

24         YEAH, I THINK THAT'S FAIR TO SAY.  I DON'T DEEM THIS TO BE

25    MICROMANAGEMENT.

1    Q.   AND MR. KAIL WRITES THAT A CANDID DISCUSSION IS NEEDED;

2    CORRECT?

3    A.   WHICH PARAGRAPH IS THAT?

4    Q.   THE SECOND.  "IN SHORT, I BELIEVE THE NEAR-TERM

5    CONVERSATION THAT NEEDS TO BE HAD AMONGST ALL OF US IS A CANDID

6    DISCUSSION ON WHERE PLATFORA IS TODAY AND WHERE DO WE SEE IT

7    BEING LEVERAGED AT NETFLIX," IS THERE A USE-CASE LONGER TERM

8    FOR IT; CORRECT?

9    A.   YES.

10   Q.   SO HE CONTINUES TO REACH OUT TO HIS TEAM TO FIND OUT WHAT

11   THEIR INPUT IS AND WHAT SHOULD HAPPEN LONG TERM; CORRECT?

12   A.   THIS IS AN OUTREACH OF THAT NATURE, CORRECT.

13   Q.   OKAY.

14        MS. HEER, COULD WE PLEASE TURN TO -- THANK YOU --

15   EXHIBIT 1100, WHICH IS NOT YET IN EVIDENCE, SO I'D ASK THAT IT

16   JUST BE SHOWN TO THE WITNESS.

17        WILL YOU PLEASE TAKE A LOOK AT THE DOCUMENT IN FRONT OF

18   YOU?  IS THIS A CONVERSATION BETWEEN YOU AND MARK FLEMING AT

19   PLATFORA?

20   A.   YES.

21   Q.   DOES THIS APPEAR TO BE AN ACCURATE COPY OF AN E-MAIL

22   BETWEEN YOU AND MARK FLEMING ON JULY 11TH, 2013?

23   A.   I PRESUME IT TO BE ACCURATE, YES.

24        MS. JAYNE:  AT THIS TIME I WOULD ASK THAT

25   EXHIBIT 1100 BE ADMITTED INTO EVIDENCE.

1          MR. SAMPSON:  NO OBJECTION.

2          THE COURT:  IT WILL BE ADMITTED.

3          (DEFENDANT'S EXHIBIT 1100 WAS ADMITTED IN EVIDENCE.)

4          MS. JAYNE:  THANK YOU.

5     Q.   MR. RALPH, JUST TO GIVE US SOME CONTEXT, MR. FLEMING WAS

6     ASKING IF YOU'D GIVE A QUOTE ABOUT PLATFORA; CORRECT?

7     A.   YES, HE IS.

8     Q.   AND YOU SAID -- THIS IN THE MIDDLE -- I CAN DO THAT, I'D

9     LIKE TO REWORD SLIGHTLY.

10         YOU SAID THAT; RIGHT?

11    A.   YES, I DID.

12    Q.   AND THEN HE SAYS, "THANKS A LOT?  I SEE GOLF IN OUR

13    FUTURE."

14    A.   THAT'S WHAT MARK SAID, YES.

15    Q.   OKAY.  AND THEN YOU PROCEEDED TO GIVE A QUOTE ABOUT YOUR

16    PERCEPTION OF PLATFORA, WHICH IS IT'LL "GIVE NETFLIX AN AGILE

17    AND SELF-SERVICE WAY TO RAPIDLY OPTIMIZE OUR REAL TIME BIDDING

18    DATA VS. SOLUTIONS FROM OUR VENDORS WHICH CAN TAKE WEEKS TO

19    TURNAROUND."

20         CORRECT?

21    A.   THAT'S WHAT I WROTE AND THAT WAS OUR ASPIRATION, YES.

22    Q.   THAT'S WHAT YOU WROTE BECAUSE THAT WAS YOUR UNDERSTANDING

23    OF WHAT THE PRODUCT WAS; CORRECT?

24    A.   THAT WOULD HAVE BEEN THE GOAL, YES.

25    Q.   AND THIS WAS -- LET'S JUST FAST FORWARD IN TIME.  THIS IS

1      JULY 2013.

2          IF WE COULD PLEASE TURN TO EXHIBIT 1105, WHICH IS NOT IN

3      EVIDENCE.

4          CAN YOU PLEASE TAKE A LOOK AT THIS EXHIBIT, MR. RALPH, AND

5      LET ME KNOW IF IT -- IT'S A CONVERSATION BETWEEN YOU AND

6      MR. FLEMING AGAIN; CORRECT?

7      A.   YES, IT IS.  I SEE MY AND HIS E-MAIL ON THIS.

8      Q.   AND DOES IT APPEAR TO BE AN ACCURATE REPRESENTATION OF THE

9      CONVERSATION AT THAT TIME?

10     A.   I'M SORRY.  THIS IS SMALL.

11     Q.   SORRY.

12     A.   I HAVE NO REASON TO DOUBT THE AUTHENTICITY OF THE E-MAIL.

13          MS. JAYNE:  THANK YOU.

14     I WOULD ASK THAT 1105 BE ADMITTED INTO EVIDENCE.

15          THE COURT:  ANY OBJECTION?

16          MR. SAMPSON:  NO OBJECTION.

17          THE COURT:  IT WILL BE ADMITTED.

18     (DEFENDANT'S EXHIBIT 1105 WAS ADMITTED IN EVIDENCE.)

19          MS. JAYNE:  THANK YOU.

20          EXCUSE ME.  MS. HEER, IF WE COULD JUST GO TO THE CENTER OF

21     THAT EXHIBIT, 3:15 P.M.

22     Q.   MR. FLEMING WRITES TO YOU THAT THEY'RE GETTING READY TO

23     RELEASE THE 3.0 PATHING -- I DON'T KNOW HOW TO PRONOUNCE

24     THAT -- CODE, AND WOULD LIKE TO SIT DOWN WITH YOU AND WALK YOU

25     THROUGH IT.  HOW DOES EARLY NEXT WEEK LOOK?

1           CORRECT?

2     A.   YES, THAT'S PRECISELY WHAT HE ASKED ME, YES.

3     Q.   AND THAT'S DATED DECEMBER 2ND, 2013?

4     A.   CORRECT.

5     Q.   AND YOUR RESPONSE WAS, "THANKS MARK.  CAN YOU LET ME KNOW

6     WHO IS INVOLVED IN THE TRAINING?  WE MAY HAVE SOMEONE TO ADD."

7     A.   YES.

8     Q.   AND THEN YOU RESPOND, "RYAN AND MIKE.  SOUND RIGHT?"

9          OR I'M SORRY.  HE RESPONDS, "RYAN AND MIKE."  CORRECT?

10    A.   YES, HE DOES.

11    Q.   AND THAT'S MIKE POW, THE GUY WE JUST DISCUSSED WHO WAS

12    UNDER YOU; CORRECT?

13    A.   WELL, I'M ASKING, "WHICH MIKE?"  SO I PRESUME I DIDN'T

14    KNOW AT THAT TIME.

15    Q.   OKAY.  BUT YOU DID HAVE A GUY NAMED MIKE?

16    A.   I DID HAVE A GUY NAMED MIKE POW.  IT WAS LIKELY MIKE POW.

17    THERE WAS A COUPLE MIKES.  I THINK I WAS CONFIRMING THAT.  BUT

18    IT'S MORE THAN LIKELY MIKE POW.

19    Q.   OKAY.  AND SO AS LATE AS DECEMBER 2013, YOU'RE TELLING

20    MARK FLEMING AT PLATFORA, WHO'S HAVING A MEETING, THAT YOU

21    MIGHT WANT TO ADD SOME PEOPLE TO THE PLATFORA MEETING; CORRECT?

22    A.   THAT'S PRECISELY WHAT THAT INDICATED, YES.

23    Q.   SO THAT MEANT IN DECEMBER 2013, YOU WERE AWARE THAT

24    PLATFORA WAS STILL ENGAGED AT NETFLIX?

25           MR. SAMPSON:  OBJECTION.  MISSTATES TESTIMONY.

1          THE COURT:  SUSTAINED.

2     BY MS. JAYNE:

3     Q.   DO YOU THINK AT THE TIME YOU WROTE THIS E-MAIL, IF YOU HAD

4     SOMEONE TO ADD TO A MEETING, YOU WERE LIKELY AWARE THAT

5     PLATFORA WAS INVOLVED AT A MINIMUM IN TRAINING AT NETFLIX?

6     A.   I WOULD HAVE HAD TO HAVE KNOWN THAT, YES.

7     Q.   OKAY.  IF WE COULD PLEASE TURN TO 1106 JUST FOR THE

8     PARTIES.

9          IF YOU COULD TAKE A LOOK AT THIS E-MAIL -- AND YOU'RE NOT

10    ON IT, BUT IF YOU COULD LET ME KNOW WHETHER YOU WERE AWARE OF

11    THE DISCUSSIONS IN JANUARY 2014 REGARDING PLATFORA?  YOU ARE

12    MENTIONED INTERNALLY WITHIN THE E-MAIL, SO I'D ASK YOU TO LOOK

13    AT THAT.

14    A.   WHERE IS MY NAME SPECIFICALLY?

15    Q.   IN THE VERY -- AFTER THE WORD "SUMMARY" IN THE VERY

16    MIDDLE.

17    A.   OH.

18         YES, I AM -- I DO SEE ME REFERENCED AND I -- IN THE

19    CONTEXT OF THIS E-MAIL IT MAKES SENSE.

20         I DON'T RECALL -- CAN YOU REPEAT THE QUESTION?

21    Q.   OH, I GUESS I DIDN'T REALLY HAVE A QUESTION.  WELL, NO, OF

22    COURSE I HAVE TO HAVE A QUESTION.

23         LOOKING AT THIS E-MAIL, DOES IT APPEAR TO BE AN ACCURATE

24    REPRESENTATION OF AN E-MAIL THAT WOULD HAVE BEEN SENT AT THIS

25    TIME PERIOD AT NETFLIX REGARDING WHAT WAS HAPPENING WITH

 1    RESPECT TO PLATFORA IN JANUARY 2014?

 2            MR. SAMPSON:  OBJECTION.  CONFUSING, LACKS

 3    FOUNDATION.

 4            MS. JAYNE:  DO YOU HAVE AN OBJECTION AS TO THIS

 5    EXHIBIT?

 6            MR. SAMPSON:  LACKS FOUNDATION AS TO THIS WITNESS.

 7            MS. JAYNE:  OKAY.

 8    Q.   THEN I'LL JUST ASK YOU SOME QUESTIONS.  IS IT TRUE THAT IN

 9    JANUARY 2014, YINGKUAN HAD CONCLUDED THAT THERE WAS GOOD

10    TRACTION FROM PEOPLE ON YOUR TEAM REGARDING PLATFORA?

11    A.   REFERRING TO THIS EXHIBIT?

12    Q.   NO.

13    A.   WITHOUT THIS EXHIBIT, I WOULDN'T HAVE AN ANSWER TO THAT.

14    Q.   OKAY.  WOULD LOOKING AT THIS PARTICULAR EXHIBIT REFRESH

15    YOUR MEMORY ABOUT WHETHER PEOPLE ON YOUR TEAM WERE HAVING GOOD

16    TRACTION WITH PLATFORA IN JANUARY OF 2014?

17    A.   CERTAINLY.

18    Q.   OKAY.

19            YOUR HONOR, MAY I ASK, WITHOUT ADMITTING THE EXHIBIT INTO

20    EVIDENCE, WHETHER THE WITNESS COULD REFER TO IT TO REFRESH HIS

21    MEMORY?

22            THE COURT:  LET ME JUST ADVISE MR. RALPH, IF IT

23    TRIGGERS YOUR MEMORY, YOU CAN TESTIFY.  BUT YOU CAN'T JUST READ

24    FROM IT IF IT SAYS SOMETHING.

25            DO YOU UNDERSTAND THE DIFFERENCE?

1          THE WITNESS:  I THINK I DID DO, BUT THIS IS -- THE

2     CONTEXT MAKES ABSOLUTE SENSE.

3          THE COURT:  NO, I'M SORRY.  I'M NOT -- I CAN'T ENGAGE

4     IN A CONVERSATION.  YOU CAN LOOK AT IT.  IF IT TRIGGERS YOUR

5     MEMORY OF AN EVENT YOU NOW RECALL OCCURRING AT THE TIME, YOU

6     MAY TESTIFY THEN WITHOUT REFERENCE TO THE DOCUMENT.

7          THE WITNESS:  IT DOES NOT TRIGGER WHAT YOU JUST

8     MENTIONED.

9          THE COURT:  OKAY.  THEN LET'S MOVE ON.

10          MS. JAYNE:  THEN I'LL MOVE ON.

11     Q.   THANK YOU, SIR.

12          TAKE THAT DOWN, PLEASE.

13          COULD WE PLEASE TURN TO EXHIBIT 338, WHICH IS IN EVIDENCE.

14          YOU'RE AWARE -- THIS WAS REGARDING THE LOGO.  YOU'RE AWARE

15     THAT MR. KAIL WAS NOT THE DECISION MAKER FOR LOGOS; CORRECT?

16     A.   I'M SORRY.  I DIDN'T HEAR THE LAST PART OF THE QUESTION.

17     Q.   MR. KAIL WAS NOT THE ONE WHO MADE DECISIONS WHETHER A

18     COMPANY COULD USE LOGOS; CORRECT?  THERE WAS A SEPARATE

19     DEPARTMENT FOR THAT?

20     A.   YEAH, I -- I THINK -- GOING BACK TO THE FREEDOM OF

21     RESPONSIBILITY, I THINK WE ALL HAD THE FREEDOM AND

22     RESPONSIBILITY TO HAVE INPUT INTO THAT.  I DON'T THINK HE WAS

23     THE SOLE DECIDER IN THESE CASES BY ANY MEANS.

24     Q.   OKAY.  AND YOU DON'T KNOW IN THIS CASE WHETHER -- OR I

25     SHOULD SAY, ISN'T IT TRUE HE NEVER APPROVED THE USE OF THE LOGO

1      FOR PLATFORA?

2      A.   I'M NOT AWARE OF WHAT STATUS OF APPROVAL OR DISAPPROVAL HE

3      PROVIDED IN THIS SCENARIO.

4      Q.   OKAY.  LET'S TURN TO THE NEXT EXHIBIT, 339, ALONG THE SAME

5      LINES.  THAT'S BEEN ALREADY ADMITTED INTO EVIDENCE.

6           CAN WE PLEASE EXPAND THE LOWER PORTION OF THAT E-MAIL.

7           SO TAKING A LOOK AT EXHIBIT 339, MR. RALPH, YOU HAD

8      NOTICED NETFLIX ON PLATFORA'S WEBSITE; CORRECT?

9      A.   CORRECT.

10     Q.   AND JUST TO GO THROUGH THIS, WE SEE THAT THEY'RE

11     SUPPOSEDLY LISTING THEIR CLIENTS; CORRECT?

12     A.   THAT -- THAT'S WHAT I INFERRED THIS TO BE, ABSOLUTELY.

13     Q.   AND WE SEE DISNEY; RIGHT?

14     A.   YES.

15     Q.   WE SEE COMCAST?

16     A.   YES.

17     Q.   WE SEE SHOPIFY?

18     A.   YES, I DO.

19     Q.   WE SEE EDMUNDS?

20     A.   YES.

21     Q.   AND SOME OTHERS THAT I CAN'T READ.

22     A.   I CAN'T READ THEM, EITHER.

23     Q.   OKAY.  SO WOULD YOU AGREE THAT IF MR. KAIL WAS LEANING

24     TOWARDS USING PLATFORA, HE MAY NOT HAVE BEEN AN OUTLIER IN THAT

25     DECISION GIVEN THE NUMBER OF WELL KNOWN COMPANIES THAT WERE

1       WORKING WITH PLATFORA AT THAT TIME?

2                   MR. SAMPSON:  YOUR HONOR, CALLS FOR SPECULATION.

3                   THE COURT:  SUSTAINED.

4       BY MS. JAYNE:

5       Q.   DO YOU BELIEVE THAT PERHAPS PLATFORA HAD A VIABLE ENOUGH

6       PRODUCT BECAUSE OF THE OTHER WELL KNOWN COMPANIES THAT WERE

7       USING THEIR PRODUCT?

8       A.   I MIGHT HAVE MY DOUBTS IN THAT REGARD GIVEN THE

9       SUPERFICIALITY OF THE NETFLIX RELATIONSHIP.  I WOULD WORRY THAT

10      THE OTHERS WERE OF THAT SAME NATURE.

11      Q.   OKAY.  SO YOU WOULD WORRY THAT DISNEY, COMCAST, SHOPIFY,

12      ALL OF THOSE, THAT THEY WERE FALSELY USING ALL THESE VARIOUS --

13      THEY WEREN'T REALLY CUSTOMERS AT THAT TIME?

14      A.   I -- I WOULD NOT STATE IT THAT WAY.

15           BUT WHAT -- WHAT -- I WOULD QUESTION THE LEVEL OF

16      ENGAGEMENT AND THE LEVEL OF TRACTION THE PRODUCT HAD BEYOND A

17      MERE DEMO OR PROOF OF CONCEPT.

18      Q.   OKAY.  AND BY THE WAY, PLATFORA ENDED UP BEING ACQUIRED BY

19      A HUGE COMPANY CALLED WORKDAY?

20                  MR. SAMPSON:  OBJECTION, YOUR HONOR.  COUNSEL IS

21      TESTIFYING.

22                  THE COURT:  SUSTAINED.

23                  MS. JAYNE:  OH, I --

24                  THE COURT:  I SUSTAINED THE OBJECTION.

25                  MS. JAYNE:  OH, OKAY.

1    Q.   ARE YOU AWARE OF WHETHER PLATFORA WAS ACQUIRED BY WORKDAY?

2    A.   I DO RECALL READING THAT THEY WERE ACQUIRED.

3    Q.   OKAY.  AND ARE YOU AWARE THAT PLATFORA ENDED UP BEING

4    HUGELY SUCCESSFUL?

5    A.   I DON'T KNOW WHAT "HUGELY" MEANS.  BUT I THINK IT HAD SOME

6    DEGREE OF SUCCESS.  I DON'T KNOW WHAT THE VALUATION WAS.

7    Q.   YOU DON'T KNOW HOW MUCH WORKDAY PURCHASED THEM FOR?

8    A.   I DON'T KNOW, NO.

9    Q.   BUT YOU AGREE THAT WORKDAY, A PRODUCT THAT WAS ACTUALLY

10   USED AT NETFLIX, IS A LARGE COMPANY?

11   A.   I -- I -- BY MOST STANDARDS OF BEING LARGE, I THINK THAT'S

12   A FAIR STATEMENT, YES.

13        BUT I DO THINK THAT WAS SEVERAL YEARS AFTER WE WERE

14   WORKING WITH THEM.

15   Q.   SEVERAL YEARS LATER, THEY WERE ACQUIRED; CORRECT?

16   A.   THAT'S MY BELIEF, YES.

17   Q.   BUT DOES THAT TELL YOU THEY WERE -- EVEN IN THE EARLY

18   STAGES, THEY WERE ON TO SOMETHING?

19   A.   IT'S HARD FOR ME TO SPECULATE ON THAT.

20   Q.   OKAY.  YOU MENTIONED THAT YOU WENT TO A DINNER WITH

21   MIKE KAIL AND MR. WERTHER; RIGHT?

22        MR. SAMPSON:  OBJECTION.  MISSTATES THE TESTIMONY.

23   HE WAS NOT AT THE DINNER.

24        THE COURT:  OVERRULED.

25   BY MS. JAYNE:

1     Q.   RIGHT?

2     A.   I NEVER WENT TO A DINNER WITH MIKE KAIL.

3     Q.   OR A MEETING?

4     A.   I HAD A -- I ATTENDED A MEETING AT THE NETFLIX OFFICES

5     WITH THEM IN THE MORNING.

6     Q.   I APOLOGIZE.  NOT A DINNER?

7     A.   THEY HAD BEEN AT DINNER.

8     Q.   RIGHT.  YOU HAD ATTENDED -- MR. KAIL ASKED YOU TO ATTEND

9     THAT MEETING; CORRECT?

10    A.   YES, IT WAS A MEETING WHERE ALL THREE OF US WERE THERE,

11    YES.

12    Q.   RIGHT.  AND HE KNEW YOUR HESITATION WITH PLATFORA;

13    CORRECT?

14    A.   YES, HE WOULD HAVE BEEN ABSOLUTELY AWARE OF THAT AT THAT

15    TIME, YES.

16    Q.   AND YET, HE SPECIFICALLY CALLED YOU OUT TO ATTEND THAT

17    MEETING; RIGHT?

18    A.   YES, HE DID.

19    Q.   AND HE ASKED YOU TO COMMUNICATE YOUR HESITATIONS OR YOUR

20    PERCEPTIONS OF SOME OF THE BUGGINESS OF THE PRODUCT; CORRECT?

21    A.   100 PERCENT, YES.

22    Q.   OKAY.  AND THEN RIGHT THERE, THERE WAS A DISCUSSION,

23    CANDIDLY IN FRONT OF YOU, ABOUT WHAT THE PRICING MIGHT BE;

24    CORRECT?

25    A.   THERE WAS A DETAILED DISCUSSION.  I DON'T REMEMBER ALL THE

1        DETAILS AND WHETHER OR NOT PRICING WAS DISCUSSED.

2             BUT, YES, THERE -- SUBSEQUENT TO MY CANDID FEEDBACK, THERE

3        WAS A FURTHER DISCUSSION BETWEEN MR. WERTHER AND MR. KAIL.

4        Q.   OKAY.  AND AFTER THAT MEETING, DID YOU GO TO MR. KAIL AND

5        SAY, WE SHOULD NOT ENGAGE WITH PLATFORA?

6        A.   I DON'T REMEMBER TAKING THAT ACTION, NO.

7        Q.   IS DISLOYALTY AT NETFLIX DEFINED AS KEEPING YOUR OPINIONS

8        TO YOURSELF?

9        A.   WELL, I CAN SAY THAT WITHIN TWO MINUTES OF THAT MEETING I

10       WENT TO A MEETING AND HAD A CANDID CONVERSATION WITH H.R. ABOUT

11       MY MISGIVINGS OF THAT SESSION.

12       Q.   AND WHO DID YOU SPEAK TO?

13       A.   ALLISON WRIGHT.

14       Q.   OKAY.  AND DID YOU GO TO MR. KAIL, EVER, AND TELL HIM, I

15       DON'T THINK WE SHOULD ENGAGE WITH PLATFORA?

16       A.   I GAVE HIM FEEDBACK, AS I EXPRESSED IN 360, THAT THAT

17       SCENARIO WAS PROBABLY LESS THAN EFFICIENT IN TERMS OF

18       INCONSISTENT COMMUNICATION.

19       Q.   OKAY.  AND WE HAD GONE THROUGH YOUR VARIOUS E-MAILS WHERE

20       YOU KIND OF WAFFLED BACK AND FORTH ON IT; CORRECT?

21       A.   I DON'T KNOW THAT I WOULD AGREE THAT I WAFFLED BACK AND

22       FORTH.

23       Q.   DID YOU SEE A SINGLE E-MAIL WHERE YOU SAID, WE SHOULD NOT

24       USE PLATFORA?

25       A.   I THINK I GAVE SEVERAL INDICATIONS THAT IT WASN'T MY

```
1    PREFERENCE.

2    Q.   OKAY.  AND BY THE WAY, WHAT WAS YOUR SOLUTION?

3    A.   WE HAD VARIOUS SOLUTIONS.  WE ENDED UP USING VARIOUS THIRD

4    PARTIES.

5    Q.   ACTUALLY, ISN'T IT TRUE THAT YOU DIDN'T?  NOTHING WAS

6    INTRODUCED TO DO THE KIND OF ANALYTICS AFTER PLATFORA THAT

7    PLATFORA DID?

8              MR. SAMPSON:  OBJECTION.  HE JUST ANSWERED THE

9    QUESTION DIFFERENTLY.

10             THE COURT:  SUSTAINED.

11             MR. SAMPSON:  MISSTATES HIS TESTIMONY.

12             THE WITNESS:  AS WAS INDICATED --

13             THE COURT:  EXCUSE ME.  I SUSTAINED THE OBJECTION.

14             THE WITNESS:  SORRY.

15   BY MS. JAYNE:

16   Q.   ISN'T IT TRUE THAT YOU DID NOT COME UP WITH A SOLUTION FOR

17   DATA ANALYTICS IN THE WAY THAT PLATFORA WAS PROPOSING?

18   A.   I DON'T AGREE WITH THAT.

19   Q.   OKAY.

20   A.   IN FACT, THERE WERE SOME VERY ADVANCED SOLUTIONS AFTER

21   MR. KAIL LEFT THE COMPANY THAT WERE CUTTING EDGE THAT WERE THEN

22   DONE INTERNALLY.

23   Q.   WELL, ACTUALLY, DIDN'T NETFLIX STOP DOING ADVERTISING SO

24   THE WHOLE MATTER BECAME MOOT?

25   A.   THAT'S COMPLETELY FALSE.
```

1    Q.  YOU'RE SAYING NETFLIX CONTINUED TO DO PAID ADVERTISING?

2    A.  THEY SPEND OVER A BILLION DOLLARS IN PAID ADVERTISING.

3    Q.  UP UNTIL WHAT POINT IN TIME?

4    A.  EVEN TODAY.

5    Q.  OKAY.  ON THE PAID -- ON THE PAID ADS ON FACEBOOK, ON

6    WHATEVER SITE?

7    A.  I THINK -- YES, THERE ARE SOME SPECIFIC TYPES OF

8    ADVERTISING THAT THEY HAVE ADS.  THEY DIDN'T GET OUT OF THAT

9    GAME ENTIRELY.

10   Q.  OKAY.  ISN'T IT TRUE THAT THEY MOVED TO A COMPLETELY

11   DIFFERENT PLATFORM, WHICH IS CALLED GOOGLE, AND THEY DID NOT

12   HAVE THE NEED FOR THIS TYPE OF ANALYTICS THAT THEY DID AT THE

13   TIME YOU WERE SEARCHING FOR IT?

14        MR. SAMPSON:  YOUR HONOR, OBJECTION.  BEYOND THE

15   SCOPE OF DIRECT.

16        THE COURT:  IT IS BEYOND.  THERE'S NO TIMEFRAME

17   IDENTIFIED.

18        MS. JAYNE:  OKAY.

19   Q.  LET'S TURN TO EXHIBIT 9, YOUR 360 REVIEW, PAGE 7, PLEASE.

20        IF WE COULD JUST HIGHLIGHT THE PARTICULAR -- THIS WAS YOUR

21   CANDID REVIEW OF MR. KAIL; CORRECT?

22   A.  THAT -- THAT'S IN MY 360 REVIEW, CORRECT.  AND IT SHOULD

23   INVOLVE CANDOR.

24   Q.  AND YOU SAID, "IT HAS BEEN A PLEASURE TO WORK WITH YOU

25   OVER THE LAST YEAR."  RIGHT?

1    A.   YES, THAT'S IN THE FIRST LINE, ABSOLUTELY.

2    Q.   "I VIEW YOUR STRENGTHS AS PUSHING THE LIMITS OF WHAT YOU,

3    YOUR TEAM AND ENTIRE I.T. ORG CAN ACCOMPLISH."  RIGHT?

4    A.   YES.

5    Q.   "AS I HAVE GOTTEN MORE COMFORTABLE WITH YOU AND BEEN EVER

6    MORE CANDID, I HAVE BEEN IMPRESSED WITH YOUR ABILITY AND DESIRE

7    TO IMPROVE AND EVOLVE."  RIGHT?

8    A.   THAT'S LITERALLY WHAT'S WRITTEN, RIGHT.

9    Q.   AND IF YOU WROTE IT, THAT MEANS YOU BELIEVED IT?

10   A.   I BELIEVE THAT'S FAIR, YES.

11   Q.   AND YOU EVEN SAID, "YOU PUSH THE BOUNDARIES, I THINK YOUR

12   BIGGEST OPPORTUNITY TO EVOLVE IS TO MORE FULLY COMMUNICATE YOUR

13   VISION."  CORRECT?

14   A.   THAT'S WHAT IT LITERALLY SAYS, CORRECT.

15   Q.   OKAY.  AND THEN YOU WENT ON, AS YOU COVERED ON DIRECT, TO

16   TALK SORT OF INDIRECTLY ABOUT PARALLEL CONVERSATIONS WITH

17   C-LEVEL EXECS; CORRECT?

18   A.   I'M SORRY.  COULD YOU REPEAT THAT?

19   Q.   YOU HAD DISCUSSED EARLIER, PART OF YOUR REVIEW WAS "YOU

20   SOMETIMES HAVE PARALLEL CONVERSATIONS WITH C-LEVEL EXECS OF OUR

21   VENDORS."  CORRECT?

22   A.   YES, THAT'S WHAT IT SAYS, YES.

23   Q.   AND MR. KAIL WAS A C-LEVEL EXECUTIVE, OR NOT A C-LEVEL,

24   BUT HE WAS -- HE WAS HIGHER UP IN MANAGEMENT THAN YOU; CORRECT?

25   A.   HE WAS HIGHER UP.  HE WAS A VICE PRESIDENT, YES.

1    Q.   RIGHT.  AND DO YOU AGREE THAT PART OF HIS JOB WAS TO TALK

2    TO OTHER COMPANIES' EXECUTIVES?

3    A.   THAT -- MOST CERTAINLY, YES.

4            MS. JAYNE:  OKAY.  IF I COULD JUST HAVE A MOMENT,

5    PLEASE?

6            THE COURT:  OF COURSE.

7        (PAUSE IN PROCEEDINGS.)

8            MS. JAYNE:  ALL RIGHT.

9        NO FURTHER QUESTIONS.  THANK YOU.

10           THE COURT:  THANK YOU.

11       REDIRECT, MR. SAMPSON?

12           MR. SAMPSON:  EXTREMELY BRIEFLY, YOUR HONOR.

13                    **REDIRECT EXAMINATION**

14   BY MR. SAMPSON:

15   Q.   THANK YOU FOR YOUR TIME, MR. RALPH.

16   A.   MY PLEASURE.

17   Q.   WITH RESPECT TO THE QUOTE THAT YOU PROVIDED TO MR. FLEMING

18   I BELIEVE, WERE YOU PAID ANYTHING FOR THAT QUOTE?

19   A.   NO.

20   Q.   WERE YOU GIVEN STOCK?

21   A.   NO.

22   Q.   OKAY.  WOULD IT HAVE BEEN -- IN YOUR UNDERSTANDING OF

23   NETFLIX POLICY, WOULD THAT HAVE BEEN A PROBLEM FOR YOU TO HAVE

24   BEEN PAID FOR THAT QUOTE?

25   A.   YES.  AND I WAS EVEN UNCOMFORTABLE, LOOKING BACK WHEN HE

RALPH REDIRECT BY MR. SAMPSON

1    HE SAID SOMETHING ABOUT GOLF IN OUR FUTURE, WHICH I NEVER TOOK

2    HIM UP ON, BUT THAT SENDS SHIVERS DOWN MY SPINE TO READ THAT

3    QUOTE ABOUT HIM TEASING ME WITH GOLF OR SOMETHING.

4    Q.   WHAT WAS THE PROBLEM WITH IF YOU WERE OFFERED GOLF OR

5    MONEY OR ANYTHING ELSE FOR A QUOTE?

6    A.   BECAUSE IT SEEMS TO BE INDICATING THAT I WOULD DO HIS

7    BIDDING IF HE TAKES ME GOLFING OR PAYS ME OR REIMBURSES ME IN

8    SOME FASHION.

9    Q.   AND WAS THAT QUOTE EARLY ON IN THE ENGAGEMENT WITH

10   PLATFORA?

11   A.   MY RECOLLECTION WAS THAT WAS RELATIVELY EARLY.  I WOULDN'T

12   HAVE GIVEN THAT QUOTE AFTER SOME OF THE EXPERIENCES.

13   Q.   AND WAS THAT QUOTE ASPIRATIONAL ABOUT WHAT PLATFORA

14   POTENTIALLY COULD HAVE DONE?

15   A.   I THINK THAT'S A FAIR CHARACTERIZATION, YES, ASPIRATIONAL.

16   Q.   AND WAS YOUR TESTIMONY TO MS. JAYNE THAT YOU, YOU SOLVED

17   YOUR AD TECH, ADVERTISING TECHNOLOGY CASE WITH OTHER

18   TECHNOLOGIES, IS THAT A CORRECT STATEMENT OF YOUR TESTIMONY?

19   A.   YES, WE DID SOME QUITE ADVANCED THINGS IN THE YEARS

20   FOLLOWING THIS ENGAGEMENT.

21   Q.   AND IT DID NOT INVOLVE PLATFORA?

22   A.   THEY DID NOT, KNOW.

23   Q.   AND MS. JAYNE ASKED YOU IF YOU COULD -- OR IF ALMOST

24   ANYONE AT NETFLIX COULD SIGN A CONTRACT; CORRECT?

25   A.   SHE DID ASK THAT, YES.

1    Q.   AND THAT INCLUDED SOMEONE OF YOUR, OF YOUR DIRECTOR LEVEL?

2    A.   CORRECT, I WOULD HAVE HAD THE ABILITY TO SIGN CONTRACTS.

3    Q.   COULD YOU PREVENT YOUR SUPERVISOR FROM SIGNING A CONTRACT

4    IF YOU DIDN'T WANT THEM TO SIGN IT?

5    A.   I DON'T BELIEVE SO, NO.

6         MR. SAMPSON:  NO FURTHER QUESTIONS.

7         THE COURT:  THANK YOU.  MAY THIS WITNESS BE EXCUSED?

8                      **RECROSS-EXAMINATION**

9    BY MS. JAYNE:

10   Q.   JUST BRIEFLY, I WANT TO MAKE SURE I HEARD THIS CORRECTLY,

11   YOU SAID IN THE YEARS FOLLOWING PLATFORA, THERE WAS A SOLUTION

12   THAT NETFLIX CAME UP WITH, OR USED SOMETHING IN THE YEARS

13   FOLLOWING PLATFORA; CORRECT?

14   A.   THAT'S CORRECT.  IT WAS SOME AMOUNT OF TIME AFTER THAT.

15   Q.   OKAY.  AND THAT WOULD HAVE -- I GUESS YOU LEFT AT SOME

16   POINT SO YOU DON'T KNOW WHAT THEY ENDED UP DOING, BUT IT TOOK

17   SOME TIME FOR A PRODUCT TO ACTUALLY BE USED REGULARLY AT

18   NETFLIX FOR THIS PURPOSE?

19   A.   YES.  IT WAS NOT A SIMPLE ENDEAVOR, THAT'S CORRECT.

20        MS. JAYNE:  THANK YOU.

21        THE COURT:  MAY THIS WITNESS BE EXCUSED?

22        MR. SAMPSON:  YES, YOUR HONOR.

23        THE COURT:  AND HE IS EXCUSED NOT SUBJECT TO RECALL?

24        MR. SAMPSON:  I DON'T BELIEVE HE'S ON THE DEFENSE

25   LIST.

```
1              MS. JAYNE:  NO, THANK YOU.

2              THE COURT:  OKAY.  MR. RALPH, THANK YOU FOR YOUR

3      TESTIMONY.  YOU ARE FREE TO GO.

4              THE WITNESS:  THANK YOU.

5              THE COURT:  MR. KALEBA, THE GOVERNMENT'S NEXT

6      WITNESS?

7              MR. KALEBA:  THANK YOU, YOUR HONOR.

8          THE UNITED STATES CALLS YINGKUAN LIU.

9              THE COURT:  MR. LIU, COME FORWARD TO THE WITNESS

10     STAND UP HERE AND STAND TO BE SWORN.  ALL THE WAY UP HERE, SIR,

11     YEAH.  AND IF YOU WOULD STAND TO TAKE THE OATH.

12             THE CLERK:  IF YOU WOULD PLEASE RAISE YOUR RIGHT

13     HAND.

14         (GOVERNMENT'S WITNESS, YINGKUAN LIU, WAS SWORN.)

15             THE WITNESS:  YES.

16             THE CLERK:  THANK YOU, SIR.  PLEASE BE SEATED.

17         IF YOU WOULD PLEASE STATE YOUR NAME AND SPELL YOUR LAST

18     NAME FOR THE RECORD.

19             THE WITNESS:  MY NAME IS YINGKUAN LIU, LAST NAME IS

20     L-I-U.

21             THE COURT:  OKAY.  MR. LIU, BECAUSE WE ARE ALL MASKED

22     AND TALKING THROUGH THE BARRIERS, I NEED YOU TO SPEAK DIRECTLY

23     INTO THE MICROPHONE.

24             THE WITNESS:  OKAY.

25             THE COURT:  THANK YOU.  PERFECT.
```

1                          **DIRECT EXAMINATION**

2       BY MR. KALEBA:

3       Q.   GOOD AFTERNOON, SIR.

4       A.   GOOD AFTERNOON.

5       Q.   WHERE DO YOU WORK?

6       A.   YOU MEAN RIGHT NOW?

7       Q.   YES.

8       A.   I'M WORKING FOR INTUITIVE SURGICAL.

9       Q.   WHAT IS YOUR JOB?

10      A.   MY CURRENT JOB IS A SENIOR MANAGER OF TECHNICAL OPERATION.

11      Q.   HOW WOULD YOU DESCRIBE YOUR JOB TO THE JURORS IN A WAY

12      THAT THEY CAN UNDERSTAND?

13      A.   WE'RE JUST HELPING THE ENGINEERS AND DEVELOPERS DOING

14      THEIR JOB.  WHEN THEY NEED THEY USE STRUCTURE, SYSTEMS,

15      SERVERS, STORAGE TO PERFORM THEIR JOBS.  WHEN THEY DO CODING,

16      THEY NEED TO HAVE ENVIRONMENT, LIKE SERVERS AND NETWORKS.

17      Q.   DO YOU HAVE A BACKGROUND IN SOFTWARE, SIR?

18      A.   NOT DIRECTLY SOFTWARE.  I WAS MOSTLY DATABASE BACKGROUND.

19      I WAS DDA WHEN I WAS AT NETFLIX.

20      Q.   YOU WERE THE DDA WHEN YOU WERE AT NETFLIX?

21      A.   UM-HUM.

22      Q.   CAN YOU EXPLAIN WHAT THAT MEANS?

23      A.   BASICALLY WE'RE JUST MANAGING THE DATABASE.  DATABASE

24      WOULD BE STORING ALL THE DATA AS WE HAD THE SOFTWARE OR

25      APPLICATIONS WE WERE GOING TO USE FOR MULTIPLE FUNCTIONS.

```
 1     Q.   FOR HOW MANY YEARS DID YOU WORK AT NETFLIX?

 2     A.   I WORKED NINE YEARS AT NETFLIX.

 3     Q.   OKAY.  WHEN DID YOU START?

 4     A.   2009.

 5     Q.   WHEN DID YOU LEAVE?

 6     A.   IN 20 -- SORRY.  IN 2019.

 7     Q.   WHAT GROUP WERE YOU IN WHILE YOU WERE AT NETFLIX?

 8     A.   I WAS IN DATABASE TEAM, LIKE I SAID.  THEN I TRANSFERRED.

 9     IT WAS THE SAME, SAME TEAM, BUT DIFFERENT WORK.

10          NETFLIX HAS THE STREAMING BUSINESS AS WE KNOW, AND WE WERE

11     HAVING THE DVD DIVISION.  SO I TRANSFERRED TO DVD DIVISION AND

12     DID THAT.

13     Q.   OKAY.  WHERE WERE YOU IN THE YEARS OF 2013 AND 2014?

14     A.   I WAS THE STREAMING SIDE OF NETFLIX.

15     Q.   THE STREAMING SIDE?

16     A.   YEAH.

17     Q.   WAS THAT -- DID YOU HAVE ANY CONNECTION WITH THE I.T.

18     GROUP WHILE YOU WERE THERE?

19     A.   YEAH, I WAS PART OF THE I.T. GROUP.

20     Q.   WHO WAS THE BOSS OF THE I.T. GROUP WHILE YOU WERE THERE?

21     A.   MIKE KAIL WAS THE V.P. OF THAT I.T.

22     Q.   DO YOU SEE HIM IN THE COURTROOM TODAY?

23     A.   YES.

24     Q.   COULD YOU DESCRIBE WHAT HE'S WEARING?

25     A.   PARDON ME?
```

1    Q.   COULD YOU DESCRIBE HIM AND WHAT HE'S WEARING?

2    A.   HE'S WEARING A SUIT WITH A BLUE SHIRT.

3    Q.   OKAY.  THANK YOU.

4         MAY THE RECORD REFLECT HE'D IDENTIFY MR. KAIL?

5              THE COURT:  YES, THE RECORD WILL SO REFLECT.

6    BY MR. KALEBA:

7    Q.   DO YOU KNOW MR. KAIL WELL?

8    A.   YEAH, I WOULD SAY SO.

9    Q.   HOW LONG HAVE YOU KNOWN HIM?

10   A.   PROBABLY AROUND 2011, 2010.

11   Q.   OKAY.  SINCE 2011?

12   A.   YEAH.

13   Q.   OKAY.  WHEN IS THE LAST TIME YOU'VE SEEN HIM?

14   A.   PERSONALLY?

15   Q.   UM-HUM.

16   A.   PROBABLY YEARS AGO.  AFTER HE LEFT NETFLIX, I -- I DIDN'T

17   SEE HIM SINCE HE LEFT NETFLIX.

18   Q.   YOU HAVEN'T SEEN HIM SINCE HE'S LEFT NETFLIX?

19   A.   UM-HUM.

20   Q.   I'D LIKE TO ASK YOU SOME QUESTIONS TODAY ABOUT A COMPANY

21   CALLED PLATFORA.

22   A.   UM-HUM.

23   Q.   HAVE YOU HEARD OF THAT COMPANY BEFORE?

24   A.   YES.

25   Q.   HOW WERE YOU INTRODUCED TO THE COMPANY PLATFORA?

1    A.   MR. KAIL WAS INTRODUCED THE COMPANY TO ME BECAUSE HE SAID

2    THEY WERE DOING SOME DATA ANALYTIC PLATFORMS THAT WERE FOR

3    INTERNAL TO USE FOR DIGITAL GROUPS.  SO HE WANTED ME TO DO SOME

4    POC AND SEE HOW, HOW WELL THEY CAN MEET OUR NEEDS FOR

5    PERFORMANCE.

6    Q.   OKAY.  YOU SAID THAT WAS MR. KAIL WHO INTRODUCED YOU?

7    A.   YES.

8    Q.   DO YOU RECALL WHAT YEAR THAT WAS?

9    A.   YEAH, I CANNOT REMEMBER SPECIFICALLY.  AFTER -- AFTER I

10   REPORT TO HIM.

11   Q.   OKAY.

12   A.   PROBABLY 2012 OR '13.

13   Q.   OKAY.  YOU USED THE PHRASE "POC."  WHAT DOES THAT MEAN?

14   A.   IT'S A PROOF OF CONCEPT.  LITERALLY BEFORE YOU PURCHASE A

15   PRODUCT WITH SOFTWARE, YOU WANT TO JUST BRING IN AND DO SOME

16   TEST AND SEE WHETHER IT IS PERFORMING OR MEETING THE

17   REQUIREMENT.

18   Q.   IS IT NORMALLY PAID OR UNPAID?

19   A.   USUALLY IT'S NOT PAID BECAUSE WE HAVEN'T DECIDE WE'LL USE

20   THEM YET.

21   Q.   BUT IS IT FAIR TO SAY IT'S FREE TO NETFLIX?

22   A.   I THINK SO.

23   Q.   OKAY.  WHAT ABOUT THE ENGINEERING TIME?  DOES IT USUALLY

24   REQUIRE SOME TIME TO TEST IT OUT?

25   A.   YOU MEAN MY TIME OR MY TEAM'S TIME?  YEAH.  SO THAT'S --

1     THAT'S NOT REALLY CONSIDERED TOO MUCH.  IT'S JUST THE WORK WE

2     HAVE TO PERFORM, BECAUSE IF THE COMPANY HAS A NEED TO BRING A

3     NEW SOFTWARE, WE HAVE TO DO THAT, SPENDING TIME TO DO THAT.

4     Q.   OKAY.  DO YOU REMEMBER WHO ELSE YOU WORKED WITH WHEN YOU

5     WERE TESTING OUT THE PLATFORA DURING THE POC?

6     A.   I MOSTLY WORKED WITH JAN AND THEN MY TEAM AND TONY.

7     Q.   JAN AND TONY?

8     A.   YEAH.

9     Q.   DO YOU RECALL THE LAST NAMES OF EITHER JAN OR TONY?

10    A.   OH, YEAH.  THE LAST NAME IS NOT VERY USUAL.  TONY, I'M

11    SORRY.

12    Q.   OKAY.  NOT RIGHT NOW YOU DON'T RECALL?

13    A.   NO, I DON'T RECALL IT.

14    Q.   OKAY.  WAS PLATFORA A WELL KNOWN COMPANY AT THE TIME THAT

15    MR. KAIL INTRODUCED IT TO YOU?

16    A.   NOT TO ME.  THE FIRST TIME I HEARD OF THEM.

17    Q.   WHAT WERE YOUR INITIAL IMPRESSIONS OF THE PLATFORA

18    PRODUCT?

19    A.   THEY CERTAINLY GET SOME INTERESTING CONCEPT AND THEY WERE

20    TRYING TO ADDRESS SOME OF THE NEEDS THAT WE WOULD WANT.  THEY

21    WERE DEFINITELY IN THE VERY UNUSUAL STAGE OF THE COMPANY.  THEY

22    WERE JUST STARTING I THINK.

23    Q.   THEY WERE JUST IN THE INITIAL STAGE OF THE COMPANY?

24    A.   UM-HUM.

25    Q.   THEY HAD A GOOD IDEA?  IS THAT WHAT YOU WERE SAYING?

1    A.   YEAH, THAT'S CORRECT.

2    Q.   WERE THEY ABLE TO -- WERE THEY STILL WORKING ON SOME OF

3    THE BUGS AT THE TIME THAT YOU WERE FIRST WORKING WITH THEM?

4    A.   YES.  WE HAVE SOME CHALLENGES WHEN WE USE SOME OF THEIR

5    PRODUCT BECAUSE THE VOLUME OF DATA WE WERE TRYING TO PUSH

6    THROUGH THE SYSTEM, THEY HAD THE -- THEY HAVE A PROBLEM TO

7    HANDLE THE DATA VOLUME WE HAVE.

8    Q.   WERE YOU INVOLVED IN THE CONTRACT NEGOTIATIONS FOR

9    PLATFORA?

10   A.   NOT REALLY.  I WAS JUST MOSTLY TECHNICAL SIDE.

11   Q.   ON THE TECHNICAL SIDE?

12   A.   UM-HUM.

13   Q.   DID YOU THINK -- WHAT ULTIMATELY HAPPENED WITH PLATFORA?

14   DID YOU END UP DECIDING TO GO WITH PLATFORA?

15   A.   I THINK WE HAD BACK AND FORTH WITH THEM.  I WORK WITH OUR

16   ENGINEER AND SOME OF THEIR TECHNICAL LEAD QUITE OFTEN TO TRY TO

17   ADDRESS THE ISSUE WE HAD.

18        BUT I THINK IN THE END, WE -- THEY STILL CANNOT REALLY

19   PERFORM WELL, SO AT LEAST IN THE CASE WE WERE TRYING TO DO FOR

20   TONY, IT'S NOT A GOOD FIT.  MAYBE THERE'S SOME OTHER USE CASE,

21   BUT FOR MY PARTICULAR CASE, IT IS NOT A GOOD FIT.

22   Q.   OKAY.  SO THEY -- YOU TRIED TO WORK IT WITH TONY'S USE

23   CASE AND IT WAS NOT A GOOD FIT?

24   A.   NO.

25   Q.   OKAY.  AND DID YOU TRY ANY OTHER USE CASES ACROSS NETFLIX?

```
 1      A.   I REMEMBER I BRIEFLY TESTED SOME OTHER ONE.  I FORGET.

 2      BUT IT WAS VERY BRIEFLY.  I FORGET THE EXACT DETAILS.

 3      Q.   OKAY.  WAS PLATFORA EVER WIDELY USED ACROSS NETFLIX?

 4      A.   I DON'T KNOW -- OH, ACROSS NETFLIX?

 5      Q.   YES.

 6      A.   NO, NOT TO MY KNOWLEDGE.

 7      Q.   OKAY.  WAS THAT BECAUSE THERE WERE TECHNICAL DIFFICULTIES

 8      WITH PLATFORA?

 9      A.   I'M NOT SURE.  MAYBE THAT'S JUST BECAUSE THEY WERE NEW.

10      AND BESIDES, I.T., MOST PART OF NETFLIX RUN THROUGH ENGINEERS,

11      THEIR OWN STUFF.  THEY DON'T WANT TO RUN THIRD PARTY.

12      Q.   NETFLIX WOULD RATHER BUILD THEIR OWN STUFF?

13      A.   YEAH, UM-HUM.

14      Q.   OKAY.  I'D LIKE TO SHOW YOU SOME DOCUMENTS.

15      A.   UM-HUM.

16      Q.   AND IF WE COULD BEGIN -- IT SHOULD POP UP ON YOUR

17      SCREEN -- WITH THE EXHIBIT NUMBER 629.

18           YOU CAN READ IT TO YOURSELF, BUT MR. LIU, WHAT IS THIS?

19      A.   IT'S MY E-MAIL TO ROBERT.  YEAH, THIS IS THE NOTIFICATION

20      TO PLATFORA THAT WE DECIDED NOT TO GO WITH THEM.

21      Q.   OKAY.

22      A.   BECAUSE I --

23      Q.   SORRY.  WAIT.  LET ME ASK THE QUESTION FIRST.

24      A.   SURE.

25      Q.   OKAY.  WHEN WAS THIS RECORD MADE?
```

1    A.   RECORD MADE?  WHAT THAT MEANS?

2    Q.   WHEN WAS THE RECORD -- WHEN WAS THIS E-MAIL MADE?

3    A.   IT'S ON FRIDAY, APRIL 18TH, 2014.

4    Q.   OKAY.  AND DID YOU USE -- IS THIS YOUR E-MAIL ADDRESS

5    HERE?

6    A.   YEAH, THIS IS MY E-MAIL ADDRESS AT NETFLIX.

7    Q.   OKAY.  AND THERE'S SEVERAL OTHER E-MAIL -- NETFLIX PERSONS

8    COPIED; IS THAT RIGHT?

9    A.   YES.

10   Q.   DO YOU RECOGNIZE THOSE PEOPLE?

11   A.   YEAH.  JAN IS WORK UNDER ME; AT THAT TIME I REPORT TO

12   BOBBY; SYLVIA IS WORKING FOR PURCHASING.

13   Q.   OKAY.  SYLVIA SUNDHOLM?

14   A.   YEAH.

15   Q.   WHO'S THAT?

16   A.   SHE'S A -- SHE'S A PURCHASING.

17   Q.   SOMEONE IN PURCHASING?

18   A.   YES.

19   Q.   AND MIKE KAIL IS ON HERE AS WELL?

20   A.   YEAH, MIKE KAIL IS ON THERE, TOO.

21        MR. SAMPSON:  OKAY.  THE UNITED STATES MOVES TO ADMIT

22   EXHIBIT NUMBER 629 AT THIS TIME.

23        THE COURT:  ANY OBJECTION?

24        MS. JAYNE:  NO.

25        THE COURT:  IT WILL BE ADMITTED.

```
1          (GOVERNMENT'S EXHIBIT 629 WAS ADMITTED IN EVIDENCE.)

2     BY MR. KALEBA:

3     Q.   OKAY.  MR. LIU, COULD YOU PLEASE READ TO THE JURY YOUR

4     E-MAIL?

5     A.   FROM THE --

6     Q.   FROM "HI ROBERT."

7     A.   OKAY.  "HI ROBERT, AS YOU MAY HAVE KNOWN AFTER THE POC AND

8     SOME DELIBERATION, WE HAVE DECIDED NOT TO EXTEND OUR PLATFORA

9     CONTRACT AT THIS TIME.

10         "OUR CONTRACT REQUIRE US TO GIVE WRITTEN NOTIFICATION TO

11    PLATFORA.  I AM NOT SURE IF YOU ARE THE RIGHT PERSON TO ADDRESS

12    THIS, IF NOT CAN YOU HELP FORWARD TO CORRECT PERSONNEL?

13         "WE COULDN'T FIND A SOLID PRODUCTION USE CASE OF PLATFORA

14    AT IT'S CURRENT STAGE, SOME OF THE KEY FEATURES LISTED BELOW

15    ARE NOT FULLY DEPLOYED OR STILL NEED IMPROVEMENT.

16         "IF YOU HAVE ANY QUESTIONS PLEASE FEEL FREE TO CONTACT

17    ME."

18    Q.   OKAY.  I'D LIKE TO START WITH THE, THE SENTENCE IN THE

19    MIDDLE WHERE IT SAYS "WE COULDN'T FIND A SOLID PRODUCTION USE

20    CASE OF PLATFORA."

21         DO YOU SEE THAT?

22    A.   YES, CORRECT.

23    Q.   IS THAT ACCURATE?

24    A.   YES.

25    Q.   OKAY.  DID YOU RECALL SOME OF THE KEY FEATURES THAT WERE
```

1    NOT DEPLOYED OR STILL NEEDED IMPROVEMENT AT PLATFORA?

2    A.   I THINK THE MAIN REASON WAS, LIKE I MENTIONED, THE DATA

3    PROBLEMS, THE PROBLEM WITH THE DATA NEEDED TO BE PROCESSED, AND

4    THEY HAVE A CONCEPT CALLED CUBE OR SOMETHING LIKE THAT, THEY

5    ALWAYS KIND OF BROKEN IF WE HAVE LARGE DATA COMING THROUGH.  SO

6    WITHOUT THIS CUBE PROCESS, THEIR FRONT END OR VISUALIZATION OF

7    THE PRODUCT CANNOT SHOW UP CORRECTLY.

8    Q.   NOW, YOU SAID EARLIER YOU WEREN'T INVOLVED IN THE CONTRACT

9    PROCESS; IS THAT RIGHT?

10   A.   YES, CORRECT.

11   Q.   OKAY.  AND THEN I'M JUST WONDERING, WHY WERE YOU THE ONE

12   WHO WROTE THIS E-MAIL THEN TO PLATFORA?

13   A.   I BELIEVE THAT SYLVIA REACHED OUT TO ME, SHE SHOWED ME

14   CONTRACTS, SHE SAID WE NEED TO GIVE THEM A FORMAL NOTIFICATION

15   OR WRITTEN NOTICE NOTIFICATION TO --

16           MS. JAYNE: OBJECTION.  HEARSAY.

17           THE WITNESS:  SORRY.

18           THE COURT:  HOLD ON.  HOLD ON.

19       WHY DON'T YOU RESTATE THE QUESTION?  I DON'T WANT THE

20   TESTIMONY TO BE THE STATEMENT OF ANOTHER PERSON.

21           MR. KALEBA:  THANK YOU.

22   Q.   I'M JUST WONDERING WHY, WHY YOU WERE THE ONE TO SEND THE

23   E-MAIL TO PLATFORA TELLING THEM THAT YOU'RE NOT GOING TO EXTEND

24   THE CONTRACT.

25   A.   FROM MY RECOLLECTION IS THAT I THINK PURCHASING WAS

1    HANDLING THE CONTRACT, BUT THEY WERE NOT DEALING WITH THE

2    TECHNICAL, SO THEY DON'T KNOW, THEY MADE THE DECISION, WHY ARE

3    YOU -- SINCE I'M THE PERSON DIRECTLY WORKING WITH THEM, THEY

4    WANTED ME TO SEND THEM SO IT'S MORE FORMAL.

5    Q.   OKAY.  DID YOU MAKE THIS DECISION ON YOUR OWN OR DID YOU

6    DISCUSS THIS WITH ANY MEMBERS OF YOUR TEAM?

7    A.   I THINK I TALKED TO MIKE BEFORE I SENT IT.  I SAID WE

8    WANTED TO SEND OUT THIS NOTICE, WE'RE NOT GOING TO EXTEND.

9    Q.   OKAY.  WHAT DO YOU RECALL ABOUT YOUR CONVERSATIONS WITH

10   MIKE ABOUT TERMINATING THE CONTRACT?

11   A.   I FORGOT.  IT'S EITHER THAT I HAD A ONE-ON-ONE MEETING

12   WITH HIM OR SOME E-MAIL.  I FORGOT.  BUT I REMEMBER I TOLD HIM

13   BEFORE I SENT THIS E-MAIL.

14   Q.   DO YOU RECALL HAVING CONVERSATIONS WITH MIKE ABOUT

15   PLATFORA TECHNICAL DIFFICULTIES?

16   A.   YEAH.  I THINK HE KNOWS DURING THE COURSE, YEAH, WE

17   CONSTANTLY REPORTING TO HIM.

18   Q.   YOU WERE CONSTANTLY REPORTING TO HIM ABOUT ISSUES?

19   A.   YEAH.

20   Q.   OKAY.  AND WHY DID YOU COPY MR. KAIL ON THIS EXHIBIT -- ON

21   THIS E-MAIL IN EXHIBIT 629?

22   A.   BECAUSE I THINK MIKE WAS THE ONE BRINGING THEM IN, AND

23   ALSO HE'S MY BOSS, SO I BETTER CC HIM.

24   Q.   OKAY.  I'D LIKE TO GO BACK IN TIME NOW TO THE BEGINNING OF

25   THE STORY, IF WE COULD.

```
1              EXHIBIT NUMBER 320.  THIS HAS BEEN ADMITTED.

2              AND IF YOU COULD GO TO PAGE 2 IN THE MIDDLE AT 12:30 P.M.

3              NOW, THE FIRST THING I'D LIKE TO ASK YOU ABOUT THE

4       TIMELINE.

5       A.   UM-HUM.

6       Q.   THE TERMINATION LETTER WAS SENT IN APRIL OF 2014, AND THIS

7       IS NOW SEPTEMBER OF 2013.  SO WHAT WAS THE SIX OR SEVEN MONTHS

8       THAT WERE GOING ON BETWEEN SEPTEMBER AND APRIL OR MARCH?

9       A.   YEAH, WE ARE WORKING WITH THEM TO TRY AND MAKE THIS

10      PRODUCT WORK FOR OUR USE CASES.

11      Q.   AND DO YOU KNOW IF THIS WAS A FULL PRODUCTION MODEL OR

12      WERE YOU STILL -- WERE YOU USING A POC?

13      A.   IT'S ALWAYS IN A POC.  NEVER REALLY HAVE A PRODUCTION USE

14      OF IT.

15      Q.   DO YOU KNOW WHETHER OR NOT NETFLIX WAS PAYING PLATFORA

16      BETWEEN THIS PERIOD OF TIME, SEPTEMBER AND --

17      A.   I'M NOT AWARE OF THAT.

18      Q.   YOU DON'T KNOW?

19      A.   NO.

20      Q.   WOULD THEY NORMALLY PAY THE VENDOR DURING THIS PERIOD OF

21      TIME?

22      A.   USUALLY THEY DON'T.  WE DON'T PAY BECAUSE THEY WANT US TO

23      USE, YOU KNOW.

24      Q.   USUALLY THEY DO NOT?

25      A.   YEAH.
```

1    Q.   I WANT YOU -- IF YOU COULD READ FOR THE -- TO THE JURY,

2    YOU SEE THE SENTENCE THAT BEGINS "IN GENERAL I THINK"?

3    A.   OH, RIGHT.  JUST READ IT.

4    Q.   YEAH, COULD YOU JUST READ THAT SENTENCE TO THE JURY,

5    PLEASE.

6    A.   OKAY.  "IN GENERAL I THINK PLATFORA IS MAKING GOOD

7    PROGRESS BUT NOT QUITE THERE YET (AS PRODUCTION SYSTEM).

8         "SPLIT INTO TWO PARTS OF THEIR MAIN FUNCTIONS, LENS

9    BUILDING AND VISUALIZATION."

10   Q.   OKAY.  AND IF YOU COULD BACK OUT, PLEASE.

11        AND THEN THERE'S SOME TECHNICAL STUFF IN THE MIDDLE WHICH

12   I'M NOT GOING TO GET INTO RIGHT NOW, BUT I'D LIKE TO GO TO THE

13   PARAGRAPH THAT'S BELOW IT THAT SAYS "THE CATCH HERE."

14        IF YOU COULD MAGNIFY THAT, PLEASE.

15        CAN YOU -- CAN YOU SEE THE SENTENCE THAT STARTS "I'D LOVE

16   TO SEE THEIR NEW FEATURE ON PROFILING"?

17   A.   UM-HUM.

18   Q.   COULD YOU PLEASE READ THAT?

19   A.   "I'D LOVE TO SEE THEIR NEW FEATURE OF PROFILING FOR LEN

20   BUILDING, I TRIED TO ENABLE IT ON OUR SERVER BUT SEEMS NOT

21   WORKING."

22   Q.   OKAY.  AND THE NEXT TWO SENTENCES, PLEASE.

23   A.   "IT WILL DEFINITELY PROVIDE A LOT OF VISIBILITY BEFORE WE

24   COMMIT TO LENGTH LEN BUILDING.  LAST TIME WHEN I TEST WITH JOHN

25   IT'S STILL A LITTLE BUGGY.

1          "I HOPE YOU CAN ROLL THAT OUT TO RELEASE SOON."

2     Q.    OKAY.  AND THEN COULD WE GO TO THE LAST PARAGRAPH, PLEASE.

3          COULD YOU READ THAT FIRST SENTENCE?

4     A.    "VISIBILITY ON PLATFORA IS OK BUT I WON'T BRAND IT RICH

5     COMPARE TO TABLEAU AND SPOTFIRE.

6          "IT'S ALMOST IMPOSSIBLE FOR PLATFORA TO PROVIDE SAME LEVEL

7     OF RICHNESS IN GRAPHIC AND PIXEL DENSITY BECAUSE THEY ARE

8     LIMITED BY BROWSER AND JAVA SCRIPT."

9     Q.    OKAY.  SIR, WHAT WAS THE PURPOSE BEHIND THIS COMMUNICATION

10    TO MR. KAIL?

11    A.    JUST TRYING TO ARTICULATE SOME OF THE CHALLENGES WE WERE

12    FACING WITH PLATFORA AND JUST INFORM HIM THAT THEY PROMISE SOME

13    FEATURES WILL IMPROVE AND THEY WERE NOT.

14    Q.    OKAY.  YOU COMPARED IT TO TABLEAU AND SPOTFIRE.  CAN YOU

15    GIVE ME SOME CONTEXT OF WHY THOSE TWO COMPANIES ARE RELEVANT?

16    A.    I BELIEVE WE WERE ALSO TESTING THOSE TWO PRODUCTS AT THE

17    SAME TIME.

18         BUT THOSE TWO ARE MAINLY FOCUSSED ON VISIBILITY, SO IT'S

19    NOT REALLY A FAIR COMPARISON BECAUSE THEY PURELY FOCUS ON

20    VISIBILITY, AND PLATFORA IS TRYING TO BUILD BOTH BACK END AND

21    FRONT END.  SO IT'S MORE OVERALL SOLUTION.

22    Q.    OKAY.  THANK YOU.

23         CAN WE GO TO EXHIBIT NUMBER 224, PLEASE, WHICH IS

24    ADMITTED.  IF YOU GO TO THE BOTTOM AT 9:50 P.M., PLEASE.

25         THIS IS AN E-MAIL THREAD, SIR, WHERE YOU'RE COPIED.  YOU

1      CAN TAKE A MOMENT JUST TO FAMILIARIZE YOURSELF.

2      A.    UM-HUM.

3      Q.    OKAY.  ARE YOU READY?

4      A.    YES.

5      Q.    OKAY.  SO I WANT TO FOCUS ON THE PERSPECTIVE OF TONY, AND

6      THEN THERE'S A PERSPECTIVE OF YING AND JAN.  THIS IS

7      MICHAEL KAIL'S SUMMARY.  IT SAYS, "TONY DOESN'T SEE THE VALUE

8      IN PLATFORA, ESPECIALLY IN THE VISUALIZATION SPACE."

9            DO YOU RECALL THAT BEING TONY'S PERSPECTIVE?

10     A.    YEAH, I THINK TONY IS NOT A BIG FAN OF PLATFORA, YEAH.

11     Q.    TONY WAS NOT A BIG FAN OF PLATFORA?

12     A.    YEAH.

13     Q.    DO YOU KNOW WHY?

14     A.    IT WAS, LIKE, BECAUSE COMPARED -- ESPECIALLY THE

15     VISIBILITY SIDE, RIGHT?  SO THE TABLEAU AND SPOTFIRE, THEY'RE

16     WAY MORE, LIKE HOW DO I SAY, MORE IMPRESSIVE OR THEY'RE MORE

17     FEATURE RICH.

18     Q.    OKAY.  THE NEXT PARAGRAPH IS -- THERE'S A SUMMARY THAT

19     SAYS YING AND JAN ARE HAPPY TO ENGAGE, BUT IT'S STILL QUITE

20     BUGGY.

21           DO YOU SEE THAT?

22     A.    YES.

23     Q.    DOES THAT FAIRLY CHARACTERIZE --

24     A.    YES.

25     Q.    -- YOUR POSITION?  YOU WERE HAPPY TO ENGAGE, EVEN THOUGH

1       IT WAS BUGGY?

2       A.    UM-HUM.

3       Q.    AND WHAT WERE YOU HAPPY TO ENGAGE IN, A FULL PRODUCTION,

4       OR A SORT OF POC LEVEL ENGAGEMENT?

5       A.    IF IT'S NOT PASSING POC, THERE'S NO WAY WE WERE GOING TO

6       GO PRODUCTION.

7       Q.    WOULD YOU EVER CHARACTERIZE YOURSELF AS REALLY

8       ENTHUSIASTIC ABOUT PLATFORA?

9       A.    NOT REALLY ENTHUSIASTIC, BUT IF MY BOSS WANT ME TO TEST, I

10      WANT TO PERFORM THE DUTY.

11      Q.    IF YOUR BOSS IS ASKING YOU TO DO IT?

12      A.    YEAH.

13      Q.    AND YOUR BOSS WAS MR. KAIL?

14      A.    YES, CORRECT.

15      Q.    WOULD YOU EVER CHARACTERIZE YOURSELF AS BULLISH ON

16      PLATFORA?

17      A.    YEAH, WE DEFINITELY TRIED TO, YEAH, SOLVE SOME OF THESE

18      PROBLEMS THAT WERE VERY, HOW DO I SAY, VERY CHALLENGED BY MANY

19      COMPANIES, YEAH.  I THINK THEY DID SOME THINGS RIGHT, BUT NOT

20      OTHERS YET.

21      Q.    THEY HAD A GOOD IDEA?

22      A.    YEAH.

23      Q.    DO YOU RECALL TRYING TO ENGAGE WITH OTHER PEOPLE AT

24      NETFLIX ABOUT USING PLATFORA DURING THIS TESTING PERIOD?

25      A.    YEAH, I DON'T RECALL VERY CLEARLY.

```
1    Q.   OKAY.  WERE YOU ASKED TO DO THAT BY MR. KAIL?

2    A.   I THINK MIKE MENTIONED SECURITY TEAM BUILD.

3    Q.   OKAY.

4    A.   THEY ALSO HAVE SOME DATA PROCESSING REQUIREMENT, POTENTIAL

5    NEED FOR THAT.

6    Q.   OKAY.  DID MR. KAIL ASK YOU TO ENGAGE WITH ANY OTHER TEAMS

7    USING PLATFORA?

8    A.   I CANNOT RECALL.

9    Q.   OKAY.  I'D LIKE TO SHOW YOU EXHIBIT NUMBER 337, PLEASE.

10        WHAT IS THIS DOCUMENT, SIR?

11   A.   IT'S AN E-MAIL FROM RYAN BALFANZ.

12   Q.   AND IS THAT ONE OF YOUR COLLEAGUES AT NETFLIX?

13   A.   I -- I DON'T REMEMBER HIM FOR SOME REASON.

14   Q.   OKAY.  DO YOU SEE OTHER COLLEAGUES ON HERE FROM NETFLIX?

15   A.   YEAH, IN THE E-MAIL WE HAVE MICHAEL POW, WHO WORKS FOR

16   TONY.  OF COURSE THERE'S JAN WORK UNDER ME, MIKE POW UNDER

17   TONY RALPH, AND BOBBY.

18   Q.   OKAY.  WHEN WAS THIS E-MAIL CREATED?

19   A.   THE E-MAIL WAS SENT FEBRUARY 11TH, 2014.

20        MR. KALEBA:  OKAY.  THE UNITED STATES MOVES

21   EXHIBIT 337 INTO EVIDENCE.

22        THE COURT:  ANY OBJECTION?

23        MS. JAYNE:  NO.

24        THE COURT:  IT WILL BE ADMITTED.

25        (GOVERNMENT'S EXHIBIT 337 WAS ADMITTED IN EVIDENCE.)
```

1        MR. KALEBA:  IF WE COULD START AT THE BOTTOM HALF OF

2   PAGE 1 AT 10:49 A.M.

3   Q.   AND, MR. LIU, I JUST WANT TO ASK YOU, WHAT'S GOING ON

4   HERE?  WHY ARE YOU REACHING OUT TO MR. BALFANZ ABOUT PLATFORA?

5   A.   I FORGOT.  I REALLY DON'T RECALL OR IF I CAN -- BUT I --

6   YEAH, SO IT WAS TALKING ABOUT APPNEXUS DATA.  IT PROBABLY

7   RELATED TO THE -- TONY'S TEAM.  YEAH, I CANNOT RECALL HERE.

8   Q.   OKAY.  IF WE GO TO THE TOP HALF OF THIS E-MAIL WHERE

9   THERE'S THE RESPONSE.

10       COULD YOU TAKE A MOMENT TO READ THAT?

11   A.   ALL RIGHT.

12       (PAUSE IN PROCEEDINGS.)

13   BY MR. KALEBA:

14   Q.   OKAY.  ARE YOU READY?

15   A.   YEAH.

16   Q.   CAN YOU READ THE FIRST PARAGRAPH?

17   A.   "SORRY FOR THE TERSE E-MAIL JUST BEFORE."

18       I DON'T KNOW WHAT THAT MEANS.

19       "I WAS WALKING AND ONLY HAD MY MOBILE ON ME.  I DO HAVE

20   SOME QUESTIONS REGARDING PLATFORA'S USE HERE AT NETFLIX.  I'M

21   PERSONALLY NOT USING IT VERY MUCH AT ALL.  I DON'T KNOW WHO IS,

22   ACTUALLY.  I DON'T EVEN SEE MANY DATA SOURCES OR DATA CATALOGS

23   WHEN I LOG IN.  MY QUESTION IS:  WHO IS USING PLATFORA AND HOW

24   MUCH TIME ARE WE SPENDING INVESTING IN MAINTAINING/UPGRADING

25   IT?"

1    Q.   OKAY.  AND I WANT TO SHOW YOU ANOTHER EXHIBIT, WHICH I

2    BELIEVE IS YOUR RESPONSE TO IT.  IT'S EXHIBIT NUMBER 1107.

3         DO YOU SEE THAT ON YOUR SCREEN, SIR?

4    A.   YEAH.

5    Q.   OKAY.  IS THIS A CONTINUATION OF THE E-MAIL CHAIN THAT WE

6    WERE JUST TALKING ABOUT?

7    A.   PARDON ME?

8    Q.   IS THIS A CONTINUATION?

9    A.   OKAY, YEAH.

10   Q.   AND WHEN WAS THIS RECORD SENT?

11   A.   THIS RECORD IS FEBRUARY 11TH, 2014.

12        MR. KALEBA:  OKAY.  THE UNITED STATES MOVES

13   EXHIBIT 1107 INTO EVIDENCE.

14        THE COURT:  ANY OBJECTION?

15        MS. JAYNE:  NO.

16        THE COURT:  IT WILL BE ADMITTED.

17   (DEFENDANT'S EXHIBIT 1107 WAS ADMITTED IN EVIDENCE.)

18        MR. KALEBA:  COULD YOU HIGHLIGHT THE BOTTOM, PLEASE,

19   AT 12:15 P.M.

20   Q.   OKAY.  CAN YOU READ THE PARAGRAPH THAT STARTS "PLATFORA

21   WAS BRINGING INTO HOUSE PRIMARILY"?

22   A.   "PLATFORA WAS BRING INTO HOUSE PRIMARILY FOR APPNEXUS DATA

23   ANALYSIS PURPOSE.  WE ARE TRYING TO FIND OTHER USER CASES FOR

24   IT BUT BLOCKED BY IT'S LIMITATION OF ONLY SUPPORT SINGLE S3

25   BUCKET AND NO SQL API."

1    Q.   OKAY.  AND THEN THE NEXT -- THIS SENTENCE THAT STARTS

2    "RIGHT NOW, JUST ME"?

3    A.   "RIGHT NOW, JUST ME AND JAN SPENDING TIME

4    MAINTAINING/UPGRADING IT.

5         "ON PLUS SIDE, THERE'S A FEW THINGS MOVING THE RIGHT

6    DIRECTION."

7    Q.   OKAY.  SIR, AT THE TIME YOU SENT THIS E-MAIL, WAS IT TRUE

8    THAT IN FEBRUARY OF 2014, IT WAS JUST YOU AND JAN WHO WERE

9    MAINTAINING OR UPGRADING PLATFORA?

10   A.   YES, CORRECT.

11   Q.   WAS IT EVER WIDELY DISTRIBUTED ACROSS THE COMPANY TO YOUR

12   KNOWLEDGE?

13   A.   NO, NOT REALLY.

14   Q.   WAS -- WERE THERE STILL TECHNICAL ISSUES WITH THE SOFTWARE

15   AT THIS TIME?

16   A.   YEAH, I BELIEVE SO.  WE'RE STILL TESTING IT AND WORKING

17   WITH THEM.

18   Q.   OKAY.  WERE YOU EVER TALKING WITH MR. RALPH, TONY RALPH,

19   ABOUT YOUR TECHNICAL TESTING AT THIS TIME?

20   A.   YEAH.  WE WORKING WITH TONY OVER TIME BECAUSE WE WANT TO

21   PRESENT THE RESULT TO HIM TO MAKE SURE THAT IT'S EITHER

22   ACCEPTABLE OR NOT ACCEPTABLE FOR HIM SO WE CAN MOVE FORWARD.

23   Q.   AND WHAT ABOUT MR. KAIL?  WERE YOU REGULARLY TALKING TO

24   MR. KAIL ABOUT IT?

25   A.   YEAH, WE JUST -- YEAH, REALLY WE CC'D HIM ON E-MAILS WHERE

1      I HAVE MY REGULAR MEETING WITH HIM, SO I WOULD PROVIDE UPDATES.

2      Q.   OKAY.  CAN WE GO TO EXHIBIT NUMBER 347, PLEASE.  AND COULD

3      YOU HIGHLIGHT --

4           WELL, WHAT IS THIS, SIR?

5      A.   IT'S AN E-MAIL FROM SYLVIA.

6      Q.   TO YOU AND TO JAN?

7      A.   YES.

8      Q.   OKAY.  WHEN WAS THIS E-MAIL SENT?

9      A.   IT'S ON MARCH 21ST, 2014.

10     Q.   AND IS THE SUBJECT MATTER THE PLATFORA TESTING?

11     A.   YES, CORRECT.

12          MR. KALEBA:  THE UNITED STATES MOVES 347 INTO

13     EVIDENCE.

14          THE COURT:  ANY OBJECTION?

15          MS. JAYNE:  OBJECTION.  HEARSAY.

16          THE COURT:  I'M NOT --

17          MR. KALEBA:  IT'S A BUSINESS RECORD.

18          THE COURT:  IT'S A BUSINESS RECORD.  THIS WITNESS --

19     OVERRULED.  IT'S NOT ADMITTED.

20          MR. KALEBA:  SORRY.  NOT?

21          THE COURT:  NOT.

22          MR. KALEBA:  OKAY.  CAN I TRY AND LAY A FOUNDATION

23     THROUGH THIS WITNESS?

24          THE COURT:  SURE.  THIS WITNESS HAS NOT ESTABLISHED A

25     BUSINESS RECORD.

```
 1              MR. KALEBA:  THANK YOU, YOUR HONOR.

 2     Q.   SIR, YOU TESTIFIED THE RECORD WAS MADE IN 2014; IS THAT

 3     CORRECT?

 4     A.   YES.

 5     Q.   WHO MADE THIS RECORD?

 6     A.   YOU MEAN THIS E-MAIL?

 7     Q.   YES.

 8     A.   SYLVIA SUNDHOLM.

 9     Q.   CORRECT.  YOU MENTIONED HER EARLIER.  DID SHE WORK AT

10     NETFLIX?

11     A.   YES.

12     Q.   AND WHERE DID SHE WORK AT NETFLIX?

13     A.   SHE'S WORKING FOR THE PURCHASING DEPARTMENT.

14     Q.   OKAY.  DID NETFLIX REGULARLY MAKE THESE RECORDS, MEANING

15     E-MAILS, TO DISCUSS COMPANY BUSINESS?

16     A.   YEAH, I THINK -- I BELIEVE SO, YEAH.

17     Q.   WE JUST SAW A BUNCH OF THESE E-MAILS?

18     A.   YEAH.

19     Q.   AND ARE THESE E-MAILS STORED BY THE COMPANY FOR REFERENCE

20     LATER AND YOU CAN COLLECT THEM ELECTRONICALLY?

21     A.   USUALLY WE DO.

22              MR. KALEBA:  OKAY.  THE UNITED STATES MOVES THIS

23     DOCUMENT INTO EVIDENCE UNDER EVIDENCE RULE 803.6.

24              MS. JAYNE:  OBJECTION.  HEARSAY, FOUNDATION.

25              THE COURT:  I DON'T -- I DON'T HAVE A SUFFICIENT
```

1       FOUNDATION OF THIS WITNESS'S KNOWLEDGE OF THE STORAGE OF THE

2       DOCUMENTS AT NETFLIX.

3       BY MR. KALEBA:

4       Q.   SIR, DID YOU USE E-MAIL WHILE YOU WERE AT NETFLIX?

5       A.   YES.

6       Q.   AND WERE YOUR E-MAILS STORED ELECTRICALLY IN SOME WAY?

7       A.   THERE'S A LITTLE BIT OF COMPLICATION.  WE CHANGED OUR

8       E-MAIL SYSTEM WHILE I WAS THERE.  WE CHANGED FROM MICROSOFT

9       EXCHANGE TO GOOGLE, GOOGLE MAIL, GMAIL.

10      Q.   OKAY.

11      A.   SO -- BUT THEY HAVE A LITTLE BIT DIFFERENT RETENTION

12      POLICY, SO I'M NOT REALLY SURE ABOUT THE RETENTION POLICY.

13      Q.   THE RETENTION POLICY, I WANT TO ASK YOU, ARE YOU ABLE

14      TO -- THESE E-MAILS ARE CREATED THROUGH SOME ELECTRONIC SYSTEM;

15      IS THAT RIGHT?

16      A.   YES, RIGHT.

17      Q.   AND THEY'RE STORED THAT WAY AS WELL?

18      A.   UM-HUM.

19      Q.   SO YOU CAN PULL THEM UP AT A LATER DATE?

20      A.   UM-HUM.

21      Q.   IS THERE ANYTHING ABOUT THIS E-MAIL THAT LOOKS INACCURATE

22      TO YOU AT THIS TIME?

23      A.   I DON'T SEE ANY INACCURACY, BECAUSE I HAVE NO REASON TO

24      THINK THIS E-MAIL IS.

25      Q.   OKAY.  LET'S COMPARE THIS WITH DEFENSE EXHIBIT 1153.  AND

1       WHEN WAS THIS RECORD MADE, SIR?

2       A.   IT'S MARCH 31ST, 2014.

3       Q.   OKAY.  AND WHO MADE THIS RECORD?

4       A.   IT'S ME SENDING THE E-MAIL TO SYLVIA.

5       Q.   OKAY.  AND DOES NETFLIX REGULARLY MAKE THESE RECORDS,

6       MEANING E-MAIL CORRESPONDENCE, TO REPORT COMMUNICATIONS ABOUT

7       THE BUSINESS?

8       A.   I DON'T SEE HOW -- WE JUST KEEP THEM IN OUR MAILBOX.

9       Q.   OKAY.  BUT DO YOU USE E-MAIL, SIR, TO DISCUSS COMPANY

10      BUSINESS?

11      A.   YEAH.

12      Q.   OKAY.  AND DOES THE COMPANY THEN SAVE THOSE E-MAILS FOR

13      YOU FOR FUTURE USE?

14      A.   YES.

15           MR. KALEBA:  OKAY.  THE UNITED STATES MOVES 347 AND

16      1153 INTO EVIDENCE AT THIS TIME UNDER 803.6.

17           THE COURT:  I'LL ADMIT BOTH OF THEM.

18      (GOVERNMENT'S EXHIBIT 347 AND DEFENDANT'S EXHIBIT 1153

19      WERE ADMITTED IN EVIDENCE.)

20           MR. KALEBA:  OKAY.  LET'S GO BACK TO 347, PLEASE.

21           THE COURT:  MR. KALEBA, WE DO NEED TO TAKE A BREAK IN

22      THE NEXT MINUTE OR TWO.

23           MR. SAMPSON:  OH, THAT'S FINE.

24           THE COURT:  SHOULD WE DO THAT BEFORE YOU GO INTO

25      THESE?

1          MR. KALEBA:  YES, YOUR HONOR.

2          THE COURT:  LET'S TAKE -- SORRY.  LET'S JUST MAKE

3     THIS A TEN MINUTE BREAK.  IN THE AFTERNOON, I FIND IT HELPFUL

4     TO HAVE TWO BREAKS, SO WE'LL MAKE THIS ONE 10 MINUTES, AND THEN

5     WE'LL TAKE ANOTHER BREAK AROUND 4:00 O'CLOCK JUST SO WE CAN GET

6     THIS AFTERNOON TO MOVE ALONG.

7          THE CLERK:  COURT IS IN RECESS.

8          (RECESS FROM 2:46 P.M. UNTIL 2:59 P.M.)

9          (JURY IN AT 2:59 P.M.)

10         THE COURT:  THANK YOU, EVERYONE.  PLEASE BE SEATED.

11    ALL COUNSEL AND PARTIES ARE PRESENT AND ALL OF OUR JURORS

12    ARE HERE.

13         MR. KALEBA, WOULD YOU LIKE TO CONTINUE WITH THE DIRECT

14    EXAMINATION?

15         MR. KALEBA:  YES, THANK YOU, YOUR HONOR.

16    Q.   MR. LIU, WOULD YOU PLEASE LOOK ON YOUR SCREEN AT EXHIBIT

17    NUMBER 347.

18         IF YOU COULD MAGNIFY THAT?

19         SO THIS IS IN MARCH OF 2014.  AND YOU'RE GETTING AN E-MAIL

20    FROM PURCHASING?

21    A.   CORRECT.

22    Q.   SO DO YOU RECALL HAVING CONVERSATIONS WITH MS. SUNDHOLM

23    ABOUT THIS E-MAIL?

24    A.   I'M NOT SURE I HAD A CONVERSATION WITH HER.  JUST GOT THIS

25    E-MAIL AND THEN REPLIED.

1    Q.   OKAY.  DID YOU TALK TO -- THE E-MAIL MENTIONED THAT YOU --

2    SHE SAYS, "MIKE KAIL MENTIONED THAT THE TWO OF YOU WERE TESTING

3    THE PLATFORA PRODUCT."

4         HOW MUCH TIME WERE YOU SPENDING -- HOW MUCH TIME WERE YOU

5    SPENDING TESTING PLATFORA IN THIS PERIOD OF TIME, MARCH OF

6    2014?

7    A.   NOT TOO MUCH.

8    Q.   OKAY.  WHEN DO YOU THINK YOU STARTED TO DECREASE YOUR TIME

9    ON PLATFORA?

10   A.   PROBABLY AROUND AFTER THIS NEW YEAR PASSED.

11   Q.   IN JANUARY?

12   A.   YEAH.

13   Q.   DO YOU BELIEVE YOU WERE SPENDING A LOT OF TIME -- HOW MUCH

14   TIME DO YOU THINK YOU WERE SPENDING ON PLATFORA IN FEBRUARY?

15   A.   MAYBE, I DON'T KNOW, JUST VERY, VERY LITTLE.  NOT VERY

16   ACTIVE.

17   Q.   VERY LITTLE, MINIMUM?

18   A.   UM-HUM.

19   Q.   DO YOU KNOW HOW MUCH TIME JAN WAS SPENDING?

20   A.   HE PROBABLY WOULD HAVE BEEN EVEN LESS.

21   Q.   AND HE WAS DOING EVEN LESS?

22   A.   UM-HUM.

23   Q.   WAS THERE ANYONE ELSE AT NETFLIX WHO WOULD HAVE BEEN

24   SPENDING MORE TIME ON PLATFORA THAN YOU?

25   A.   PROBABLY NOT.

1    Q.   OKAY.  SO YOU'RE THE PLATFORA GUY?

2    A.   UM-HUM.

3    Q.   OKAY.  WERE YOU CHECKING IN WITH MIKE KAIL IN JANUARY,

4    FEBRUARY, AND MARCH ABOUT YOUR USE OF PLATFORA?

5    A.   I PROBABLY WAS BECAUSE THE, THEY HAD SOME TIME TO PLAN

6    RELEASE, SO, YEAH, I THINK I DEFINITELY HAVE CONTACT WITH HIM.

7    Q.   OKAY.  DURING THE PERIOD OF TIME THAT YOU WERE TESTING

8    PLATFORA, WERE YOU EVER OFFERED ANY MONEY FROM PLATFORA?

9    A.   NO.

10   Q.   ANY SHARES AT PLATFORA?

11   A.   NO.

12   Q.   ANY GIFTS AT PLATFORA?

13   A.   NO, NO.

14   Q.   WOULD THAT BE A PROBLEM IF YOU WERE OFFERED THESE THINGS

15   BY PLATFORA WHILE YOU WERE TESTING THEIR PRODUCT?

16   A.   YES.

17   Q.   WHAT'S THE PROBLEM?

18   A.   IT WOULD BE CONFLICT OF INTEREST.

19   Q.   DO YOU KNOW WHETHER MR. KAIL HAD ANY KIND OF RELATIONSHIP

20   WITH PLATFORA DURING THIS PERIOD OF TIME?

21   A.   NO.  HE ONLY MENTIONED THAT HE WAS FRIENDS WITH THE CEO,

22   BUT THAT'S ALL I KNOW.

23   Q.   OKAY.  CAN YOU DESCRIBE SOME OF THE USE CASES THAT YOU

24   TRIED TO USE BUT WERE UNSUCCESSFUL AT NETFLIX?  I THINK YOU

25   MENTIONED EARLIER, WAS IT AD TECH?

1        A.    YEAH.

2        Q.    AND THAT WAS TONY RALPH?

3        A.    YEAH, THAT WAS TONY RALPH'S DATA, HIS INFORMATION.  THAT'S

4        APPNEXUS DATA THAT WAS COLLECTED AND MARKETING CAMPAIGN DATA,

5        WE NEEDED PROJECTS TO FIGURE OUT THE IMPRESSION AND CLICK

6        THROUGH FROM THOSE DATA.

7        Q.    OKAY.  IS APPNEXUS DIFFERENT FROM TONY OR IS THAT THE

8        SAME?

9        A.    IT'S A DIFFERENT COMPANY.  THEY'RE JUST HELPING US TO

10       MAINTAIN OR MANAGE THE DATA.

11       Q.    OKAY.  OKAY.  I MEANT ANY USE CASES OF PLATFORA AT

12       NETFLIX.  SO I THINK YOU TRIED TO USE IT FOR TONY'S GROUP?

13       A.    UM-HUM.

14       Q.    OKAY.  AND THEN YOU MENTIONED EARLIER A POTENTIAL

15       SECURITY?

16       A.    YEAH.

17       Q.    WHAT WAS THAT?

18       A.    I'M NOT SURE THAT'S REALLY GOING OFF GROUND AT ALL.  WE

19       JUST MENTION SOMETIME.

20       Q.    OKAY.  WERE THERE ANY OTHER USE CASES THAT YOU TRIED AND

21       THAT WERE UNSUCCESSFUL THAT YOU CAN REMEMBER?

22       A.    NO, I DON'T REMEMBER.

23       Q.    OKAY.  WHEN WAS THE DECISION MADE THEN TO TERMINATE THE

24       CONTRACT WITH PLATFORA?

25       A.    I THINK IT'S PROBABLY BEFORE SYLVIA SENT THE E-MAIL, IT'S

```
1        PROBABLY ALREADY DETERMINED THAT WE'RE NOT GOING TO GO WITH IT.

2    Q.   OKAY.  SO BY THE TIME YOU RECEIVED THIS E-MAIL, YOU

3    ALREADY KNEW THAT PLATFORA WAS GOING NOWHERE?

4    A.   UM-HUM.

5    Q.   OKAY.  CAN WE GO TO EXHIBIT NUMBER 1153?  IF WE GO IN THE

6    MIDDLE WHERE IT'S MAR 25TH.

7        AND THIS APPEARS TO BE A COMMUNICATION BETWEEN YOU AND JAN

8    ABOUT --

9    A.   UM-HUM.  YES.

10   Q.   -- WHAT YOU'RE GOING TO DO.

11       DO YOU RECALL HAVING A MEETING WITH JAN TO DECIDE WHAT

12   YOUR RECOMMENDATION WAS GOING TO BE?

13   A.   IT WAS JUST A QUICK CHAT.  JAN IS JUST SUPPORTING ME, SO

14   HE'S NOT DOING THE ACTUAL LOT OF WORK.  MOST OF THE WORK IS

15   DONE BY ME.

16   Q.   OKAY.  THE NEXT SENTENCE SAYS, "I WILL CYCLE BACK WITH

17   MIKE AND SEE HOW WE WANT TO MOVE FORWARD."

18   A.   UM-HUM.

19   Q.   WHO IS THE MIKE IN THIS?

20   A.   IT'S MIKE KAIL.

21   Q.   OKAY.  DO YOU RECALL CIRCLING BACK WITH MIKE?

22   A.   YEAH.

23   Q.   OKAY.  WHAT DO YOU RECALL ABOUT THAT?

24   A.   I FORGOT IT.  MAYBE TALK TO HIM OR E-MAIL.  I FORGOT WHICH

25   ONE I DID WHEN I CIRCLED BACK TO HIM.
```

1    Q.   WELL, PUTTING ASIDE THE FORM OF THE COMMUNICATION, WHAT

2    WAS YOUR MESSAGE?  WHAT WAS THE CONTENT?

3    A.   I THINK THE MESSAGE WAS JUST, LIKE, WE CANNOT MAKE IT WORK

4    AND PROBABLY NOT, NOT MOVE FORWARD WITH IT.

5    Q.   OKAY.  DID YOU HAVE THE FINAL SAY ON THE PLATFORA DECISION

6    OR WAS THAT WITH MIKE KAIL?

7    A.   WELL, SO MIKE WANTED US TO MAKE IT WORK AND FOR USE CASES

8    FOR TONY, AND I CANNOT MAKE A GOOD USE CASE, OR GOOD WORKING

9    ENVIRONMENT FOR TONY TO BE A SUCCESS, SO WE HAVE NO USE, NO

10   USERS, DEFINITELY NO NEED FOR IT.

11   Q.   OKAY.  DID HE SUPPORT YOUR RECOMMENDATION?

12   A.   MIKE?

13   Q.   MIKE.

14   A.   YEAH.

15   Q.   OKAY.

16   A.   HE SAID YEAH, HE ALREADY SAY YES.

17   Q.   HE SIGNED OFF ON THAT DECISION?

18   A.   YEAH, HE PROBABLY AGREED.

19   Q.   HE PROBABLY AGREED OR HE DEFINITELY AGREED?

20   A.   HE DEFINITELY AGREED.  OTHERWISE I WOULDN'T SEND THE

21   E-MAIL.

22   Q.   OKAY.  WELL, LET'S GO TO THAT.  THAT'S EXHIBIT 629, WHICH

23   HAS BEEN ADMITTED.

24        IS THIS THE E-MAIL YOU'RE TALKING ABOUT?

25   A.   YES.

1    Q.   OKAY.  SO DO YOU RECALL TALKING TO MIKE KAIL ABOUT THIS

2    E-MAIL?

3    A.   UM-HUM.

4    Q.   OKAY.  AND WHAT DO YOU RECALL ABOUT THAT SPECIFIC TO THIS

5    E-MAIL?

6    A.   I CC'D HIM FOR THE FIRST PART, BUT I BELIEVE I TALKED TO

7    HIM BEFORE I SENT IT OUT.

8    Q.   AND YOU BELIEVE HE WAS SUPPORTIVE OF YOU AND BEHIND YOU?

9    A.   YEAH.

10   Q.   DID HE TELL YOU TO SEND THIS E-MAIL?

11   A.   I'M NOT SURE SPECIFICALLY IF HE TOLD ME, SAID, YEAH, YOU

12   CAN DO IT, SOMETHING LIKE THAT.

13   Q.   OKAY.  WELL, SOMEONE FROM NETFLIX HAD TO LET PLATFORA

14   KNOW; RIGHT?

15   A.   UM-HUM.

16   Q.   OKAY.  AND IT WAS GOING TO BE YOU, NOT HIM?

17   A.   DOESN'T REALLY MATTER.  I THINK SYLVIA ASKED ME, SO I FEEL

18   IT'S A CONTRACTUAL RESTRICTION THAT WE HAVE TO -- CONTRACTUAL

19   RESTRICTION TO TELL THEM FORMALLY IN WRITING ABOUT IT.

20            MR. KALEBA:  OKAY.  MAY I HAVE A MOMENT, YOUR HONOR?

21            THE COURT:  ALL RIGHT.

22        (DISCUSSION OFF THE RECORD BETWEEN GOVERNMENT COUNSEL.)

23            MR. KALEBA:  THANK YOU, MR. LIU.

24        I HAVE NO FURTHER QUESTIONS.

25            THE COURT:  ALL RIGHT.

1          CROSS-EXAMINATION.

2                    **CROSS-EXAMINATION**

3     BY MS. JAYNE:

4     Q.   GOOD AFTERNOON, MR. LIU.

5     A.   GOOD AFTERNOON.

6     Q.   WOULD YOU AGREE THAT WHEN YOU WORKED WITH A VENDOR, WHEN

7     YOU WORKED FOR NETFLIX, YOU TRIED TO TREAT IT AS, AS MORE OF A

8     PARTNERSHIP?

9     A.   YES.

10    Q.   SO MEANING, YOU KNOW, BOTH PARTIES ARE INVESTING TIME AND

11    EFFORT INTO IT, IT'S COLLABORATIVE; CORRECT?

12    A.   YES.

13    Q.   OKAY.  AND IN THE CASE OF PLATFORA, IT SOUNDS LIKE, FROM

14    AT LEAST SOMETIME IN AUGUST 2013 UNTIL MARCH OR APRIL 2014, YOU

15    WERE ENGAGED WITH PLATFORA; CORRECT?

16    A.   UM-HUM, CORRECT.

17    Q.   AND BECAUSE OF THAT PARTNERSHIP, PLATFORA WAS PUTTING IN A

18    LOT OF EFFORT AS WELL?  WOULD YOU AGREE?

19    A.   YES.

20    Q.   THEY WERE TRYING TO PROCESS, AS YOU SAID, A LOT OF DATA;

21    RIGHT?

22    A.   UM-HUM.

23    Q.   IS THAT YES?

24    A.   NO, THE DATA ACTUALLY I'M TRYING TO PROCESS USING THEIR

25    SYSTEM.  SO THEY JUST PROVIDE THE SYSTEM.  I'M TRYING TO

1    PROCESS THE DATA.

2    Q.   YOU'RE TRYING TO PROCESS THE DATA USING THEIR PRODUCT?

3    A.   YEAH.

4    Q.   AND YOU HAD VARIOUS MEETINGS AND INTERACTIONS WITH PEOPLE

5    FROM PLATFORA; CORRECT?

6    A.   YES, CORRECT.

7    Q.   AND SO IN THOSE SIX, SEVEN MONTHS, PLATFORA WAS ALSO

8    TRYING TO MAKE IT WORK; CORRECT?

9    A.   UM-HUM, CORRECT.

10   Q.   THEY WERE TRYING TO REACH THAT 3.0 BIG RELEASE; CORRECT?

11   A.   UM-HUM, CORRECT.

12   Q.   OKAY.  AND I THINK YOU SAID -- YOU WERE INTERVIEWED

13   PREVIOUSLY IN CONNECTION WITH THIS CASE; RIGHT?

14   A.   NO, IN THIS CASE, NO.

15   Q.   NO.  YOU WERE INTERVIEWED BY, BY LAWYERS, FBI?

16   A.   OH, I HAD -- YEAH, I HAD A CONVERSATION WITH THE FBI,

17   YEAH.

18   Q.   OKAY.  AND I THINK YOU SAID THAT, WITH SOME EVENT -- WITH

19   SOME VENDORS, YOU DON'T EVEN HAVE TO GO THROUGH POC.  IF YOU

20   LIKE IT, YOU CAN JUST BUY IT; RIGHT?

21   A.   THAT'S VARIED.  USUALLY YOU WANT TO GO THROUGH THE PROCESS

22   TO TEST, TO ENSURE A GOOD FIT.

23   Q.   DID YOU MAKE A STATEMENT TO -- ON FEBRUARY 10TH, 2021,

24   THAT IT'S NOT ALWAYS NECESSARY TO EVEN TEST IT, YOU COULD JUST

25   ACTUALLY SIGN A CONTRACT -- IF THE PRODUCT WORKED, THE TEAM

1    COULD JUST SIGN A CONTRACT AND PURCHASE IT?  DID YOU SAY THAT?

2    A.   THAT'S USUALLY WE REACH OUT TO THEM SAYING WE WANT TO USE

3    THEIR PRODUCT.  SO IF THEY REACH OUT TO US, WE WANT TO TEST IT

4    OUT.

5    Q.   OKAY.  BUT IN THIS CASE, THERE WAS THIS SIX, SEVEN MONTH

6    PERIOD WHERE YOU WERE TRYING TO MAKE IT WORK; CORRECT?

7    A.   UM-HUM, YES, CORRECT.

8    Q.   YES.  AND YOU DIDN'T KNOW ONE WAY OR THE OTHER, I SUPPOSE,

9    WHETHER THEY WERE GETTING PAID SOME LESSER FEE DURING THAT TIME

10   PERIOD; CORRECT?

11   A.   NO, I'M NOT AWARE OF THAT.

12   Q.   OKAY.  AND FOR A SIX, SEVEN MONTH ENGAGEMENT WHERE BOTH

13   PARTIES ARE INVOLVED, WOULD IT BE REASONABLE FOR THERE TO BE

14   SOME PAYMENT TO THAT VENDOR THAT YOU'RE IN PARTNERSHIP WITH?

15   A.   IT DEPENDS.  A LOT OF TIMES THE VENDOR WANTS US TO USE

16   THEIR PRODUCT AND THEY'RE NOT ESTABLISHED VENDOR, YEAH, THEY

17   HAVE INCENTIVE TO IMPRESS US TO USE, SO USUALLY THEY WILL, THEY

18   WILL CUT, CUT SOME -- YEAH, THEY WOULD WANT US TO USE IT TO

19   TEST IT.

20   Q.   SO THEY WILL CUT THEIR FEE TO SOME EXTENT?

21   A.   YEAH.

22   Q.   SO THERE WILL BE SOME PAYMENT, BUT IT WOULDN'T BE LIKE

23   THEIR FULL PRICES; RIGHT?

24   A.   YEAH, IT REALLY DEPENDS ON THE NEGOTIATION, RIGHT.  SO I

25   AM NOT A PART OF THAT, SO I DON'T KNOW.

```
 1     Q.   OKAY.  AND YOU'RE AWARE OF CERTAIN CULTURAL NORMS AT

 2     NETFLIX, LIKE YOU'RE FAMILIAR WITH THE POLICY, DON'T TRY TO

 3     PLEASE YOUR BOSS; RIGHT?

 4     A.   UM-HUM.

 5     Q.   ARE YOU FAMILIAR WITH THAT?

 6     A.   NOT EXACTLY THAT TERM.  SO JUST DO THE BEST INTEREST FOR

 7     NETFLIX.

 8     Q.   DO THE BEST INTERESTS FOR NETFLIX.  AND IF YOU DON'T, THE

 9     KEEPER TEST MIGHT RESULT IN YOU BEING REMOVED FROM NETFLIX;

10     CORRECT?

11     A.   YES.

12     Q.   AND YOU AGREE THAT AT NETFLIX, THEY TRIED TO BE -- THEY

13     TRIED NOT TO HAVE A LOT OF MICROMANAGEMENT; CORRECT?

14     A.   YES.

15     Q.   PEOPLE ARE GIVEN A LOT OF INDEPENDENCE TO MAKE DECISIONS?

16     A.   YES, THERE'S NO MICROMANAGEMENT.

17     Q.   OKAY.  AND WERE YOU AWARE THAT WHEN YOU WORKED UNDER

18     MIKE KAIL, HIS GOAL WAS TO TAKE UP 100 PERCENT I.T. IN THE

19     CLOUD; RIGHT?

20     A.   YES.

21     Q.   AND HE WAS ALSO INTERESTED IN ZERO TRUST SECURITY?  ARE

22     YOU FAMILIAR WITH THAT?

23     A.   YES.

24     Q.   AND DO YOU BELIEVE THAT WHEN YOU WERE WORKING FOR

25     MIKE KAIL, HE WAS TRYING TO ACCOMPLISH THOSE GOALS?
```

1     A.   YES.

2     Q.   OKAY.  AND FOR THE I.T. DEPARTMENT, YOU DID WORK WITH A

3     NUMBER OF DIFFERENT OUTSIDE VENDORS TO TRY TO ACCOMPLISH THESE

4     GOALS; RIGHT?

5     A.   UM-HUM, YES.

6     Q.   SO WHEN YOU SAID EARLIER ABOUT BUILDING, BUILDING IS MORE

7     KURT BROWN'S TEAM THAT HAD TO DO WITH CUSTOMER FACING; CORRECT?

8     A.   UM-HUM.

9     Q.   I'M SORRY?

10    A.   CAN YOU SAY WHAT YOU MEAN BY "BUILDING"?

11    Q.   YOU WERE TALKING EARLIER ABOUT BUILDING A PRODUCT VERSUS

12    BUYING A PRODUCT.

13    A.   YEAH, SO BUILDING BASICALLY IS THE ENGINEERING TEAM

14    DEVELOPED IN HOUSE.  WE DIDN'T BUY IT.  THEY WERE IN HOUSE

15    DEVELOPED BY ENGINEERING TEAM.

16    Q.   BUT THAT WASN'T YOUR TEAM?

17    A.   NO.  I.T. DON'T DO IN HOUSE.  WE USUALLY GO WITH VENDORS.

18    Q.   I.T. USUALLY GOES WITH VENDORS?

19    A.   UM-HUM.

20    Q.   AND NETFLIX DID TRY OUT A LOT OF STARTUPS TO GET IN ON NEW

21    TECHNOLOGY; TRUE?

22    A.   YEAH, SOMETIMES.  YEAH, SOME -- SOMETIMES TRUE.

23    Q.   AND PLATFORA, AT THE TIME YOU WERE TRYING IT OUT, WAS ONE

24    OF THOSE TECHNOLOGIES THAT, THAT NETFLIX WAS TRYING OUT IN ITS

25    EARLY STAGES?  WOULD YOU AGREE?

1    A.   YES.

2    Q.   AND DID YOU BELIEVE THAT THE CAPABILITIES THAT THEY HAD

3    WERE SUPERIOR TO, FOR EXAMPLE, OTHER COMPANIES THAT WERE JUST

4    PROVIDING VISUALIZATION, LIKE TABLEAU?

5    A.   YEAH, THEY DEFINITELY HAVE A GOOD CONCEPT.

6    Q.   OKAY.  AND YOU AGREE THAT, FOR EXAMPLE, COMPARING TABLEAU

7    TO PLATFORA IS NOT APPLES-TO-APPLES?

8    A.   YEAH, IT'S NOT COMPLETELY A FAIR COMPARISON, YEAH.

9    Q.   OKAY.  AND WHEN YOU WORKED FOR MIKE KAIL, FROM WHAT YOU

10   SAW -- WELL, DID YOU LIKE -- DID YOU LIKE WORKING AT NETFLIX

11   GENERALLY?

12   A.   YES.

13   Q.   DID YOU LIKE WORKING FOR MIKE KAIL?

14   A.   YES.

15   Q.   OKAY.  AND WHEN YOU WORKED FOR HIM, DID YOU PERCEIVE THAT

16   HE WAS WORKING TOWARDS THE BEST INTERESTS OF THE I.T.

17   DEPARTMENT AT NETFLIX?

18   A.   YEAH, I WOULD SAY SO.

19   Q.   OKAY.  AND YOU NEVER COMPLAINED THAT HE WASN'T WORKING FOR

20   NETFLIX'S BEST INTEREST FROM WHAT YOU COULD SEE?

21   A.   NO, I DIDN'T.

22   Q.   OKAY.  AND, OF COURSE, YOU WERE ENCOURAGED AT NETFLIX,

23   THROUGH THESE REVIEWS, TO BE HONEST ABOUT YOUR PERCEPTIONS OF

24   PEOPLE?

25   A.   UM-HUM.

1    Q.   YES?

2    A.   YES, YES.

3    Q.   SO FROM -- LET'S GO CHRONOLOGICALLY HERE.

4         FROM THE OUTSET, YOU HAD SOME PRETTY DETAILED INVOLVEMENT

5    IN TRYING OUT PLATFORA; CORRECT?

6    A.   YES, CORRECT.

7    Q.   AND YOU WERE ACTUALLY INTERESTED IN LEARNING MORE BECAUSE

8    OF THE POSSIBILITIES THAT THEY PRESENTED; RIGHT?

9    A.   YES.

10   Q.   OKAY.  AND YOU WERE ASKED TO PUT TOGETHER SOME USE CASES

11   TO TRY THAT OUT; RIGHT?

12   A.   YES.

13   Q.   DID MIKE KAIL EVER FORCE YOU TO WORK ON SOMETHING?

14   A.   NO, HE'S NOT FORCE, BUT, YEAH, USUALLY HE WILL GIVE

15   GUIDANCE AND, YOU KNOW, SO HE'S NOT INVOLVED TOO MUCH.  SO HE

16   JUST SAY TRY OUT THIS PRODUCT AND HE GIVES GENERAL GUIDANCE AND

17   I WILL FOLLOW THROUGH AND TELL HIM.

18   Q.   SO HE MIGHT SAY TRY THIS OUT, AND THEN IT'S UP TO YOU TO

19   TRY IT OUT AND BE HONEST ABOUT IT; RIGHT?

20   A.   YEAH.

21   Q.   IF WE COULD PLEASE TURN TO WHAT'S BEEN ADMITTED AS

22   EXHIBIT 337.  THANK YOU.

23        THE E-MAIL THAT HAS ALREADY BEEN DISCUSSED PREVIOUSLY

24   COMES FROM -- IT SAYS RYAN BALFANZ; CORRECT?

25   A.   YES, CORRECT.

```
 1        Q.   AND IS IT TRUE THAT THAT PERSON IS NOT -- WAS NOT ON --

 2        UNDER MIKE ON YOUR TEAM; CORRECT?

 3        A.   NO.  YEAH, HE'S NOT.

 4        Q.   HE WAS ON A COMPLETELY DIFFERENT TEAM?

 5        A.   YES.

 6        Q.   AND DO YOU AGREE THAT SOMETHING LIKE PLATFORA WOULDN'T BE

 7        ROLLED OUT TO THE ENTIRE COMPANY; RIGHT?

 8        A.   NO.  YEAH, IT WON'T.

 9        Q.   AND IT HAS A SPECIFIC DIRECTION; CORRECT?

10        A.   YEAH, WE STILL TEST OUT, SO WE DON'T REALLY KNOW WHICH

11        DIRECTION.

12        Q.   OKAY, FAIR ENOUGH.  SO THIS PERSON WHO IS E-MAILING YOU

13        ABOUT ITS USE WAS IN A COMPLETELY DIFFERENT TEAM; CORRECT?

14        A.   UM-HUM.

15        Q.   YES?

16        A.   YES.

17        Q.   OKAY.  AND ON THIS DATE IN FEBRUARY 2014, YOU, AT THE

18        BOTTOM OF THE E-MAIL, YOU WERE UPDATING ABOUT THE PLATFORA

19        SPACE; CORRECT?

20        A.   UM-HUM, YES.

21        Q.   AND YOU WERE SAYING THAT THERE WERE CERTAIN UPGRADES TO

22        IT; CORRECT?

23        A.   YES.

24        Q.   HOW IT WAS INTERACTING WITH APPNEXUS; CORRECT?

25        A.   YES.
```

1    Q.   AND THAT -- JUST SOME OTHER TECHNICAL FEEDBACK ON IT;

2    RIGHT?

3    A.   UM-HUM, YES.

4    Q.   AND THEN YOU RESPONDED SEPARATELY -- AFTER RYAN ASKED YOU

5    ABOUT IT, YOU RESPONDED TO HIS E-MAIL PRESUMABLY; CORRECT?

6    A.   YES, I THINK SO.

7    Q.   OKAY.  IF I COULD PLEASE SHOW YOU -- IT'S NOT BEEN

8    ADMITTED -- EXHIBIT 1107.

9         CAN YOU PLEASE TAKE A LOOK AT THIS E-MAIL, AND YOU CAN

10   START AT THE BOTTOM TO GIVE SOME CONTEXT.

11        DO YOU SEE AN E-MAIL FROM RYAN?

12   A.   YES.

13   Q.   I'M SORRY.  WE CAN GO TO THE NEXT PAGE SO YOU CAN GET SOME

14   CONTEXT.  SORRY.

15        DO YOU SEE THE E-MAIL FROM RYAN WE JUST DISCUSSED WHERE

16   HE'S ASKING QUESTIONS OF YOU?

17   A.   YES.

18   Q.   AND WAS THAT YOUR RESPONSE ON PAGE 1 TO 2?

19   A.   UM-HUM.

20   Q.   IS THAT YES?

21   A.   YES.

22            MS. JAYNE:  OKAY.  I WOULD ASK THAT EXHIBIT 1107 BE

23   ADMITTED INTO EVIDENCE.

24            THE CLERK:  YOUR HONOR, 1107 IS ALREADY IN EVIDENCE.

25            MS. JAYNE:  OH, SORRY.  THERE YOU GO.  IF WE COULD

1      HAVE THAT UP.

2      Q.   AND YOU RESPONDED AT THE BOTTOM, "HI RYAN."  CORRECT?

3      A.   YES, CORRECT.

4      Q.   WE'RE TRYING TO FIND SOME OTHER USE CASES FOR IT; CORRECT?

5      A.   YES.

6      Q.   AND THEN YOU SAY, "WE ARE IN DEVELOPMENT PARTNERSHIP WITH

7      THEM."  RIGHT?

8      A.   YES.

9      Q.   "PLATFORA PROMISED TO ADDRESS THESE IN THEIR NEXT MAJOR

10     RELEASE 3.0 IN COMING QUARTER."

11          YOU WROTE THAT; CORRECT?

12     A.   YES.

13     Q.   SO YOU ANTICIPATED THAT SOME OF THE PROBLEMS YOU WERE

14     EXPERIENCING WOULD BE POTENTIALLY RESOLVED IN THEIR 3.0

15     RELEASE; CORRECT?

16     A.   YES.

17     Q.   OKAY.  THANK YOU.

18          AND AT THIS TIME, DID YOU HAVE ANOTHER PRODUCT THAT YOU

19     WERE WORKING WITH THAT PROMISED TO DO THIS TYPE OF DATA

20     ANALYSIS THAT PLATFORA WAS DOING?

21     A.   I BELIEVE TONY WAS WORKING ON SOMETHING ELSE.  I WORKED

22     WITH HIM ON THE TABLEAU.

23     Q.   I'M NOT TALKING ABOUT JUST THE VISUALIZATION, BUT I'M

24     TALKING ABOUT THE DATA ANALYTICS THAT PLATFORA WAS PROVIDING.

25          DID YOU HAVE SOMETHING ON PAR, SOMETHING APPLES-TO-APPLES

1    AT THAT TIME THAT YOU COULD -- THAT YOU WERE ALSO TRYING OUT?

2    A.   NO, WE WERE NOT.

3    Q.   OKAY.  IF WE COULD PLEASE TURN TO EXHIBIT 1153 THAT'S BEEN

4    ADMITTED.

5         THIS WAS IN MARCH 2014, I'LL JUST -- IF YOU CAN ADDRESS

6    THE CENTER OF THAT.

7         HERE YOU'RE RESPONDING TO SYLVIA AS TO HER QUERY; CORRECT?

8    A.   YES.

9    Q.   AND YOU SAY, "WE ARE GOING TO HAVE A MEETING WITH THEM TO

10   GO OVER THEIR NEW FEATURES RELEASED ON 3.0."  CORRECT?

11   A.   YES.

12   Q.   SO YOU EXPECTED, AGAIN, THAT 3.0 MIGHT HAVE BETTER

13   RESULTS; CORRECT?

14   A.   YES.

15   Q.   AND YOU SAID YOU ARE GOING TO CIRCLE BACK WITH MIKE TO

16   DECIDE HOW TO MOVE FORWARD; CORRECT?

17   A.   YES, CORRECT.

18   Q.   AND THEN AFTER YOU MET WITH MIKE, AS REFLECTED IN THIS

19   E-MAIL, YOU BOTH AGREED THAT YOU'RE NOT GOING TO MOVE FORWARD;

20   CORRECT?

21   A.   YES, CORRECT.

22   Q.   THANK YOU.

23        DID IT TURN OUT THAT EVEN THOUGH THEY HAD A GOOD PRODUCT,

24   IT JUST WASN'T WORKING AT THAT TIME FOR NETFLIX?  CORRECT?

25   A.   YES, THERE -- IT WASN'T WORKING FOR OUR NEEDS.

1        MR. KALEBA:  EXCUSE ME.  OBJECTION, YOUR HONOR.

2    LACKS FOUNDATION THAT THEY HAVE A GOOD PRODUCT.

3        THE COURT:  SUSTAINED.

4        MS. JAYNE:  OKAY.

5    Q.  DID YOU BELIEVE THAT PLATFORA HAD THE POTENTIAL TO BE A

6    GOOD PRODUCT?

7    A.  YEAH.  WITH SOME WORK, YEAH, IT COULD BE.

8    Q.  OKAY, IT COULD BE.

9        BUT YOU AND MIKE DECIDED THAT, GIVEN WHATEVER WAS GOING ON

10   AT NETFLIX AT THAT TIME --

11   A.  UM-HUM.

12   Q.  -- IT'S PROBABLY BEST NOT TO MOVE FORWARD; CORRECT?

13   A.  YES, CORRECT.

14   Q.  AND HE SUPPORTED YOUR DECISION ON THAT; CORRECT?

15   A.  YES.

16   Q.  AND IS IT FAIR TO SAY THAT MAYBE THERE WAS A LOT OF

17   FACTORS THAT WENT INTO THAT DECISION, NOT JUST ONE THING THAT

18   HAPPENED; CORRECT?

19   A.  UM-HUM.  YES, CORRECT.

20   Q.  OKAY.  AND IS IT ALSO TRUE, EVEN IN EARLY 2014, THERE WERE

21   PEOPLE AT NETFLIX WHO WERE REQUESTING ACCOUNTS AND WANTED TO

22   TRY IT OUT?  PEOPLE WERE E-MAILING ABOUT ADDING THEMSELVES TO

23   MEETINGS OR TRYING IT OUT; CORRECT?

24   A.  YES.

25   Q.  AND TRUE THAT YOU AND/OR JAN EVEN E-MAILED DIRECTLY WITH

 1    PLATFORA TO TALK ABOUT THEIR INCREMENTAL RELEASES AND

 2    IMPROVEMENTS, AND THEY WOULD RESPOND BACK TO YOU WITH, WITH

 3    ATTEMPTS AT ANSWERING YOUR QUESTIONS?  TRUE?

 4    A.   YES.

 5    Q.   I'M SORRY.  IS 1108 IN EVIDENCE?

 6         IF YOU COULD PLEASE TAKE A LOOK AT EXHIBIT 1108, JUST THE

 7    WITNESS AND THE PARTIES, PLEASE.

 8         DO YOU SEE AN E-MAIL IN THE MIDDLE THAT IS DIRECTED TO YOU

 9    AND THEN YOUR RESPONSE?

10    A.   YES.

11    Q.   OKAY.  AND THIS IS AN E-MAIL BETWEEN YOU AND SOMEONE NAMED

12    ROBERT DE MARTINO AT PLATFORA?

13    A.   YES.

14    Q.   AND DOES THIS APPEAR TO BE AN ACCURATE COMMUNICATION OF

15    THE E-MAIL BETWEEN YOU AND THIS INDIVIDUAL?

16    A.   YES.

17         MS. JAYNE:  I WOULD ASK THAT 1108 BE ADMITTED INTO

18    EVIDENCE.

19         THE COURT:  ANY OBJECTION?

20         MR. KALEBA:  NO, YOUR HONOR.

21         THE COURT:  IT WILL BE ADMITTED.

22    (DEFENDANT'S EXHIBIT 1108 WAS ADMITTED IN EVIDENCE.)

23         MS. JAYNE:  THANK YOU.

24    Q.   SO I JUST WANT TO MAKE SURE THAT I CAPTURE WHAT'S

25    HAPPENING CORRECTLY AT THIS TIME.  IN MARCH 2014,

1    ROBERT DE MARTINO E-MAILS YOU AND JAN SAYING WE "WOULD LIKE TO

2    SCHEDULE SOME TIME TO GO THRU OUR 3.0 RELEASE WITH BRIAN

3    DENKER" AND WHOEVER.  RIGHT?

4    A.   UM-HUM, YES.

5    Q.   AND THEN HE WRITES, "WE HAVE CONCLUDED SUCCESSFUL POCS ON

6    THE PRE-RELEASE VERSION AND WILL BE ROLLING OUT SOON."

7    CORRECT?  HE WROTE THAT TO YOU?  THAT'S THE "WE HAVE

8    CONCLUDED" -- DO YOU SEE WHERE I'M AT?

9    A.   YEAH.  BUT I'M NOT SURE ABOUT THE POC NETFLIX HAD.  LET ME

10   CHECK.

11   Q.   I'M SORRY.  IS THAT WHAT HE WROTE WITH YOU?

12   A.   YEAH, I'M CHECKING THE CONTEXT.

13        (PAUSE IN PROCEEDINGS.)

14   BY MS. JAYNE:

15   Q.   IS IT TRUE THAT HE'S E-MAILING YOU THAT HE WANTS TO GO

16   OVER 3.0?

17   A.   YES, BUT I'M NOT SURE THAT THIS IS REALLY REFERRING TO OUR

18   POC.  HE'S PROBABLY MENTIONED THAT HE HAD SOME SUCCESSFUL POC

19   WITH OTHER VENDORS.  THEY WANT TO BRING IT TO US.

20        I DON'T KNOW.  I DON'T REMEMBER, RECALL OUR POC WAS

21   SUCCESSFUL.  OTHERWISE WE WOULDN'T STOP THE CONTRACT.

22   Q.   RIGHT.  AND I THINK WE -- YOU'RE USING THE WORD

23   "SUCCESSFUL" MEANING THEY'RE ROLLING OUT 3.0; CORRECT?

24   A.   UM-HUM, YES.

25   Q.   AND FOR YOU, IT WASN'T SUCCESSFUL BECAUSE YOU TERMINATED

1    THE CONTRACT; RIGHT?

2    A.   NOT AT THIS POINT.  BEFORE THEY RELEASE THE 3.0 -- WE

3    TERMINATE THE CONTRACT AT THE END OF MARCH, SO THIS IS EARLY

4    MARCH.

5    Q.   SO IN EARLY MARCH, HE'S WRITING TO YOU THAT THEY HAVE

6    THEIR 3.0 RELEASE; CORRECT?

7    A.   YEAH.  I THINK THAT AFTER 3.0 WE FOUND IT STILL COULD NOT

8    FUNCTION AS WE WANTED, SO THAT'S WHY WE DECIDED NOT TO -- NO

9    MORE EXTENSION.

10   Q.   GOT IT.  SO JUST TO GO THROUGH THE TIMELINE, MARCH 7TH,

11   HE'S TELLING YOU WE HAVE OUR 3.0 RELEASE?

12   A.   UM-HUM.

13   Q.   DO YOU WANT TO MEET?  AND THEN YOU RESPOND LET'S GO OVER A

14   TIME NEXT WEEK TO GO THROUGH THE NEW FEATURES OF PLATFORM 3.0;

15   RIGHT?

16   A.   CORRECT.

17   Q.   AND THEN SOME OTHER STUFF ABOUT HADOOP; CORRECT?

18   A.   YES.

19   Q.   SO YOU'RE SAYING, LET'S GO OVER IT, IN EARLY MARCH.

20   A.   UM-HUM.

21   Q.   BUT BY THE END OF MARCH, EARLY APRIL, YOU DETERMINED, EVEN

22   THOUGH THEY GAVE US 3.0, IT STILL DOESN'T WORK FOR US; CORRECT?

23   A.   YES, CORRECT.

24   Q.   AND THAT'S WHY THE CONTRACT WAS TERMINATED; CORRECT?

25   A.   CORRECT.

1    Q.   AND IN THAT E-MAIL WE LOOKED AT, YOU UNDERSTOOD THAT YOU

2    WERE TERMINATING -- I THINK THE E-MAIL WAS CALLED CONTRACT;

3    RIGHT?

4    A.   UM-HUM.

5    Q.   YOU UNDERSTOOD YOU WERE TERMINATING A CONTRACT?

6    A.   YES.

7    Q.   THANK YOU FOR THAT EXHIBIT.

8         ONE MOMENT, PLEASE.

9         (PAUSE IN PROCEEDINGS.)

10            MS. JAYNE:  I'M SORRY, I'M MISSING A BINDER.

11        (PAUSE IN PROCEEDINGS.)

12            MS. JAYNE:  I'M SORRY, YOUR HONOR.  I CAN'T FIND THE

13   BINDER.

14            MR. KALEBA:  HERE YOU GO (HANDING).

15            MS. JAYNE:  OH, THANK YOU.

16   Q.   AND I BELIEVE THIS IS -- OH, RIGHT.  WE WENT OVER THIS.

17        IT WAS IN APRIL THAT YOU TOOK -- THAT YOU WERE THE ONE

18   THAT E-MAILED MR. DE MARTINO; CORRECT?

19   A.   YES, CORRECT.

20   Q.   OKAY.  THANK YOU SO MUCH.  I'LL FIND THAT BINDER.

21        AND BY THE WAY, WHEN YOU WERE WORKING ON PLATFORA,

22   APPNEXUS WAS STILL THE PLATFORM THAT WAS BEING USED?

23   A.   YOU MEAN WHEN I WAS AT NETFLIX THAT PLATFORA WAS BEING

24   USED?  NO.  AFTER THIS, WE STOPPED ENGAGEMENT WITH THEM.

25   Q.   NO, I'M TALKING ABOUT APPNEXUS.

1    A.   OH.  APPNEXUS, I FORGOT.  I DON'T REMEMBER WHETHER IT WAS

2    STILL BEING USED OR NOT.

3    Q.   BUT PLATFORA WAS SUPPOSED TO -- THANK YOU FOR THAT

4    EXHIBIT -- WAS SUPPOSED TO SOMEHOW WORK WITH APPNEXUS; CORRECT?

5    A.   I THINK THEY'RE PROCESSING THE DATA FROM APPNEXUS.  I

6    FORGOT THE REAL --

7    Q.   OKAY.  I'M GOING TO GET THE TERMS RIGHT.  I HAVE ACTUALLY

8    NO IDEA.

9         PLATFORA IS PROCESSING THE DATA FROM APPNEXUS; RIGHT?

10   A.   YES.

11   Q.   AND AT SOME POINT, NETFLIX ACTUALLY STOPPED WORKING WITH

12   APPNEXUS; CORRECT?

13   A.   I DON'T KNOW ABOUT THAT.  I'M NOT FOLLOWING APPNEXUS.

14   Q.   OKAY.  FAIR ENOUGH.

15   A.   PROBABLY TONY'S GROUP DOING THAT.

16   Q.   OKAY.  AND NOW I'D LIKE TO TURN TO EXHIBIT 9, PLEASE,

17   PAGE 15.

18        I HAVE MENTIONED THIS A LITTLE BIT EARLIER, BUT THERE'S

19   THESE -- THERE'S REVIEWS THAT YOU GIVE OF FELLOW EMPLOYEES AT

20   NETFLIX; CORRECT?

21   A.   YES.

22   Q.   THE 360 REVIEW?

23   A.   YES.

24   Q.   AND THAT'S WHERE YOU'RE SUPPOSED TO BE CANDID AND HONEST

25   ABOUT OTHERS AT NETFLIX, WHAT THEY CAN START, CONTINUE, AND

1       STOP DOING; CORRECT?

2       A.   YES, CORRECT.

3       Q.   AND WAS THIS YOUR REVIEW OF MICHAEL KAIL ON MAY 18TH,

4       2012?

5       A.   YES.

6       Q.   AND I'D JUST LIKE TO GO OVER SOME OF THIS, IF THAT'S OKAY,

7       AND ASK YOU IF YOU MEANT WHAT YOU WROTE.

8       A.   YES, UM-HUM.  YES.

9       Q.   SO YOU SAID THAT "ONE OF THE GREATEST ACHIEVEMENTS AFTER

10      MIKE JOINED NETFLIX IS TO BRIDGE THE GAP BETWEEN I.T. OPS AND

11      ENGINEERING."  CORRECT?

12      A.   YES.

13      Q.   THERE WAS QUITE A BIT OF DISCONNECTION AND

14      MISCOMMUNICATION BEFORE, AND NOW IT'S BETTER AND CONSTRUCTIVE;

15      CORRECT?

16      A.   YES.

17      Q.   YOU COMPLIMENTED HIM FOR GAINING TRUST AND RESPECT ON EACH

18      OTHER THE PAST FEW MONTHS AND STEERING I.T. OPS TOWARD CUSTOMER

19      SERVICE AND SERVICE CENTRIC; CORRECT?

20      A.   YES.

21      Q.   AND YOU SAID THAT -- "HOW FAST WE CAN PROVIDE INNOVATIVE

22      SERVICES TO OUR USERS AND HELP BOOST THEIR PRODUCTIVITY AND

23      COLLABORATION."  CORRECT?

24      A.   YES.

25      Q.   AND "INSTEAD OF ACTING LIKE GATE KEEPER AND SAY NO TO OUR

1    USERS, I SAW TEAMS PRACTICE MORE ON, 'SORRY WE DON'T HAVE THAT

2    SERVICE YET BUT CAN WE OFFER YOU THIS INSTEAD."  CORRECT?

3    A.   YES.

4    Q.   YOU'RE COMPLIMENTING HIM FOR TRYING TO FIND SOLUTIONS;

5    RIGHT?

6    A.   YES.

7    Q.   AND YOU SAID, "ON A PERSONAL LEVEL, I APPRECIATE MIKE CAN

8    ALWAYS PROVIDE VALUABLE GUIDANCE TO HELP MY TRANSITION FROM

9    INDIVIDUAL CONTRIBUTOR TO A MANAGER."  CORRECT?

10   A.   YES.

11   Q.   DID HE -- HE WAS SOMEHOW INVOLVED OR HELP YOU BECOME A

12   MANAGER?

13   A.   I BELIEVE AFTER MIKE BECAME A LEADER OF I.T., HE PROMOTED

14   ME FROM I.T. INDIVIDUAL CONTRIBUTOR TO A MANAGER.

15   Q.   TO A MANAGER.  AND YOU BELIEVED THAT DUE TO HIS GUIDANCE,

16   YOU WERE ABLE TO BE A BETTER MANAGER?

17   A.   YES.

18   Q.   OKAY.  AND THEN YOU TALKED ABOUT I.T. OPS IN GENERAL AND,

19   UNDER HIS LEADERSHIP, THEY CAN OVERCOME WHATEVER WALLS THEY

20   HAVE; CORRECT?

21   A.   YES.

22   Q.   OKAY.  AND YOU WROTE ONE OF THESE EVERY YEAR ABOUT

23   MR. KAIL?

24   A.   PARDON ME?

25   Q.   YOU WROTE -- YOU WROTE ONE OF THESE WHEN YOU WORKED AT

1   NETFLIX, THIS WAS PART OF THE PROCESS?  YES?

2   A.  YES, CORRECT.

3   Q.  AND OF COURSE YOU HAD THE FREEDOM TO ALSO COMPLAIN IF YOU

4   DIDN'T LIKE THE WAY HE WAS DOING SOMETHING; CORRECT?

5   A.  YES.

6           MS. JAYNE:  JUST A MOMENT, PLEASE.

7       (PAUSE IN PROCEEDINGS.)

8           MS. JAYNE:  ALL RIGHT.  THANK YOU, SIR.

9           THE WITNESS:  THANK YOU.

10          THE COURT:  REDIRECT FOR THIS WITNESS?

11          MR. KALEBA:  THANK YOU, YOUR HONOR.

12                    **REDIRECT EXAMINATION**

13  BY MR. KALEBA:

14  Q.  MR. LIU, IT SOUNDS LIKE YOU ENJOYED WORKING WITH MR. KAIL.

15  IS THAT RIGHT?

16  A.  YES, CORRECT.

17  Q.  DID YOU EVER TALK WITH MR. KAIL ABOUT ETHICS?

18  A.  ETHICS?

19  Q.  ETHICS.

20  A.  OH, YES.

21  Q.  YOU DID?  OKAY.  WHAT DID YOU TALK ABOUT?

22  A.  NETFLIX?

23  Q.  NOT NETFLIX.  ETHICS.

24  A.  WHAT IS ETHICS?  SORRY ABOUT THAT.

25  Q.  DID YOU EVER TALK WITH MR. KAIL ABOUT CONFLICTS OF

1    INTEREST?

2    A.   NO, I DON'T THINK SO.

3    Q.   DID YOU EVER TALK WITH MR. KAIL ABOUT ACCEPTING

4    COMPENSATION FROM VENDORS?

5         MS. JAYNE:  OBJECTION.  BEYOND THE SCOPE OF CROSS.

6         MR. KALEBA:  I'M ASKING --

7         THE COURT:  SUSTAINED.

8    BY MR. KALEBA:

9    Q.   DID YOU EVER TALK WITH MR. KAIL ABOUT CULTURE, THE NETFLIX

10   CULTURE?

11   A.   YES, WE DO.

12   Q.   OKAY.  I'D LIKE YOU TO TURN TO EXHIBIT NUMBER 11.

13        MS. JAYNE:  OBJECTION.  BEYOND THE SCOPE OF CROSS.

14        THE COURT:  OVERRULED.

15   BY MR. KALEBA:

16   Q.   DO YOU HAVE IT ON YOUR SCREEN YET, EXHIBIT 11?

17   A.   NO.

18        THE COURT:  WE'RE GETTING THERE.

19        THE WITNESS:  OKAY.

20   BY MR. KALEBA:

21   Q.   SO MS. JAYNE BEGAN HER EXAMINATION ASKING YOU ABOUT

22   NETFLIX CULTURE, AND I WANT TO FOCUS YOU ON THE BOTTOM OF THIS

23   E-MAIL.

24   A.   YES.

25   Q.   AND DO YOU SEE THAT?  WHEN WAS THIS E-MAIL CREATED?

1    A.   APRIL 3RD, 2012.

2    Q.   OKAY.  AND ARE YOU THE SENDER OF THIS E-MAIL?

3    A.   YES, CORRECT.

4    Q.   OKAY.  AND WHAT'S THE SUBJECT MATTER OF THIS E-MAIL?

5    A.   IT'S INTERVIEW WITH A CANDIDATE CALLED JAKE VARGAS.

6    Q.   OKAY.  AND DOES THE SUBJECT MATTER RELATE TO THE CANDIDATE

7    WHO WAS GOING TO BE WORKING AT NETFLIX?

8    A.   YES.

9    Q.   OKAY.  AND THE E-MAILS -- YOU USED THE E-MAILS IN THE

10   COURSE OF YOUR JOB?

11   A.   YES.

12   Q.   AND THE E-MAILS ARE SAVED AND MAINTAINED BY NETFLIX?

13   A.   YES, CORRECT.

14            MR. KALEBA:  OKAY.  THE UNITED STATES MOVES

15   EXHIBIT NUMBER 11, JUST PAGE 1, INTO EVIDENCE.

16            THE COURT:  ANY OBJECTION?

17            MS. JAYNE:  NO.

18            THE COURT:  IT WILL BE ADMITTED.

19        (GOVERNMENT'S EXHIBIT 11, PAGE 1, WAS ADMITTED IN

20   EVIDENCE.)

21            THE COURT:  THAT'S JUST PAGE 1.

22            MR. KALEBA:  THANK YOU, YOUR HONOR.

23        AND IF YOU CAN ACTUALLY HIGHLIGHT THE BOTTOM HALF WHERE

24   IT'S THE MICHAEL KAIL RESPONSE.

25   Q.   AND, MR. LIU, IF YOU COULD BEGIN BY READING THE BOTTOM OF

1       THIS E-MAIL, THIS IS YOUR E-MAIL TO THE GROUP, WHICH IS,

2       "SOMETIME I AM DEBATING."

3            DO YOU SEE THAT?

4       A.   YES.

5       Q.   PLEASE READ THAT.

6       A.   "SOMETIME I AM DEBATING IF I SHOULD HINT THE CANDIDATE TO

7       READ OUR CULTURE DECK OR WE SHOULD CHECK IF THE CANDIDATE WILL

8       TAKE INITIATIVE TO CHECK FOR HIMSELF OR HERSELF."

9       Q.   PLEASE CONTINUE.

10      A.   "TELL THEM TO READ CULTURE DECK CAN DEFINITELY HELP THE

11      CANDIDATE PASSING H.R. ROUND BUT NOT SURE IF THAT DEFEAT THE

12      PURPOSE."

13      Q.   OKAY.  WHY DID YOU SEND THIS E-MAIL?

14      A.   BECAUSE WE WERE HAVING A LOT OF HARD TIMES TO HIRE GOOD

15      CANDIDATE, THEY WERE VERY TECHNICALLY STRONG, BUT SOMETIMES

16      THEY'RE JUST NOT READING OUR CULTURE DECK AND THEY'RE NOT

17      PASSING H.R.  SO WE LIKE THEM VERY WELL TECHNICALLY, BUT THEY,

18      THEY COULDN'T GET THROUGH H.R.

19      Q.   OKAY.  WHAT IS IT ABOUT THE CULTURE DECK THAT MATTERED AT

20      NETFLIX?

21      A.   THE CULTURE DECK IS MORE ABOUT THE FREEDOM AND

22      RESPONSIBILITY CULTURE NETFLIX HAS, HOW WE LOOKING AT VALUES

23      AND -- VALUE WE APPRECIATE FOR INDIVIDUALS.  YEAH, SO THAT'S

24      HOW THEY HAVE THE CULTURE.  IT'S VERY DIFFERENT FROM MANY BIG

25      COMPANIES.

1    Q.   OKAY.  FREEDOM AND RESPONSIBILITY ARE VALUES; IS THAT

2    RIGHT?

3    A.   YES.

4    Q.   OKAY.  WAS THE -- THE FREEDOM TO DO WHAT?

5    A.   FREEDOM TO DO EVERYTHING IN THE INTEREST, BEST INTEREST OF

6    NETFLIX.  SO WHATEVER YOU SOLVE TO BENEFIT THE COMPANY, YOU

7    HAVE THE FREEDOM TO DO IT, AND TOTAL RESPONSIBILITY FOR THAT AS

8    WELL.

9    Q.   OKAY.  COULD YOU PLEASE READ MR. KAIL'S RESPONSE TO YOU?

10   A.   "REED DIRECTLY INSTRUCTED ME TO READ THE CULTURE DECK

11   PRIOR TO IN-PERSON INTERVIEWING, SO THAT'S HOW I'VE BEEN

12   OPERATING (MEANING THAT I TELL PROSPECTIVE EMPLOYEES TO READ

13   IT)."

14   Q.   OKAY.  WHO IS -- WHO DO YOU UNDERSTAND THE "REED" TO BE

15   REFERRING TO?

16   A.   IT WOULD BE REED HASTINGS, THE CEO OF THE NETFLIX.

17        MR. KALEBA:  THANK YOU, YOUR HONOR.

18        NO FURTHER QUESTIONS.

19        THE COURT:  ALL RIGHT.

20        ANYTHING ELSE FOR THIS WITNESS?

21        MS. JAYNE:  YES.

22                      **RECROSS-EXAMINATION**

23   BY MS. HEER:

24   Q.   MR. LIU, THIS CULTURE DECK THAT YOU JUST TESTIFIED ABOUT,

25   AND YOU SAID THAT NETFLIX WAS REALLY DIFFERENT THAN A LOT OF

1    OTHER COMPANIES; RIGHT?

2    A.   YES.

3    Q.   AND THEY PUT A LOT OF VALUE ON INDEPENDENT THINKERS;

4    CORRECT?

5    A.   UM-HUM, YES.

6    Q.   THEY VALUED PEOPLE WHO WOULD TAKE RISKS IF IT WAS IN THE

7    INTERESTS OF THE COMPANY; CORRECT?

8    A.   YES.

9    Q.   AND THEY ALSO WEREN'T SHY TO LET PEOPLE GO IMMEDIATELY;

10   CORRECT?

11   A.   YES.

12   Q.   I THINK NETFLIX HAS A CULTURE ABOUT GIVING A VERY NICE

13   SEVERANCE PACKAGE, WE'D RATHER GIVE YOU A SEVERANCE PACKAGE AND

14   FIRE YOU IMMEDIATELY THAN DO A BIG H.R. ANALYSIS?

15   A.   YES.

16   Q.   AND SO WOULD YOU AGREE THAT IF SOMEBODY WAS, EVEN A

17   MANAGER OR A DIRECTOR, WAS WASTING THE TIME OF ENGINEERS,

18   BRINGING IN A BUNCH OF GARBAGE, DOING A BAD JOB, THEY WOULD BE

19   FIRED IMMEDIATELY?

20   A.   NOT ALWAYS, BUT MUCH MORE FREQUENTLY AT NETFLIX NOW.

21   Q.   MORE FREQUENTLY AT NETFLIX?

22   A.   YEAH.

23   Q.   AND, OF COURSE, THE CULTURE OF THOSE WORKING FOR THAT

24   PERSON WERE TO VOICE THEIR OPINIONS; CORRECT?

25   A.   YES.

1    Q.   NETFLIX VALUED HONESTY; CORRECT?

2    A.   YES.

3    Q.   AND THEY VALUED -- THEY HAD THIS CULTURE BECAUSE THEY

4    WANTED PEOPLE TO BE INNOVATIVE AND THINK OUTSIDE THE BOX;

5    CORRECT?

6    A.   YES.

7         MS. JAYNE:  ONE MOMENT.

8         (PAUSE IN PROCEEDINGS.)

9    BY MS. JAYNE:

10   Q.   DO YOU THINK MR. KAIL WAS ONE OF THOSE PEOPLE WHO WAS

11   INNOVATIVE AND THOUGHT OUTSIDE THE BOX?

12   A.   YEAH, I WOULD THINK SO.

13        MS. JAYNE:  THANK YOU.

14        THE COURT:  MAY THIS WITNESS BE EXCUSED?

15        MR. KALEBA:  YES, YOUR HONOR, NOT SUBJECT TO RECALL.

16        THE COURT:  ALL RIGHT.  MR. LIU, THANK YOU FOR YOUR

17   TESTIMONY.  YOU'RE FREE TO GO.

18        THE WITNESS:  ALL RIGHT.  THANK YOU.

19        MR. SAMPSON:  YOUR HONOR, THE UNITED STATES CALLS

20   KURT BROWN.

21        THE COURT:  ALL RIGHT.

22        MR. BROWN, IF YOU WOULD COME ALL THE WAY UP HERE TO THE

23   FRONT TO THE WITNESS STAND AND STAND TO BE SWORN.

24        THE CLERK:  IF YOU WOULD, SIR, PLEASE STAND AND RAISE

25   YOUR RIGHT HAND.

1          **(GOVERNMENT'S WITNESS, KURT BROWN, WAS SWORN.)**

2               THE WITNESS:  YES.

3               THE CLERK:  THANK YOU, SIR.  PLEASE BE SEATED.

4          AND IF YOU WOULD STATE YOUR NAME AND SPELL YOUR LAST NAME

5     FOR THE RECORD.

6               THE WITNESS:  MY NAME IS KURT BROWN, B-R-O-W-N.

7               THE COURT:  OKAY.  MR. BROWN, WITH MASKS AND ALL OF

8     THE DISTANCE, I NEED YOU TO SPEAK LOUDLY AND INTO THE

9     MICROPHONE, OKAY.

10              THE WITNESS:  YES.

11              THE COURT:  THANK YOU.

12         GO AHEAD, MR. SAMPSON.

13                         **DIRECT EXAMINATION**

14    BY MR. SAMPSON:

15    Q.   GOOD AFTERNOON, MR. BROWN.  HOW ARE YOU?

16    A.   GOOD, THANK YOU.

17    Q.   MR. BROWN, ARE YOU EMPLOYED?

18    A.   I AM.

19    Q.   WHERE DO YOU WORK?

20    A.   I WORK AT SALESFORCE.

21    Q.   AND WHAT'S YOUR TITLE AT SALESFORCE?

22    A.   I'M A SENIOR VICE PRESIDENT.

23    Q.   AND PHYSICALLY WHERE DO YOU WORK?

24    A.   I WORK IN SEATTLE.

25    Q.   OKAY.  SO YOU CAME DOWN TO TESTIFY TODAY?

```
 1    A.   I DID.

 2    Q.   OKAY.  HOW LONG HAVE YOU BEEN AT SALESFORCE?

 3    A.   ALMOST TWO YEARS.

 4    Q.   WHERE WERE YOU BEFORE THAT?

 5    A.   I WAS AT NETFLIX.

 6    Q.   SORRY.  LET ME FIX THIS.

 7         YOU WORKED AT NETFLIX?

 8    A.   I DID.

 9    Q.   WHAT WAS YOUR TITLE WHEN YOU LEFT NETFLIX?

10    A.   I WAS DIRECTOR OF DATA PLATFORM.

11    Q.   ALL RIGHT.  AND APPROXIMATELY WHEN WAS THAT THAT YOU LEFT?

12    A.   IN 2019.

13    Q.   HOW LONG WERE YOU AT NETFLIX?

14    A.   I WAS THERE FOR NINE YEARS.

15    Q.   SO YOU STARTED SOMETIME AROUND 2010?

16    A.   THAT'S CORRECT.

17    Q.   WHAT WAS YOUR POSITION WHEN YOU WERE HIRED?

18    A.   I WAS DIRECTOR OF DATA PLATFORM.

19    Q.   SO THE WHOLE TIME?

20    A.   YES, CORRECT.

21    Q.   AND DID THAT FALL WITHIN I.T. OPERATIONS OR DID IT FALL

22    WITHIN SOME OTHER PART OF NETFLIX?

23    A.   IT MOVED AROUND TO DIFFERENT ORGANIZATIONS, BUT IT WAS

24    NEVER PART OF -- ACTUALLY, IT WAS PART OF OPERATIONS INITIALLY,

25    BUT THAT WAS SEPARATE FROM I.T.
```

1    Q.   AND HOW ABOUT IN 2013, 2014?

2    A.   IT WAS PART OF CENTRAL INFRASTRUCTURE AT THAT TIME.

3    Q.   OKAY.  AND WHAT WAS YOUR -- WHAT WERE YOUR DUTIES AS

4    DIRECTOR OF DATA PLATFORM AT NETFLIX?

5    A.   SO I MANAGED THE BIG DATA SYSTEMS SO THAT NETFLIX COULD

6    UNDERSTAND ALL THE DATA THAT'S COLLECTED FOR THE NETFLIX

7    SERVICE AND USE IT TO IMPROVE THE BUSINESS.

8    Q.   AND SO IS IT -- IT'S FAIR TO SAY THAT NETFLIX HAS MANY,

9    MANY USERS IN THE COUNTRY AND ELSEWHERE?

10   A.   YES, DEFINITELY.

11   Q.   AND IT -- THE ENGAGEMENT OF THOSE USERS GENERATES A LOT OF

12   DATA?

13   A.   YES.

14   Q.   AND SO WAS -- IS IT FAIR TO SAY THAT PART OF YOUR JOB WAS

15   USING TOOLS TO MANAGE THAT DATA?

16   A.   THAT'S CORRECT.

17   Q.   OKAY.  DID YOU -- ARE YOU FAMILIAR WITH SOMEONE NAMED

18   MICHAEL KAIL?

19   A.   I AM.

20   Q.   DO YOU SEE HIM IN THE COURTROOM?

21   A.   NOT YET.  OH --

22   Q.   DO YOU RECOGNIZE --

23   A.   YES.

24   Q.   DO YOU RECOGNIZE THAT PERSON TO BE MR. KAIL?

25   A.   I DO.

1      Q.   WITH THE BLUE SHIRT AND THE JACKET?

2      A.   YES, I DO.

3           MR. SAMPSON:  YOUR HONOR, THE WITNESS HAS IDENTIFIED

4      THE DEFENDANT.

5           THE COURT:  YES, THE RECORD WILL SO REFLECT.

6      BY MR. SAMPSON:

7      Q.   AND DID YOU WORK UNDER MR. KAIL OR ALONGSIDE MR. KAIL?

8      A.   ALONGSIDE, BUT NOT VERY CLOSELY.

9      Q.   ALL RIGHT.  WHAT KINDS OF INTERACTIONS WOULD YOU HAVE WITH

10     MR. KAIL IN YOUR WORK AT NETFLIX?

11     A.   VERY MINIMAL ON THE WORKING SIDE.  EVERY THREE MONTHS

12     THERE WAS AN EXECUTIVE OFF SITE MEETING, SO I WOULD SEE HIM

13     CASUALLY AT THOSE MEETINGS.

14     Q.   IS THERE A NAME FOR THAT TYPE OF MEETING?

15     A.   IT'S CALLED A QBR, QUARTERLY BUSINESS REVIEW.

16     Q.   AND SO IS THAT WHERE DIRECTORS OR OTHER HIGHER LEVEL

17     NETFLIX EMPLOYEES DISCUSSED THE BUSINESS?

18     A.   THAT'S CORRECT.

19     Q.   AND WHAT WAS MR. KAIL'S TITLE AT THE TIME?

20     A.   I BELIEVE WHEN HE STARTED HE WAS A DIRECTOR, AND THEN HE

21     LATER WAS A V.P.

22     Q.   AND WHAT KINDS OF DATA MANAGEMENT TOOLS WAS NETFLIX USING

23     IN 2012 AND 2013?

24     A.   HADOOP WAS ONE OF THE BIGGEST ONES.  AND HIVE AND PIG ARE

25     SOME KIND OF FUNNY SOUNDING TOOLS THAT ARE IN THAT SPACE.

1    Q.   OKAY.  ARE ANY OF THOSE KNOWN AS OPEN SOURCE?

2    A.   YES, THOSE ARE ALL OPEN SOURCE TOOLS.

3    Q.   WHAT DOES OPEN SOURCE MEAN?

4    A.   OPEN SOURCE MEANS THAT ANY COMPANY CAN USE IT, THEY DON'T

5    HAVE TO PAY A VENDOR TO USE IT, AND THEY CAN CONTRIBUTE BACK TO

6    IT.

7    Q.   AND SO THIS IS A PUBLICLY AVAILABLE CODE THAT COMPANIES OR

8    ORGANIZATIONS CAN USE?

9    A.   YES, AND COLLABORATE ON.

10   Q.   OKAY.  AND IS IT FAIR TO SAY THAT SOME OF THE OPEN SOURCE

11   PRODUCTS REQUIRE WORK TO INTEGRATE AT A PARTICULAR COMPANY OR

12   FOR A PARTICULAR NEED?

13   A.   TYPICALLY, YES.

14   Q.   OKAY.  WERE YOU USING ANY OTHER, ANY OTHER DATA MANAGEMENT

15   TOOLS OTHER THAN HIVE, PIG, AND HADOOP AT NETFLIX IN 2012 AND

16   2013?

17   A.   YEAH.  WE WERE USING MICROSTRATEGY, TABLEAU, AND PROBABLY

18   A HANDFUL OF OTHER TOOLS.

19   Q.   OKAY.  AND SO NETFLIX HAD A TABLEAU LICENSE AT THE TIME?

20   A.   THAT'S CORRECT.

21   Q.   SO THAT WAS NOT AN OPEN SOURCE TOOL?

22   A.   THAT'S CORRECT, IT WAS NOT AN OPEN SOURCE TOOL.

23   Q.   AND HOW ABOUT MICROSTRATEGY?

24   A.   SAME, IT WAS NOT AN OPEN SOURCE TOOL.

25   Q.   AND WHAT WERE -- WHAT WAS TABLEAU USED FOR, IN YOUR

1    EXPERIENCE?

2    A.   USUALLY FOR, ESPECIALLY BACK THEN, FOR AD HOC ANALYTICS,

3    MEANING ONE-OFF ANALYSIS THAT PEOPLE WOULD DO.

4    Q.   ANALYSIS OF LARGE DATA SETS?

5    A.   TYPICALLY.  BUT USUALLY YOU WOULD HAVE TO PROCESS THE DATA

6    FIRST BECAUSE IT WAS SO BIG THAT YOU HAD TO PREPROCESS IT

7    BEFORE YOU COULD PUT IT IN THE TOOL.

8    Q.   OKAY.  HAVE YOU EVER HEARD OF A SOFTWARE, A VENDOR CALLED

9    PLATFORA?

10   A.   I HAVE.

11   Q.   AND DO YOU RECALL WHEN YOU FIRST HEARD ABOUT PLATFORA?

12   A.   NOT THE EXACT YEAR, BUT IT WAS SOMETIME AFTER -- PROBABLY

13   AROUND WHEN I STARTED AT NETFLIX OR WITHIN THE FIRST COUPLE

14   YEARS OF BEING AT NETFLIX.

15   Q.   OKAY.  AND WAS -- DID YOU HAVE ANY MEETINGS WITH ANYONE

16   FROM PLATFORA?

17   A.   YES, I DID.

18   Q.   DO YOU RECALL ABOUT WHEN THAT WAS?

19   A.   SOMEWHERE BETWEEN 2010 AND 2013.

20   Q.   WAS MR. KAIL INVOLVED IN THE EARLY MEETING, YOUR FIRST

21   MEETING WITH PLATFORA?

22   A.   NO, HE WAS NOT.

23   Q.   AND WHAT WAS YOUR -- WERE YOU GIVEN A PITCH ABOUT WHAT

24   PLATFORA COULD SOLVE FOR YOU AS DIRECTOR OF THE DATA PLATFORM?

25   A.   YES, I WAS.

1    Q.   WHAT WAS YOUR IMPRESSION AT THE TIME ABOUT WHETHER

2    PLATFORA WOULD HAVE BEEN A GOOD FIT FOR YOUR NEEDS?

3    A.   YEAH.  I MEAN, IT -- IN THEORY, IT MIGHT HAVE BEEN.  BUT

4    IN REALITY, IT JUST WASN'T READY FOR PRIME TIME.

5    Q.   HOW WERE YOU ABLE TO DETERMINE THE DIFFERENCE BETWEEN THE

6    THEORY AND THE REALITY?

7    A.   YEAH.  SO USUALLY FROM DEMOS THEY WOULD RUN THROUGH THE

8    ARCHITECTURE, THEY WOULD SHOW US WHAT IT COULD DO.  SOMETIMES

9    YOU WOULD ACTUALLY KICK THE TIRES ON IT.

10        BUT EVEN THE VISUAL -- THE WAY IT DID VISUALIZATIONS

11   LOOKED VERY CLUNKY COMPARED TO SOMETHING LIKE TABLEAU.

12        SO IT WASN'T A VERY GOOD FIT.

13   Q.   DID YOU -- DID YOU PROVIDE THAT FEEDBACK TO PLATFORA?

14   A.   I DID.

15   Q.   AND SO YOU DID NOT ENGAGE WITH THEM AT THAT TIME?

16   A.   NOT BEYOND A PERIODIC MEETING OR SEEING THEM AT

17   CONFERENCES.

18   Q.   AND DO YOU HAVE A, AN ENGINEERING BACKGROUND YOURSELF?

19   A.   I DO.

20   Q.   SO WERE YOU A PERSON WHO WAS -- WERE YOU GIVEN AN

21   OPPORTUNITY TO TEST OUT PLATFORA, OR DID YOU JUST SIT IN ON THE

22   PITCH?

23   A.   YEAH.  SO -- NO, I DID NOT BE HANDS ON MYSELF.  IT NEVER

24   GOT TO THAT POINT FOR MY TEAM BECAUSE WE RULED IT OUT, LIKE A

25   LOT OF OTHER TOOLS, BEFORE IT EVER GOT THERE.

1    Q.   DID YOU LEAVE THE DOOR OPEN TO POTENTIALLY A LATER

2    ENGAGEMENT?

3    A.   YEAH.  IT'S ALWAYS POSSIBLE THAT SOMEBODY CAN DELIVER IN

4    THE FUTURE.

5    Q.   IS IT -- IF IT HAD WORKED, WOULD IT HAVE SOLVED A PROBLEM

6    THAT YOU WERE FACING WITH THE DATA PLATFORM?

7    A.   IF IT HAD WORKED WELL FOR OUR NEEDS, THEN IT WOULD HAVE

8    BEEN INTERESTING.

9    Q.   AFTER THAT MEETING, DID YOU CONTINUE TO USE THE FIVE

10   ENTITIES YOU MENTIONED, MICROSTRATEGY, TABLEAU, HIVE, PIG,

11   HADOOP?

12   A.   YEP.

13   Q.   DID THERE COME A TIME WHEN YOU HEARD ABOUT PLATFORA

14   POTENTIALLY BEING USED OR TESTED AT NETFLIX AFTER THAT MEETING?

15   A.   YES.

16   Q.   DO YOU RECALL ABOUT WHEN THAT WAS?

17   A.   NOT OFF THE TOP OF MY HEAD, BUT HAVING SEEN SOME OF THE

18   E-MAILS LATER, IT WAS 2012, 2013.

19   Q.   WERE YOU AWARE OF WHETHER THERE WAS A PILOT OF PLATFORA IN

20   THE I.T. OPERATIONS ORGANIZATION --

21   A.   YES.

22   Q.   -- AT NETFLIX?

23   A.   I KNEW THERE WAS.

24   Q.   AND HOW DID YOU FIND THAT OUT?

25   A.   I DON'T REMEMBER HOW I INITIALLY FOUND OUT, BUT IT WAS

1      PROBABLY A CASUAL DISCUSSION THAT SOMEBODY HAD WITH ME.

2      Q.   OKAY.

3      A.   IT COULD HAVE BEEN A DIRECT CONVERSATION THAT SAID, HEY,

4      WE'RE LOOKING AT THIS.

5      Q.   DID YOU PROVIDE YOUR FEEDBACK TO THAT PERSON ABOUT YOUR

6      FEELINGS ABOUT PLATFORA?

7      A.   YES.

8      Q.   DID YOU -- DID YOU UNDERSTAND WHAT USE CASE IT WAS BEING

9      TESTED FOR IN THE I.T. OPERATIONS ORGANIZATION?

10     A.   YEAH, MY UNDERSTANDING IS FOR THE ADVERTISING TECHNOLOGY

11     SPACE.

12     Q.   DO YOU RECALL WHO AT THE TIME WAS, WAS A DIRECTOR FOR

13     ADVERTISING TECHNOLOGY?

14     A.   I DON'T.  I KNOW MIKE KAIL WAS INVOLVED WITH IT.  I KNOW

15     TONY RALPH WAS INVOLVED WITH IT.  I THINK JAN, OR J-A-N, I'M

16     NOT SURE IF HE WAS AN ENGINEER OR MANAGER.

17     Q.   OKAY.  DO YOU -- FROM YOUR CONVERSATIONS WITH ANY OF THOSE

18     INDIVIDUALS, DID YOU HAVE AN UNDERSTANDING ABOUT WHETHER

19     PLATFORA, WHETHER ANY TESTING WAS SUCCESSFUL?

20     A.   I NEVER --

21          MS. JAYNE:  OBJECTION.  HEARSAY.

22          THE COURT:  OVERRULED.

23     BY MR. SAMPSON:

24     Q.   YOU CAN ANSWER.

25          THE COURT:  YOUR UNDERSTANDING, NOT WHAT OTHERS TOLD

BROWN DIRECT BY MR. SAMPSON

1      YOU.

2              THE WITNESS:  OKAY.  I KNOW THAT THERE WAS A POC.  I

3      WAS IN MEETINGS WHERE WE TALKED ABOUT THE POC SPECIFICALLY, AND

4      I NEVER HEARD OF IT GETTING TO FRUITION OR BEING USED IN

5      PRODUCTION.

6      BY MR. SAMPSON:

7      Q.   WAS MR. KAIL IN ANY OF THOSE MEETINGS?

8      A.   I BELIEVE SO, BUT I CAN'T SAY FOR CERTAINTY.

9      Q.   DO YOU RECALL ANYTHING MR. KAIL SAID TO YOU ABOUT PLATFORA

10     IN I.T. OPERATIONS?

11     A.   I MEAN, THE ONLY THING I REALLY REMEMBER IS ABOUT THIS

12     LOGO, THE PLATFORA LOGO, AND SINCE IT OVERLAPPED WITH MY SPACE,

13     I WANTED TO SPEAK WITH HIM ABOUT IT.

14     Q.   OKAY.  COULD YOU JUST DESCRIBE WHAT YOU MEAN BY OVERLAPPED

15     WITH YOUR SPACE?

16     A.   SO WHAT PLATFORA WAS TRYING TO SOLVE WAS BEING ABLE TO

17     VISUALIZE BIG DATA AND MY SPACE WAS BIG DATA, SO -- AND IT

18     DOESN'T MEAN THAT OTHER PEOPLE AT THE COMPANY MIGHT NOT ALSO

19     WORK IN BIG DATA, TO BE FAIR.

20             AND -- BUT WHEN, YOU KNOW, WE EVALUATED IT FOR MY SPACE

21     AND IT DIDN'T SEEM VERY EFFECTIVE, AND WE NOTICED THAT THERE

22     WAS -- OUR LOGO, THE NETFLIX LOGO WAS BEING USED ON THE SITE

23     AND THAT WAS -- IT SEEMED WEIRD TO ME.

24     Q.   AND IS THAT BECAUSE, TO YOUR KNOWLEDGE, THE PLATFORA

25     ENGAGEMENT NEVER WENT PAST A DEMONSTRATION OR A PROOF OF

1    CONCEPT?

2    A.    THAT WAS MY UNDERSTANDING.

3    Q.    ARE THERE RESTRICTIONS ON WHAT THIRD PARTIES CAN AND

4    CANNOT DO WITH THE NETFLIX LOGO?

5    A.    IT DEPENDS.  IT WOULD DEPEND ON THE CONTRACT THAT YOU

6    HAVE.  SO SOME CONTRACTS MIGHT EXPLICITLY EXCLUDE IT.  OTHERS

7    MIGHT NOT.

8    Q.    OKAY.  WHAT WERE YOUR FEELINGS ABOUT THE USE OF THE

9    NETFLIX LOGO BY A COMPANY WHOSE PRODUCT WAS NOT SUCCESSFUL AT

10   NETFLIX?

11   A.    INTERESTINGLY, EVEN IF A PRODUCT WAS SUCCESSFUL AT

12   NETFLIX, WE OFTEN WOULD NOT LET THEM USE OUR LOGO, SO THE BAR

13   WAS VERY HIGH.  IF IT WAS NOT BEING USED, I WOULD NOT THINK THE

14   LOGO WOULD BE THERE.

15   Q.    IS THAT BECAUSE ALLOWING THE USE OF A LOGO CONFERS SOME

16   KIND OF VALIDATION TO THAT ENTITY?

17   A.    YES.  IT BASICALLY USES THE NETFLIX BRAND HALO FOR SOMEONE

18   ELSE'S BENEFIT, SO UNLESS NETFLIX GETS A LOT OF BENEFIT ABOUT

19   IT, NETFLIX DIDN'T WANT THE NETFLIX LOGO ON OTHER COMPANIES'

20   SITES.

21   Q.    AND JUST FOR CONTEXT, WHEN YOU SAY "HALO," DO YOU MEAN A

22   GOOD REPUTATION?

23   A.    YES.

24   Q.    PLEASE TAKE A LOOK ON YOUR SCREEN AT EXHIBIT 340, AND I'D

25   LIKE TO ASK YOU A FEW QUESTIONS.

```
1        IF WE COULD ZOOM IN ON THE TOP AND LEAVE THE WHITE SPACE

2    OFF.

3        DO YOU SEE THAT DOCUMENT?

4    A.   I DO.

5    Q.   WAS YOUR E-MAIL KUBROWN@NETFLIX.COM?

6    A.   IT WAS.

7    Q.   AND THIS E-MAIL IS DATED DECEMBER 3RD, 2013?

8    A.   IT IS.

9    Q.   AND IT -- THERE'S THREE E-MAILS, ESSENTIALLY, BUT YOU'RE

10   INVOLVED AND YOU POSE A QUESTION TO MR. KAIL; IS THAT CORRECT?

11   A.   YES.

12   Q.   IS THAT MR. KAIL'S NETFLIX.COM E-MAIL ADDRESS?

13   A.   IT IS.

14   Q.   AND SO DID YOU --

15       WELL, BASED ON THAT, YOUR HONOR, I WOULD MOVE FOR

16   ADMISSION OF EXHIBIT 340.

17           THE COURT:  ANY OBJECTION?

18           MS. JAYNE:  NO.

19           THE COURT:  IT WILL BE ADMITTED.

20       (GOVERNMENT'S EXHIBIT 340 WAS ADMITTED IN EVIDENCE.)

21   BY MR. SAMPSON:

22   Q.   CAN YOU DESCRIBE THE CONTACT THAT YOU RECEIVED FROM

23   SOMEBODY NAMED ARIEL TSEITLIN.

24   A.   YEAH.  HE WAS A FORMER PEER OF MINE.  WE HAD THE SAME

25   MANAGER AT NETFLIX.  HE'S SINCE GONE ON TO A VENTURE CAPITALIST
```

1      FIRM.  AND HE WAS GIVING GIVEN A PITCH BY PLATFORA SAYING THAT

2      NETFLIX WAS A CUSTOMER, SO HE WANTED TO FIND OUT ANY DETAILS ON

3      IT.

4      Q.   AND HOW DID THAT STRIKE YOU TO HEAR THAT?

5      A.   I WAS SURPRISED.

6      Q.   AND WHY DID YOU REACH OUT TO MR. KAIL?

7      A.   BECAUSE I CAN TELL --

8      Q.   PLEASE SPEAK LOUDER.

9      A.   I CAN TELL EVEN MORE CLEARLY FROM THIS E-MAIL BECAUSE I

10     KNEW THEY HAD EVALUATED THEM FOR AD TECH AND THAT I DIDN'T KNOW

11     OF ANYONE ELSE USING THEM, SO THAT WOULD BE THE MOST NATURAL

12     TEAM THAT HAD SOME OVERLAP WITH THAT COMPANY.

13     Q.   AND SO COULD YOU JUST READ THE, THE PART THAT YOU WROTE TO

14     MR. KAIL?

15     A.   I SAID, "HI MIKE, SOUNDS STRANGE TO ME THAT PLATFORA IS

16     SAYING WE ARE A CUSTOMER (AND OUR LOGO IS ON THEIR SITE -

17     WWW.PLATFORA.COM/CUSTOMERS).  MY TEAM HAS TALKED WITH THEM A

18     FEW TIMES AND I KNOW WE EVALUATED THEM FOR AD TECH, BUT NO ONE

19     IS ACTUALLY USING THEM AT NETFLIX AS FAR AS I KNOW.

20         "IS THERE SOMETHING IN THE WORKS WITH THEM THAT YOU KNOW

21     OF?"

22     Q.   WHAT WAS HIS RESPONSE?  CAN YOU READ IT?

23     A.   "WE ARE USING THEM FOR SOME AD TECH USE CASES."

24     Q.   SO THAT'S ADVERTISING TECHNOLOGY?

25     A.   THAT'S CORRECT.

1    Q.   AND DID YOU PREVIOUSLY TESTIFY THAT MR. RALPH WAS INVOLVED

2    WITH ADVERTISING TECHNOLOGY?

3    A.   I DID.

4    Q.   AND DID YOU HAVE ANY CONVERSATION WITH MR. BROWN ABOUT

5    WHETHER MR. KAIL'S STATEMENT WAS CORRECT?

6    A.   MR. RALPH, YOU MEAN?

7    Q.   MR. RALPH, THANK YOU.

8    A.   YEAH.  I DON'T REMEMBER THE TIMING, BUT I'VE HAD VARIOUS

9    CONVERSATIONS, I'M SURE INCLUDING THE INITIAL EVALUATION.

10   Q.   WHAT WAS MR. RALPH AGAINST GOING FORWARD WITH PLATFORA?

11        MS. JAYNE:  OBJECTION.  CALLS FOR HEARSAY.

12        THE COURT:  SUSTAINED.

13   BY MR. SAMPSON:

14   Q.   DID YOU DISCUSS WITH MR. KAIL MORE IN DEPTH THAN THIS

15   E-MAIL WHAT THOSE AD TECH USE CASES WERE?

16   A.   YES.

17   Q.   WHAT DID HE SAY?

18   A.   I DON'T RECALL HIS RESPONSE AT THIS POINT.  I JUST KNOW I

19   TALKED TO HIM ABOUT AD TECH AND PLATFORA.

20   Q.   DID MR. KAIL SAY THAT PLATFORA WAS BEING USED?

21   A.   I DON'T RECALL.  ALL I KNOW IS IT WAS A PILOT THAT WAS IN

22   THE WORKS AT SOME POINT.  I'M NOT SURE OF THE TIMING RELATIVE

23   TO THIS E-MAIL.

24   Q.   DID YOU SET UP ANY KIND OF MEETING WITH MR. KAIL TO

25   DISCUSS, TO DISCUSS THE USE OF THE LOGO BY PLATFORA?

```
1    A.   I DID.

2    Q.   AND YOU ACTUALLY DID HAVE THE MEETING?

3    A.   I DID HAVE THE MEETING, YES.

4    Q.   AND YOU EXPRESSED YOUR FEELINGS ABOUT WHETHER IT SHOULD OR

5    SHOULD NOT BE USED BY PLATFORA?

6    A.   FROM NETFLIX, YES.

7    Q.   THE NETFLIX LOGO SHOULD NOT BE USED BY PLATFORA?

8    A.   YES, CORRECT.  SORRY.

9    Q.   DID YOU -- DO YOU KNOW WHAT THE DIFFERENCE BETWEEN PROOF

10   OF CONCEPT AND PRODUCTION IS?

11   A.   YES.

12   Q.   WHAT IS THE DIFFERENCE?

13   A.   PROOF OF CONCEPT IS IT'S NOT IN PRODUCTION YET, SO YOU'RE

14   TRYING TO PROVE OUT WHETHER IT'S WORTH TRYING TO GET IT INTO

15   PRODUCTION.

16   Q.   DID YOU GET ANY KIND OF INDICATION FROM MR. KAIL THAT

17   PLATFORA WAS IN PRODUCTION?

18   A.   NO.  BUT I WILL SAY PRODUCTION WAS HAZY SOMETIMES.

19   Q.   OKAY.  HAVE YOU EVER BEEN INVOLVED IN PROOF OF CONCEPTS AT

20   NETFLIX?

21   A.   I HAVE.

22   Q.   HAVE YOU EVER PAID THE VENDOR DURING A PROOF OF CONCEPT?

23   A.   NOT THAT I CAN RECALL.

24   Q.   AND WHY IS THAT?

25   A.   BECAUSE TYPICALLY WHEN YOU'RE DOING A PROOF OF CONCEPT,
```

1    THEY'RE TRYING TO GET THEIR PRODUCT INTO YOUR COMPANY AND

2    THEY'RE ON THE HOOK TO PROVE IT.  SO THERE'S NO GOOD REASON FOR

3    YOU TO PAY FOR THAT.

4    Q.   SO UNTIL THEY DEMONSTRATE SOME KIND OF VALUE, YOU WOULD

5    NOT PAY FOR IT?

6    A.   NOT TYPICALLY.

7    Q.   DID MR. KAIL AGREE THAT THE LOGO SHOULD BE REMOVED FROM

8    PLATFORA'S MARKETING MATERIALS?

9    A.   HE DID.

10   Q.   ALL RIGHT.  AND DID YOU -- DID YOU CHECK BACK LATER TO

11   FOLLOW UP WITH MR. KAIL?

12   A.   I DID.

13   Q.   WAS THAT BECAUSE THE LOGO HAD NOT BEEN REMOVED WHEN YOU

14   CHECKED?

15   A.   I THINK THERE WAS -- BOTH HAD HAPPENED.  ONCE IT WAS

16   SUPPOSED TO BE REMOVED AND IT HADN'T, AND THEN I FOLLOWED UP

17   AGAIN AND THEN IT WAS AFTER THAT SECOND TIME.

18   Q.   PLEASE LOOK AT EXHIBIT 343.

19        IS -- DO YOU SEE IT?

20   A.   I DO.

21   Q.   IS THIS AN E-MAIL CHAIN BETWEEN YOURSELF AND MR. KAIL?

22   A.   IT IS.

23   Q.   AND THE SUBJECT IS "RE: PLATFORA"?

24   A.   YES.

25   Q.   AND IT'S DATED JANUARY 29TH, 2014?

1    A.    THAT'S CORRECT.

2    Q.    AND YOU'RE DISCUSSING THE LOGO ISSUE WITH MR. KAIL; IS

3    THAT CORRECT?

4    A.    THAT IS CORRECT.

5               MR. KALEBA:  YOUR HONOR, I WOULD MOVE FOR ADMISSION

6    OF 343.

7               THE COURT:  ANY OBJECTION?

8               MS. JAYNE:  NO.

9               THE COURT:  IT WILL BE ADMITTED.

10        (GOVERNMENT'S EXHIBIT 343 WAS ADMITTED IN EVIDENCE.)

11   BY MR. SAMPSON:

12   Q.    SO APPROXIMATELY SEVEN OR SO WEEKS LATER, YOU'RE -- IS

13   THAT CORRECT, YOU'RE FOLLOWING UP WITH MR. KAIL ABOUT THE

14   PLATFORA LOGO?

15   A.    YES.

16   Q.    AND CAN YOU JUST -- LET'S JUST READ THE STATEMENTS, READ

17   YOUR STATEMENT TO MR. KAIL, PLEASE.

18   A.    SURE.  I SAID, "HEY MIKE, I WANTED TO TOUCH BASE ON

19   PLATFORA TO SEE WHERE THINGS STAND.

20        "OF PARTICULAR NOTE, THEY STILL HAVE OUR LOGO UP ON THEIR

21   WEBSITE AS ONE OF THEIR FEW/MARQUEE CUSTOMERS.  THAT DOESN'T

22   FEEL RIGHT, GIVEN OUR LIMITED TO NO USAGE.

23        THANKS, KURT."

24   Q.    WHAT IS A MARQUEE CUSTOMER?

25   A.    MARQUEE WOULD BE LIKE HIGHLY VISIBLE AND SHOWCASED

1    CUSTOMER.

2    Q.   A MORE WELL KNOWN CUSTOMER TO THE PUBLIC OR TO THE

3    INDUSTRY?

4    A.   YES.

5    Q.   AND WHERE -- YOUR STATEMENT, "THAT DOESN'T FEEL RIGHT,

6    GIVEN OUR LIMITED TO NO USAGE," WHERE DID YOU GET THAT

7    INFORMATION?

8    A.   BECAUSE I HAD NOT HEARD THAT WE WERE --

9         THE CLERK:  I'M SORRY, YOUR HONOR.  IF I CAN

10   INTERRUPT JUST FOR A SECOND.

11        I HAVE TO RESET THE SYSTEM.

12        THE COURT:  YOU KNOW WHAT?  THIS WAS GOING TO BE A

13   TIME TO TAKE A BREAK, SO LET'S DO THAT.  LET'S TAKE OUR SECOND

14   BREAK.  LET'S COME BACK IN TEN MINUTES.

15        THE CLERK:  THANK YOU, YOUR HONOR.

16        COURT IS IN RECESS.

17        (RECESS FROM 4:05 P.M. UNTIL 4:19 P.M.)

18        (JURY IN AT 4:19 P.M.)

19        THE COURT:  PLEASE BE SEATED, EVERYONE.  WE'RE ALL

20   BACK, ALL OF OUR JURORS AND PARTIES AND COUNSEL.

21        OUR WITNESS HAS RETURNED.  THANK YOU.

22        AND MR. SAMPSON, GO AHEAD.

23   BY MR. SAMPSON:

24   Q.   MR. BROWN, I BELIEVE MY QUESTION BEFORE THE BREAK WAS FOR

25   YOU TO BEGIN READING FROM THE BOTTOM YOUR E-MAIL TO MR. KAIL ON

1    EXHIBIT 343.

2    A.   WHERE WOULD YOU LIKE ME TO START READING IT?

3    Q.   FROM THE EARLIEST E-MAIL AT THE BOTTOM, PLEASE.

4    A.   "HEY MIKE, I WANTED TO TOUCH BASE ON PLATFORA TO SEE WHERE

5    THINGS STAND.

6         "OF PARTICULAR NOTE, THEY STILL HAVE OUR LOGO UP ON THEIR

7    WEBSITE AS ONE OF THEIR FEW/MARQUEE CUSTOMERS.  THAT DOESN'T

8    FEEL RIGHT, GIVEN OUR LIMITED TO NO USAGE."

9    Q.   I JUST REALIZED I ASKED YOU THAT BEFORE.

10        WITH RESPECT TO LIMITED OR NO USAGE, WHERE DID THAT

11   UNDERSTANDING COME FROM?

12   A.   BECAUSE WHEN I FOLLOWED UP, I HAD NOT HEARD OF ANY

13   PRODUCTION USAGE OF THAT, PLATFORA.

14   Q.   DID MR. KAIL RESPOND TO YOUR E-MAIL?

15   A.   HE DID.

16   Q.   WHAT DID HE SAY?

17   A.   HE SAID "WILL REACH OUT TO THEM (AGAIN) TOMORROW."

18   Q.   DID HE LATER CONFIRM THAT IT HAD BEEN REMOVED?

19   A.   I DID.

20   Q.   DID HE CONFIRM THAT IT HAD BEEN REMOVED?

21   A.   HE DID ALSO.

22   Q.   MR. BROWN, I BELIEVE YOU TESTIFIED EARLIER THAT YOU'VE

23   DONE PROOFS OF CONCEPT FOR TECHNOLOGY AT NETFLIX.  CORRECT?

24   A.   THAT'S CORRECT.

25   Q.   DOES NETFLIX HAVE A CONFLICT OF INTEREST POLICY?

1     A.   I BELIEVE SO.

2     Q.   AND WHAT DO YOU UNDERSTAND IT TO INCLUDE?

3               MS. JAYNE:  OBJECTION.  RELEVANCE AS TO TIME PERIOD.

4               THE COURT:  WHY DON'T YOU DEFINE THE TIME PERIOD?

5     BY MR. SAMPSON:

6     Q.   WAS THERE EVER A TIME THAT YOU KNEW NETFLIX DIDN'T HAVE A

7     CONFLICT OF INTEREST POLICY?

8     A.   I WAS -- NO, I WOULD ASSUME IT'S ALWAYS HAD A CONFLICT OF

9     INTEREST POLICY.

10    Q.   AND WHAT DID YOU UNDERSTAND THAT TO COVER?

11    A.   IT IS THAT YOU DON'T DO SOMETHING THAT IS A CONFLICT OF

12    THE BEST INTERESTS OF NETFLIX.

13    Q.   SO, MR. BROWN, IF YOU WERE DOING A PROOF OF CONCEPT AND A

14    VENDOR OFFERED YOU STOCK OPTIONS, WOULD THAT BY A POTENTIAL

15    CONFLICT OF INTEREST?

16    A.   IT WOULD.

17    Q.   IN YOUR MIND, WOULD THAT BE A CLEAR POTENTIAL CONFLICT OF

18    INTEREST?

19    A.   YES.

20    Q.   WOULD IT ALSO POTENTIALLY VIOLATE THE CULTURE AT NETFLIX?

21    A.   IT WOULD.

22    Q.   AND IS THAT THE FREEDOM AND RESPONSIBILITY CULTURE?

23    A.   YES.

24              MR. SAMPSON:  NO FURTHER QUESTIONS.

25              THE COURT:  THANK YOU.

```
1          CROSS-EXAMINATION.

2                        CROSS-EXAMINATION

3     BY MS. JAYNE:

4     Q.   GOOD AFTERNOON, MR. BROWN.

5     A.   HELLO.

6     Q.   OKAY.  SO AS I UNDERSTAND IT, YOU WORKED IN A DIVISION

7     CALLED DATA SCIENCE AND ENGINEERING; CORRECT?

8     A.   I -- IT WAS DIFFERENT NAMES, BUT AT ONE POINT THAT WAS THE

9     NAME, YES.

10    Q.   AND YOU -- YOU AND YOUR TEAM WERE SORT OF DEVELOPERS;

11    CORRECT?

12    A.   THAT'S CORRECT.

13    Q.   AND YOU WERE MORE FORWARD FACING TO CUSTOMERS, MEANING ALL

14    THE US WHO WATCH NETFLIX?

15    A.   SAY THAT AGAIN, PLEASE.

16    Q.   WAS WHAT YOU WERE DOING MORE AIMED AT, NOT TOWARDS THE

17    I.T. DEPARTMENT, BUT TO OUTSIDE PEOPLE THAT USED THE PRODUCT?

18    A.   IN AN INDIRECT WAY, YES.

19    Q.   OKAY.  AND AS YOU MENTIONED, I.T. WAS A COMPLETELY

20    DIFFERENT DEPARTMENT; RIGHT?

21    A.   THAT IS CORRECT.

22    Q.   AND SO YOU -- YOU AND MR. KAIL, YOU DIDN'T WORK UNDER HIM,

23    HE DIDN'T WORK UNDER YOU, YOU'RE PARALLEL OR COMPLETELY

24    DIFFERENT TRACKS; CORRECT?

25    A.   THAT'S CORRECT.
```

1    Q.   AND FOR THE PURPOSES OF YOUR DIVISION, YOU DO A LOT MORE

2    BUILDING OF PRODUCTS; CORRECT?

3    A.   IT'S A COMBINATION, BUILDING AND PURCHASING.

4    Q.   OKAY.  AND YOU MENTIONED THAT YOU PURCHASED -- WHEN YOU

5    WERE WORKING ON TRYING TO COMPILE DATA REGARDING NETFLIX USERS,

6    YOU USED HADOOP AND PIG AND TABLEAU AND YOU SAID A HANDFUL OF

7    OTHERS; CORRECT?

8    A.   THAT'S RIGHT.

9    Q.   AND SO DO YOU RECALL WHAT THOSE HANDFUL OF OTHERS WERE?

10   A.   TIMING FACTORS IN.  SPARK, PRESTO ARE SOME OTHERS.  THOSE

11   ARE THE BIGGEST ONES THAT COME TO MIND.

12   Q.   OKAY.  SO YOU HAD TO USE NOT ONLY OPEN SOURCE AND YOUR OWN

13   ENGINEERS AND THESE OTHER COMPANIES, IT TOOK A LOT OF DIFFERENT

14   THINGS TO MAKE -- TO GET TO WHAT YOU WANTED AS FAR AS GETTING

15   THE DATA; CORRECT?

16   A.   YES, IT TOOK EFFORT.

17   Q.   IT TOOK -- YOU MAY HAVE TO PAY MULTIPLE VENDORS TO ARRIVE

18   AT THE PRODUCT YOU WERE LOOKING FOR; CORRECT?  OR THE END

19   RESULT?

20   A.   YOU MIGHT HAVE TO ENGAGE WITH MULTIPLE VENDORS.  PAY IS A

21   DIFFERENT QUESTION.

22   Q.   ENGAGE OR -- I MEAN, DO MOST VENDORS WORK FOR FREE?

23   A.   IF YOU'RE USING THEM IN PRODUCTION, THEY DO NOT WORK FOR

24   FREE.

25   Q.   OKAY.  SO I JUST WANT TO KIND OF GO THROUGH THE TIMELINE

1    HERE.  IT SOUNDS LIKE PRETTY EARLY ON IN YOUR TIME AT NETFLIX,

2    YOU MET WITH PLATFORA; CORRECT?

3    A.   THAT'S CORRECT.

4    Q.   AND YOU STARTED IN 2010?

5    A.   AT NETFLIX, YES.

6    Q.   OKAY.  AND DO YOU THINK IT WAS AROUND 2010 OR AROUND THAT

7    TIME THAT YOU MET WITH THEM?

8    A.   WITHIN A COUPLE YEARS OF THEN.

9    Q.   I'M SORRY?

10   A.   WITHIN A COUPLE YEARS OF 2010, YES.

11   Q.   OKAY.  AND -- WELL, THE TIME PERIOD I THINK THAT WE'RE

12   TALKING ABOUT HERE IS 2013, SO IT WAS PRIOR TO THAT; CORRECT?

13   PRIOR TO THESE E-MAILS THAT WE'VE BEEN SEEING?

14   A.   THE FIRST TIME I TALKED WITH THEM WAS BEFORE THAT, YES.

15   Q.   OKAY.  SO THEY CAME TO YOU PRETTY EARLY ON, AND YOU

16   DETERMINED AFTER A MEETING WITH THEM THAT, FOR YOUR TEAM, IT'S

17   NOT SOMETHING YOU NEEDED; CORRECT?

18   A.   IT WOULD HAVE BEEN INTERESTING, BUT IT DIDN'T SEEM READY

19   FOR USE.

20   Q.   OKAY.  IN THAT TIME PERIOD?

21   A.   THAT'S CORRECT.

22   Q.   AND YOU DIDN'T DO A PILOT OR POC, IT WAS JUST SOME KIND OF

23   A PITCH?

24   A.   IT WAS A PITCH, YES.

25   Q.   OKAY.  SO THEN SOME TIME PASSES AND YOU LEARN ABOUT

1     PLATFORA BECAUSE A FORMER COLLEAGUE REACHED OUT TO YOU;

2     CORRECT?

3     A.   I DON'T RECALL HOW I LEARNED.

4     Q.   OH, SORRY.

5     A.   I DON'T RECALL HOW I REENGAGED, BUT I KNOW I REENGAGED

6     MULTIPLE TIMES.

7     Q.   RIGHT.  I THINK WE SAW AN E-MAIL FROM A PERSON NAMED

8     ARIEL.

9     A.   OH, YES.

10    Q.   SO ARIEL DREW YOUR ATTENTION AND SAID, OH, IS NETFLIX A

11    CUSTOMER?  RIGHT?

12    A.   YES.

13    Q.   AND THAT'S WHAT TRIGGERED YOU TO REACH OUT TO MR. KAIL AND

14    ASK WHAT WAS GOING ON WITH PLATFORA; CORRECT?

15    A.   CORRECT.

16    Q.   BECAUSE YOU KNEW YOUR DIVISION AT LEAST IT WASN'T BEING

17    USED?

18    A.   I KNEW IT WASN'T USED IN MY DIVISION, AND MY UNDERSTANDING

19    IS IT WASN'T BEING USED IN GENERAL.

20    Q.   OKAY.  AND DID YOU GO AND TALK TO YINGKUAN LIU?

21    A.   I DOUBT I TALKED TO HIM, BUT I DON'T RECALL.  I MIGHT

22    HAVE.

23    Q.   DID YOU TALK TO JAN KRIVOCHEIA?

24    A.   I'M NOT SURE.

25    Q.   OKAY.  AND MR. KAIL'S RESPONSE, I THINK WE SAW THE E-MAIL,

1    I DON'T -- LET ME KNOW IF YOU WANT ME TO PULL IT UP.  HE SAID

2    IT WAS BEING USED IN AD TECH; CORRECT?

3    A.   THAT'S CORRECT.

4    Q.   OKAY.  AND THEN -- AND THEN SOMETIME AFTER THAT --

5    ACTUALLY, LET'S GO AHEAD AND PULL UP EXHIBIT 340 THAT'S BEEN

6    ADMITTED INTO EVIDENCE.

7         SO THIS IS IN DECEMBER 2013; CORRECT?

8    A.   YES, THAT'S CORRECT.

9    Q.   HE SAYS, "WE ARE USING THEM FOR SOME AD TECH USE CASES."

10   CORRECT?

11   A.   THAT IS CORRECT.

12   Q.   AND YOU DON'T KNOW ONE WAY OR THE OTHER WHETHER ENGINEERS

13   IN DECEMBER 2013 WERE ENGAGING WITH PLATFORA, DO YOU?

14   A.   OBVIOUSLY MY UNDERSTANDING IS THEY WEREN'T, BECAUSE I SAID

15   WE EVALUATED THEM FOR AD TECH.  SO I KNEW THAT THEY HAD

16   EVALUATED THEM IN THE PAST.

17   Q.   I'M SORRY.  YOU SAID WHAT?

18   A.   I SAID I KNOW WE HAD EVALUATED THEM FOR AD TECH, AND THAT

19   WAS NOT MY TEAM, THAT WAS THAT TEAM.  SO MY UNDERSTANDING WAS

20   THAT THEY HAD EVALUATED THEM, BUT I DIDN'T KNOW THAT THEY STILL

21   WERE.

22   Q.   OKAY.  YOU DIDN'T KNOW ONE WAY OR THE OTHER THAT THEY

23   WERE?  YOU DIDN'T INTERVIEW EVERYBODY WHO WAS WORKING AND

24   ENGAGING IN PLATFORA; CORRECT?

25   A.   NO.

BROWN CROSS BY MS. JAYNE

1    Q.   SO IF YINGKUAN LIU WAS ACTIVELY ENGAGED IN DECEMBER 2013,

2    YOU WOULDN'T KNOW ONE WAY OR THE OTHER, WOULD YOU?

3    A.   NO.

4    Q.   AND HE GAVE YOU AN ANSWER; CORRECT?

5    A.   THAT IS CORRECT.

6    Q.   AND THEN IF WE COULD JUST GO TO EXHIBIT 343, PLEASE.

7         AND I THINK YOU SAID THAT YOU HAD A MEETING REGARDING --

8    OR I'M SORRY.  AT THE END OF JANUARY, YOU SAID, "I WANTED TO

9    TOUCH BASE," CORRECT, "TO SEE WHERE THINGS STAND.  THEY HAVE

10   OUR LOGO ON THEIR WEBSITE."  CORRECT?

11   A.   THAT'S CORRECT.

12   Q.   AND SOMETIME BETWEEN DECEMBER 3RD AND JANUARY 2014, YOU

13   MAY HAVE HAD A MEETING WITH MICHAEL KAIL TO DISCUSS THE LOGO?

14   A.   I THINK I MIGHT HAVE.

15   Q.   I MEAN, YOU HAD TESTIFIED ABOUT THAT EARLIER; RIGHT?

16   A.   YEAH.

17   Q.   OKAY.

18   A.   I JUST DON'T REMEMBER THE DATES.

19   Q.   RIGHT, YOU DON'T REMEMBER THE DATES.  BUT SOMETIME FROM

20   WHEN HE SAID IN DECEMBER USING IT IN AD TECH TO THE END OF

21   JANUARY, SOMETIME IN THAT TIME PERIOD YOU MET WITH HIM?

22   A.   YES.

23   Q.   CORRECT?

24   A.   YES.

25   Q.   AND HE TOLD YOU -- OR YOU DISCUSSED THE LOGO SPECIFICALLY;

1    CORRECT?

2    A.   THAT'S RIGHT.

3    Q.   AND ISN'T IT TRUE THAT HE TOLD YOU HE DIDN'T ALLOW THEM TO

4    USE THE LOGO; CORRECT?

5              MR. SAMPSON:  OBJECTION.  MISSTATES THE TESTIMONY.

6              THE COURT:  SUSTAINED.

7    BY MS. JAYNE:

8    Q.   DID HE EVER GIVE YOU ANY INDICATION THAT HE HAD PERMITTED

9    THE USE OF THE LOGO?

10   A.   NO.

11   Q.   AND, IN FACT, THAT WOULDN'T BE WITHIN HIS SPECIFIC ROLE

12   TO -- THERE'S A DIFFERENT DIVISION THAT WOULD HAVE HAD TO

13   APPROVE THE USE OF LOGOS; CORRECT?

14   A.   IT'S COMPLICATED.  HE WOULD -- WHOEVER WAS WORKING WITH

15   THE VENDOR WOULD ALSO WORK WITH OTHER PEOPLE IDEALLY TO MAKE

16   SURE THAT THAT HAPPENS.

17   Q.   IT'S SUPPOSED TO GO THROUGH SOME CHAIN AT NETFLIX WHERE IT

18   GETS APPROVAL; CORRECT?

19   A.   IF YOU PROACTIVELY REACH OUT TO THEM, YES.

20   Q.   OKAY.  AND HE -- IN ANY EVENT, HIS RESPONSE WAS THAT HE

21   WOULD ASK THEM TO REMOVE IT; CORRECT?

22   A.   THAT IS CORRECT.

23   Q.   AND THEN HE TELLS YOU HERE, BY THE END OF JANUARY, THAT

24   HE'S GOING TO ASK THEM AGAIN TO REMOVE IT; CORRECT?

25   A.   THAT'S CORRECT.

1    Q.   OKAY.  THANK YOU.

2         WERE YOU AWARE THAT PLATFORA WENT THROUGH AN UNPAID PROOF

3    OF CONCEPT?

4    A.   I DON'T KNOW ACTUALLY THE NATURE OF PAID OR UNPAID --

5    Q.   OKAY.

6    A.   -- FOR PLATFORA.

7    Q.   AND IS IT POSSIBLE FOR A VENDOR TO GO THROUGH AN UNPAID

8    PROOF OF CONCEPT AND THEN GO INTO A TIME PERIOD WHERE IT'S LIKE

9    A PROOF OF CONCEPT, BUT THE PRICE IS REDUCED AND BOTH PARTIES

10   ARE WORKING TOGETHER?

11   A.   IT'S POSSIBLE.

12   Q.   OKAY.  YOU ALSO STATED THAT YOU BELIEVED IT WOULD BE A

13   CONFLICT OF INTEREST IF SOMEBODY RECEIVED ANY COMPENSATION

14   FROM, FROM A COMPANY THAT DID BUSINESS WITH NETFLIX; CORRECT?

15   A.   NOT ANY COMPANY THAT DID BUSINESS, BUT IF YOU WERE IN A

16   POSITION OF RECOMMENDING OR NOT RECOMMENDING A COMPANY, THEN

17   THAT WOULD BE A CONFLICT OF INTEREST.

18   Q.   OKAY.  DO YOU THINK THAT -- WOULD THAT GO FOR SOMEBODY,

19   LET'S SAY, IN A HIGHER UP POSITION, SOMEBODY IN A POSITION OF

20   POWER AT THE COMPANY TO RECEIVE ANY SORT OF COMPENSATION FROM

21   ANY COMPANY WHOSE PRODUCT NETFLIX WAS USING?

22   A.   NO, I DON'T THINK -- I THINK THERE ARE CASES WHERE THAT

23   WOULD BE FINE IF IT'S IN NETFLIX'S BEST INTERESTS, THEN THERE

24   WOULD BE CASES WHERE IT ACTUALLY HELPS NETFLIX TO DO IT.

25        BUT NOT IF IT -- NOT IF YOU WOULD CHOOSE THAT PRODUCT OVER

1      SOMETHING -- SOMEONE ELSE, THAT WOULD NOT.  THAT WOULD BE A

2      CONFLICT OF INTEREST.

3      Q.   GOT IT.  SO IT'S ONLY A CONFLICT OF INTEREST IF IT'S NOT

4      IN NETFLIX'S BEST INTEREST?

5      A.   IT'S -- I'M SURE THERE ARE SCENARIOS I CAN THINK OF THAT

6      WOULD NOT BE TRUE THE WAY YOU JUST SAID IT.

7      Q.   OKAY.  I'M JUST TRYING TO UNDERSTAND YOUR ANSWER.  YOU'RE

8      SAYING IN SOME INSTANCES IT MIGHT BE OKAY TO RECEIVE

9      COMPENSATION FROM A COMPANY THAT'S DOING BUSINESS WITH NETFLIX

10     IF THAT PARTICULAR COMPANY IS A GOOD IDEA FOR NETFLIX, IS IN

11     NETFLIX'S BEST INTEREST?

12     A.   NOT NECESSARILY.  IN THAT CASE, HOPEFULLY YOU JUST PAY

13     THEM LIKE ANY OTHER VENDOR AND YOU DECIDE THEM ON THEIR OWN

14     MERITS.

15     Q.   RIGHT.

16     A.   BUT YOU'RE ALSO BEING COMPENSATED.

17     Q.   RIGHT.  SO IF THAT'S HAPPENING, WOULD YOU CONSIDER THE

18     VIOLATION OF THEIR CULTURE OR THEIR -- OR CONFLICT OF INTEREST,

19     WHATEVER, TO -- IF WHAT YOU JUST DESCRIBED IS HAPPENING, TO

20     RECEIVE COMPENSATION FROM A COMPANY THAT'S DOING BUSINESS WITH

21     NETFLIX?

22     A.   TYPICALLY I WOULD SAY, BUT IT WOULD BE SITUATIONAL.  SO I

23     WOULD NEED TO KNOW MORE ABOUT THE SITUATION TO SAY WITH

24     ABSOLUTE CERTAINTY WHAT YOU'RE GETTING AT.

25     Q.   SO YOU'RE SAYING THERE ARE INSTANCES WHERE ONE COULD

1    RECEIVE COMPENSATION FROM A COMPANY THAT DID BUSINESS WITH

2    NETFLIX AND STILL HAVE NETFLIX'S BEST INTERESTS IN MIND?

3    A.   SO IF, FOR EXAMPLE, THE CEO OF THE COMPANY WAS ON A BOARD

4    OF ANOTHER MAJOR COMPANY, THERE COULD BE A MUTUAL BEST INTEREST

5    THERE.  I HAVE NO IDEA ABOUT COMPENSATION IN THAT REGARD

6    THOUGH.

7    Q.   OKAY.  SO, FOR EXAMPLE, IF THE CEO OF NETFLIX,

8    REED HASTINGS, SAT ON THE BOARD OF A COMPANY THAT DID BUSINESS

9    WITH NETFLIX AND RECEIVED SIGNIFICANT COMPENSATION, DO YOU

10   THINK THAT WOULD BE A CONFLICT OF INTEREST IF THAT COMPANY WAS

11   DOING BUSINESS WITH NETFLIX?

12         MR. SAMPSON:  OBJECTION, YOUR HONOR.  BEYOND THE

13   SCOPE OF DIRECT.

14         THE COURT:  I'M GOING TO SUSTAIN IT.  THIS WITNESS IS

15   NOT AN EXPERT IN THIS FIELD.

16         MS. JAYNE:  OKAY.  JUST ONE MOMENT, YOUR HONOR.

17         (PAUSE IN PROCEEDINGS.)

18   BY MS. JAYNE:

19   Q.   AND, AGAIN, AS YOU SAID BEFORE, BECAUSE MICHAEL KAIL WAS

20   ON A COMPLETELY DIFFERENT TEAM, YOUR INTERACTIONS WITH HIM WERE

21   FAIRLY LIMITED OTHER THAN THESE OCCASIONAL MEETINGS; CORRECT?

22   A.   FAIRLY LIMITED, YES.

23         MS. JAYNE:  OKAY.  THANK YOU SO MUCH.

24         THE COURT:  REDIRECT FOR THIS WITNESS?

25         MR. SAMPSON:  NO, YOUR HONOR, NOT SUBJECT TO RECALL.

1           THE COURT:  IS MR. BROWN EXCUSED WITHOUT RECALL?

2           MR. SAMPSON:  CORRECT, YES, YOUR HONOR.

3           THE COURT:  ALL RIGHT.  MR. BROWN, THANK YOU FOR YOUR

4    TESTIMONY.

5           THE WITNESS:  THANK YOU.

6           THE COURT:  AND THANK YOU FOR THE TRAVEL HERE.

7        MR. SAMPSON, YOUR NEXT WITNESS.

8           MR. SAMPSON:  YOUR HONOR, THE UNITED STATES CALLS

9    MICHAEL ASHER.

10          THE COURT:  MR. ASHER, IF YOU WOULD COME ALL THE WAY

11   UP HERE TO THE FRONT OF THE WITNESS STAND AND STAND TO BE

12   SWORN.  ALL THE WAY UP HERE, SIR.  THANK YOU.

13          THE WITNESS:  HERE?

14          THE COURT:  YEP.  AND IF YOU WOULD JUST STAND FOR A

15   MOMENT TO BE SWORN.

16          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

17       **(GOVERNMENT'S WITNESS, MICHAEL ASHER, WAS SWORN.)**

18          THE WITNESS:  YES.

19          THE CLERK:  THANK YOU, SIR.  PLEASE BE SEATED.

20       AND TO BEGIN, IF YOU WOULD STATE YOUR NAME AND SPELL YOUR

21   LAST NAME FOR THE RECORD.

22          THE WITNESS:  DO I KEEP THIS ON?

23          THE COURT:  YES.  I'M SORRY.

24          THE WITNESS:  OKAY.

25          MICHAEL ASHER.

1                          **DIRECT EXAMINATION**

2       BY MR. SAMPSON:

3       Q.   GOOD AFTERNOON, MR. ASHER.  HOW ARE YOU?

4       A.   GOOD.

5       Q.   WHERE DO YOU WORK CURRENTLY?

6       A.   CURRENTLY AT A COMPANY CALLED NEO4J.  NEO, N-E-O, THE

7       LETTER -- THE NUMBER 4, AND A J.

8       Q.   AND HOW LONG HAVE YOU BEEN THERE?

9       A.   ABOUT TWO AND A HALF YEARS.

10      Q.   WHAT'S YOUR POSITION THERE?

11      A.   CFO.

12      Q.   IS THAT CHIEF FINANCIAL OFFICER?

13      A.   YEAH.

14      Q.   HAVE YOU BEEN A CHIEF FINANCIAL OFFICER BEFORE?

15      A.   NO.

16      Q.   WHERE DID YOU WORK BEFORE NEO4J?

17      A.   A COMPANY CALLED HACKERRANK.

18      Q.   AND IS THAT IN THE BAY AREA?

19      A.   YES.

20      Q.   OKAY.  AND HOW ABOUT BEFORE THAT?

21      A.   A COMPANY CALLED PLATFORA.

22      Q.   AND WHAT WAS YOUR POSITION AT PLATFORA?

23      A.   SAME THING, CHIEF FINANCIAL -- CHIEF FINANCIAL OFFICER.

24      Q.   OKAY.  SO YOU HAVE BEEN A CHIEF FINANCIAL OFFICER BEFORE?

25      A.   YES.

1    Q.   OKAY.  AND WERE YOU -- HAVE YOU BEEN A CHIEF FINANCIAL

2    OFFICER BEFORE YOU WORKED WITH PLATFORA?

3    A.   YES.

4    Q.   HOW FAR BACK DOES THAT GO?

5    A.   I'VE BEEN DOING THIS A LONG TIME, PROBABLY ABOUT 25 YEARS.

6    Q.   SO SINCE THE 1990S?

7    A.   YEAH.

8    Q.   WHAT ARE THE DUTIES OF A CHIEF FINANCIAL OFFICER AT A

9    TECHNOLOGY COMPANY?

10   A.   IT'S TO, TO DO THE PLANNING AND THE BUDGETS AND TO OVERSEE

11   THE WHOLE FINANCE FUNCTION.

12   Q.   AND ARE YOU INVOLVED WITH THE COMPANY'S STOCK,

13   STOCKHOLDERS, OR AWARDS OF STOCK OPTIONS?

14   A.   YEAH.  SO WE DO THE ADMINISTRATION OF THAT AS WELL.

15   Q.   AND HOW LONG WERE YOU AT PLATFORA?

16   A.   I THINK ABOUT TWO YEARS.

17   Q.   DO YOU RECALL ABOUT WHAT YEARS?

18   A.   LET'S SEE.  I'VE BEEN WITH MY CURRENT COMPANY ABOUT TWO

19   AND A HALF TO THREE, AND HACKER ABOUT TWO, SO PROBABLY ABOUT

20   FIVE YEARS AGO, SO MAYBE I STARTED SEVEN YEARS AGO.

21   Q.   OKAY.  I'LL SHOW YOU SOME DOCUMENTS SHORTLY.

22   A.   OKAY.

23   Q.   AND WERE YOU CFO THE WHOLE TIME?

24   A.   YEAH, THE WHOLE TIME I WAS THERE.  OBVIOUSLY THE COMPANY

25   PREDATED ME AND WAS -- SURVIVED POST ME LEAVING.

1      Q.   SURE.  WAS IT A RELATIVELY NEW COMPANY WHEN YOU WERE

2      THERE?

3      A.   PRETTY NEW.  IT WAS PROBABLY AROUND FOR A FEW YEARS BEFORE

4      I GOT THERE.

5      Q.   OKAY.  AND WHAT -- WHAT DOES PLATFORA -- WHAT WAS

6      PLATFORA'S PRODUCT AT THE TIME THAT YOU WERE THERE?  COULD YOU

7      JUST DESCRIBE IT IN AS NON-TECHNICAL TERMS AS YOU CAN FOR THE

8      JURY?

9      A.   YES.  SO PLATFORA MADE ANALYTIC SOFTWARE SO PEOPLE COULD

10     RUN REPORTS ON HUGE VOLUMES OF DATA.

11     Q.   AND WHO, IF YOU KNOW, FOUNDED THE COMPANY?

12     A.   A GENTLEMAN NAMED BEN WERTHER.

13     Q.   AND WAS HE THE CHIEF EXECUTIVE OFFICER?

14     A.   YEAH, FOUNDER AND CEO, YES.

15     Q.   OKAY.  AND WAS -- WHO HIRED YOU?  OR DID I ASK THAT?

16     MR. WERTHER HIRED YOU; IS THAT CORRECT?

17     A.   YES, HE DID.

18     Q.   AND WHEN MR. WERTHER HIRED YOU, HAD YOU ALREADY -- DID YOU

19     KNOW HIM FROM PREVIOUS WORK?

20     A.   YEAH.  WE WORKED TOGETHER AT A COMPANY CALLED GREENPLUM.

21     LIKE GREEN THE COLOR, AND THEN PLUMB THE FRUIT.

22     Q.   AND WAS THAT IN THE SAME SPACE OF ANALYTIC SOFTWARE?

23     A.   YEAH, THAT WAS SLIGHTLY DIFFERENT.  IT WAS DATABASE.  BUT

24     VERY SIMILAR, YES.

25     Q.   WHEN YOU WERE HIRED, ABOUT HOW MANY PEOPLE WORKED AT

1    PLATFORA?

2    A.   MAN, IT'S TOUGH TO REMEMBER.  I WANT TO SAY 40 OR 50

3    MAYBE.

4    Q.   WAS IT GROWING AT THE TIME?

5    A.   YEAH, GROWING VERY FAST.

6    Q.   WHEN YOU WERE HIRED, DID IT HAVE ANY SALES?

7    A.   YES.  WHEN I GOT THERE, PROBABLY A FEW MILLION IN SALES

8    ALREADY.  BUT PRETTY SMALL COMPANY, PRETTY YOUNG.

9    Q.   WAS PLATFORA ENGAGED IN PROOF OF CONCEPTS, IF YOU KNOW

10   THAT TERM?

11   A.   YES.

12   Q.   AND HOW DID -- WHAT'S YOUR UNDERSTANDING OF HOW THOSE

13   WORKED?

14   A.   A PROOF OF CONCEPT, THE SOFTWARE WE -- THE SOFTWARE WE

15   SOLD TO OTHER COMPANIES IS VERY COMPLICATED, AND SINCE IT'S NEW

16   SOFTWARE AS WELL, NOT REALLY WELL KNOWN IN THE INDUSTRY,

17   COMPANIES WANT TO SEE IT INSTALLED AND IMPLEMENTED ON THEIR, ON

18   THEIR COMPUTING SYSTEMS TO TRY IT OUT.

19        SO WE WOULD GO DO A POC, A PROOF OF CONCEPT, WHERE WE

20   WOULD INSTALL IT, TRY IT, SHOW IT WORKING WITH THEIR DATA OVER

21   A PERIOD OF TIME.  AND THE IDEA WAS TO TURN THAT INTO A SALE AT

22   SOME POINT.

23   Q.   WERE THOSE -- WERE THOSE ALWAYS PAID, EVER PAID BY THE

24   POTENTIAL CLIENT?

25   A.   A MIX.  WE WOULD ALWAYS TRY TO GET THEM PAID BECAUSE IT

1    SHOWED THAT THE COMPANY WAS MORE SERIOUS ABOUT IT.

2    Q.   WERE THERE EVER SOME UNPAID?

3    A.   YES.

4    Q.   WOULD IT BE FAIR TO SAY SOME OF THE UNPAID WERE AT MORE

5    WELL KNOWN COMPANIES?

6    A.   YEAH.  A LOT OF COMPANIES, LIKE SAY LIKE IF THERE'S A

7    COMPANY, A FORTUNE 500 COMPANY OR A REALLY BIG INTERESTING

8    COMPANY FOR US, THEY WILL DO THE POC, BUT WE REFUSE TO PAY FOR

9    IT.  AS LONG AS WE THOUGHT IT WAS WELL QUALIFIED, THAT THEY

10   WERE SERIOUS ABOUT IT, WE WOULD STILL GO FORWARD AND DO A POC.

11   Q.   IS THAT BECAUSE THERE WOULD BE A POTENTIALLY VALUABLE

12   CONTRACT OR A WELL KNOWN CUSTOMER INVOLVED?

13   A.   THAT'S RIGHT.

14   Q.   WAS -- DID PLATFORA HAVE A SALES TEAM WHEN YOU WERE HIRED?

15   A.   YES.  I DON'T RECALL HOW BIG IT WAS, BUT SINCE THEY HAD

16   SALES, I -- THEY HAD SOME SALES PEOPLE.

17   Q.   ARE YOU FAMILIAR WITH SOMEONE NAMED MICHAEL ROSSI?

18   A.   YES.

19   Q.   WHO'S THAT?

20   A.   HE WAS THE, I THINK THE V.P. OF SALES AT PLATFORA, OR

21   HE -- A SALES MANAGER OR V.P. OF SALES.

22   Q.   AND DID -- WAS THERE EVER CONSIDERATION OF NETFLIX AS A

23   POTENTIAL CUSTOMER OF PLATFORA?

24   A.   YEAH, NETFLIX WOULD HAVE BEEN IN THE SWEET SPOT OF THE

25   KIND OF CUSTOMER THAT WE WERE LOOKING FOR, A BIG, WELL KNOWN

1        BRAND WITH LOTS OF DATA.

2        Q.   SO BECAUSE NETFLIX HAD A LARGE NUMBER OF CUSTOMERS AND A

3        LARGE OFFERING, THEY POTENTIALLY HAD A LARGE AMOUNT OF DATA TO

4        ANALYZE?

5        A.   YES.

6        Q.   AND SO WERE THEY A POTENTIALLY VALUABLE CUSTOMER IN TERMS

7        OF BEING ABLE TO PITCH YOUR PRODUCT TO OTHER COMPANIES?

8        A.   YEAH, THAT'S RIGHT.  SO WITH AN EARLY COMPANY, YOU WANT TO

9        GET THESE KIND OF MARQUEE WINS SO THEY -- AND GET THEM USING

10       THE PRODUCT AND REFERENCEABLE, SO THEN WHEN YOU GO TO ANOTHER

11       COMPANY, YOU CAN SAY, HEY, LOOK, THEY USE IT AND THEY'RE

12       SUCCESSFUL.

13       Q.   DID YOU SAY REFERENCEABLE?

14       A.   YES.

15       Q.   DOES THAT MEAN SOMEBODY AT THE HAPPY CUSTOMER WOULD GIVE A

16       GOOD REFERENCE TO A POTENTIAL CUSTOMER?

17       A.   YEAH.

18       Q.   OKAY.  AND SO WAS NETFLIX KNOWN FOR BEING, FOR ADOPTING

19       ADVANCED OR REALLY GOOD TECHNOLOGY?

20       A.   YEAH, NETFLIX HAD A REPUTATION FOR BEING AN EARLY ADOPTER

21       AND REALLY USING TECHNOLOGY TO ITS LEVELS.

22       Q.   OKAY.  AND SO WAS MR. ROSSI INVOLVED WITH TRYING TO LAND

23       NETFLIX WAS A CUSTOMER?

24       A.   I BELIEVE SO.  I DON'T THINK HE WAS THE DIRECT SALES

25       PERSON, BUT HE WAS THE SALES MANAGER OF THE DIRECT SALES

1      PERSON.

2      Q.   WAS THERE -- ARE YOU FAMILIAR WITH SOMEBODY NAMED

3      MARK FLEMING?

4      A.   YES.  YEAH, HE WAS THE SALES PERSON ON THE NETFLIX

5      ACCOUNT.

6      Q.   OKAY.  AND WAS THERE AN OUTREACH FROM PLATFORA TO NETFLIX?

7      A.   YES.  I DON'T KNOW HOW THAT CONNECTION GOT STARTED, BUT,

8      YEAH, THERE MUST HAVE BEEN SOME OUTREACH.

9      Q.   AND DID NETFLIX AGREE TO DO A PROOF OF CONCEPT?

10     A.   YES.

11     Q.   IS THAT KNOWN AS AN EVALUATION AGREEMENT?

12     A.   YES, THOSE ARE TYPICALLY SYNONYMOUS.

13     Q.   OKAY.  PLEASE LOOK ON YOUR SCREEN -- OR IF YOU PREFER

14     PAPER, THERE'S A BINDER WITH YOUR NAME ON IT TO YOUR LEFT -- AT

15     307.

16     A.   WAIT, I -- OKAY, I SEE IT.

17     Q.   AND IT'S A MULTI-PAGE DOCUMENT.  IF YOU COULD GO TO

18     PAGE 3.

19          OH.  SO PLEASE DON'T TOUCH THE SCREEN.  YOU MIGHT -- YEAH,

20     THERE YOU GO.

21          SO WE'LL QUEUE UP THE THIRD PAGE FOR YOU.

22     A.   YEAH.

23     Q.   I WISH YOU COULD SWIPE IT.

24     A.   YEAH.  IT LOOKS SWIPABLE.

25     Q.   SO IS -- I'LL ASK SOME TECHNICAL QUESTIONS ABOUT THIS IN A

1    SECOND, BUT IS THIS YOUR SIGNATURE?

2    A.   YEAH, THAT'S MY DOCUSIGN SIGNATURE.

3    Q.   OKAY.  SO COULD YOU JUST EXPLAIN WHAT DOCUSIGN IS, HOW IT

4    WORKS?

5    A.   SO DOCUSIGN IS A -- IS SOFTWARE THAT ALLOWS YOU TO SIGN

6    CONTRACTS, OR SIGN ANYTHING ELECTRICALLY, SO YOU DON'T HAVE TO

7    PRINT IT, SIGN IT WITH A PEN, SCAN IT, AND SEND IT BACK.  IT'S

8    ALL ELECTRONIC.  SO YOU CAN STORE A SIGNATURE IN THERE AND JUST

9    CLICK, CLICK SIGN DOCUMENTS.

10   Q.   OKAY.  SO YOU DON'T NEED A NOTARY, FOR EXAMPLE, TO

11   ESTABLISH THAT YOU SIGNED SOMETHING?

12   A.   THAT'S RIGHT.

13   Q.   OKAY.  SO IN 2013, YOU WERE USING DOCUSIGN?

14   A.   YEAH.

15   Q.   OKAY.  AND THAT'S YOUR DOCUSIGN SIGNATURE?

16   A.   YES, IT LOOKS LIKE THAT.

17   Q.   AND TURNING BACK TO THE FIRST PAGE, IS THIS AN EVALUATION

18   AGREEMENT WITH NETFLIX?  IT'S A LITTLE HARD TO READ.

19   A.   YES.

20   Q.   YES, IT IS AN EVALUATION AGREEMENT WITH NETFLIX?

21   A.   YES.

22        MR. SAMPSON:  OKAY.  YOUR HONOR, I MOVE TO ADMIT THIS

23   DOCUMENT UNDER 803.6.

24        THE COURT:  ANY OBJECTION?

25        MS. JAYNE:  NO.

1                THE COURT:  IT WILL BE ADMITTED.

2           (GOVERNMENT'S EXHIBIT 307 WAS ADMITTED IN EVIDENCE.)

3      BY MR. SAMPSON:

4      Q.   SO CAN YOU JUST DESCRIBE WHAT -- WITHOUT HAVING TO READ

5      ALL OF THIS, CAN YOU JUST DESCRIBE GENERALLY WHAT THE TERMS OF

6      AN EVALUATION AGREEMENT ARE?

7      A.   YEAH.  AGAIN, MAYBE NOT SPECIFIC TO THIS EXACT ONE, BUT

8      GENERALLY SPEAKING, IT GIVES THE COMPANY, IN THIS CASE NETFLIX,

9      THE RIGHT TO USE THE SOFTWARE OF PLATFORA FOR A SPECIFIC USE OR

10     A CERTAIN AMOUNT OF TIME.

11     Q.   OKAY.  AND IN THIS CASE, SECTION 5 HALFWAY DOWN THE PAGE,

12     WHAT'S THE TERM?

13     A.   SIXTY DAYS.

14     Q.   AND BELOW THE TERM, THERE'S A CONDITION THAT THE CUSTOMER

15     PROVIDE FEEDBACK; CORRECT?

16     A.   YES.

17     Q.   SO THAT'S ONE OF THE THINGS THAT PLATFORA GETS FOR DOING

18     THE EVALUATION?

19     A.   YES.

20     Q.   OKAY.  SO -- AND AT THE TOP, THE BEGINNING, THE EFFECTIVE

21     DATE IS JUNE 26TH, 2013; CORRECT?

22     A.   YES.

23     Q.   OKAY.  PLEASE GO TO THE BACK TO THE SIGNATURE PAGE,

24     PAGE 3.

25          AND WHO SIGNED ON BEHALF OF NETFLIX?

1    A.   MIKE KAIL.

2    Q.   AND THAT APPEARS TO BE PERHAPS A DIGITAL SIGNATURE?

3    A.   YEAH, IT LOOKS SIMILAR LIKE THE DOCUSIGN VERSION.

4    Q.   AND BACK TO PAGE 2 AT THE BOTTOM LEFT CORNER, THERE

5    APPEARS TO BE SOME OTHER SIGNATURES SIMILAR TO THAT.

6         DO YOU SEE THAT?  THEY MAY BE SUPERIMPOSED.

7    A.   YEAH.

8    Q.   BUT TO YOUR KNOWLEDGE, MR. KAIL WAS -- DID SIGN THE

9    EVALUATION AGREEMENT BETWEEN PLATFORA AND NETFLIX?

10   A.   YES.

11   Q.   ON OR AROUND JUNE 26TH, 2013?

12   A.   YES.

13   Q.   SO AFTER THAT, WHAT IS YOUR UNDERSTANDING OF WHAT HAPPENS

14   AFTER AN EVALUATION AGREEMENT IS SIGNED?

15   A.   SO USUALLY THAT KICKS OFF A PROCESS WHERE PLATFORA WOULD

16   SEND THE SOFTWARE OVER TO NETFLIX AND THEN USE PROFESSIONAL

17   SERVICES OR HIGHLY TECHNICALLY SKILLED PEOPLE TO HELP NETFLIX,

18   THE CUSTOMER, IMPLEMENT THE SOFTWARE.

19   Q.   WERE YOU AT ANY MEETINGS BETWEEN PLATFORA EMPLOYEES AND

20   ENGINEERS AND NETFLIX EMPLOYEES AND ENGINEERS?

21   A.   NO.  THAT -- I DON'T RECALL, BUT THAT WOULD NOT BE MY

22   TYPICAL JOB.

23   Q.   OKAY.  HAVE YOU EVER MET MR. KAIL?

24   A.   YES.

25   Q.   IS HE SITTING IN THE COURTROOM TODAY?

1      A.   I CAN'T RECOGNIZE ANYONE WITH THEIR FACE MASK, AND IT'S

2      BEEN FIVE YEARS.

3      Q.   THAT'S FAIR.  BUT IS HE SITTING HERE TO MY RIGHT?

4      A.   MAYBE.

5      Q.   OKAY.  OKAY.  BUT YOU -- YOU MET HIM IN 2013?

6      A.   YEAH.

7      Q.   OKAY.  WAS IT DURING THE EVALUATION AGREEMENT?

8      A.   YEAH, IT WOULD HAVE BEEN DURING THAT TIME PERIOD, YEAH.

9      Q.   SO WHEN IT BEGAN -- THE EFFECTIVE DATE IS JUNE 26TH.  IT

10     WOULD HAVE ENDED IN LATE AUGUST, CORRECT, 2013?

11     A.   YEAH, TWO MONTHS, 60 DAYS LATER, YEAH.

12     Q.   OKAY.  AND DID YOU HEAR -- DID YOU HEAR ANY OF THE

13     FEEDBACK THAT WAS PART OF THIS CONTRACT?

14     A.   YES.

15     Q.   WHAT, WHAT KIND OF FEEDBACK WERE YOU HEARING FROM THE

16     NETFLIX SIDE OF THE PROOF OF CONCEPT?

17     A.   YEAH, THIS WAS -- THIS WAS A TRICKY ONE WHERE NETFLIX HAD

18     A LOT OF DATA AND A CHALLENGING WORKLOAD, OR IT WAS CHALLENGING

19     FOR OUR EARLY SOFTWARE.  BUT WE WERE VERY CONFIDENT THAT WE

20     COULD GET IT TO WORK.

21     Q.   PLEASE LOOK AT EXHIBIT 312, AND SPECIFICALLY I'LL ASK YOU

22     TO LOOK AT THE LAST PAGE, PAGE 6.

23          DO YOU -- I UNDERSTAND IT'S NOT YOUR SIGNATURE, BUT DO YOU

24     RECOGNIZE THE SIGNATURE ON THE LAST PAGE OF THE DOCUMENT?

25     A.   THERE'S TWO SIGNATURES, ONE MIKE KAIL, THE OTHER

```
1    BEN WERTHER.

2    Q.   OKAY.  AND MR. KAIL'S APPEARS TO SAY DOCUSIGN; CORRECT?

3    A.   YEAH.

4    Q.   OKAY.  AND BEN WERTHER SIGNED AS THE FOUNDER AND CEO?

5    A.   YEAH.

6    Q.   AND GOING BACK TO THE FIRST PAGE, CAN YOU DESCRIBE THIS

7    DOCUMENT?

8    A.   THIS LOOKS LIKE AN ADVISORY BOARD MEMBER AGREEMENT.

9         MR. SAMPSON:  OKAY.  YOUR HONOR, I MOVE FOR ADMISSION

10   OF EXHIBIT 312.

11        THE COURT:  ANY OBJECTION?

12        MS. JAYNE:  NO.

13        THE COURT:  IT WILL BE ADMITTED.

14   (GOVERNMENT'S EXHIBIT 312 WAS ADMITTED IN EVIDENCE.)

15   BY MR. SAMPSON:

16   Q.   LOOKING AT THE FIRST PAGE, THIS IS AN ADVISORY BOARD

17   MEMBER AGREEMENT BETWEEN MR. KAIL AND PLATFORA; CORRECT?

18   A.   YES.

19   Q.   AND THE EFFECTIVE DATA IS AUGUST 2ND, 2013?

20   A.   YES.

21   Q.   WAS THAT DURING THE 60 DAY PILOT PERIOD?

22   A.   YES, IT APPEARS TO BE, YES.

23   Q.   WHAT DO YOU UNDERSTAND AN ADVISORY BOARD MEMBER -- OH, CAN

24   WE --

25        THE CLERK:  LET ME TRY AGAIN.
```

1          MR. SAMPSON:  YOU HAVE TO RESET?

2          THE CLERK:  YEAH.  IT'LL JUST BE A SECOND.

3       (PAUSE IN PROCEEDINGS.)

4          THE CLERK:  OKAY, WE'RE GOOD.

5          THE COURT:  IS THAT ON?

6          THE CLERK:  YES.

7    BY MR. SAMPSON:

8    Q.  SO JUST TO RECAP, THIS IS AN ADVISORY BOARD MEMBER

9    AGREEMENT BETWEEN MICHAEL KAIL AND PLATFORA INCORPORATED;

10   CORRECT?

11   A.  YES.

12   Q.  AND I BELIEVE YOU TESTIFIED THAT IT WAS -- WELL, I'LL JUST

13   MOVE ON.

14       WHAT IS YOUR UNDERSTANDING OF AN ADVISORY BOARD MEMBER

15   AGREEMENT?

16   A.  SO THIS IS AN AGREEMENT WHERE SOMEONE PROVIDES SOME

17   SERVICES TO THE COMPANY, AND IT COULD BE -- THERE'S VARIOUS

18   DIFFERENT KINDS OF IT, BUT IT COULD BE THAT SOMEONE WHO'S JUST

19   VERY KNOWLEDGEABLE ABOUT THE KINDS OF THINGS THAT WE DO AND CAN

20   GIVE FEEDBACK ON OUR PRODUCT AND OUR SERVICES.

21   Q.  AND IN EXCHANGE FOR THAT FEEDBACK, WHAT DOES THE ADVISOR

22   GET PER THIS AGREEMENT, PARAGRAPH 1(B)?

23   A.  YEAH, THIS WOULD BE STOCK OPTIONS.

24   Q.  CAN YOU DESCRIBE WHAT AN OPTION IS?

25   A.  A STOCK OPTION IS A, AN OPTION TO BUY STOCK, COMMON STOCK,

1       AT A PREDETERMINED PRICE.

2       Q.    AND IS THAT PRICE STATED IN THIS AGREEMENT?

3       A.    YEAH.

4       Q.    DO YOU RECALL WHAT THAT PRICE IS, OR CAN YOU FIND IT?

5       A.    OFTEN IT IS NOT SPECIFIED IN THE AGREEMENT.

6       Q.    OKAY.  DO YOU KNOW, FROM YOUR MEMORY, WHAT THE -- WHAT THE

7       PRICE OF THE PREDETERMINED OPTIONS WERE FOR THIS AGREEMENT?

8       A.    I DON'T RECALL.

9       Q.    OKAY.  NOW, WHAT IS VESTING?

10      A.    I'M SORRY, I DIDN'T HEAR YOU.

11      Q.    VESTING.

12      A.    OH, VESTING IS YOU DON'T OWN -- THE PERSON GETTING THE

13      SHARES DO NOT GET ACCESS TO OWN THE SHARES RIGHT AWAY.  IT --

14      THEY GET THEM OVER A CERTAIN PERIOD OF TIME.

15      Q.    OKAY.  AND PARAGRAPH 1(B) SAYS THE STOCK OPTION SHALL VEST

16      MONTHLY ON A PRO RATA BASIS FOR FOUR YEARS FOLLOWING THE

17      EFFECTIVE DATE; CORRECT?

18      A.    YES.

19      Q.    BUT IT ALSO SAYS "YOUR OPTION GRANT WILL BE ELIGIBLE FOR

20      EARLY EXERCISE."

21            DO YOU SEE THAT?

22      A.    YEAH.

23      Q.    WHAT IS EARLY EXERCISE?

24      A.    THAT IS, YOU CAN BUY THE SHARES UPFRONT, EVEN THOUGH YOU

25      TECHNICALLY DO NOT -- YOU DON'T HAVE ACCESS TO THEM UNTIL YOU

 1    VEST, AND YOU DO THAT ESSENTIALLY FOR TAX REASONS.

 2    Q.   SO YOU -- BY EARLY EXERCISING, YOU CAN PAY NOW FOR ALL OF

 3    YOUR 75,000 SHARES?

 4    A.   YEAH.

 5    Q.   EVEN THOUGH YOU HAVE NOT TECHNICALLY EARNED THEM; IS THAT

 6    CORRECT?

 7    A.   THAT'S RIGHT.

 8    Q.   OKAY.  BUT GOING BACK TO THE VESTING PERIOD, THIS

 9    AGREEMENT IS FOR 75,000 SHARES OVER FOUR YEARS; CORRECT?

10    A.   THAT'S RIGHT.

11    Q.   SO SOMETHING ON THE ORDER OF 1500 OR 2,000 SHARES A MONTH

12    IF I'M DOING MY MATH CORRECTLY?

13    A.   YEAH, YEAH.

14    Q.   SO AT MONTH 1, THERE'S MAYBE 1,000 OR SO SHARES; MONTH 2,

15    MAYBE 2- OR 3,000?  IS THAT HOW IT WORKS?

16    A.   YES.

17    Q.   SO THE ADVISOR BEGINS EARNING THE OPTIONS RIGHT AWAY;

18    CORRECT?

19    A.   YES.

20    Q.   OKAY.  WERE YOU INVOLVED IN THE DISCUSSIONS WITH MR. KAIL

21    ABOUT THIS ADVISORY BOARD AGREEMENT WITH ITS TERMS?

22    A.   YOU KNOW, I DON'T REMEMBER EXACTLY.  BUT, YES, THAT IS

23    SOMETHING THAT I WOULD TALK TO BEN, THE CEO, ABOUT AND SAY,

24    HEY, IS THIS SOME -- IS THIS A SITUATION WHERE WE THINK THIS

25    PERSON WOULD BE A GOOD ADVISOR, AND THEN WE WOULD FIGURE OUT

1    EXACTLY WHAT THAT WOULD LOOK LIKE AND SEND IT OVER TO WHOEVER

2    WE WANTED TO BE THE ADVISOR.  SO I WOULD HAVE BEEN INVOLVED IN

3    THAT TYPICALLY.

4    Q.   WHAT WAS YOUR UNDERSTANDING ABOUT WHAT WOULD BE GOOD AS AN

5    ADVISOR ABOUT MR. KAIL?

6    A.   SO THIS, THIS WOULD BE SIMILAR TO OTHER ADVISORY THAT I'VE

7    SEEN BEFORE WHERE THERE'S SOMEONE WHO IS AT A COMPANY THAT

8    WOULD BE VERY FAMILIAR WITH OUR PRODUCT, VERY FAMILIAR WITH WHY

9    THEY BOUGHT IT, VERY FAMILIAR WITH HOW WE IMPLEMENTED IT AND

10   CAN GIVE FEEDBACK OVER A PERIOD OF TIME OF WHAT'S WORKING,

11   WHAT'S NOT WORKING, WHAT CAN WE DO TO IMPROVE THINGS.

12        AND SO THAT PERSON WOULD BE VERY VALUABLE TO A COMPANY

13   LIKE PLATFORA, ESPECIALLY IN THE EARLY DAYS.

14   Q.   OKAY.  EVEN BEFORE THAT PERSON'S COMPANY BECAME A

15   CUSTOMER?

16   A.   YES, BECAUSE THEY CAN GET THAT VALUABLE EXPERIENCE.

17   Q.   IS A CUSTOMER -- IS AN ADVISOR SOMEBODY WHO'S EXPECTED TO

18   FIELD REFERENCE CALLS ABOUT A PRODUCT?

19   A.   THEY COULD.  IT'S CERTAINLY -- THEY HAVE TO BE HAPPY WITH

20   THE PRODUCT FIRST.  BUT THAT WOULD BE SOMETHING THAT WE WOULD,

21   WE WOULD WANT TO HAPPEN.

22   Q.   AND DO YOU HAVE AN UNDERSTANDING OF WHAT PERCENTAGE OF THE

23   COMPANY 75,000 SHARES WOULD HAVE BEEN AT THE TIME?

24   A.   I DON'T REMEMBER, BUT IT WOULD NOT BE -- IT WOULD BE FAR

25   LESS THAN 1 PERCENT.

1    Q.   AND THE --

2    A.   THAT WOULD BE MY GUESS.

3    Q.   GO AHEAD.

4    A.   THAT WOULD BE MY GUESS, BUT I DON'T RECALL HOW MANY SHARES

5    WE HAD.

6    Q.   OKAY.  AND DID -- DID MR. KAIL ASK FOR A CERTAIN

7    PERCENTAGE OR AMOUNT OF SHARES, OR HOW WAS THIS AMOUNT

8    DETERMINED?

9    A.   I -- I DON'T RECALL.

10   Q.   DO YOU KNOW WHO WAS INVOLVED WITH ANY -- WAS THERE ANYBODY

11   ELSE AT PLATFORA THAT WAS INVOLVED IN DISCUSSIONS ABOUT

12   COMPENSATION FOR ADVISORS?

13   A.   YOU KNOW, I DON'T KNOW THE SPECIFICS.  USUALLY IT WOULD BE

14   ME AND THE CEO.

15   Q.   WERE THERE OTHER ADVISORS TO PLATFORA AT THE TIME OF THIS

16   AUGUST 2ND, 2013 ADVISORY AGREEMENT?

17   A.   I DON'T RECALL.

18   Q.   WERE -- DID YOU EVER HAVE ANY DISCUSSIONS WITH MR. KAIL

19   ABOUT WHETHER HE WAS APPROVED BY HIS EMPLOYER, NETFLIX, TO BE

20   AN ADVISOR TO PLATFORA?

21   A.   I DON'T RECALL ANY OF THOSE.  TYPICALLY WE WOULD RELY ON

22   THE PERSON TO GO GET APPROVAL, WHETHER IT WAS A BOARD MEMBER OR

23   AN ADVISOR, WE USUALLY DON'T GO TO THAT COMPANY AND ASK IF IT'S

24   OKAY WITH THEM.

25   Q.   AND AFTER THIS AGREEMENT WAS SIGNED, HOW -- HOW DID

1    MR. KAIL MEET HIS OBLIGATIONS UNDER THE ADVISORY AGREEMENT?

2    DID HE GO TO MEETINGS?  DID HE WRITE REPORTS?

3    A.   YEAH.  I -- YOU KNOW, EACH ONE IS A LITTLE DIFFERENT, BUT

4    THAT WOULD BE -- WHAT YOU'RE DESCRIBING WOULD BE STANDARD.  IT

5    WOULD BE GOING TO SOME MEETINGS, MAYBE A CUSTOMER ADVISORY

6    BOARD TYPE OF A THING, THAT WOULD BE TYPICAL.

7         BUT I DON'T RECALL THIS ONE SPECIFICALLY.

8            THE COURT:  MR. SAMPSON, WE'RE GOING TO HAVE TO END

9    FOR THE DAY.

10           MR. SAMPSON:  YES, YOUR HONOR.

11           THE COURT:  ALL RIGHT.

12        MR. ASHER, I'M GOING TO NEED YOU TO RETURN ON MONDAY

13   MORNING AT 9:00 O'CLOCK.  ALL RIGHT?

14           THE WITNESS:  OKAY.

15           THE COURT:  LADIES AND GENTLEMEN, WE'VE REACHED THE

16   END OF OUR COURT DAY AND THE END OF THE WEEK.  I'M SURE YOU'RE

17   ALL PLEASED ABOUT THAT.

18        I'M GOING TO HAVE YOU LEAVE YOUR NOTEBOOKS -- ARE THEIR

19   JUROR NUMBERS ON THEIR NOTEBOOKS?

20           THE CLERK:  I ASKED EACH JUROR TO WRITE THEIR NUMBER

21   AND THEIR NAME ON THE NOTEBOOK.

22           THE COURT:  OKAY.  AND IF YOU HAVEN'T DONE THAT YET,

23   WOULD YOU?  BECAUSE WE'RE GOING TO MOVE DOWN THE HALL TO

24   COURTROOM 1 AND I HAVE TO GATHER -- I WON'T, BUT

25   MS. SALINAS-HARWELL WILL GATHER THEM UP AND HAVE THEM FOR YOU

```
1    ON MONDAY.  NO ONE IS GOING TO READ THEM, BUT WE ARE GOING TO

2    MOVE.

3           SO AS I TOLD YOU, WE'RE -- I'M SO SORRY THAT WE'RE GOING

4    TO BE IN OUR THIRD COURTROOM.  I'VE NEVER HAD THAT HAPPEN

5    BEFORE.

6           BUT WE'RE ALL JUGGLING THE SPACES, AND THE COURTROOM AT

7    THE END OF THE HALL IS A LITTLE BIT BIGGER THAN THIS ONE, BUT

8    THIS IS SUPPOSED TO BE FOR OTHER PURPOSES, SO WE WERE JUST

9    BORROWING THIS ONE TODAY.

10          SO COME UP TO THE FIFTH FLOOR ON MONDAY, COME AGAIN AT

11   8:30, WE'LL START PROMPTLY AT 9:00.

12          AND I'M GOING TO REMIND YOU AGAIN, YOU'RE NOT TO FORM OR

13   EXPRESS ANY OPINIONS IN THE CASE, YOU'RE NOT DO ANY RESEARCH OR

14   INVESTIGATION OR TALK TO ANYONE ABOUT ANYTHING IN REGARD TO THE

15   CASE.

16          SO THANK YOU ALL.  LEAVE THOSE BADGES ON YOUR CHAIR AS

17   WELL, AND WE'LL GET THOSE DOWN THE HALL FOR YOU AS WELL.

18          AND HAVE A GOOD WEEKEND.  I WILL SEE YOU MONDAY.

19              THE WITNESS:  MAY I?

20              THE COURT:  YES, YOU CAN CERTAINLY GO.  WHY DON'T YOU

21   JUST WAIT FOR THE JURY TO LEAVE?  THANK YOU.

22              THE WITNESS:  OKAY.

23       (JURY OUT AT 5:01 P.M.)

24              THE COURT:  OKAY.  WERE WE GOING TO -- ARE THESE

25   STILL JURORS IN THE COURTROOM?
```

```
1              THE CLERK:  NO, YOUR HONOR.

2              THE COURT:  OKAY, GOOD.  I DIDN'T RECOGNIZE THEM AS

3        JURORS.

4          OKAY.  THANK YOU ALL.  WE WILL START MONDAY MORNING

5        PROMPTLY AT 9:00.  DO YOU NEED TO COME IN AT 8:30?

6              MR. SAMPSON:  NO, YOUR HONOR.  BUT I BELIEVE ON

7        MONDAY, WE PLAN TO FILE SOMETHING RELATED TO THE BEN WERTHER

8        DEPOSITION THAT WE WILL NEED TO LAY A FOUNDATION FOR THAT.

9              MR. KALEBA:  FOR TUESDAY.

10             MR. SAMPSON:  FOR TUESDAY.

11             THE COURT:  OKAY.  AND I DON'T KNOW WHAT FOUNDATION

12       YOU'VE LAID FOR IT EXCEPT THAT HE'S THE CEO.  I DON'T THINK

13       THAT WAS IN CONTENTION.

14             MR. SAMPSON:  UNDERSTOOD, YOUR HONOR.

15             THE COURT:  IT'S THE AVAILABILITY ISSUE.  BUT THANK

16       YOU.  THAT'S GOOD TO KNOW.

17         I BELIEVE ON TUESDAY WE'LL BE ABLE TO START AT 9:30

18       BECAUSE MY CRIMINAL CALENDAR IS SURPRISINGLY SMALL.  SO IF YOU

19       WANT TO REACH OUT TO WHOEVER YOUR WITNESSES ARE GOING TO BE

20       TUESDAY MORNING, THEY CAN COME A FEW MINUTES EARLY, THAT

21       SHOULDN'T BE AN INCONVENIENCE.  BUT IT'LL JUST HELP US TO KEEP

22       THINGS GOING.

23             MS. JAYNE:  I'M GLAD YOUR HONOR SAID THAT.  I DIDN'T

24       REALIZE WE WERE NOT STARTING AT 9:00.  OKAY.  NORMALLY IT WOULD

25       HAVE BEEN 10:00?
```

1      THE COURT:  ON TUESDAY IT WOULD NORMALLY BE AT 10:00,

2  BUT I HAVE A REMARKABLY SMALL CRIMINAL CALENDAR, SO THERE'S NO

3  REASON TO WAIT.

4      MS. JAYNE:  GOT IT.

5      THE COURT:  TUESDAY MORNING, I MEAN, WE CAN MEET AT

6  8:30, AND THEN MY CRIMINAL CALENDAR COMES IN AT 9:00.  BUT WE

7  CAN'T MEET AT 9:00.  I HAVE A CRIMINAL CALENDAR.

8      MS. JAYNE:  WE COME FOR 8:30?

9      THE COURT:  AND YOU'LL LET ME KNOW THE NIGHT BEFORE.

10  SO YOU'LL BE FILING SOMETHING OVER THE WEEKEND.

11      MR. SAMPSON:  I BELIEVE OVER THE WEEKEND OR ON --

12      THE COURT:  AND YOU WILL E-MAIL IT TO ME?

13      MR. SAMPSON:  OF COURSE, YOUR HONOR.

14      THE COURT:  THANK YOU.  AND IT'S NOT -- I DON'T NEED

15  IT UNTIL TUESDAY.

16      MR. SAMPSON:  THAT'S OUR BELIEF.

17      THE COURT:  GOOD.  BECAUSE OTHERWISE IT WAS DUE FIVE

18  MINUTES AGO.

19      MR. SAMPSON:  YES, I UNDERSTAND.

20      THE COURT:  OKAY.  THAT'S GOOD.

21   I WILL SEE YOU THEN AT 9:00 O'CLOCK ON MONDAY MORNING.

22  THANK YOU ALL.  IT WAS A VERY PRODUCTIVE DAY.

23      MS. JAYNE:  THANK YOU.  HAVE A NICE WEEKEND.

24      MR. SAMPSON:  THANK YOU, YOUR HONOR.

25      (THE EVENING RECESS WAS TAKEN AT 5:03 P.M.)

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8   STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9   280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10  CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16  _____
    LEE-ANNE SHORTRIDGE, CSR, CRR
17  CERTIFICATE NUMBER 9595

18       DATED:  APRIL 10, 2021

19

20

21

22

23

24

25