1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5     UNITED STATES OF AMERICA,        )  CR-18-00172 BLF
                                       )
6                    PLAINTIFF,        )  SAN JOSE, CALIFORNIA
                                       )
7              VS.                     )  APRIL 23, 2021
                                       )
8     MICHAEL KAIL,                    )  VOLUME 11
                                       )
9                    DEFENDANT.        )  PAGES 2255-2533
      _____ )

10

11                  TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE BETH LABSON FREEMAN
12              UNITED STATES DISTRICT JUDGE

13    A P P E A R A N C E S:

14    FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                            BY:  COLIN C. SAMPSON
15                               DANIEL KALEBA
                            450 GOLDEN GATE AVENUE, BOX 36055
16                          SAN FRANCISCO, CALIFORNIA  94102

17    FOR THE DEFENDANT:    JAYNE LAW GROUP
                            BY:  JULIA M. JAYNE
18                          483 9TH STREET, SUITE 200
                            OAKLAND, CALIFORNIA  94607

19

20    ALSO PRESENT:         FRANCHESCA CHELI
                            LAURIE WORTHEN
21                          BALJINDER HEER

22    OFFICIAL COURT REPORTERS:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                  CERTIFICATE NUMBER 9595
23                                IRENE RODRIGUEZ, CSR, CRR, RMR
                                  CERTIFICATE NUMBER 8074

24          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25               TRANSCRIPT PRODUCED WITH COMPUTER

1

2                              INDEX OF WITNESSES

3        DEFENDANT'S

4        **MICHAEL KAIL**
               CROSS-EXAM BY MR. SAMPSON (RES.)        P. 2279
               REDIRECT EXAM BY MS. JAYNE              P. 2349
5              RECROSS-EXAM BY MR. SAMPSON             P. 2389

6

7        GOVERNMENT'S CLOSING ARGUMENT                 P. 2418

8        DEFENDANT'S CLOSING ARGUMENT                  P. 2458

9        GOVERNMENT'S REBUTTAL ARGUMENT                P. 2513

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXHIBITS

                                    MARKED        ADMITTED

GOVERNMENT'S

120                                                2285
128                                                2287
135                                                2288
143                                                2289
225                                                2291
221                                                2294
220                                                2295
221                                                2294
220                                                2295
605                                                2299
626                                                2303
953                                                2307
651                                                2309
310                                                2314
344                                                2319
342                                                2320
111                                                2326
421                                                2330


DEFENDANT'S

1163, PAGES 1-3                                    2341

```
1        SAN JOSE, CALIFORNIA                     APRIL 23, 2021

2                        P R O C E E D I N G S

3            (COURT CONVENED AT 8:33 A.M.)

4            (JURY OUT AT 8:33 A.M.)

5                THE COURT:  GOOD MORNING, EVERYONE.  PLEASE BE

6        SEATED.

7            WE'RE ON THE RECORD OUTSIDE THE PRESENCE OF THE JURY.

8            WE HAVE A COUPLE OF THINGS TO DO TODAY.  WE HAVE THE

9        DEFERRED ARGUMENT ON MS. JAYNE'S MOTION, WHICH WAS TIMELY MADE,

10       AND I WANT TO HEAR THAT ARGUMENT.  I WANT TO LET YOU MAKE THE

11       RECORD THAT YOU NEED.

12           MR. KAIL IS NOT HERE?

13               MS. JAYNE:  HE'S NOT, AND I HONESTLY CAN'T RECALL IF

14       I TOLD HIM TO BE HERE OR NOT.  I MAY HAVE --

15               THE COURT:  SO WE'RE ARGUING MOTIONS AND THEY'RE ON

16       THE LAW ONLY, SO I DON'T BELIEVE IT'S A CRITICAL PHASE OF THE

17       CASE WHERE WE NEED TO WAIT FOR HIM.

18           DO YOU HAVE AUTHORITY TO WAIVE HIS APPEARANCE?

19               MS. JAYNE:  I DO.  I DO.  I THINK THIS IS SIMILAR TO

20       WHEN WE ARGUED JURY INSTRUCTIONS, WHICH WAS CRITICAL, AND HE

21       WAS NOT PRESENT.

22               THE COURT:  OKAY.  THEN, MR. SAMPSON, YOU HAVE TO

23       OBJECTION TO GOING FORWARD WITH THE MOTIONS?

24               MR. SAMPSON:  NO, YOUR HONOR.

25               THE COURT:  OKAY.  LET'S DO THAT.
```

```
1              MS. JAYNE, LET ME HEAR YOUR MOTION.

2              MS. JAYNE:  OKAY.  I APPRECIATE THAT, YOUR HONOR.  I

3       APOLOGIZE, I JUST CAN'T RECALL IF I TOLD HIM OR NOT.

4              THE COURT:  AND I DO NEED YOU CLOSER TO THAT

5       MICROPHONE.

6              MS. JAYNE:  OKAY.  YOUR HONOR, I WON'T SPEND TOO MUCH

7       TIME ON THE LAW, AND I DON'T KNOW IF THE COURT HAD AN

8       OPPORTUNITY TO VIEW THE MOTION THAT WAS FILED WHICH SET FORTH

9       SOME OF THE LEGAL STANDARDS FOR THE --

10             THE COURT:  IT WAS FILED.  I DIDN'T SEE IT IF IT

11      WASN'T E-MAILED TO ME.  I'LL GLADLY READ IT, BUT I'M SORRY.

12         IT DIDN'T SHOW UP ON THE DOCKET THIS MORNING.

13             MS. JAYNE:  IT CAME THROUGH ECF YESTERDAY AROUND

14      MAYBE 2:00 P.M.

15             THE COURT:  IT SHOULD HAVE SHOWN UP.  I'M SORRY.

16             MS. JAYNE:  YEAH.  AND I --

17             THE COURT:  I WILL MOST DEFINITELY READ IT.

18             MS. JAYNE:  THANK YOU, YOUR HONOR.  AND I APOLOGIZE,

19      I, AGAIN, FORGOT TO E-MAIL IT.

20         SO WITH THE LEGAL STANDARD IN TERMS OF RULE 29, AS

21      YOUR HONOR NOTED, IT WAS APPROPRIATELY MADE, AND THE STANDARD

22      IS WHETHER THE EVIDENCE, VIEWED IN THE LIGHT MOST FAVORABLE TO

23      THE GOVERNMENT, WOULD PERMIT ANY RATIONAL TRIER OF FACT TO

24      CONCLUDE THAT THE DEFENDANT WAS GUILTY BEYOND A REASONABLE

25      DOUBT, AND ALTHOUGH CIRCUMSTANTIAL ALONE CAN SUPPORT A
```

1    CONVICTION, THERE ARE TIMES THAT IT ONLY AMOUNTS TO REASONABLE

2    SPECULATION AND NOT TO SUFFICIENT EVIDENCE.

3        IN THIS CASE, THERE'S NO EVIDENCE UPON WHICH A REASONABLE

4    MIND MIGHT FAIRLY CONCLUDE GUILT BEYOND A REASONABLE DOUBT ON

5    EACH AND EVERY ELEMENT OF THE CHARGED OFFENSE, AND, THEREFORE,

6    A JUDGMENT OF ACQUITTAL IS REQUIRED.

7        THE LAW IS CLEAR THAT WHEN THE EVIDENCE EQUALLY SUPPORTS

8    AN INFERENCE OF INNOCENCE AND GUILT, A REASONABLE JURY MUST

9    ENTERTAIN A REASONABLE DOUBT.

10        I'M NOT GIVING THE CASE CITATIONS RIGHT NOW, BUT THEY ARE

11    IN THE PAPERS THAT I'VE GIVEN.

12        THIS IS ABSOLUTELY CRITICAL IN THIS CASE BECAUSE THE

13    INSUFFICIENT TESTIMONY OF GOVERNMENT'S WITNESSES, EVEN IF IT

14    SUPPORTS AN EQUAL THEORY OF INNOCENCE AND GUILT, THAT WOULD

15    RESULT IN A JUDGMENT OF ACQUITTAL.  AND HERE THE GOVERNMENT HAS

16    PROPOSED TWO THEORIES OF WIRE FRAUD, ENGAGING IN A SCHEME TO

17    DEFRAUD NETFLIX OF HONEST SERVICES, AND ALSO PECUNIARY FRAUD.

18        WITH RESPECT TO HONEST SERVICES, THE GOVERNMENT STATED THE

19    EVIDENCE WOULD SHOW THE THIRD PARTY COMPANIES PROVIDED MR. KAIL

20    COMPENSATION IN EXCHANGE FOR THE NETFLIX CONTRACTS.

21        HOWEVER, THE GOVERNMENT HAS NOT PRESENTED ANY EVIDENCE OF

22    SUCH AN EXCHANGE.  IN FACT, SOME OF THE GOVERNMENT'S OWN

23    WITNESSES EXPLICITLY STATED IN THEIR TESTIMONY THAT SUCH A

24    SCHEME DID NOT EXIST.  FOR EXAMPLE, IN CROSS-EXAMINATION,

25    MR. ROSSI, AMONG EVERY VENDOR WHO TESTIFIED, DID NOT THINK THAT

1      PLATFORA WAS GUARANTEED A CONTRACT WITH NETFLIX, EVEN THOUGH

2      MR. KAIL WAS AN ADVISOR.

3           HE FURTHER TESTIFIED THAT GETTING A CONTRACT WITH NETFLIX

4      WOULD REQUIRE PLATFORA TO WORK FOR IT.

5           MR. WERTHER'S DEPOSITION SAID THE EXACT SAME THING.  THERE

6      WAS ABSOLUTELY NO EXPECTATION OF A CONTRACT IN EXCHANGE FOR ANY

7      STOCK OPTIONS.

8           VARMA KUNAPARAJU WITH VISTARA TESTIFIED EXACTLY THE SAME

9      WAY, THAT HE DIDN'T BELIEVE THAT GIVING MR. KAIL ANYTHING WOULD

10     RESULT IN A CONTRACT.  HE TESTIFIED THAT HE WORKED HARD FOR

11     NETFLIX'S BUSINESS, PROVIDED A VALUABLE SERVICE, AND ULTIMATELY

12     HIS TEAM WAS PROVIDED -- HIS TEAM PROVIDED A VALUABLE SERVICE

13     TO NETFLIX.

14          EVERY SINGLE WITNESS TESTIFIED THEY DIDN'T EXPECT TO

15     BENEFIT BY HAVING MR. KAIL AS AN ADVISOR IN TERMS OF ANY TYPE

16     OF SHORTCUTS AT NETFLIX.  THEY DIDN'T RECEIVE SHORTCUTS AND

17     THEY HAD TO WORK FOR THE CONTRACT, DEMONSTRATE VALUE, AND

18     DELIVER A GOOD PRODUCT FOR NETFLIX'S NEEDS.

19          THIS EXCHANGE IS THE CRITICAL PART OF A QUID PRO QUO.

20     CONFLICT OF INTEREST, WHICH WAS THE MAJORITY OF THE

21     GOVERNMENT'S CASE, IS NOT A CRIME.

22          SECRET PAYMENTS, EVEN IF THEY WERE, ARE NOT A CRIME.

23          UNDISCLOSED SELF-DEALING, WHICH IS WHAT MR. WELLS AND

24     MR. HASTINGS TESTIFIED TO THAT THEY HAD A PROBLEM WITH THE

25     UNDISCLOSED SELF-DEALING.

1        THEY DIDN'T HAVE A PROBLEM WITH WHAT MR. KAIL WAS DOING AT

2    WORK.  THEY DIDN'T HAVE A PROBLEM WITH HIS CONTRACTS.  THEY

3    DIDN'T HAVE A PROBLEM WITH HIS JOB PERFORMANCE, AND EVERY

4    SINGLE WITNESS TESTIFIED THEY BELIEVED MR. KAIL WORKED IN

5    NETFLIX'S BEST INTEREST.

6        IT WAS ONLY LOOKING BACKWARDS THAT THEY WANTED TO KNOW

7    ABOUT THE PAYMENTS.

8        LYING TO YOUR EMPLOYER IS WHAT THE GOVERNMENT MAY HAVE

9    PROVEN, BUT THAT'S NOT A CRIME.

10        AND I CAN GO THROUGH EACH, EACH COUNT AS WELL.  COUNTS ONE

11    THROUGH NINETEEN ALL FOLLOW THE SAME THEME WITH RESPECT TO

12    NETSKOPE, MAGINATICS, DOCURATED, ELASTICBOX, SUMO LOGIC,

13    PLATFORA, VISTARA, NUMERIFY, AND EVEN COUNT SIXTEEN, THE

14    SUNSHINE E-MAIL.  ONCE AGAIN, LYING TO YOUR EMPLOYER IS

15    IRRELEVANT WHEN YOU'RE NOT ENGAGED IN A SCHEME TO DEFRAUD.

16        MR. KAIL'S STATE OF MIND IS WHAT IS AT ISSUE IN THIS CASE.

17    THE GOVERNMENT DID NOT PROVE THAT HE SPECIFICALLY INTENDED TO

18    DEFRAUD NETFLIX.

19        WHETHER OR NOT THEY PROVED THAT HE SHOULD HAVE DISCLOSED

20    HIS COMPENSATION TO NETFLIX, WELL, THAT'S THE DEFENSE OF AN

21    HONEST MISTAKE.

22        THERE'S NOT A SINGLE WITNESS OR A SINGLE PIECE OF EVIDENCE

23    THAT DEMONSTRATES A SPECIFIC INTENT TO DECEIVE AND CHEAT

24    NETFLIX.  THAT'S THE OTHER THEORY OF WIRE FRAUD, DECEIVE AND

25    CHEAT.

1          AND WHAT DOES THAT MEAN?  THAT MEANS NOT -- THAT MEANS

2     MONEY OR PROPERTY LOSS.

3          AND UNITED STATES VERSUS KELLY, 140 SUPREME COURT 1565,

4     DECIDED JUST LAST YEAR, A CASE OUT OF NEW JERSEY, "THE

5     BRIDGEGATE CASE," IT'S KIND OF A NICKNAME FOR IT, WAS VERY,

6     VERY EXPLICIT.  PROPERTY INTEREST IS AN ECONOMIC INTEREST, AND

7     THE JURY INSTRUCTIONS SAY SO.  THE RIGHT TO CONTROL CONTRACTS,

8     THE RIGHT TO MAKE DECISIONS ON CONTRACTS IS NOT A PROPERTY

9     INTEREST.

10         YEARS BEFORE UNITED STATES VERSUS ZAUBER, 857 F.2D 137,

11    THIRD CIRCUIT, 1988, THE COURT HELD THAT DEFENDANTS CAN'T

12    SCHEME TO DEFRAUD AN ENTITY WHEN THAT SAME ENTITY GAVE THE

13    DEFENDANTS THE AUTHORITY TO EXERCISE CONTROL AND AUTHORITY OVER

14    AN ENTITY'S PROPERTY OR MONEY.  AND IN ZAUBER, THE DEFENDANTS

15    ENGAGED IN A KICKBACK SCHEME WHERE THEY SWITCHED FROM ONE

16    ADMINISTRATION COMPANY TO ANOTHER THAT PAID SUBSTANTIALLY LOWER

17    RETURN ON INVESTMENT.  THE GOVERNMENT ARGUED THE SCHEME

18    DEPRIVED THE ENTITY OVER CONTROL OVER THE MONIES PAID AND THUS

19    COMMITTED MONEY IMPROPERLY.

20         THE THIRD CIRCUIT REJECTED THIS ARGUMENT, REASONING THAT

21    THE RIGHT TO CONDUCT BUSINESS FREE OF FALSE, FICTITIOUS AND

22    FRAUDULENT INFORMATION IS AN INTANGIBLE PROPERTY RIGHT THAT

23    DOES NOT SUPPLY THE ECONOMIC BENEFIT REQUIRED TO SUSTAIN A

24    MONEY OR PROPERTY FRAUD CONVICTION.

25         MUCH LIKE THIS CASE, MR. KAIL HAD THE AUTHORITY TO

1    NEGOTIATE AND SIGN CONTRACTS.  THIS EXPLICIT PERMISSION TO

2    CONTROL ASSETS IS INCONSISTENT WITH THE THEORY OF DEPRIVING OF

3    MONEY OR PROPERTY.

4         AND THE COURT IN ZAUBER HELD THAT THERE WAS NO ALLEGATION

5    IN THE INDICTMENT AS WELL OF AN ACTUAL MONEY OR PROPERTY LOSS.

6         AND IF YOU LOOK AT THE FACTS THEMSELVES, DESPITE THE FACT

7    THAT THE RIGHT TO CONTROL IS NOT A PROPERTY LOSS, THERE WAS NO

8    EVIDENCE THAT NETFLIX LOST MONEY OR PROPERTY.

9         TO THE CONTRARY.  THE EVIDENCE SHOWED THAT DUE TO

10   MR. KAIL'S LEADERSHIP, NETFLIX GAINED A SIGNIFICANT ADVANTAGE

11   OVER ITS COMPETITORS AND SAVED MONEY.

12        NOT A SINGLE WITNESS TESTIFIED THAT MR. KAIL SHOULD NOT

13   HAVE ENTERED INTO A PARTICULAR CONTRACT, THAT NETFLIX TOOK A

14   LOSS AS A RESULT OF ANY OF THE CONTRACTS ENTERED INTO.

15        WHETHER OR NOT AT THE END OF THE DAY A PARTICULAR --

16   NETFLIX DECIDED TO CONTINUE WORKING WITH A VENDOR OR NOT IS

17   IRRELEVANT BECAUSE, AS YOUR HONOR KNOWS, NETFLIX SUED --

18   DOESN'T COME IN AS EVIDENCE, BUT THERE ARE REASONS THAT CAME

19   OUT.  DID THE REASON -- FOR EXAMPLE, THERE WAS A QUESTION ABOUT

20   VISTARA, DID THE CANCELLATION OF THE CONTRACT HAVE TO DO WITH

21   TECHNICAL REASONS?  THE ANSWER IS NO.  AND THERE WAS AN

22   IMPLICATION THAT AN INVESTIGATION WAS ONGOING.

23        NETFLIX'S DECISION DOWN THE ROAD, BECAUSE OF THEIR

24   PERCEIVED CONFLICT OF INTEREST AND THE PROBLEM WITH HIS

25   POTENTIAL VIOLATION OF EMPLOYMENT, COULD DRIVE THEIR DECISIONS.

1        BUT AS EVERY WITNESS TESTIFIED, THE MOMENT MR. KAIL LEFT

2    NETFLIX, THEY WERE SATISFIED THAT HE HAD DONE AN EXCELLENT JOB

3    AND THAT HE HAD NOT DEPRIVED THEM OF ANY MONEY OR PROPERTY AND,

4    IN FACT, MOVED THE COMPANY FORWARD.

5        WITH RESPECT TO MONEY LAUNDERING, MR. KAIL IS ALSO

6    ENTITLED TO A JUDGMENT OF ACQUITTAL.  FIRST, IF THERE WAS NO

7    INTENT TO DEFRAUD, THERE'S NO MONEY LAUNDERING.

8        THE GOVERNMENT ALSO HAS TO PROVE BEYOND A REASONABLE DOUBT

9    THAT MR. KAIL UNDERSTOOD AND BELIEVED THAT THE FUNDS HE

10    RECEIVED FROM NETENRICH AND VISTARA AND -- JUST NETENRICH AND

11    VISTARA WERE THE PROCEEDS OF CRIME, MUCH LIKE THE COURT HEARD

12    ABOUT DRUG MONEY, HOW CAN YOU NOT KNOW THAT'S THE PROCEEDS OF

13    CRIME.

14        IN THIS INSTANCE, THE COURT HEARD THAT THE COMMISSION

15    PAYMENTS WERE PART OF A CONTRACT.  AGAIN, SHOULD HE HAVE

16    DISCLOSED THOSE?  MAYBE.  IT DOESN'T REALLY MATTER.

17        THE POINT IS, DID HE BELIEVE THAT HE WAS COMMITTING A

18    CRIME WHEN HE DEPOSITED THOSE FUNDS INTO ONE BANK ACCOUNT AND

19    BECAUSE HE WAS THE SINGLE MEMBER LLC OWNER OF THAT BANK

20    ACCOUNT, HE HAD THE FREEDOM TO MOVE THAT MONEY AROUND HOWEVER

21    HE WISHED.

22        BUT HE DIDN'T BELIEVE HE DID SO WITH A SPECIFIC INTENT TO

23    DEFRAUD, WITH UNDERSTANDING THAT THOSE WERE THE PROCEEDS OF A

24    CRIME, NOT THE PROCEEDS OF SECRET PAYMENTS, THE PROCEEDS OF

25    CRIME, AND THE COURT MUST ENTER A JUDGMENT OF ACQUITTAL ON

1       THOSE COUNTS AS WELL.

2              A CRITICAL ELEMENT JUST TO NOTE TO THE COURT IS THAT

3       MR. KAIL KNEW THE TRANSACTION INVOLVED CRIMINALLY DERIVED

4       PROFIT, AND THE COURT HEARD MR. KAIL AND OTHERS TESTIFY THAT

5       THE COMMISSIONS WERE HOW NETENRICH AND VISTARA DID BUSINESS.

6       THEY WERE ROLE MODELS HOW THEY SET IT UP.

7              MR. KAIL'S UNIX MERCENARY ACCOUNT WAS -- THE BUSINESS,

8       FIRST OF ALL, HAS BEEN IN EXISTENCE FOR A NUMBER OF YEARS.  THE

9       BANK ACCOUNTS WERE SET UP AND THE TAX I.D. NUMBER DEVELOPED

10      BY -- AT THE REQUEST OF NETENRICH AND VISTARA.  THAT'S HOW THEY

11      DID BUSINESS.  THEY WEREN'T GOING TO PAY AN INDIVIDUAL.

12             NOBODY TESTIFIED THAT THIS WAS A COVERT OPERATION, THAT

13      THIS WAS INTENDED TO DISGUISE FRAUD.

14             AGAIN, THOSE COMMISSIONS WERE NOTHING MORE THAN

15      UNDISCLOSED PAYMENTS, AND, THEREFORE, IF IT DOESN'T SATISFY THE

16      ELEMENTS OF WIRE OR MAIL FRAUD, THEN CERTAINLY THEY WILL NOT

17      SATISFY THE ELEMENTS OF CRIMINAL PROCEEDS.

18             MY ARGUMENTS APPLY WITH RESPECT TO MAIL AND WIRE FRAUD TO

19      COUNTS ONE THROUGH NINETEEN.  WITHOUT GOING THROUGH EACH

20      PARTICULAR COUNT'S ADMISSION, I WILL POINT OUT TO THE COURT

21      THAT REALLY THE DIFFERENTIATING FACTOR IS THEY'RE ALL INVOLVING

22      THE WIRE.  THERE'S NO DISPUTE ABOUT THAT.  INTERSTATE COMMERCE,

23      THERE'S NO DISPUTE ABOUT THAT.

24             BUT THE SPECIFIC INTENT TO DEFRAUD, THE SPECIFIC INTENT TO

25      DECEIVE AND CHEAT IS LACKING, AND IF THERE'S AN EQUAL INFERENCE

1    OF INNOCENCE, THIS COURT MUST ENTER A JUDGMENT OF ACQUITTAL.

2         THANK YOU.

3              THE COURT:  THANK YOU.

4         MR. SAMPSON, DID YOU WANT TO RESPOND?

5              MR. KALEBA:  YES, YOUR HONOR.  IF IT'S OKAY, CAN I BE

6    SEATED FOR THIS.

7              THE COURT:  YES, IT'LL MAKE YOU CLOSER TO THAT

8    MICROPHONE.

9              MR. KALEBA:  THANK YOU, YOUR HONOR.

10        FIRST IS WE UNDERSTAND THIS TO BE RAISED UNDER RULE 29,

11   WHICH IS ONLY EVALUATING THE GOVERNMENT'S EVIDENCE, AND SO I'M

12   NOT GOING TO ADDRESS THE EVIDENCE THAT WAS PROFFERED BY THE

13   DEFENSE IN THEIR CASE-IN-CHIEF.

14        AND THE STANDARD IS WHETHER THE RELEVANT QUESTION IS,

15   AFTER VIEWING THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO THE

16   PROSECUTION, ANY RATIONAL TRIER OF FACT COULD HAVE FOUND THE

17   ESSENTIAL ELEMENTS OF THE CRIME BEYOND A REASONABLE DOUBT.

18   THAT'S JACKSON V. VIRGINIA, 443 U.S. 307 AT 319.  THERE'S ALSO

19   THE RELATED NINTH CIRCUIT CITATION IN UNITED STATES VERSUS

20   CHRISTIANSEN, 828 F.3D 763, AND UNITED STATES VERSUS MINCOFF,

21   574 F.3D 1186.

22        RELATEDLY, IT'S THE EXCLUSIVE FUNCTION OF THE JURY TO

23   DETERMINE THE CREDIBILITY OF WITNESSES, TO RESOLVE EVIDENTIARY

24   CONFLICTS, AND TO DRAW REASONABLE INFERENCES FROM PROVEN FACTS.

25   THAT'S UNITED STATES VERSUS DREITZLER, 577 F.2D 539, A NINTH

1      CIRCUIT CASE.

2           WE BELIEVE THE GOVERNMENT HAS PROVEN SUFFICIENT EVIDENCE

3      THAT A RATIONAL TRIER OF FACT, BASED ON THE FACTS THAT HAVE

4      BEEN SUBMITTED AND THE EVIDENCE THAT'S BEEN SUBMITTED, AS WELL

5      AS THE REASONABLE INFERENCES THAT CAN BE DRAWN FROM THOSE

6      FACTS, THAT MR. KAIL IS GUILTY OF ALL THE CRIMES THAT WERE

7      CHARGED.

8           WITH RESPECT TO THE MONEY OR PROPERTY THAT WAS ALLEGED FOR

9      EACH OF THE COUNTS AND IN THE INDICTMENT, THE GOVERNMENT HAS

10     SUBMITTED EVIDENCE THAT MR. KAIL ENTERED INTO CONTRACTS WITH

11     VENDORS.  HE SIGNED OFF ON PURCHASE ORDERS, HE SIGNED OFF ON

12     INVOICES, AND HE WAS RESPONSIBLE, AND HE PARTICIPATED IN THE

13     DECISIONMAKING.

14          RELATEDLY, THE GOVERNMENT HAS SHOWN FOR EACH OF THOSE

15     CONTRACTS, MR. KAIL HAD AN ADVISORY AGREEMENT.  THESE WERE

16     EXHIBITS 606, 451, 653, 501, 125, 556, 623, 312, 403, 461, AND

17     669.

18          THE MONEY OR PROPERTY THAT'S ALLEGED IS NOT JUST LIMITED

19     TO THE CONTRACT THAT WAS ENTERED.  CLEARLY THAT'S MONEY OR

20     PROPERTY OF NETFLIX AND THEY'RE PAYING THESE VENDORS.

21          BUT MR. KAIL ALSO SOLD ACCESS, SOLD TO THE VENDORS THINGS

22     THAT HE DIDN'T HAVE THE RIGHT TO SELL, WHICH IS THE USE OF THE

23     NETFLIX LOGO, USE OF NETFLIX ENGINEERING TIME, USE OF NETFLIX

24     AS A CUSTOMER REFERENCE.  THAT WAS ALL MONEY OR PROPERTY THAT

25     BELONGED TO NETFLIX.

1          WITH RESPECT TO THE HONEST SERVICES FRAUD THEORIES,

2     YOUR HONOR, WE'RE NOT SURPRISED THAT MANY OF THE WITNESSES WHO

3     TESTIFIED, THE CEO WITNESSES FROM THE VENDORS WERE RELUCTANT TO

4     ADMIT THAT THIS WAS A BRIBE THAT THEY WERE PAYING.  WE DON'T

5     BELIEVE THAT TESTIMONY TO BE CREDIBLE.  WE THINK THE JURY -- A

6     RATIONAL JUROR COULD REACH A CONTRARY CONCLUSION BASED ON THE

7     TOTALITY OF THE EVIDENCE, NOT JUST BASED ON THE STORY THAT WAS

8     TOLD ON THE WITNESS STAND, BUT BASED ON THE COURSE OF CONDUCT

9     THAT HAPPENED IN 2012, 2013, 2014.

10          THERE'S EVIDENCE THAT WAS SUBMITTED IN THE RECORD THAT'S

11     INCONSISTENT WITH THE TESTIMONY OF THE WITNESSES.  FOR EXAMPLE,

12     EXHIBIT 309, WHICH IS THE E-MAIL CHAIN RELATED TO PLATFORA AND

13     WERTHER WHEN HE'S DESCRIBING THE WHISKEY DINNER THAT HE HAD,

14     WHERE HE DESCRIBES THEY HAD -- MR. KAIL DISCUSSED TWO THINGS

15     WITH HIM.  THE FIRST WAS THE ADVISORY AGREEMENT WHERE HE ASKED

16     FOR A QUARTER POINT OF PLATFORA, AND IN HIS WORDS IN THE

17     E-MAIL, QUOTE, "THE STRONG SUGGESTION THAT IF WE DO THAT,"

18     MEANING IF WE ENTER INTO AN ADVISORY AGREEMENT WITH MR. KAIL,

19     "WE'D BE ABLE TO GET A $600,000, THREE YEAR DEAL."

20          EXHIBIT 313, WHICH IS AN AUGUST 5TH E-MAIL OF MR. WERTHER,

21     AS WELL AS WITH MR. ROSSI, WHERE MR. WERTHER BRAGS ABOUT

22     SIGNING UP MR. KAIL AS A PAID ADVISOR AND MR. ROSSI RESPONDED,

23     THERE IS NO EXCUSE NOW FOR NOT CLOSING IT.

24          THAT IS AS CLEAR EVIDENCE OF A QUID PRO QUO AS THERE COULD

25     BE.

1          EXHIBIT 333, THIS IS FURTHER EVIDENCE OF THE QUID PRO QUO,

2     THIS IS WHERE PLATFORA, BEN WERTHER, MR. ASHER, AND MR. ROSSI,

3     ALL WHO TESTIFIED, ALL WHO DENIED A QUID PRO QUO, BUT THEY'RE

4     TALKING ABOUT DISNEY, THEIR SPECIAL CUSTOMER, AND THAT THEY

5     SHOULD ALSO KICK 20,000 SHARES TO KHAI AT DISNEY AND

6     BEN WERTHER, IN HIS OWN WORDS, SAID WITH RESPECT TO MR. KAIL,

7     CLEARLY THERE IS SOME PAY-TO-PLAY THERE.

8          A RATIONAL JUROR COULD CONCLUDE THAT HE'S REFERRING TO A

9     QUID PRO QUO.

10          THE STATE OF MIND OF PLATFORA CONTINUES.  EXHIBIT 330.

11     BEN WERTHER AND THERESA VU, MS. VU ALSO TESTIFIED, WHEN THEY

12     WERE TRYING TO GET MR. KAIL TO DO CUSTOMER REFERENCE STUFF,

13     MS. VU SAYS, KAIL HAS EQUITY NOW, SO HE OWES US MORE THAN A

14     NORMAL CUSTOMER.  BEN WERTHER RESPONDS, AGREED.

15          THE TIMING OF THESE DEALS WE THINK ARE CONSISTENT WITH

16     WHAT THE -- WE THINK EVERY VENDOR KNEW WHAT THEY WERE DOING.  A

17     RATIONAL JUROR COULD CONCLUDE THAT THEY WERE PAYING FOR ACCESS

18     TO NETFLIX THROUGH MR. KAIL.

19          I THINK IT'S ALSO IMPORTANT TO REMEMBER THE TESTIMONY OF

20     FRANK SLOOTMAN, THE PUBLIC COMPANY CEO OF SERVICENOW, WHO

21     TESTIFIED ABOUT HIS DINNER WITH MR. KAIL AND HOW MR. KAIL

22     SOLICITED A PRESCRIBE FROM MR. SLOOTMAN BECAUSE HE WANTED A

23     PIECE OF THE ACTION.  HE SAID SERVICENOW IS GETTING A LOT OUT

24     OF THIS RELATIONSHIP WITH NETFLIX, BUT MR. KAIL PERSONALLY WAS

25     NOT GETTING SOMETHING OUT OF IT.  MR. SLOOTMAN TESTIFIED HE DID

```
 1        NOT PAY THAT BRIBE TO MR. KAIL.

 2            WE'RE GOING TO, I THINK, SAVE THIS FOR CLOSING ARGUMENT,

 3        BUT WE DO THINK THERE IS SUFFICIENT EVIDENCE THAT A RATIONAL

 4        JUROR COULD CONCLUDE THAT THIS WAS A QUID PRO QUO.

 5            WITH RESPECT TO WHETHER OR NOT NETFLIX GOT SOMETHING OUT

 6        OF THIS, WHETHER OR NOT THEY HAD SOME BENEFIT, WHETHER OR NOT

 7        THEY SUFFERED ECONOMIC DAMAGES, THOSE ARE NOT ELEMENTS OF THE

 8        OFFENSE OF EITHER CRIME.  IF THERE'S DAMAGES TO BE AWARDED,

 9        THAT WOULD BE DETERMINED LATER AT A DIFFERENT PHASE BY THIS

10        COURT, NOT BY THE JURY.  IT'S NOT A QUESTION FOR THEM TO

11        ANSWER.

12            WE BELIEVE, WITH RESPECT TO THE SPECIFIC INTENT TO

13        DEFRAUD, BASED UPON THE EVIDENCE THAT WE'VE SUBMITTED, A

14        RATIONAL JUROR COULD CONCLUDE, IN LIGHT OF MR. KAIL'S

15        DISHONESTY WITH HIS PEERS, IN LIGHT OF THE PROVEN FALSE

16        STATEMENTS THAT HE'S MADE IN THE DOCUMENTS, E-MAILS WITH GAGAN

17        HASTEER, REED HASTINGS, WITH DAVID WELLS AND OTHERS, THAT HE

18        CONCEALED THIS INTENTIONALLY AND HE MADE FALSE STATEMENTS ABOUT

19        HIS RELATIONSHIPS WITH THEM AND A RATIONAL JUROR COULD, AFTER

20        CONSIDERING ALL THE EVIDENCE, AFTER WEIGHING THE CREDIBILITY OF

21        ALL THE WITNESSES, THEY COULD RESOLVE THAT EVIDENTIARY CONFLICT

22        IN FAVOR OF THE GOVERNMENT AND IN THE LIGHT MOST FAVORABLE OF

23        THE GOVERNMENT AT THIS TIME THEY COULD CONCLUDE MR. KAIL WAS

24        GUILTY.

25            SO WE BELIEVE THIS IS AN APPROPRIATE QUESTION FOR THE JURY
```

1        AND THE COURT SHOULD DENY THE MOTION UNDER RULE 29.

2              THE COURT:  ALL RIGHT.  WELL, CERTAINLY I'VE LISTENED

3        TO ALL THE EVIDENCE AS IT'S COME IN, AND I'VE BEEN ABLE TO VIEW

4        IT ALONG WITH THE JURY.

5              MS. JAYNE, I DO HAVE YOUR BRIEF HERE.  I WAS ABLE TO LOOK

6        IT OVER.  THANK YOU FOR THAT, I DO APPRECIATE IT.  AND I WILL

7        EXERCISE MY DISCRETION TO DEFER RULING ON THIS MOTION UNTIL A

8        LATER PHASE OF THE CASE.  I'M SATISFIED THAT WE SHOULD MOVE

9        FORWARD.

10             THE GOVERNMENT DID FILE A MOTION LAST NIGHT TO ADMIT -- TO

11       ADMIT EXHIBIT 957 UNDER RULE 408, AND I DID NOT REQUIRE NOR

12       WOULD THERE HAVE BEEN TIME FOR MS. JAYNE TO SUBMIT A WRITTEN

13       RESPONSE.

14             BUT BEFORE I EVEN GET TO A WRITTEN RESPONSE, I'M NOT

15       SATISFIED THAT THE GOVERNMENT HAS LAID OUT AN EXCEPTION TO --

16       UNDER 408 (D) AND I HAVE ZERO CASE AUTHORITY THAT A

17       CIRCUMSTANCE LIKE THIS WOULD BE APPROVED BY THE NINTH CIRCUIT

18       OR, FRANKLY, ANY CIRCUIT.

19             IT APPEARS TO ME THAT THE DOCUMENT ITSELF CLEARLY WOULD GO

20       TO -- CLEARLY WOULD BE IMPEACHMENT UNDER NORMAL CIRCUMSTANCES

21       IF IT WAS UNRELATED TO A SETTLEMENT DISCUSSION IN THE CIVIL

22       SUIT.  THERE'S NO QUESTION THAT THERE'S BEEN AN OPENING OF THE

23       DOOR.  BUT THAT'S NOT MY CONSIDERATION.

24             AND SO, MR. SAMPSON, IT APPEARS TO ME THAT YOU ARE

25       OFFERING THIS TO DISPROVE THE VALIDITY OF THE DISPUTED CLAIM,

```
 1      AND THAT'S EXPRESSLY PROHIBITED.  YOU DIDN'T ENUNCIATE AN

 2      EXCEPTED PURPOSE IN YOUR BRIEF, SO I'LL GIVE YOU A MOMENT TO

 3      DISCUSS THAT BEFORE I TURN TO MS. JAYNE, ALTHOUGH, FRANKLY, I'M

 4      NOT SURE SHE REALLY NEEDS TO DO ANYTHING HERE.  SO --

 5              MR. SAMPSON:  WELL, YOUR HONOR, OUR POSITION IS THAT

 6      THE COURT SHOULD CONSIDER THIS NOT AS A COMPROMISE OFFER AND

 7      NEGOTIATION, YOUR HONOR.

 8          MR. KAIL WENT AROUND HIS LAWYERS --

 9              MS. JAYNE:  OBJECTION.  ASSUMES FACTS NOT IN

10      EVIDENCE.

11              MR. SAMPSON:  WELL, HE DID NOT INCLUDE ANY ATTORNEYS

12      IN THIS COMMUNICATION.

13              THE COURT:  YOU DON'T HAVE TO HAVE AN ATTORNEY.  I

14      DON'T SEE ANYTHING IN RULE 408 THAT REQUIRES THE SETTLEMENT

15      DISCUSSIONS TO BE ATTORNEY TO ATTORNEY.  AND, IN FACT,

16      LITIGANTS ALWAYS RETAIN THE RIGHT TO PERSONALLY TALK AMONG

17      THEMSELVES, EVEN TO THEIR OPPOSING LITIGANT.  MR. HASTINGS WAS

18      CLEARLY THAT.

19              MR. SAMPSON:  YES, YOUR HONOR.  BUT THERE'S NO --

20      THERE'S NO OFFER SET OUT HERE.  THERE'S NO -- THERE'S NO ACTUAL

21      COMPROMISE.  THERE IS AN ASSERTION THAT HE -- THERE'S AN

22      ADMISSION THAT HE DID NOT FULLY DISCLOSE HIS ADVISORY ROLES TO

23      MR. --

24              THE COURT:  THE WHOLE DOCUMENT WHICH YOU SENT ME

25      CONCLUDES, AND I DON'T KNOW WHETHER -- DOES MS. JAYNE HAVE THE
```

1    DOCUMENT?

2              MR. SAMPSON:  YES.

3              THE COURT:  SHE WOULD IF IT'S HER CLIENT'S.

4              MS. JAYNE:  YES, THE LANGUAGE --

5              THE COURT:  AN AGREEABLE SETTLEMENT, I DON'T KNOW HOW

6    IT NEEDS TO BE MUCH CLEARER, AND I DON'T KNOW OF ANY PROVISION

7    IN THE RULE FOR AN EXCEPTION IF YOU EXCLUDE THE MAGIC WORDS.

8         SO WHAT IS THE -- SO I DON'T THINK IT -- IT DOESN'T COME

9    IN -- IT IS AN OFFER OF SETTLEMENT.  WHAT -- AND SO DO YOU

10   BELIEVE THAT THERE'S AN EXCEPTION?

11             MR. SAMPSON:  NOT UNDER RULE 408(B).

12             THE COURT:  THANK YOU.  I DO APPRECIATE THAT.

13        AND I WILL JUST SAY THAT THESE ARE EXACTLY THE KINDS OF

14   DOCUMENTS AND DISCUSSIONS THAT RULE 408 IS MEANT TO PROTECT, TO

15   ENABLE HONEST SETTLEMENT DISCUSSIONS THAT BRING RESOLUTION OF

16   CASES.

17        IT'S A POLICY CHOICE IN THE RULES.  IT DOESN'T HAVE TO BE

18   THAT WAY.  THERE'S NO MORE TO IT.  AND IN MY EXPERIENCE, MOST

19   CASES SETTLE ON THE BASIS OF AN INITIAL APOLOGY MADE BY ONE

20   PARTY TO THE OTHER TO OPEN THE DOOR TO RESOLUTION WHICH

21   CONCLUDES WITH A NO ADMISSION OF LIABILITY BY ANYONE.  THAT'S

22   JUST THE WAY THEY'RE DONE.

23             AND SO THANK YOU.  I DO DENY THE REQUEST.

24             MS. JAYNE, I DON'T NEED ANY ARGUMENT FROM YOU.

25             AND I APPRECIATE -- I APPRECIATE THE GOVERNMENT'S EFFORT

1      TO BRING IT IN.  I RECOGNIZE THAT IT COULD BE VERY POWERFUL IN

2      THE CASE, BUT I WILL EXCLUDE IT.

3          OKAY.  THANK YOU.  WE ARE RIGHT ON TIME.  I WILL JUST NOTE

4      FOR THE RECORD, IF I HAD NEGLECTED TO, THIS DISCUSSION HAS BEEN

5      OUTSIDE THE PRESENCE OF THE JURY.  MR. KAIL HAS JOINED US ABOUT

6      15 MINUTES AGO.

7          AND I THINK WE'RE READY TO BRING OUR JURY IN.

8              MS. JAYNE:  SORRY, YOUR HONOR.  PER OUR DISCUSSION

9      YESTERDAY, THERE WAS AN OBJECTION THAT I WANTED TO NOTE --

10             THE COURT:  OH, YES, THERE IS.  THANK YOU.  GO AHEAD,

11     PLEASE.

12             MS. JAYNE:  YES.  SO I HAD OBJECTED TO THE DISCUSSION

13     OF MR. KAIL'S SALARY AND THE GOVERNMENT PROFFERED THAT, WELL,

14     MR. KAIL SAID HE WORKED HARD, AND I BELIEVE THE TESTIMONY THAT

15     CAME IN WAS THAT HIS 360 REVIEWS, WHICH WERE ALREADY IN

16     EVIDENCE IN THE GOVERNMENT'S CASE-IN-CHIEF, NOTED THAT HE WAS

17     ONE OF THE HARDEST WORKING INDIVIDUALS AT NETFLIX, BUT THAT

18     SIMPLY NOTING AND ACKNOWLEDGING THAT DID NOT OPEN THE DOOR TO

19     HOW MUCH -- TO HIS ACTUAL SALARY.  NETFLIX DIDN'T PAY ON AN

20     HOURLY BASIS ANYWAY, AND SO I'M NOTING THE OBJECTION REGARDING,

21     REGARDING THAT OPENING THE DOOR TO SALARY.

22             THE COURT:  OKAY.

23         ANY COMMENT, MR. SAMPSON?

24             MR. SAMPSON:  MS. JAYNE ELICITED TESTIMONY ABOUT

25     NIGHTS, WEEKENDS, ALL THE WORK HE PUT IN, SO WE BELIEVED THE

1    DOOR WAS OPENED.

2         THE COURT:  OKAY.  I DID DETERMINE THAT THE DOOR WAS

3    OPENED, AND I WILL -- AND SO THANK YOU FOR MAKING THE RECORD.

4    I APPRECIATE THAT.

5         I ALSO WILL ADD TO THE RECORD THAT I DO BELIEVE THE DOOR

6    WAS OPENED BASED UPON THE TESTIMONY OF MR. KAIL, AND IN

7    CONSIDERING THE CONTEXT OF THIS CASE, THE AMOUNT OF THE INCOME

8    AND THE SOPHISTICATION OF A SILICON VALLEY JURY, I DON'T

9    BELIEVE THAT THERE WILL BE ANY PREJUDICIAL EFFECT TO THE

10   ADMISSION OF THAT INFORMATION.

11        I THINK THAT IT -- MR. KAIL EARNED A GENEROUS AND

12   COMFORTABLE INCOME, BUT HE WAS NOT A BILLIONAIRE ON THAT

13   SALARY.  AND THE JURY HAS SEEN A NUMBER OF BILLIONAIRES COME

14   THROUGH OUR COURTROOM, SO I THINK IN LIGHT OF THE CASE, THE

15   SOPHISTICATION OF PEOPLE LIVING IN SILICON VALLEY, WHICH IS

16   WHAT OUR JURY IS, THAT THERE IS NO PREJUDICIAL EFFECT.

17        THE PROBATIVE VALUE IS MODEST, I WILL SAY, BUT I STILL

18   BELIEVE THE DOOR WAS OPENED AND I BELIEVE THERE WAS NO

19   PREJUDICE.

20        MS. JAYNE:  THANK YOU, YOUR HONOR.

21        YOUR HONOR, SORRY, JUST ONE MORE POINT.  I BELIEVE THE

22   GOVERNMENT IS GOING TO BE GOING DOWN THE ROAD OF TAX RETURNS

23   AND THE COURT HAD EXCLUDED A DISCUSSION OF TAX RETURNS.  THERE

24   WAS A TAX RETURN THAT WAS AMENDED LATER, BECAUSE VISTARA HAD

25   LATER SENT A 1099 THAT IT HAD NEGLECTED TO DO SO INITIALLY.

1        THE COURT:  I DIDN'T REMEMBER THAT THERE WAS A

2   DISCUSSION OF TAX RETURNS.

3        MR. SAMPSON:  ONLY WITH MS. KIKUGAWA RELATED TO

4   WHETHER HE DECLARED UNIX MERCENARY IN 2012 OR BEFORE WHICH IS

5   WHEN HE CREATED THAT ENTITY.  I DON'T INTEND TO INTRODUCE TAX

6   EVASION AS A --

7        THE COURT:  THAT'S NOT CHARGED.

8        MR. SAMPSON:  IT WAS THE 1099 AND THE PAYMENTS THAT

9   THE GOVERNMENT WAS ELICITING AT THE END OF THE DAY.

10       YOUR HONOR, JUST AS A HOUSEKEEPING MATTER, IF YOU WANT ME

11   TO DO IT IN FRONT OF THE JURY, BUT I DID NOT ACTUALLY MOVE OR

12   ADMISSION OF EXHIBIT 4, WHICH WAS THE OFFER LETTER, AND I WOULD

13   ASK FOR ADMISSION OF EXHIBIT 4 TO SPEED THINGS UP.

14       THE COURT:  IS THERE ANY OBJECTION TO THAT?

15       MS. JAYNE:  THE OFFER LETTER?

16       MR. SAMPSON:  IT WAS THE ONE THAT SAID THE SALARY.

17       THE COURT:  WELL, I UNDERSTAND YOU OBJECT TO THE

18   SALARY.

19       MS. JAYNE:  YEP.

20       THE COURT:  BUT OTHER THAN THE SALARY ITSELF, YOU

21   DON'T OBJECT TO THE DOCUMENT?

22       MS. JAYNE:  I MEAN, I UNDERSTAND IT'S A RECORD.

23       THE COURT:  OKAY.  I WILL ADMIT IT.

24       OKAY.  HAVE WE GOT EVERYTHING WE NEED THEN?

25       MR. SAMPSON:  YES, YOUR HONOR.

1          THE COURT:  GOOD.  WE'LL BRING OUR JURY IN.

2          (PAUSE IN PROCEEDINGS.)

3          (JURY IN AT 9:06 A.M.)

4          THE COURT:  GOOD MORNING, EVERYONE.  PLEASE BE

5     SEATED.  WELCOME.  WE'RE BACK ON THE RECORD IN UNITED STATES

6     VERSUS MICHAEL KAIL.

7          COUNSEL ALL AND PARTIES ARE PRESENT AND ALL OF OUR JURORS

8     ARE HERE.

9          MR. SAMPSON, WE LEFT OFF IN THE MIDDLE OF MR. KAIL'S

10    CROSS-EXAMINATION.

11         ARE YOU READY TO PICK UP?

12         MR. SAMPSON:  YES, YOUR HONOR.

13         THE COURT:  MR. KAIL, I'M GOING TO ASK YOU TO RETURN

14    TO THE WITNESS STAND, PLEASE.  AND, SIR, I'M GOING TO HAVE YOU

15    STAND TO BE SWORN FOR THIS NEW COURT DAY.

16         THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

17         **(DEFENDANT'S WITNESS, MICHAEL KAIL, WAS SWORN.)**

18         THE WITNESS:  YES.

19         THE CLERK:  THANK YOU, SIR.  PLEASE BE SEATED.

20    ///

21    ///

22    ///

23    ///

24

25

1          **CROSS-EXAMINATION (RESUMED)**

2     BY MR. SAMPSON:

3     Q.   GOOD MORNING, MR. KAIL.

4     A.   GOOD MORNING.

5     Q.   ON WEDNESDAY YOU TESTIFIED THAT YOU DISCLOSED ADVISORY

6     RELATIONSHIPS ON YOUR LINKEDIN PAGE; CORRECT?

7     A.   THAT IS CORRECT.

8     Q.   DID YOU EVER HAVE NETENRICH LISTED ON YOUR LINKEDIN PAGE?

9     A.   I DON'T RECALL SPECIFICALLY, BUT I WOULD ASSUME SO.

10    Q.   BUT YOU NEVER DISCLOSED THAT YOU WERE A REFERRAL PARTNER

11    FOR NETENRICH, DID YOU?

12    A.   NO.

13    Q.   YOU NEVER DISCLOSED THAT YOU WERE A REFERRAL PARTNER FOR

14    VISTARA, DID YOU?

15    A.   NOT ON LINKEDIN.

16    Q.   ANYWHERE ELSE?

17    A.   I DON'T BELIEVE SO.

18    Q.   LET'S LOOK AT 107.  THIS IS THE NETENRICH SALES

19    REPRESENTATIVE AGREEMENT THAT YOU SIGNED AS THE PRINCIPAL OF

20    UNIX MERCENARY, LLC WITH NETENRICH; IS THAT RIGHT?

21    A.   YES.

22    Q.   THERE'S NO CONFIDENTIALITY PROVISION IN THIS DOCUMENT, IS

23    THERE?

24         YOU CAN GO TO PAGE 2.

25    A.   THERE DOES NOT APPEAR TO BE, NO.

1      Q.   GO TO PAGE 1, SECTION 2.1.

2           IT STATES THAT "THIS AGREEMENT SHALL IN NO WAY LIMIT

3      NICHE'S RIGHT TO SELL DIRECTLY OR INDIRECTLY ANY PRODUCT OR

4      SERVICE TO ANY CURRENT OR PROSPECTIVE CUSTOMERS, INCLUDING

5      PROSPECTS," DOES IT NOT?

6      A.   IT DOES.

7      Q.   NETENRICH DIDN'T HAVE TO PAY A REFERRAL PARTNER UNDER THIS

8      AGREEMENT, DID THEY?

9               MS. JAYNE:  OBJECTION.  SPECULATION.

10              THE COURT:  OVERRULED.

11              THE WITNESS:  I NEVER DISCUSSED NETENRICH'S BUSINESS

12     PRACTICES WITH THEM.

13     BY MR. SAMPSON:

14     Q.   BUT YOU GAVE THEM THE NAME UNIX MERCENARY, DIDN'T YOU?

15     A.   YES.

16     Q.   AND UNDER THIS AGREEMENT, YOU WERE TO BE PAID 12 PERCENT

17     OF THE MONTHLY BILLINGS TO COMPANIES THAT YOU REFERRED; IS THAT

18     CORRECT?

19     A.   THAT IS CORRECT.

20     Q.   PLEASE GO TO 114, WHICH I BELIEVE IS IN EVIDENCE.

21          MR. KAIL, YOUR ASSISTANT, MS. LA, TOLD RAGHU KAMATH AND

22     VARMA KUNAPARAJU THAT SHE SPEAK WITH YOU AND SOMEONE NAMED

23     ALEXIS.

24          DO YOU SEE THAT?

25     A.   YES.

1    Q.   AND SHE TOLD THEM THAT YOU WOULD REMAIN THE SOLE POC FOR

2    NETFLIX; IS THAT RIGHT?

3    A.   THAT IS WHAT'S WRITTEN, YES.

4    Q.   AND HERE POC MEANS POINT OF CONTACT; CORRECT?

5    A.   IT DOES.

6    Q.   AND THE MEETING WITH ALEXIS WAS NOT GOING TO BE SCHEDULED;

7    IS THAT RIGHT?

8    A.   CORRECT.

9    Q.   122, PLEASE, WHICH I DON'T BELIEVE IS IN.

10        MS. JAYNE:  I'M SORRY, WHICH EXHIBIT?

11        MR. SAMPSON:  122.

12        THE CLERK:  122 IS IN.

13        MR. SAMPSON:  OH, IT IS.  THANK YOU.

14   Q.   MR. KAIL, YOU E-MAILED VARMA KUNAPARAJU AND SOMEONE NAMED

15   ERIN BLAKE AT NETENRICH ON JANUARY 10, 2013.

16        DO YOU SEE THAT?

17   A.   IT'S NOT ON MY SCREEN YET.

18        (PAUSE IN PROCEEDINGS.)

19   BY MR. SAMPSON:

20   Q.   IS IT UP ON YOUR SCREEN, SIR?

21   A.   IT IS NOW.

22   Q.   AND YOUR STATEMENT WAS, "THE REASON I NEED TO BE KEPT IN

23   THE LOOP IS THE FACT THAT I'M THE ONE WHO INTRODUCED NETENRICH

24   INTO THE NETFLIX ENVIRONMENT, SO IT'S ALSO MY REPUTATION THAT

25   TAKES A HIT WHEN THINGS DON'T GO WELL."

1          WAS THAT YOUR STATEMENT?

2     A.   YES, THAT IS WHAT I WROTE IN THE E-MAIL.

3     Q.   108, PLEASE, WHICH IS IN EVIDENCE.

4          MR. KUNAPARAJU SENT YOU THE ADVISORY AGREEMENT FOR

5     NETENRICH IN AUGUST 2012.

6          DO YOU SEE THAT?

7     A.   YES.

8     Q.   AND HE ASKED YOU TO POPULATE EXHIBIT A ABOUT THE SERVICES

9     THAT YOU WOULD PROVIDE AS AN ADVISOR; IS THAT RIGHT?

10    A.   CORRECT.

11    Q.   HE ALSO TOLD YOU THAT VISTARA WAS A WHOLLY OWNED

12    SUBSIDIARY OF NETENRICH?

13    A.   YES, HE DID.

14    Q.   AND HIS E-MAIL IS IN RESPONSE TO YOUR REQUEST TO FINISH UP

15    THIS WEEK, INCLUDING AN OPTION GRANT.

16         DO YOU SEE THAT?

17    A.   NOT YET.  IT'S NOT ON THE SCREEN.

18    Q.   THAT WAS THE SAME, SAME EXHIBIT, 108.

19            MR. KALEBA:  WHAT'S THE NUMBER?

20            MR. SAMPSON:  108.

21    Q.   AT THE BOTTOM.

22    A.   YES, THAT'S THE E-MAIL I WROTE.

23    Q.   PLEASE GO TO 113.

24         THE SUBJECT LINE OF THIS E-MAIL IS EMERGENCY DBA.

25         DO YOU SEE THAT?

1    A.   YES.

2    Q.   AND THAT'S DATABASE ADMINISTRATOR?

3    A.   IT IS.

4    Q.   AND YOU E-MAILED MR. KAMATH AND SAID $110 DOLLARS AN HOUR

5    IS CORRECT; RIGHT?

6         DO YOU SEE THAT?

7    A.   YES.

8    Q.   AND MR. KAMATH RESPONDED, IT'S 120.

9         DO YOU SEE THAT?

10   A.   I DO.

11   Q.   AND YOU ACCEPTED THAT 120, DID YOU NOT?

12   A.   THAT WAS NETFLIX'S STANDARD RATE FOR ALL CONTINGENT

13   WORKERS, YES.

14   Q.   IS THAT A YES?

15        YOU SAID "120 AN HOUR IS FINE, WE'LL STAY WITH THAT SINCE

16   THIS IS SHORTER TERM."

17        IS THAT WHAT YOU SAID TO MR. KAMATH?

18   A.   YES.

19   Q.   AND 27 MONTHS LATER WHEN YOU LEFT NETFLIX, THERE WERE

20   STILL CONTRACTORS WITH NETENRICH UNDER THE $120 AN HOUR

21   CONTRACT, WERE THERE NOT?

22   A.   YES, THAT WAS NETFLIX'S STANDARD RATE.

23   Q.   BUT 27 MONTHS LATER, THERE WERE STILL NETENRICH CONTRACTS

24   AT NETFLIX?

25   A.   YES.  NOT THIS INDIVIDUAL, I DON'T BELIEVE, BUT THERE WERE

1       NETENRICH CONTRACTORS, YES.

2       Q.   AS MANY AS FOUR AT A TIME?

3       A.   I DON'T KNOW THE SPECIFIC NUMBER, BUT IT WAS IN A RANGE OF

4       PROBABLY TWO TO FOUR.

5       Q.   LET'S GO TO 123, WHICH IS IN EVIDENCE, PAGE 47.

6            THIS IS FOR ONE NETENRICH ENGINEER FOR 160 HOURS FOR A

7       MONTH; CORRECT?

8       A.   CORRECT.

9       Q.   NEXT PAGE.

10           THIS IS FOR THE SAME PERIOD FOR TWO OTHER NETENRICH

11      ENGINEERS; CORRECT?

12      A.   CORRECT.

13      Q.   NEXT PAGE.

14           THIS IS FOR APRIL FOR ONE NETENRICH ENGINEER; CORRECT?

15      A.   APRIL OF 2014, NOT 2012, YES.

16      Q.   CORRECT.

17           NEXT PAGE.

18           AND THIS IS FOR APRIL FOR TWO OTHER NETENRICH ENGINEERS;

19      IS THAT RIGHT?

20      A.   THAT IS CORRECT.

21      Q.   LET'S GO TO 53.

22           AND THIS IS FOR JUNE FOR A NETENRICH ENGINEER; CORRECT?

23      A.   CORRECT.

24      Q.   NEXT PAGE.

25           THIS IS FOR TWO MORE ENGINEERS FROM NETENRICH FOR JUNE

1      2014; CORRECT?

2      A.   CORRECT.

3      Q.   AND SO FROM APRIL OR EARLIER TO, THROUGH JUNE, NETFLIX WAS

4      GETTING INVOICED FOR NETENRICH ENGINEERS, WERE THEY NOT?

5      A.   THEY WERE.

6      Q.   AND YOU WERE RECEIVING 12 PERCENT OF THOSE BILLINGS

7      THROUGH UNIX MERCENARY, LLC?

8      A.   YES.

9      Q.   LET'S LOOK AT EXHIBIT 120.  LET'S GO TO PAGE 2.  IT'S A

10     LITTLE HARD TO READ.  YOU CAN BLOW IT UP.

11          MR. KAIL, IS THIS YOUR E-MAIL TO OTHER NETFLIX EMPLOYEES?

12     A.   YES, THAT'S MY E-MAIL ON PAGE 2.

13            MR. SAMPSON:  I MOVE FOR ADMISSION OF 120.

14            THE COURT:  ANY OBJECTION?

15            MS. JAYNE:  NO.

16            THE COURT:  IT WILL BE ADMITTED.

17          (GOVERNMENT'S EXHIBIT 120 WAS ADMITTED IN EVIDENCE.)

18     BY MR. SAMPSON:

19     Q.   YOU SAID "I.T.-OPS HAS A FEW CONTRACTORS FROM NETENRICH

20     AND THEIR CONTROLLER JUST REACHED OUT TO ME TO CHECK ON THE

21     STATUS OF THAT INVOICE.  CAN SOMEONE LET ME KNOW WHERE WE ARE

22     WITH PAYING THAT?"

23          THAT WAS YOUR QUESTION?

24     A.   YES, THAT IS WHAT I WROTE.

25     Q.   PAGE 1.

1          AND YOUR E-MAIL WAS TO STREAMING AP, WAS IT NOT?

2     A.   YES.

3     Q.   AND THAT'S ACCOUNTS PAYABLE?

4     A.   ACCOUNTS PAYABLE, YES.

5     Q.   AND A FEW DAYS LATER YOU E-MAILED MS. IGNACIO AND

6     MS. SAN FILIPPO AT NETFLIX; CORRECT?

7     A.   YES.

8     Q.   AND THEY WERE IN ACCOUNTS PAYABLE?

9     A.   I BELIEVE MS. IGNACIO WAS -- MS. SAN FILIPPO WAS IN THE

10    CONTINGENT WORKER DIVISION.

11    Q.   OKAY.  AND YOU SAID AT THE TOP, "LET ME KNOW WHAT, IF

12    ANYTHING, YOU NEED FROM ME TO GET THIS EXPEDITED."

13         THAT'S WHAT YOU TOLD NETFLIX EMPLOYEES?

14    A.   THAT'S WHAT I ASKED, YES.

15    Q.   128, PLEASE.

16         IS THIS YOUR E-MAIL TO STREAMING AP?

17    A.   YES.

18    Q.   AND DOES IT ATTACH ON PAGE 2 AN INVOICE FOR NETENRICH FROM

19    AUGUST 2013, ACTUALLY, YEAH, THE PERIOD FOR AUGUST 2013?

20    A.   THEY SENT ME THE INVOICE.

21    Q.   YES OR NO, MR. KAIL?

22    A.   THE INVOICE WAS ATTACHED, NOT BY ME.

23    Q.   OKAY.  AND YOU FORWARDED THIS E-MAIL TO STREAMING AP AT

24    NETFLIX?

25    A.   I BELIEVE I REPLIED.

1     Q.   PAGE 1.

2          YOU GOT THIS E-MAIL FROM NETENRICH, DID YOU NOT?

3     A.   YES.

4     Q.   AND YOU FORWARDED IT TO STREAMING AP, DID YOU NOT?

5     A.   YES, I DID.

6              MR. SAMPSON:  I MOVE FOR ADMISSION OF 128.

7              THE COURT:  ANY OBJECTION?

8              MS. JAYNE:  NO.

9              THE COURT:  IT WILL BE ADMITTED.

10         (GOVERNMENT'S EXHIBIT 128 WAS ADMITTED IN EVIDENCE.)

11    BY MR. SAMPSON:

12    Q.   SO, MR. KAIL, YOU RECEIVED THE INVOICE FROM NETENRICH AND

13    YOU FORWARDED IT TO STREAMING AP AND SAID "APPROVED FOR

14    PAYMENT" IN AUGUST 2013, DID YOU NOT?

15    A.   I DID.

16    Q.   AND NO ONE ELSE AT NETFLIX WAS LISTED ON THE E-MAIL WITH

17    THE INVOICE TO YOU AND YOU DID NOT -- LET ME FINISH WITH THAT.

18         THE INVOICE FROM NETENRICH CAME DIRECTLY TO YOU, DID IT

19    NOT?

20    A.   THIS ONE DID, YES.

21    Q.   135.  IS THIS AN E-MAIL FROM YOU TO STREAMING AP AT

22    NETFLIX.COM?

23    A.   YES, ALONG WITH A COUPLE NETENRICH E-MAILS.

24    Q.   YES.  AND ON THE SECOND PAGE, IS THERE AN ATTACHMENT WHICH

25    IS AN INVOICE FROM NETENRICH?

1      A.   YES, THERE IS.

2              MR. SAMPSON:  I MOVE FOR ADMISSION OF 135.

3              THE COURT:  ANY OBJECTION?

4              MS. JAYNE:  NO.

5              THE COURT:  IT WILL BE ADMITTED.

6          (GOVERNMENT'S EXHIBIT 135 WAS ADMITTED IN EVIDENCE.)

7      BY MR. SAMPSON:

8      Q.   PAGE 2.

9          THIS IS AN INVOICE FOR THREE NETENRICH ENGINEERS; CORRECT?

10     A.   CORRECT.

11     Q.   FOR -- WELL, I WON'T TRY THAT.

12         PAGE 1.

13         YOUR E-MAIL TO STREAMING AP AT NETFLIX WAS "APPROVED."

14         YOUR STATEMENT WAS "APPROVED," WAS IT NOT?

15     A.   CORRECT.

16     Q.   143.

17         IS THIS AN E-MAIL FROM YOU TO STREAMING AP?

18     A.   YES.

19     Q.   AND DOES IT ATTACH AN INVOICE FROM NETENRICH FOR

20     ENGINEERS?

21     A.   IS THAT ON PAGE 2?

22     Q.   YES.  WE CAN GO TO PAGE 2.

23         IS THAT RIGHT?

24     A.   CORRECT.

25             MR. SAMPSON:  I MOVE FOR ADMISSION OF 143.

1              THE COURT:  ANY OBJECTION?

2              MS. JAYNE:  NO.

3              THE COURT:  IT WILL BE ADMITTED.

4         (GOVERNMENT'S EXHIBIT 143 WAS ADMITTED IN EVIDENCE.)

5    BY MR. SAMPSON:

6    Q.   AND THIS IS FOR TWO NETENRICH ENGINEERS; IS THAT RIGHT?

7    A.   CORRECT.

8    Q.   AND UNDER THE REFERRAL PARTNER AGREEMENT, YOU WERE

9    RECEIVING 12 PERCENT OF THIS INVOICE, WERE YOU NOT?

10   A.   CORRECT.

11   Q.   PAGE 1.

12        AND YOUR E-MAIL TO STREAMING AP SAID "APPROVED," DID IT

13   NOT?

14   A.   YES.

15   Q.   210, WHICH IS ADMITTED, PAGE 2.  IT'S A LITTLE HARD TO

16   READ, BUT WE'LL BLOW IT UP.

17        YOU, AT THE TOP, YOU E-MAIL STREAMING AP AND

18   MS. SYLVIA SUNDHOLM.

19        DO YOU SEE THAT?

20   A.   I DO.

21   Q.   AND YOU'RE FORWARDING AN E-MAIL FROM NETENRICH EMPLOYEES,

22   ARE YOU NOT?

23   A.   I'M NOT SURE WHAT I'M FORWARDING HERE.

24   Q.   WELL, THE SUBJECT IS "FORWARD FULLY EXECUTED AGREEMENT,

25   VISTARAIT AND NETFLIX."

1          DO YOU SEE THAT?

2    A.   YES.

3               MR. SAMPSON:  I MOVE FOR ADMISSION OF 210.

4               THE COURT:  ANY --

5               MR. SAMPSON:  OH, I'M SORRY, IT'S ADMITTED.

6               THE COURT:  OKAY.

7    BY MR. SAMPSON:

8    Q.   AND YOUR STATEMENT TO MS. SUNDHOLM AT STREAMING AP IS

9    "APPROVED FOR PAYMENT."

10         DO YOU SEE THAT?

11   A.   YES.

12   Q.   AND AT THE TOP OF PAGE 1, MS. SUNDHOLM E-MAILS

13   STREAMING AP AND YOU AND SAYS, "IT'S BEST TO ROUTE THESE TO

14   MIKE FOR NON P.O. APPROVAL."

15         DO YOU SEE THAT?

16   A.   I DO.

17   Q.   "BOTH OF THESE INVOICES CAN GO TO MIKE FOR APPROVAL."

18         DO YOU SEE THAT?

19   A.   YES.

20   Q.   225.

21         IS THIS AN E-MAIL BETWEEN YOU AND STREAMING AP AT NETFLIX?

22   A.   YES, IT IS.

23               MR. SAMPSON:  MOVE FOR ADMISSION OF 225.

24               THE COURT:  ANY OBJECTION?

25               MS. JAYNE:  NO.

1          THE COURT:  IT WILL BE ADMITTED.

2          (GOVERNMENT'S EXHIBIT 225 WAS ADMITTED IN EVIDENCE.)

3     BY MR. SAMPSON:

4     Q.   THIS IS SEPTEMBER 18, 2013.

5          AT THE BOTTOM, YOU'RE SAYING, "NOT URGENT, BUT CAN SOMEONE

6     GIVE ME AN ETA ON PAYMENT FOR THE 2ND VISTARA INVOICE THAT I

7     APPROVED A COUPLE OF WEEKS AGO?"

8          IS THAT YOUR STATEMENT?

9     A.   THAT IS WHAT I WROTE, YES.

10    Q.   AND THE SUBJECT IS "VISTARAIT INVOICE PAYMENT STATUS?"

11    QUESTION MARK?

12    A.   CORRECT.

13    Q.   YOU'RE ASKING WHEN VISTARA IS GOING TO GET PAID?

14    A.   I AM.

15    Q.   AND YOU WERE RECEIVING 15 PERCENT OF VISTARA INVOICES AT

16    THE TIME, WERE YOU NOT?

17    A.   YES.

18    Q.   331.  SORRY.  231.  PAGE 37.

19         THIS PAGE IS -- THIS IS -- PAGE 37 IS AN INVOICE FROM

20    VISTARA TO STREAMING FOR $33,750.

21         DO YOU SEE THAT?

22    A.   I DO.

23    Q.   AND THIS IS FOR THE PERIOD ENDING APRIL 30TH, 2014?

24    A.   CORRECT.

25    Q.   AND YOU WERE RECEIVING 15 PERCENT OF -- YOU WERE RECEIVING

1    A 15 PERCENT COMMISSION ON THIS INVOICE, WERE YOU NOT?

2    A.   CORRECT.

3    Q.   AND THIS WAS AFTER YOU SENT AN E-MAIL TO MR. HASTINGS AND

4    MR. WELLS ON MARCH 23RD, 2014?

5    A.   RELATED TO?

6    Q.   RELATED TO SUNSHINE?

7    A.   YES, I BELIEVE SO.

8    Q.   208, PLEASE.

9         IS THIS AN E-MAIL FROM MR. KUNAPARAJU TO YOU?

10   A.   YES, IT'S HIM SENDING ME THE STATEMENT OF WORK.

11   Q.   THE VISTARA STATEMENT OF WORK?

12   A.   THE VISTARA STATEMENT OF WORK.

13   Q.   AND HE SAYS, "THANKS FOR GIVING US THE OPPORTUNITY TO

14   DEPLOY VISTARAIT PLATFORM FOR NETFLIX NEEDS."

15        DO YOU SEE THAT?

16   A.   I DO.

17   Q.   HE DOESN'T E-MAIL ANYONE ELSE IN NETFLIX I.T., DOES HE?

18   A.   NOT IN THIS MESSAGE, NO.

19   Q.   129.

20        IS THIS AN E-MAIL FROM YOU TO MR. KUNAPARAJU AND HIS

21   E-MAIL BACK?

22   A.   YES, IT IS.

23   Q.   AND ON AUGUST 27, 2013, YOU ASKED FOR $15,750 BY 5:00 P.M.

24   FRIDAY; IS THAT RIGHT?

25   A.   AS PART OF THE REFERRAL AGREEMENT.

1      Q.   IS THAT RIGHT, MR. KAIL?

2      A.   YES.

3      Q.   CAN WE DO A SIDE-BY-SIDE WITH EXHIBIT 706, PAGE 2.

4           AND THIS IS THE CHECK THAT, FOR $15,750 DATED THREE DAYS

5      LATER THAT VISTARA SENT TO YOU, IS IT NOT?

6      A.   IT IS.

7      Q.   130, WHICH IS ADMITTED.

8           YOUR STATEMENT TO MR. KUNAPARAJU, SEPTEMBER 25TH, 2013,

9      SUBJECT LINE, "BOTH INVOICES APPROVED."

10          DO YOU SEE THAT?

11     A.   I DO.

12     Q.   AND YOU WERE REFERRING TO NETENRICH OR VISTARA INVOICES?

13     A.   YES.

14     Q.   AND YOU SAY, "DUE TO HAVING TO PAY ESTIMATED TAXES FOR

15     CALIFORNIA, WOULD BE NICE TO GET THE 15,750 THAT IS OWED."

16          DO YOU SEE THAT?

17     A.   I DO.

18     Q.   THAT'S YOUR STATEMENT?

19     A.   THAT'S WHAT I WROTE, YES.

20     Q.   221, WHICH IS NOT YET IN EVIDENCE.

21          IS THIS AN E-MAIL BETWEEN YOU AND MR. KUNAPARAJU, MAY 9TH,

22     2013.

23     A.   YES, IT IS.

24          MR. SAMPSON:  MOVE FOR ADMISSION OF 221.

25          THE COURT:  ANY OBJECTION?

1          MS. JAYNE:  NO.

2          THE COURT:  IT WILL BE ADMITTED.

3          (GOVERNMENT'S EXHIBIT 221 WAS ADMITTED IN EVIDENCE.)

4     BY MR. SAMPSON:

5     Q.   AND THIS E-MAIL IS JUST BETWEEN YOU AND MR. KUNAPARAJU;

6     CORRECT?

7     A.   CORRECT.

8     Q.   AND THE SUBJECT IS "RE; INVOICING."

9     A.   CORRECT.

10    Q.   AND IN THE MIDDLE, YOU TELL MR. KUNAPARAJU THAT "THE

11    BIGGER CONCERN IS THE TEAM'S OVERALL DISSATISFACTION WITH

12    VISTARA."

13         DO YOU SEE THAT?

14    A.   I DO.

15    Q.   "SOMEONE ON YOUR TEAM SHOULD MONITOR THAT CLOSELY."

16         DO YOU SEE THAT?

17    A.   I DO.

18    Q.   YOU DIDN'T INCLUDE ANYONE ELSE ON YOUR TEAM WHEN YOU GAVE

19    THIS FEEDBACK, DID YOU?

20    A.   NOT IN THIS E-MAIL, NO.

21    Q.   220, WHICH IS NOT YET IN EVIDENCE.

22         IS THIS AN E-MAIL BETWEEN YOU AND BOBBY MENESES AT

23    NETFLIX?

24    A.   IT IS.

25         MR. SAMPSON:  MOVE FOR ADMISSION OF 220.

```
 1              THE COURT:  ANY OBJECTION?

 2              MS. JAYNE:  NO.

 3              THE COURT:  IT WILL BE ADMITTED.

 4         (GOVERNMENT'S EXHIBIT 220 WAS ADMITTED IN EVIDENCE.)

 5    BY MR. SAMPSON:

 6    Q.   AND SOMEONE FROM NETENRICH REACHED OUT TO MR. MENESES AND

 7    CC'D YOU ABOUT DOING A SUCCESS SORRY RELATED TO NETFLIX; IS

 8    THAT RIGHT?

 9    A.   THAT'S CORRECT.

10    Q.   AND THIS WAS NOVEMBER 2012?

11    A.   YES.

12    Q.   AND GOING TO THE E-MAIL ABOVE THAT, MR. MENESES E-MAILED

13    YOU AND SAID, "AT A HIGH LEVEL, THIS FEELS LIKE CART BEFORE THE

14    HORSE."

15         DO YOU SEE THAT?

16    A.   I DO.

17    Q.   AND YOU AGREE?

18    A.   YES, I DID.

19    Q.   131.

20         IS THIS AN E-MAIL -- I BELIEVE IT'S IN EVIDENCE ACTUALLY,

21    YES -- SO WE'LL SHOW THE JURY.

22         THIS IS AN E-MAIL JUST BETWEEN YOU AND MR. KUNAPARAJU.

23         DO YOU SEE THAT?

24    A.   I DO.

25    Q.   AND AT THE BOTTOM, MR. KUNAPARAJU SAID THAT SOMEBODY NAMED
```

1     HEMANTH IS THE POINT OF CONTACT.

2          DO YOU SEE THAT?

3     A.   I DO.

4     Q.   AND YOU ASKED, "DOES HEMANTH KNOW THE CONTEXT OF MY/OUR

5     ARRANGEMENT?"

6          IS THAT WHAT YOU WROTE?

7     A.   YES, THAT'S WHAT I WROTE.

8     Q.   SO HEMANTH, DO YOU KNOW WHERE HE WAS AT THE TIME?

9     A.   LOCATION-WISE, I HAD NO IDEA.

10    Q.   BUT HE WORKED AT NETENRICH?

11    A.   YES.

12    Q.   SO HEMANTH SHOULD KNOW THE CONTEXT OF YOUR ARRANGEMENT; IS

13    THAT RIGHT?

14    A.   HE SHOULD KNOW THAT I'M A REFERRAL PARTNER, YES.

15    Q.   YOU TESTIFIED THAT THE BUSINESS MODEL OF NETENRICH IS TO

16    WORK WITH REFERRAL PARTNERS, IS IT NOT?

17    A.   IT WAS THEN, YES.

18    Q.   BUT MR. KUNAPARAJU SAID, "OOPS.  I UNDERSTAND THE CONTEXT

19    NOW.  NOPE."

20          DO YOU SEE THAT?

21    A.   I DO.

22    Q.   DID YOU SHARE THE CONTEXT OF YOUR REFERRAL ARRANGEMENT

23    WITH ANYONE AT NETFLIX?

24    A.   NOT THAT I RECALL, NO.

25    Q.   146, WHICH IS IN EVIDENCE.

1              YOU -- LET'S GO TO PAGE 2.  LET'S GO -- IT'S A LONG

2       E-MAIL.  LET'S GO TO PAGE 3.

3              YOU ASKED FOR ONE OF YOUR COMMISSION PAYMENTS AT THE

4       BOTTOM OF PAGE 3, YOU ASKED IF THEY COULD DO A WIRE TO YOU.

5              DO YOU SEE THAT?

6       A.   I DO.

7       Q.   AND THIS IS BECAUSE THE CHECK DIDN'T ARRIVE WHEN YOU

8       EXPECTED IT?

9       A.   THIS IS BECAUSE OF THEIR ONGOING ACCOUNTING CHALLENGES

10      THAT --

11      Q.   I -- MR. KAIL; THAT A YES OR NO?

12              MS. JAYNE:  OBJECTION.  THE QUESTION MAY BE CON --

13              THE COURT:  OVERRULED.  THE WITNESS MAY ANSWER.

14              THE WITNESS:  CAN YOU RE-ASK THE QUESTION?

15      BY MR. SAMPSON:

16      Q.   THIS WAS BECAUSE A CHECK THAT YOU WERE EXPECTING HAD NOT

17      YET ARRIVED; CORRECT?

18      A.   CORRECT.

19      Q.   PAGE 2 AT THE BOTTOM.

20              AND YOU ADDED VARMA TO THE E-MAIL CHAIN; CORRECT?

21      A.   CORRECT.

22      Q.   AND THE NEXT DAY YOU E-MAILED THE SAME PEOPLE AND SAID

23      "STILL NOT RECEIVED."

24              DO YOU SEE THAT?

25      A.   I DO.

1     Q.   PAGE 1.

2          AND THE NEXT DAY YOU ASKED THEM TO FEDEX THE PAYMENT?

3     A.   YES.

4     Q.   AND THE NEXT DAY YOU INDICATED, "OF COURSE THE CHECK

5     ARRIVED TONIGHT."

6          DO YOU SEE THAT?

7     A.   I DO.

8     Q.   BUT MS. MENDELSOHN RESPONDED ON THE 14TH THAT SHE HAD

9     FEDEXED ANOTHER CHECK.

10         DO YOU SEE THAT?

11    A.   I DO.

12    Q.   DID YOU GET THAT CHECK?

13    A.   I BELIEVE I DID, YES.

14    Q.   YOUR RESPONSE WAS "RECEIVED, BUT IT WAS SENT TO NETFLIX,

15    NOT MY HOME ADDRESS.  PLEASE ALWAYS USE THE LATTER."

16         IS THAT RIGHT?

17    A.   CORRECT.

18    Q.   147, WHICH IS IN EVIDENCE.

19         THIS IS AN E-MAIL FROM YOU TO HEMANTH AND VARMA KUNAPARAJU

20    APRIL 2ND, 2014.

21         DO YOU SEE THAT?

22    A.   I DO.

23    Q.   THE SUBJECT IS "COMMISSION STATEMENTS"?

24    A.   YES.

25    Q.   AND YOU SAID, "PLEASE E-MAIL TO THIS ADDRESS, NOT MY

1        @NETFLIX.COM ONE."

2            DO YOU SEE THAT?

3    A.   I DO.

4    Q.   AND YOU SENT THIS E-MAIL FROM YOUR PERSONAL GMAIL ACCOUNT?

5    A.   I DID.

6    Q.   AND THIS WAS EIGHT DAYS AFTER THE E-MAIL FROM MR. HASTINGS

7    TO YOU ABOUT SUNSHINE?

8    A.   GIVE OR TAKE, YES.

9    Q.   LET'S GO TO 605.

10           DID YOU SIGN THIS ORDER FORM FOR SUMO LOGIC?

11   A.   I DID.

12           MR. SAMPSON:  AND MOVE FOR ADMISSION OF 605.

13           THE COURT:  ANY OBJECTION?

14           MS. JAYNE:  NO.

15           THE COURT:  IT WILL BE ADMITTED.

16       (GOVERNMENT'S EXHIBIT 605 WAS ADMITTED IN EVIDENCE.)

17   BY MR. SAMPSON:

18   Q.   SO IN JULY 2012, NETFLIX BECAME A CUSTOMER OF SUMO LOGIC?

19   A.   YES.

20   Q.   603.

21           AND IN AUGUST OF 2012, YOU BECAME A CUSTOMER ADVISOR TO

22   SUMO LOGIC; IS THAT RIGHT?

23   A.   I CAN'T TELL THE DATE FROM THIS E-MAIL.

24   Q.   OKAY.  BUT IN JUNE 2012, THEY INDICATED THEY LOOKED

25   FORWARD TO GETTING YOU INVOLVED AS A CUSTOMER EXECUTIVE ADVISOR

1     TO SUMO LOGIC.

2          DO YOU RECALL THAT?

3     A.   UPON SEEING THIS E-MAIL, YES.

4     Q.   THAT REFRESHES YOUR RECOLLECTION?

5     A.   UPON SEEING THIS E-MAIL, YES.  I DON'T RECALL THE SPECIFIC

6     DATE.

7     Q.   AND YOUR STATEMENT TO MR. LOISELLE WAS, "I BELIEVE THAT

8     SUMO LOGIC WILL BE A GREAT SUCCESS AT NETFLIX AS WELL AS A

9     MYRIAD OF OTHER CUSTOMERS.  I GREATLY LOOK FORWARD TO ASSISTING

10    WITH BOTH."

11         DO YOU SEE THAT?

12    A.   I DO.

13    Q.   AND YOU WERE BEING INVITED TO BE ON THE CUSTOMER ADVISORY

14    BOARD OF SUMO LOGIC?

15    A.   NOT SPECIFICALLY IN THIS E-MAIL.  IT WAS IN CONVERSATION.

16    Q.   WELL, THEY -- MR. LOISELLE SAID WE ESPECIALLY LOOK

17    FORWARD, "I ESPECIALLY LOOK FORWARD TO GETTING YOU INVOLVED AS

18    A CUSTOMER EXECUTIVE ADVISOR"?

19         DID HE NOT?

20    A.   THAT'S WHAT MR. LOISELLE WROTE, YES.

21    Q.   606.  PAGE 2.

22         YOU DOCUSIGNED THIS ADVISORY AGREEMENT, DID YOU NOT?

23    A.   I DID, YES.

24    Q.   614.

25         YOU TOLD THE JURY -- LET'S TAKE IT DOWN.

1           MR. KAIL, DO YOU RECALL TELLING THE JURY IN YOUR DIRECT

2   TESTIMONY ON WEDNESDAY, QUOTE, "I NEVER PUSHED THE NETENRICH

3   ENGINEERS OR VISTARA PRODUCTS ON TEAM MEMBERS OR FORCED THEM TO

4   USE IT."

5           DO YOU RECALL THAT?

6   A.   I DO.

7   Q.   DID YOU EVER PUSH ANYONE TO USE THE SUMO LOGIC TOOL?

8   A.   I NEVER PUSHED THEM TO USE ANY TOOL, NO.

9   Q.   614.

10          IS THIS YOUR E-MAIL TO SUMO LOGIC EMPLOYEES?

11  A.   YES.

12  Q.   YOU SAID, "I'M PUSHING MY TEAMS TO USE THE TOOL, BUT THE

13  PERFORMANCE ISSUES ARE PROBLEMATIC."

14          IS THAT WHAT YOU WROTE?

15  A.   THAT'S WHAT I WROTE.

16  Q.   IN MAY 2013, DID SUMO LOGIC GRANT YOU MORE SHARES, MORE

17  OPTIONS?

18  A.   AT SOME POINT IN 2013, YES, THEY DID.

19  Q.   AND AT THE TIME, YOU WERE ALREADY COMMITTED IN A MULTI

20  YEAR ADVISORY AGREEMENT WITH SUMO LOGIC, WERE YOU NOT?

21  A.   I WAS, YES.

22  Q.   GO BACK TO 606, PAGE 2.

23          DO YOU RECALL THE TESTIMONY THAT THE 2011 DATE IS NOT --

24  IS OFF BY A YEAR AND IT WAS 2012?

25  A.   YES.  THAT WAS LATER RESOLVED.

1   Q.   BUT IN 2012, YOU SIGNED THE EXECUTIVE -- SORRY -- THE

2   ADVISORY BOARD AGREEMENT, DID YOU NOT?

3   A.   I DID.

4   Q.   AND SUMO LOGIC PUT RIGHT IN THE ADVISORY AGREEMENT, THE

5   BOTTOM BULLET, THAT THE ADVISOR HOLD A V.P./C-LEVEL I.T. ROLE

6   AT A MARQUEE SUMO LOGIC CUSTOMER.

7        DO YOU SEE THAT?

8   A.   I DO.

9   Q.   AND ALSO HOST AN ANNUAL CUSTOMER ADVISORY EVENT?

10  A.   YES.

11  Q.   THE FIRST BULLET POINT IS PARTICIPATE IN A VIDEO ENDORSING

12  SUMO LOGIC?

13  A.   YES.

14  Q.   AND THESE ARE PARTS OF THE CONTRACT THAT YOU SIGNED WITH

15  SUMO LOGIC?

16  A.   THIS IS PART OF THE ADVISORY BOARD AGREEMENT, YES.

17  Q.   AND THAT WAS A CONTRACT; RIGHT?

18  A.   YES.

19  Q.   626.

20       IS THIS AN E-MAIL BETWEEN YOU AND EMPLOYEES OF SUMO LOGIC

21  AND BILL BURNS?

22  A.   IT IS, YES.

23  Q.   AND AT THE BOTTOM, ON SEPTEMBER 2014 -- SEPTEMBER 24TH,

24  2013 --

25       I MOVE FOR ADMISSION OF 626.

1              THE COURT:  ANY OBJECTION TO 626?

2              MS. JAYNE:  NO.

3              THE COURT:  IT WILL BE ADMITTED.

4         (GOVERNMENT'S EXHIBIT 626 WAS ADMITTED IN EVIDENCE.)

5    BY MR. SAMPSON:

6    Q.  AT THE BOTTOM YOU SAID, "FEEDBACK FROM MY TEAM IS THAT THE

7    GRAPHING HAS BEEN EXTREMELY SLOW."

8         DO YOU SEE THAT?

9    A.  I DO.

10   Q.  AND YOU SAID, "BILL'S TEAM --" IS THAT BILL BURNS?

11   A.  IT IS, YES.

12   Q.  YOU SAID, "BILL'S TEAM IS GETTING EXTREMELY FRUSTRATED AND

13   I'M TRYING TO GET OUT AHEAD OF THAT."

14        IS THAT WHAT YOU WROTE?

15   A.  IT IS.

16   Q.  627.

17        TOWARD THE BOTTOM, THERE'S A SUMO ISSUES AT NETFLIX E-MAIL

18   ADDRESS.

19        DO YOU SEE THAT?

20   A.  I DO.

21   Q.  SO NETFLIX HAD AN E-MAIL ADDRESS FOR SUMO ISSUES?

22   A.  I WASN'T AWARE OF IT UNTIL SEEING THIS EXHIBIT.

23   Q.  BUT YOU RECEIVED -- YOU RECEIVED THAT -- FORWARDED THAT

24   E-MAIL, DID YOU NOT?

25   A.  I DID.

1    Q.   AND THIS WAS AFTER YOU SIGNED AN $800,000 TWO YEAR DEAL

2    WITH SUMO LOGIC?

3    A.   I BELIEVE SO.  I'M NOT SURE ON THE DATE.

4    Q.   628.

5         AND YOU TOLD EMPLOYEES OF SUMO LOGIC, "I AM RAPIDLY LOSING

6    INTERNAL 'CHAMPIONS' AND GENERAL FEEDBACK IS 'SUMO IS

7    UNUSABLE.'"

8         IS THAT WHAT YOU WROTE?

9    A.   IT IS.

10   Q.   620, PAGE 2.

11        IS THAT YOUR E-MAIL?

12   A.   IT IS.

13   Q.   AND YOU WROTE TO EMPLOYEES OF SUMO LOGIC LETTING THEM KNOW

14   THAT YOU WERE GOING TO A DIFFERENT COMPANY; IS THAT RIGHT?

15   A.   I DID.

16   Q.   AND YOUR NEW CEO WOULD BE DOUG MACK WITH FANATICS?

17   A.   IT WOULD HAVE BEEN, YES.

18   Q.   AND AT THE BOTTOM YOU SAID "NETFLIX AND REED HAVE BEEN

19   VERY UNDERSTANDING AND GRACIOUS."

20        DO YOU SEE THAT?

21   A.   I DO.

22   Q.   LET'S GO TO PAGE 1.

23        THERE WAS THEN A RESPONSE FROM MR. MUSSELMAN OF SUMO, AND

24   YOU RESPONDED TO THAT; IS THAT RIGHT?

25   A.   YES, ON JULY 17TH.

1    Q.   AND DOUG IS DOUG MAC?

2    A.   YES, IT WOULD BE.

3    Q.   AND YOU SAID, "DOUG IS ALSO FULLY AWARE AND SUPPORTIVE OF

4    MY ADVISORY ROLES"?

5         IS THAT RIGHT?

6    A.   THAT'S WHAT I WROTE, YES.

7    Q.   AND REED HASTINGS WAS NOT SUPPORTIVE OF PAID ADVISORY

8    ROLES; ISN'T THAT RIGHT?

9    A.   ACCORDING TO HIS TESTIMONY, YES.

10   Q.   AND HIS E-MAIL TO YOU ON MARCH 25TH, 2014; CORRECT?

11   A.   IN THE CONTEXT OF PLATFORA AND THAT EXCHANGE, YES.

12   Q.   YOU DIDN'T TELL REED HASTINGS THAT YOU WERE GETTING SHARES

13   FROM SUMO LOGIC, DID YOU?

14   A.   I DID NOT.

15   Q.   MR. HASTINGS WAS SUPPORTIVE OF WHAT HE KNEW ABOUT YOUR

16   ADVISORY ROLES; IS THAT RIGHT?

17   A.   WE RARELY IF EVER DISCUSSED --

18   Q.   IS THAT RIGHT?

19   A.   CAN YOU RESTATE THE QUESTION.

20   Q.   YOU STATED, "REED IS SUPPORTIVE OF MY ADVISORY ROLES."

21        CORRECT?

22   A.   I SAID DOUG IS FULLY AWARE, NOT REED.

23   Q.   YOU SAID "DOUG IS ALSO FULLY AWARE."

24        DO YOU SEE THAT?

25   A.   YES.

1    Q.   WHEN DID YOU DECIDE YOU WERE LEAVING NETFLIX?

2    A.   LATE JUNE, EARLY JULY OF 2014.

3    Q.   953, PLEASE.

4         IS THIS AN E-MAIL FROM YOU TO DOUG MACK AT FANATICS?

5    A.   IT IS, YES.

6    Q.   AND THERE'S AN ATTACHMENT, CV, MDKAIL?

7    A.   YES.

8              MR. SAMPSON:  I MOVE FOR ADMISSION OF 953.

9              THE COURT:  ANY OBJECTION?

10             MS. JAYNE:  I'M JUST LOOKING TO SEE IF IT CONTAINS

11   HEARSAY.

12        IT DOES, BUT --

13             THE COURT:  SORRY.  IS IT BEING OFFERED FOR THE

14   TRUTH?

15             MR. SAMPSON:  NOT THAT IT'S UNDERWHELMING.

16             THE COURT:  ALL RIGHT.  THE OBJECTION'S OVERRULED.  I

17   WILL ADMIT EXHIBIT 953.

18             MS. JAYNE:  YOUR HONOR, I AM JUST LOOKING AT THE ONE

19   PAGE.  I'VE BEEN INFORMED THERE ARE OTHERS.

20             THE COURT:  IS THERE A SECOND PAGE?

21             MR. SAMPSON:  LET'S GO TO THE SECOND PAGE.

22             THE COURT:  I DON'T HAVE THE EXHIBIT.  I CAN'T RULE

23   ON SOMETHING I CAN'T SEE.

24   BY MR. SAMPSON:

25   Q.   IS THAT YOUR CV, YOUR RESUME?

1    A.   THAT IS WHAT I WOULD HAVE SENT MR. MACK, YES.

2    Q.   NEXT PAGE, IF THERE IS ONE.

3         DOES YOUR HONOR HAVE SUFFICIENT INFORMATION TO RULE?

4              THE COURT:  YES.  IT IS ADMITTED.

5         (GOVERNMENT'S EXHIBIT 953 WAS ADMITTED IN EVIDENCE.)

6    BY MR. SAMPSON:

7    Q.   LET'S GO BACK TO PAGE 2.

8              MS. JAYNE:  YOUR HONOR, CAN WE START WITH PAGE 1 FOR

9    THE JURY.

10             MR. SAMPSON:  IT'S ADMITTED.

11             THE COURT:  I ADMITTED THE ENTIRE DOCUMENT, INCLUDING

12   PAGE 1.

13   BY MR. SAMPSON:

14   Q.   THAT'S YOUR RESUME, MR. KAIL?

15   A.   AT THAT TIME, YES.

16   Q.   AS OF THE TIME YOU SENT IT?

17   A.   YES.

18   Q.   PAGE 1.

19        SO JULY 1ST, 2014, YOU ARE SEEKING A JOB WITH FANATICS?

20   A.   MR. MACK AND I HAD DISCUSSED AN OPPORTUNITY AT FANATICS,

21   YES.

22   Q.   AND HAD YOU APPLIED TO OTHER JOBS BEFORE THAT?

23   A.   I DON'T RECALL EVER APPLYING TO A JOB.

24   Q.   HEWLETT-PACKARD?

25   A.   I INTERVIEWED AT HEWLETT-PACKARD.  I DID NOT APPLY.

1    Q.   YOU INTERVIEWED FOR A JOB?

2    A.   I DID.

3            MS. JAYNE:   AND I'M GOING TO OBJECT AS TO TIME.   DOES

4    THIS GO BACK TO HIGH SCHOOL, OR --

5            THE COURT:   THAT'S -- THAT'S A FAIR -- WHY DON'T WE

6    HAVE A TIME ON THIS?

7    BY MR. SAMPSON:

8    Q.   IN 2014 YOU INTERVIEWED FOR A JOB AT HEWLETT-PACKARD;

9    CORRECT?

10   A.   CORRECT.

11   Q.   AND WAS THAT BEFORE YOU SENT THIS RESUME TO MR. MACK?

12   A.   YES.

13   Q.   AND YOU WERE NOT SELECTED FOR THAT JOB; CORRECT?

14   A.   CORRECT.

15   Q.   WHO WAS?

16   A.   RALPH LOURA.

17   Q.   WAS THAT ANOTHER CUSTOMER ADVISOR AT DOCURATED?

18   A.   I BELIEVE MR. LOURA WAS, YES.

19   Q.   DID YOU ALSO APPLY TO AVEGANT, A-V-E-G-A-N-T?

20           MS. JAYNE:   OBJECTION.   RELEVANCE.

21           THE COURT:   OVERRULED.

22           THE WITNESS:   I DID NOT APPLY TO AVEGANT, NO.

23   BY MR. SAMPSON:

24   Q.   DID YOU INTERVIEW FOR A JOB THERE?

25   A.   THEY ASKED ME -- I DON'T RECALL THE SPECIFICS.   THEY MAY

1    HAVE ASKED ME TO DISCUSS A CEO ROLE WITH AVEGANT, BUT --

2    Q.   AND WAS THAT SOMETIME BEFORE JULY 1ST, 2014?

3    A.   I DON'T REMEMBER THE DATE.  SORRY.

4    Q.   651.

5         IS THIS YOUR E-MAIL WITH ANKUR SRIVASTAVA?

6    A.   IT IS.

7              MR. SAMPSON:  I MOVE FOR ADMISSION -- DATED

8    FEBRUARY 8TH, 2013.

9              THE COURT:  ANY OBJECTION?

10             MS. JAYNE:  NO.

11             THE COURT:  IT WILL BE ADMITTED.

12        (GOVERNMENT'S EXHIBIT 651 WAS ADMITTED IN EVIDENCE.)

13   BY MR. SAMPSON:

14   Q.   AND MR. SRIVASTAVA IS INTRODUCING HIMSELF AND REFERRING TO

15   A DEMO OF ELASTICBOX; CORRECT?

16   A.   YEAH.  IT'S REFERRING TO A DEMO THAT I HAD SEEN.

17   Q.   OKAY.  AND YOUR RESPONSE WAS, "I DON'T HAVE ANY COMPELLING

18   USE CASES FOR ELASTICBOX AT THIS TIME, BUT WILL MAKE AN INTRO

19   TO A LOCAL COMPANY THAT MIGHT."

20        DO YOU SEE THAT?

21   A.   I DO.

22   Q.   652.  I BELIEVE THAT THIS IS ADMITTED.

23        IS THIS -- MR. SRIVATSAV IS THE CEO OF ELASTICBOX;

24   CORRECT?

25   A.   CORRECT.

1    Q.   AND HE REFERENCES A MEETING THE NIGHT BEFORE?

2    A.   YES.

3    Q.   YOU MET HIM IN PERSON?

4    A.   I DON'T RECALL SPECIFIC.  I BELIEVE WE MUST HAVE BASED

5    UPON THE E-MAIL.

6    Q.   AND HE ASKED FOR YOUR PERSONAL E-MAILS -- E-MAIL TO SEND

7    SOME PAPERWORK, DOES HE NOT?

8    A.   HE DID.

9    Q.   AND THAT'S AT 10:21 A.M.?

10   A.   YES.

11   Q.   AND 10:22 A.M., YOU RESPOND?

12   A.   I DID.

13   Q.   YOU GAVE HIM YOUR PERSONAL E-MAIL?

14   A.   I DID.

15   Q.   AND YOUR RESPONSE WAS, "WILL WORK ON THE INTRO TO THE

16   INTERNAL TEAM."

17        IS THAT YOUR STATEMENT?

18   A.   YES.

19   Q.   653.

20        FIVE DAYS LATER, MR. SRIVATSAV APOLOGIES FOR A DELAY, BUT

21   INDICATES HE'S ONE WEEK AWAY FROM ISSUING YOU NEW OPTIONS.

22        DO YOU SEE THAT?

23   A.   I DO.

24   Q.   SUBJECT IS "ELASTICBOX ADVISORY"?

25   A.   YES.

1    Q.   654.

2         THE NEXT DAY, YOU MAKE AN INTRO TO EMPLOYEES AT NETFLIX;

3    CORRECT?

4    A.   I DO, YES.

5    Q.   AND ELASTICBOX GOT A PILOT AT NETFLIX, DID THEY NOT?

6    A.   AFTER SUBSEQUENT MEETINGS, THEY DID.

7    Q.   AND YOU WERE THE SIGNER ON THE $600,000 CONTRACT WITH

8    ELASTICBOX IN JUNE 2013, WERE YOU NOT?

9    A.   I BELIEVE I WAS, YES.

10   Q.   659.

11        AND AFTER THAT, IN OCTOBER 2013, YOU E-MAILED AN

12   ELASTICBOX EMPLOYEE NAMED TIMOTHY STEPHAN.

13        DO YOU SEE THAT?

14   A.   I DO.

15   Q.   AND YOU SAID "CONSIDER ME PART OF THE EOB UNTIL THERE'S

16   REASON OTHERWISE.  AND LET ME KNOW HOW I CAN BEST HELP TO MAKE

17   YOU AND ELASTICBOX EXTREMELY SUCCESSFUL."

18        DO YOU SEE THAT?

19   A.   I DO.

20   Q.   EAB IS ELASTICBOX ADVISORY BOARD?

21   A.   IN THIS CONTEXT, YES.

22   Q.   AT THE TIME -- 660.

23        YOU WERE AWARE AT THE TIME THAT YOU HAD SIGNED

24   ELASTICBOX'S BIGGEST CONTRACT, WERE YOU NOT?

25   A.   I DON'T KNOW IF I EVER DISCUSSED THE CONTRACT SIZE AND

1       THEIR CUSTOMERS WITH THEM.

2       Q.   OKAY.   OKAY.   IN NOVEMBER, THE CEO OF ELASTICBOX INDICATED

3       THAT ON THE AGENDA FOR THE BOARD WOULD BE OFFICIAL ADVISORY

4       SHARE GRANT, AN OFFICIAL ADVISORY SHARE GRANT, DID HE NOT?

5       A.   HE DID.

6       Q.   AND 662.  I BELIEVE THESE ARE ALL ADMITTED.

7            MR. SRIVATSAV, A COUPLE WEEKS LATER, NEAR THANKSGIVING,

8       E-MAILS YOU AND YOU RESPOND; CORRECT?

9       A.   CORRECT.

10      Q.   OKAY.  AND HE'S ATTACHING A SECOND CONTRACT WITH

11      ELASTICBOX, IS HE NOT?

12      A.   I BELIEVE SO, YES.

13      Q.   AND THAT WAS FOR $850,000; CORRECT?

14      A.   CORRECT.

15      Q.   AND MR. SRIVATSAV TELLS YOU THAT HE WOULD NEED IT SIGNED

16      BEFORE THE END OF DECEMBER FOR THEM TO RECOGNIZE THE DEAL.

17           DO YOU SEE THAT?

18      A.   I DO.

19      Q.   AND YOU SIGNED THE $850,000 CONTRACT WITH ELASTICBOX IN

20      NOVEMBER; CORRECT?

21      A.   CORRECT.

22      Q.   AND YOUR RESPONSE WAS, "I JUST DOCUSIGNED THIS AND SENT

23      BACK TO BOTH OF YOU.

24           "HAPPY THANKSGIVING."

25           DO YOU SEE THAT?

1    A.   YES.

2    Q.   YOU WENT ON TO BE ON THE BOARD OF ELASTICBOX, DIDN'T YOU?

3    A.   I JOINED THE BOARD AFTER I HAD LEFT NETFLIX, YES.

4    Q.   HOW LONG AFTER YOU LEFT NETFLIX?

5    A.   I WOULD -- I DON'T REMEMBER SPECIFICALLY.  I WOULD SAY TWO

6    TO THREE WEEKS OR SOMETHING.

7    Q.   NOW, TAKE A LOOK AT 667, WHICH I BELIEVE IS IN.

8         THIS IS AN E-MAIL FROM YOU TO MR. SRIVASTAVA?

9    A.   IT IS.

10   Q.   AND YOU'RE ASKING ABOUT WHETHER ELASTICBOX IS CLOSING

11   CREDIT SUISSE AS A CUSTOMER, WERE YOU NOT?

12   A.   I WAS, YES.

13   Q.   AND YOU STATED, "MY PERSONAL INTEREST IS THAT, DUE TO SOX,

14   I NEED YOU GUYS TO CLOSE A DEAL $1 A YEAR BIGGER THAN OURS IN

15   ORDER FOR ME TO SECURE A BOD SEAT."

16        DO YOU SEE THAT?

17   A.   YES.

18   Q.   BOD IS BOARD OF DIRECTORS?

19   A.   IN THIS CONTEXT, YES.

20   Q.   "BIGGER THAN OURS" MEANS BIGGER THAN NETFLIX, DOES IT NOT?

21   A.   IT DOES.

22   Q.   AND SARBAINS-OXLEY IS SOX; CORRECT?

23   A.   YES.

24   Q.   AND YOU ARE INDICATING THAT YOU ARE PERSONALLY INTERESTED

25   IN JOINING OF BOARD OF ELASTICBOX IN JANUARY 2014; CORRECT?

1    A.  YES, CORRECT.  THEY HAD REACHED OUT TO ME ABOUT THE BOARD

2    OF DIRECTORS OPPORTUNITY.

3    Q.  AND YOU UNDERSTOOD THAT YOU COULDN'T GET ON THE BOARD YET

4    DUE TO THE SARBAINS-OXLEY ACT; CORRECT?

5    A.  YES, I BELIEVE RAVI, THE CEO, EXPLAINED THAT TO ME.

6    Q.  AND THAT'S BECAUSE YOU WORKED FOR THEIR BIGGEST CUSTOMER;

7    IS THAT CORRECT?

8    A.  CORRECT.

9    Q.  AND THAT'S BECAUSE THOSE REQUIREMENTS RELATE TO CONFLICTS

10   OF INTEREST, IS THAT NOT RIGHT?

11   A.  I DON'T KNOW THE SPECIFICS OF THE SARBAINS-OXLEY

12   REQUIREMENTS.

13   Q.  315, WHICH I DON'T THINK IS IN.  IT'S NOT IN EVIDENCE YET.

14       OKAY.  WE'LL SKIP 315 FOR NOW.

15       310.  AND I THINK THIS IS A TWO-PAGE E-MAIL.  START WITH

16   THE SECOND PAGE.

17       IS THIS AN E-MAIL BETWEEN YOU AND BEN WERTHER AT PLATFORA?

18   A.  IT IS.

19           MR. SAMPSON:  I MOVE FOR ADMISSION OF 310.

20           THE COURT:  ANY OBJECTION?

21           MS. JAYNE:  NO.

22           THE COURT:  IT WILL BE ADMITTED.

23       (GOVERNMENT'S EXHIBIT 310 WAS ADMITTED IN EVIDENCE.)

24   BY MR. SAMPSON:

25   Q.  THIS STARTS WITH AN E-MAIL FROM YOU TO MR. WERTHER;

1    CORRECT?

2    A.   CORRECT.

3    Q.   JULY 31ST, 2013?

4    A.   CORRECT.

5    Q.   AND YOU SAID THE SUBJECT, I BELIEVE, IS THANKS, BUT YOU

6    SAID "I LOOK FORWARD TO HELPING YOU IN BOTH A NETFLIX AND

7    ADVISORY CAPACITY."

8         IS THAT WHAT YOU WROTE TO MR. WERTHER?

9    A.   IT IS.

10   Q.   ZOOM OUT.

11        AND IT'S RELATED TO AN ADVISORY BOARD POSITION; CORRECT?

12   A.   CORRECT.

13   Q.   OKAY.  AND AT THE TOP YOU SAID, "WILL DOCUSIGN AND SEND

14   BACK SHORTLY"?

15   A.   CORRECT.

16   Q.   ALL RIGHT.  FIRST PAGE.

17        AND ON THE 2ND OF AUGUST -- WELL, ON THE 2ND OF AUGUST,

18   MR. WERTHER TOLD YOU THAT IT WAS A QUARTER OF A PERCENT OF THE

19   SHARES OF THE COMPANY; CORRECT?

20   A.   CORRECT.

21   Q.   AND THAT'S THE AMOUNT OF SHARES THAT YOU WANTED FOR

22   ADVISORY SERVICES, IS IT NOT?

23   A.   I DON'T RECALL SPECIFICALLY ASKING FOR A CERTAIN PERIOD OF

24   TIME.

25   Q.   DO YOU RECALL MR. WERTHER'S VIDEOTAPED DEPOSITION

1    TESTIMONY?

2    A.   YES.

3    Q.   DO YOU RECALL HIM INDICATING THAT THE PERCENTAGE CAME FROM

4    YOU?

5    A.   AND I DON'T RECALL ASKING FOR THAT PERCENTAGE.

6    Q.   DO YOU RECALL ASKING FOR A DIFFERENT PERCENTAGE?

7    A.   I DON'T RECALL ASKING FOR ANY PERCENTAGE.

8    Q.   AND YOU ASKED -- YOU SAID, "APPRECIATE IT.  WILL DO MY

9    BEST TO ADD VALUE.

10        "WHAT IS THE CURRENT STRIKE?"

11        CORRECT?

12   A.   YES, I WROTE THAT.

13   Q.   AND THEY GAVE YOU THE STRIKE PRICE FOR THE STOCK; CORRECT?

14   A.   YES, MR. WERTHER DID.

15   Q.   AND 309.

16        NO ONE ELSE WAS IN THE MEETING BETWEEN YOU AND MR. WERTHER

17   OVER DRINKS ON JULY 31ST, 2013, WERE THEY?

18   A.   I DON'T REMEMBER SPECIFICALLY.  I DON'T BELIEVE SO.

19   Q.   SO MR. WERTHER, ON AUGUST 1ST -- AND I REALIZE YOU'RE NOT

20   ON THIS E-MAIL, THIS IS IN EVIDENCE -- INDICATES THAT YOU MADE

21   A STRONG SUGGESTION THAT IF YOU BECOME AN ADVISORY BOARD MEMBER

22   FOR PLATFORA, THEY WOULD GET A $600,000, THREE YEAR DEAL.

23        DO YOU SEE THAT?

24   A.   I DO.

25   Q.   WAS THAT YOUR DISCUSSION WITH MR. WERTHER ON JULY 31ST,

1    2013?

2    A.   NO, I DON'T BELIEVE THAT IT WAS.

3    Q.   DID YOU TALK TO MR. WERTHER THAT NIGHT ABOUT WHAT YOU HAD

4    DONE FOR SUMO LOGIC?

5    A.   I DON'T -- THIS WAS EIGHT YEARS AGO.  I DON'T RECALL THE

6    SPECIFICS OF OUR CONVERSATION.

7    Q.   HOW ABOUT THE GENERALITIES?

8    A.   IN GENERAL, WE DISCUSSED MANY THINGS, INCLUDING

9    ADVISORY -- HOW I WAS AN ADVISOR TO MULTIPLE COMPANIES.

10   Q.   314, WHICH IS ADMITTED.

11        ON AUGUST 5TH, YOU E-MAILED MR. WERTHER, MR. ROSSI, AND

12   SOMEONE ELSE AT PLATFORA SAYING "LOOKING FORWARD TO HELPING YOU

13   GUYS."

14        DO YOU SEE THAT?

15   A.   I DO.

16   Q.   AND THAT'S AFTER MR. WERTHER INDICATED THAT YOU WERE

17   OFFICIALLY AN ADVISOR?

18   A.   YES.

19   Q.   320.

20        YOU E-MAILED TONY RALPH, YINGKUAN LIU, AND JAN KRIVOCHEIA

21   ON SEPTEMBER 4TH, 2013, ABOUT PLATFORA.

22   A.   ON SEPTEMBER 4TH, YES.

23   Q.   YES, ON SEPTEMBER 4TH, YES.

24        AND YOU SAID, "I HAD A VERY PRODUCTIVE MEETING WITH THEM

25   TONIGHT."

1        DO YOU SEE THAT?

2   A.   YES.

3   Q.   AND YOU WERE REFERRING TO A MEETING WITH PLATFORA?

4   A.   YES.

5   Q.   AND TONY RALPH, YINGKUAN LIU, AND JAN KRIVOCHEIA WERE NOT

6   IN THAT MEETING, WERE THEY?

7   A.   THEY WERE NOT.

8   Q.   224, WHICH IS IN.

9        AND THIS IS AN E-MAIL FROM YOU TO TONY -- THE SAME THREE

10  NETFLIX EMPLOYEES; CORRECT?

11  A.   YES.

12  Q.   AND YOU REFER TO A CANDID CALL WITH BEN.  IS THAT

13  BEN WERTHER?

14  A.   YES, IT WOULD HAVE BEEN.

15  Q.   AND YOU SAID, "I WOULD LIKE TO CONTINUE THE ENGAGEMENT ON

16  OUR SIDE."

17       DO YOU SEE THAT?

18  A.   I DO.

19  Q.   AND THESE THREE WERE NOT IN THAT CALL WITH BEN WERTHER,

20  WERE THEY?

21  A.   NO.

22  Q.   328.

23       YOU HAD A CONVERSATION WITH MS. VU SEPTEMBER 19TH, 2013

24  ABOUT TONY RALPH; CORRECT?

25  A.   CORRECT.

1    Q.   AND YOU SAID, "TONY IS STILL SKEPTICAL."

2         DO YOU SEE THAT?

3    A.   I DO.

4    Q.   AND THIS IS AFTER, TOWARD THE BOTTOM, YOU SIGNED A PILOT

5    DEAL THAT MORNING; CORRECT?

6    A.   CORRECT.

7    Q.   344.

8         YOU -- PAGE 2.

9         THIS IS AN E-MAIL BETWEEN -- YOU'RE FORWARDING AN E-MAIL

10   FROM KURT BROWN TO YOU, YOU'RE FORWARDING THAT E-MAIL TO

11   BEN WERTHER; CORRECT?

12   A.   CORRECT.

13            MR. SAMPSON:  MOVE FOR ADMISSION OF 344.

14            THE COURT:  ANY OBJECTION?

15            MS. JAYNE:  NO.

16            THE COURT:  IT WILL BE ADMITTED.

17        (GOVERNMENT'S EXHIBIT 344 WAS ADMITTED IN EVIDENCE.)

18   BY MR. SAMPSON:

19   Q.   AND YOU FORWARD THIS E-MAIL AND IT'S ABOUT THE PLATFORA

20   LOGO; CORRECT?

21   A.   CORRECT.

22   Q.   AND THIS IS THE SECOND TIME THAT MR. BROWN HAS REACHED OUT

23   TO YOU ABOUT THE PLATFORA LOGO, OR ABOUT THE NETFLIX LOGO BEING

24   USED BY PLATFORA?

25   A.   I DON'T KNOW IF THIS WAS -- IF THIS WAS THE FIRST OR

1       SUBSEQUENT TIME, NO.

2       Q.   OKAY.  BUT YOU -- YOU ASKED MR. WERTHER TO TAKE DOWN THE

3       LOGO?

4       A.   I DID.

5       Q.   AND YOU SAID, "UNTIL WE HAVE 3.0 DEPLOYED AND THUS A USE

6       CASE THAT WE CAN SPEAK TO INTERNALLY"?

7       A.   YES.

8       Q.   AND YOU SAID, "THIS IS CAUSING ME SOME INTERNAL ISSUES AS

9       VC'S HAVE BEEN PINGING KURT."

10           CORRECT?

11      A.   CORRECT.

12      Q.   342.

13           IS THIS AN E-MAIL BETWEEN YOU AND BEN WERTHER?

14      A.   IT IS.

15      Q.   MARCH 6TH, 2014?  YES?

16      A.   YES.

17      Q.   PAGE 2.

18           AND IT CONTINUES FROM EARLIER IN JANUARY; CORRECT?

19      A.   YES.

20               MR. SAMPSON:  I MOVE FOR ADMISSION OF 342.

21               THE COURT:  ANY OBJECTION?

22               MS. JAYNE:  NO.

23               THE COURT:  IT WILL BE ADMITTED.

24           (GOVERNMENT'S EXHIBIT 342 WAS ADMITTED IN EVIDENCE.)

25

1      BY MR. SAMPSON:

2      Q.   BACK TO PAGE 1.

3           YOU SAID TO MR. WERTHER ON MARCH 6TH, 2014, "BEST TO WORK

4      WITH YINGKUAN TO HELP DRIVE USE CASES."

5           DO YOU SEE THAT?

6      A.   I DO.

7      Q.   AND YOU SAID, "I TALKED TO YING IN PERSON ABOUT AN HOUR

8      AGO, BUT CAN ONLY DO SO MUCH PUSHING FROM MY SIDE WITHOUT

9      HAVING A CONFLICT OR BEING DRACONIAN."

10          IS THAT RIGHT?

11     A.   THAT'S WHAT I WROTE, YES.

12     Q.   SO YOU RECOGNIZED THAT YOU MIGHT HAVE A POTENTIAL

13     CONFLICT?

14     A.   THAT'S WHAT I WROTE, YES.

15     Q.   1153.  OH, ACTUALLY, KEEP THAT.

16          1153, WHICH I BELIEVE IS IN.  AND LET'S GO TO THE BOTTOM.

17     OH, ACTUALLY --

18          MS. SUNDHOLM IS ASKING FOR AN UPDATE ON PLATFORA ON

19     MARCH 25TH, 2014; CORRECT?

20     A.   I WASN'T ON THIS E-MAIL.

21     Q.   UNDERSTOOD.

22     A.   BUT THAT'S WHAT I READ, YES.

23     Q.   OKAY.  AND THAT IS THE MORNING BEFORE MR. HASTINGS -- THE

24     MORNING THAT MR. HASTINGS LATER E-MAILED YOU ABOUT PLATFORA?

25     A.   I DON'T REMEMBER THE DATE OF THAT E-MAIL.  BUT WITHIN A

1        FEW DAYS I WOULD GUESS.

2        Q.   WE CAN MOVE BACK.

3             AND AT THE TOP MR. LIU RESPONDS AND HE REFERS TO TALKING

4        TO MIKE ABOUT THIS.

5             DO YOU SEE THAT?

6        A.   YES.

7        Q.   AND YOUR TESTIMONY WAS THAT YOU TALKED TO YINGKUAN ABOUT

8        ENDING PLATFORA; CORRECT?

9        A.   YINGKUAN AND I SPOKE, YES, ABOUT PLATFORA.

10       Q.   AND YINGKUAN DECIDED TO NOT MOVE FORWARD WITH PLATFORA AT

11       THE END OF MARCH 2014; CORRECT?

12       A.   WE ALL DECIDED, YES.

13       Q.   348.

14            AND I BELIEVE THIS IS IN.

15            AND THAT EVENING, YOU RESIGNED FROM THE PLATFORA ADVISORY

16       BOARD?

17       A.   I'M NOT SURE WHAT YOU MEAN BY THAT EVENING.

18       Q.   WELL, MR. LIU'S E-MAIL AT THE TOP INDICATING HE SPOKE TO

19       YOU WAS DATED THE SAME DAY; CORRECT?  WAS DATED MARCH 31ST,

20       2014, WAS IT NOT?

21       A.   CORRECT.

22       Q.   SO ON MARCH 31ST, 2014, IN THE EVENING, YOU RESIGNED FROM

23       THE PLATFORA ADVISORY BOARD; CORRECT?

24       A.   CORRECT.

25       Q.   AND YOU SAID, "I CAN'T SERVE IN A CAPACITY THAT I FEEL

1     BENEFITS THE COMPANIES, AND, AS DISCUSSED, WHEN THAT'S THE

2     CASE, I ASKED TO BE TERMINATED."

3          DO YOU SEE THAT?

4     A.   I DO.

5     Q.   SO THE SAME DAY THAT NETFLIX DECIDES NOT TO PROCEED WITH

6     PLATFORA, YOU RESIGNED FROM THE PLATFORA ADVISORY BOARD;

7     CORRECT?

8     A.   CORRECT.

9     Q.   YOU HAD NOT TOLD PLATFORA BEFORE THIS THAT YOU WERE

10    RESIGNING FROM THE PLATFORA BOARD; CORRECT?

11    A.   I DON'T RECALL IF I DID OR DIDN'T.  PROBABLY NOT.

12    Q.   345.

13         RECOGNIZING THAT YOU'RE NOT ON THIS E-MAIL, MR. KAIL,

14    MR. ASHER, ON MARCH 6TH, IS TALKING ABOUT COZYING UP TO

15    YINGKUAN.

16         DO YOU SEE THAT?

17    A.   I DO.

18    Q.   AND HE SAYS, "BRING HIM INTO OUR HQ, AND SHOW HIM SOME

19    LOVE.  POTENTIALLY EVEN GIVE HIM SOME ADVISORY SHARES AND

20    INTRODUCE HIM TO AVK."

21         AND HE SAYS, "KAIL'S PLAY."

22         DO YOU SEE THAT?

23    A.   I DO.

24    Q.   IS THAT STATEMENT INCORRECT, THAT CHARACTERIZATION?

25    A.   I'M NOT SURE WHAT HE'S REFERRING TO, BUT -- SO IT'S

1    INCORRECT.

2    Q.  IT'S INCORRECT BECAUSE YOU'RE NOT SURE WHAT HE'S REFERRING

3    TO?

4    A.  I WASN'T PART OF THIS CONVERSATION.  I'M NOT AWARE OF IT

5    UNTIL I SAW THIS EXHIBIT.

6    Q.  IS IT YOUR MO TO CONTINUE CONTRACTS WITH COMPANIES FOR

7    ADVISORY SHARES AND INTRODUCTIONS TO VC'S?

8    A.  NO.

9    Q.  SO MR. ASHER IS INCORRECT WHEN HE MAKES THIS

10   CHARACTERIZATION OF KAIL'S PLAY?

11   A.  THAT'S MY BELIEF, YES.

12   Q.  351.  IS THIS AN E-MAIL -- THIS IS IN EVIDENCE.

13       YOU -- MS. SUNDHOLM E-MAILED YOU IN APRIL ABOUT THE

14   $155,000 INVOICE NETFLIX RECEIVED FROM PLATFORA; CORRECT?

15   A.  CORRECT.

16   Q.  AND YOUR RESPONSE WAS "THAT WAS THE NEGOTIATED EXIT AS WE

17   ARE TERMINATING THE CONTRACT (AS THEY DID MEET THE GOALS LAID

18   OUT)."

19       DO YOU SEE THAT?

20   A.  I DO.

21   Q.  PLEASE LOOK AT -- CAN WE DO A SIDE-BY-SIDE WITH 1110.

22   LET'S JUST GO TO 1110.  THAT'S NOT GOING TO WORK.  LET'S JUST

23   GO STRICTLY TO 1110, WHICH IS IN EVIDENCE?

24            THE CLERK:  YES.

25            MR. SAMPSON:  OKAY.

1    Q.   AND DO YOU SEE MR. ASHER AND MR. WERTHER ARE DISCUSSING

2    THAT 155,000 NUMBER; CORRECT?

3    A.   CORRECT.

4    Q.   AND IT RELATES TO PLATFORA'S BOOKINGS ACCORDING TO

5    MR. ASHER; CORRECT?

6    A.   THAT'S WHAT HE WROTE, YES.

7    Q.   AND IT'S TO AVOID SOME KIND OF ACCOUNTING ISSUE OR

8    DEBOOKING.

9         DO YOU SEE THAT?

10   A.   I DO.

11   Q.   SO THAT $155,000 NUMBER CAME FROM PLATFORA, DID IT NOT?

12   A.   IT DID, YES.

13   Q.   AND YOU HAD SEEN MR. LIU'S E-MAIL TO PLATFORA FROM --

14   STATING THAT THEY DID NOT HAVE THE FEATURES OUTLINED IN THE

15   ROADMAP; CORRECT?

16   A.   THAT'S WHAT MR. LIU WROTE, YES.

17   Q.   AND YOU WERE CC'D ON THAT E-MAIL?

18   A.   I BELIEVE SO.

19   Q.   AND YOU DIDN'T CORRECT HIM?

20   A.   NOT IN E-MAIL.  I BELIEVE I DID IN PERSON.

21   Q.   OKAY.  BACK TO 351.

22        YOU ACCEPTED THE 155,000 NUMBER THAT PLATFORA WANTED TO

23   END THE RELATIONSHIP WITH NETFLIX; CORRECT?

24   A.   AFTER INTERNAL DISCUSSION, YES.

25   Q.   1111, PLEASE, WHICH -- THIS IS A DEFENSE EXHIBIT.  I

1      BELIEVE IT IS IN?

2              THE CLERK:  IT IS NOT.

3              MR. SAMPSON:  IT'S NOT.

4      Q.   THIS IS AN E-MAIL BETWEEN YOU AND BEN WERTHER?

5      A.   IT IS.

6      Q.   AND THE SUBJECT LINE IS "ADVISORY AGREEMENT/NETFLIX

7      CONTRACT."

8           DO YOU SEE THAT?

9      A.   I DO.

10     Q.   APRIL 22ND, 2014?

11     A.   YES.

12             MR. SAMPSON:  I MOVE FOR ADMISSION OF 1111.

13             THE COURT:  ANY OBJECTION?

14             MS. JAYNE:  NO.

15             THE COURT:  IT WILL BE ADMITTED.

16          (GOVERNMENT'S EXHIBIT 111 WAS ADMITTED IN EVIDENCE.)

17     BY MR. SAMPSON:

18     Q.   AND SO YOU, ON APRIL 21ST, 2014, TOLD PLATFORA, OR TOLD

19     MR. WERTHER THAT YINGKUAN, YING SENT THAT ON HIS OWN AND YOU

20     WEREN'T A MESSENGER; CORRECT?

21     A.   THAT IS CORRECT.

22     Q.   AND YOU SAID, "SEND ME THE FINAL INVOICE FOR 155K AND

23     WE'LL WRAP THIS UP."

24          DO YOU SEE THAT?

25     A.   I DO.

1    Q.   AND BEN WERTHER RESPONDS, "MIKE, I APPRECIATE YOU HELPING

2    US WRAP THIS UP CLEANLY."

3         DO YOU SEE THAT?

4    A.   I DO.

5    Q.   LET'S GO TO PAGE 2.

6         MR. WERTHER INDICATES, "I UNDERSTAND THE SENSITIVITY OF

7    THE SITUATION AND THE COMPLEX POLITICS OVER THERE.  I HAVE NO

8    DESIRE TO PUT YOU IN AN UNTENABLE POSITION."

9         DO YOU SEE THAT?

10   A.   I DO.

11   Q.   MR. WERTHER IS THREATENING TO PUT YOU IN AN UNTENABLE

12   POSITION AT NETFLIX, IS HE NOT?

13            MS. JAYNE:  OBJECTION.  MISSTATES THE EXHIBIT.

14            THE COURT:  OVERRULED.

15            THE WITNESS:  I DIDN'T INTERPRET THIS AS A THREAT IN

16   ANY WAY.

17   BY MR. SAMPSON:

18   Q.   IF THERE WAS A DISPUTE BETWEEN PLATFORA AND NETFLIX OVER

19   THE PAYMENT, YOUR ADVISORY ARRANGEMENT WITH PLATFORA MIGHT

20   BECOME KNOWN TO PEOPLE AT NETFLIX; CORRECT?

21   A.   NO, THAT WAS NOT PART OF THE CONTRACT.  I DON'T BELIEVE

22   THAT WOULD HAVE BEEN THE CASE.  I -- I CAN ONLY SPECULATE.

23   Q.   YOU APPROVED THE $155,000 INVOICE FROM PLATFORA AS HUSH

24   MONEY TO KEEP YOUR ADVISORY RELATIONSHIP WITH THEM QUIET,

25   DIDN'T YOU?

1          MS. JAYNE:  OBJECTION.  ARGUMENTATIVE.

2          THE COURT:  SUSTAINED.

3     BY MR. SAMPSON:

4     Q.  DID YOU APPROVE THE $155,000 INVOICE TO WRAP THINGS UP

5     CLEANLY WITH PLATFORA, AS MR. WERTHER INDICATED ON PAGE 1?

6     A.  TO AVOID POTENTIAL CONTRACT LITIGATION, I SIGNED THAT

7     AFTER INTERNAL DISCUSSION.

8     Q.  401.

9          YOU TOLD MR. REWARI OF NUMERIFY, IN LATE 20 -- ON

10    CHRISTMAS, 2013 THAT "TO BE COMPLETELY CANDID, I'M NOT

11    ENTERTAINING VERY MANY OFFERS AT THIS TIME.  I WANT TO MAKE

12    SURE THAT THE CURRENT SET OF COMPANIES THAT I'M HELPING ARE

13    COMPLETELY TAKEN CARE OF."

14         DO YOU SEE THAT?

15    A.  YES.

16    Q.  YOUR ADVISORY SERVICES WERE IN HIGH DEMAND; IS THAT RIGHT?

17    A.  I'M NOT SURE WHAT HIGH DEMAND WOULD BE, BUT --

18    Q.  DID YOU HAVE MORE OFFERS THAN YOU ACCEPTED?

19    A.  YES.

20    Q.  AND YOU ASKED FOR A DIRECT, CANDID, IN-PERSON

21    CONVERSATION?

22    A.  YES.

23    Q.  407.

24         YOU WERE OFFERED EARLY EXERCISE FOR NUMERIFY ADVISORY

25    SHARES; CORRECT?

1      A.   ACCORDING TO THIS, YES.

2      Q.   YOU DON'T RECALL IT?

3      A.   NOT --

4      Q.   AND YOUR RESPONSE WAS, "I'M NOT DOING EARLY EXERCISE,

5      GOING TO GET KILLED IN TAXES SOON, SO NEED THE 7200."

6           IS THAT WHAT YOU SAID?

7      A.   YES, THAT'S WHAT I WROTE.

8      Q.   AND 421.

9           WHEN YOU WENT TO YAHOO, YOU BROUGHT -- YOU HAD A MEETING

10     WITH NUMERIFY; CORRECT?

11          MS. JAYNE:  OBJECTION.  RELEVANCE, BEYOND THE SCOPE

12     OF THE INDICTMENT.

13          THE COURT:  OVERRULED.

14          THE WITNESS:  I INTRODUCED NUMERIFY TO SOME TEAM

15     MEMBERS, YES.

16     BY MR. SAMPSON:

17     Q.   IS THIS AN E-MAIL BETWEEN YOU AND MR. REWARI REGARDING

18     NUMERIFY?

19     A.   IT IS.

20          MR. SAMPSON:  I MOVE FOR ADMISSION OF 421.

21          MS. JAYNE:  OBJECTION.  HEARSAY.  WE DON'T HAVE THE

22     BUSINESS RECORDS FROM YAHOO.

23          MR. SAMPSON:  MICHAEL KAIL'S STATEMENT IS NOT

24     HEARSAY.

25          THE COURT:  I WILL ADMIT IT.  THE OBJECTION'S

1       OVERRULED.

2            (GOVERNMENT'S EXHIBIT 421 WAS ADMITTED IN EVIDENCE.)

3       BY MR. SAMPSON:

4       Q.   MR. KAIL, YOU DIDN'T DISCLOSE YOUR ADVISORY RELATIONSHIP

5       WITH NUMERIFY TO YAHOO, DID YOU?

6       A.   I DON'T RECALL WHAT I DISCLOSED.

7       Q.   WAS THE FINANCIAL LIMIT OF YOUR AUTHORITY AT YAHOO

8       $250,000 A YEAR?

9       A.   IF I RECALL CORRECTLY, THE 250 NUMBER WAS BROAD ACROSS THE

10      ORGANIZATION.  ANYTHING ABOVE THAT HAD TO GO TO THE CAPITAL

11      ALLOCATION REVIEW COMMITTEE, WHICH WAS ALSO -- I WAS PART OF.

12      Q.   OKAY.  BUT THERE WERE OTHER MEMBERS ON THAT COMMITTEE?

13      A.   THERE WERE THREE OTHER MEMBERS, I BELIEVE.

14      Q.   AND YOU TOLD MR. REWARI THAT A CONTRACT WITH NUMERIFY

15      WOULD HAVE TO BE BELOW 250,000 A YEAR; CORRECT?

16      A.   THAT WAS THE START OF THE NEGOTIATION.

17      Q.   IS THAT A YES OR NO?

18      A.   YES.

19      Q.   HIS INITIAL OFFER WAS OVER 250,000 A YEAR; CORRECT?

20      A.   I DON'T RECALL THE SPECIFICS OR NEGOTIATION.

21      Q.   DO YOU STILL HAVE THE NETSKOPE STOCK, MR. KAIL?

22      A.   I DO.

23      Q.   DO YOU RECALL HOW MANY SHARES?

24      A.   NOT SPECIFICALLY, NO.

25      Q.   YOU EXERCISED THE FIRST ROUND OF 106,000 SHARES; CORRECT?

1    A.   CORRECT.

2    Q.   AT 8.3 CENTS A SHARE; CORRECT?

3    A.   I BELIEVE THAT'S CORRECT.

4    Q.   DO YOU KNOW THE SHARE PRICE TODAY?

5    A.   NO, I DON'T.  THEY'RE PRIVATELY HELD.

6    Q.   YOU'VE NEVER CHECKED?

7    A.   I HAVE NO WAY OF CHECKS A PRIVATELY HELD COMPANY'S STOCK

8    PRICE.

9    Q.   YOU DON'T KNOW THE VALUE OF YOUR SHARES OF NETSKOPE; IS

10   THAT CORRECT?

11   A.   THAT IS CORRECT.

12   Q.   492.

13        YOU SIGNED THE NETSKOPE AGREEMENT -- THE NETSKOPE PURCHASE

14   ORDER, 466, ON JULY 9TH, 2014; CORRECT?

15   A.   CORRECT.

16   Q.   AND YOU HAD BEEN AN ADVISOR TO NETSKOPE SINCE AT LEAST

17   NOVEMBER 2012; CORRECT?

18   A.   THAT'S WHEN I SIGNED THE CONSULTING AGREEMENT, YES.

19   Q.   APOLOGIES.  TAKE THAT DOWN, PLEASE.

20        464, WHICH I BELIEVE IS IN.

21        AND YOU INTRODUCED NETSKOPE TO NETFLIX; CORRECT?

22   A.   I BELIEVE THAT'S CORRECT.

23   Q.   AND ON PAGE 2, YOU SIGNED THE NETSKOPE ORDER FORM ON

24   JULY 9TH, 2014?

25   A.   I DID.

1    Q.   AND YOU WERE ALREADY APPLYING TO OTHER JOBS AT THAT TIME?

2    A.   I WAS IN CONVERSATIONS WITH FANATICS.  I DIDN'T APPLY TO

3    THE JOB.

4    Q.   YOU WERE BEING INTERVIEWED BY OTHER POTENTIAL EMPLOYERS,

5    WERE YOU NOT?

6    A.   I WAS TALKING TO MR. MACK, YES.

7    Q.   YOU HAD SENT HIM YOUR RESUME?

8    A.   YES.

9    Q.   DID YOU GET A SET PERCENTAGE OF NETSKOPE?  DID YOU GET A

10   QUARTER OF A PERCENT?

11   A.   I DON'T RECALL WHAT THE SPECIFIC PERCENTAGE WAS.

12   Q.   DID YOU DO EIGHT TO TEN HOURS A WEEK OF WORK FOR NETSKOPE

13   FOR THE 18 MONTHS THAT YOU WERE EMPLOYED AT NETFLIX AFTER YOU

14   SIGNED THAT AGREEMENT?

15           MS. JAYNE:  OBJECTION.  VAGUE AS TO WORK.

16           THE COURT:  OVERRULED.

17           THE WITNESS:  I DID NOT KEEP A TIMECARD OF MY TIME

18   SPENT HELPING NETFLIX -- NETSKOPE, NO.

19   BY MR. SAMPSON:

20   Q.   463, WHICH I DON'T THINK IS IN.

21           THE CLERK:  IT IS.

22           MR. SAMPSON:  IT IS, THANK YOU.

23   Q.   THIS IS AN E-MAIL FROM PAUL OSHAN TO YOU, CORRECT, AT THE

24   BOTTOM?

25   A.   CORRECT.

1    Q.   AND NOBODY ELSE AT NETFLIX?

2    A.   NOT ON THIS E-MAIL, NO.

3    Q.   OKAY.  AND THEN YOU FORWARD IT TO SYLVIA SUNDHOLM; IS THAT

4    RIGHT?

5    A.   CORRECT.

6    Q.   AND YOU SAID "SYLVIA, CAN YOU WORK WITH PAUL AT NETSKOPE

7    ON GETTING THEM SET UP AS A VENDOR."

8         CORRECT?

9    A.   I DO.

10   Q.   PAUL IS PAUL OSHAN?

11   A.   PAUL IS PAUL OSHAN, YES.

12   Q.   YOU DIDN'T INCLUDE ANYONE ELSE IN NETFLIX'S I.T.

13   DEPARTMENT, I.T. OPERATIONS DEPARTMENT ON THIS E-MAIL, DID YOU?

14   A.   NOT ON THIS E-MAIL, NO.

15   Q.   YOU TESTIFIED ON DIRECT THAT YOU EXERCISED YOUR MAGINATICS

16   SHARES; CORRECT?

17   A.   I DON'T BELIEVE I SAID I EXERCISED THEM.  I THINK THEY

18   ACCELERATED BECAUSE OF THE EMC ACQUISITION.

19   Q.   THANK YOU.

20        AND SO WHEN THE COMPANY WAS PURCHASED, YOU HAD THE

21   OPPORTUNITY TO PUT IN THE OPTION PRICE AND YOU WERE PAID SOME

22   OTHER VALUE; CORRECT?

23   A.   I BELIEVE -- I'M NOT AN EXPERT HERE.  I BELIEVE IT WAS

24   TAKEN OUT OF THE PROCEEDS.

25   Q.   OKAY.  SO YOU DIDN'T HAVE TO PUT ANY MONEY IN?

1    A.   I HONESTLY DON'T RECALL THE MECHANICS OF THAT.

2    Q.   YOU MADE JUST OVER $120,000 ON THAT SALE; CORRECT?

3    A.   CORRECT.

4    Q.   508, PLEASE.

5         AND IN MAY 2013, YOU E-MAILED MR. GILL ABOUT SETTING UP A

6    FAMILY TRUST AT THE TOP?

7    A.   YES, I TOLD HIM THAT THE TRUST WE WERE SETTING UP WAS IN

8    PROCESS.

9    Q.   AND IT WAS THAT TRUST THAT HELD THE MAGINATICS SHARES?

10   A.   I DON'T -- I HONESTLY DON'T KNOW IF THEY WERE HELD IN THE

11   TRUST.  IF THEY WERE ISSUED BEFORE, IT WOULDN'T HAVE BEEN IN

12   THE TRUST.  I DON'T KNOW IF I TRANSFERRED THEM.

13   Q.   OKAY.  AND YOU SAID TO MR. GILL, "HOPE TO SEE SOME OF MY

14   ADVISORY ROLES AND INVESTMENTS PAY OFF AS WE'RE TRYING TO SAFE

15   UP TO BUY A HOUSE LIKE THIS ONE."

16        DO YOU SEE THAT?

17   A.   I DO.

18   Q.   YOU NEEDED MORE THAN YOUR SALARY AT NETFLIX TO DO THAT?

19        MS. JAYNE:  OBJECTION.  RELEVANCE, ARGUMENTATIVE.

20        THE COURT:  OVERRULED.

21        THE WITNESS:  IN LOS GATOS, GIVEN THE COST OF

22   PROPERTY, I ASSUME THAT'S WHAT I WOULD BE THINKING.

23   BY MR. SAMPSON:

24   Q.   509.

25        YOU WERE ALREADY AN ADVISOR TO MAGINATICS IN SEPTEMBER

1    2013, WERE YOU NOT?

2    A.   I WAS.

3    Q.   AND AT THE END OF SEPTEMBER, YOU ASKED IF MAGINATICS COULD

4    STRUCTURE SOMETHING TO GET YOU A BIT OF MONTHLY CASH FLOW IN

5    RETURN FOR ADVISORY SERVICES; CORRECT?

6    A.   I ASKED MR. GILL THAT SEPARATE FROM MAGINATICS, YES.

7    Q.   YOU ASKED HIM FOR CASH WITHOUT RELATION TO MAGINATICS?

8    A.   MR. GILL, AS HE TESTIFIED, WAS INVOLVED IN --

9    Q.   IS THAT A YES?

10            MS. JAYNE:  OBJECTION.  IT'S NOT A YES OR NO ANSWER.

11            MR. SAMPSON:  HE'S GIVING TESTIMONY.

12            THE COURT:  OVERRULED.  THE WITNESS IS TO ANSWER THE

13   QUESTION.

14            THE WITNESS:  CAN YOU RESTATE THE QUESTION?

15   BY MR. SAMPSON:

16   Q.   YOU ASKED -- IS IT YOUR TESTIMONY THAT YOU WERE ASKING

17   MR. GILL FOR CASH UNRELATED TO MAGINATICS?

18   A.   YES.

19   Q.   MR. GILL AT THE TIME WAS THE CEO OF MAGINATICS?

20   A.   YES.

21   Q.   WERE YOU ASKING HIM FOR A PERSONAL -- WERE YOU ASKING HIM

22   TO PERSONALLY PAY YOU CASH?

23   A.   NO.

24   Q.   AND AT THE TIME, YOU WERE ALREADY ACCRUING ADVISORY SHARES

25   IN MAGINATICS; CORRECT?

1    A.   I DON'T KNOW WHAT THE VESTING SCHEDULE OF CLIFF WAS

2    SPECIFICALLY TO MAGINATICS.

3    Q.   BUT YOU SAID IT WAS IN RETURN FOR ADVISORY SERVICES, DID

4    YOU NOT?

5    A.   I DID.

6    Q.   YOU FOLLOWED UP A FEW WEEKS LATER; CORRECT?  510.

7    A.   A COUPLE MONTHS LATER.

8    Q.   OKAY.  EARLY DECEMBER OF 2013 YOU SAID, "WE HAD DISCUSSED

9    A MONTHLY CASH FLOW AND I WANTED TO CHECK BACK.  IF NOT

10   FEASIBLE, I WILL ATTEMPT OTHER AVENUES."

11        DO YOU SEE THAT?

12   A.   YES.

13   Q.   BY OTHER AVENUES, DO YOU MEAN OTHER COMPANIES?

14   A.   I DON'T KNOW WHAT I MEANT BY THAT STATEMENT.

15   Q.   YOU WERE REFERRING TO ANOTHER VENDOR, WEREN'T YOU,

16   MR. KAIL?

17        MS. JAYNE:  OBJECTION.  ARGUMENTATIVE.

18        THE COURT:  OVERRULED.

19        THE WITNESS:  I DON'T KNOW WHAT I MEANT BY THE

20   STATEMENT.

21   BY MR. SAMPSON:

22   Q.   THIS WAS A SHAKEDOWN, WAS IT NOT, MR. KAIL?

23   A.   NO.

24        MS. JAYNE:  OBJECTION.  ARGUMENTATIVE.

25        THE COURT:  SUSTAINED.

1    BY MR. SAMPSON:

2    Q.   1001.

3         IS THAT YOUR DOCUSIGN, MR. KAIL?

4    A.   IT IS.

5            MR. SAMPSON:  IS 1001 IN EVIDENCE?

6            THE CLERK:  IT IS.

7    BY MR. SAMPSON:

8    Q.   SO FEBRUARY 25TH, 2013, YOU SIGNED THE PILOT FOR

9    DOCURATED; IS THAT RIGHT?

10   A.   YES.

11   Q.   555.

12        AND YOU MET WITH MS. TSERKOVNY AND MR. GORBANSKY ON

13   WEDNESDAY, MAY 29TH, 2013; CORRECT?

14   A.   I BELIEVE SO.

15   Q.   AND YOU MET THEM AT A CAFE OFF CAMPUS FROM NETFLIX?

16   A.   YEAH.  IT WAS RIGHT BY NETFLIX.

17   Q.   WAS ANYONE ELSE FROM NETFLIX THERE WITH YOU?

18   A.   I DON'T RECALL IF MR. DAVID BURT WAS OR NOT.

19   Q.   AND YOU TOLD THEM IN THAT MEETING THAT YOU WORK WITH

20   STARTUPS AS AN ADVISOR, DID YOU NOT?

21   A.   I DON'T RECALL THE SPECIFICS OF OUR CONVERSATION EIGHT

22   YEARS AGO.

23   Q.   YOU DON'T RECALL?

24   A.   NO.

25   Q.   560.

1          THEY INVITED YOU TO BECOME AN ADVISOR OF DOCURATED;

2    CORRECT?

3    A.   THEY DID, YES.

4    Q.   AND I BELIEVE THIS IS ADMITTED.  YES.

5          AND YOU SIGNED -- YOU SIGNED AN AGREEMENT WITH DOCURATED

6    IN MAY 2013; CORRECT?

7    A.   I BELIEVE THAT'S THE UNPAID PILOT DOCUMENT.

8    Q.   WELL, WE CAN TAKE THIS ONE DOWN.

9          BUT AT THE MEETING THAT YOU HAD WITH MS. TSERKOVNY AND

10   MR. GORBANSKY, THE DOCURATED PILOT PERIOD WAS ABOUT TO EXPIRE;

11   CORRECT?

12   A.   I DON'T REMEMBER THE DATE OF THE CONTRACT.

13   Q.   OKAY.  1001.

14        THIS WAS A 90 DAY PILOT EXPIRING MAY 29, 2013; IS THAT

15   RIGHT?

16   A.   CORRECT.

17   Q.   553.

18        THAT'S THE DATE OF YOUR MEETING WITH MS. TSERKOVNY AND

19   MR. GORBANSKY; CORRECT?

20   A.   CORRECT.

21   Q.   OKAY.  NEXT PAGE.

22        AND -- NEXT PAGE.

23        AND THE DAY AFTER YOUR MEETING WITH THEM, YOU SIGNED A

24   PAID CONTRACT ON BEHALF OF NETFLIX WITH DOCURATED; CORRECT?

25   A.   CORRECT.

1    Q.   AND ON JUNE 3RD, 2013, DOCURATED SENT YOU ADVISORY BOARD

2    PAPERWORK; CORRECT?

3    A.   I DON'T KNOW THE SPECIFIC DATE.

4    Q.   556.

5         DOES THAT LOOK CORRECT?

6    A.   THAT LOOKS CORRECT.

7    Q.   AND YOU BECAME A STRATEGIC ADVISORY TO DOCURATED, DID YOU

8    NOT?

9    A.   I DID.

10   Q.   AND YOU WERE GIVEN THE OPTION TO EARLY EXERCISE YOUR

11   SHARES?

12   A.   YES.

13   Q.   AND DID YOU?

14   A.   I BELIEVE I DID, YES.

15   Q.   557.

16        DOCURATED WAS IN NEW YORK; CORRECT?

17   A.   CORRECT.

18   Q.   AND YOU RECEIVED A FEDEX OF DOCURATED PAPERWORK FROM

19   DOCURATED IN NEW YORK?

20   A.   YES.

21   Q.   AND DOCURATED OFFERED YOU MORE ADVISORY SHARES IN JANUARY

22   2014; CORRECT?

23   A.   CORRECT.

24   Q.   564, PAGE 2.  PAGE 3.

25        AND YOU SIGNED A $120,000 AGREEMENT WITH DOCURATED IN

1     MARCH 2014; CORRECT?

2     A.   CORRECT.

3     Q.   YOU TESTIFIED ON DIRECT -- YOU WERE ASKED ON DIRECT IF YOU

4     HAD ANYTHING TO DO WITH DOCURATED GETTING A CONTRACT AT

5     NETFLIX.

6          DO YOU RECALL THAT?

7     A.   YES.

8     Q.   AND YOU SAID NO.

9     A.   CORRECT.

10    Q.   YOU SIGNED THIS; CORRECT?

11    A.   I SIGNED THE CONTRACT, YES.

12    Q.   DID YOU HAVE NO CHOICE BUT TO SIGN IT?

13    A.   AFTER DISCUSSION WITH MY TEAM, WE DECIDED TO MOVE FORWARD

14    WITH THIS PART OF THE DOCURATED CONTRACT.

15    Q.   DOCURATED WAS REPLACED WITH SHERLOCK, WAS IT NOT?

16    A.   THAT WOULD HAVE BEEN -- IF IT WAS, IT WAS AFTER I LEFT.  I

17    DON'T KNOW IF -- WHAT IT WAS REPLACED WITH, IF AT ALL.

18    Q.   1163, PAGE 2, WHICH I BELIEVE IS IN.  IT MAY BE PARTIALLY

19    IN.

20          THE CLERK:  IT IS NOT.

21          MR. SAMPSON:  IT IS NOT.

22    Q.   LET'S GO TO PAGE 1 THEN.

23          THIS IS TITLED -- DO YOU SEE THE TITLE?

24    A.   YEAH.

25    Q.   "MIKE AND SABRY ONE ON ONE."

1    A.   YES.

2    Q.   AND MIKE IS YOU?

3    A.   THAT IS ME.

4    Q.   SABRY REPORTED TO YOU AT NETFLIX?

5    A.   HE DID.  HE WAS MY DIRECTOR.

6    Q.   OKAY.  PAGE 2.

7         IS THIS A SUMMARY OF DISCUSSIONS, ONE ON ONE'S BETWEEN YOU

8    AND SABRY TOZIN?

9    A.   YES.

10   Q.   AND IT SAYS 5-15, GENERAL PROJECT UPDATE, SHERLOCK.

11        DO YOU SEE THAT?

12   A.   I DO.

13   Q.   THE LAUNCH IS MAY 20TH?

14   A.   UM-HUM.

15        MR. SAMPSON:  I MOVE FOR ADMISSION OF PAGES 1 AND 2

16   OF 1163.

17        THE COURT:  ANY OBJECTION?

18        MS. JAYNE:  NO.

19        THE COURT:  IT WILL BE ADMITTED.

20   (DEFENDANT'S EXHIBIT 1163, PAGES 1 AND 2, WAS ADMITTED IN

21   EVIDENCE.)

22        THE COURT:  THAT'S JUST PAGES 1 AND 2?

23        MR. SAMPSON:  YES.

24        MS. JAYNE:  OH.  JUST ONE MOMENT, YOUR HONOR.

25        THE COURT:  WE'RE GOING TO NEED TO TAKE A BREAK.

1          MR. SAMPSON:  I'M VERY CLOSE, YOUR HONOR.  IF YOU

2     WANT TO TAKE A BREAK NOW, THAT'S FINE.

3          THE COURT:  IS THIS ANY OBJECTION TO THE LIMIT THE

4     PORTION OF THE EXHIBIT?

5          MS. JAYNE:  I'M NOT SURE WHY -- I JUST NEED TO LOOK

6     AT THE WHOLE DOCUMENT.  I'M NOT SURE WHY ONLY PART.

7          THE COURT:  OKAY.

8          MR. SAMPSON:  OKAY.  I WOULD MOVE FOR PAGE 3 AS WELL.

9          THE COURT:  OKAY.  IS THAT THE FULL DOCUMENT THEN.

10         MR. SAMPSON:  IT IS NOT, YOUR HONOR.  IT'S A LENGTHY

11    DOCUMENT.

12         MS. JAYNE:  IT IS NINE PAGES, SO I JUST WANT --

13         THE COURT:  ALL RIGHT.  LET'S NOT DISCUSS IT.  IS

14    THERE ANY OBJECTION TO THE FIRST THREE PAGES?

15         MS. JAYNE:  THERE'S NOT AN OBJECTION TO THE ENTIRE

16    DOCUMENT.  SO, YES, THERE'S AN OBJECTION TO A PORTION.

17         THE COURT:  I WILL ADMIT THE FIRST THREE PAGES BASED

18    ON RELEVANCE TO THIS LINE OF QUESTIONING.

19         (DEFENDANT'S EXHIBIT 1163, PAGE 3, WAS ADMITTED IN

20    EVIDENCE.)

21         THE COURT:  WHEN YOU SAY NOT MUCH MORE, HOW MUCH ARE

22    YOU TALKING ABOUT?

23         MR. SAMPSON:  WELL, THIS IS THE NINTH COMPANY, AND I

24    JUST HAVE A FEW MORE QUESTIONS AFTER THAT.

25         THE COURT:  MINUTES.

1            MR. SAMPSON:  OH, TEN OR SO.

2            THE COURT:  THEN WE'LL TAKE A BREAK NOW.

3            MR. SAMPSON:  OKAY.

4            THE COURT:  THAT'S TOO LONG.

5        OKAY.  WE'LL TAKE A 15 MINUTE BREAK.

6            THE CLERK:  COURT IS IN RECESS.

7        (RECESS FROM 10:38 A.M. UNTIL 10:56 A.M.)

8        (JURY IN AT 10:56 A.M.)

9            THE COURT:  PLEASE BE SEATED, EVERYONE.  WE'RE BACK

10    ON THE RECORD.  ALL COUNSEL AND PARTIES ARE PRESENT.  ALL OF

11    OUR JURORS ARE HERE.

12            MR. SAMPSON, YOU MAY CONTINUE.

13            MR. SAMPSON:  I BELIEVE WE WERE ON 1163, PAGE 3.

14    Q.  SO, MR. KAIL, THIS IS THE ONE-ON-ONE SHARE DOCUMENT THAT

15    YOU --

16            THE COURT:  YOUR MICROPHONE DOESN'T SEEM TO BE

17    PICKING UP.

18            MR. SAMPSON:  SORRY.

19            THE COURT:  THANKS.

20    BY MR. SAMPSON:

21    Q.  MR. KAIL, THIS IS THE ONE-ON-ONE SHARE DOCUMENT BETWEEN

22    YOU AND SABRY TOZIN; CORRECT?

23    A.  CORRECT.

24    Q.  AND YOU'RE DISCUSSING SHERLOCK AT THE BOTTOM; CORRECT?

25    A.  NOT ON THIS PAGE.

```
1    Q.   AT THE BOTTOM OF THIS PAGE?

2    A.   OH, SORRY.  YES.

3    Q.   AND ABOVE THAT YOU'RE DISCUSSING SOMETHING CALLED ASGARD

4    VERSUS ELASTICBOX?

5    A.   YES.

6    Q.   AND THAT'S FOR DAM, DIGITAL ASSET MANAGEMENT?

7    A.   YES.

8    Q.   WE CAN GO UP.

9         AND ABOVE THAT, IN APRIL, YOU'RE DISCUSSING NUMERIFY WITH

10   MR. TOZIN?

11   A.   YES.

12   Q.   AND ABOVE THAT, THERE'S A REFERENCE TO SUNSHINING.

13        DO YOU SEE THAT?

14   A.   YES.

15   Q.   DID YOU DISCUSS SUNSHINING WITH MR. TOZIN?

16   A.   ACCORDING TO THIS DOCUMENT, IT WAS A BULLET POINT.  I

17   DON'T RECALL A DISCUSSION WITH HIM.

18   Q.   BUT YOU KNEW WHAT SUNSHINING WAS, WHAT THE TERM SUNSHINING

19   MEANT?

20   A.   IN GENERAL, YES.

21   Q.   AND THERE'S A REFERENCE TO A FLIGHT TO NEW YORK CITY;

22   CORRECT?

23   A.   CORRECT.

24   Q.   DID YOU FLY TO NEW YORK CITY TO MEET WITH MR. GORBANSKY

25   AND MS. TSERKOVNY?
```

1    A.   I DON'T RECALL.  I DON'T BELIEVE SO.  I'M NOT SURE IF THIS

2    WAS HIS FLIGHT OR MY FLIGHT, MR. TOZIN'S FLIGHT OR MINE.

3    Q.   OKAY.  YOU NEVER MET WITH MR. GORBANSKY AND MS. TSERKOVNY

4    IN NEW YORK CITY?

5    A.   I DON'T RECALL MEETING THEM IN NEW YORK CITY UNTIL AFTER I

6    LEFT NETFLIX.

7    Q.   THE BOTTLE OF DOM PERIGNON THAT THEY SENT YOU, DO YOU

8    RECALL THAT?

9    A.   I DO.

10   Q.   DID YOU RAFFLE THAT OFF IN THE OFFICE?

11   A.   I DID NOT.  THAT WAS A PERSONAL --

12   Q.   THANK YOU.

13        563.

14        ACTUALLY, I'M SORRY, BACK TO 1163, PAGE 2.

15            THE COURT:  1163 OR 163?

16            MR. SAMPSON:  1163.  IT'S A DEFENSE EXHIBIT.

17            THE COURT:  THANK YOU.

18   BY MR. SAMPSON:

19   Q.   THERE'S A REFERENCE TO SHERLOCK LAUNCHING MAY 20TH.

20        DO YOU SEE THAT?

21   A.   I DO.

22   Q.   AND IT'S A COLLABORATION WITH GAGAN'S TEAM.  IS THAT

23   GAGAN HASTEER?

24   A.   IT IS.

25   Q.   GO TO PAGE 1.  THANK YOU.

1        LET'S GO TO 563.

2        IS THIS -- THIS IS IN EVIDENCE.  IS THIS AN E-MAIL FROM

3   YOU TO MR. GORBANSKY FROM YOUR GMAIL ACCOUNT?

4   A.   IT IS, YES.

5   Q.   AND YOU SAID, AUGUST 4TH, 2014, THE SUBJECT IS

6   "DOCURATED - DAM PROPOSAL REVIEW."

7        DO YOU SEE THAT?

8   A.   YES.

9   Q.   DIGITAL ASSET MANAGEMENT PROPOSAL?

10  A.   YES.

11  Q.   AND YOU SAID "BEST TO TRY TO LEVERAGE SABRY.

12  UNFORTUNATELY NOT MUCH I CAN DO NOW."  CORRECT?

13  A.   CORRECT.

14  Q.   AND YOU TELL HIM THAT YOU ARE GOING TO BE WORKING AT

15  YAHOO; CORRECT?

16  A.   I DID, YES.

17  Q.   LET'S GO TO 235.

18       NOW, SEPTEMBER 18, 2014, YOU WERE ALREADY AT YAHOO;

19  CORRECT?

20  A.   CORRECT.

21  Q.   BUT MS. SPRAGUE WORKED UNDER YOU IN THE I.T. OPERATIONS

22  DEPARTMENT AT NETFLIX?

23  A.   SHE DID.

24  Q.   AND MS. SPRAGUE IS TELLING SOMEBODY FROM VISTARAIT THAT

25  SHE DIDN'T THINK THAT THE PRODUCT WAS ACTUALLY EVER PUT INTO

1    PRODUCTION IN ANY OF THE SPACES THAT SHE WAS AWARE OF.

2         DO YOU SEE THAT?

3    A.   I DO.

4    Q.   WAS HER STATEMENT INCORRECT?

5    A.   I BELIEVE SO, YES.

6    Q.   OKAY.  MR. TELLES, WHO SHE'S RESPONDING TO, SAYS -- HE'S

7    WITH VISTARA -- AND HE UNDERSTANDS THAT IT IS IN LIMITED USE

8    WITHIN NETFLIX.

9         DO YOU SEE THAT?

10   A.   I DO.

11   Q.   WAS HIS STATEMENT INCORRECT AT THE TIME?

12   A.   I'VE NEVER MET MR. TELLES.  I BELIEVE HE JOINED A MONTH

13   BEFORE THIS.

14        MR. SAMPSON:  MOVE TO STRIKE.  IT'S NONRESPONSIVE,

15   SPECULATIVE.

16        THE COURT:  SUSTAINED.  IT WILL BE STRICKEN.

17   BY MR. SAMPSON:

18   Q.   DID YOU BELIEVE HIS STATEMENT WAS CORRECT?

19   A.   NO.

20   Q.   LET'S GO TO -- YOU TESTIFIED ON WEDNESDAY THAT YOUR SALARY

21   AT NETFLIX WAS $500,000 A YEAR WHEN YOU LEFT; CORRECT?

22   A.   CORRECT.

23   Q.   YOUR SALARY AT NETFLIX NEVER WENT DOWN; CORRECT?

24   A.   CORRECT.

25   Q.   OKAY.  LET'S -- I'M GOING TO SHOW YOU EXHIBIT 7, PAGE 3.

1        IS THIS A COPY OF YOUR 2013 W-2 FORM FROM NETFLIX?

2            MS. JAYNE:  OBJECTION.  RELEVANCE, YOUR HONOR.

3            THE COURT:  OVERRULED.

4            MS. JAYNE:  AND MOTION IN LIMINES.

5    BY MR. SAMPSON:

6    Q.  MR. KAIL?

7    A.  YES.

8            MS. JAYNE:  403 GROUNDS.  IT'S BEEN ESTABLISHED.

9            THE COURT:  WE'LL HAVE TO TALK OUT IN THE HALLWAY.  I

10   DON'T KNOW WHAT YOU'RE DOING.

11       (SIDE-BAR DISCUSSION OFF THE RECORD.)

12           THE COURT:  THE OBJECTION IS SUSTAINED.  THE DOCUMENT

13   IS NOT RELEVANT.

14   BY MR. SAMPSON:

15   Q.  PLEASE GO TO EXHIBIT 680.

16       MR. KAIL, AT THE TOP, IS THAT YOUR E-MAIL TO

17   FRANK SLOOTMAN, MARCH 15TH, 2013?

18   A.  IT IS.

19   Q.  AND MR. SLOOTMAN ASKED YOU THE SAME DAY WHAT YOUR EQUITY

20   CONSIDERATION THAT YOU RECEIVED FROM OTHER COMPANIES FOR

21   ADVISORY ROLES.

22       DO YOU SEE THAT?

23   A.  I DO.

24   Q.  AND YOU SAID, 1/2 PERCENT -- 1/5 PERCENT TO 1/2 PERCENT,

25   TWO YEAR VESTING.

1           THAT'S YOUR STATEMENT?

2     A.   THAT'S WHAT I WROTE, YES.

3     Q.   SO YOU'RE TELLING MR. SLOOTMAN WHAT OTHER COMPANIES WERE

4     COMPENSATING YOU FOR ADVISORY POSITIONS.

5     A.   CORRECT.

6     Q.   CAN WE PULL THAT UP VERSUS EXHIBIT 309.  OKAY.  LET'S JUST

7     PULL UP 309.  GO TO PAGE 2, PLEASE.

8           JUST A MOMENT, YOUR HONOR.

9               THE COURT:  OKAY.

10          (DISCUSSION OFF THE RECORD BETWEEN GOVERNMENT COUNSEL.)

11              MR. SAMPSON:  THANK YOU.  PAGE 1 ACTUALLY.

12    Q.   AND UNDERSTANDING YOU'RE NOT ON THIS E-MAIL, MR. WERTHER

13    IS STATING THAT YOU TAKE A QUARTER POINT.

14          DO YOU SEE THAT?

15    A.   I DO.

16    Q.   BUT THAT NUMBER DIDN'T COME FROM YOU?

17    A.   I DON'T BELIEVE IT DID, NO.

18              MR. SAMPSON:  NO FURTHER QUESTIONS.

19              THE COURT:  THANK YOU.

20          REDIRECT?

21              MS. JAYNE:  YES, PLEASE.

22                   **REDIRECT EXAMINATION**

23    BY MS. JAYNE:

24    Q.   ALL RIGHT.  GOOD MORNING, MR. KAIL.

25          CAN WE PLEASE TURN TO EXHIBIT 962.

1           TAKING A LOOK AT THIS, DO YOU SEE A DEPOSIT FROM PANDESSA

2    CORPORATION?

3    A.   I DO.

4    Q.   AND DID YOU EVER INTRODUCE PANDESSA TO NETFLIX?

5    A.   I DON'T BELIEVE I DID, NO.

6    Q.   AND DO YOU KNOW IF THAT COMPANY EVER HAD A CONTRACT WITH

7    NETFLIX?

8    A.   I DON'T BELIEVE THEY DID, NO.

9    Q.   AND WERE YOU DOING SOME KIND OF WORK FOR PANDESSA?

10           MR. SAMPSON:  BEYOND THE SCOPE OF DIRECT, YOUR HONOR.

11   OF CROSS.

12           MS. JAYNE:  THIS DOCUMENT CAME UP.  THESE COMPANIES

13   CAME UP, I SHOULD SAY.

14           THE COURT:  OVERRULED.

15           THE WITNESS:  SORRY.  CAN YOU REPEAT THE QUESTION?

16   BY MS. JAYNE:

17   Q.   WERE YOU DOING SOME KIND OF WORK WITH PANDESSA?

18   A.   I WAS DOING CONSULTING FOR PANDESSA.

19   Q.   WHAT ABOUT -- THERE'S A LINE, PUBLIC RESOURCES ORG.

20   A.   YES.

21   Q.   WERE YOU DOING WORK FOR PUBLIC RESOURCES ORG?

22   A.   YES.

23   Q.   DID YOU EVER INTRODUCE THEM TO NETFLIX?

24   A.   NO.  IT WAS COMPLETELY UNRELATED.

25   Q.   DID YOU -- WHAT ABOUT FIXSTREAM NETWORKS?  DO YOU SEE AN

1      INCOME FROM FIXSTREAM?

2      A.   YEAH.  IT WAS A STARTUP THAT WAS JUST LAUNCHING UNDER

3      STEALTH PREPRODUCT.  I WAS GIVING THEM PRODUCT STRATEGY ADVICE.

4      Q.   WERE YOU MAKING THE DEPOSITS INTO YOUR UNIX MERCENARY

5      ACCOUNT?

6      A.   ACCORDING TO THIS DOCUMENT, YES.

7      Q.   OKAY.  AND DID FIXSTREAM EVER HAVE A CONTRACT WITH

8      NETFLIX?

9      A.   NOT DURING MY TIME THERE, NO.

10     Q.   THANK YOU.  OF THE VENDORS MENTIONED IN THIS TRIAL, WHICH

11     COMPANIES DO YOU STILL HOLD STOCK OPTIONS IN?

12     A.   NETSKOPE AND SUMO LOGIC.

13     Q.   OKAY.  AND WHAT ABOUT THE ONES THAT YOU HAD STOCK OPTIONS

14     THAT YOU DIDN'T EXERCISE?  DO THOSE HAVE ANY VALUE?

15     A.   NO.

16     Q.   NOW, DO YOU RECALL ON CROSS-EXAMINATION YOU WERE ASKED A

17     NUMBER OF QUESTIONS ABOUT CERTAIN VENDORS THAT DIDN'T TESTIFY

18     IN THIS TRIAL?

19     A.   CORRECT, YES.

20     Q.   AND DO YOU RECALL THAT YOU -- SOME OF YOUR ANSWERS WERE

21     THAT YOU DON'T RECALL?

22     A.   YES.

23     Q.   FOR SOME OF THE COMPANIES -- FOR THOSE COMPANIES -- NOW,

24     DURING THE COURSE OF THIS TRIAL, DID YOU SEE THE CONTRACTS OF

25     THE VENDORS THAT TESTIFIED?

1    A.   YES, I DID.

2    Q.   FOR THE VENDORS THAT WERE BROUGHT UP THAT WERE NOT PART OF

3    THIS TRIAL, WHEN WAS THE LAST TIME YOU WOULD HAVE WORKED ON --

4    WHEN WAS THE LAST TIME YOU WOULD HAVE HAD ACCESS IN THE COURSE

5    OF YOUR EMPLOYMENT TO ANY OF THOSE CONTRACTS?

6              MR. SAMPSON:  RELEVANCE.

7              THE COURT:  OVERRULED.

8              THE WITNESS:  SORRY.  CAN YOU RESTATE THAT, PLEASE?

9    BY MS. JAYNE:

10   Q.   YES.  HOW LONG AGO DID YOU WORK FOR NETFLIX?

11   A.   I LEFT LATE JULY 2014.

12   Q.   AND WHEN YOU LEFT, DID YOU TAKE THE CONTRACTS WITH YOU?

13   A.   NO.

14   Q.   DO YOU HAVE AN INDEPENDENT RECOLLECTION OF EVERY CONTRACT

15   THAT EVER CROSSED YOUR PATH AT NETFLIX?

16   A.   NO.  NOT EVEN CLOSE.

17   Q.   DID YOU -- YESTERDAY DID YOU HAVE AN OPPORTUNITY TO REVIEW

18   ANY NOTES OR INFORMATION REGARDING THOSE, SOME OF THOSE

19   COMPANIES?

20   A.   YES, I DID.

21   Q.   DID THOSE NOTES ASSIST YOU WITH SOME OF THE DETAILS

22   SURROUNDING SOME OF THOSE COMPANIES?

23   A.   REFRESHING MY MEMORY, YES.

24   Q.   DO YOU RECALL THAT YOU WERE ASKED ABOUT ONELOGIN?

25   A.   I DON'T REALLY --

1    Q.   ON CROSS.

2    A.   I WAS, YES.

3    Q.   WERE YOU ON ADVISOR TO ONELOGIN?

4    A.   I WAS.

5    Q.   DID YOU BECOME AN ADVISOR BEFORE OR AFTER ONELOGIN IN A

6    CONTRACT WITH NETFLIX?

7    A.   AFTER.

8    Q.   DID YOU DO A VIDEO TESTIMONIAL FOR ONELOGIN?

9    A.   YES, I DID.

10   Q.   WAS THAT APPROVED BY NETFLIX COMMUNICATIONS DEPARTMENT?

11   A.   YES, AND IT WAS FILMED ON NETFLIX CAMPUS.

12   Q.   WAS ANYONE ELSE FROM NETFLIX IN THE VIDEO THAT THE

13   GOVERNMENT SHOWED YOU A SCREENSHOT OF?

14   A.   THERE WERE SEVERAL NETFLIX EMPLOYEES AS PART OF IT, AND

15   SPECIFICALLY ASHLEY SPRAGUE AND SYLVIA SUNDHOLM.

16   Q.   DID YOU EVER EXERCISE THE ONELOGIN SHARES?

17   A.   I DON'T BELIEVE I DID.

18   Q.   DID YOU EVER TELL ANYONE AT NETFLIX THAT YOU HAD BECOME AN

19   ADVISOR TO ONELOGIN?

20   A.   I DID.  I TOLD MY ENTIRE ORGANIZATION, AND I ALSO TOLD

21   MR. HASTINGS.

22   Q.   HOW DO YOU RECALL THAT YOU TOLD MR. HASTINGS?

23   A.   I BELIEVE IT WAS THE PRE-GOOGLE DOC, BUT WE HAD A

24   ONE-ON-ONE BEFORE THAT, AND IT WAS PART OF OUR CONVERSATION

25   DURING THAT ONE-ON-ONE.

1    Q.   HOW DO YOU REMEMBER THAT SPECIFIC ONE-ON-ONE?  HAD YOU

2    EVER BEEN AN ADVISOR BEFORE?

3    A.   NO, ONELOGIN WAS MY FIRST ADVISORY ROLE.  I WAS EXTREMELY

4    PROUD OF THAT FACT AND WANTED TO SHARE MY EXCITEMENT.

5    Q.   AND DO YOU RECALL WHAT, IF ANY, REACTION MR. HASTINGS HAD?

6    A.   NO.  WE WERE DISCUSSING A LOT OF THINGS AT THE TIME.  IT

7    WAS JUST, LIKE, KIND OF IGNORED.

8    Q.   AND DID YOU GET ANY SENSE THAT HE HAD A PROBLEM WITH THAT?

9    A.   HE DIDN'T VOICE A PROBLEM AT THAT TIME, SO NO.

10   Q.   YOU WERE ALSO -- DO YOU RECALL BEING ASKED ABOUT BOX THE

11   OTHER DAY?

12   A.   YES, I DO.

13   Q.   WERE YOU EVER A FORMAL CUSTOMER ADVISOR TO BOX?

14   A.   I DON'T RECALL ANY CONTRACT.  IT WAS MUCH MORE OF AN

15   INFORMAL CUSTOMER COUNCIL.

16   Q.   WHAT'S A CUSTOMER COUNCIL?

17   A.   IT'S A GROUP OF CUSTOMERS OF A GIVEN VENDOR THAT GET

18   TOGETHER TYPICALLY ONCE A QUARTER TO HAVE A GENERAL DISCUSSION.

19   Q.   DO YOU RECALL THE TESTIMONY FROM BEN WERTHER FROM HIS

20   DEPOSITION REGARDING THAT COUNCIL?

21   A.   YES, AND THE LANGUAGE IN THEIR CONTRACT ABOUT THEIR

22   GENERAL CUSTOMER ADVISORY BOARD COUNCIL.

23   Q.   HOW DOES WHAT YOU DESCRIBED COMPARE TO THAT, THE COUNCIL?

24   A.   VERY SIMILAR.  SO IT WAS AN INFORMAL GROUP THAT GAVE

25   GENERAL FEEDBACK ON A VERY PERIODIC BASIS.

1    Q.   DID YOU CONSIDER YOURSELF TO BE A FORMAL, IT A FORMAL

2    ADVISOR TO BOX, LIKE ON AN ADVISORY BOARD?

3    A.   NO, NOT AT ALL.

4    Q.   DID YOU HAVE ANY SHARES IN BOX?

5    A.   NO, I DID NOT.

6    Q.   WOULD YOU HAVE ASKED FOR SHARES IF YOU WERE NOT A FORMAL

7    ADVISOR?

8    A.   NO.  I DON'T -- AND I DON'T BELIEVE I DID.

9    Q.   YOU WERE -- DO YOU REMEMBER BEING ASKED ABOUT A COMPANY

10   CALLED PLIVO THE OTHER DAY?

11   A.   YES, YES.

12   Q.   DID YOU EVER SIGN A CONTRACT WITH PLIVO AT NETFLIX?

13   A.   NOT THAT I RECALL.

14   Q.   DO YOU KNOW WHO WOULD HAVE SIGNED THE CONTRACT, EITHER A

15   CONTRACT OR AN NDA WITH MARIE VO?

16          MR. SAMPSON:  CALLS FOR SPECULATION.

17          THE COURT:  SUSTAINED.

18   BY MS. JAYNE:

19   Q.   WERE YOU ABLE TO CONFIRM WHETHER OR NOT YOU SIGNED A

20   CONTRACT WITH PLIVO?

21          MR. SAMPSON:  THE WITNESS HAS TESTIFIED.  ASKED AND

22   ANSWERED.

23          MS. JAYNE:  OKAY.

24          THE COURT:  MOVE ON.

25

1     BY MS. JAYNE:

2     Q.   YOU WERE ALSO -- DO YOU RECALL BEING ASKED ABOUT

3     PURE STORAGE?

4     A.   YES.

5     Q.   AND DID YOU BECOME AN ADVISOR TO PURE STORAGE?

6     A.   YES, I DID.

7     Q.   DID THAT RESULT IN ANY MONEY TO YOU?

8     A.   NO.

9     Q.   DID YOU BECOME AN ADVISOR BEFORE OR AFTER A CONTRACT WITH

10    NETFLIX?

11    A.   WELL AFTER.

12    Q.   DO YOU RECALL BEING ASKED ABOUT TIDEMARK?

13    A.   YES.

14    Q.   DID YOU HAVE AN ADVISOR AGREEMENT WITH TIDEMARK?

15    A.   I DID, YES.

16    Q.   WAS THAT BEFORE OR AFTER A CONTRACT WITH NETFLIX?

17    A.   I BELIEVE IT WAS AFTER.

18    Q.   WERE YOU ON THE BOARD OF TIDEMARK FOR A LENGTHY PERIOD OF

19    TIME?

20    A.   I BELIEVE IT WAS SEVEN MONTHS.

21    Q.   DOES IT -- HAVE YOU -- YOU'VE HEARD WITNESSES TESTIFY

22    ABOUT THEIR BOARDS HAVING TO APPROVE CERTAIN STOCK OPTIONS?

23    A.   YES.

24    Q.   AND CAN THAT SOMETIMES TAKE TIME?

25    A.   YES, SOMETIMES IT TAKES SEVERAL MONTHS.

1      Q.   AND DID -- IN THE TIME PERIOD THAT YOU WERE AWAITING FOR

2      THE BOARD, OR BEFORE YOU LEFT, I SHOULD SAY, BEFORE YOU WERE NO

3      LONGER ON THE BOARD OF TIDEMARK, DID THE BOARD EVER GET TO

4      APPROVE THOSE STOCK OPTIONS?

5      A.   NO.   THE BOARD NEVER APPROVED THE TIDEMARK OPTION GRANT.

6      Q.   YOU WERE ASKED ABOUT BLUEBOX.

7      A.   YES.

8      Q.   DO YOU REMEMBER THAT?

9      A.   YES.

10     Q.   AND DO YOU KNOW IF BLUEBOX EVER MADE IT PAST A PROOF OF

11     CONCEPT?

12     A.   THEY DID NOT.

13     Q.   WERE YOU EVER AN ADVISOR TO BLUEBOX?

14     A.   YES, I WAS.

15     Q.   DID YOU BECOME AN ADVISOR BEFORE OR AFTER YOU WORKED AT

16     NETFLIX?

17     A.   I BECAME AN ADVISOR TO BLUEBOX DURING MY TIME AT NETFLIX.

18     Q.   AND WHEN DID YOU GET THE STOCK OPTIONS FROM BLUEBOX?

19     A.   I DON'T RECALL THE OPTION GRANT.   THE SHARES WERE IN,

20     SOMETIME IN 2015.

21     Q.   WERE YOU STILL AT NETFLIX?

22     A.   NO.

23     Q.   YOU WERE ASKED ABOUT -- DID YOU RECEIVE ANY MONEY FROM

24     BLUEBOX?

25     A.   NO.

1    Q.   YOU WERE ASKED ABOUT WORKDAY; CORRECT?

2    A.   CORRECT.

3    Q.   AND THAT WAS BY MR. SAMPSON?

4    A.   CORRECT.

5    Q.   WERE YOU EVER AN ADVISOR TO WORKDAY?

6    A.   NO.

7    Q.   DID NETFLIX HAVE A CONTRACT WITH WORKDAY?

8    A.   YES.

9    Q.   DID YOU PARTICIPATE IN ANY SORT OF -- WELL, AT SOME POINT

10   DID WORKDAY GO PUBLIC?

11   A.   THEY DID.

12   Q.   AND DID YOU HAVE ANY TYPE OF OPPORTUNITY TO GET STOCK

13   OPTIONS WHEN THEY WERE GOING PUBLIC?

14   A.    NOT OPTIONS.  THE CEO INVITED ME TO PARTICIPATE AT MY OWN

15   DISCRETION IN THE FRIENDS AND FAMILY PROGRAM, WHICH MEANT YOU

16   GOT TO INVEST YOUR OWN PERSONAL CAPITAL INTO THE IPO AT THE

17   OPEN PRICE FOR A GIVEN ALLOCATION, BUT THERE WAS NO -- THERE

18   WERE NOT OPTIONS, THERE WAS NO DISCOUNT.

19   Q.   OKAY.  AND THAT WAS WHEN -- AT THE SAME TIME THE COMPANY

20   WAS GOING PUBLIC?

21   A.   YES.  YOU GOT TO BUY SHARES AT THE IPO OPEN OF THE MARKET.

22   Q.   AND DID YOU HAVE TO USE YOUR OWN MONEY TO DO THAT?

23   A.   I DID, YES.

24   Q.   DO YOU REMEMBER BEING ASKED ABOUT CYPHORT?

25   A.   I DO, YES.

1     Q.   DID NETFLIX HAVE A CONTRACT WITH CYPHORT?

2     A.   YES, I BELIEVE THEY HAD TWO CONTRACTS WITH CYPHORT.

3     Q.   WERE YOU INVOLVED IN THE NEGOTIATION OR SIGNING OF EITHER

4     OF THOSE CONTRACTS?

5     A.   NO, I WAS NOT.

6     Q.   WAS ONE OF THOSE CONTRACTS EVEN DURING THE TIME YOU WERE

7     AT NETFLIX?

8     A.   YES, IT WAS.

9     Q.   AND WAS -- WERE THERE TWO OF THEM; RIGHT?

10    A.   YES.

11    Q.   WAS ONE OF THEM AFTER YOU LEFT NETFLIX?

12    A.   I DON'T RECALL THE DATE.  SORRY.

13    Q.   OKAY.  AND DO YOU -- ARE YOU CURRENTLY AN ADVISOR TO

14    COMPANIES?

15    A.   YES, I AM.

16    Q.   WITH RESPECT TO UNIX, AT SOME POINT I THINK YOU TESTIFIED

17    EARLIER YOU REGISTERED IT WITH THE CALIFORNIA SECRETARY OF

18    STATE?

19    A.   YES, I REGISTERED IT OFFICIALLY WITH THE STATE OF

20    CALIFORNIA.

21    Q.   AND DO YOU RECALL ON CROSS-EXAMINATION BEING SHOWN A

22    REFERRAL PARTNER AGREEMENT WITH A DATE?

23    A.   YES.

24    Q.   DID YOU SUBMIT THE REGISTRATION PAPERWORK BEFORE OR AFTER

25    THE REFERRAL PARTNER AGREEMENT?

1    A.   BEFORE.

2    Q.   DOES THE -- IN YOUR EXPERIENCE, DOES THE SECRETARY OF

3    STATE TURN AROUND THE FILE STAMPED COPY OF REGISTRATION

4    PAPERWORK IMMEDIATELY?

5              MR. SAMPSON:  OBJECTION TO THE WITNESS'S PERSONAL

6    KNOWLEDGE ABOUT THE SECRETARY OF STATE.

7              THE COURT:  SUSTAINED.

8    BY MS. JAYNE:

9    Q.   HOW MUCH AFTER YOUR SUBMISSION TO THE SECRETARY OF STATE

10   DID YOU GET VALIDATION THAT IT HAD BEEN APPROVED?

11             MR. SAMPSON:  LEADING.

12             THE COURT:  SUSTAINED.

13   BY MS. JAYNE:

14   Q.   WHEN DID YOU SUBMIT THE REGISTRATION PAPERWORK IN RELATION

15   TO THE DATE?

16   A.   IF I RECALL CORRECTLY, IT WOULD HAVE BEEN LATE JANUARY OF

17   2012.

18   Q.   AND WHEN DID YOU RECEIVE THE CONFIRMATION FROM THE

19   SECRETARY OF STATE?

20   A.   IF I RECALL, IT WAS STAMPED FEBRUARY 8TH, 2012.

21   Q.   DO YOU RECALL BEING ASKED ABOUT AN E-MAIL WITH MR. KAMATH

22   THAT REFERENCED A, SOMEONE NAMED ALEXIS?

23   A.   YES, I DO.

24   Q.   WHO WAS ALEXIS AT NETFLIX?

25   A.   SHE WAS PART OF THE, WHAT NETFLIX CALLED THE TALENT TEAM,

1      WHICH WAS THE RECRUITING TEAM.

2      Q.   OKAY.  WERE YOU THE SOLE POINT OF CONTACT WITH NETENRICH

3      AND VISTARA?

4      A.   NO.

5      Q.   WERE THERE MEETINGS WITH NETENRICH AND/OR VISTARA THAT YOU

6      DIDN'T ATTEND?

7      A.   SEVERAL.

8      Q.   IF WE COULD TURN TO EXHIBIT 122, PLEASE.

9           DO YOU RECALL BEING ASKED ABOUT THE PHRASE, JUST EARLIER

10     TODAY, "IT'S MY REPUTATION THAT TAKES A HIT WHEN THINGS DON'T

11     GO WELL"?

12     A.   YES, I DO.

13     Q.   WHAT DID YOU MEAN BY THAT?

14     A.   I MEANT THAT IF I INTRODUCED INDIVIDUALS OR PRODUCTS INTO

15     THE NETFLIX ENVIRONMENT, SPECIFICALLY MY TEAMS, THEY WOULD LOSE

16     RESPECT FOR ME AS A TECHNICAL LEADER AND THAT MEANT A LOT TO

17     ME -- OR MEANS A LOT TO ME.

18          SO I WANTED TO MAINTAIN MY, MY BEING ABLE TO BRING IN THE

19     PROPER SERVICES AND PEOPLE AND PRODUCTS.

20     Q.   SO WHAT DO YOU THINK WOULD HAPPEN IF YOU WERE BRINGING IN

21     POOR PRODUCTS, OR INTRODUCING POOR PRODUCTS OR PEOPLE TO YOUR

22     TEAMS AT NETFLIX?

23     A.   IT WOULD RESULT IN A LOT OF FRUSTRATION WITH THE TEAM,

24     SUBSEQUENT POOR 360 REVIEW FEEDBACK AND FEEDBACK TO MY MANAGER

25     AND THE OVERALL PRODUCTIVITY OF BOTH THE I.T. ORGANIZATION AND

1     THE COMPANYWIDE WOULD GO DOWN SIGNIFICANTLY.

2     Q.   THANK YOU.

3          YOU WERE ASKED ABOUT SOME INVOICES TO ENGINEERS.

4          DO YOU RECALL THAT?

5     A.   I DO, YES.

6     Q.   DID YOU DECIDE HOW MUCH ENGINEERS WERE NEEDED AT NETFLIX

7     IN A GIVEN MONTH?

8     A.   NO.  I WASN'T INVOLVED IN THE REQUISITION OR INTERVIEWING

9     OR SUBSEQUENTLY HIRING ON A CONTRACTOR.

10    Q.   IF WE COULD PLEASE TURN TO EXHIBIT 1035.  PAGE 9, PLEASE.

11         THIS HAS BEEN ADMITTED INTO EVIDENCE.

12         AND YOU'RE ULTIMATELY ON THE E-MAIL AS WELL.  DO YOU SEE

13    THE MESSAGE -- IF WE COULD TURN TO -- AT THE VERY BOTTOM, THE

14    MESSAGE FROM BILL BURNS, "ON A SEPARATE NOTE," WAS THAT MESSAGE

15    SENT TO YOU?

16    A.   I WAS NOT ON THAT E-MAIL UNTIL IT GOT FORWARDED TO ME FROM

17    VARMA.

18    Q.   AND WHAT DID YOU -- FROM YOUR UNDERSTANDING, WHAT IS BILL

19    ASKING FOR HERE?

20    A.   HE'S ASKING FOR ANOTHER NETWORK ENGINEER BECAUSE THEY WERE

21    STILL VERY SHORT STAFFED.  I BELIEVE I SPOKE ABOUT THAT.

22    Q.   ALL RIGHT.  THANK YOU.

23         AND HERE WERE YOU -- IN THE MESSAGE FROM BILL TO VISTARA,

24    WERE YOU EVEN A POINT OF CONTACT?

25    A.   NO.  I DIDN'T -- I WASN'T AWARE OF THIS E-MAIL UNTIL IT

1        GOT FORWARDED TO ME.

2        Q.   IF WE COULD PLEASE TURN TO EXHIBIT 1087, WHICH HAS BEEN

3        ADMITTED.

4             DO YOU SEE THAT THIS IS AN INVOICE FOR JULY 2013?

5        A.   YES.  THIS WOULD HAVE BEEN A NETENRICH INVOICE FOR

6        NETFLIX.

7        Q.   OKAY.  AND WHAT IS IT THAT BOBBY MENESES SAYS TO -- WELL,

8        YOU'RE NOT ON THE E-MAIL, BUT TO INDIVIDUALS AT NETFLIX AND

9        NETENRICH?

10       A.   HE'S INSTRUCTING THEM THAT ASHI SHETH SHOULD BE THE

11       APPROVAL PERSON FOR THESE GIVEN ENGINEERS.

12       Q.   AND THEN IS THERE AN ATTACHMENT?

13       A.   IT WAS AN INVOICE SENT FROM NETENRICH.

14       Q.   IS THIS CONSISTENT WITH YOUR UNDERSTANDING THAT YOU DIDN'T

15       NEED TO REVIEW ALL THE INVOICES WITH VENDORS?

16       A.   YES, ABSOLUTELY.

17       Q.   IF WE COULD PLEASE TURN TO EXHIBIT 208.

18            YOU WERE ASKED ABOUT THIS EXHIBIT -- IT'LL BE UP IN A

19       MOMENT -- ON CROSS-EXAMINATION.

20            AND DO YOU SEE THE MESSAGE FROM VARMA, "THANKS FOR GIVING

21       US THE OPPORTUNITY"?

22       A.   YES.

23       Q.   WAS IT YOUR SOLE DECISION WHETHER OR NOT VISTARA WOULD BE

24       DEPLOYED AT NETFLIX?

25       A.   NO.  THIS E-MAIL IS AFTER MULTIPLE TEAM MEETINGS

1    DISCUSSING VISTARA AND GETTING INPUT FROM THE DIFFERENT ORGS

2    THAT WOULD BE USING THE PLATFORM, OR BENEFITING FROM THE

3    PLATFORM.

4    Q.   DID YOU BELIEVE THAT YOU WERE PERMITTED TO MAJOR

5    INTRODUCTIONS?

6    A.   YES, EVERYONE WAS ABLE TO MAKE INTRODUCTIONS.

7    Q.   DID YOU ONLY MAKE INTRODUCTIONS BECAUSE SOMEBODY --

8    BECAUSE YOU MAY ONE DAY GET STOCK OPTIONS?

9    A.   NO.

10   Q.   DID YOU SOMETIMES MAKE INTRODUCTIONS BEFORE THERE WAS ANY

11   ADVISORY AGREEMENT?

12   A.   YES, MULTIPLE TIMES.

13   Q.   IF WE COULD PLEASE TURN -- WELL, THANK YOU.

14        WAS THERE SOME -- WERE THERE ANY ISSUES WITH THE VISTARA

15   ACCOUNTING DEPARTMENT?

16   A.   YES.

17             MR. SAMPSON:  OBJECTION.

18             THE WITNESS:  I HEARD MS. MENDELSOHN IN HER

19   TESTIMONY, THERE WERE SEVERAL ISSUES WITH THE ACCOUNTING

20   DEPARTMENT WITH THE INEFFICIENCIES.  I THINK SHE HAD

21   SIGNIFICANT TURNOVER OVER A PERIOD OF MONTHS AND SEEMED TO BE,

22   FROM EXTERNAL, IN A STATE OF DISARRAY.

23   BY MS. JAYNE:

24   Q.   WHY DID YOU -- YOU WERE ASKED SOME QUESTIONS ABOUT

25   E-MAILING VISTARA PEOPLE, OR VARMA, FOR PAYMENT; CORRECT?

1     A.   CORRECT.

2     Q.   WHY DID YOU HAVE TO SEND MULTIPLE E-MAILS?

3               MR. SAMPSON:  SPECULATIVE.

4               THE COURT:  THE WITNESS CAN TESTIFY ABOUT HIS OWN

5     CONDUCT AND THE REASONS FOR IT.

6               MS. JAYNE:  OKAY.

7               THE WITNESS:  I SENT E-MAIL ESCALATIONS TO VARMA WHEN

8     A PERIOD OF TIME HAD PASSED THAT THEY WERE UNRESPONSIVE, AND I

9     DIDN'T KNOW WHAT WAS GOING ON IN THE ACCOUNTING DEPARTMENT AND

10    WANTED HIM TO BE AWARE THAT HE MAY HAVE SOME ISSUES IN HIS

11    COMPANY.

12    BY MS. JAYNE:

13    Q.   YOU WERE ASKED -- OKAY.  ACTUALLY, LET'S GO AHEAD AND TURN

14    TO EXHIBIT 131.

15         WHO WAS -- THIS REFERENCES A HEMANTH.  WHO WAS HEMANTH, IF

16    YOU KNOW?

17    A.   HEMANTH PENMETSA WAS AN OVERALL PROJECT MANAGER, NOT -- I

18    DON'T BELIEVE HE WAS INVOLVED IN ACCOUNTING.

19    Q.   AND DO YOU KNOW WHERE HE WAS LOCATED?

20    A.   I BELIEVE HE WAS IN HYDERABAD, INDIA.

21    Q.   AND DO YOU SEE THAT YOU WROTE "DOES HEMANTH KNOW THE

22    CONTEXT OF MY/OUR ARRANGEMENT"?

23    A.   YES.

24    Q.   AND WHAT DID YOU MEAN BY THAT?

25    A.   I MEANT GIVEN THAT HE WAS NOT IN ACCOUNTING, DOES HE KNOW

1      THAT I'M A REFERRAL PARTNER?  I DON'T BELIEVE THAT PROJECT

2      MANAGERS HAD ANY KNOWLEDGE OF ANY REFERRAL PARTNERS TO

3      NETENRICH OR VISTARA.

4      Q.   AND THEN WAS THERE A RESPONSE ABOUT NOW THEY'RE -- WAS

5      THERE A REFERENCE TO A NEW ACCOUNTING MANAGER?

6      A.   YES.  THEY HAD JUST HIRED A NEW ACCOUNTING MANAGER PER

7      VARMA'S E-MAIL.

8      Q.   OKAY.  IF WE COULD PLEASE TURN TO EXHIBIT 221.  LET'S

9      ACTUALLY JUST START IN THE MIDDLE AND THEN WE'LL WORK OUR WAY

10     UP.

11          YOU WERE ASKED ABOUT YOUR COMMENT "OVERALL DISSATISFACTION

12     WITH VISTARA."

13     A.   YES.

14     Q.   WHY DID YOU WRITE THAT?

15     A.   IT WAS A WAY -- IT WAS A STRATEGIC MOVE ON MY PART TO GET

16     VARMA'S ATTENTION AND HAVE FEATURES AND FUNCTIONALITIES ADDED

17     TO THE PLATFORM AT A FASTER RATE THAN THEY WERE DOING.

18     Q.   DID YOU OFTEN DO THAT WITH VENDORS, TRY TO GET MORE OUT OF

19     THEM, I GUESS?

20     A.   YEAH.  I WAS CONSTANTLY PUSHING VENDORS TO DELIVER MORE

21     FEATURES AND FUNCTIONALITY FOR NETFLIX.

22     Q.   DID YOU BELIEVE THAT YOUR TEAM WAS OVERALL DISSATISFIED

23     WITH VISTARA?

24     A.   NO.  THAT WAS -- THAT'S WHY IT WAS AN INTERNAL MESSAGE TO

25     VARMA JUST TO PUSH ON HIM.

1      Q.   AND THEN IF WE COULD TURN TO THE TOP.

2           AND WHAT WAS VARMA'S RESPONSE AS FAR AS MEETING?

3      A.   SO HE UNDERSTOOD MY POINT AND THEY HAD BEEN MEETING WITH

4      ADDITIONAL MEMBERS OF MY TEAM TO ADD THE CAPABILITIES THAT WE

5      HAD DISCUSSED AND WERE PART OF THE SECOND PHASE OF VISTARA.

6      Q.   AND DID HE REPORT THAT HE HAD A POSITIVE OR NEGATIVE

7      MEETING?

8      A.   IT WAS EXTREMELY POSITIVE, AND THAT WAS THE FEEDBACK

9      CONSISTENT ACROSS ALL MEETINGS THAT I HEARD ABOUT.

10     Q.   ALL RIGHT.  THANK YOU.

11          IF WE COULD PLEASE TURN TO EXHIBIT 220.

12          THIS WAS -- YOU WERE ASKED ABOUT WHETHER YOU AGREED ABOUT

13     THE CART BEFORE THE HORSE.

14     A.   YES.

15     Q.   WHAT DID YOU MEAN BY THIS, OR WHAT WAS YOUR UNDERSTANDING

16     OF WHAT WAS HAPPENING HERE?

17     A.   VENDORS ALWAYS WANTED TO DO STORIES, ESPECIALLY FEATURING

18     NETFLIX, AND IT WAS STILL REASONABLY EARLY ON IN THE VISTARA

19     USAGE AND WE REALLY -- WE WANTED TO HAVE A BIGGER STORY, AND WE

20     WERE STILL ROLLING OUT FEATURES AND FUNCTIONALITY THAT

21     ULTIMATELY WOULD BE BETTER FOR NETFLIX, BUT THE STORY WOULD

22     HAVE BEEN BETTER FOR VISTARA.

23          SO BOBBY AND I AGREED, LIKE, LET'S JUST WAIT UNTIL THE

24     PLATFORM IS EVEN BIGGER THAN IT WAS.

25     Q.   AND WOULD YOU HAVE HAD TO GET ANY KIND OF APPROVAL FOR

1    THAT?

2    A.  YES, ABSOLUTELY, I HAD TO GO THROUGH THE CORPORATE

3    COMMUNICATIONS TEAM.

4    Q.  DID YOU EVER APPROVE STATEMENTS OR LOGO -- DID YOU APPROVE

5    STATEMENTS OR LOGOS JUST ANY TIME A VENDOR ASKED?

6    A.  NO.  I DIDN'T HAVE THE AUTHORITY.

7    Q.  DID YOU EVER PROMISE LOGOS OR QUOTES IN EXCHANGE FOR STOCK

8    OPTIONS?

9    A.  NO.

10   Q.  DID VENDORS SOMETIMES PUT UP LOGOS WITHOUT SEEKING

11   PERMISSION FIRST?

12   A.  YES.  OVER THE YEARS, SEVERAL VENDORS PUT UP LOGOS AND

13   ASKED FOR FORGIVENESS LATER, BECAUSE THEY COULD HAVE IT UP FOR

14   SOME TIME UNTIL SOMEONE DISCOVERED THAT THE LOGO WAS IN USE

15   WITHOUT EXPLICIT PERMISSION.

16   Q.  YOUR UNDERSTANDING WAS THAT THAT SHOULD BE APPROVED FIRST?

17   A.  YES.  IT HAD TO GO THROUGH THE CORPORATE COMMUNICATIONS

18   AND BRANDING TEAM.

19   Q.  AND DID YOU DO THAT WITH PLATFORA WHEN YOU WERE NOTIFIED

20   OF THAT?  DID YOU INFORM THEM TO TAKE IT DOWN?

21   A.  YES, I REQUESTED THAT THEY TAKE DOWN THE LOGO.

22   Q.  IF WE COULD PLEASE TURN TO EXHIBIT 614.

23       DO YOU SEE YOUR COMMENT ABOUT "PUSHING MY TEAMS TO USE THE

24   TOOL"?

25   A.  YES.

1    Q.   WHAT DID YOU MEAN BY THIS?

2    A.   ONCE AGAIN, THIS WAS AN E-MAIL DIRECTLY FROM ME TO THE

3    VENDOR, AND USING THAT VERBIAGE TO LEVERAGE -- TO GET THEM TO

4    RESPOND TO ANY ISSUE THAT IS WE WERE HAVING.

5    Q.   WERE YOU PUSHING YOUR TEAMS TO USE SUMO LOGIC?

6    A.   NO, AND I DON'T THINK -- NO ONE TESTIFIED OR NO 360 REVIEW

7    EVER ACCUSED ME OF --

8              MR. SAMPSON:  OBJECTION, YOUR HONOR.

9              THE COURT:  SUSTAINED.

10   BY MS. JAYNE:

11   Q.   DID ANYBODY EVER COMPLAIN THAT YOU PUSHED THEM TO USE ANY

12   TOOL?

13   A.   NO.

14   Q.   DID YOU READ IN ANY 360 REVIEW ABOUT ANYONE PRESSURING --

15   ABOUT YOU PRESSURING ANYONE TO USE A TOOL?

16   A.   NO, I NEVER RECEIVED ANY SUCH FEEDBACK.

17   Q.   DID YOU HEAR ANYONE IN THIS TRIAL TESTIFY TO THAT?

18             MR. SAMPSON:  OBJECTION, YOUR HONOR.

19             THE COURT:  SUSTAINED.

20   BY MS. JAYNE:

21   Q.   LET'S TURN TO EXHIBIT 626.

22        DO YOU SEE BELOW, YOU PUT "BILL'S TEAM IS GETTING

23   EXTREMELY FRUSTRATED"?

24   A.   I DO.

25   Q.   AND DO YOU KNOW WHY YOU WERE WRITING THAT?

1    A.   YES.  ONCE AGAIN, I WANTED SUMO LOGIC TO DELIVER THE

2    GRAPHING AND VISUALIZATION FEATURES FASTER THAN THEY WERE

3    DOING.  SO THIS WAS AN E-MAIL SENT TO GET THEIR ATTENTION AND

4    PRIORITIZATION.

5    Q.   AND WAS BILL'S TEAM ACTIVELY ENGAGING SUMO LOGIC?

6    A.   YES, IT WAS PART OF OUR OVERALL SECURITY INITIATIVE, OR

7    ZERO TRUST SECURITY INITIATIVE, AND THEY DIDN'T WANT NETFLIX

8    AND THE ORGANIZATION TO BE INSECURE AND THEY WANTED TO HAVE

9    VISIBILITY, SO THIS WAS A HIGH PRIORITY TOOL AND PROJECT FOR

10   THEM.

11   Q.   DID YOU GET FEEDBACK THAT BILL DID NOT WANT TO OR DID NOT

12   LIKE SUMO LOGIC?

13   A.   NO.  BILL WAS EXTREMELY BULLISH ON IT.

14   Q.   DOES THAT MEAN POSITIVE?

15   A.   POSITIVE.  AND AT ONE POINT HE WROTE TO ME THAT HE WANTED

16   TO DOUBLE DOWN ON SUMO LOGIC.

17        MR. SAMPSON:  CALLS FOR HEARSAY.

18        THE COURT:  SUSTAINED.

19   BY MS. JAYNE:

20   Q.   IF WE COULD PLEASE TURN TO EXHIBIT 681.

21        DO YOU RECALL -- NO, 651.  SORRY.  I CAN'T READ MY OWN

22   WRITING.

23        DO YOU RECALL WHAT THE SITUATION WAS WHEN YOU FIRST SAW

24   ELASTICBOX?

25   A.   YES.  IT WAS FAIRLY EARLY IN THEIR COMPANY AND IT WAS

1    PROBABLY ONE OF THE FIRST PRESENTATIONS THEY DID AND IT WASN'T

2    VERY POLISHED.

3         AND ELASTICBOX AT THAT TIME WAS ALSO MISSING A SPECIFIC

4    FEATURE I WAS LOOKING FOR.  THAT WAS THE VM WARE INTEGRATION.

5    Q.  AND SO AFTER SEEING THAT INITIAL PRESENTATION, DID YOU

6    THINK THAT THERE COULD BE ANY INTEREST AT NETFLIX FOR IT?

7              MR. SAMPSON:  LEADING.

8              THE COURT:  SUSTAINED.

9    BY MS. JAYNE:

10   Q.  HOW DID YOU FEEL AFTER SEEING THAT FIRST PRESENTATION OF

11   ELASTICBOX WITH RESPECT TO NETFLIX?

12   A.  I BELIEVED IT HAD POTENTIAL AFTER THE FIRST MEETING.

13   Q.  WHAT DID YOU MEAN BY "I DON'T HAVE ANY COMPELLING USE

14   CASES"?

15   A.  THE CONTEXT HERE IS ANKUR WAS THEIR SALES DIRECTOR WHO

16   CAME FROM EMC, WHICH I HAD INTERACTIONS WITH BEFORE.  EMC SALES

17   PEOPLE ARE TYPICALLY VERY AGGRESSIVE, AND THIS WAS JUST A WAY

18   FOR ME TO FEND OFF AN AGGRESSIVE SALES PERSON.

19   Q.  OKAY.  BUT DID YOU LATER GET ANY MORE INFORMATION ABOUT

20   ELASTICBOX?

21   A.  YES.  AT THE REQUEST, I BELIEVE, OF ONE OF THEIR INVESTORS

22   OR POTENTIAL INVESTORS, I HAD A SUBSEQUENT MEETING WITH THE

23   TEAM IN WHICH THEY GAVE A MUCH BETTER PRESENTATION, AND THEY

24   ALSO HAD CODED UP THE VM WARE INTEGRATION THAT WE NEEDED.

25   Q.  YOU BELIEVED THAT THAT WOULD HAVE BEEN USEFUL TO NETFLIX,

1      THAT VM WARE INTEGRATION?

2      A.   YES.  IT ALSO WAS GOING TO SAVE US MONEY ON OUR VM WARE

3      CONTRACT.

4      Q.   HOW SO?

5      A.   IT WOULD ALLOW US TO MOVE AWAY FROM ONE VENDOR AS WE WERE

6      MOVING TO CLOUD, WE COULD LEVERAGE AWS INSTEAD OF VM WARE

7      RUNNING ON HARDWARE IN OUR DATA CENTER.

8      Q.   WAS VM WARE MORE EXPENSIVE THAN ELASTICBOX?

9      A.   VM WARE IS EXTREMELY EXPENSIVE, SO YES.

10     Q.   IF WE COULD PLEASE TURN TO EXHIBIT 652.

11          DO YOU SEE THAT YOU WROTE "WILL WORK ON INTRO TO INTERNAL

12     TEAM"?

13     A.   I DO, YES.

14     Q.   DID YOU BELIEVE YOU WERE OBLIGATED TO MAKE ANY KIND OF

15     INTRODUCTION TO YOUR TEAM?

16     A.   NO.  I NEVER FELT OBLIGATED MAKE AN INTRODUCTION.

17     Q.   DID YOU WANT TO MAKE AN INTRODUCTION?

18     A.   YES, I DID.

19     Q.   WHY?

20     A.   BECAUSE WE WERE LOOKING FOR WAYS TO REDUCE OUR VM WARE

21     FOOTPRINT AND SPEND, AND I THOUGHT THIS WAS ONE OF THE WAYS TO

22     DO IT, OR POTENTIALLY DO IT.

23     Q.   DID YOU INTRODUCE EVERY SINGLE COMPANY THAT YOU ADVISED?

24     FOR EXAMPLE, WE HAD EARLIER COVERED PANDESSA.  DID YOU

25     INTRODUCE EVERY SINGLE COMPANY TO NETFLIX?

1      A.   NO, I DID NOT.

2              MR. SAMPSON:  LEADING, YOUR HONOR.

3              THE COURT:  OVERRULED.

4      BY MS. JAYNE:

5      Q.   WHAT DID -- WHAT DID -- WHAT DOES AN INTRODUCTION MEAN TO

6      YOU?

7      A.   IT'S VERY INFORMAL, LIKE, TELL MY TEAM, LOOK, I LOOKED AT

8      THIS COMPANY, I THINK THE PRODUCT OR PLATFORM IS INTERESTING,

9      WHY DON'T YOU GUYS TAKE A DEEPER LOOK AND SEE IF IT CAN FIX A

10     PROBLEM FOR THE COMPANY OR ADD TO OUR EFFICIENCIES.

11          BUT I LEFT IT UP TO THEM.  SO IT WAS JUST A HANDOFF AND

12     LET THE TECHNICAL TEAM LEVERAGE THEIR EXPERTISE TO MAKE A

13     DECISION AND RECOMMENDATION.

14     Q.   WOULD THERE -- WOULD YOU AT LEAST HAVE TO HAVE SOME

15     INTEREST IN THE POTENTIAL OF WHAT -- HOW IT COULD HELP NETFLIX

16     BEFORE EVEN MAKING AN INTRODUCTION?

17             MR. SAMPSON:  SPECULATIVE.

18             THE COURT:  OVERRULED.

19             THE WITNESS:  YES.  IT HAD TO FIT INTO OUR OVERALL

20     STRATEGY WITH THE TWO OVERARCHING PILLARS OF 100 PERCENT I.T.

21     IN THE CLOUD AND ZERO TRUST SECURITY AND BE PART OF THAT

22     OVERALL STRATEGY BEFORE I MADE A -- BEFORE I FOUND IT

23     INTERESTING AND POTENTIALLY MADE AN INTRODUCTION.

24     BY MS. JAYNE:

25     Q.   AND DID YOU FEEL THAT -- DID YOU BELIEVE YOU HAD THE

1    TECH -- THANK YOU -- THE TECHNICAL EXPERIENCE TO SORT OF SORT

2    OUT WHETHER SOMETHING MIGHT BE A GOOD FIT?

3    A.   YES.  MY 20 TO 25 YEARS BEFORE THIS ROLE AT NETFLIX OF

4    BEING IN TECHNOLOGY I THINK WAS -- LED ME TO BE A CREDIBLE

5    REFERENCE AND RESOURCE TO EVALUATE.

6    Q.   WHY DID YOU -- YOU WERE ASKED ABOUT THE SECOND CONTRACT

7    WITH ELASTICBOX.  WHY DID YOU SIGN THAT?

8    A.   THAT WAS A DECISION MADE BY MY TEAM.  I SIGNED THE

9    CONTRACT, BUT IT WAS -- THEY OFFERED A SAAS SOLUTION, AND IN

10   ADDITION TO THEIR APPLIANCE THAT WE RAN ON OUR DATA CENTER, AS

11   WE WERE MIGRATING TO THE CLOUD, THE SAAS PART OF THEIR PLATFORM

12   SOLVED SOME PRETTY MASSIVE CHALLENGES FOR US.

13   Q.   DID YOU BELIEVE THAT THAT WAS CREDIBLE TO YOU, BEFORE YOU

14   SIGNED THE CONTRACT, THAT NETFLIX WAS HAVING THE PROBLEMS YOU

15   DESCRIBED.

16            MR. SAMPSON:  VAGUE.

17            THE COURT:  OVERRULED.

18            THE WITNESS:  YES, AND WE HAD MULTIPLE INTERNAL

19   DISCUSSIONS ABOUT WHAT WE WERE DOING, WHAT WE NEEDED, AND DID

20   THIS REALLY SOLVE THOSE.

21        AND THE RESPONSE WAS OVERWHELMINGLY YES.

22            MR. SAMPSON:  CALLS FOR HEARSAY.

23            THE COURT:  OVERRULED.

24   BY MS. JAYNE:

25   Q.   DID YOU EVER JUST SIGN CONTRACTS SOMEHOW ON YOUR OWN

1    WITHOUT ANY DISCUSSIONS WITH ANYBODY?

2    A.   NO.  THAT WOULDN'T HAVE BEEN POSSIBLE.  AS I SAID, WE

3    REVIEWED THEM WEEKLY OR BI-WEEKLY WITH AN FP&A RESOURCE, IN

4    ADDITION TO SENDING IT TO THE CONTRACTS TEAM.

5    Q.   BUT EVEN ASIDE FROM THE PEOPLE ON THE CONTRACTS TEAM, AS

6    FAR AS ENGINEERS, DID YOU EVER COVERTLY START A CONTRACT

7    WITHOUT OTHER PEOPLE'S INPUT?

8    A.   NO, I WOULDN'T HAVE DONE THAT.  SOMEBODY HAD TO DEPLOY IT

9    OR KNOW ABOUT THE SOLUTION.

10   Q.   YOU WERE ASKED ABOUT AN E-MAIL WITH PLATFORA I THINK IN

11   TERMS OF YOU HAD RESPONDED, I THINK IT'S -- 310, CAN WE TURN TO

12   THAT, PLEASE.

13        SOMEWHERE ON HERE, I THINK, MAYBE PAGE 2, YOU SAID NETFLIX

14   AND ADVISORY CAPACITY.

15        HOW DID YOU VIEW YOUR ROLE AT NETFLIX WITH RESPECT TO

16   PLATFORA?

17   A.   IT WAS REALLY ABOUT ME BEING THE AGGREGATOR OF FEEDBACK

18   AND LEVERAGING MY ROLE TO GET ATTENTION WHEN NEEDED, BUT BEING

19   INCLUSIVE, LETTING THE TEAMS MAKE THEIR RECOMMENDATION, USE IT.

20   IF I NEEDED TO ESCALATE SOMETHING TO THE PLATFORA TEAM, THAT'S

21   WHEN I STEPPED IN.  I THINK YOU SAW THAT IN SOME OF MY

22   INCLUSIVE E-MAILS.

23   Q.   DID YOU GENERALLY TRY TO INCLUDE MEMBERS OF YOUR TEAM'S

24   FEEDBACK, AND MEMBERS OF YOUR TEAM IN COMMUNICATIONS?

25   A.   YES.  IT WAS ALWAYS A COLLABORATIVE EFFORT, AND I ALWAYS

1       INCLUDED THE TEAM IN DISCUSSIONS OR LOOPED THEM IN AFTER IF I

2       HAD A ONE-ON-ONE DISCUSSION WITH SOMEBODY.

3       Q.   WHY DID YOU -- DID YOU CONSIDER TONY RALPH'S OPINION?

4       A.   ALWAYS, YES.

5       Q.   WHY DID YOU SPEND SO MUCH TIME INCLUDING HIS OPINIONS?

6               MR. SAMPSON:  COUNSEL IS TESTIFYING.

7               MS. JAYNE:  STRIKE THAT LAST PART.

8       BY MS. JAYNE:

9       Q.   WHY DID YOU -- WHY DID YOU MAKE SO MUCH EFFORT TO GET HIS

10      OPINION AS WELL.

11      A.   IT WAS ULTIMATELY THE AD TECH CHARTER, WHICH WAS GIVEN TO

12      ME, I HIRED TONY SPECIFICALLY TO RUN SOME OF THE STRATEGY

13      AROUND THAT, AND I WANTED HIM TO HAVE A VOICE IN THE STRATEGY.

14      Q.   DID HE EVER TELL YOU THAT HE DIDN'T WANT IT?

15              MR. SAMPSON:  CALLS FOR HEARSAY.

16              THE COURT:  SUSTAINED.

17      BY MS. JAYNE:

18      Q.   NOW, IN TERMS -- AND THEN HOW DID YOU VIEW YOUR ROLE AS AN

19      ADVISOR TO PLATFORA?

20      A.   COMPLETELY SEPARATE.  MY ROLE TO PLATFORA AS ADVISOR WAS

21      TO GIVE THEM MY PERSPECTIVE ON WHERE -- WHAT FEATURES THEY

22      SHOULD ADD AND WHAT PRIORITY IN THEIR PRODUCT ROADMAP, DO

23      POTENTIAL CUSTOMER REFERENCE CALLS, TALK TO INVESTORS, AND WITH

24      SOME ADVISORY ROLES, INCLUDING PLATFORA, EVEN HELP THEM WITH

25      HIRING OR FEEDBACK ON INDIVIDUALS THEY HAD HIRED, LIKE

```
1        MR. ROSSI.

2    Q.   IF WE COULD PLEASE TURN TO EXHIBIT 320.

3         THIS WAS BROUGHT UP ON CROSS.  DO YOU SEE THAT YOU, YOU

4    E-MAILED JAN AND YINGKUAN?

5    A.   YES.

6    Q.   AND YOU NOTED THAT YOU HAD A MEETING WITH, I GUESS,

7    PLATFORA?

8    A.   CORRECT.

9    Q.   AND WOULD YOU HAVE THEN TOLD YINGKUAN AND JAN ABOUT THE

10   MEETING WITH PLATFORA?

11   A.   YES.  THAT'S WHY I LOOPED IN JAN, TONY, AND YING TO LET

12   THEM KNOW I MET WITH PLATFORA AND THAT WE SHOULD MEET AND

13   DISCUSS WHAT I TALKED ABOUT.

14   Q.   IF WE COULD PLEASE TURN TO EXHIBIT 342.  IF WE COULD START

15   WITH PAGE 2.

16        DO YOU SEE THIS IS YOU WRITING -- ARE YOU WRITING TO

17   BEN WERTHER ON JANUARY 9TH, 2014?

18   A.   YES, THAT WAS MY E-MAIL TO BEN.

19   Q.   AND THERE'S A COMMENT THERE, "RYAN ALSO REQUESTING

20   ACCOUNTS FOR ALEX AND KATHY."

21        DO YOU SEE THAT YOU WROTE THAT?

22   A.   I DO, YES.

23   Q.   WHAT DID YOU MEAN BY THAT IN 2014?

24   A.   SO RYAN, WHO WAS ON GAGAN HASTEER'S TEAM, WAS WORKING WITH

25   PLATFORA AND HELPING ON A TECHNICAL BASIS.  HE WAS GETTING
```

1    ADDITIONAL ACCOUNTS FOR -- I BELIEVE THEY WERE EITHER PEOPLE IN

2    MARKETING OR ON HIS TEAM TO START -- TO CONTINUE WORKING WITH

3    PLATFORA.

4    Q.   DID THIS SUGGEST TO YOU AT THIS TIME THAT THERE WAS

5    ENGAGEMENT AND INTEREST?

6              MR. SAMPSON:  LEADING.

7              THE COURT:  SUSTAINED.

8    BY MS. JAYNE:

9    Q.   WAS THERE INTEREST FROM YOUR PERSPECTIVE IN JANUARY 2014

10   OF PLATFORA AT NETFLIX?

11   A.   YES, IT WENT BEYOND INTEREST.  IT WAS ACTUALLY BEING USED.

12   WE WERE WORKING TO GET THE INSIGHTS INTO OUR DIGITAL AD

13   CAMPAIGNS THAT WE SPOKE ABOUT.

14   Q.   CAN WE PLEASE TURN TO PAGE 1.

15        THERE'S A COMMENT SOMEWHERE HERE, YOU SAID BEING

16   DRACONIAN.  OH, THERE IT IS AT THE TOP, "CAN ONLY DO SO MUCH

17   WITHOUT HAVING A CONFLICT OR BEING DRACONIAN."

18        DID YOU -- WELL, WHAT DID YOU MEAN BY THAT?

19   A.    IT MEANT I COULDN'T PUSH YING, JAN, OR ANYBODY ELSE TO USE

20   PLATFORA WITHOUT THEIR, THEIR BUY IN ON IT, AND I TRIED TO KEEP

21   MY ROLE AS AN ADVISOR AND THE BUSINESS RELATIONSHIP AT NETFLIX

22   COMPLETELY SEPARATE.  SO I COULDN'T PUSH HIM BECAUSE I WAS AN

23   ADVISOR TO A GIVEN COMPANY.  HE NEEDED TO BE -- TO BELIEVE IN

24   IT AND BE BENEFITING FROM THE PRODUCT.

25   Q.   WERE YOU COGNIZANT OF SORT OF THE LINE BETWEEN ADVISOR AND

1      WHATEVER, EMPLOYEE AT NETFLIX?

2      A.   YES, ALWAYS.  I TRIED TO KEEP UP AN INTERNAL FIREWALL

3      BETWEEN THE TWO.

4      Q.   DO YOU BELIEVE YOU WERE PUBLIC ABOUT YOUR ADVISOR ROLE AT

5      PLATFORA?

6      A.   YES, I BELIEVE I WAS VERY PUBLIC.

7      Q.   DID YOU -- DO YOU KNOW IF YOU EVER TOLD ANYONE ON YOUR

8      TEAM THAT YOU WERE AN ADVISOR TO PLATFORA?

9      A.   I DON'T SPECIFICALLY RECALL TELLING ANYONE, BUT I BELIEVE

10     IT WAS A WELL-KNOWN FACT.

11     Q.   WHY DID YOU BELIEVE THAT IT WAS NOT -- THERE WAS AN E-MAIL

12     MENTION ABOUT WHEN YOU WERE REMOVING YOURSELF FROM THE ADVISORY

13     BOARD AT PLATFORA.

14          LET'S TURN TO EXHIBIT 348.  THAT'S EASIER.

15          DO YOU REMEMBER BEING ASKED ABOUT THIS?

16     A.   YES, I DO.

17     Q.   AND WHAT DID YOU MEAN BY THE STATEMENT "I CAN'T SERVE IN A

18     CAPACITY THAT I FEEL BENEFITS THE COMPANY"?

19     A.   THAT WAS AN ATTEMPT AT A NICE WAY OF INFORMING MR. WERTHER

20     THAT I DIDN'T REALLY ENJOY WORKING WITH HIM.  I THINK I SAID IN

21     MY DIRECT TESTIMONY, PART OF MY ADVISORY BOARD IS I REALLY NEED

22     TO ENJOY WORKING WITH THE LEADERSHIP TEAM AND BEN AND I HAD HAD

23     OUR DIFFERENCES OVER THE MONTHS ABOUT THEIR PRODUCT STRATEGY,

24     HIS CHOICES IN SOME HIRING DECISIONS HE MADE AND OTHERS, AND

25     THIS WAS JUST A NICE WAY OF EXITING WITHOUT GETTING INTO THOSE

1      DETAILS AND MAKING IT PERSONAL.

2      Q.  I'M NOT GOING TO GO BACK TO THAT E-MAIL WE JUST LOOKED AT,

3      BUT DID YOU VOICE AN OPINION WITH RESPECT TO ONE OF HIS HIRES?

4      A.  YES, I DID.  I SPECIFICALLY TOLD HIM AFTER MY MEETING --

5              MR. SAMPSON:  CALLS FOR -- THE ANSWER CONTAINS

6      HEARSAY, YOUR HONOR.

7              THE COURT:  SUSTAINED.

8      BY MS. JAYNE:

9      Q.  DID YOU OFFER ANY OPINION AS TO ONE OF BEN WERTHER'S

10     EMPLOYEES?

11     A.  YES, I DID.

12     Q.  WHO WAS THAT?

13     A.  MIKE ROSSI.

14     Q.  DID YOU OFFER FAVORABLE OR NEGATIVE FEEDBACK AT THAT

15     POINT?

16     A.  EXTREMELY NEGATIVE.

17     Q.  AND DID MR. ROSSI -- DO YOU KNOW IF HE GOT TERMINATED FROM

18     PLATFORA?

19     A.  HE DID A FEW MONTHS LATER.

20     Q.  AND AT THIS TIME, APRIL 1ST -- BY APRIL 1ST, 2000 -- WELL,

21     IF WE COULD PLEASE TURN TO EXHIBIT 1111.

22         YOU WERE ASKED ABOUT THIS PARTICULAR E-MAIL ON CROSS AND

23     THE INCLUSION OF YINGKUAN AS FAR AS A MESSENGER.

24         DO YOU REMEMBER BEING ASKED ABOUT THAT?

25     A.  YES, I DO.

1    Q.   AND WHAT DID YOU MEAN BY THIS?  GIVE US CONTEXT ABOUT

2    THIS?

3    A.   THIS GOES BACK TO THE DIFFERENCE OF OPINION BETWEEN

4    MR. WERTHER AND I AND HE WAS UPSET THAT THEY DIDN'T HEAR IT

5    DIRECTLY FROM ME, THEY GOT AN E-MAIL FROM YINGKUAN INSTEAD OF

6    FROM ME, AND THEY TOOK A TYPICAL CHAIN OF COMMAND VIEW THAT THE

7    MESSAGE SHOULD ALWAYS COME FROM THE HEAD OF THE ORGANIZATION,

8    NOT AN INDIVIDUAL MANAGER OR A GIVEN CONTRIBUTOR, AND THEY WERE

9    UPSET ABOUT THAT.

10   Q.   DID YINGKUAN -- DID YOU HAVE A DISCUSSION WITH YINGKUAN

11   ABOUT TERMINATING THE PLATFORA CONTRACT?

12   A.   YES, I -- YINGKUAN, AND I BELIEVE JAN, AND PERHAPS

13   TONY RALPH, WE ALL HAD AN IN-PERSON DISCUSSION BEFORE THAT

14   E-MAIL WAS EVER SENT.

15   Q.   AND DID YINGKUAN HAVE AUTHORITY TO SEND SUCH AN E-MAIL?

16   A.   YEAH.  ANYBODY HAD THE AUTHORITY, AND THERE WAS NO ISSUE

17   INTERNALLY WITH ME OR WITH NETFLIX ABOUT IT.  THIS WAS

18   PLATFORA'S PERSPECTIVE AND FRUSTRATION.

19   Q.   WHAT WAS -- WHAT DID YOU -- IF WE COULD TURN TO PAGE 2,

20   PLEASE.

21        WHAT WAS THE -- THERE WAS A REFERENCE TO CLEANLY AND

22   POLITICS.  I CAN'T REMEMBER WHAT PAGE THAT WAS ON, BUT YOU WERE

23   ASKED ABOUT THAT.

24        DO YOU RECALL -- WHAT WOULD YOU HAVE MEANT BY THAT?

25   A.   SO THE CLEANLY PORTION WOULD HAVE BEEN NETFLIX WAS UNDER A

1     BINDING LEGAL CONTRACT, PLATFORA HAD MET THE 3.0 FEATURES, SO

2     NETFLIX WAS ULTIMATELY ON THE HOOK TO PAY FOR THE THREE YEAR

3     AGREEMENT.

4          AND CLEANLY WOULD BE LET'S AGREE FOR A TERMINATION FEE

5     THAT DOESN'T HAVE TO INVOLVE LITIGATION AND GETTING LEGAL

6     INVOLVED FOR A CONTRACT DISPUTE WHICH WOULD HAVE MOSTLY LIKE

7     BEEN MORE COSTLY.

8     Q.   AND WHAT WAS MEANT BY COMPLEX POLITICS?

9     A.   THAT WAS WRITTEN BY MR. WERTHER WHO WAS REFERRING TO

10    KURT BROWN AND THEIR INTERACTIONS AND VIEWS OF KURT AND KURT --

11    MR. KURT BROWN AND MYSELF.

12    Q.   WERE THERE SOME SORT OF, I GUESS, OVERLAPPING AREAS OF

13    RESPONSIBILITY WHEN IT CAME TO ADVERTISING?

14    A.   YES.  THERE WERE PROBABLY THREE GROUPS THAT ALL HAD A

15    PORTION OF THE ADVERTISING TECH INITIATIVE, AND THERE WAS A

16    FAIR AMOUNT OF INTERNAL POLITICS AND LAND GRABBING GOING ABOUT

17    AND TURF WARS FIGHTING OVER THAT FOR VARIOUS REASONS.

18    Q.   THANK YOU.

19         TO THE BEST OF YOUR KNOWLEDGE, DID NUMERIFY BECOME A

20    CONTRACTOR TO YAHOO?

21    A.   NO, THEY DID NOT.

22    Q.   WHEN -- IF WE COULD PLEASE TURN TO 463.

23         DO YOU RECALL BEING ASKED ABOUT SETTING UP AS A VENDOR?

24    A.   YES.

25    Q.   WAS THIS A UNILATERAL DECISION ON YOUR PART, THAT THEY

1    WERE GOING TO BE SET UP AS A VENDOR?

2    A.   NO.  THIS WAS A RESULT OF A SIX-PLUS MONTH POC WITH THE

3    SECURITY TEAM AND OTHERS.

4    Q.   SO WHAT HAD TO HAPPEN BEFORE YOU COULD REQUEST THAT A

5    VENDOR BE SET UP WITH SYLVIA SUNDHOLM?

6    A.   IF WE WERE IN A POC OR PILOT, THEY FIRST HAD TO MEET THE

7    ACCEPTANCE CRITERIA SET FORTH BY THE TEAMS RUNNING THE PILOT.

8    THEN THE SUBSEQUENT NEGOTIATION AND CONTRACT.

9        BUT IT HAD TO GO THROUGH THAT PHASE OF TESTING AND

10   APPROVAL.

11   Q.   IF WE COULD PLEASE TURN TO EXHIBIT 510.

12       WERE YOU AN ADVISOR TO ANY COMPANIES THAT AMARJIT GILL WAS

13   INVOLVED IN OTHER THAN MAGINATICS?

14   A.   YES, THERE WERE AT LEAST TWO OTHERS.

15   Q.   AND DO YOU KNOW WHO AMIT IS?

16   A.   YES, AMIT PARIKH, WHO IS THE CEO OF OUTFORCE, WHICH IS

17   THEY PROVIDE FRACTIONAL SERVICES TO COMPANIES, LIKE A

18   FRACTIONAL CFO, CHIEF FINANCIAL OFFICER.

19   Q.   AND DID YOU ALSO ADVICE OUT FORCE?

20   A.   NOT DIRECTLY.  THERE WAS NO ADVISORY RELATIONSHIP WITH

21   OUTFORCE.

22   Q.   WERE YOU RECEIVING ANY STOCK OPTIONS FROM OTHER COMPANIES

23   THAT YOU ADVERTISED THAT MR. AMARJIT GILL WAS INVOLVED IN?

24   A.   YES, I WAS AN ADVISOR AND HAD OPTION GRANTS FROM AT LEAST

25   TWO OTHER COMPANIES THAT MR. GILL WAS INVOLVED WITH THAT DID

1      NOT HAVE CONTRACTS AT NETFLIX.

2      Q.   OKAY.  AND SO DO YOU RECALL THAT THAT WAS IN THIS TIME

3      PERIOD, 2013?

4      A.   YES, IT WAS.

5      Q.   IF WE COULD PLEASE TURN TO EXHIBIT 1051.  IF WE COULD TURN

6      TO THE BOTTOM.  DO YOU SEE AN E-MAIL FROM ALEXIS GORBANSKY TO

7      YOU AND DAVID?

8      A.   YES, I DO.

9      Q.   WHO'S DAVID?

10     A.   THAT WOULD BE DAVID BURT, WHO WAS A V.P. OF FP&A,

11     FINANCIAL PLANING AND ANALYSIS.

12     Q.   AND WHAT'S THE DATE OF THAT E-MAIL?

13     A.   MAY 23RD, 2013.

14     Q.   AND WHAT IS THE NATURE OF -- WE CAN LOOK AT THE VERY

15     BOTTOM LINE.  WHAT IS BEING SENT TO YOU BY DAVID?

16     A.   THIS WAS AT THE END OF THE EVALUATION TEAM THAT WAS DONE

17     BY DAVID BURT AND HIS TEAM, AND THIS WAS MOVING FORWARD INTO

18     CONTRACT FROM PILOT.

19     Q.   SO IS THE ATTACHED AGREEMENT BEING SENT TO YOU AND DAVID

20     ON MAY 23RD, 2013?

21     A.   YES, IT WAS.

22     Q.   IF WE COULD PLEASE TURN TO EXHIBIT 555.

23          YOU WERE ASKED ABOUT THIS E-MAIL, MAY 31ST, 2013.

24          DO YOU SEE THAT?

25     A.   YES.

1      Q.   AND IT WAS DOCUMENTING A MEETING THAT WAS HAD?

2      A.   YES.

3      Q.   WAS THAT MEETING AFTER THE E-MAIL WE JUST SAW WHERE THE

4      CONTRACT WAS SENT TO YOU AND DAVID?

5      A.   YES.  IT APPEARS TO BE SIX OR SEVEN DAYS AFTER.

6      Q.   SO WERE YOU INVITED TO THE ADVISORY BOARD IN THIS E-MAIL

7      ON MAY 31ST, 2013?

8      A.   THIS WAS THEIR REQUEST, OR THEY WOULD BE HONORED IF I

9      CONSIDERED JOINING.

10     Q.   OKAY.  AND WAS THIS AND THE MEETING AFTER THE DOCURATED

11     HAD ALREADY -- AND NETFLIX HAD ALREADY AGREED TO MOVE INTO

12     CONTRACT?

13     A.   YES, AND THIS WAS AFTER MR. BURT AND I DISCUSSED THE

14     CONTRACT AS WELL.

15     Q.   OKAY.  IF WE COULD PLEASE TURN TO 1163.  IF WE COULD

16     PLEASE TURN TO PAGE 2.

17          THIS IS A -- DO YOU RECOGNIZE BEING ASKED ABOUT THIS

18     ONE-ON-ONE WITH SABRY?

19     A.   YES, I DO.

20     Q.   AND DO YOU SEE THE REFERENCE TO SHERLOCK?

21     A.   I DO.

22     Q.   DO YOU KNOW WHAT SHERLOCK IS, OR WAS?

23     A.   I DO.  IT WAS A, AN APPLICATION FOR THE LEGAL TEAM TO

24     MANAGE CONTRACTS.

25     Q.   AND HOW, IF AT ALL, DOES THAT RELATE TO DOCURATED?

1    A.   IT WAS COMPLETELY UNRELATED.  DOCURATED WAS NEVER USED BY

2    THE LEGAL TEAM OR FOR CONTRACTS.

3    Q.   SO WAS -- TO YOUR UNDERSTANDING, WAS SHERLOCK, COULD IT

4    HAVE BEEN A REPLACEMENT OR A SUBSTITUTE FOR DOCURATED?

5    A.   NO.  IT WAS -- THEY WERE COMPLETELY SEPARATE.  AND NETFLIX

6    WOULD NOT HAVE DEVELOPED THE DOCURATED PLATFORM AS PART OF

7    SHERLOCK.  THAT WOULD NOT HAVE BEEN A GOOD BUILD OR BUY

8    DECISION.

9    Q.   OKAY.  SO SHERLOCK, TO YOUR UNDERSTANDING, WAS INTENDED

10   FOR LEGAL?  IT HAD SOMETHING TO DO --

11           MR. SAMPSON:  LEADING.

12           THE COURT:  SUSTAINED.

13   BY MS. JAYNE:

14   Q.   DID SHERLOCK HAVE SOMETHING TO DO WITH THE LEGAL

15   DEPARTMENT?  DID SHERLOCK HAVE SOMETHING TO DO WITH LEGAL?

16   A.   SHERLOCK WAS AN APPLICATION THAT ALLOWED LEGAL TO

17   EFFICIENTLY MANAGE VERSIONS OF CONTRACTS AND GO THROUGH

18   HISTORY.

19   Q.   AND WAS DOCURATED BROUGHT IN FOR LEGAL TO YOUR KNOWLEDGE?

20   A.   NOT DURING MY TIME.

21   Q.   DID YOU UNDERSTAND DOCURATED TO BE A SOFTWARE AS A

22   SERVICE?

23   A.   YES, IT WAS A CLOUD SOFTWARE AS A SERVICE PLATFORM.

24   Q.   AND WHAT IS THIS -- WE SEE, BELOW SHERLOCK, ATEN.  WHAT IS

25   THAT?

1    A.   THAT WAS THE INTERNALLY DEVELOPED NAME, ATEN, THAT SERVED

2    AS A DIGITAL ASSET MANAGEMENT SOLUTION FOR THE CREATIVE

3    MARKETING TEAM TO MANAGE ASSETS LIKE LOGOS AND SCREENSHOTS AND

4    OTHER DIGITAL CONTENT.

5    Q.   HOW, IF AT ALL, DID DOCURATED RELATE TO ATEN?

6    A.   DOCURATED WAS BEING INTEGRATED AS THE FOUNDATION FOR ATEN

7    TO MANAGE ALL OF THOSE DIGITAL ASSETS, WHICH IS PRECISELY WHAT

8    THE DOCURATED PLATFORM WAS DEVELOPED TO DO IS MANAGING DIGITAL

9    ASSETS.

10   Q.   AND WHILE YOU WERE AT NETFLIX, DID YOU CANCEL DOCURATED?

11   A.   NO.

12   Q.   THANK YOU.

13        DID YOU EVER RECEIVE -- YOU WERE ASKED ABOUT SOME WINE.

14   DID YOU EVER RECEIVE WINE AND GIFTS FROM VARIOUS VENDORS?

15   A.   YES, I DID.

16   Q.   AND WHAT DID YOU DO WHEN YOU RECEIVED THOSE?

17   A.   THE GIFTS THAT I RECEIVED AT THE NETFLIX OFFICE, I BROUGHT

18   IN TO MY DIRECTORS OR MANAGER'S MEETING AND WE RAFFLED THEM OFF

19   OR HAD SOME GAME TO FIGURE OUT WHO WON THAT PRIZE.

20   Q.   DID YOU RAFFLE OFF SOMETHING THAT YOU WOULD HAVE

21   CONSIDERED A PERSONAL GIFT?

22   A.   NO.

23   Q.   DO YOU RECALL A DINNER MEETING WITH FRANK SLOOTMAN?

24   A.   I RECALL AT LEAST TWO DINNERS AT WHICH MR. SLOOTMAN AND I

25   WERE AT.  I DON'T SPECIFICALLY RECALL --

1    Q.   DID YOU HEAR MR. SLOOTMAN TESTIFY?

2    A.   I DID.

3          MR. SAMPSON:  BEYOND THE SCOPE, YOUR HONOR.

4          THE COURT:  IT IS BEYOND THE SCOPE.

5          MS. JAYNE:  OH.

6    Q.   LET'S TURN TO EXHIBIT 650.

7          DO YOU RECALL AN E-MAIL WHERE -- THAT WAS DISCUSSED ON

8    CROSS REGARDING PERCENTAGE POINTS?

9    A.   YES.

10   Q.   DID THAT INQUIRY COME FROM MR. SLOOTMAN OR A PROPOSAL FROM

11   YOU TO MR. SLOOTMAN?  AND IF YOU REMEMBER THE E-MAIL?  I DON'T

12   HAVE IT.

13   A.   MR. SLOOTMAN INQUIRED WHAT MY TYPICAL ADVISORY BOARD ROLE

14   LOOKED LIKE AND THE EQUITY AMOUNT.

15   Q.   SO DID HE REACH OUT TO YOU FOR THAT INFORMATION?

16   A.   HE DID.

17   Q.   AND YOUR -- DID YOUR ORIGINAL E-MAIL TO HIM HAVE ANYTHING

18   TO DO WITH BEING AN ADVISOR OR GETTING STOCK OPTIONS FROM

19   MR. SLOOTMAN?

20   A.   NO.  MY ORIGINAL E-MAIL TO MR. SLOOTMAN WAS ABOUT I DID A

21   REFERENCE CALL FOR SERVICENOW WITH THE UNITED STATES POSTAL

22   SERVICE AND IT WAS JUST FOLLOWING UP SAYING YOU SHOULD GO CLOSE

23   U.S.P.S.

24   Q.   OKAY.  DID YOU ASK FOR ANYTHING IN EXCHANGE FOR MAKING

25   THAT CALL?

1          MR. SAMPSON:  BEYOND THE SCOPE, YOUR HONOR.

2          THE COURT:  IT IS BEYOND THE SCOPE.

3          MS. JAYNE:  ALL RIGHT.  THANK YOU.

4          THE COURT:  IS IT POSSIBLE TO FINISH IN A FEW MINUTES

5     WITH THIS WITNESS BEFORE LUNCH?

6          MR. SAMPSON:  I THINK SO.

7          THE COURT:  OKAY.  LET'S DO THAT.

8          RECROSS FOR THIS WITNESS.

9                          **RECROSS-EXAMINATION**

10    BY MR. SAMPSON:

11    Q.   YOU TESTIFIED ON REDIRECT THAT YOU REACHED OUT TO PLATFORA

12    TO HAVE THEM TAKE DOWN THE LOGO, THE NETFLIX LOGO; CORRECT?

13    A.   CORRECT.

14    Q.   THAT WAS AFTER GAGAN HASTEER HAD ASKED YOU ABOUT THE

15    NETFLIX LOGO ON THEIR SITE?

16    A.   I DON'T RECALL IF IT WAS GAGAN OR -- I DON'T RECALL WHO

17    ASKED ME ORIGINALLY.

18    Q.   WAS THAT AFTER TONY RALPH ASKED YOU TO HAVE THEM TAKE IT

19    DOWN?

20    A.   I DON'T RECALL WHO ASKED ME ORIGINALLY TO TAKE IT DOWN.

21    Q.   YOU DON'T RECALL WHETHER KURT BROWN ALSO ASKED YOU TO TAKE

22    IT DOWN GIVEN LIMITED TO NO USAGE?

23    A.   I RECALL KURT BROWN ASKING, YES.

24    Q.   AND HE FOLLOWED UP WITH YOU IN JANUARY 2014?

25    A.   HE E-MAILED ME IN JANUARY 2014, YES.

1    Q.  IN EXHIBIT 1051 WHEN YOU WERE SETTING UP THE MEETING WITH

2    IRENE TSERKOVNY AND ALEXIS GORBANSKY, DID YOU NOT INCLUDE

3    DAVID BURT IN THE MEETING ARRANGEMENTS; CORRECT?

4         MS. JAYNE:  OBJECTION.  MISSTATES TESTIMONY.

5    BY MR. SAMPSON:

6    Q.  WELL, THE TESTIMONY WAS ABOUT THE BOTTOM OF THE E-MAIL.

7         THE COURT:  OVERRULED.

8    BY MR. SAMPSON:

9    Q.  YOU DID NOT INCLUDE MR. BURT IN YOUR ARRANGEMENTS ABOUT

10   THE TIME AND PLACE OF THE MEETING?

11   A.  MR. BURT WAS IN THE BEVERLY HILLS OFFICE, SO, NO, I DID

12   NOT.

13   Q.  106 QUICKLY.  WHICH HAS BEEN ADMITTED, I BELIEVE?

14        THE CLERK:  YES.

15   BY MR. SAMPSON:

16   Q.  THIS IS AN E-MAIL BETWEEN YOU AND VARMA KUNAPARAJU

17   JANUARY 17, 2012.

18        DO YOU SEE THAT?

19   A.  YES, I DO.

20   Q.  IT REFERENCES A MEETING THAT DAY?

21        MS. JAYNE:  OBJECTION.  BEYOND THE SCOPE OF CROSS.

22        MR. SAMPSON:  NO.  SHE BROUGHT UP THIS DOCUMENT,

23   YOUR HONOR.

24        THE COURT:  SUSTAINED.

25        MS. JAYNE:  I DIDN'T BRING IT UP.

1           THE COURT:  I'M SORRY.  IT'S OVERRULED.

2           MR. SAMPSON:  OH, I'M SORRY.  LET ME -- I CAN GET

3    THERE, YOUR HONOR.

4    Q.  DID YOU -- DID YOU SEND IN THE PAPERWORK FOR UNIX LLC

5    AFTER JANUARY 17TH, 2012?

6    A.  I DON'T RECALL THE SPECIFIC DATE I SENT IN THE LLC

7    PAPERWORK, OR FILED THE LLC PAPERWORK.

8    Q.  WHEN YOU DID THE ONELOGIN VIDEO WITH OTHER PEOPLE FROM

9    CONTRACTS AND ELSEWHERE, DID YOU TELL ANYONE ELSE AT NETFLIX

10   THAT YOU WERE GETTING SHARES IN ONELOGIN?  OPTIONS?

11   A.  NO.  I ASSUMED EVERYONE KNEW THAT ADVISORS WERE

12   COMPENSATED WITH STOCK OPTIONS.

13   Q.  AND YOU TESTIFIED THAT YOU WERE EXCITED ABOUT YOUR

14   ONELOGIN ADVISORY AGREEMENT BECAUSE IT WAS THE FIRST ONE YOU

15   DID?

16   A.  YES.

17   Q.  IN YOUR EXCITEMENT, DID YOU TELL MR. HASTINGS THAT YOU

18   WERE BEING COMPENSATED BY -- WITH OPTIONS IN ONELOGIN?

19   A.  HIS REACTION ABOUT THE ADVISOR --

20   Q.  YES OR NO, MR. KAIL?

21   A.  NO.

22           MR. SAMPSON:  NO FURTHER QUESTIONS.

23           THE COURT:  ANYTHING ELSE FOR THIS WITNESS?

24           MS. JAYNE:  NO.  THANK YOU.

25           THE COURT:  MR. KAIL, THANK YOU FOR YOUR TESTIMONY.

1    YOU MAY STEP DOWN.

2         ALL RIGHT.  WE HAVE REACHED THE LUNCH HOUR.  WE'LL TAKE

3    OUR LUNCH HOUR UNTIL 1:00 O'CLOCK.

4         LET ME JUST ASK, IS THERE ANY MORE WITNESSES FOR THE

5    DEFENSE?

6              MS. JAYNE:  NO, YOUR HONOR.

7              THE COURT:  DOES THE DEFENSE REST?

8              MS. JAYNE:  YES, THE DEFENSE RESTS.  THANK YOU.

9              THE COURT:  AND WILL THERE BE A REBUTTAL CASE BY THE

10   GOVERNMENT?

11             MR. SAMPSON:  CAN WE RESPOND TO THE COURT AFTER THE

12   LUNCH BREAK, YOUR HONOR?

13             THE COURT:  YES, YOU MAY.

14             MR. SAMPSON:  THANK YOU.

15             THE COURT:  ALL RIGHT.  I'LL SEE YOU ALL AT 1:00

16   O'CLOCK.

17             THE CLERK:  COURT IS IN RECESS.

18        (THE LUNCH RECESS WAS TAKEN FROM 12:01 P.M. UNTIL 1:04

19   P.M.)

20

21

22

23

24

25

1           **AFTERNOON SESSION**

2           (JURY IN AT 1:04 P.M.)

3           THE COURT:  GOOD AFTERNOON, EVERYONE.  PLEASE BE

4      SEATED.

5           WE'RE BACK ON THE RECORD WITH ALL COUNSEL AND PARTIES ARE

6      HERE, AND ALL OF OUR JURORS ARE HERE AS WELL.

7           MR. SAMPSON, WILL THE GOVERNMENT BE PRESENTING A REBUTTAL

8      CASE?

9           MR. KALEBA:  NO, YOUR HONOR.  THE GOVERNMENT RESTS.

10          THE COURT:  ALL RIGHT.  THANK YOU.

11          ALL RIGHT.  LADIES AND GENTLEMEN, WE HAVE NOW -- I'VE GOT

12     THIS WALL IN FRONT OF ME.  THIS IS GOING TO BE HARD.  I'VE BEEN

13     SITTING BACK FOR A WHILE.

14          WE HAVE NOW REACHED THE CONCLUSION OF THE PRESENTATION OF

15     EVIDENCE TO YOU.  I'M GOING TO MOVE DIRECTLY INTO JURY

16     INSTRUCTIONS, AND THE ATTORNEYS ARE GOING TO MAKE THEIR FINAL

17     CLOSING ARGUMENTS TO YOU THIS AFTERNOON.

18          I THINK THAT'S GOING TO TAKE US TO THE END OF THE DAY, SO

19     YOU WON'T ACTUALLY BEGIN YOUR DELIBERATIONS UNTIL MONDAY

20     MORNING.  BUT I WANT TO TAKE ADVANTAGE OF THE TIME, YOU'RE

21     ALREADY HERE, AND WE'LL KEEP THE CASE MOVING ALONG.

22          SO LET ME JUST EXPLAIN THIS A LITTLE BIT.

23          YOU HEARD ME READ JURY INSTRUCTIONS AT THE BEGINNING, AND

24     AS I SAID TO YOU, YOU WILL BE GETTING A WRITTEN COPY OF THEM TO

25     TAKE INTO THE JURY ROOM.

1          I AM REQUIRED TO READ THEM, AND I'M SORRY, THAT MEANS I

2     KIND OF BURY MY FACE IN THE INSTRUCTIONS.  BUT I -- I'M NOT --

3     THEY'RE CAREFULLY DRAFTED, AND I WOULDN'T WANT TO MISSTATE THE

4     LAW TO YOU, SO I'M GOING TO READ THEM.

5          WHEN I'M -- I'M GOING TO STOP READING RIGHT BEFORE I TELL

6     YOU WHAT YOU ACTUALLY DO IN THE JURY ROOM.  SO IT'S SORT OF --

7     IT'S NOT A BIG CLIFFHANGER, BUT IT'S THE QUESTION I KNOW YOU'LL

8     HAVE ON YOUR MIND.  I'M GOING TO GIVE YOU THOSE INSTRUCTIONS

9     RIGHT BEFORE YOU BEGIN YOUR DELIBERATION.  IT MAKES MORE SENSE.

10          BUT I'M GOING TO GIVE YOU THE INSTRUCTIONS ON THE LAW THAT

11     WILL ASSIST YOU IN CONSIDERING THE CLOSING ARGUMENTS OF THE

12     ATTORNEYS.

13          THEY MAY ALSO BRING SOME OF THESE INSTRUCTIONS BACK IN

14     THEIR CLOSING ARGUMENTS FOR YOU TO CONSIDER, AND I ALWAYS THINK

15     IT HELPS IF YOU'VE HEARD ME RECITE THEM FIRST SO THAT YOU DON'T

16     NEED TO QUESTION WHETHER THOSE WILL ACTUALLY BE THE

17     INSTRUCTIONS.

18          AND SO YOU'LL HAVE THAT AS WELL.

19          SO WITH -- AND IT'S A LITTLE BIT OF READING, I'M SORRY TO

20     SAY, AND I HOPE THAT -- I HOPE I CAN BREATHE THROUGH THE MASK

21     AND TALK THAT LONG, AND THAT'LL BE -- YOU MAY SEE ME PULLING MY

22     MASK A LITTLE BIT AWAY FROM MY FACE SO THAT I CAN GET A DEEPER

23     BREATH OF AIR, BUT I'LL CERTAINLY DO MY BEST.

24          MEMBERS OF THE JURY, NOW THAT YOU HAVE HEARD ALL THE

25     EVIDENCE, IT IS MY DUTY TO INSTRUCT YOU ON THE LAW THAT APPLIES

1    TO THIS CASE.  A COPY OF THESE INSTRUCTIONS WILL BE AVAILABLE

2    IN THE JURY ROOM FOR YOU TO CONSULT.

3         IT IS YOUR DUTY TO WEIGH AND EVALUATE ALL THE EVIDENCE

4    RECEIVED IN THE CASE AND, IN THAT PROCESS, TO DECIDE THE FACTS.

5    IT IS YOUR DUTY TO APPLY THE LAW AS I GIVE IT TO YOU TO THE

6    FACTS AS YOU FIND THEM, WHETHER YOU AGREE WITH THE LAW OR NOT.

7         YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE AND THE

8    LAW.  DO NOT ALLOW PERSONAL LIKES OR DISLIKES, SYMPATHY,

9    PREJUDICE, FEAR, OR PUBLIC OPINION TO INFLUENCE YOU.

10        YOU SHOULD ALSO NOT BE INFLUENCED BY ANY PERSON'S RACE,

11   COLOR, RELIGIOUS BELIEFS, NATIONAL ANCESTRY, SEXUAL

12   ORIENTATION, GENDER IDENTITY, GENDER, OR ECONOMIC

13   CIRCUMSTANCES.

14        ALSO, DO NOT ALLOW YOURSELF TO BE INFLUENCED BY PERSONAL

15   LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, PUBLIC OPINION,

16   OR BIASES, INCLUDING UNCONSCIOUS BIASES.

17        UNCONSCIOUS BIASES ARE STEREOTYPES, ATTITUDES, OR

18   PREFERENCES THAT PEOPLE MAY CONSCIOUSLY REJECT, BUT MAY BE

19   EXPRESSED WITHOUT CONSCIOUS AWARENESS, CONTROL, OR INATTENTION.

20        YOU WILL RECALL THAT YOU TOOK AN OATH PROMISING TO DO SO

21   AT THE BEGINNING OF THE CASE.

22        YOU MUST FOLLOW ALL OF THESE INSTRUCTIONS AND NOT SINGLE

23   OUT SOME AND IGNORE OTHERS; THEY ARE ALL IMPORTANT.

24        PLEASE DO NOT READ INTO THESE INSTRUCTIONS OR ANYTHING I

25   MAY HAVE SAID OR DONE OR ANY SUGGESTION AS TO WHAT THE VERDICT

1    SHOULD BE.  THAT IS A MATTER ENTIRELY UP TO YOU.

2         THE CHARGES ARE NOT EVIDENCE.  MR. KAIL HAS PLEADED NOT

3    GUILTY TO THE CHARGES.  MR. KAIL IS PRESUMED TO BE INNOCENT

4    UNLESS AND UNTIL THE GOVERNMENT PROVES MR. KAIL GUILTY BEYOND A

5    REASONABLE DOUBT.

6         IN ADDITION, MR. KAIL DOES NOT HAVE TO TESTIFY OR PRESENT

7    EVIDENCE, ALTHOUGH HE DID THAT, AND HE DOES NOT NEED TO PROVE

8    HIS INNOCENCE.

9         THE GOVERNMENT HAS THE BURDEN OF PROVING EVERY ELEMENT OF

10   THE CHARGES BEYOND A REASONABLE DOUBT.

11        PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT LEAVES YOU

12   FIRMLY CONVINCED THAT MR. KAIL IS GUILTY.  IT IS NOT REQUIRED

13   THAT THE GOVERNMENT PROVE GUILT BEYOND ALL POSSIBLE DOUBT.

14        A REASONABLE DOUBT IS A DOUBT BASED UPON REASON AND COMMON

15   SENSE AND IS NOT BASED PURELY ON SPECULATION.  IT MAY ARISE

16   FROM A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL THE EVIDENCE,

17   OR FROM LACK OF EVIDENCE.

18        IF, AFTER A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL THE

19   EVIDENCE, YOU ARE NOT CONVINCED BEYOND A REASONABLE DOUBT THAT

20   THE DEFENDANT IS GUILTY, IT IS YOUR DUTY TO FIND MR. KAIL NOT

21   GUILTY.

22        ON THE OTHER HAND, IF, AFTER A CAREFUL AND IMPARTIAL

23   CONSIDERATION OF ALL THE EVIDENCE, YOU ARE CONVINCED BEYOND A

24   REASONABLE DOUBT THAT THE DEFENDANT IS GUILTY, IT IS YOUR DUTY

25   TO FIND MR. KAIL GUILTY.

1          THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

2     FACTS ARE CONSISTS OF:

3          THE SWORN TESTIMONY OF ANY WITNESS;

4          THE EXHIBITS RECEIVED IN EVIDENCE; AND,

5          ANY FACTS TO WHICH THE PARTIES HAVE AGREED.

6          IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

7     TESTIMONY AND EXHIBITS RECEIVED IN EVIDENCE.

8          THE FOLLOWING THINGS ARE NOT EVIDENCE, AND YOU MAY NOT

9     CONSIDER THEM IN DECIDING WHAT THE FACTS ARE:

10         QUESTIONS, STATEMENTS, OBJECTIONS, AND ARGUMENTS BY THE

11    LAWYERS ARE NOT EVIDENCE.  THE LAWYERS ARE NOT WITNESSES.

12    ALTHOUGH YOU MUST CONSIDER A LAWYER'S QUESTIONS TO UNDERSTAND

13    THE ANSWERS OF A WITNESS, THE LAWYER'S QUESTIONS ARE NOT

14    EVIDENCE.  SIMILARLY, WHAT THE LAWYERS HAVE SAID IN THEIR

15    OPENING STATEMENTS, WILL SAY IN THEIR CLOSING ARGUMENTS AND AT

16    OTHER TIMES IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT

17    IT IS NOT EVIDENCE.  IF THE FACTS AS YOU REMEMBER THEM DIFFER

18    FROM THE WAY THE LAWYERS STATE THEM, YOUR MEMORY OF THEM

19    CONTROLS.

20         ANY TESTIMONY THAT I HAVE EXCLUDED, STRICKEN, OR

21    INSTRUCTED YOU TO DISREGARD IS NOT EVIDENCE.  IN ADDITION, SOME

22    EVIDENCE WAS RECEIVED FOR A LIMITED PURPOSE; WHEN I HAVE

23    INSTRUCTED YOU TO CONSIDER CERTAIN EVIDENCE IN A LIMITED WAY,

24    YOU MUST DO SO.

25         ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN THE COURT WAS NOT

1      IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE SOLELY

2      ON THE EVIDENCE RECEIVED AT THE TRIAL.

3          EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

4      IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS ABOUT

5      WHAT THE WITNESS PERSONALLY SAW OR HEARD OR DID.

6      CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE, THAT IS, IT IS

7      PROOF OF ONE OR MORE FACTS FROM WHICH YOU CAN FIND ANOTHER

8      FACT.

9          YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

10     EVIDENCE.  EITHER CAN BE USED TO PROVE A FACT.  THE LAW MAKES

11     NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT

12     OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH

13     WEIGHT TO GIVE TO ANY EVIDENCE.

14         IN DECIDING THE FACTS IN THE CASE, YOU MAY HAVE TO DECIDE

15     WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

16     YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

17     NONE OF IT.

18         IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

19     INTO ACCOUNT:

20         THE WITNESS'S OPPORTUNITY AND ABILITY TO SEE OR HEAR OR

21     KNOW THE THINGS TESTIFIED TO;

22         THE WITNESS'S MEMORY;

23         THE WITNESS'S MANNER WHILE TESTIFYING;

24         THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, IF ANY;

25         THE WITNESS'S BIAS OR PREJUDICE, IF ANY;

1          WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S

2     TESTIMONY;

3          THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT OF

4     ALL THE EVIDENCE; AND,

5          ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

6          SOMETIMES A WITNESS MAY SAY SOMETHING THAT IS NOT

7     CONSISTENT WITH SOMETHING ELSE HE OR SHE SAID.  SOMETIMES

8     DIFFERENT WITNESSES WILL GIVE DIFFERENT VERSIONS OF WHAT

9     HAPPENED.  PEOPLE OFTEN FORGET THINGS OR MAKE MISTAKES IN WHAT

10    THEY REMEMBER.  ALSO, TWO PEOPLE MAY SEE THE SAME EVENT BUT

11    REMEMBER IT DIFFERENTLY.  YOU MAY CONSIDER THESE DIFFERENCES,

12    BUT DO NOT DECIDE THAT TESTIMONY IS UNTRUE JUST BECAUSE IT

13    DIFFERS FROM OTHER TESTIMONY.

14         HOWEVER, IF YOU DECIDE THAT A WITNESS HAS DELIBERATELY

15    TESTIFIED UNTRUTHFULLY ABOUT SOMETHING IMPORTANT, YOU MAY

16    CHOOSE NOT TO BELIEVE ANYTHING THAT WITNESS SAID.

17         ON THE OTHER HAND, IF YOU THINK THE WITNESS TESTIFIED

18    UNTRUTHFULLY ABOUT SOME THINGS, BUT TOLD THE TRUTH ABOUT

19    OTHERS, YOU MAY ACCEPT THE PART YOU THINK IS TRUE AND IGNORE

20    THE REST.

21         THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

22    NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY.

23    WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES WERE AND HOW

24    MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

25         IN THIS CASE, MR. KAIL HAS TESTIFIED.  YOU SHOULD TREAT

1    THIS TESTIMONY JUST AS YOU WOULD THE TESTIMONY OF ANY OTHER

2    WITNESS.

3         YOU ARE HERE ONLY TO DETERMINE WHETHER MR. KAIL IS GUILTY

4    OR NOT GUILTY OF THE CHARGES.  MR. KAIL IS NOT ON TRIAL FOR ANY

5    CONDUCT OR OFFENSE NOT CHARGED.

6         A SEPARATE CRIME IS CHARGED AGAINST MR. KAIL IN EACH

7    COUNT.  YOU MUST DECIDE EACH COUNT SEPARATELY.  YOUR VERDICT ON

8    ONE COUNT SHOULD NOT CONTROL YOUR VERDICT ON ANY OTHER COUNT.

9         THE OFFENSES CHARGED IN EACH COUNT ARE ALLEGED TO HAVE

10   BEEN COMMITTED "ON OR ABOUT" CERTAIN DATES.

11        ALTHOUGH IT IS NECESSARY FOR THE GOVERNMENT TO PROVE

12   BEYOND A REASONABLE DOUBT THAT THE OFFENSES WERE COMMITTED ON

13   DATES REASONABLY NEAR THE DATES ALLEGED, IT IS NOT NECESSARY

14   FOR THE GOVERNMENT TO PROVE THAT THE OFFENSES WERE COMMITTED

15   PRECISELY ON THE DATE CHARGED.

16        YOU HAVE HEARD EVIDENCE THAT MR. KAIL COMMITTED OTHER ACTS

17   NOT CHARGED HERE.  YOU MAY CONSIDER THIS EVIDENCE ONLY FOR ITS

18   BEARING, IF ANY, ON THE QUESTION OF MR. KAIL'S INTENT, PLAN,

19   KNOWLEDGE, OR ABSENCE OF MISTAKE, AND FOR NO OTHER PURPOSE.

20   YOU MAY NOT CONSIDER THIS EVIDENCE AS EVIDENCE OF GUILT OF THE

21   CRIME FOR WHICH MR. KAIL IS NOW ON TRIAL.

22        CERTAIN CHARTS AND SUMMARIES HAVE BEEN ADMITTED INTO

23   EVIDENCE.  CHARTS AND SUMMARIES ARE ONLY AS GOOD AS THE

24   UNDERLYING SUPPORTING MATERIAL.  YOU SHOULD, THEREFORE, GIVE

25   THEM ONLY SUCH WEIGHT AS YOU THINK THE UNDERLYING MATERIAL

1       DESERVES.

2            THE PARTIES HAVE AGREED TO CERTAIN FACTS THAT HAVE BEEN

3       STATED TO YOU.  THOSE FACTS ARE NOW CONCLUSIVELY ESTABLISHED.

4            DEFENDANT MICHAEL KAIL IS CHARGED IN COUNTS ONE THROUGH

5       NINETEEN WITH HONEST WIRE SERVICES FRAUD, IN VIOLATION OF

6       SECTION 1343 AND 1346 OF TITLE 18 OF THE UNITED STATES CODE.

7       IN ORDER FOR MR. KAIL TO BE FOUND GUILTY OF THESE CHARGES, THE

8       GOVERNMENT MUST PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A

9       REASONABLE DOUBT:

10           FIRST, MR. KAIL DEVISED OR KNOWINGLY PARTICIPATED IN A

11      SCHEME OR PLAN TO DEPRIVE NETFLIX, INC., OF ITS RIGHT OF HONEST

12      SERVICES.

13           SECOND, THE SCHEME OR PLAN CONSISTS OF A BRIBE OR KICKBACK

14      IN EXCHANGE FOR MR. KAIL'S SERVICES.  THE EXCHANGE MAY BE

15      EXPRESS OR MAY BE IMPLIED FROM ALL OF THE SURROUNDING

16      CIRCUMSTANCES.

17           THIRD, MR. KAIL OWED A FIDUCIARY DUTY TO NETFLIX, INC.

18          FOURTH, MR. KAIL ACTED WITH THE SPECIFIC INTENT TO DEFRAUD

19      BY DEPRIVING NETFLIX, INC., OF THE RIGHT OF HONEST SERVICES.

20           FIFTH, MR. KAIL'S ACT WAS MATERIAL, THAT IS, IT HAD A

21      NATURAL TENDENCY TO INFLUENCE OR WAS CAPABLE OF INFLUENCING A

22      PERSON OR ENTITY'S ACTS.

23           SIXTH, MR. KAIL USED OR CAUSED TO BE USED AN INTERSTATE

24      WIRE COMMUNICATION TO CARRY OUT OR ATTEMPT TO CARRY OUT AN

25      ESSENTIAL PART OF THE SCHEME.

1        NUMBER ONE, THE SCHEME OR PLAN TO DEPRIVE HONEST SERVICES.

2        THE FIRST ELEMENT THAT THE GOVERNMENT MUST PROVE IS THAT

3   THE DEFENDANT KNOWINGLY DEVISED OR PARTICIPATED IN A SCHEME OR

4   PLAN TO DEPRIVE NETFLIX, INC., OF ITS RIGHT TO HIS HONEST

5   SERVICES.

6        A SCHEME IS ANY PLAN OR COURSE OF ACTION FORMED WITH THE

7   INTENT TO ACCOMPLISH SOME PURPOSE.  THUS, TO FIND THE DEFENDANT

8   GUILTY OF THIS OFFENSE, YOU MUST FIND THAT THE DEFENDANT

9   DEVISED OR PARTICIPATED IN A PLAN OR SOURCE OF ACTION INVOLVING

10  BRIBES OR KICKBACKS GIVEN OR OFFERED TO THE DEFENDANT.

11       NUMBER TWO.  THE BRIBE OR KICKBACK IN EXCHANGE FOR

12  SERVICES.

13       THE SECOND ELEMENT THAT THE GOVERNMENT MUST PROVE IS THAT

14  THE SCHEME OR PLAN CONSISTED OF A BRIBE OR KICKBACK IN EXCHANGE

15  FOR MR. KAIL'S SERVICES.  BRIBERY AND KICKBACKS INVOLVE THE

16  EXCHANGE OF A THING OR THINGS OF VALUE FOR SERVICES BY A

17  FIDUCIARY, IN OTHER WORDS, A QUID PRO QUO (A LATIN PHRASE

18  MEANING "THIS FOR THAT" OR "THESE FOR THOSE").

19       THE DEFENDANT AND THE PAYOR NEED NOT STATE THE QUID PRO

20  QUO IN EXPRESS TERMS, FOR OTHERWISE THE LAW'S EFFECT COULD BE

21  FRUSTRATED BY KNOWING WINKS AND NODS.  RATHER, THE INTENT TO

22  EXCHANGE MAY BE ESTABLISHED BY CIRCUMSTANTIAL EVIDENCE, BASED

23  UPON THE DEFENDANT'S WORDS, CONDUCT, ACTS, AND ALL THE

24  SURROUNDING CIRCUMSTANCES DISCLOSED BY THE EVIDENCE AND THE

25  RATIONAL OR LOGICAL INFERENCES THAT MAY BE DRAWN FROM THEM.

1       IT IS NOT A DEFENSE TO THE CLAIM THAT NETFLIX BENEFITED

2   FROM THE ALLEGED CONDUCT.  THE OFFENSE OF "HONEST SERVICES"

3   FRAUD IS NOT CONCERNED WITH THE WISDOM OR RESULTS OF THE

4   DEFENDANT'S DECISIONS, BUT RATHER WITH THE MANNER IN WHICH THE

5   DEFENDANT MAKES HIS OR HER DECISIONS.

6       ALSO, IT IS NOT NECESSARY FOR THE GOVERNMENT TO PROVE THAT

7   THE SCHEME ACTUALLY SUCCEEDED, OR THAT ANY ACT WAS ACTUALLY

8   TAKEN BY THE DEFENDANT IN THE COURSE OF THE SCHEME.

9       WHAT THE GOVERNMENT MUST PROVE IS THAT THE DEFENDANT

10  KNOWINGLY DEVISED OR PARTICIPATED IN A SCHEME OR ARTIFICE TO

11  DEFRAUD NETFLIX, INC. OF ITS RIGHT TO DEFENDANT'S HONEST

12  SERVICES THROUGH BRIBES OR KICKBACKS.

13      ALSO, BECAUSE PEOPLE RARELY ACT FOR A SINGLE PURPOSE, THE

14  GIVER NEED NOT HAVE OFFERED OR PROVIDED THE THING OF VALUE ONLY

15  IN EXCHANGE FOR SPECIFIC SERVICES, AND THE DEFENDANT NEED NOT

16  HAVE SOLICITED OR ACCEPTED THE THING OF VALUE ONLY IN EXCHANGE

17  FOR THOSE SERVICES.

18      IF YOU FIND BEYOND A REASONABLE DOUBT THAT THE GIVER

19  OFFERED OR PROVIDED A THING OF VALUE IN EXCHANGE FOR THE

20  PERFORMANCE OF SERVICES, THEN IT MAKES NO DIFFERENCE THAT THE

21  GIVER MAY HAVE HAD ANOTHER LAWFUL MOTIVE FOR PROVIDING A THING

22  OF VALUE.

23      LIKEWISE, IF YOU FIND BEYOND A REASONABLE DOUBT THAT THE

24  DEFENDANT SOLICITED OR RECEIVED A THING OF VALUE IN EXCHANGE

25  FOR THE SERVICES, THEN IT MAKES NO DIFFERENCE THAT THE

1        DEFENDANT MAY ALSO HAVE HAD ANOTHER LAWFUL MOTIVE FOR

2        SOLICITING OR ACCEPTING THE THING OF VALUE.

3                "ANYTHING OF VALUE" INCLUDES THINGS POSSESSING INTRINSIC

4        VALUE, WHETHER TANGIBLE OR INTANGIBLE, THAT THE PERSON GIVING

5        OR OFFERING OR THE PERSON SOLICITING OR RECEIVING CONSIDERS TO

6        BE WORTH SOMETHING.

7                UNDISCLOSED CONFLICTS OF INTEREST, SECRET PAYMENTS OR

8        UNDISCLOSED SELF-DEALING ALONE, IS NOT SUFFICIENT TO CONSTITUTE

9        HONEST SERVICES FRAUD.

10               NUMBER THREE.  FIDUCIARY DUTY.

11               A "FIDUCIARY" DUTY EXISTS WHENEVER ONE COMPANY PLACES

12       SPECIAL TRUST AND CONFIDENCE IN ANOTHER PERSON -- THE FIDUCIARY

13       -- IN RELIANCE THAT THE FIDUCIARY WILL EXERCISE HIS DISCRETION

14       AND EXPERTISE WITH THE UTMOST HONESTY AND FORTHRIGHTNESS IN THE

15       INTERESTS OF THE ENTITY, SUCH THAT THE ENTITY RELAXES THE CARE

16       AND VIGILANCE THAT IT WOULD ORDINARILY EXERCISE, AND THE

17       FIDUCIARY KNOWINGLY ACCEPTS THAT SPECIAL TRUST AND CONFIDENCE

18       AND THEREAFTER UNDERTAKES TO ACT ON BEHALF OF THE OTHER ENTITY

19       BASED ON SUCH RELIANCE.

20               THE MERE FACT THAT A BUSINESS RELATIONSHIP ARISES BETWEEN

21       A PERSON AND A COMPANY DOES NOT MEAN THAT EITHER OWES A

22       FIDUCIARY DUTY TO THE OTHER.  IF ONE ENGAGES OR EMPLOYS ANOTHER

23       AND THEREAFTER DIRECTS, SUPERVISES, OR APPROVES THE OTHER'S

24       ACTIONS, THE PERSON SO EMPLOYED IS NOT NECESSARILY A FIDUCIARY.

25       RATHER, AS PREVIOUSLY STATED, IT IS ONLY WHEN ONE PARTY PLACES,

1     AND THE OTHER ACCEPTS, A SPECIAL TRUST AND CONFIDENCE --

2     USUALLY INVOLVING THE EXERCISE OF PROFESSIONAL EXPERTISE AND

3     DISCRETION -- THAT A FIDUCIARY RELATIONSHIP EXISTS.

4           WITH REGARD TO OMISSIONS OF MATERIAL FACT ONLY, TO

5     CONVICT, YOU MUST FIND THAT MR. KAIL HAD A DUTY TO DISCLOSE THE

6     OMITTED FACT ARRIVING OUT OF A RELATIONSHIP OF TRUST.  THAT

7     DUTY CAN ARISE EITHER OUT OF THE AFOREMENTIONED FORMAL

8     FIDUCIARY RELATIONSHIP, OR AN INFORMAL, TRUSTING RELATIONSHIP

9     IN WHICH ONE PARTY ACTS FOR THE BENEFIT OF ANOTHER AND INDUCES

10    THE TRUSTING PARTY TO RELAX THE CARE AND VIGILANCE WHICH IT

11    WOULD ORDINARILY EXERCISE.  THE REQUIREMENT THAT YOU FIND A

12    DUTY TO DISCLOSE IN ORDER TO CONVICT DOES NOT APPLY TO

13    MATERIALLY FALSE STATEMENTS.

14          NUMBER FOUR.  MATERIALITY.

15          THE FIFTH ELEMENT THAT THE GOVERNMENT MUST PROVE IS THAT

16    MR. KAIL'S ACT OR ACTIONS WERE MATERIAL; THAT IS, THAT IT HAD A

17    NATURAL TENDENCY TO INFLUENCE, OR WAS CAPABLE OF INFLUENCING, A

18    PERSON'S ACTS.

19          NUMBER FIVE.  USE OF WIRE OR RADIO COMMUNICATIONS.

20          THE FINAL ELEMENT THAT THE GOVERNMENT MUST ESTABLISH IS

21    THAT THE DEFENDANT USED A WIRE OR RADIO COMMUNICATION IN

22    INTERSTATE COMMERCE TO CARRY OUT OR TO ATTEMPT TO CARRY OUT THE

23    SCHEME OR PLAN.  A WIRING IS CAUSED WHEN ONE KNOWS THAT A WIRE

24    WILL BE USED IN THE ORDINARY COURSE OF BUSINESS OR WHEN ONE CAN

25    REASONABLY FORESEE SUCH USE.  TO "USE A WIRE OR RADIO

1    COMMUNICATION IN INTERSTATE COMMERCE" MEANS TO SEND INFORMATION

2    ACROSS STATE LINES BY MEANS OF WIRE, INCLUDING TELEPHONE OR

3    TELEGRAPH LINES, OR RADIO COMMUNICATIONS.  IT INCLUDES E-MAIL,

4    THE ELECTRONIC TRANSFER OF FUNDS, INTERNET COMMUNICATIONS, OR

5    OTHER ELECTRONIC COMMUNICATION USING WIRES OR RADIOS, AS LONG

6    AS THE COMMUNICATION OR TRANSMISSION OF INFORMATION IS BETWEEN

7    STATES.

8         IT NEED NOT HAVE BEEN REASONABLY FORESEEABLE TO THE

9    DEFENDANT THAT THE WIRE COMMUNICATION WOULD BE INTERSTATE IN

10   NATURE.  RATHER, IT MUST HAVE BEEN REASONABLY FORESEEABLE TO

11   THE DEFENDANT THAT SOME WIRE COMMUNICATION WOULD OCCUR IN

12   FURTHERANCE OF THE SCHEME, AND AN INTERSTATE WIRE COMMUNICATION

13   MUST ACTUALLY HAVE OCCURRED IN FURTHERANCE OF THE SCHEME.

14        WIRE FRAUD.

15        THE DEFENDANT IS ALSO CHARGED IN COUNTS ONE THROUGH

16   NINETEEN WITH WIRE FRAUD IN VIOLATION OF SECTION 1343 OF

17   TITLE 18 OF THE UNITED STATES CODE.  IN ORDER FOR MR. KAIL TO

18   BE FOUND GUILTY OF THAT CHARGE, THE GOVERNMENT MUST PROVE EACH

19   OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

20        FIRST, MR. KAIL KNOWINGLY DEVISED A SCHEME OR PLAN TO

21   DEFRAUD, OR A SCHEME OR PLAN FOR OBTAINING MONEY OR PROPERTY BY

22   MEANS OF FALSE OR FRAUDULENT PRETENSES, REPRESENTATIONS, OR

23   PROMISES, OR OMITTED FACTS.  DECEITFUL STATEMENTS OF

24   HALF-TRUTHS MAY CONSTITUTE FALSE OR FRAUDULENT REPRESENTATIONS;

25        SECOND, THE STATEMENTS MADE OR FACTS OMITTED AS PART OF

1    THE SCHEME WERE MATERIAL; THAT IS, THEY HAD A NATURAL TENDENCY

2    TO INFLUENCE, OR WERE CAPABLE OF INFLUENCING, A PERSON TO PART

3    WITH MONEY OR PROPERTY;

4         THIRD, MR. KAIL ACTED WITH THE SPECIFIC INTENT TO DEFRAUD;

5    THAT IS, THE INTENT TO DECEIVE AND CHEAT; AND,

6         NUMBER FOUR, MR. KAIL USED, OR CAUSED TO BE USED, AN

7    INTERSTATE WIRE COMMUNICATION TO CARRY OUT OR ATTEMPT TO CARRY

8    OUT AN ESSENTIAL PART OF THE SCHEME.

9         IN DETERMINING WHETHER A SCHEME TO DEFRAUD EXISTS, YOU MAY

10   CONSIDER NOT ONLY THE DEFENDANT'S WORDS AND STATEMENTS, BUT

11   ALSO THE CIRCUMSTANCES IN WHICH THEY ARE USED AS A WHOLE.

12        IN REGARD TO OMISSIONS OF MATERIAL FACT ONLY, TO CONVICT

13   YOU MUST FIND THAT DEFENDANT HAD A DUTY TO DISCLOSE THE OMITTED

14   FACTS ARRIVING OUT OF A RELATIONSHIP OF TRUST.  THAT DATA CAN

15   ARISE EITHER OUT OF A FORMAL FIDUCIARY RELATIONSHIP, OR AN

16   INFORMAL, TRUSTING RELATIONSHIP IN WHICH ONE PARTY ACTS FOR THE

17   BENEFIT OF ANOTHER AND INDUCES THE TRUSTING PARTY TO RELAX THE

18   CARE AND VIGILANCE WHICH IT WOULD ORDINARILY EXERCISE.  THE

19   REQUIREMENT THAT YOU FIND A DUTY TO DISCLOSE IN ORDER TO

20   CONVICT DOES NOT APPLY TO MATERIALLY FALSE STATEMENTS.

21        A WIRING IS CAUSED WHEN ONE KNOWS THAT A WIRE WILL BE USED

22   IN THE ORDINARY COURSE OF BUSINESS OR WHEN ONE CAN REASONABLY

23   FORESEE SUCH USE.  IT NEED NOT HAVE BEEN REASONABLY FORESEEABLE

24   TO THE DEFENDANT THAT THE WIRE COMMUNICATION WOULD BE

25   INTERSTATE IN NATURE.  RATHER, IT MUST HAVE BEEN REASONABLY

1    FORESEEABLE TO THE DEFENDANT THAT SOME WIRE COMMUNICATION WOULD

2    OCCUR IN FURTHERANCE OF THE SCHEME, AND AN INTERSTATE WIRE

3    COMMUNICATION MUST ACTUALLY HAVE OCCURRED IN FURTHERANCE OF THE

4    SCHEME.

5         A PROPERTY INTEREST IS AN ECONOMIC INTEREST.  THUS, THE

6    TERM "PROPERTY" AS USED IN THE WIRE FRAUD INSTRUCTIONS, MEANS

7    MONEY OR ANOTHER FORM OF PROPERTY WITH ECONOMIC VALUE.

8         DEFENDANT MICHAEL KAIL IS CHARGED IN COUNTS TWENTY THROUGH

9    TWENTY-TWO WITH HONEST SERVICES MAIL FRAUD IN VIOLATION OF

10   SECTIONS 1341 AND 1346 OF TITLE 18 OF THE UNITED STATES CODE.

11   IN ORDER FOR MR. KAIL TO BE FOUND GUILTY OF THESE CHARGES, THE

12   GOVERNMENT MUST PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A

13   REASONABLE DOUBT:

14        FIRST, MR. KAIL DEVISED OR KNOWINGLY PARTICIPATED IN A

15   SCHEME OR PLAN TO DEPRIVE NETFLIX, INC. OF ITS RIGHT OF HONEST

16   SERVICES;

17        SECOND, THE SCHEME OR PLAN CONSISTS OF A BRIBE OR KICKBACK

18   IN EXCHANGE FOR MR. KAIL'S SERVICES;

19        THIRD, MR. KAIL OWED A FIDUCIARY DUTY TO NETFLIX, INC.;

20        FOURTH, MR. KAIL ACTED WITH THE SPECIFIC INTENT TO DEFRAUD

21   BY DEPRIVING NETFLIX, INC. OF THE RIGHT TO HONEST SERVICES;

22        FIFTH, MR. KAIL'S ACT WAS MATERIAL; THAT IS, THE ACT HAD A

23   NATURAL TENDENCY TO INFLUENCE, OR WAS CAPABLE OF INFLUENCING, A

24   PERSON'S OR ENTITY'S ACTS; AND,

25        SIXTH, MR. KAIL USED, OR CAUSED SOMEONE TO USE, THE MAILS

1    TO CARRY OUT OR TO ATTEMPT TO CARRY OUT THE SCHEME OR PLAN.

2         NUMBER 1.  SCHEME OR PLAN TO DEPRIVE HONEST SERVICES.

3         THE FIRST ELEMENT THAT THE GOVERNMENT MUST PROVE IS THAT

4    THE DEFENDANT KNOWINGLY DEVISED OR PARTICIPATED IN A SCHEME OR

5    PLAN TO DEPRIVE NETFLIX, INC. OF ITS RIGHT TO HIS HONEST

6    SERVICES.  A "SCHEME" IS A PLAN OR COURSE OF ACTION FORMED WITH

7    THE INTENT TO ACCOMPLISH SOME PURPOSE.  THUS, TO FIND THE

8    DEFENDANT GUILTY OF THIS OFFENSE, YOU MUST FIND THAT THE

9    DEFENDANT DEVISED OR PARTICIPATED IN A PLAN OR COURSE OF ACTION

10   INVOLVING BRIBES OR KICKBACKS GIVEN OR OFFERED TO THE

11   DEFENDANT.

12        NUMBER 2.  THE BRIBE OR KICKBACK IN EXCHANGE FOR SERVICES.

13        THE SECOND ELEMENT THAT THE GOVERNMENT MUST PROVE IS THAT

14   THE SCHEME OR PLAN CONSISTED OF A BRIBE OR KICKBACK IN EXCHANGE

15   FOR DEFENDANT'S SERVICES.  BRIBERY AND KICKBACKS INVOLVE THE

16   EXCHANGE OF A THING OR THINGS OF VALUE FOR SERVICES BY A

17   FIDUCIARY; IN OTHER WORDS, A QUID PRO QUO (A LATIN PHRASE

18   MEANING "THIS FOR THAT" OR "THESE FOR THOSE ").

19        THE DEFENDANT AND THE PAYOR NEED NOT STATE THE QUID PRO

20   QUO IN EXPRESS TERMS, FOR OTHERWISE THE LAW'S EFFECT COULD BE

21   FRUSTRATED BY KNOWING WINKS AND NODS.  RATHER, THE INTENT TO

22   EXCHANGE MAY BE ESTABLISHED BY CIRCUMSTANTIAL EVIDENCE, BASED

23   UPON THE DEFENDANT'S WORDS, CONDUCT, ACTS, AND ALL THE

24   SURROUNDING CIRCUMSTANCES DISCLOSED BY THE EVIDENCE AND THE

25   RATIONAL OR LOGICAL INFERENCES THAT MAY BE DRAWN FROM THEM.

1          IT IS NOT A DEFENSE TO THE CLAIM THAT NETFLIX BENEFITED

2     FROM THE ALLEGED CONDUCT.  THE OFFENSE OF "HONEST SERVICES"

3     FRAUD IS NOT CONCERNED WITH THE WISDOM OR RESULTS OF THE

4     DEFENDANT'S DECISIONS, BUT RATHER WITH THE MANNER IN WHICH THE

5     DEFENDANT MAKES HIS OR HER DECISIONS.

6          ALSO, IT IS NOT NECESSARY FOR THE GOVERNMENT TO PROVE THAT

7     THE SCHEME ACTUALLY SUCCEEDED, OR THAT ANY ACT WAS ACTUALLY

8     TAKEN BY THE DEFENDANT IN THE COURSE OF THE SCHEME.

9          WHAT THE GOVERNMENT MUST PROVE IS THAT THE DEFENDANT

10    KNOWINGLY DEVISED OR PARTICIPATED IN A SCHEME OR ARTIFICE TO

11    DEFRAUD NETFLIX, INC. OF ITS RIGHT TO DEFENDANT'S HONEST

12    SERVICES THROUGH BRIBES OR KICKBACKS.

13         ALSO, BECAUSE PEOPLE RARELY ACT FOR A SINGLE PURPOSE, THE

14    GIVER NEED NOT HAVE OFFERED OR PROVIDED THE THING OF VALUE ONLY

15    IN EXCHANGE FOR SPECIFIC SERVICES, AND THE DEFENDANT NEED NOT

16    HAVE SOLICITED OR ACCEPTED THE THING OF VALUE ONLY IN EXCHANGE

17    FOR THOSE SERVICES.

18         IF YOU FIND BEYOND A REASONABLE DOUBT THAT THE GIVER

19    OFFERED OR PROVIDED A THING OF VALUE IN EXCHANGE FOR THE

20    PERFORMANCE OF SERVICES, THEN IT MAKES NO DIFFERENCE THAT THE

21    GIVER MAY ALSO HAVE HAD ANOTHER LAWFUL MOTIVE FOR PROVIDING A

22    THING OF VALUE.

23         LIKEWISE, IF YOU FIND BEYOND A REASONABLE DOUBT THAT THE

24    DEFENDANT SOLICITED OR RECEIVED A THING OF VALUE IN EXCHANGE

25    FOR THE SERVICES, THEN IT MAKES NO DIFFERENCE THAT THE

1    DEFENDANT MAY ALSO HAVE HAD ANOTHER LAWFUL MOTIVE FOR

2    SOLICITING OR ACCEPTING THE THING OF VALUE.

3            "ANYTHING OF VALUE" INCLUDES THINGS POSSESSING INTRINSIC

4    VALUE, WHETHER TANGIBLE OR INTANGIBLE, THAT THE PERSON GIVING

5    OR OFFERING OR THE PERSON SOLICITING OR RECEIVING CONSIDERS TO

6    BE WORTH SOMETHING.

7            UNDISCLOSED CONFLICTS OF INTEREST, SECRET PAYMENTS, OR

8    UNDISCLOSED SELF-DEALING ALONE IS NOT SUFFICIENT TO CONSTITUTE

9    HONEST SERVICES MAIL FRAUD.

10           3.  FIDUCIARY DUTY.

11           A "FIDUCIARY" DUTY EXISTS WHENEVER ONE COMPANY PLACES

12   SPECIAL TRUST AND CONFIDENCE IN ANOTHER PERSON -- THE

13   FIDUCIARY -- IN RELIANCE THAT THE FIDUCIARY WILL EXERCISE HIS

14   DISCRETION AND EXPERTISE WITH THE UTMOST HONESTY AND

15   FORTHRIGHTNESS IN THE INTEREST OF THE ENTITY, SUCH THAT THE

16   ENTITY RELAXES THE CARE AND VIGILANCE THAT IT WOULD ORDINARILY

17   EXERCISE, AND THE FIDUCIARY KNOWINGLY ACCEPTS THAT SPECIAL

18   TRUST AND CONFIDENCE AND THEREAFTER UNDERTAKES TO ACT ON BEHALF

19   OF THE OTHER ENTITY BASED ON SUCH RELIANCE.

20           THE MERE FACT THAT A BUSINESS RELATIONSHIP ARISES BETWEEN

21   A PERSON AND A COMPANY DOES NOT MEAN THAT EITHER OWES A

22   FIDUCIARY DUTY TO THE OTHER.  IF ONE ENGAGES OR EMPLOYS ANOTHER

23   AND THEREAFTER DIRECTS, SUPERVISES, OR APPROVES THE OTHER'S

24   ACTIONS, THE PERSON SO EMPLOYED IS NOT NECESSARILY A FIDUCIARY.

25   RATIONAL, AS PREVIOUSLY STATED, IT IS ONLY WHEN ONE PARTY

```
1    PLACES, AND THE OTHER ACCEPTS, A SPECIAL TRUST AND

2    CONFIDENCE -- USUALLY INVOLVING THE EXERCISE OF PROFESSIONAL

3    EXPERTISE AND DISCRETION -- THAT A FIDUCIARY RELATIONSHIP

4    EXISTS.

5            WITH REGARD TO OMISSIONS OF MATERIAL FACT ONLY, TO CONVICT

6    YOU MUST FIND THAT MR. KAIL HAD A DUTY TO DISCLOSE THE OMITTED

7    FACTS ARISING OUT OF A RELATIONSHIP OF TRUST.  THAT DUTY CAN

8    ARISE EITHER OUT OF THE AFOREMENTIONED FORMAL FIDUCIARY

9    RELATIONSHIP, OR AN INFORMAL, TRUSTING RELATIONSHIP IN WHICH

10   ONE PARTY ACTS FOR THE BENEFIT OF ANOTHER AND INDUCES THE

11   TRUSTING PARTY TO RELAX THE CARE AND VIGILANCE WHICH IT WOULD

12   ORDINARILY EXERCISE.  THE REQUIREMENT THAT YOU FIND A DUTY TO

13   DISCLOSE IN ORDER TO CONVICT DOES NOT APPLY TO MATERIALLY FALSE

14   STATEMENTS.

15           MATERIALITY.

16           THE FIFTH ELEMENT THAT THE GOVERNMENT MUST PROVE IS THAT

17   THE DEFENDANT'S ACT OR ACTIONS WERE MATERIAL; THAT IS, IT HAD A

18   NATURAL TENDENCY TO INFLUENCE, OR WAS CAPABLE OF INFLUENCING, A

19   PERSON'S ACTS.

20           NUMBER 5.  USE OF THE MAILS.

21           A MAILING IS CAUSED WHEN ONE KNOWS THAT THE MAILS WILL BE

22   USED IN THE ORDINARY COURSE OF BUSINESS OR WHEN ONE CAN

23   REASONABLY FORESEE SUCH USE.  IT DOES NOT MATTER WHETHER THE

24   MATERIAL MAILED WAS ITSELF FALSE OR DECEPTIVE SO LONG AS THE

25   MAIL WAS USED AS PART OF THE SCHEME, NOR DOES IT MATTER WHETHER
```

1    THE SCHEME OR PLAN WAS SUCCESSFUL OR THAT ANY MONEY OR PROPERTY

2    WAS OBTAINED.

3         THE DEFENDANT MICHAEL KAIL IS CHARGED IN COUNTS TWENTY

4    THROUGH TWENTY-TWO WITH MAIL FRAUD IN VIOLATION OF SECTION 1341

5    OF TITLE 18 OF THE UNITED STATES CODE.  IN ORDER FOR MR. KAIL

6    TO BE FOUND GUILTY OF THAT CHARGE, THE GOVERNMENT MUST PROVE

7    EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

8         FIRST, MR. KAIL KNOWINGLY DEVISED A SCHEME OR PLAN TO

9    DEFRAUD, OR A SCHEME OR PLAN FOR OBTAINING MONEY OR PROPERTY BY

10   MEANS OF FALSE OR FRAUDULENT PRETENSES, REPRESENTATIONS, OR

11   PROMISES, OR OMITTED FACTS.  DECEITFUL STATEMENTS OF

12   HALF-TRUTHS MAY CONSTITUTE FALSE OR FRAUDULENT REPRESENTATIONS;

13        SECOND, THE STATEMENTS MADE OR FACTS OMITTED AS PART OF

14   THE SCHEME WERE MATERIAL; THAT IS, THEY HAD A NATURAL TENDENCY

15   TO INFLUENCE, OR WERE CAPABLE OF INFLUENCING, A PERSON TO PART

16   WITH MONEY OR PROPERTY;

17        THIRD, MR. KAIL ACTED WITH THE SPECIFIC INTENT TO DEFRAUD;

18   THAT IS, THE INTENT TO DECEIVE AND CHEAT; AND,

19        FOURTH, MR. KAIL USED, OR CAUSED TO BE USED, THE MAILS TO

20   CARRY OUT OR ATTEMPT TO CARRY OUT AN ESSENTIAL PART OF THE

21   SCHEME.

22        IN DETERMINING WHETHER A SCHEME TO DEFRAUD EXISTS, YOU MAY

23   CONSIDER NOT ONLY THE DEFENDANT'S WORDS AND STATEMENTS, BUT

24   ALSO THE CIRCUMSTANCES IN WHICH THEY ARE USED AS A WHOLE.

25        WITH REGARD TO OMISSIONS OF MATERIAL FACT ONLY, TO CONVICT

1   YOU MUST FIND THAT DEFENDANT HAD A DUTY TO DISCLOSE THE OMITTED

2   FACT ARISING OUT OF A RELATIONSHIP OF TRUST.  THAT DUTY CAN

3   ARISE EITHER OUT OF A FORMAL FIDUCIARY RELATIONSHIP, OR AN

4   INFORMAL, TRUSTING RELATIONSHIP IN WHICH ONE PARTY ACTS FOR THE

5   BENEFIT OF ANOTHER AND INDUCES THE TRUSTING PARTY TO RELAX THE

6   CARE AND VIGILANCE WHICH IT WOULD ORDINARILY EXERCISE.  THE

7   REQUIREMENT THAT YOU FIND A DUTY TO DISCLOSE IN ORDER TO

8   CONVICT DOES NOT APPLY TO MATERIALLY FALSE STATEMENTS.

9        A MAILING IS CAUSED WHEN ONE KNOWS THAT THE MAILS WILL BE

10  USED IN THE ORDINARY COURSE OF BUSINESS OR WHEN ONE CAN

11  REASONABLY FORESEE SUCH USE.  IT DOES NOT MATTER WHETHER THE

12  MATERIAL MAILED WAS ITSELF FALSE OR DECEPTIVE SO LONG AS THE

13  MAIL WAS USED AS PART OF THE SCHEME, NOR DOES IT MATTER WHETHER

14  THE SCHEME OR PLAN WAS SUCCESSFUL OR THAT ANY MONEY OR PROPERTY

15  WAS OBTAINED.

16       A PROPERTY INTEREST IS AN ECONOMIC INTEREST.  THUS, THE

17  TERM "PROPERTY" AS USED IN MAIL FRAUD INSTRUCTIONS, MEANS MONEY

18  OR ANOTHER FORM OF PROPERTY WITH ECONOMIC VALUE.

19       WITH RESPECT TO HONEST SERVICES WIRE FRAUD CHARGED IN

20  COUNTS ONE THROUGH NINETEEN, IN VIOLATION OF 18 U.S. CODE

21  SECTIONS 1343 AND 1346, AND HONEST SERVICES MAIL FRAUD CHARGED

22  IN COUNTS TWENTY THROUGH TWENTY-TWO, IN VIOLATION OF 18 U.S.

23  CODE SECTIONS 1341 AND 1346, AND INTENT TO DEFRAUD IS AN INTENT

24  TO DECEIVE AND CHEAT, WHICH MEANS TO ACT KNOWINGLY AND WITH A

25  SPECIFIC INTENT TO USE FALSE OR FRAUDULENT PRETENSES,

1    REPRESENTATIONS, PROMISES OR OMISSIONS TO CAUSE LOSS OF HONEST

2    SERVICES.

3         WITH RESPECT TO WIRE FRAUD CHARGED IN COUNTS ONE THROUGH

4    NINETEEN, IN VIOLATION OF 18 U.S. CODE SECTION 1343, AND MAIL

5    FRAUD CHARGED IN COUNTS TWENTY THROUGH TWENTY-TWO, IN VIOLATION

6    OF 18 U.S. CODE SECTION 1341, AN INTENT TO DEFRAUD IS AN INTENT

7    TO DECEIVE AND CHEAT.

8         IN REGARD TO COUNTS ONE THROUGH NINETEEN CHARGING WIRE

9    FRAUD IN VIOLATION OF 18 U.S. CODE SECTION 1343 AND HONEST

10   SERVICES WIRE FRAUD IN VIOLATION OF 18 U.S. CODE SECTION 1343

11   AND 1346, AND COUNTS TWENTY TO TWENTY-TWO CHARGING MAIL FRAUD

12   IN VIOLATION OF 18 U.S. CODE SECTION 1341 AND HONEST SERVICES

13   MAIL FRAUD IN VIOLATION OF 18 U.S. CODE SECTION 1341 AND 1346,

14   AN ACT IS DONE KNOWINGLY IF MR. KAIL IS AWARE OF THE ACT AND

15   DOES NOT ACT OR FAIL TO ACT THROUGH IGNORANCE, MISTAKE, OR

16   ACCIDENT.  YOU MAY CONSIDER EVIDENCE OF MR. KAIL'S WORDS, ACTS,

17   OR OMISSIONS, ALONG WITH ALL THE OTHER EVIDENCE, IN DECIDING

18   WHETHER HE ACTED KNOWINGLY.

19        IN REGARD TO COUNTS TWENTY-THREE THROUGH TWENTY-NINE

20   CHARGING MONEY LAUNDERING IN VIOLATION OF 18 U.S. CODE SECTION

21   1957, AN ACT IS DONE KNOWINGLY IF MR. KAIL IS AWARE OF THE ACT

22   AND DOES NOT ACT OR FAIL TO ACT THROUGH IGNORANCE, MISTAKE, OR

23   ACCIDENT.  THE GOVERNMENT IS NOT REQUIRED TO PROVE THAT

24   MR. KAIL KNEW THAT HIS ACTS OR OMISSIONS WERE UNLAWFUL.  YOU

25   MAY CONSIDER EVIDENCE OF MR. KAIL'S WORDS, ACTS, OR OMISSIONS,

1    ALONG WITH ALL THE OTHER EVIDENCE IN DECIDING WHETHER HE ACTED

2    KNOWINGLY.

3         GOOD FAITH IS A COMPLETE DEFENSE TO CHARGES OF WIRE FRAUD,

4    HONEST SERVICES WIRE FRAUD, MAIL FRAUD, AND HONEST SERVICES

5    MAIL FRAUD AS ALLEGED IN COUNTS ONE THROUGH TWENTY-TWO.

6    MR. KAIL IS NOT REQUIRED TO PROVE GOOD FAITH.  THE GOVERNMENT

7    MUST PROVE INTENT TO DEFRAUD BEYOND A REASONABLE DOUBT.

8         AN HONESTLY HELD OPINION OR AN HONESTLY FORMED BELIEF

9    CANNOT PROVIDE FRAUDULENT INTENT EVEN IF THE OPINION OR BELIEF

10   IS MISTAKEN.

11        NEVERTHELESS, IF YOU FIND THAT MR. KAIL ACTED WITH

12   RECKLESS DISREGARD FOR THE TRUTH OF A MATERIAL

13   MISREPRESENTATION, SUCH A FINDING IS INCONSISTENT WITH GOOD

14   FAITH.  THUS, AN HONEST BELIEF THAT A BUSINESS VENTURE WOULD

15   ULTIMATELY SUCCEED DOES NOT CONSTITUTE GOOD FAITH IF MR. KAIL

16   INTENDED TO DECEIVE NETFLIX BY MAKING MATERIAL REPRESENTATIONS

17   THAT HE KNEW TO BE FALSE OR FRAUDULENT, OR IF MR. KAIL ACTED

18   WITH RECKLESS DISREGARD FOR THE TRUTH OF A MATERIAL

19   MISREPRESENTATION.

20        THE DEFENDANT MICHAEL KAIL IS CHARGED IN COUNTS

21   TWENTY-THREE THROUGH TWENTY-NINE WITH MONEY LAUNDERING IN

22   VIOLATION OF SECTION 1957 OF TITLE 18 OF THE UNITED STATES

23   CODE.  IN ORDER FOR MR. KAIL TO BE FOUND GUILTY OF THAT CHARGE,

24   THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND

25   A REASONABLE DOUBT:

2417

1          FIRST, MR. KAIL KNOWINGLY ENGAGED OR ATTEMPTED TO ENGAGE

2     IN A MONETARY TRANSACTION;

3          SECOND, MR. KAIL KNEW THAT THE TRANSACTION INVOLVED

4     CRIMINALLY DERIVED PROPERTY;

5          THIRD, THE PROPERTY HAD A VALUE GREATER THAN $10,000;

6          FOURTH, THE PROPERTY WAS, IN FACT, DERIVED FROM WIRE FRAUD

7     OR MAIL FRAUD; AND,

8          FIFTH, THE TRANSACTION OCCURRED IN THE UNITED STATES.

9          THE TERM "MONETARY TRANSACTION" MEANS THE DEPOSIT,

10     WITHDRAWAL, TRANSFER, OR EXCHANGE, IN OR AFFECTING INTERSTATE

11     COMMERCE, OF FUNDS OR A MONETARY INSTRUMENT BY, THROUGH, OR TO

12     A FINANCIAL INSTITUTION.

13          THE TERM "FINANCIAL INSTITUTION" MEANS AN INSURED BANK

14     UNDER THE FEDERAL DEPOSIT INSURANCE ACT, A COMMERCIAL BANK OR

15     TRUST COMPANY, OR A CREDIT UNION.

16          THE TERM "CRIMINALLY DERIVED PROPERTY" MEANS ANY PROPERTY

17     CONSTITUTING, OR DERIVED FROM, THE PROCEEDS OF A CRIMINAL

18     OFFENSE.  THE GOVERNMENT MUST PROVE THAT MR. KAIL KNEW THAT THE

19     PROPERTY INVOLVED IN THE MONETARY TRANSACTION CONSTITUTED, OR

20     WAS DERIVED FROM, PROCEEDS OBTAINED BY SOME CRIMINAL OFFENSE.

21     THE GOVERNMENT DOES NOT HAVE TO PROVE THAT MR. KAIL KNEW THE

22     PRECISE NATURE OF THAT CRIMINAL OFFENSE, OR KNEW THE PROPERTY

23     INVOLVED IN THE TRANSACTION REPRESENTED THE PROCEEDS OF WIRE

24     FRAUD OR MAIL FRAUD.

25          ALTHOUGH THE GOVERNMENT MUST PROVE THAT OF THE PROPERTY AT

1      ISSUE MORE THAN $10,000 WAS CRIMINALLY DERIVED, THE GOVERNMENT

2      DOES NOT HAVE TO PROVE THAT ALL OF THE PROPERTY AT ISSUE WAS

3      CRIMINALLY DERIVED.

4            ALL RIGHT.  I'M GOING TO STOP HERE.  I KNOW THAT'S A LOT

5      FOR YOU TO ABSORB.  THERE'S SOME REPETITION.

6            BUT I THINK THAT WILL HELP YOU WHEN YOU ACTUALLY TAKE A

7      LOOK AT THESE JURY INSTRUCTIONS.

8            SO NOW I AM GOING TO TURN TO THE ATTORNEYS FOR THEIR

9      CLOSING ARGUMENTS.

10            THE GOVERNMENT MAKES THE FIRST CLOSING ARGUMENT, AND THEN

11      THE DEFENSE HAS THE OPPORTUNITY, AND THE GOVERNMENT, BECAUSE IT

12      BEARS THE BURDEN OF PROOF, MAY MAKE A FINAL CLOSING ARGUMENT

13      AND WILL RESERVE TIME FOR THAT.

14            MR. SAMPSON, ARE YOU READY FOR THE CLOSING ARGUMENT?

15            MR. SAMPSON:  YES, YOUR HONOR.  WE'RE JUST SETTING

16      UP.

17            THE COURT:  OKAY.

18      (PAUSE IN PROCEEDINGS.)

19            MR. SAMPSON:  JUST ONE MOMENT, YOUR HONOR.

20      (PAUSE IN PROCEEDINGS.)

21      **(MR. SAMPSON GAVE HIS CLOSING ARGUMENT ON BEHALF OF THE**

22      **GOVERNMENT.)**

23            MR. SAMPSON:  NETFLIX WAS ON THE CUTTING EDGE.  IT

24      WAS A LEADER IN I.T. MOVING INTO THE CLOUD.  MR. KAIL WAS THE

25      HEAD OF I.T.  HE KNEW HOW IMPORTANT HIS POSITION THERE WAS.

1       YOU SAW THE VIDEO CLIP WHERE MR. KAIL TALKED ABOUT HOW

2  MUCH STARTUPS WANTED TO WORK WITH NETFLIX AND GET THE NETFLIX

3  LOGO.  THEY WANTED TO BE A PART OF THAT SUCCESS.  AND THEY

4  WANTED TO BE SUCCESSFUL THEMSELVES.

5       MR. KAIL ALSO KNEW SOMETHING ELSE.  THAT BY SIGNING A

6  NETFLIX CONTRACT WITH THOSE STARTUPS, YOU COULD DO MUCH MORE

7  THAN ADD TO A COMPANY'S SALES FIGURES AND THEIR BOTTOM LINE.

8       HE COULD SET THE COMPANY ON A PATH FOR SUCCESS, AND

9  MR. KAIL TESTIFIED THAT A LOT OF THESE COMPANIES THAT HE

10  BROUGHT INTO NETFLIX DID DO WELL AND HAD GOOD EXITS, AND HE'S

11  RIGHT.

12       BUT THIS CASE ISN'T ABOUT MAKING GOOD BUSINESS BETS OR BAD

13  BUSINESS BETS IN SILICON VALLEY.

14       THIS IS A CASE ABOUT MAKING RIGGED BUSINESS BETS IN

15  SILICON VALLEY.

16       TO GET A NETFLIX CONTRACT, MR. KAIL WAS A GATEKEEPER, AND

17  HE KNEW IT.  AND HE JUST WANTED A PIECE OF THE ACTION.  FOR

18  THAT LITTLE PIECE, LET'S CALL IT AN ADVISORY ROLE, CUSTOMER

19  ADVISORY, EXECUTIVE ADVISOR, TECHNICAL ADVISORY, MR. KAIL COULD

20  UNLOCK A STREAM OF BENEFITS FROM AN EARLY, PRE-REVENUE, EARLY

21  STARTUP LOOKING TO GET A FIRST CUSTOMER OFF OF A PROOF OF

22  CONCEPT.

23       THAT STREAM OF BENEFITS WAS AN INTRODUCTION, IT WAS A DEMO

24  WITH TALENTED NETFLIX ENGINEERS THAT GAVE FEEDBACK ON THE

25  POTENTIAL USE CASES FOR A PRODUCT.  AND IT LED MR. KAIL TO

1    BEING AN INTERNAL CHAMPION, OR AS MR. LOISELLE TESTIFIED, AN

2    ECONOMIC BUYER.  THEY COULD BUY THE BUYER, THEY COULD JUMP THE

3    LINE, AND AT THE RIGHT TIME AND FOR THE RIGHT PRICE, MR. KAIL

4    WOULD SIGN A PAYING CONTRACT, A CONTRACT THAT THE COMPANY COULD

5    USE TO GET OTHER CLIENTS, OTHER CUSTOMERS, HEY, LOOK, NETFLIX

6    IS USING US, YOU SHOULD, TOO.  AND AS AN ADVISOR, MR. KAIL

7    WOULD TALK THE COMPANY UP, HE WOULD GIVE REFERENCES, SIT ON

8    PANELS, AND EVERYONE'S STOCK WOULD GO UP, INCLUDING MR. KAIL.

9        EVERYONE BENEFITED FROM THIS DYNAMIC, EXCEPT FOR NETFLIX.

10        LADIES AND GENTLEMEN, YOU HEARD TESTIMONY ABOUT THE TALENT

11    AT NETFLIX.  YOU HEARD ABOUT THE KEEPER TEST.  YOU HEARD THE

12    CEO TESTIFY ABOUT HIRING TRUSTWORTHY PEOPLE.  YOU SAW THE

13    CULTURE DECK WHICH TALKED ABOUT PAYING EMPLOYEES TOP OF THE

14    MARKET FOR THEIR JUDGMENT, THEIR LOYALTY, FOR THEIR HONESTY.

15        THE CULTURE AT NETFLIX ALLOWED PEOPLE TO THRIVE WITHOUT

16    EXERTING TOO MANY RULES.  BUT IT DID HAVE RULES.  ITS EMPLOYEES

17    HAD TO ACT IN NETFLIX'S BEST INTEREST.  THEY HAD TO BE LOYAL TO

18    NETFLIX.

19        THEY HAD TO BE HONEST.  THAT WAS ONE OF THE NECESSARY

20    RULES.

21        REMEMBER IN THE OPENING WHEN MS. JAYNE SAID THERE WERE NO

22    RULES?  MANAGING ON THE EDGE OF CHAOS?

23        BUT THERE WERE RULES.  THERE WERE NECESSARY RULES.  THEY

24    WERE CALLED OUT SPECIFICALLY IN THE CULTURE DECK.

25        MR. KAIL UNDERSTOOD THIS.

1          AND THE REQUIREMENT OF HONESTY IS A PART OF THE CODE OF

2     ETHICS AS WELL.

3          EXHIBIT 5.  MR. KAIL TESTIFIED THAT HE GOT THESE E-MAILS.

4     THESE WERE THE ANNUAL E-MAILS ABOUT THE CODE OF ETHICS.  AND

5     EVEN FROM THE BULLET POINTS, IT'S QUITE CLEAR, THE FIRST BULLET

6     POINT SAYS "HONEST AND ETHICAL CONDUCT," AND IT GOES ON TO

7     INCLUDE THE ETHICAL HANDLING OF ACTUAL OR APPARENT CONFLICTS OF

8     INTEREST BETWEEN PERSONAL AND PROFESSIONAL RELATIONSHIPS.

9          IT GOES ON TO REQUIRE INTERNAL REPORTING FOR VIOLATIONS OF

10    THE CODE.  AND THERE'S ACCOUNTABILITY IF YOU DON'T.

11         AND EVEN JUST READING THE BULLETS IN THE E-MAIL, MR. KAIL

12    UNDERSTOOD WHAT WAS REQUIRED FROM HIM AS A V.P., AS AN

13    EMPLOYEE, AS A TRUSTED MEMBER OF THE NETFLIX TEAM.

14         YOU SEE THESE BULLET POINTS AGAIN IN THE CODE OF ETHICS.

15    SAME BULLET POINTS, HONEST AND ETHICAL CONDUCT, PROMPT INTERNAL

16    REPORTING.

17         ETHICAL CONDUCT IS CONSIDERED TO BE CONDUCT CONFORMED TO

18    THE ACCEPTED PROFESSIONAL STANDARDS OF CONDUCT.  IT GOES ON TO

19    SAY IT INCLUDES THE ETHICAL HANDLING OF ACTUAL OR APPARENT

20    CONFLICTS OF INTEREST BETWEEN PERSONAL AND PROFESSIONAL

21    RELATIONSHIPS.  IT DEFINES CONFLICTS OF INTEREST.  A CONFLICT

22    OF INTEREST EXISTING WHERE THE INTERESTS OR BENEFIT OF ONE

23    PERSON CONFLICT OR APPEAR TO CONFLICT WITH THE INTERESTS OR

24    BENEFITS OF THE CONDITION, THE COMPANY BEING NETFLIX.  IT'S NOT

25    POSSIBLE TO DESCRIBE EVERY SITUATION, BUT 96 PARTIES, AND THAT

1    INCLUDES EMPLOYEES, IT INCLUDES MR. KAIL, MUST NEVER USE OR

2    ATTEMPT TO USE THEIR POSITION WITHIN THE COMPANY TO OBTAIN

3    IMPROPER PERSONAL BENEFITS.  IF ANYONE IS AWARE OF A CONFLICT,

4    THEY'RE REQUIRED TO DISCUSS THE MATTER WITH A HIGHER LEVEL OF

5    MANAGEMENT, WHICH IN MR. KAIL'S CASE WAS THE CEO AND THE CFO

6    LATER.

7        MR. KAIL'S OWN EMPLOYMENT AGREEMENT, WHICH HE TESTIFIED

8    ABOUT, ALSO INCLUDES THE DISCUSSION OF CONFLICTS.  IF YOU HAVE

9    ANY DOUBT AS TO WHETHER YOUR WORK WITH ANOTHER ENTITY MIGHT

10   CONFLICT WITH YOUR WORK AT NETFLIX, YOU ASK YOUR MANAGER.

11       THIS IS ANOTHER INDICATION THAT NETFLIX CARED ABOUT LOYAL,

12   UNCONFLICTED EMPLOYEES.

13       DID MR. KAIL EVER EXPRESS ANY CONFUSION ABOUT THESE

14   POLICIES?  HE DID NOT.

15       DID HE TELL ANYONE THAT HE WAS TAKING COMPENSATION FROM

16   VENDORS TO NETFLIX?  DID HE SEEK GUIDANCE?  HE DID NOT.

17       BUT HERE'S THE CRIMINAL REALITY.  FROM 2012 UNTIL HE LEFT

18   NETFLIX, MR. KAIL WAS TAKING CASH AND ACCRUING STOCK OPTIONS

19   FROM MULTIPLE COMPANIES THAT HE DID BUSINESS WITH AS V.P. OF

20   I.T. OPERATIONS AT NETFLIX.  AND IN DOING SO, MR. KAIL

21   DEFRAUDED NETFLIX OUT OF MONEY, AND HE DEPRIVED HIS EMPLOYER OF

22   ITS RIGHT TO HIS HONEST, UNCONFLICTED SERVICES.

23       YOU SEE THE STREAM OF BENEFITS OF CASH AND OPTIONS, SOME

24   OF WHICH HE EXERCISED GOING TO MR. KAIL, PERSONAL BENEFITS TO

25   HIM OUTSIDE OF HIS EMPLOYMENT.

1          SO WHAT ARE THE CHARGES?

2          LADIES AND GENTLEMEN, THERE'S TWO KINDS OF FRAUD, TWO WAYS

3     EACH.  AND ALSO MONEY LAUNDERING.

4          IF IT SEEMS COMPLICATED, IT'S NOT.  FOR EACH OF COUNTS ONE

5     THROUGH NINETEEN, THE GOVERNMENT NEED PROVE TWO CRIMES:  ONE,

6     THAT MR. KAIL ENGAGED IN A SCHEME TO DEFRAUD NETFLIX OF ITS

7     RIGHT OF HONEST SERVICES BY TAKING BRIBES AND KICKBACKS; AND/OR

8     THAT MR. KAIL COMMITTED FRAUD AGAINST NETFLIX, DEPRIVING

9     THEM -- TO DEPRIVE THEM OF MONEY OR PROPERTY.

10         AND FOR COUNTS ONE THROUGH NINETEEN, THOSE ARE WIRE FRAUD

11    COUNTS.  THEY INVOLVE INTERSTATE WIRES WHICH, BY THE WAY, THE

12    INTERSTATE NATURE OF THOSE WIRES ARE PART OF EXHIBIT 999, THE

13    DEPOSITION OF THE PARTIES.

14         FOR COUNTS TWENTY TO TWENTY-TWO, IT'S A SCHEME TO DEFRAUD

15    BY MAIL.  A SCHEME TO DEFRAUD NETFLIX ONE WAY, WHICH IS TO

16    DEPRIVE NETFLIX OF ITS RIGHT OF HONEST SERVICES, AND ALSO TO

17    DEPRIVE NETFLIX OF MONEY OR PROPERTY.

18         AND THAT IS ACCOMPLISHED THROUGH THE USE OF THE MAILS.

19         COUNTS TWENTY-THREE TO TWENTY-NINE ARE A LITTLE LESS

20    COMPLICATED.  THERE'S ONLY ONE VERSION OF EACH, ENGAGING IN

21    MONETARY TRANSACTIONS WITH PROCEEDS OF SPECIFIED UNLAWFUL

22    ACTIVITY.

23         LADIES AND GENTLEMEN, LET ME POINT OUT THAT THE GOVERNMENT

24    HERE HAS THE BURDEN.  WE HAVE TO PROVE THESE CHARGES BEYOND A

25    REASONABLE DOUBT.  WE ACCEPT THAT BURDEN.

1          HERE'S A LOOK AT THAT VERDICT FORM.  YOU HAVE 51 DECISIONS

2     TO MAKE, THAT'S TWO EACH FOR COUNTS ONE THROUGH TWENTY-TWO, ONE

3     EACH FOR COUNTS TWENTY-THREE TO TWENTY-NINE, MONEY LAUNDERING.

4          AS TO EACH COUNT, YOU'LL BE ASKED TO DECIDE WHETHER THE

5     DEFENDANT IS GUILTY OR NOT GUILTY OF WIRE FRAUD AND GUILTY OR

6     NOT GUILTY OF MAIL FRAUD FOR THE -- SORRY, HONEST SERVICES WIRE

7     FRAUD.

8          AND FOR THE MAIL FRAUD, FOR EXAMPLE, COUNT TWENTY-ONE,

9     YOU'LL BE ASKED TO DECIDE IF THE DEFENDANT IS GUILTY OR NOT

10    GUILTY OF MAIL FRAUD AND GUILTY OR NOT GUILTY OF HONEST

11    SERVICES MAIL FRAUD.

12         LET'S TALK ABOUT THE DEFENDANT'S KNOWLEDGE.

13         WE HEARD REED HASTINGS TESTIFY ABOUT THE SHARED GOOGLE

14    DOC, THE SHARED DOCUMENT THAT HE HAD WITH MR. KAIL THAT THEY

15    COULD BOTH EDIT THAT KEPT TRACK OF THE MANY THINGS THAT THEY

16    HAD TO DEAL WITH AT NETFLIX.

17         THIS REFLECTS THAT ON MARCH 5TH, 2013, MR. KAIL AND

18    REED HASTINGS HAD A CONVERSATION ABOUT CONFLICT AVOIDANCE.

19    MR. HASTINGS TESTIFIED THAT THE DARK BULLET POINTS ARE THE --

20    YES, THE DARK BULLET POINTS WERE HIS STATEMENT AND THAT THE

21    HOLLOW BULLET POINTS WERE MR. KAIL'S RESPONSES RELATED TO THE

22    DISCUSSION THAT THEY HAD ON THIS ISSUE.

23         MR. HASTINGS POINTED OUT THAT NOT ONLY IN THIS DOCUMENT,

24    THAT WITH A PUBLICLY TRADED COMPANY LIKE GOOGLE IS DIFFERENT

25    FROM OWNING STOCK IN A STARTUP OR A BUSINESS THAT WOULD DO

1    BUSINESS WITH THE I.T. DEPARTMENT, AND HE POINTED OUT BOX.  HE

2    POINTED OUT ONELOGIN.

3         MR. HASTINGS, THE CEO, ALSO POINTED OUT GIFTS AND OTHER

4    PERKS.

5         MR. KAIL DOESN'T REMEMBER THE CONVERSATION.  ACCORDING TO

6    MR. HASTINGS'S TESTIMONY, THE HOLLOW BULLET POINTS REFLECT THAT

7    MR. KAIL STATED HE WOULD REVIEW IT WITH HIS DIRECTORS, HE WOULD

8    REVIEW IT WITH THE ENTIRE ORGANIZATION AT THE NEXT QUARTERLY

9    BUSINESS REVIEW, AND THAT HE WOULD REVIEW HIS GENERAL POLICY

10   AROUND THIS WITH MR. HASTINGS.

11        EXHIBIT 9, YOU SAW THE 360 REVIEW.  GOOD REVIEWS AND THE

12   CONSTRUCTIVE REVIEWS.

13        MR. HASTEER, IN THE 2014360 REVIEW FOR MR. KAIL, WAS

14   HONEST.  HE WAS BRAVE.  HE WAS FOLLOWING THE NETFLIX CODE OF

15   ETHICS WHICH REQUIRED THE ETHICAL HANDLING OF POTENTIAL

16   CONFLICTS OF INTEREST AND THE REPORTING OF THOSE CONFLICTS OF

17   INTEREST.

18        HE SAID THAT HIS EVALUATION TEAM, AT LEAST TWO MEMBERS OF

19   IT, CONCLUDED THAT TABLEAU WAS BETTER THAN PLATFORA.  THE

20   ENGINEERS WERE DISAPPOINTED WHEN MR. KAIL WENT WITH PLATFORA,

21   DIDN'T UNDERSTAND THE REASONING BEHIND IT.

22        AND THEN MR. HASTEER POINTED OUT THAT MR. KAIL'S POTENTIAL

23   INVOLVEMENT AS AN ADVISOR WITH SOME OF THESE VENDORS, NOT JUST

24   PLATFORA, SOME OF THESE VENDORS ALSO CREATES THE PERCEPTION OF

25   A CONFLICT OF INTEREST AND THAT HIS EMPLOYEE WASTED TIME ON THE

1        PLATFORA -- ON THE TABLEAU/PLATFORA EVALUATION.

2             MR. HASTEER WAS KEYING UP MR. KAIL'S CONFLICT OF INTEREST,

3        HE WAS CONCERNED ABOUT AN APPARENT OR POTENTIAL CONFLICT OF

4        INTEREST.

5             NOW, THAT CAUGHT THE ATTENTION OF THE CEO.  MR. HASTINGS

6        TESTIFIED THAT VERY QUICKLY HE WROTE AN E-MAIL TO MR. KAIL ON

7        THIS ISSUE.  THE SUBJECT WAS SUNSHINE, WHICH IS THE IDEA OF

8        EXPLAINING WHY YOU'RE MAKING THE DECISION YOU'RE MAKING AND

9        THAT YOU'RE NOT -- YOU DON'T HAVE A CONFLICT OF INTEREST THAT

10       CAUSES YOU TO MAKE THE WRONG DECISION FOR THE WRONG REASONS.

11            MR. HASTINGS STARTS BY REFERENCING A CONVERSATION A YEAR

12       OR TWO AGO.  REMEMBER, THE TOPIC TRACKER IS DATED MARCH 5TH,

13       2013, AND THIS IS MARCH 25TH, 2014.

14            MR. HASTINGS REITERATES THE POLICY, MAKING IT QUITE CLEAR,

15       "YOU WANT TO AVOID ANY POTENTIALLY CONFLICTING RELATIONSHIPS

16       WITH ANYONE YOU MIGHT DO BUSINESS WITH.  YOU ARE FREE TO

17       VOLUNTEER, BUT NOT TO TAKE ANY COMP," AND HE CALLS OUT CASH,

18       OPTIONS, ET CETERA.

19            HE SAYS IT WAS IN THE REVIEW OF THE TABLEAU COMPETITOR,

20       WHICH WAS PLATFORA.  HE SAID "YOU SHOULD MAKE SURE EVERYONE ON

21       YOUR TEAM AND YOU LIVE THE VALUE OF TRANSPARENCY AND CANDOR AND

22       HAVE THE REPUTATION FOR THIS."

23            HE USES THE TERM "VOLUNTEER" AGAIN.  "IF EVERYONE KNEW YOU

24       WERE ONLY A VOLUNTEER, THIS STUFF WOULDN'T COME UP."

25            MR. HASTINGS THOUGHT HE WAS COMING TO MR. KAIL'S DEFENSE.

1          MR. KAIL RESPONDS, AND LADIES AND GENTLEMEN, MR. KAIL HAD

2     A DUTY TO DISCLOSE ACTUAL OR APPARENT CONFLICTS OF INTEREST

3     BEFORE THIS E-MAIL.  IT'S IN THE CODE OF ETHICS.  IT'S IN THE

4     ANNUAL CODE OF ETHICS.  IT'S IN THE E-MAIL.  IT'S IN THOSE

5     BULLET POINTS YOU SAW.

6          JUST LIKE THE MARCH 2013 TOPIC TRACKER DISCUSSION ABOUT

7     BOX OR ONELOGIN, BUT HERE MR. KAIL'S RESPONSE IS ILLUMINATING.

8          MR. KAIL SAYS, "UNDERSTOOD AND AGREED, AND I HAD

9     PREVIOUSLY SET CONTEXT AROUND PLATFORA AND THAT I'M NOT

10    FORMALLY HELPING THEM."

11         HE SAYS HE IS NOT FORMALLY HELPING PLATFORA.  HE AGREES

12    WITH MR. HASTINGS THAT HE'S ONLY A VOLUNTEER.

13         MR. KAIL GOES ON, MINUTES LATER, TO CLOSE OUT THE TOPIC.

14    AND HE SAYS HE'S SETTING UP A MEETING WITH GAGAN, THAT'S

15    GAGAN HASTEER, TO GIVE HIM CONTEXT ABOUT GAGAN'S MISPERCEPTION.

16    GAGAN HAS IT WRONG.

17         MR. KAIL GOES BEYOND OMITTING MATERIAL, GOES BEYOND

18    OMITTING FACTS, AND LIES TO REED HASTINGS.  AND HE REPEATS THE

19    LIE AGAIN.

20         TRUST AND RESPONSIBILITY, CANDOR, SUNSHINE, HONEST AND

21    ETHICAL CONDUCT, CONTEXT, WHATEVER YOU CALL IT, THE EVIDENCE

22    SHOWS THAT MR. KAIL KNEW THAT HE WAS REQUIRED TO DISCLOSE TO

23    HIS SUPERIOR WHEN HE HAD A CONFLICT.  THE EVIDENCE SHOWS THAT

24    MR. KAIL UNDERSTOOD THAT OBLIGATION, AND HE WAS CONFUSED ABOUT

25    IT.  MR. HASTINGS TOLD HIM POINT BLANK THAT HE IS NOT TO TAKE

1    COMP.  HE CAN ONLY BE A VOLUNTEER.

2         AND WHAT DID MR. KAIL DO?  HE LIED.  HE LIED DIRECTLY TO

3    HIS SUPERIOR.  HE REPEATED THE LIE TO THE CFO AND TO THE H.R.

4    PERSON ON THIS E-MAIL.

5         AND THEN HE SET UP A MEETING WITH MR. HASTEER.

6    MR. HASTEER TESTIFIED THAT MR. KAIL TOLD HIM THAT HE WASN'T

7    TAKING COMPENSATION FROM PLATFORA.  MR. KAIL DOES NOT REMEMBER

8    THAT CONVERSATION.

9         MR. KAIL WAS WEAPONIZING NETFLIX'S OWN BUSINESS

10   TERMINOLOGY TO GET OUT OF THE JAM HE WAS IN.

11        WHAT MR. KAIL DID AFTER THIS IS ALSO VERY IMPORTANT, TO

12   LET'S GET INTO IT.

13        PLATFORA.  YOU'VE HEARD A LOT ABOUT PLATFORA IN THIS

14   TRIAL.  YOU'VE SEEN THE VIDEO DEPOSITION OF MR. WERTHER.  YOU

15   HEARD LIVE TESTIMONY FROM MR. ROSSI, THE HEAD OF SALES;

16   MR. ASHER, THE COMPANY'S CFO; THERESA VU, WHO WAS IN PRODUCT

17   FOR PLATFORA.

18        AND YOU HEARD TESTIMONY FROM NETFLIX TEAM MEMBERS, LIKE

19   TONY RALPH, YINGKUAN LIU, GAGAN HASTEER, KURT BROWN.

20        YOU'VE SEEN A LOT OF EXHIBITS.  YOU SAW MR. KAIL'S E-MAIL

21   TO GAGAN HASTEER ON MARCH 25TH, THE SAME DAY AS MR. HASTINGS'

22   E-MAIL IN WHICH MR. KAIL CALLS PLATFORA A FAILED PILOT.

23        BUT IT STARTED WITH A PILOT.

24        DURING THAT PILOT, MR. KAIL MET WITH THE EXECUTIVES AT

25   PLATFORA.  HE MET THEM ALONE.  HE MADE HIS ASK. .25 PERCENT OF

1    THE COMPANY, 75,000 SHARES, AND FOR THAT, THEY WOULD GET THEIR

2    ADVISOR.

3         MR. KAIL SAID, ON JULY 31ST, 2013, THE NIGHT OF ONE OF

4    THOSE MEETINGS, "I LOOK FORWARD TO HELPING YOU IN BOTH A

5    NETFLIX AND ADVISORY CAPACITY."

6         AFTER THAT, HE DOCUSIGNED THE ADVISORY AGREEMENT AND SENT

7    IT TO PLATFORA.

8         HE SAID "WILL DO MY BEST TO ADD VALUE."

9         AND BY THE WAY, HOW MUCH WAS THE STRIKE PRICE ON MY

10   OPTIONS?

11        THE E-MAILS OF THE PLATFORA EMPLOYEES ON THE OTHER SIDE OF

12   THIS ARRANGEMENT CONFIRM THE MEETING.  MR. WERTHER RECOUNTS

13   MR. KAIL'S CONVERSATION, THAT HE HAD A GREAT CHAT WITH MR. KAIL

14   OVER DRINKS, AND MR. KAIL PITCHED HIS VALUE AS AN ADVISOR,

15   I.E., HE TAKES A QUARTER POINT AND GAVE LOTS OF EXAMPLES OF HOW

16   HE GOES TO EXTREME TO PROVIDE CUSTOMER REFERENCES, ET CETERA.

17        "IT IS A LOT OF EQUITY, BUT HE WAS CLEAR THAT IF HE WASN'T

18   ADDING VALUE, THEN IT'D BE A FOUR YEAR VESTING CYCLE AND

19   EXAMINE WE COULD JUST END THE RELATIONSHIP EARLY."

20        IF THAT WASN'T ENOUGH, MR. WERTHER GOES ON, AND THIS IS

21   ONLY TO EMPLOYEES INSIDE PLATFORA.  THE STRONG SUGGESTION WAS

22   THAT IF WE DO THAT, AND REMAIN RESPONSIVE LIKE WE HAVE BEEN,

23   WE'D BE ABLE TO GET A $600,000 THREE YEAR DEAL DONE BY

24   LABOR DAY."

25        MR. ROSSI, WHO YOU HEARD FROM TESTIFY IN THE GOVERNMENT'S

1    CASE, AN E-MAIL FROM MR. WERTHER THAT NIGHT, YEAH, THAT

2    EVENING, "WHAT A GREAT LOGO, BEN."  NOT WHAT A GREAT ADVISOR,

3    BEN.  NOT WHAT A GREAT LUMINARY, BEN.  "WHAT A GREAT LOGO."

4         CLEARLY HE HAS BEEN WORKING THE GREY AREA BETWEEN CUSTOMER

5    ADVISORY BOARD ADVISOR, CAB, AND LEVERAGING THE NETFLIX LOGO

6    FOR PERSONAL ADVANTAGE, LET'S ROLL WITH THIS.

7         THERE WAS NO CONFUSION INSIDE OF PLATFORA WHAT THEY WERE

8    GETTING.

9         EXHIBIT 312 IS THE ADVISORY AGREEMENT DOCUSIGNED BY

10   MR. KAIL AUGUST 2ND, 2013, 75,000 SHARES -- 75,000 OPTIONS.

11   THIS IS WHILE THE PILOT IS STILL GOING.  THIS IS WHILE THE

12   NETFLIX ENGINEERS ARE TESTING THE PRODUCT.  THIS IS WHILE

13   MR. KAIL IS STILL GETTING FEEDBACK FROM HIS TEAM.

14        MR. KAIL'S OTHER ACTIONS WITH PLATFORA DEMONSTRATE HIS

15   CONFLICT.  DURING THE PILOT, MR. KAIL DOES SOME DIGGING FOR

16   MS. VU ON COMPETITORS TO PLATFORA.  SHE SPECIFICALLY ASKS HIM

17   FOR COMPETITIVE PRICING ON MICROSTRATEGY AND TABLEAU.  MR. KAIL

18   SAYS I WASN'T INVOLVED IN THOSE NEGOTIATIONS, SO I WILL HAVE TO

19   DO SOME DIGGING, AND INDEED HE DOES.

20        TWO DAYS LATER, HE RESPONDS WITH THE PRICES FOR TABLEAU,

21   DISCOUNTS FOR SUBSEQUENT YEARS.  HE RESPONDS WITH PRICING FOR

22   MICROSTRATEGY AND SAYS IT HAS BEEN NEGOTIATED.  IT'S DISCOUNTED

23   IF WE BUY 50 USERS AT A TIME.

24        LADIES AND GENTLEMEN, MR. KAIL'S EXPLANATION OF USING AN

25   UNNAMED CTO FRIEND'S, OR CIO FRIEND'S LOG IN TO A WEBSITE

1    DOESN'T ADD UP.

2         NETFLIX HAD A TABLEAU LICENSE.  THE NEGOTIATIONS BEGAN ON

3    PRICING.

4         MR. ASHER, THE CFO IN CHARGE OF BOOKINGS, EARNINGS, OTHER

5    CONTRACTS, SAYS TO MR. KAIL THAT THEY WANT 100,000 A YEAR, AND

6    MR. KAIL HAD TOLD THEM, TONY -- THAT'S TONY RALPH -- DOESN'T

7    SEE THE VALUE IN 100,000 A YEAR, IS HE IN THE TEAM, TO BE

8    COMPLETELY CANDID, DON'T.  THEY CAN DO MORE, FASTER, WITH HIVE,

9    PIG, TABLEAU.

10        MR. ASHER EXPLAINS THAT THE 100,000 A YEAR IS JUST A

11   PLACEHOLDER FOR A BIGGER SUBSCRIPTION WHEN 3.0 COMES OUT SOME

12   DAY.

13        HE GOES ON.  IF WE DID NOT DELIVER THE FUNCTIONALITY, YOU

14   WOULD OPT OUT.  WE'RE NOT LOOKING TO STICK YOU WITH A THREE

15   YEAR SUBSCRIPTION FOR NO VALUE.

16        REMEMBER MR. RALPH'S TESTIMONY ABOUT BEING IN ON A MEETING

17   WITH PEOPLE FROM PLATFORA AND MR. KAIL AND MR. RALPH PROVIDING

18   THE NEGATIVE FEEDBACK AND THEN MR. KAIL, AND I BELIEVE HE

19   TESTIFIED IT WAS BEN WERTHER, BEGAN TALKING ABOUT THE PRICES OF

20   THE DEAL THAT HAD ALREADY BEEN DONE.  THEY WERE ALREADY TALKING

21   PRICING TERMS.  MR. RALPH THOUGHT THAT HE HAD INPUT.  BUT IT'S

22   CLEAR HERE IN EARLY SEPTEMBER, MR. RALPH DID NOT SEE THE VALUE.

23        WHAT HAPPENS?  MR. KAIL'S AN ADVISOR, PLATFORA IS IN A

24   PILOT -- WHICH, BY THE WAY, GETS EXTENDED FOR A PERIOD OF TIME.

25   MR. KAIL EXTENDS THE PILOT.

 1          AND TOWARD THE END OF SEPTEMBER, MID-SEPTEMBER, MR. KAIL

 2    DOCUSIGNS THE SUBSCRIPTION AGREEMENT.

 3          10,000 A MONTH FOR SEVEN MONTHS, AND THEN 250,000 A YEAR

 4    FOR THE REST OF THE THREE YEAR PERIOD.

 5          IF YOU ADD IT UP, THAT'S $600,000.  THAT'S A THREE YEAR

 6    DEAL.  THAT'S WHAT MR. WERTHER SAID MR. KAIL COULD DELIVER.

 7          THERE'S A TERMINATION PARAGRAPH AT THE OWNED OF THAT SEVEN

 8    MONTHS, THAT NETFLIX WOULD HAVE TO GIVE THEM WRITTEN NOTICE TO

 9    TERMINATE FOR CAUSE IF THE ROADMAP CAPABILITIES WERE NOT

10    PROVIDED.

11          THAT SAME DAY MR. KAIL AND MS. VU ARE TALKING THE SAME DAY

12    MR. KAIL SIGNS THE PLATFORA CONTRACT, HE SAYS "TONY IS STILL

13    SKEPTICAL."

14          IS THIS THE COLLABORATIVE FEEDBACK THAT MR. KAIL TESTIFIED

15    ABOUT TODAY?  IS THIS THE GROUP DECISION THAT MR. KAIL

16    TESTIFIED ABOUT TODAY?

17          HE TELLS MS. VU, "MAYBE JUST YOU AND I CAN HAVE THE

18    CONVERSATION THEN."

19          AND THERE'S MR. KAIL TELLING STREAMING AP, THAT'S THE

20    E-MAIL BOX AT NETFLIX FOR ACCOUNTING PAYABLE, "APPROVED."

21          SO THIS IS MR. KAIL APPROVING THE INVOICE IN MONTH ONE.

22          REMEMBER THE ISSUE WITH THE PLATFORA LOGO.  AFTER THE

23    CONTRACT IS SIGNED, PLATFORA BEGINS TOUTING NETFLIX AS A

24    CUSTOMER.  WHY WOULDN'T THEY?  NETFLIX IS A VALUABLE BRAND.

25          MR. HASTEER TESTIFIED THAT MR. KAIL WAS THE DECISIONMAKER

1       ON PLATFORA.  MR. HASTEER DIDN'T SAY IT WAS A TEAM DECISION.

2       IT WAS MR. HASTEER'S UNDERSTANDING, AFTER GIVING FEEDBACK, THAT

3       THEY WOULDN'T BE MOVING FORWARD WITH PLATFORA.  THAT'S WHY

4       MR. HASTEER WAS SURPRISED TO FIND OUT FROM HIS TEAM THAT THE

5       LOGO WAS UP.

6            AND THEN IN OCTOBER 2013, MR. HASTEER TALKED TO MR. KAIL

7       AND SAID HE BELIEVED IT SHOULD BE TAKEN DOWN.

8            MR. RALPH ALSO THOUGHT THE SAME.  HE WAS THE AD TECH

9       PERSON THAT WAS GOING TO BE USING THE PRODUCT.  HE WAS THE ONE

10      IN THE MEETING WHERE HE WAS CUT OUT AND MR. KAIL AND

11      MR. WERTHER BEGAN TALKING ABOUT TERMS.

12           MR. BROWN -- MR. RALPH TESTIFIED THAT HE SAW THE LOGO, AND

13      HE THOUGHT IT SHOULD BE TAKEN DOWN AND HE TOLD MR. KAIL ABOUT

14      IT.  MR. KAIL IGNORED HIM.

15           BURT BROWN TESTIFIED THAT HE SAW THE LOGO AND THAT HE

16      PINGED MR. KAIL IN DECEMBER, AND THEN IN JANUARY, AND EXHIBIT

17      343 IS THE JANUARY E-MAIL IN WHICH MR. BROWN SAYS THAT IT

18      DOESN'T FEEL RIGHT GIVEN OUR LIMITED TO NO USAGE.

19           MR. KAIL SAID HE'D REACH OUT AGAIN, AND LATER CONFIRMED

20      THE LOGO HAD BEEN REMOVED.

21           WAS THERE A FALLING OUT BETWEEN MR. KAIL AND MR. WERTHER

22      OVER PERSONALITY DIFFERENCES AS HE DESCRIBED?  OR WAS IT

23      BECAUSE OF THE BUSINESS RELATIONSHIP WAS SOURING AND NETFLIX

24      WASN'T USING THE PRODUCT?

25           YOU SAW PLENTY OF EVIDENCE ABOUT ISSUES THAT PEOPLE HAD

1    WITH PLATFORA.  MR. WERTHER REACHED OUT IN MARCH 2014 SAYING WE

2    CAN'T GET A STAKEHOLDER TO ENGAGE, WE'VE BEEN STUCK TALKING TO

3    JAN AND YINGKUAN WHO WILL KICK THE TIRES BUT DON'T SEEM TO

4    REALLY CARE.  AND HE SAYS TO HIS ADVISOR, MR. KAIL, IT FEELS

5    LIKE WE NEED YOU IN THAT KICKOFF TO MAKE SURE EVERYONE IS

6    BROUGHT IN AND FOCUSSED ON GETTING SOMETHING THAT IS MEANINGFUL

7    FOR YOU GUYS.

8         MR. KAIL RESPONDS WITH SOME HONESTY.  "I TALKED TO YING IN

9    PERSON ABOUT AN HOUR AGO, BUT CAN ONLY DO SO MUCH PUSHING FROM

10   MY SIDE WITHOUT HAVING A CONFLICT OR BEING DRACONIAN."

11        DOES THAT SOUND LIKE AN UNCONFLICTED ADVISOR?  OR DOES

12   THAT SOUND LIKE SOMEBODY WHO'S PUSHING BECAUSE HE'S ACCRUING

13   SHARES?  HE'S INVESTED IN THE SUCCESS OF PLATFORA AT NETFLIX,

14   EVEN THOUGH HE HAS TO PUSH YINGKUAN TO USE IT.

15        HERE'S THE FAILED PILOT E-MAIL, THE SAME NIGHT AS THE

16   REED HASTINGS E-MAIL TO MR. KAIL ABOUT VOLUNTEERING, THIS STUFF

17   WOULDN'T COME UP.

18        MR. KAIL SAYS THANKS FOR THE FEEDBACK TO MR. HASTEER.  AND

19   HE WANTS TO SET CONTEXT ON THE PLATFORA TOPIC.  HE REITERATES,

20   "I'M NOT FORMALLY HELPING THEM, AND WE'RE NOT DOING ANY DEAL

21   WITH THEM AFTER THE FAILED PILOT."

22        IS THAT WHAT YOU SAW IN THE EVIDENCE, LADIES AND

23   GENTLEMEN?  THIS IS CONSISTENT WITH HOW MR. HASTEER RECALLS --

24   WHAT MR. HASTEER RECALLS OF THE CONVERSATION.

25        BUT IT'S CLEAR, MR. KAIL IS GOING TO LIE TO EVERYBODY

1      ABOUT WHETHER HE'S FORMALLY HELPING PLATFORA OR NOT.

2           IT'S NOT UNTIL SIX DAYS LATER THAT MR. KAIL ACTUALLY

3      RESIGNS.  HE'D LIKE TO EXPLAIN IN PERSON, BUT HE WANTS -- HE'S

4      ASKING TO REMOVE HIMSELF FROM THE PLATFORA ADVISORY BOARD

5      BECAUSE HE CAN'T SERVE IN A CAPACITY THAT HE FEELS BENEFITS THE

6      COMPANY, AND HE ASKED TO BE TERMINATED.

7           LADIES AND GENTLEMEN, ISN'T THIS THE SAME DAY THAT MR. LIU

8      SAYS THAT THEY WON'T BE GOING FORWARD WITH PLATFORA AT THE END

9      OF THE QUARTER?  OR AT THE END OF THE FIRST NUMBER OF MONTHS OF

10     THE CONTRACT?  AND THEY TERMINATE HIM.  THEY PROVIDE HIM WITH

11     HIS 10,937 SHARES AND HE'S GOT SOME TIME TO EXERCISE THEM IF HE

12     WANTS.

13          BUT IT'S NOT QUITE OVER WITH PLATFORA.  MR. LIU GOES ON,

14     AND THIS IS ON APRIL 18TH, BEFORE THE DATE OF THE CONTRACT, AND

15     HE TELLS PLATFORA, AND MR. KAIL IS ON THIS E-MAIL, "WE HAVE

16     INDICTED NOT TO EXTEND OUR PLATFORA CONTRACT.  WE COULDN'T FIND

17     A SOLID PRODUCTION USE CASE OF PLATFORA AT ITS CURRENT STAGE,"

18     AND IMPORTANTLY, HE SAYS "SOME OF THE KEY FEATURES LISTED BELOW

19     ARE NOT FULLY DEPLOYED OR STILL NEED IMPROVEMENT."

20          PLATFORA HAS NOT DELIVERED ON THAT ROADMAP.  MR. KAIL IS

21     ON THERE.  DOES HE SAY NO, NO, YINGKUAN IS WRONG, THEY

22     COMPLETELY DELIVERED, FULL COMPLIANCE WITH THE CONTRACT?

23          HE DOES NOT.

24          AND, REMEMBER, MR. KAIL HAD PREVIOUSLY CALLED IT A FAILED

25     PILOT.

1      WHAT HAPPENS NEXT?

2      $155,000 INVOICE COMES IN FROM PLATFORA AND MS. SUNDHOLM,

3  WHO TESTIFIED HERE IN THIS TRIAL, ASKED MR. KAIL ABOUT IT

4  WONDERING IF THERE WAS SOME OTHER CONTRACT OR AGREEMENT BECAUSE

5  NETFLIX SHOULDN'T BE ON THE HOOK FOR THE REST OF THIS MONEY.

6      THEY WERE PAYING 10,000 A MONTH, THE CONTRACT HAD BEEN

7  ENDED BY YINGKUAN.  WHY IS THIS $155,000 BILL COMING IN?

8      LADIES AND GENTLEMEN, YOU'VE SEEN THE EXHIBITS AND YOU

9  KNOW WHY.  MR. ASHER EXPLAINED TO MR. KAIL THAT $155,000 WAS

10  THE NUMBER THAT PLATFORA NEEDED TO AVOID A BAD REVENUE PROBLEM,

11  A RECOGNITION, A REVENUE RECOGNITION PROBLEM BECAUSE THEY HAD

12  BOOKED THE WHOLE FIRST YEAR OF THE DEAL.

13      THEY SAID THEY DIDN'T WANT TO PUT MR. KAIL IN AN UNTENABLE

14  POSITION.  BUT IT WAS THEIR VIEW THAT NETFLIX WOULD HAVE TO PAY

15  FOR THE REST OF THE YEAR.

16      WHAT DID MR. KAIL DO?  HE APPROVED IT.  HE WRAPPED IT UP

17  CLEANLY.  HE TOLD MS. SUNDHOLM THAT THEY MET THE ROADMAP, THAT

18  THEY MET THEIR END OF THE CONTRACT, AND NETFLIX PAID THE BILL.

19      SUMO LOGIC.

20      MR. KAIL MEETS WITH SUMO LOGIC AND, IN HIS WORDS, HE

21  BELIEVED THAT SUMO LOGIC WOULD BE A GREAT SUCCESS AT NETFLIX,

22  AS WELL AS A MYRIAD OF OTHER CUSTOMERS, AND HE GREATLY LOOKED

23  FORWARD TO ASSISTING WITH BOTH.

24      HE WOULD HELP AT NETFLIX.  HE WOULD BE THE INTERNAL

25  CHAMPION.  HE WOULD BE THE ECONOMIC BUYER.

1          FOR A FRACTION OF A PERCENTAGE OF YOUR STARTUP, YOU COULD

2     BUY YOUR BUYER.

3          MR. KAIL SIGNS $300,000, HALF A TERABYTE A DAY CONTRACT

4     WITH SUMO LOGIC, AND THAT WAS HUGE FOR THEM.  IT WAS THEIR

5     BIGGEST CONTRACT TO DATE, $300,000.

6          HE ENTERS AN ADVISORY BOARD AGREEMENT ABOUT 11 OR 12 DAYS

7     LATER.  REMEMBER, IT'S 2012, NOT 2011.

8          AND THERE ARE SOME TERMS IN THAT ADVISORY AGREEMENT,

9     INCLUDING THAT THE ADVISOR IS SUBJECT TO THIS AGREEMENT, WHICH

10    BY THE WAY, PAYS SHARES, OPTIONS; THAT THE ADVISOR HOLD A

11    VICE PRESIDENT OR C-LEVEL I.T. ROLE AT A MARQUEE LEVEL

12    CUSTOMER, NETFLIX WAS THAT CUSTOMER, AND IN ORDER TO BE AN

13    ADVISOR, IN ORDER TO GET THE SHARES, IN ORDER TO COMPLY WITH

14    THE CONTRACT THAT MR. KAIL SIGNED, HE HAD TO BE A CUSTOMER.  HE

15    HAD TO HOST A CUSTOMER EVENT.  HE HAD TO ENDORSE SUMO LOGIC.

16    IT'S BAKED INTO THE CONTRACT.

17         HE DIRECTS THE DATE ON THE ADVISORY AGREEMENT, DOCUSIGNS,

18    IT SENDS IT BACK.

19         MR. LOISELLE TELLS HIM, HE'S GOT AN EXERCISE PRICE AT 48

20    CENTS A SHARE.  REMEMBER, LADIES AND GENTLEMEN, MR. KAIL

21    EVENTUALLY EXERCISED THOSE OPTIONS.

22         THE NEXT YEAR, IT'S NOT A HALF A TERABYTE, IT'S A FULL

23    TERABYTE.  IT'S NOT A $300,000 CONTRACT, IT'S 400,00 A YEAR FOR

24    2 YEARS.  800,000.  IT'S THEIR FIRST TERABYTE DEAL.

25         MR. KAIL GETS MORE SHARES.  IN MAY 2013, HE GETS 20,000

1   MORE OPTIONS FOR LESS THAN A DOLLAR EACH.  HE EVENTUALLY

2   EXERCISES THOSE OPTIONS.  HE'S GOT THE EARLY EXERCISE OPTION,

3   TOO.

4        AND, LADIES AND GENTLEMEN, THE VESTING COMMENCEMENT DATE

5   IS A YEAR EARLIER.  SO WHEN HE SIGNS THIS, HE'S ALREADY VESTED

6   HALF HIS OPTIONS.  THE FIRST GRANT IS 30,000, 48 CENTS A SHARE.

7   THE SECOND GRANT, 20,000, 94 CENTS A SHARE.

8        IF YOU DO THE MATH, LADIES AND GENTLEMEN, I THINK YOU'LL

9   FIND THAT'S ABOUT $34,000 TO EXERCISE THOSE 50,000 OPTIONS,

10  WHICH MR. KAIL DID.  MR. KAIL TESTIFIED THAT HE STILL HAS THE

11  STOCK.  HE DID NOT RECALL MR. LOISELLE TESTIFYING THAT IT WAS

12  ABOUT $20 A SHARE AT THE IPO.  $50,000, 20 DOLLARS A SHARE,

13  THAT'S A MILLION DOLLARS.

14       HERE ARE THE CERTIFICATES, EXHIBIT 632.

15       SOME OF THESE COMPANIES MR. KAIL DIDN'T EXERCISE HIS

16  OPTIONS IN, BUT OTHERS HE DID.  SUMO LOGIC, MAGINATICS,

17  DOCURATED, NETSKOPE.

18       LADIES AND GENTLEMEN, THE EVIDENCE DOES NOT SHOW THAT

19  MR. KAIL DECLINED OR RETURNED HIS RIGHT TO THE OPTION.  HE

20  DIDN'T RAFFLE THEM OFF.  HE HAD THE RIGHT TO BUY THEM, AND HE

21  BOUGHT THE ONES HE WANTED.  THEY HAD VALUE.

22       MR. KAIL PROVIDED THOSE ENDORSEMENTS THAT WERE PART OF THE

23  SUMO LOGIC ADVISORY AGREEMENT.  EXHIBIT 607.

24       BUT HE HAD FEEDBACK, THERE WERE PROBLEMS WITH SUMO LOGIC.

25  AGAIN, THE WORD "PUSHING."  REMEMBER MR. KAIL TESTIFIED THAT HE

1    DIDN'T PUSH ANYONE TO USE VISTARA?  IN HIS OWN WORDS IN 2013,

2    HE WAS PUSHING PEOPLE TO USE SUMO.  "I'M PUSHING MY TEAMS TO

3    USE THE TOOL, BUT THE PERFORMANCE ISSUES ARE PROBLEMATIC.

4    GRAPHING HAS BEEN EXTREMELY SLOW.  BILL'S TEAM IS GETTING

5    EXTREMELY FRUSTRATED.  I'M TRYING TO GET OUT AHEAD OF THAT."

6        HE'S TRYING TO GET OUT AHEAD OF THAT BECAUSE HE HAS A

7    VESTED INTEREST IN SUMO'S SUCCESS.

8        THIS IS THE RENEWAL IN JULY, ABOUT TWO MONTHS AFTER HIS

9    SECOND STOCK GRANT PAPERWORK, AND MR. KAIL IS SIGNING THE

10   $800,000 TWO YEAR DEAL, THE FIRST TERABYTE DEAL.  THAT'S NOW

11   $1.1 MILLION IN CONTRACT VALUE FOR SUMO FROM NETFLIX SIGNED BY

12   MR. KAIL.

13       BUT, AGAIN, THERE ARE PROBLEMS.  NEED TO GET DATA OUT

14   QUICKLY.  MR. KAIL SAYS, "I WANT TO GET (MORE) OUT AHEAD OF

15   THESE ISSUES.  IT'S BECOMING INCREASINGLY DIFFICULT TO TELL MY

16   TEAMS TO BE PATIENT WHILE THE SUMO ENGINEER TEAMS WORK ON THE

17   PERFORMANCE ISSUES."

18       IN 2014, HE SAYS "I'M RAPIDLY LOSING INTERNAL CHAMPIONS

19   AND THE GENERAL FEEDBACK IS SUMO IS UNUSABLE."

20       $800,000, TWO YEAR CONTRACT.

21       MR. KAIL EVENTUALLY LEAVES NETFLIX, AND HE'S HEADED TO A

22   PLACE CALLED FANATICS.  AND HE TELLS HIS FRIENDS AT SUMO LOGIC

23   THAT HE'S LEAVING.  AND HE MENTIONS REED HASTINGS AND HIS NEW

24   CEO, DOUG, AND HE SAID "DOUG IS ALSO FULLY AWARE AND SUPPORTIVE

25   OF MY ADVISORY ROLES."

1            DID MR. KAIL BELIEVE THAT REED HASTINGS WAS SUPPORTIVE OF

2    HIS PAID ADVISORY ROLES?  OF HIS ADVISORY ROLES WITH COMP?

3    LADIES AND GENTLEMEN, THE EVIDENCE DEMONSTRATES THAT IN MARCH

4    2013, REED HASTINGS MADE CLEAR, YOU CAN'T HAVE STOCK IN

5    STARTUPS.  YOU'VE GOT TO AVOID GIFTS AND PERKS.

6            THE EVIDENCE IS CLEAR THAT MR. HASTINGS SENDS AN E-MAIL TO

7    MR. KAIL IN MARCH 2014 AFTER THE 360 REVIEW BY MR. HASTEER THAT

8    YOU ARE ONLY A VOLUNTEER AND IF PEOPLE KNEW THAT, THIS STUFF

9    WOULDN'T COME UP.  HE MAKES CLEAR, YOU CAN'T TAKE COMPENSATION.

10           MR. KAIL DOESN'T DISCLOSE TO ANYONE AT NETFLIX THAT THESE

11   CONTRACTS, THAT THESE ADVISORY ROLES ARE COMPENSATED.

12           BUT SOMEHOW EVERYONE KNOWS BECAUSE IT'S THE STANDARD.

13           THIS IS THE $400,000 A YEAR, 2 YEAR DEAL, $800,000.

14   MR. KAIL SAID HE'S ALSO SIGNED THE GRANT PAPERWORK.  SHORTLY

15   AFTER THAT, HE RETURNED THE GRANT PAPERWORK BY FEDEX.

16           JUST AFTER MR. KAIL LEAVES, HE GETS A THANK YOU FROM

17   PEOPLE AT SUMO, "THANK YOU FOR MAKING SURE YEAR 2 WENT THROUGH.

18   PAYMENT WAS RECEIVED."

19           NOW, REMEMBER, LADIES AND GENTLEMEN, HOW VALUABLE THE

20   NETFLIX BRAND IS TO THE STARTUPS?  MR. LOISELLE SAID HE WOULD

21   HAVE DONE A THIRD MONEY LOSING DEAL IF HE HAD A CHANCE TO HAVE

22   A CONTRACT WITH NETFLIX.  HE SAID "LET ME RESTATE THAT.  MOST

23   DEFINITELY YES."

24           NETFLIX WAS AN EXTREMELY VALUABLE CUSTOMER TO HAVE ON

25   HAND.

1          WHAT ABOUT NETSKOPE?

2          YOU HEARD MR. BERI, CEO OF NETSKOPE, CO-FOUNDER, HE'S BEEN

3     THERE THE WHOLE TIME, MR. KAIL WAS PAID $5,000 A MONTH AS PART

4     OF HIS LATE 2012 ADVISORY CONTRACT, A CASH COMPONENT AND A

5     SHARE COMPONENT, 26,500 OPTIONS TO START.  REMEMBER, YOU HEARD

6     TESTIMONY FROM MR. SHOKER THAT -- AND YOU SAW AN EXHIBIT

7     INDICATING THAT THAT HAD SPLIT TWICE, SO HE ENDED UP WITH

8     106,500 OPTIONS.

9          MR. KAIL, I BELIEVE -- I BELIEVE THE TESTIMONY WAS THAT,

10    FROM MR. BERI, THAT NETSKOPE WAS IN STEALTH MODE PRIOR TO THIS.

11    MR. KAIL WAS ADVISING THEM, RECEIVING MONTHLY PAYMENTS, VESTING

12    HIS OPTIONS AT NETSKOPE.  HE DOES A PILOT AT NETFLIX.

13         MR. KAIL SIGNS THE FIRST PAYING DEAL WITH NETSKOPE.  I'M

14    SORRY.  I BELIEVE IT'S ACTUALLY 112,500.  AGAIN, YOUR MEMORY OF

15    THE EVIDENCE CONTROLS.

16         BUT, REMEMBER, THE SECOND LIVE CUSTOMER E-MAIL AFTER A

17    HEALTH CARE COMPANY.  REMEMBER THE WIN CAFE E-MAIL AFTER

18    MR. KAIL SIGNED THE CONTRACT?  MR. KAIL SAT ON AN RSA

19    CONFERENCE.  YOU SAW PARTS OF THAT VIDEO.  THE CONTRACT, IT'S

20    1125, EXHIBIT 464.

21         MR. KAIL SIGNS ON JULY 9TH, 2014.  MR. KAIL IS ON HIS WAY

22    OUT OF NETFLIX.  HE'S ALREADY APPLIED FOR OTHER -- WELL, NOT

23    APPLIED.  HE'S ALREADY BEEN INTERVIEWED BY OTHER POTENTIAL

24    EMPLOYERS, INCLUDING FANATICS.

25         HE'S ON HIS WAY OUT.  HE'D BEEN AN ADVISOR TO NETSKOPE FOR

1    SOME TIME, AND ON HIS WAY OUT.  HE SIGNS A PAYING DEAL, 112,500

2    ON JULY 9TH, 2014.

3         THEY'VE PAID HIM ABOUT 100,000 AT THIS POINT.  HE SIGNS

4    112,500 ON HIS WAY OUT THE DOOR.

5         MR. KAIL TESTIFIED -- I BELIEVE THIS WAS WEDNESDAY, IT

6    MUST HAVE BEEN -- SOMETIMES IT'S THE CULTURAL NORM TO SEND THE

7    CONTRACT TO THE HEAD OF I.T., AND THAT WAS HIM.

8         SO OTHER PEOPLE HAVE SIGNATORY CAPABILITIES WHEN THINGS

9    ARE SENT TO HIM.  THEY HAVE A GOOD RELATIONSHIP WITH PAUL OSHAN

10   AND THE SALES TEAM.

11        WAS THAT THE CASE?  WAS MR. KAIL JUST SIGNING WHATEVER WAS

12   PUT IN FRONT OF HIM?  OR WAS HE DELIVERING ON WHAT HE HAD BEEN

13   PAID TO DO ALL ALONG, GET NETSKOPE ITS SECOND PAYING CUSTOMER?

14   GET NETSKOPE INTO NETFLIX.

15        MR. FRY TESTIFIED THAT IT WAS MR. KAIL THAT BROUGHT

16   NETSKOPE IN AND THAT HE WAS INVOLVED IN THE PROOF OF CONCEPT.

17   HE WAS ASKED, WAS NETFLIX EVER WIDELY DEPLOYED?  HE SAYS ACROSS

18   THE COUNTRY.  I BELIEVE THE QUESTIONER MEANT THE COMPANY.  AND

19   MR. FRY'S RESPONSE WAS NEVER FOR US, ACHIEVED THE SCALE IT

20   NEEDED TO FULLY DEPLOY.

21        NUMERIFY.

22        MR. KAIL, REMEMBER THE E-MAIL WHERE HE SAID, I AM NOT

23   ENTERTAINING VERY MANY OFFERS AT THIS TIME.  HE WANTED TO MAKE

24   SURE EVERYONE HE WAS ADVERTISING WAS COMPLETELY TAKEN CARE OF.

25        THAT'S BECAUSE MR. KAIL OFFERED A PACKAGE.  WHAT CAME WITH

1      THE MICHAEL KAIL PACKAGE?  YOU GET A FOOT HOLD.  YOU GET TO BE

2      CONSIDERED.  YOU GET TO JUMP IN LINE.  YOU GET A POC.  YOU GET

3      FEEDBACK AND ATTENTION FROM SOME OF THE BEST AND BRIGHTEST

4      ENGINEERS IN SILICON VALLEY.  YOU GET MR. KAIL ON TOP AS THE

5      BUYER.  YOU GET THE LOGO.

6          AND AFTERWARDS, YOU GET MR. KAIL'S REFERENCES AND CALLS.

7      THINK OF THE BARGAINING POSITION THAT MR. KAIL HAD AS THE

8      VICE PRESIDENT OF ONE OF THE MOST WELL-KNOWN BRANDS IN THE

9      COUNTRY.  THINK BACK TO 2012, 2013, 2014 AT THESE STARTUPS THAT

10     HAD VERY FEW CUSTOMERS, THEY WERE ACTIVELY ENGAGED IN PROOFS OF

11     CONCEPT TO PROVE THEIR VALUE.  THEY WERE HUSTLING TO GET A GOOD

12     PAYING CLIENT, A MARQUEE CLIENT.  THINK OF THE IMBALANCE THERE.

13         WHAT WOULD THEY BE WILLING TO DO?

14         MR. KAIL SENT THE ADVISORY AGREEMENT IN EARLY 2014 FOR

15     NUMERIFY AND HE DOCUSIGNS IT.  AGAIN, IT PROVIDES FOR SHARES.

16         NUMERIFY GETS A DEAL AT NETFLIX.

17         NETENRICH.

18         THIS IS THE REFERRAL ARRANGEMENT.  HEARD FROM THREE

19     NETENRICH PEOPLE ASSOCIATED WITH NETENRICH, RAGHU KAMATH,

20     VARMA KUNAPARAJU, AND KATHERYN MENDELSOHN, THE CONTROLLER.

21         NETENRICH WAS AN I.T. OUTSOURCING ENTITY.  WELL, THAT

22     DIDN'T QUITE FIT WITH NETFLIX'S NEEDS.  NETFLIX DIDN'T NEED TO

23     OUTSOURCE ITS I.T.  IT HAD ITS OWN NOC, NETWORK OPERATIONS

24     CENTER.

25         BUT WHAT DID MR. KAIL NEED?  HE NEEDED SOME CONTRACTORS,

1    HE NEEDED SOME ENGINEERS.

2         MR. KAIL ENTERED INTO A SALES REPRESENTATIVE AGREEMENT.

3    AND LOOK AT THE DATE, FEBRUARY 5TH, 2012.  THIS WAS BEFORE

4    UNIX MERCENARY, LLC -- NOW, HE HAD THE WEBSITE OR HE HAD THE

5    E-MAIL ADDRESS -- BUT THE LLC HADN'T BEEN REGISTERED YET WITH

6    THE CALIFORNIA SECRETARY OF STATE.

7         AND MAYBE IT WAS IN PROCESS BECAUSE OF MR. KAIL'S EARLIER

8    MEETING WITH VARMA KUNAPARAJU.  REMEMBER MR. KAMATH WAS IN

9    MICHIGAN IN THE EARLY PART OF 2012.

10        MR. KAIL SIGNS THIS AND, BY THE WAY, IT DOESN'T HAVE ANY

11   CONFIDENTIALITY REQUIREMENTS.  IT JUST SAYS THAT NETENRICH CAN

12   PAY MR. KAIL 12 PERCENT OF THE BILLINGS FOR PARTICULAR

13   PROSPECTS.

14        MR. KAIL'S PROSPECTS WAS NETFLIX.  MR. KAIL WORKED AT

15   NETFLIX.  MR. KAIL COULD GET 12 PERCENT OF EVERYTHING NETENRICH

16   BILLED TO NETFLIX.

17        THERE IS THE ARTICLES OF ORGANIZATION THREE DAYS LATER.

18        HERE ARE THE BILLINGS.

19        NETENRICH, AND LATER VISTARA, THE WHOLLY-OWNED SUBSIDIARY,

20   THE SOFTWARE COMPONENT, THEY HAD A SALES REPRESENTATIVE INSIDE

21   THEIR CUSTOMER.  IT WAS THE ONLY ARRANGEMENT THEY HAD LIKE

22   THAT.

23        NOT JUST A SALES REPRESENTATIVE INSIDE THE CUSTOMER, THE

24   SALES REPRESENTATIVE WAS THE CUSTOMER.  MR. KAIL UNDERSTOOD

25   THAT EVERY DOLLAR HE APPROVED AS HEAD OF I.T. MEANT $12 OR --

1    12 CENTS OR 15 CENTS, 12 CENTS FROM NETENRICH, 15 CENTS FROM

2    VISTARA, INTO HIS OWN POCKET.  THAT WAS FOR THE ENGINEERS THAT

3    MR. KAIL HAD WORKING UNDER HIM, THREE TO FOUR AT A TIME.

4         AND FOR THAT, HE WAS EARNING CASH, HUNDREDS OF THOUSANDS

5    OF DOLLARS.

6         LADIES AND GENTLEMEN, IT IS NOT JUST A COINCIDENCE THAT

7    UNIX MERCENARY STEPPED INTO THE SALES REPRESENTATIVE ROLE.  IT

8    WAS MR. KAIL'S CREATION.

9         WHAT DOES THE EVIDENCE SHOW?  DOES IT SHOW THAT UNIX WAS

10   AN ESTABLISHED CONSULTING BUSINESS AT THE TIME?

11        NO.  IT SHOWED THAT MR. KAIL E-MAILED -- MR. KAIL --

12   SORRY.

13        UNIX MERCENARY HAD BEEN REGISTERED LATER.  IT DIDN'T HAVE

14   A BANK ACCOUNT UNTIL LATER IN THE YEAR.  IT DIDN'T HAVE AN

15   EMPLOYEE IDENTIFICATION NUMBER UNTIL LATER IN THE YEAR.

16        THE EVIDENCE SHOWS THAT MR. KAIL FOUND A WAY TO AUGMENT

17   HIS OWN STAFF IN THE I.T. DEPARTMENT AND TO EARN CASH ON THE

18   SIDE DIRECTLY FROM THE INVOICES HE APPROVED.  THAT'S HOW HE GOT

19   A PIECE OF THE ACTION.  THAT'S HOW HE GOT CASH FLOW.

20        NETENRICH, UNDER THAT -- UNDER THAT SALES REP AGREEMENT,

21   COULD HAVE SOLD DIRECTLY TO THE CLIENT WITHOUT PAYING UNIX.

22   MR. KAIL COULD HAVE SAID, NO.

23        MR. KALEBA TOLD YOU IN HIS OPENING THAT THERE WERE NO

24   COINCIDENCES HERE.  IT IS NO COINCIDENCE THAT MR. KAIL PUT HIS

25   OWN ENTITY AND HIS OWN PERSONAL INTERESTS THERE TO BENEFIT FROM

1      HIS ROLE AS THE APPROVER OF I.T. INVOICES AND CONTRACTS.

2           AND MR. KAIL DID NOT USE NETENRICH LIKE NETENRICH'S OTHER

3      CLIENTS.  MR. KAIL USED NETENRICH TO AUGMENT HIS STAFF, NOT TO

4      OUTSOURCE THE I.T. DEPARTMENT BECAUSE THAT WASN'T NETFLIX'S

5      MODEL.  AND IT LED TO OVER $2 MILLION IN BILLINGS.

6           IT WAS NOT A SHORT-TERM ARRANGEMENT TO AUGMENT STAFF.  IT

7      BECAME PAY LONG TERM ARRANGEMENT TO LINE MR. KAIL'S POCKET,

8      HUNDREDS OF THOUSANDS OF DOLLARS.

9           AND FOR VISTARA, IT WAS OVER ONE MILLION.  NOT A

10     MILLION -- A MILLION IN BILLINGS TO NETFLIX.  IT WAS OVER

11     100,000 IN MR. KAIL'S POCKET.

12          AND THESE COMPANIES USED THE NETFLIX LOGO ON THEIR

13     WEBSITE.

14          AND REMEMBER, WHEN MR. KAMATH AND MR. KUNAPARAJU BOTH

15     TESTIFIED THAT THEY WENT TO MEET WITH MR. KAIL IN EARLY 2012 TO

16     MAKE SURE THAT THERE WASN'T A CONFLICT, AND WHAT DID MR. KAIL

17     DO?  HE TOLD THEM HE COULD WALK INTO THE CEO'S OFFICE AND CLEAR

18     IT UP.

19          WERE THEY GOING TO TAKE HIM UP ON THAT?  OF COURSE NOT.

20     THEY BACKED DOWN.  THEY WERE SATISFIED AND ALLOWED MR. KAIL TO

21     OBTAIN CASH INTO BANK ACCOUNTS HE CONTROLLED FROM HIS BILLINGS

22     AT NETFLIX.

23          YOU SAW THE E-MAILS TODAY WHERE MR. KAIL WAS FOLLOWING UP

24     AND DEMANDING HIS CHECKS.  HE WAS FOLLOWING UP BOTH WITH

25     ACCOUNTS PAYABLE AT NETFLIX AND HE WAS FOLLOWING UP TO MAKE

1     SURE THAT HE GOT HIS COMMISSIONS.

2         REMEMBER, HE WANTED 15,000 BY FRIDAY AT 5:00 P.M.?  AND HE

3     GOT IT.

4         LADIES AND GENTLEMEN, DO YOU THINK THE VENDORS WEREN'T

5     WORRIED ABOUT WHAT WOULD HAPPEN IF MR. KAIL WASN'T HAPPY?

6         HERE'S THE NETENRICH ADVISOR AGREEMENT.  50,000 SHARES.

7     HE BECOMES AN ADVISOR ON TOP OF THE SALES COMMISSIONS.  IT'S

8     AMENDED A YEAR LATER, 50,000 MORE OPTIONS.

9         VISTARA, HERE IS A LISTING SUMMARY OF THE COMMISSIONS AND

10    CHARGES TO NETFLIX, A MILLION 3 TO NETFLIX, 207, MIKE

11    COMMISSION.

12        REMEMBER ROB FRY'S TESTIMONY?  SEVERAL TEAMS TESTED IT, A

13    LOT OF TESTING.  DID WE DO A BROAD ROLLOUT?  NO, ONLY BECAUSE

14    WE NEVER TRUSTED IT OR GOT IT TO THE POINT TO REPLACE THE

15    EXISTING TOOLS.

16        $1.7 MILLION OVER TWO YEARS WAS NOT DEPLOYED COMPANY-WIDE,

17    AND THAT'S CONSISTENT WITH MS. SPRAGUE'S TESTIMONY AND HER

18    E-MAIL AFTER MR. KAIL LEFT.  THAT WAS NOT DEPLOYED WIDELY.

19        NUMERIFY.

20        APOLOGIES.

21        MR. KAIL SIGNS, DOCUSIGNS AN AGREEMENT FOR ADVISORY

22    SHARES, TELLS MR. REWARI HE'S NOT GOING TO EARLY EXERCISE.

23    HE'S GOT A REASON WHY.

24        HE PROVIDES A QUOTE.  IT LISTS HIM AS V.P. OF I.T. AND IT

25    SAYS CIO.

1          REMEMBER MR. SHETH'S TESTIMONY?  THAT NUMERIFY WAS A GOOD

2     IDEA, BUT NOT A RIGHT FIT FOR NETFLIX BECAUSE NETFLIX HAD THAT

3     GENIUS BAR MODEL FOR REVIEWING I.T. TICKETS.

4          AND NUMERIFY'S VALUE WAS FOR DETAILED I.T. SERVICE

5     TICKETS.

6          REMEMBER IT WAS AN $85,000 DEAL THAT WAS GOING TO

7     AUTOMATICALLY START AFTER THE, AFTER THE 90 DAY POC?  AND

8     MR. REWARI PINGED MR. KAIL IN MAY SAYING, COULD YOU CLOSE THE

9     LOOP WITH SYLVIA, SYLVIA SUNDHOLM?

10         MR. KAIL CONFIRMS HE DID AND NUMERIFY BECOMES -- NETFLIX

11    BECOMES A PAYING CUSTOMER OF NUMERIFY.

12         AGAIN, THIS IS AFTER MR. KAIL WAS CONFRONTED BY

13    MR. HASTINGS ABOUT HIS POTENTIAL CONFLICTS OF INTEREST.

14         ELASTICBOX.

15         YOU SAW SOME OF THESE E-MAILS TODAY.  SOMEONE REACHED OUT

16    TO MR. KAIL FROM ELASTICBOX, SOMEBODY WHO'S DONE BUSINESS WITH

17    NETFLIX FROM A PRIOR COMPANY.  MR. KAIL SAYS I DON'T HAVE ANY

18    COMPELLING USE CASES FOR ELASTICBOX AT THIS TIME.

19         WHAT HAPPENS ABOUT SIX WEEKS LATER?  THE CEO REACHES OUT

20    TO MR. KAIL, AND HE WANTS HIS PERSONAL E-MAIL, HE WANTS TO SEND

21    HIM SOME PAPERWORK.

22         ONE MINUTE LATER MR. KAIL RESPONDS WITH HIS PERSONAL

23    E-MAIL AND SAID, "WILL WORK ON THE INTRO TO THE TEAM."  THAT'S

24    THE NETFLIX I.T. TEAM.  ELASTICBOX GETS ITS FOOT IN THE DOOR.

25         MR. KAIL TESTIFIED TODAY THAT HE HAD AN INTERNAL FIREWALL.

1    DO YOU SEE THAT INTERNAL FIREWALL HERE ONE MINUTE LATER?

2         MR. KAIL TESTIFIED THAT SOMETIMES HE WOULD TELL HIS TEAM,

3    WHY DON'T YOU GUYS TAKE A DEEPER LOOK?  THAT'S HOW MR. KAIL GOT

4    THESE COMPANIES IN THE DOOR.

5         BUT MR. KAIL DIDN'T TELL HIS TEAM THAT HE WAS TAKING

6    ADVISORY SHARES.  THEY DIDN'T NEED TO KNOW THAT.

7         WHAT DOES THIS LEAD TO?  IT LEADS TO A $600,000 THREE YEAR

8    CONTRACT SIGNED BY MR. KAIL.  LATER IN THE YEAR, THERE'S

9    DISCUSSIONS ABOUT MR. KAIL SAYING, CONSIDER ME A PART OF THE

10   CAB UNTIL THERE'S REASON OTHERWISE.  MAYBE IT'S EAB, EXECUTIVE

11   CUSTOMER BOARD.

12        LATER IN THE MONTH, THANKSGIVING, HAPPY THANKSGIVING,

13   MR. KAIL SENDS ANOTHER CONTRACT.  HERE IT IS, NOVEMBER 27TH,

14   DOCUSIGNED BY MR. KAIL.  EVEN MORE MONEY.  850,000, 3 YEAR

15   DEAL, 5 MONTHS AFTER THE FIRST.  ELASTICBOX'S BIGGEST CUSTOMER.

16        MR. KAIL SIGNS THE MASTER SERVICES AGREEMENT IN JUNE,

17   THAT'S BEFORE THE $600,000 CONTRACT.

18        THE CEO OF ELASTICBOX TELLS MR. KAIL, WE'RE ONE WEEK AWAY

19   FROM ISSUING YOU OPTIONS.  HE KNOWS THAT HE'S GOING TO BENEFIT.

20        850,000.

21        MR. SRIVASTAVA TESTIFIED THAT THERE WASN'T REALLY ANY

22   NEGOTIATION OVER THAT 850,000.  MAYBE IT WAS ALREADY ARRANGED.

23        HERE'S THE ADVISORY AGREEMENT.  MR. KAIL AGAIN.  WHAT'S

24   THE STRIKE PRICE?  17 CENTS A SHARE FOR 10,000, THAT'S THE

25   FIRST 10,000.  HE DOES A CUSTOMER SLIDE AND A QUOTE, HE'S THE

1      V.P. OF I.T. AT NETFLIX, AFTER ALL.  HIS OPINION HAS VALUE.

2          DOCURATED.

3          ALEXIS GORBANSKY TESTIFIED ABOUT DOCURATED, A CONTENT

4      CURATION TOOL.

5          WELL, RECALL EXHIBIT 1001, MR. KAIL WAS THE SIGNER ON THE

6      PILOT.  MR. KAIL HAS INDICATED THAT SOMEONE ELSE KNEW SOMEONE

7      AT DOCURATED AND HE DIDN'T BRING THEM IN, BUT HE SIGNED PILOT.

8      THE 90 DAY PILOT, IT WAS ENDING AT THE END OF MAY.

9          WHAT HAPPENS?  MR. KAIL HAS AN IN-PERSON, OFF-CAMPUS

10     MEETING WITH THE CO-FOUNDERS OF DOCURATED AS THEIR POC IS ABOUT

11     TO END, AND THEY'RE EITHER GOING TO LOSE NETFLIX HAS A CUSTOMER

12     OR GAIN A PAYING CUSTOMER.

13         DOCUMENTATION ABOUT MEETING.  MR. KAIL JUST HAPPENS TO

14     MENTION THAT HE WORKS CLOSELY WITH SOME STARTUPS.  REMEMBER,

15     THIS IS TWO DAYS EARLIER, SO THIS IS MAY 29TH.

16         MR. KAIL SIGNS THE DOCURATED FIRST PAYING CONTRACT, IT'S

17     MODEST, 21,000.  IT'S A BIG CUSTOMER, THOUGH, BIG NAME

18     CUSTOMER.

19         GUESS WHAT HAPPENS AFTER THAT?  CAN WE CHAT THIS WEEKEND?

20         WHAT HAPPENS ON MONDAY?  MR. KAIL IS OFFERED A

21     CONFIDENTIAL STRATEGIC ADVISOR AGREEMENT.  POTENTIAL REFERENCE

22     FOR CUSTOMERS, PROVIDE FEEDBACK.

23         HE DOESN'T TELL HIS TEAM THAT HE'S GETTING ACCELERATED

24     EXERCISE OF DOCURATED STOCK AT 33 CENTS A SHARE.

25         THAT'S THE SECOND GRANT, ACTUALLY.  28,000 SHARES TO

1    START, 21 CENTS A SHARE.  HE EXERCISES THOSE.

2          HE GETS A FEDEX FROM MR. GORBANSKY WITH THE PAPERWORK.  HE

3    RECEIVES IT.  HE CONFIRMS RECEIPT.  THAT'S A MAILING.

4          REMEMBER MR. MUSSELMAN TESTIFIED THAT IT WAS LIKE A NASCAR

5    WITH ALL THE LOGOS SLAPPED ON IT?  HERE'S THE NASCAR FOR

6    DOCURATED.  WHO'S AT THE TOP?  THE BIG NAME BRANDS, INCLUDING

7    NETFLIX.  IT WAS VALUABLE FOR DOCURATED.

8          THE NEXT YEAR, MR. KAIL IS OFFERED A SECOND OPTION GRANT

9    IN JANUARY.  HE SIGNS THE PAPERWORK IN MARCH BUT DOESN'T

10   EXERCISE.

11         MARCH 21, HE SIGNS THE SECOND AGREEMENT.  THIS ONE IS OVER

12   FOUR TIMES LARGER, $120,000 A YEAR.

13         HE DOES A VIDEO TESTIMONIAL, TOO.

14         MAGINATICS.

15         ANOTHER ADVISORY BOARD AGREEMENT, MORE SHARES IN 2013,

16   APRIL, HE'S GRANTED STOCK, 30,000 SHARES, 15 CENTS A SHARE.

17         THIS IS MR. GILL, WHO MR. KAIL DOES OTHER ADVISORY WORK

18   FOR.

19         THIS IS A MODEST INVOICE OF 10,000, NETFLIX IS A CUSTOMER.

20         MR. KAIL EXERCISED THESE OPTIONS.  HE FILLS OUT THE

21   PAPERWORK AND SENDS IT IN TO THE IRS, CERTIFIED MAIL RECEIPT,

22   $4500 CHECK, HE'S GOT HIS SHARES.

23         MR. KAIL'S ALREADY AN ADVISOR TO MAGINATICS, BUT HE

24   REACHES OUT AND HE SAYS, HEY, "NO PRESSURE, JUST WANTED TO

25   CONTINUE THE CONVERSATION ON IF WE CAN STRUCTURE SOMETHING TO

1    GET ME A BIT OF MONTHLY CASH FLOW IN RETURN FOR ADVISOR

2    SERVICES."

3         WHAT OTHER ADVISOR SERVICES?  HE'S ALREADY AN ADVISOR.

4    HE'S ALREADY GOT A CONTRACT.

5         IN DECEMBER, HE FOLLOWS BACK UP.  "WE HAD DISCUSSED A

6    MONTHLY CASH FLOW, AND I WANTED TO CHECK BACK.  IF NOT

7    FEASIBLE, I WILL ATTEMPT OTHER AVENUES."

8         IF YOU DON'T GIVE ME MONEY, I'M GOING TO MAKE IT SOMEWHERE

9    ELSE.

10        MR. GILL SAYS "WE CAN WORK OUT SOMETHING."

11        THESE ARE THE INVOICES TOTALING $60,000 FROM MAGINATICS IN

12   MARCH 2014.

13        MR. KAIL BROUGHT MAGINATICS IN.  MR. KAIL ENSURED THEY

14   SUCCEEDED.

15        LADIES AND GENTLEMEN, MR. KAIL DISCUSSED THE CULTURE DECK,

16   HE PROVIDED A COPY OF IT TO MR. HASTINGS TO UPLOAD TO GOOGLE

17   DRIVE.  HE DID A VIDEO TALKING ABOUT THE CULTURE DECK.  HE

18   RECEIVED THE CONFLICT OF INTEREST E-MAILS, EVEN IF IT JUST HAD

19   THE BULLETS ON IT, THAT'S ENOUGH.

20        HE HAD THE TOPIC TRACKER FROM MARCH 2013 WITH

21   MR. HASTINGS.  HE HAD CONVERSATIONS WITH HIM THAT HE DOESN'T

22   RECALL, BUT THEY'RE DOCUMENTED IN THE SHARED DOCUMENT.

23        AND AT THE -- AND TOWARD THE END, MR. KAIL IS CONFRONTED

24   SPECIFICALLY, YOU CAN'T BE PAID COMP.  IF ONLY PEOPLE KNEW YOU

25   WERE JUST A VOLUNTEER.

1        MR. KAIL WAS NOT JUST A VOLUNTEER.  MR. KAIL WAS RECEIVING

2    MONEY, HE WAS RECEIVING OPTIONS, HE WAS EXERCISING OPTIONS, AND

3    HE WAS EXERCISING HIS CONTROL AS THE V.P. OF I.T. WITH HIS

4    ABILITY TO BRING COMPANIES IN, PUSH HIS TEAMS, APPROVE

5    CONTRACTS, SMOOTH THINGS OVER.

6        MR. KAIL CONCEALED HIS SCHEME.  HE LIES AFTER BEING

7    DIRECTLY CONFRONTED AND HE LIES REPEATEDLY.

8        BUT HE ALSO DIRECTS COMMUNICATIONS TO HIS PERSONAL GMAIL

9    AFTER THAT.  HE SENDS -- HE DIRECTS PAPERWORK TO GO TO HIS HOME

10    ADDRESS WHEN IT'S RELATED TO COMMISSIONS CHECKS AND SOME

11    CONTRACTS, ADVISORY CONTRACTS.

12        HE TELLS SUMO LOGIC, "DOUG IS ALSO AWARE AND SUPPORTIVE OF

13    MY ADVISOR ROLES," IMPLYING HE'S GOT ALL THE SUPPORT HE NEEDS

14    TO DO WHAT HE'S DOING.  HE CAN TAKE THE SHARES.  HE CAN HELP

15    THESE COMPANIES.

16        HE LIES TO SYLVIA SUNDHOLM WHEN HE TELLS HER THAT PLATFORA

17    MET ALL THE GOALS LAID OUT, PAY THEM THEIR $155,000 DOES.  PAY

18    THEM THE EXACT AMOUNT THAT MIKE ASHER SAID HE NEEDED TO PAY

19    THEM TO AVOID AN UNTENABLE POSITION.

20        HERE ARE A COUPLE OTHERS.  MR. KAIL RECEIVES THE CERTIFIED

21    MAIL HERE.  HE SAYS IT WENT TO NETFLIX, NOT HIS HOME ADDRESS,

22    PLEASE ALWAYS USE THE LATTER.

23        AFTER HE'S CONFRONTED AFTER THE PLATFORA DEAL FALLS

24    THROUGH, MR. KAIL REALIZES HE BETTER NOT USE HIS NETFLIX E-MAIL

25    ADDRESS, SO HE E-MAILS FROM HIS GMAIL, HE SAYS PLEASE USE THIS

1    ADDRESS, NOT MY AT NETFLIX.COM ONE.

2         DOES HEMANTH KNOW THE CONTEXT OF OUR ARRANGEMENT?  WAS

3    THIS A TYPICAL SALES REPRESENTATIVE ARRANGEMENT?

4         MR. KAIL CONTROLLED THE CONVERSATION.  HE ALONE WAS

5    FREQUENTLY ON THE E-MAILS WITH THE CEO'S OF THESE COMPANIES.

6    ISN'T THAT CONSISTENT WITH MR. RALPH'S 360 REVIEW WHERE HE SAID

7    THAT MR. KAIL WAS HAVING CONTRARY CONVERSATIONS WITH THE

8    VENDORS TO WHAT MR. RALPH AND HIS TEAM WAS HAVING.

9         MR. KAIL MAKES THE ASK FOR COMPENSATION, .25 PERCENT CASH

10   FROM NETSKOPE.  CASH FROM MAGINATICS.  HE ASKS FRANK SLOOTMAN

11   FOR A PIECE OF THE UPSIDE OF SERVICENOW.

12        CASH TO UNIX MERCENARY IN THE FORM OF A SET PERCENTAGE.

13        EXERCISED SHARES IN A NUMBER OF COMPANIES, SOME OF WHICH

14   HE STILL HOLDS.

15        MR. KAIL IS EXPLAINING NOW WHAT HE MEANT BY A LOT OF THE

16   THINGS HE SAID.  HE WANTS YOU TO THINK ONE THING BACK THEN.

17   LOOK AT HIS COMMUNICATIONS WITH THE VENDORS.

18        I CAN ONLY DO SO MUCH PUSHING.  WHEN IT DOESN'T WORK OUT,

19   HE CAN'T BENEFIT THE COMPANY.  HE GIVES UP PRICING INFORMATION.

20        PUSHING, PUSHING MY TEAMS, TRYING TO GET OUT AHEAD OF

21   ISSUES.

22        YOU CAN FEEL THE FRUSTRATION HE HAS WHEN THINGS AREN'T

23   WORKING OUT AND HE HAS TO DECIDE WHAT TO DO BECAUSE HE'S

24   GETTING SHARES.

25        YOU HEARD MR. SHETH, YOU HEARD MR. RALPH AND OTHERS

1    TESTIFY ABOUT PRODUCTS NOT BEING USED, NOT BEING A GOOD FIT,

2    BEING A GOOD IDEA, BUT NOT FOR NETFLIX.

3         THESE ARE EARLY CONTRACTS WITH THE STARTUPS.  CONTRACT

4    NUMBER 2, BIGGEST CUSTOMER, MR. KAIL IS THE SIGNER ON THE

5    BIGGEST CONTRACTS.

6         LADIES AND GENTLEMEN, THESE ARE E-MAILS TALKING ABOUT THE

7    ADVISOR.  LADIES AND GENTLEMEN, THEY'RE ONE AND THE SAME.

8         THE PERCENTAGE, THE ASK, THEY COME FROM MR. KAIL.

9    ALTHOUGH SOME OF THESE COMPANIES KNOW TO MAKE THE OFFER.

10   REMEMBER EXHIBIT 114, I THINK YOU SAW IT TODAY, MR. KAIL WANTED

11   TO BE THE SOLE POINT OF CONTRACT FOR NETFLIX FOR NETENRICH, AND

12   THEY SAID THAT THEY WOULD NOT SCHEDULE THAT MEETING WITH

13   ALEXIS.

14        MR. KAIL CONTROLLED THE RELATIONSHIP SO THAT MR. KAIL

15   COULD KEEP HIS TEAM AT NETFLIX FROM FINDING OUT HOW HE WAS

16   LINING HIS POCKETS.

17        LADIES AND GENTLEMEN, IT'S TIME FOR TO YOU WEIGH THE

18   EVIDENCE.

19        BUT THERE IS NO RULE THAT SAYS YOU HAVE TO CHECK YOUR

20   COMMON SENSE WHEN YOU WALK THROUGH THE JURY ROOM DOOR.

21        THESE WERE BRIBES.  THESE WERE KICKBACKS.

22        MR. KAIL COMMITTED NETFLIX TO PAYING OFF PLATFORA, TO

23   WASTING NETFLIX FUNDS, TO SIGNING PAID DEALS ON HIS WAY OUT TO

24   BENEFIT HIS OWN PERSONAL INTERESTS.  HE WAS NOT ACTING IN

25   NETFLIX'S BEST INTEREST.

1      THE MONEY LAUNDERING, QUICKLY, MONEY, OVER $10,000, YOU

2   HEARD MS. KIKUGAWA TESTIFY THAT SHE CAREFULLY TRACED THE FUNDS

3   AND USED THE LOWEST INTERMEDIATE BALANCE METHOD.  SHE

4   CALCULATED AND ACCOUNTED FOR THE MONEY THAT WASN'T FROM

5   NETENRICH, WASN'T FROM VISTARA.  SHE MADE CERTAIN ASSUMPTIONS

6   AND, WITH THOSE, SHE FOUND THAT CERTAIN TRANSACTIONS CONTAINED

7   MORE THAN $10,000 IN ALLEGED SUA PROCEEDS, SPECIFIED UNLAWFUL

8   ACTIVITY PROCEEDS, MONEY FROM NETENRICH, MONEY FROM VISTARA,

9   POTENTIALLY MONEY FROM NETSKOPE.

10      MR. KAIL MOVED THE MONEY.  HE MOVED THE MONEY FROM

11   UNIX MERCENARY, LLC BANK ACCOUNTS THAT HE CONTROLLED AND HE

12   MOVED THEM TOWARD HIMSELF.

13      THIS WAS MR. KAIL MOVING THE MONEY.  HE PUT IT FIRST IN

14   UNIX MERCENARY AND THEN WHEN HE NEEDS IT, RETIREMENT ACCOUNT.

15   PURCHASE OF A HOUSE.  MOVING MONEY IN LARGE CHUNKS TO ACCOUNTS

16   IN HIS AND HIS SPOUSE'S NAME.

17      MR. KAIL HAS TOLD YOU HIS STORY.  THERE'S A LOT OF

18   MYSTERY.  HE CLAIMS THAT HE NEVER ACTED IN CONFLICT WITH HIS

19   DUTY TO ACT IN NETFLIX'S BEST INTEREST, WHICH HE UNDERSTOOD.

20      BUT HE WASN'T.  NOT WHEN HE WAS BEING PAID TENS OF

21   THOUSANDS OF DOLLARS A MONTH FROM NETENRICH AND VISTARA FOR

22   INVOICES THAT HE APPROVED.

23      NOT WHEN HE WAS TAKING STOCK AND MAKING INTROS, GETTING

24   PEOPLE IN THE DOOR, SIGNING CONTRACTS, TAKING MORE STOCK,

25   SIGNING MORE CONTRACTS.

1          THIS IS YOUR TIME TO WEIGH THE EVIDENCE AND DECIDE IF THE

2     GOVERNMENT HAS PROVEN BEYOND A REASONABLE DOUBT THAT MR. KAIL

3     WAS ENGAGED IN FRAUD SCHEMES AGAINST HIS FORMER EMPLOYER,

4     NETFLIX.

5          MR. KAIL OFFERED THAT PACKAGE, THAT WAS ACCESS, THAT WAS

6     SUCCESS.  IF YOU COULD LAND NETFLIX, YOU HAD A PROVEN PRODUCT.

7     MR. KAIL OFFERED ANOTHER WAY IN, BUT IT WAS GOING TO COST.

8          MR. KAIL WAS OPEN TO NETFLIX DOING BUSINESS WITH STARTUPS,

9     BUT ONLY IF THEY DID BUSINESS WITH MR. KAIL, TOO.  THAT'S

10    EXACTLY WHAT HE DID.  HE HUNG A "FOR SALE SIGN" UNDER THE

11    NETFLIX LOGO, AND HE LET COMPANIES KNOW THAT IF THEY PAID HIM,

12    THEY WERE GOING TO GET A LEG UP, THEY WERE GOING TO GET A PAID

13    CONTRACT, THEY WERE GOING TO GET TO USE THAT LOGO.

14         MR. KAIL AND THE STARTUPS BENEFITS.  BUT, LADIES AND

15    GENTLEMEN, THE GRIM REALITY WAS THAT MR. KAIL LIED.  HE HAD THE

16    DUTY TO DISCLOSE:  HE DIDN'T.  HE CONCEALED THE MATERIAL FACTS

17    OF HIS CONFLICT FROM HIS EMPLOYER.  HE TOLD NO ONE ABOUT HIS

18    COMPENSATION AT NETFLIX, AND DID HE THAT TO CARRY OUT HIS

19    SCHEME TO DEFRAUD NETFLIX AND TO BENEFIT HIMSELF AND OTHERS AND

20    TO VIOLATE NETFLIX'S RIGHT TO HIS UNCONFLICTED, HONEST

21    SERVICES.

22         MR. KAIL'S MOVEMENT OF THE PROCEEDS TO HIS ACCOUNTS

23    CONSTITUTED MONEY LAUNDERING FROM THAT UNLAWFUL ACTIVITY.

24         SO WHEN YOU CONSIDER ALL THE EVIDENCE, LADIES AND

25    GENTLEMEN, THAT YOU HEARD, THAT YOU'VE SEEN, WHEN YOU WEIGH IT,

1    WE SUBMIT THAT YOU WILL HAVE BUT ONE CONCLUSION TO DRAW FROM

2    THIS EVIDENCE, AND THAT'S THAT MR. KAIL IS GUILTY OF ALL COUNTS

3    BEYOND A REASONABLE DOUBT.

4            THE COURT:  THANK YOU, MR. SAMPSON.

5        WE'RE GOING TO TAKE A BREAK BEFORE THE DEFENSE CLOSING

6    ARGUMENT.  LET'S TAKE A TEN MINUTE BREAK.

7            THE CLERK:  COURT IS IN RECESS.

8        (RECESS FROM 3:06 P.M. UNTIL 3:17 P.M.)

9        (JURY IN AT 3:17 P.M.)

10           THE COURT:  PLEASE BE SEATED, EVERYONE.

11       WE'RE BACK ON THE RECORD.  ALL OF OUR COUNSEL AND THE

12   PARTIES ARE HERE, ALL OF OUR JURORS.

13       AND MS. JAYNE, WOULD YOU LIKE TO MAKE YOUR CLOSING

14   ARGUMENT?

15           MS. JAYNE:  YES, THANK YOU.

16       **(MS. JAYNE GAVE HER CLOSING ARGUMENT ON BEHALF OF THE**

17   **DEFENDANT.)**

18           MS. JAYNE:  THERE'S AN OLD PROVERB THAT SAYS DON'T

19    LET THE FACTS GET IN THE WAY OF A GOOD STORY.

20       AND THAT'S WHAT THE PROSECUTORS DID JUST NOW.  AND IN

21   THEIR OPENING STATEMENT.  THEY TOLD AN INTERESTING BUT SKEWED

22   STORY THAT WAS TOTALLY UNSUPPORTED BY THE EVIDENCE IN THIS

23   CASE.

24       STORIES AREN'T EVIDENCE.  AND LIFE ISN'T LINEAR OR ONE

25   DIMENSIONAL AS THE GOVERNMENT WOULD HAVE YOU BELIEVE.

1          THEIR WHOLE CASE COMES DOWN TO A LINEAR VISUAL.  STOCK

2     OPTIONS, CUSTOMER, WITHOUT CONSIDERING ANY OF THE CONTEXT

3     SURROUNDING REAL LIFE, AND CONTEXT MATTERS BECAUSE IF THAT WERE

4     THE CASE, ALL THAT WOULD BE REQUIRED FOR A CRIMINAL CONVICTION,

5     JUST THROW AWAY THE EVIDENCE, YOU DON'T NEED THE WITNESSES,

6     DISREGARD THE JURY INSTRUCTIONS.

7          EVEN IN THE FACE OF TESTIMONY THAT DIRECTLY CONTRADICTS

8     THEIR VERSION OF EVENTS.  THEY'VE MARCHED ON IN THIS MISSION TO

9     FORCE THIS FIT.  UNRELATED WITNESSES WHO HAVE NOT MET EACH

10    OTHER BEFORE TESTIFIED OVER AND OVER AGAIN, AND THERE WAS NO

11    QUID PRO QUO, THAT THESE ADVISOR AGREEMENTS ARE STANDARD IN THE

12    INDUSTRY, AND EVERYONE TESTIFIED THAT FORMAL BOARDS ALWAYS

13    INCLUDE STOCK OPTIONS.

14         BUT HERE WE ARE.  THEY JUST KEEP PUSHING THE SQUARE PEG IN

15    THE ROUND HOLE, AND IN YOUR ROLE AS JURORS YOU CAN'T BE

16    RELUCTANT TO TELL THE GOVERNMENT "I DISAGREE.  YOU DIDN'T PROVE

17    YOUR STORIES BEYOND A REASONABLE DOUBT."

18         BUT THEY HAVE A JOB TO DO, SO THEY CAN'T LET THE

19    INCONSISTENT OR INCONVENIENCE FACTS GET IN THE WAY.

20         AND I REALIZE THESE CLOSING ARGUMENTS ARE LONG, BUT PLEASE

21    BEAR WITH ME AND KEEP IN MIND THERE CAN BE NO SHORTCUTS.  IF

22    YOU'RE IN MR. KAIL'S SHOES, YOU WOULD WANT SOMEONE TO FIGHT

23    HARD FOR YOU UNDER THESE CIRCUMSTANCES, ESPECIALLY AS A PERSON

24    WHO'S MAINTAINED THEIR INNOCENCE TO THESE CHARGES.

25         BUT THE GOVERNMENT HAS TRIED TO TAKE SHORTCUTS AND ASKED

1    YOU TO JUST IGNORE DIRECT EVIDENCE AND HAVE URGED YOU TO

2    SPECULATE ABOUT WHAT YOU DIDN'T HEAR AS EVIDENCE.

3          WE'LL COME BACK TO THIS, BUT WHAT I WANT TO REMIND YOU OF,

4    EVEN AS YOU START YOUR DELIBERATIONS, IS THAT MR. KAIL IS STILL

5    PRESUMED TO BE INNOCENT.

6          TO GIVE YOU A VISUAL, I JUST WANT YOU TO IMAGINE THAT

7    MR. KAIL IS PROTECTED BY A BRICK WALL, WHICH IS THE PRESUMPTION

8    OF INNOCENCE.  THIS WALL PROTECTS AND SURROUNDS HIM AND JUST

9    BECAUSE PROSECUTORS DECIDED TO CHARGE HIM, JUST BECAUSE HE WAS

10   INDICTED, THAT MEANS NOTHING.

11         AND IF YOU TAKE AN HONEST LOOK AT THE EVIDENCE AND THE

12   LAW, YOU'LL SEE THAT DESPITE THEIR EFFORTS TO GET SOME

13   WITNESSES TO TELL, TO REWRITE HISTORY, TELL A DIFFERENT STORY,

14   THE GOVERNMENT HAS BEEN UNABLE TO PRESENT RELIABLE EVIDENCE TO

15   CHIP AWAY AND BREAK DOWN THIS WALL.

16         THAT'S EXACTLY WHAT THEY HAVE TO DO IN ORDER TO SATISFY

17   THE BURDEN OF PROOF.  SPECULATION, A THEORY WITHOUT CONCRETE

18   EVIDENCE DOES NOT DESTROY THIS WALL.

19         IF YOU FEEL ANY UNCERTAINTY OR HESITATION AS TO WHETHER

20   THE GOVERNMENT HAS TRULY OVERCOME THIS PRESUMPTION, EVEN IF YOU

21   FEEL LIKE, YOU KNOW, YOU DON'T LIKE MISCONDUCT, YOU DON'T THINK

22   IT'S ETHICAL, YOU WOULD HAVE DONE THINGS DIFFERENTLY, THESE ARE

23   ALL VALID FEELINGS ABOUT LEGAL ACTIVITIES.  BUT IF THERE WAS NO

24   QUID PRO QUO, YOU CAN'T FIND MR. KAIL GUILTY.

25         IF YOU THINK THE GOVERNMENT HAS MADE SOME PERSUASIVE

1    ARGUMENTS AND THERE'S SOME EVIDENCE, BUT YOU'RE NOT SURE, YOU

2    MUST FIND HIM NOT GUILTY.

3         THERE ARE DEEPER, FUNDAMENTAL INJUSTICES WITH THESE

4    ALLEGATIONS.  THE MOTION THAT SOMEBODY CAN BE PROSECUTED OR

5    CONVICTED FOR WHAT ESSENTIALLY COMES DOWN TO THE GOVERNMENT

6    SAYING A VIOLATION OF THE TERMS OF THEIR EMPLOYMENT AGREEMENT

7    IS OUTRAGEOUS.

8         THIS IS ESPECIALLY TRUE WHEN A COMPANY LIKE NETFLIX, THAT

9    YOU'VE HEARD LIMITS RULES, EXUDES A PHILOSOPHY OF TAKING RISKS,

10   BEING INNOVATIVE -- AND THAT'S EXACTLY WHAT MR. KAIL DID --

11   ESPECIALLY WHEN THERE WERE NO EXPLICIT POLICIES ABOUT ADVISORY

12   ROLES.

13        THE GOVERNMENT HAS TAKEN THE LAW ON BRIBERY AND KICKBACKS

14   AND HERE PERVERTED IT AND TWISTED IT TO A PLACE IT DOESN'T

15   BELONG.

16        I'M NOT GOING TO ASK YOU TO TAKE MY WORD FOR IT, THOUGH.

17   I'M GOING TO REMIND YOU OF THE FACTS AND EVIDENCE IN THIS CASE,

18   THE LACK OF EVIDENCE THAT SUPPORTS MY CONCLUSION.

19        BUT BEFORE I DO THAT, I WANT TO TALK ABOUT WHAT YOU

20   LEARNED ABOUT MY CLIENT, MR. KAIL, DURING THE COURSE OF THIS

21   TRIAL FROM THE WITNESSES WHO TESTIFIED.

22        BRILLIANT ENGINEER, THOUGHT LEADER, TECHNICAL, LUMINARY,

23   BRING LEADER, EVEN A MENTOR, RESPECTED, INFLUENTIAL, OUTSPOKEN

24   AND VERY PUBLIC ABOUT HIS ADVISORY POSITIONS.

25        NOT A SINGLE PERSON TESTIFIED THAT MR. KAIL DIDN'T HAVE

1    NETFLIX'S BEST INTERESTS IN MIND DURING THE COURSE OF HIS

2    EMPLOYMENT.  YOU HEARD A LOT ABOUT CONFLICT OF INTEREST.

3    MORALITY, MAYBE.  BUT NOT A SINGLE PERSON TESTIFIED THAT

4    MIKE KAIL ACTUALLY VIOLATED NETFLIX'S NUMBER ONE MODEL, ACT IN

5    THEIR BEST INTEREST.

6         EVEN REED HASTINGS THOUGHT MICHAEL KAIL WAS DOING AN

7    EXCELLENT JOB IN HIS VERY VISIBLE POSITION AS THE V.P. OF THE

8    ENTIRE I.T. ORGANIZATION.  NOBODY TESTIFIED HE WASTED THEIR

9    TIME WITH USELESS TECHNOLOGY.  NOBODY SAID HE PRESSURED THEM TO

10   WORK ON PROJECTS.  NO ONE EVER ACCUSED HIM OF PUTTING HIS OWN

11   INTERESTS FIRST.

12        IN SPITE OF THAT, BECAUSE OF THEIR LINEAR VIEW, THE

13   GOVERNMENT ASKS YOU TO SPECULATE, ASSUME, FORGET EVERYTHING YOU

14   HEARD BECAUSE HE GOT COMPENSATION, HE MUST HAVE BEEN DEFRAUDING

15   NETFLIX.

16        PICTURE THIS.  YOU'RE A PLUMBER, OR YOU HIRE A PLUMBER TO

17   FIX YOUR KITCHEN SINK, YOU HIRE A COMPANY TO DO THAT.  PLUMBER

18   DOES A GREAT JOB, REALLY SKILLED, GREAT WORK.  WHEN HE'S DONE,

19   YOU ASK HIM, HEY, CAN YOU COME BY ON THE WEEKEND AND WORK ON MY

20   BATHROOM?  I'LL JUST PAY YOU CASH DIRECTLY.

21        THE PLUMBER SAYS, SURE, I'LL DO IT ON THE SIDE.  HE

22   DOESN'T TELL HIS EMPLOYER.

23        MAYBE IT'S EVEN DURING THE WEEK DURING BUSINESS HOURS.  HE

24   GO AND DOES SOME EXTRA WORK FOR YOU.

25        IS THAT IN VIOLATION OF THE PLUMBER'S EMPLOYMENT CONTRACT?

1    MAYBE.

2         IS IT A LITTLE SHADY?  MAYBE.

3         BUT IS IT ILLEGAL?  IS HE VIOLATING FEDERAL LAW WHEN HE

4    TAKES THAT SECRET PAYMENT?  THAT UNDISCLOSED SELF-DEALING?

5         THANK GOODNESS THE LAW SAYS NO.

6         SECRET PAYMENTS, UNDISCLOSED SELF-DEALING, CONFLICT OF

7    INTEREST BY THEMSELVES ARE NOT ILLEGAL.  AND I'M GOING TO KEEP

8    REPEATING THAT BECAUSE THIS CASE IS NOT ABOUT CONFLICT OF

9    INTEREST.  YOU WILL NOT SEE THE WORDS "CONFLICT OF INTEREST" IN

10   YOUR JURY INSTRUCTIONS OTHER THAN THE SENTENCE SAYING THAT'S

11   NOT ILLEGAL.  YOU WILL NOT SEE IT IN YOUR VERDICT FORM.

12        THE JUDGE READ OUT TO YOU THE DEFINITION OF MAIL AND WIRE

13   HONEST SERVICES FRAUD.  THESE ARE THE ELEMENTS, INCLUDING A

14   SCHEME OR PLAN TO DEPRIVE; SPECIFIC INTENT TO DEPRIVE; ACT WAS

15   MATERIAL.

16        THE OTHER PART OF THOSE INSTRUCTIONS THE GOVERNMENT DIDN'T

17   PLAY FOR YOU, WHAT IS NOT HONEST SERVICES FRAUD?

18        AS I SAID JUST, THOSE SECRET PAYMENTS, NOT A CRIME.

19   UNDISCLOSED SELF-DEALING?  CONFLICTS OF INTEREST ALONE IS NOT

20   SUFFICIENT TO CONSTITUTE HONEST SERVICES MAIL OR WIRE FRAUD.

21        THE PROBLEM THAT NETFLIX HAD WASN'T WITH THE ADVISOR

22   POSITIONS OR EVEN THE CONTRACTS.

23        THEY HAD A PROBLEM WITH THE SECRET PAYMENTS, WITH THE

24   UNDISCLOSED SELF-DEALING.

25        DAVID WELLS HIMSELF SAID ADVISING CAN GET AN INSIDE VIEW

1        INTO EMERGING TECHNOLOGY.

2             HE WAS ASKED, YOU SAID EARLIER, HE COULD ADVISE, HE JUST

3        COULDN'T RECEIVE COMPENSATION.

4             THAT'S RIGHT.

5             YOU DON'T HAVE AN ISSUE WITH EMPLOYEES SITTING ON ADVISORY

6        BOARDS?

7             NO.  THAT ALLOWS THEM TO GET KNOWLEDGE OF EMERGING

8        TECHNOLOGY.

9             DAVID WELLS SAID, IF IT WASN'T FOR THE COMPENSATION -- I

10       ASKED, IF IT WASN'T FOR THE COMPENSATION, IT COULD BENEFIT

11       NETFLIX?

12            SURE.

13            SO THE PROBLEM IS THE CONFLICT OF INTEREST?

14            YES.

15            THE PROBLEM IS THE COMPENSATION?

16            YES.

17            NOT THE ADVISOR POSITION ITSELF?

18            THAT'S CORRECT.

19            DAVID WELLS DIDN'T ACCUSE MR. KAIL OF FRAUD.  HE ACCUSED

20       HIM OF NON-DISCLOSURE.  FROM WHAT HE'S SAYING, THIS IS AN

21       EMPLOYMENT VIOLATION.

22            AND THIS IS, OF COURSE, THE SAME DAVID WELLS WHO RECEIVES

23       OUTSIDE COMPENSATION HIMSELF AND HE ADMITTED, THERE'S NO

24       PROBLEM WITH MAKING MONEY ON THE SIDE.  WE JUST WANT TO KNOW

25       ABOUT IT.

1          THE MAIL AND WIRE FRAUD THEORY IS ANOTHER CONFUSING AND

2     ILL-FITTED THEORY THAT THE GOVERNMENT'S FORCING IN DESPERATION

3     FOR A CONVICTION.  BUT THEY DON'T SUCCEED AS I'LL PROVE

4     SHORTLY.

5          FIRST, THEY HAVE TO PROVE A SCHEME TO DEFRAUD, NOT A

6     CONFLICT OF INTEREST, NOT A VIOLATION OF AN EMPLOYMENT, BUT AN

7     ACTUAL SCHEME TO DEPRIVE NETFLIX OF MONEY OR PROPERTY.

8          WHAT'S PROPERTY?  A PROPERTY INTEREST IS AN ECONOMIC

9     INTEREST.  IT'S THE RIGHT TO CONTROL SOMETHING.

10          THE RIGHT TO CONTROL SOMETHING?  CONTROL SOMETHING LIKE A

11     CONTRACT?  THAT'S AN INTANGIBLE RIGHT.  IT'S NOT AN ECONOMIC

12     INTEREST.

13          SO IF YOU FIND THAT NETFLIX WAS DEPRIVED OF THE

14     OPPORTUNITY TO MAKE DECISIONS AS TO CONTRACTS OR THE RIGHT TO

15     HAVE CONTROL OVER THE CONTRACTS, BUT THAT THE SCHEME DIDN'T

16     DEPRIVE THEM OF ACTUAL MONEY OR PROPERTY, YOU CAN'T CONVICT

17     MR. KAIL OF WIRE OR MAIL FRAUD UNDER THIS THEORY.

18          IN OTHER WORDS, THE GOVERNMENT HAS TO PROVE THAT MR. KAIL

19     WAS SCHEMING TO GET NETFLIX TO PAY OUT VENDORS WHEN THEY

20     SHOULDN'T HAVE.  TO PUT IT EVEN MORE PLAINLY, DID NETFLIX --

21     WHAT EVIDENCE WAS THERE THAT NETFLIX PAID FOR SOMETHING IT

22     DIDN'T RECEIVE?

23          HOW CAN MR. KAIL TRADE CONTRACTS WITH VENDORS WHEN IT WAS

24     NEVER HIS UNILATERAL DECISION?  THIS IS NOT UNIQUE TO NETFLIX.

25     DECISIONS ARE MADE AS A TEAM IN THIS INDUSTRY.  THAT'S WHAT

1       PROOF OF CONCEPTS ARE.  YOU KNOW, THIS MAY BE UNIQUE TO TECH,

2       AS I LEARNED, BECAUSE IN OTHER INDUSTRIES, MAYBE ONE PERSON CAN

3       DECIDE WHAT AIR CONDITIONING VENDOR ARE WE GOING TO USE?  WHAT

4       PLUMBING VENDOR ARE WE GOING TO USE?

5           BUT NOT IN THIS INDUSTRY.  NOT IN COMPANIES OF THIS SIZE.

6       NOT AT NETFLIX, AND NOT BY MR. KAIL.

7           LOOK AT WHERE NETFLIX IS TODAY.  IN PART, THAT'S DUE TO

8       MR. KAIL'S WORK FOR THREE YEARS IN GIVING NETFLIX A COMPETITIVE

9       EDGE.  HE WAS GIVEN A VERY AGGRESSIVE TIMELINE FOR CLOUD, AND

10      HE DELIVERED IT.  NO ONE DISPUTED THAT.  HE DIDN'T COST THEM

11      MONEY OR PROPERTY.  HE MADE THEM MONEY.

12          REMEMBER THAT ROB FRY TESTIFIED, "THE COMPANIES THAT HE

13      BROUGHT FORWARD FOR THE CHALLENGES THAT WE HAD MADE SENSE,

14      YES."

15          THIS DEFEATS WIRE FRAUD.

16          HE ALSO SAID JUST GENERALLY ABOUT STARTUPS, IT'S NOT TODAY

17      WHEN WE'RE KEEPING THEM AROUND.  IT'S ABOUT TRYING TO SOLVE THE

18      PROBLEM NOT TODAY, BUT LOOK AT THEIR ROADMAP OF WHAT THEY'RE

19      GOING TO DO FOR YOU IN THE FUTURE.

20          FURTHER, THINK ABOUT ALL THE PEOPLE WHO SAID MR. KAIL

21      ACTED IN NETFLIX'S BEST INTERESTS.  EVEN REED HASTINGS ADMITTED

22      THAT IF MICHAEL KAIL HAD BEEN MAKING BAD DECISIONS, HE WOULDN'T

23      HAVE KEPT HIS JOB AND HE WOULDN'T HAVE TRIED TO CONVINCE HIM TO

24      STAY.

25          EVERYONE ASKED SAID THE SAME THING.  WAS NETFLIX'S MOTTO

 1    BE GUIDED BY THEIR BEST INTERESTS?

 2         MR. KAIL TOLD YOU, HE THOUGHT HE ACTED IN NETFLIX'S BEST

 3    INTERESTS WITH RESPECT TO ALL THE VENDORS HE INTRODUCED TO

 4    NETFLIX OR THE CONTRACTS HE SIGNED AND NOBODY HAS DISPUTED

 5    THAT.

 6         NOBODY HAS DISPUTED THAT HIS INTRODUCTIONS OR ANY OF THE

 7    CONTRACTS WERE TO THE DETRIMENT OF NETFLIX.  MOREOVER, HE MADE

 8    INTRODUCTIONS, INTRODUCTIONS TO COMPANIES THAT HE COULD

 9    ENVISION HAVING THE TECHNICAL SKILLS TO DO SO AS ADVANCING

10    NETFLIX.  HE UNDERSTOOD THE FUTURE OF I.T.  NOT THAT

11    INTRODUCTIONS ARE CRIMINAL, BUT HIS INTRODUCTIONS TO THESE

12    VENDORS, TO HIS TEAM SAYING, HEY, CHECK THIS OUT, THEY MADE

13    SENSE THE ONES YOU HEARD ABOUT.

14         WE WOULD HAVE SEEN IN HIS JOB PERFORMANCE REVIEWS IF THE

15    OPPOSITE WERE TRUE.

16         ANOTHER IMPORTANT JURY INSTRUCTION, GOOD FAITH IS A

17    COMPLETE DEFENSE, A COMPLETE DEFENSE TO CHARGES OF WIRE FRAUD,

18    HONEST SERVICES FRAUD, MAIL FRAUD, AND HONEST SERVICES MAIL

19    FRAUD.

20         AN HONESTLY HELD OPINION OR AN HONESTLY FORMED BELIEF

21    CANNOT PROVIDE FRAUDULENT INTENT, EVEN IF THAT OPINION OR

22    BELIEF IS MISTAKEN.

23         IF YOU DECIDE MR. KAIL MADE A MISTAKE, HE SHOULD HAVE DONE

24    THINGS DIFFERENTLY.  AN HONESTLY HELD BELIEF LIKE THAT NEGATES

25    CRIMINAL INTENT.

1          LET'S TALK ABOUT THE SPECIFIC COMPANIES AND WHAT EVIDENCE

2     CAME IN.

3          PLATFORA IS COUNTS THIRTEEN TO FIFTEEN.  AND, AGAIN, THE

4     QUESTIONS ASK WHETHER THERE WERE BRIBES AND KICKBACKS OR A

5     SCHEME TO CHEAT AND DECEIVE.

6          PLATFORA'S PRODUCT FIT RIGHT INTO THE REAL TIME BIDDING

7     THAT MR. KAIL WAS DIRECTED BY HIS BOSS TO TAKE CARE OF.  DID IT

8     HAVE PROBLEMS ALONG THE WAY?  YEAH.

9          AND YOU'VE HEARD THAT ALL TECHNOLOGY, ESPECIALLY NEW

10    TECHNOLOGY, IS GOING TO HAVE BUGS AND THEY FIX THEM.

11         LOOK CLOSELY BY THE E-MAILS WRITTEN BY MR. KAIL AND THE

12    ENGINEERS, ESPECIALLY TONY RALPH.  NOT ONCE DID HE SAY, I DON'T

13    WANT THIS, STOP.  HE WAS UNSURE ABOUT IT, BUT THEN HE CAME BACK

14    AND SAID HE WANTED MORE MEETINGS.  HE WASN'T SAYING NO.

15         LET'S -- OOPS, LET'S NOT TAKE A LOOK.

16         LET'S TAKE A LOOK AT SOME OF HIS COMMENTS HERE.  THESE ARE

17    FROM HIS E-MAILS, DIRECTLY FROM HIS E-MAILS.

18         OSTENSIBLY IT COULD BE A FIT FOR WHAT WE WERE SEEKING.

19         IT WAS LEADING DOWN A PATH OF WHAT IS WORKING, WHAT IS NOT

20    WORKING.

21         THESE ARE ABOUT PLATFORA.

22         WAS DEFINITELY NOT GOING TO GIVE A YES/NO.  JUST A COUPLE

23    BULLET POINTS FROM THE TEAM.

24         IT'S DEFINITELY WORTH CONTINUING TO EXAMINE.

25         LET'S SEE WHERE THE TEAM GRAVITATES.

1          CONVINCED A SOLUTION DOESN'T EXIST IN A MATURE STATE.

2     WHATEVER PATH WE CHOOSE, IT'S GOING TO TAKE EFFORT.  I'M NOT

3     ASKING YOU TO CHANGE COURSE AT THIS POINT -- JUST WANTED TO

4     PROVIDE MY PERSPECTIVE.

5          ON AND ON, BACK AND FORTH.

6          AND, PLUS, CONSIDER THIS.

7          OH, THERE'S MORE.

8          WE WOULD HAVE HOPED FOR THAT THE NEXT RELEASE COULD HAVE

9     DONE EVERYTHING WE WOULD HAVE WISHED.

10         I'D SUGGEST CONTINUING TO KEEP PLATFORA MOVING FORWARD AS

11    THE CONVERSATIONS WITH THEM ARE ONGOING.

12         AM FINE WITH CONTINUED ENGAGEMENT.

13         AND EVEN IN DECEMBER 2013, THANKS, MARK, AT PLATFORA, CAN

14    YOU LET ME KNOW WHO IS INVOLVED IN THE TRAINING?  WE MAY HAVE

15    SOMEONE TO ADD.

16         IF YOU'RE SAYING NO, WHY ARE YOU ADDING PEOPLE TO THE

17    TRAINING AS LATE AS DECEMBER 2013?  HE DIDN'T SAY, WE SHOULDN'T

18    MOVE FORWARD WITH PLATFORA.

19         PLUS, THERE WAS A POINT WHERE TONY RALPH, I BELIEVE, WAS

20    UNTRUTHFUL ON THE STAND.  HE GAVE TESTIMONY ABOUT THIS MEETING

21    WITH MR. KAIL AND BEN WERTHER WHERE THEY DISCUSSED PRICING.

22    THAT WAS IN ABOUT SEPTEMBER 2013, THERE'S AN E-MAIL -- THERE

23    WAS AN EXHIBIT, 323, THAT GOES ALONG WITH THAT.  HE SAYS HE

24    FELT SO SICK AFTER THAT MEETING, HE WENT STRAIGHT TO H.R., TWO

25    MINUTES LATER HE SAID HE WENT TO H.R. BECAUSE THIS CONFLICT OF

1        INTEREST WAS SO APPARENT.

2              SEPTEMBER 2013, WE HEARD NOTHING ABOUT THAT.  IF HE WENT

3        TO H.R. IN SEPTEMBER 2013 AND COMPLAINED ABOUT A CONFLICT OF

4        INTEREST, DOES THAT MEAN EITHER NETFLIX DIDN'T CARE OR HE

5        DIDN'T ACTUALLY MAKE SUCH A COMPLAINT?  BECAUSE IF HE DID, WHAT

6        HAPPENED?  THEY DID NOTHING?  IS THAT BELIEVABLE?

7              OR IS IT POSSIBLE THAT MAYBE HE WAS EXAGGERATING JUST A

8        LITTLE, EXAGGERATING, THINKING ABOUT WHAT HAPPENED SO MANY

9        YEARS AGO?

10             AND BY THE WAY, THE PLATFORA PILOT WAS EXTENDED FOR FREE.

11       THAT WAS THE FREE PART OF IT.

12             WHAT DID YINGKUAN SAY ABOUT PLATFORA?  MR. LIU TESTIFIED

13       THAT THEY WERE NOT TESTING OUT ANYTHING ELSE AT THE TIME THAT

14       COULD DO WHAT PLATFORA DID.  AS LATE AS MARCH 2014, HE WAS

15       MEETING WITH PLATFORA TO GO OVER THE 3.0 FEATURES.  HE SAID IT

16       WAS UP TO THE TEAMS TO TRY IT OUT.  3.0 RELEASED, BUT DECIDED

17       NOT TO EXTEND.

18             HE WAS BULLISH, I.E., POSITIVE ON PLATFORA.

19             WHETHER HE THOUGHT THEY WERE EXACTLY WHERE THEY SHOULD BE

20       DIDN'T CHANGE THE FACT THAT THEY DID DELIVER ON THEIR END THE

21       3.0 WITHIN THE PROMISED TIME PERIOD WHICH, OF COURSE, TRIGGERED

22       THE CANCELLATION FEE.

23             AND HE SAID MANY FACTORS WENT INTO THE DECISION TO CANCEL.

24             MR. HASTEER, ON THE OTHER HAND, YOU'LL SEE FROM THE

25       EXHIBITS, THE E-MAILS, THAT HIS ENGINEERS PLAYED AROUND IN

1     SUMMER OF 2013.  HE NEVER TRIED IT.  HE NEVER LOOKED AT IT.  A

2     COUPLE DAYS HIS ENGINEERS PLAYED AROUND.  MONTHS AND MONTHS

3     AFTER THAT, AS YOU CAN SEE, OTHER ENGINEERS WERE INTIMATELY

4     INVOLVED.

5           AND IF MR. KAIL WAS BEING BRIBED, ACCORDING TO THE

6     GOVERNMENT'S THEORY, WOULDN'T HE BE MOTIVATED TO OVERRULE AND

7     GET ANOTHER CONTRACT IN PLACE FOR HUNDREDS OF THOUSANDS OF

8     DOLLARS?

9           THE FACT THAT HE CANCELLED AFTER DISCUSSIONS WITH HIS TEAM

10    RESULTED IN NO MONEY TO HIM, THAT SHOWS THAT HE WASN'T

11    CONFLICTED, HE WAS KEEPING THOSE POSITIONS SEPARATE.

12          OF COURSE, WHEN IT TURNED OUT, AS I SAID, THAT THE PROJECT

13    WASN'T -- JUST WASN'T GOING TO HAPPEN FOR A VARIETY OF REASONS,

14    MR. KAIL AGREED AND IT WAS CANCELLED.  HE DIDN'T TRY TO KEEP

15    THEM GOING IN THE SHADOWS, DIDN'T FORCE HIS TEAM, LET'S KEEP

16    GOING, COME ON, LET'S MAKE IT WORK.  HE SIMPLY COLLABORATED

17    WITH YINGKUAN AND DECIDED UNFORTUNATELY IT WASN'T GOING TO WORK

18    OUT.

19          AND FROM THE E-MAIL THAT WAS JUST SHOWN IN THE

20    GOVERNMENT'S CLOSING, IT WAS CANCELLED IN APRIL, NOT MARCH.

21    CANCELLED WEEKS LATER AFTER MR. KAIL LEFT THE ADVISORY BOARD.

22          DOES THIS MEAN THAT PLATFORA WAS A BAD IDEA AND A WASTE OF

23    TIME?  NOT AT ALL.  YOU HEARD THAT IT WAS EXTREMELY VALUABLE TO

24    THE CHIEF MARKETING OFFICER AND MADE HIM MORE EFFICIENT WITH

25    THE AD BUYING.  THAT WASN'T DISPUTED.

1          THOSE ANALYTICS PROVIDED THE ADVERTISING TEAM WITH REAL

2     DATA SO THEY COULD SAVE MONEY ON ADVERTISING, WHICH IS

3     EXPENSIVE.

4          PLATFORA'S ANALYTICS HELPED NETFLIX DECIDE WHICH ADS

5     WORKED AND WHICH ADS DIDN'T, AND THE GOVERNMENT DIDN'T DISPUTE

6     THIS EVIDENCE.

7          NO ONE SAID THAT THOSE ANALYTICS WERE USELESS TO THE CHIEF

8     MARKETING OFFICER AND OTHERS.  AND IF THAT WERE THE CASE, I'M

9     SURE YOU WOULD HAVE HEARD ABOUT IT.

10         BUT IT DOESN'T EXIST BECAUSE THE PRODUCT DELIVERED VALUE.

11         ULTIMATELY, YES, THE CONTRACT WAS CANCELLED FOR A VARIETY

12    OF REASONS AS YINGKUAN TOLD YOU, AND MR. KAIL SAID ONE OF THOSE

13    REASONS, EVENTUALLY NETFLIX MOVED TO A GOOGLE DOUBLE CLICK

14    PLATFORM.  THAT WAS ALSO UNDISPUTED.

15         THINGS CHANGED, THEY CANCELLED, AND PLATFORA HELD THEM OUT

16    TO PART OF THE CONTRACT, NOT TO A WHOLE CONTRACT, BUT TO PART

17    OF IT.

18         SO CONSIDER AGAIN, WHERE'S THE QUID PRO QUO.  WHERE'S THE

19    EXCHANGE OF PAYMENT FOR CONTRACT?

20         THE GOVERNMENT IS SAYING, LET'S JUST SKIP OVER ALL THE

21    FACTS, LET'S IGNORE THE INVOLVEMENT OF THE TEAMS, LET'S JUST

22    LOOK AT THE TIMING.

23         THIS ISN'T LIKE A BANK ROBBERY, LOOK, THERE HE IS,

24    FINGERPRINTS ON THE CASE, IDENTIFICATION MADE, CASE CLOSED.

25         THIS IS ABOUT SPECIFIC INTENT.  WHO'S INTENT?  MR. KAIL'S.

1    WAS HE PLOTTING AND PLANNING TO DECEIVE AND CHEAT NETFLIX ALL

2    SO HE COULD GET SOME POTENTIALLY WORTHLESS STOCK OPTIONS AT THE

3    RISK OF RUNNING HIS I.T. DEPARTMENT INTO THE GROUND AND RUINING

4    HIS REPUTATION?

5         PEOPLE WERE AWARE OF THE CONTRACTS.  NOT ONLY THAT, WE

6    WERE AWARE OF THE PRODUCTS BECAUSE THEY WORKED ON THEM AND USED

7    THEM AND THE TECHNOLOGY SAVED NETFLIX TIME, MONEY, AND LED THEM

8    TO OUTPACE THEIR COMPETITION IN THE STREAMING MARKET.

9         AND THIS CULTURE AT NETFLIX DEMANDED FEEDBACK IF ENGINEERS

10   PERCEIVED THAT THEY WERE BEING FORCED TO DO SOMETHING AND

11   REPEATEDLY WORK ON BAD TECHNOLOGY.  INSTEAD, E-MAIL AFTER

12   E-MAIL SHOWED GREAT FEEDBACK ALONG WITH CRITICAL FEEDBACK ON

13   THE TECHNOLOGY.  THE ENGINEERS USED ALL THE PRODUCTS AT ISSUE

14   IN THIS TRIAL.

15        ALL THE VENDORS, VARIOUS TEAMS TESTED THE PRODUCTS,

16   APPROVED THEM, USED THEM.  SOME OF THEM MR. KAIL HAD TO USE IN

17   HIS JOB.  ADVERTISING USED THEM, FP&A, THE LIST GOES ON.

18        BUT COMING BACK TO PLATFORA, IF THEY'RE TRYING TO CONVICT

19   HIM OF A FEDERAL CRIME FOR RUNNING PLATFORA, THEY DIDN'T GET TO

20   TAKE SHORTCUTS.  I ASK YOU TO NOT OVERLOOK THE OVERWHELMING

21   EVIDENCE THAT THERE'S JUST NOT QUID PRO QUO.

22        THE INTRODUCTIONS TO TEAMS IS EQUIVALENT TO A SCHEME TO

23   DECEIVE AND CHEAT NETFLIX OF MONEY AND PROPERTY?  IS THAT WHAT

24   THEY'RE SAYING?  EVEN IF ONE IS GETTING COMPENSATION, THE LAW

25   SAYS THAT ALONE IS NOT A CRIME.

1          OH, THE COMPANY GETS TO DO THE POC.  AND, AGAIN, THERE'S

2     AN INTRODUCTION, IT'S UP TO THE TEAMS TO DECIDE WHAT TO DO.

3     THAT WASN'T IN EXCHANGE FOR STOCK OPTIONS.

4          AND YOU HEARD NETFLIX GETS THE BENEFIT OF THAT POC.  WHY

5     DID THEY DO IT?  COMPANY AFTER COMPANY AFTER COMPANY YOU HEARD,

6     THEY'RE LOOKING FOR SOLUTIONS.  NETFLIX GETS TO LEVERAGE THESE

7     VENDORS TO THEIR ADVANTAGE.

8          YOU HEARD FROM MIKE ASHER AND THE VIDEO DEPOSITION OF

9     BEN WERTHER, THERE WERE NO PROMISES.  THE CONTRACT WAS

10    UNRELATED TO ADVISORY ROLES.  THE WORDS WERE NO CONNECTION, NOT

11    CONTINGENT.  THEY WERE NOT AMBIGUOUS ABOUT THAT.

12         WERTHER SAID IN HIS DEPOSITION, OKAY, THAT WAS PROBABLY

13    SOME POORLY WORDED LANGUAGE, AND IT WASN'T TRUE.

14         WHAT'S THE GOVERNMENT'S THEORY?  THAT ALL THEIR WITNESSES

15    GOT ON THE STAND AND LIED, THEIR OWN WITNESSES?

16         MICHAEL ROSSI'S COMMENTS IN THE E-MAIL DIDN'T MATCH THE

17    FACTS.  AND MIKE ROSSI WAS FIRED, AS YOU KNOW.

18         THE $600,000 WASN'T GUARANTEED.  THERE WAS E-MAILS, AGAIN,

19    NEGOTIATING THAT PRICE BACK AND FORTH.  THERE WAS NO GUARANTEE.

20         YOU HAVE TO LOOK AT ALL OF THE CONTEXT SURROUNDING WHAT'S

21    HAPPENING AND MR. KAIL'S INTENT.

22         THE GOVERNMENT PROMISED YOU, PROMISED IN OPENING STATEMENT

23    THAT YOU -- THAT THERE WOULD BE EVIDENCE OF HOW THERE WERE

24    COMPETING PRODUCTS AND MR. KAIL CHOSE THE INFERIOR ONE.  THEY

25    PROMISED THAT EVIDENCE.

1          BUT WHERE WAS IT?  DID ANY OF YOU HEAR ANY EVIDENCE THAT

2     THERE WERE TWO PRODUCTS AT THE SAME TIME THAT COULD DELIVER THE

3     SAME FUNCTIONALITIES AND MR. KAIL TOLD HIS TEAM, WE'RE GOING

4     WITH THIS ONE, THE INFERIOR ONE?

5          FIRST, AS YOU MAY HAVE LEARNED IN THIS INDUSTRY, THERE ARE

6     RARELY COMPETING PRODUCTS.  THIS NEW TECHNOLOGY IS SEEKING TO

7     SOLVE A VERY SPECIFIC PROBLEM.  EVEN YINGKUAN TOLD YOU, AT THAT

8     TIME, THERE WASN'T REALLY A COMPETITOR TO PLATFORA.  IT

9     COULDN'T DO THE SAME THINGS.

10         YEAH, YOU CAN COBBLE TOGETHER TEN OTHER PRODUCTS AND WASTE

11    A BUNCH OF TIME.  THAT'S NOT WHAT WE'RE TALKING ABOUT.

12         THIS IS VERY DIFFERENT THAN A PUBLIC BIDDING PROCESS, FOR

13    EXAMPLE.  YOU MAY BE FAMILIAR WITH THIS SITUATION, LET'S SAY A

14    CITY, FOR EXAMPLE, SENDS OUT WHAT ARE CALLED RFP'S, REQUESTS

15    FOR PROPOSAL, TO SAY, A CONSTRUCTION PROJECT, OKAY?  AND

16    VARIOUS VENDORS BID ON THE JOB, THEY ALL BID ON THE SAME JOB.

17    THEY'RE ALL BASICALLY PROPOSING TO DO THE SAME THING.  WE HAVE

18    TO BUILD SEVEN BUILDINGS.  OKAY.  MAYBE EACH ONE HAS A

19    DIFFERENT PRICE, MAYBE SOME DIFFERENT MATERIAL, BUT THEY'RE ALL

20    BIDDING FOR THE SAME THING.

21         IF A CITY EMPLOYEE ACCEPTS MONEY IN EXCHANGE FOR SELECTING

22    THAT PARTICULAR BIDDER, IF THEY HAVE THAT POWER AND THEY DO

23    THAT, THIS IS IN THE NEWS.  THAT'S BRIBERY.  THAT'S A KICKBACK.

24    THAT'S CHEATING AND DECEIVING.  THAT'S CUTTING IN LINE.

25         THERE WAS NO CUTTING IN LINE HERE.  THE GOVERNMENT

1      PROMISED YOU'D HEAR ABOUT THAT.  DID YOU HEAR ANY TESTIMONY

2      ABOUT ANY OF THESE VENDORS GETTING ANY BREAKS AT ALL?  GETTING

3      ANY ADVANTAGES OVER SOME IDENTIFIABLE COMPETITOR?

4           NOT AT ALL.

5           MR. SAMPSON THEN SAID THERE WAS A "FOR SALE SIGN" ON

6      MR. KAIL.  THAT'S A FUN STORY.  BUT THAT'S NOT SUPPORTED BY THE

7      EVIDENCE.

8           EVERY SINGLE ONE OF THESE VENDORS HAD TO WORK VERY HARD TO

9      PLEASE NETFLIX, AND AS THE ENGINEERS TOLD YOU, THE RELATIONSHIP

10     IS COLLABORATIVE.  THEY'RE NOT LOOKING FOR ONE-OFFS.  THEY'RE

11     LOOKING FOR PARTNERSHIPS.  THESE POC'S WITH EARLY TECHNOLOGIES

12     BENEFIT NETFLIX, AND WHEN YOU LOOK AT HOW SUCCESSFUL NETFLIX

13     IS, THAT'S NOT BY COINCIDENCE.

14          THEY'VE DONE SMARTER, BETTER, IN PART THANKS TO PEOPLE

15     LIKE MIKE KAIL WHO ARE VISIONARIES.

16          THE COMPANIES YOU HEARD ABOUT IN THIS TRIAL WERE OFFERING

17     SOMETHING UNIQUE, SOLVING A SPECIFIC PROBLEM, AND THEY GOT

18     CHOSEN BY THE TEAMS AFTER POC'S BECAUSE THE TEAMS SAW VALUE.

19          AND YOU HEARD WHAT SOME OF THESE PRODUCTS COULD DO.

20     UNBELIEVABLE.  THE TECHNOLOGY TEN YEARS AGO, THAT'S WHERE WE

21     ARE TODAY.  AMAZING.

22          AND AS I SAID, THEY WERE ON TO SOMETHING BECAUSE THEY HAD

23     FUTURE SUCCESS.  WAS THEIR SUCCESS BECAUSE OF THAT ONE NETFLIX

24     LOGO?  IF THEY HAD A POOR PRODUCT, THEY WOULDN'T SUCCEED IN A

25     CUTTHROAT MARKET LIKE TECHNOLOGY.  THEY SUCCEEDED BECAUSE THEY

1   WERE ON TO SOMETHING AND THEY DELIVERED AND IT TAKES MORE THAN

2   ONE CLIENT TO MAKE THAT KIND OF SUCCESS.  SO WHERE WAS THE

3   CHEATING?  WHERE WAS THE CUTTING IN LINE?

4        THIS WASN'T THAT PUBLIC BIDDING PROCESS, WHAT THEY HAVE TO

5   DO -- WHERE THEY HAVE TO BID A BUNCH OF COMPANIES FOR THE SAME

6   PROJECT.

7        HERE, IN TECH, AS I UNDERSTAND IT, IF A PRODUCT SOLVES A

8   PROBLEM, THEY DON'T HAVE TO TRY OUT TEN OTHERS BEFORE DECIDING.

9   THIS ISN'T AN RFP.  THIS SOLVES OUR PROBLEM.  WE DON'T HAVE TO

10  GIVE -- LOOK FOR SOMETHING ELSE OUT THERE TO SEE JUST IN CASE.

11       THEY DON'T HAVE TIME FOR THAT.  IF THEY LIKE IT, THEY GET

12  WHAT THEY WANT, THEY GET THEIR SPECIFICATIONS, THEY PUSH AND

13  PUSH THE VENDORS, THEY GET WHAT THEY WANT, THEY MOVE FORWARD.

14       MR. KAIL DIDN'T MANIPULATE THAT PROCESS.

15       NETENRICH IS A CLASSIC EXAMPLE, AT BEST, OF SECRET

16  PAYMENTS FOR UNDISCLOSED SELF-DEALING.

17       AGAIN, NOT CRIMINAL.

18       THE COMMISSIONS OCCURRED.  MR. KAIL ADMITTED THAT.

19       BUT UNDISCLOSED COMMISSIONS BY THEMSELVES DO NOT MAKE A

20  FEDERAL CRIME.

21       WHERE WAS THE SCHEME TO DEFRAUD OR THE BRIBERY HERE?

22  NETENRICH OPERATED IN THIS REFERRAL MODEL.  THEIR CUSTOMERS

23  WERE NOT OVERCHARGED.  THAT'S HOW THEY DO BUSINESS.  THEY DO SO

24  PRESENTLY.

25       THEREFORE, THEY REQUESTED THAT MR. KAIL INCORPORATE HIS

1    EXISTING BUSINESS SO THEY COULD PAY HIM AS A CORPORATION, NOT

2    AN INDIVIDUAL.  HE DID SO, AND THAT REFERRAL AGREEMENT WAS NOT

3    A CONTRACT DOCUMENTING THAT.  AT MOST, IT WAS AN UNDISCLOSED

4    PAYMENT.

5         EXCUSE ME, MAY I SEE THE TIME?

6         SHOULD HE HAVE DISCLOSED IT?  MAYBE.

7         SHOULD HE ASK FOR PERMISSION FIRST?  MAYBE THAT WOULD HAVE

8    BEEN GOOD.

9         DOES THAT VIOLATE SOME UNWRITTEN POLICY?  THOSE THINGS

10   DON'T MATTER IN THIS CRIMINAL CASE.

11        THE CONDUCT WAS NOT A SCHEME TO DEFRAUD.

12        MR. KAIL WAS NOT SUPERVISING OR CHOOSING THOSE NETENRICH

13   ENGINEERS.  YOU HEARD TESTIMONY THAT OTHERS AT NETFLIX

14   INTERVIEWED THEM, HIRED THEM, MANAGED THEM, AND APPROVED THEIR

15   INVOICES.

16        EXHIBIT 1087 DOCUMENTS THAT INVOICES WENT TO ASHI SHETH.

17        THANK YOU.  THANK YOU VERY MUCH.

18        THEY WEREN'T -- MR. SAMPSON SAID THESE ENGINEERS WERE

19   WORK, UNDER MR. KAIL.  WELL, THAT'S MISLEADING.  SURE, HE'S AT

20   THE TOP OF THE FOOD CHAIN.  HE'S HEAD OF I.T.  BUT HE DIDN'T

21   AUGMENT THESE ENGINEERS.  NETFLIX ENGINEERS HIRED WHO THEY

22   WANTED, HOW MUCH TIME THEY WANTED INDEPENDENT OF MR. KAIL'S

23   OPINION.

24        AND WHEN GIVEN THE OPPORTUNITY TO GENERATE ADDITIONAL

25   INCOME FOR HIMSELF, IF YOU BELIEVE THE GOVERNMENT'S THEORY, HE

1    SHOULD HAVE BEEN RIGHT ON KAMATH'S PROPOSAL TO ADD ADDITIONAL

2    FEATURES WHICH INVOLVED THAT NUMBER.  ACCORDING TO THE

3    GOVERNMENT, HE COULD HAVE DONE IT, JUST SIGNED IT, NO ONE MAY

4    HAVE NOTICED.

5         SO THE FACT THAT HE REJECTED THAT FLIES IN THE FACE OF

6    THEIR SELF-ABOVE-ALL-ELSE THEORY.  IT WASN'T IN NETFLIX'S BEST

7    INTEREST FOR THAT CONTRACT AS HE TOLD NETENRICH, AND,

8    THEREFORE, HE DIDN'T EVEN CONSIDER IT.  HE NEVER EVEN MADE AN

9    INTRODUCTION TO HIS ENGINEERS ABOUT THAT OFFSHORE PRODUCT.

10        AND MR. KAMATH TESTIFIED THAT ON ITS FACE, IT APPEAR THAT

11   HAD MR. KAIL AND NETENRICH WERE OPERATING IN NETFLIX'S BEST

12   INTERESTS.  THE ENGINEERS WERE HIGH QUALITY.  MR. KAIL HAD NOT

13   EASED THEIR WAY INTO NETFLIX.  HE WASN'T EVEN INVOLVED IN THE

14   INTERVIEWING.  THEY PROVIDED A VALUABLE SERVICE, AND THEY

15   DIDN'T OVERBILL.

16        IN THE CASE OF VISTARA, I THINK WE SAW SOMETIMES THEY

17   UNDERBILLED.

18        MR. KAMATH DIDN'T DENY THAT ALL THE STATEMENTS MR. KAIL

19   MADE TO HIM ABOUT HAVING FREEDOM, ABOUT WORKING TOWARDS

20   NETFLIX'S BEST INTERESTS, ABOUT PROVIDING VALUE WERE ABSOLUTELY

21   TRUE.  THOSE STATEMENTS, IN FACT, WERE CONSISTENT WITH

22   MR. KAIL'S STATE OF MIND, THAT HE BELIEVED AS LONG AS IT DIDN'T

23   CONFLICT WITH NETFLIX'S BEST INTERESTS, HE COULD BE AN ADVISOR,

24   EVEN IF IT CAME WITH STOCK OPTIONS, WHICH TO HIM WAS PRETTY

25   OBVIOUS.

1          AND IN THOSE NETENRICH INVOICES, IF ANY EVENT, WHERE'S THE

2     CONFLICT IF HE'S NOT EVEN THE ONE SIGNING THE INVOICE.

3          TO SUMMARIZE NETENRICH, ENGINEERS WERE NOT INTERVIEWED BY

4     MR. KAIL AND THEIR INVOICES WERE NOT APPROVED BY HIM.

5          THERE WAS A NEED FOR ENGINEERS, THERE WAS POSITIVE

6     FEEDBACK, REQUESTS TO BRING IN MORE, REJECTIONS OF OFFSHORING,

7     REFERRAL AGREEMENT WAS THEIR BUSINESS MODEL, NOT A BRIBE OR A

8     KICKBACK.  THE COMMISSIONS RELATED TO ANY REFERRAL, AND YOU

9     HEARD THAT THERE WERE OTHERS THAT MR. KAIL REFERRED TO

10    NETENRICH AND VISTARA THAT ALSO RESULTED IN COMMISSIONS.

11         AND, AGAIN, UNDISCLOSED SELF-DEAL AND SECRET PAYMENTS

12    DON'T EQUATE TO MAIL AND WIRE FRAUD.

13         VISTARA, COUNT SEVENTEEN, SIMILAR QUESTIONS THAT YOU'LL

14    HAVE TO ANSWER.

15         AND WITH RESPECT TO VISTARA, IT WAS THE SAME BUSINESS

16    MODEL, THE REFERRAL PARTNER, THE PRICE WAS NOT INFLATED TO

17    NETFLIX, AND IN FACT, YOU HEARD MR. KAIL DROVE DOWN THE PRICE

18    DUE TO HIS NEGOTIATIONS SKILLS.

19         VISTARA WAS THE FIRST COMPANY TO DO THE SINGLE PANE OF

20    GLASS.  THIS IS A MUCH MORE COMMON TECHNOLOGY NOW PRECISELY

21    BECAUSE IT'S SO VALUABLE TO LARGE ENTERPRISES.  AND YOU HEARD

22    IT WAS RUNNING ON THOUSANDS OF MACHINES.  THE DATA CENTER,

23    PICTURE THIS, THE BIG SCREENS, WAS MONITORING ALL THESE ALERTS

24    AND PATCHES.

25         THINK HOW MUCH EASIER IT MADE THEIR JOBS, AS MR. KAIL

1    DESCRIBED.  NONE OF THAT WAS CONTRADICTED BY ANYONE.

2         DESPITE THE GOVERNMENT'S CROSS-EXAMINATION OF VARIOUS

3    INNUENDOS, THEY NEVER CHALLENGED MR. KAIL'S TESTIMONY THAT THE

4    PRODUCT BROUGHT VALUE TO NETFLIX.  VISTARA WAS REDUCING THE

5    DATA CENTER FOOTPRINT AS NOTED IN EXHIBIT 1035.  THAT WAS

6    MR. KAIL'S CHARTER FROM REED HASTINGS, REDUCE THE DATA CENTER

7    FOOTPRINT.  IT DID THAT.

8         AND IF YOU HAVE ANY DOUBT ABOUT THE SERVICES AND VALUE

9    VISTARA PROVIDED, TAKE A LOOK AT THE STATEMENT OF WORK.  IT

10   DESCRIBES IN VERY EXPLICIT DETAIL -- I'M NOT GOING TO SHOW YOU

11   RIGHT NOW -- THE SERVICES.

12        NOW, ASHLEY SPRAGUE TESTIFIED SHE ASSUMED THIS WAS IN POC

13   PHASE WHEN HER TEAM WAS USING A PRODUCT FOR A FEW YEARS.  IS

14   THAT CREDIBLE?  MAYBE SHE SIMPLY DOESN'T RECALL.

15        ACCORDING TO HER, THE COMPANY WAS DOING SALES PITCHES FOR

16   TWO YEARS.  THAT'S HARDLY BELIEVABLE, ESPECIALLY SINCE IT

17   DIRECTLY CONTRADICTS THE TESTIMONY OF SOMEONE BELOW HER,

18   ROB FRY.

19        AFTER TAKING A LOOK AT THE PRODUCT, AFTER BEING ASKED BY

20   MR. KAIL, HEY, YOU WANT TO CHECK THIS OUT, AND AFTER ROB FRY

21   DID SO WITHOUT ANY PRESSURE FROM MR. KAIL, HE RECOMMENDED USING

22   VISTARA.  HE TESTIFIED ONE OF THE THINGS THEY DID VERY WELL WAS

23   ASSET INVENTORY.  HE TESTIFIED THEY CONTINUED WORKING WITH THEM

24   BECAUSE THEY CONTINUED TO SHOW PROGRESS.

25        ISN'T THAT ONE OF THE HALLMARKS OF A GOOD STARTUP, BEING

1    RESPONSIVE?  CONTINUING TO SHOW PROGRESS?  MAKING IMPROVEMENTS?

2         ROB FRY TESTIFIED TO THE QUALITIES THAT MAKE A STARTUP

3    WORTHWHILE TO CONTINUE ON WITH.  I MEAN, WHAT MORE COULD THEY

4    ASK FOR?  HE TESTIFIED THE CONTRACT ALSO WASN'T CANCELLED FOR

5    TECHNICAL REASONS.

6         ROB FRY TESTIFIED THAT HE WAS TRYING TO FILL IN A

7    TECHNICAL CHALLENGE THEY HAD AT NETFLIX.  AND VISTARA WAS THE

8    TOOL AT THE TIME THAT THEY WERE LOOKING AT.

9         HE ULTIMATELY GAVE NO OPINION ONE WAY OR THE OTHER WHETHER

10   THEY WERE PAID OR NOT.  HE DIDN'T KNOW.  BUT HE WORKED ON IT

11   FOR A NUMBER OF YEARS.

12        AS LATE AS JANUARY 2014, ROB FRY WAS REQUESTING ADDITIONAL

13   IMPLEMENTATIONS FOR ASSET MANAGEMENT AS WE SEE IN EXHIBIT 1015.

14   ASSET MANAGEMENT FEATURES, ROB FRY.  ROB FRY AND HIS TEAM, NEXT

15   SET OF MILESTONES.

16        WAS THE PRODUCT GOING TO TAKE A WHILE TO MAYBE DELIVER

17   EVERYTHING SINCE THEY WERE RUNNING ON -- THEY KEPT TRACK, AS

18   YOU HEARD, THEY KEPT TRACK OF ALL OF THESE VIRTUAL MACHINES, SO

19   MUCH DATA.  IT WAS RUNNING ON THESE MACHINES AND RECEIVING

20   GOODNESS KNOWS HOW MUCH DATA.

21        BUT YOU HEARD COUNTLESS TIMES, NO TECHNOLOGY IS EXPECTED

22   TO BE DELIVERED AS PERFECT.

23        BUT THE BEAUTY OF VISTARA, MUCH LIKE ANTIVIRUS SOFTWARE,

24   IS IT DOES ITS JOB IN THE BACKGROUND WHILE MAKING THE JOB OF

25   THE NETWORK ENGINEERS EASIER, SAVING THEM COUNTLESS HOURS DUE

1     TO THE SEARCHING AND PATCHING THE VISTARA AGENT WAS DOING ON

2     THE MACHINES.

3            MR. KAIL AND VARMA EXPLAINED HOW IT WORKED AND THE VALUE

4     IT PROVIDED.

5            SO WHEN YOU LOOK BACK AT VISTARA, NETENRICH, AND THE

6     COMMISSION PAYMENTS, WELL, AGAIN, YOU MAY BE LIKE, HMM, I DON'T

7     LIKE THAT.  OR MAYBE YOU THINK, HMM, IT WAS A VIOLATION OF THE

8     EMPLOYMENT AGREEMENT.

9            THOSE REFERRAL PAYMENTS WERE NOT BRIBES.  THAT WOULD

10    SUGGEST THAT NETENRICH AND VISTARA'S ENTIRE BUSINESS MODEL WAS

11    BASED ON BRIBERY, THE BRIBERY SYSTEM.

12           THE FAILURE TO DISCLOSE THE PAYMENTS WAS JUST THAT,

13    FAILURE TO DISCLOSE.

14           LIKE IN MY PLUMBER EXAMPLE, IT MAY BE FROWNED UPON, BUT

15    IT'S NOT A FEDERAL CRIME TO FAIL TO DISCLOSE SELF-DEALING.  THE

16    JURY INSTRUCTIONS ARE CLEAR ON THAT.

17           IN SUMMARY, VISTARA, MR. KAIL LOWERED THE PRICE, AS LONG

18    AS NETFLIX'S BEST INTEREST -- THIS IS MR. KAIL'S STATE OF MIND

19    AT THE TIME HE SAYS.

20           DETAILED STATEMENT OF WORK, USED AND IMPLEMENTED THOUSANDS

21    OF MACHINES, MEETINGS FOR YEARS WITH ROB AND ASHLEY, REFERRAL

22    AGREEMENT WAS NOT A BRIBE OR KICKBACK.

23           DOCURATED RELATES TO COUNTS FIVE THROUGH EIGHT AND THIS

24    PRIMARILY WAS USED IN TWO TEAMS, FP&A AND MARKETING.

25           NOW, AS FOR DOCURATED, ASHLEY SPRAGUE WOULD HAVE YOU

1        BELIEVE THAT IT WAS INTRODUCED TO NETFLIX BY MR. KAIL.

2            WHY WOULD SHE SAY THAT?  WHY WOULD SHE SAY THAT WHEN WE

3        KNOW, WE ALL HEARD FROM TESTIMONY AND E-MAILS, IT ISN'T TRUE.

4            BECAUSE WHEN ACCUSATIONS ARE MADE, THERE GETS TO BE ALL

5        KINDS OF RUMORS, AND EIGHT YEARS LATER, ASHLEY SPRAGUE IS ASKED

6        TO TESTIFY FOR THE GOVERNMENT ABOUT HER FORMER EMPLOYER, SHE

7        GOES ALONG WITH THE STORY.

8            DOES SHE DOUBLE-CHECK BEFORE ANSWERING WITH CONFIDENCE

9        THAT MR. KAIL'S THE ONE WHO INTRODUCED DOCURATED?  DOES SHE

10       EVER STOP TO SAY, HMM, LET ME CHECK MY FACTS ON THAT?

11           NO.  SHE ANSWERED WITH COMPLETE CONFIDENCE BECAUSE SHE'S

12       REWRITING HISTORY TO SUIT WHAT SHE THINKS THE RIGHT ANSWER IS.

13           "DO YOU KNOW HOW DOCURATED WAS INTRODUCED TO NETFLIX?

14       QUESTION.

15           "WHO INTRODUCED IT?

16           "MIKE KAIL."

17           ON CROSS AFTER SOME QUESTIONING:  "DO YOU KNOW WHO

18       INTRODUCED DOCURATED TO NETFLIX?

19           "I GUESS I'M NOT SURE."

20           ON CROSS SHE'S NOT SO SURE.  AND, OF COURSE, WE KNOW IT

21       WAS DAVID BURT.

22           WHY WOULD SHE SAY THIS IF SHE HAS NO COMPLAINTS ABOUT

23       MR. KAIL?  HE HELPED IN HER CAREER.  WHY EXAGGERATE JUST A BIT?

24           BECAUSE SHE'S LOOKING BACK TEN YEARS AGO WITH THE LENS OF

25       WHERE SHE IS TODAY.  NOW IT'S CONVENIENT.  THAT FITS THE

 1      NARRATIVE.

 2          HOW MANY WITNESSES TESTIFIED IN THE SAME WAY, CHANGING

 3      THEIR STORY, EVEN THOUGH THERE'S FACTS TO CONTRADICT THEM?

 4          ASHI SHETH, HE TESTIFIED HE DIDN'T EVEN KNOW DOCURATED WAS

 5      A SOFTWARE SERVICE AND PURPORTED TO SAY IT WOULD LOOK DIFFERENT

 6      ON A MAC VERSUS A PC.

 7          EVEN A LAY PERSON UNDERSTANDS THAT A PLATFORM OR WEBSITE

 8      IS INTENDED TO OPERATE THE SAME REGARDLESS OF THE HARDWARE AND

 9      THAT COMPANIES TAKE GREAT PAINS TO UNIFY THOSE THINGS.

10          IT SOUNDED LIKE HE JUST DIDN'T KNOW WHAT HE WAS TALKING

11      ABOUT, EVEN CLAIMING THAT DOCURATED WAS INTENDED FOR THE LEGAL

12      DEPARTMENT.

13          NONE OF THOSE DOCURATED CONTRACTS, AND NO TESTIMONY BY THE

14      CEO EVER SUGGESTED THAT IT WAS INTENDED FOR LEGAL.  THE LEGAL

15      DEPARTMENT WOULD HAVE REVIEWED THE CONTRACT.  THAT'S ABOUT IT.

16          HE WAS PROBABLY, TAKING A GUESS, THINKING OF SHERLOCK

17      WHICH MR. KAIL TESTIFIED ABOUT, A COMPLETELY DIFFERENT PRODUCT

18      FOR A COMPLETELY DIFFERENT PURPOSE.

19          BUT HERE HE IS, CONFIDENT AS CAN BE.

20          ON DIRECT EXAM, AGAIN, "DID YOU DISCUSS THE REPLACEMENT OF

21      DOCURATED WITH MR. KAIL?

22          "YES.

23          "DO YOU RECALL ANYTHING HE SAID?

24          "I DON'T.

25          "DID HE APPROVE THE REPLACEMENT?

1              "YES.  WE MOVED FORWARD WITH IT."

2          TECHNICALLY, HE'S LYING UNDER OATH.  IT DIDN'T HAPPEN.

3          ASHI SHETH ON CROSS:  "IS IT POSSIBLE THAT DOCURATED WAS

4      STILL IN PLACE WHEN MR. KAIL LEFT?

5          "OH, MAYBE HE SAW IT THERE.  IT IS POSSIBLE."

6          AND, OF COURSE, WE KNOW, MR. KAIL DIDN'T REPLACE DOCURATED

7      AND CERTAINLY NOT WITH SOME RANDOM, UNRELATED PRODUCT.  IT

8      REALLY SOUNDED LIKE HE WAS TRYING TO FORCE THE FIT WHEN HE

9      TESTIFIED ON BEHALF OF THE GOVERNMENT.

10         AT A MINIMUM, HE'S JUST AN UNRELIABLE HISTORIAN ABOUT WHAT

11     DOCURATED WAS AND HE WAS CONFUSED -- MAYBE HE WAS CONFUSED

12     ABOUT WHAT PRODUCT HE WAS SUPPOSED TO BE TALKING ABOUT AND HE

13     WAS TALKING ABOUT SOMETHING COMPLETELY DIFFERENT.

14         BUT MR. KAIL HAS MAINTAINED HIS STATE OF MIND THAT HE

15     DIDN'T EVER BELIEVE HE INTENDED OR DID DEFRAUD NETFLIX AND NOT

16     A SINGLE WITNESS HAS TESTIFIED THAT HE DID.

17         IN ANY EVENT, WE KNOW THAT NETFLIX MET DOCURATED THROUGH

18     DAVID BURT AND MR. BURT INTRODUCED MR. KAIL AS SOMEONE ACTIVE

19     IN THE STARTUP SPACE AS WELL.  THE CONTRACT WAS SENT TO BOTH OF

20     THEM, AND DESPITE WHAT THE GOVERNMENT MAY WISH YOU TO BELIEVE,

21     THE EVIDENCE SHOWS THE CONTRACT WAS SENT BEFORE ADVISORY WAS

22     EVEN DISCUSSED.

23         THIS IS AN EASY ONE.  MAY 23RD, YOU HEARD THIS IN

24     TESTIMONY TODAY, THE AGREEMENT ATTACHED TO THE E-MAIL WAS SENT

25     TO DAVID BURT AND MR. KAIL.  THAT'S EXHIBIT 1051.

1          ON THAT SAME E-MAIL, THERE'S A DISCUSSION, WE'D LOVE TO

2    MEET YOU IN PERSON.

3          OKAY.  THERE'S NO DISCUSSION OF ADVISORY.  THEY'VE ALREADY

4    BEEN IN TALKS FOR GETTING THIS PRODUCT.

5          LATER, AFTER THE MEETING -- SO THEY SEND THE CONTRACT,

6    PROBABLY TAKES SOME TIME TO GO THROUGH LEGAL, WHATEVER.  RIGHT?

7          THE CONTRACT WAS ALREADY SOLIDIFIED BEFORE THERE WAS EVEN

8    A DISCUSSION OF ADVISORY.

9          WAIT, THAT CONTRADICTS THE GOVERNMENT'S THEORY.  DO NOT

10   CONSIDER IT.

11         THAT'S WHAT THEY'RE SAYING.

12         ON MAY 31ST IS WHEN, WE'RE BUILDING AN ADVISORY BOARD.

13   GREAT MEETING YOU.

14         THE CONTRACT'S ALREADY DONE.

15         BUT THE GOVERNMENT WOULD HAVE YOU DISREGARD ALL THIS

16   BECAUSE IT DOESN'T FIT THE NARRATIVE.  NO QUID PRO QUO DOESN'T

17   MAKE FOR A VERY COMPELLING CASE OF HONEST SERVICES FRAUD, DOES

18   IT?

19         BUT REMEMBER THAT THIS DOCURATED PRODUCT WAS FOR FP&A

20   FIRST AND THEN FOR ADVERTISING.

21         DURING THIS TIME, THE PRODUCT WAS RECOGNIZED AS AN AWARD

22   FINALIST AT TECH CRUNCH.  THEY WERE DOING SOMETHING RIGHT.

23         DOCURATED WAS EXPANDED TO AN UNLIMITED NUMBER OF USERS SO

24   THE MARKETING TEAM COULD STORE THEIR CONTENT INTO A DIGITAL

25   ASSET MANAGEMENT SYSTEM AND THAT FEATURE WAS UNIQUE TO

1    DOCURATED AT THE TIME.

2         THE SECOND AGREEMENT WAS SENT NOT JUST TO MR. KAIL.  LOOK

3    AT EXHIBIT 1060, HIM AND SABRY TOZIN.

4         DID HE END UP WITH THE FINAL SIGNATURE, THAT'S WHAT MAKES

5    IT BRIBERY?  YOU CAN SEE EVEN IN EXHIBIT 1003 THAT BY JULY

6    2014, THE DOCURATED TEAM IS COLLABORATING, HOW DO WE WORK WITH

7    NETFLIX?  SO THERE'S NEW EMPLOYEES IN MARKETING AND I.T. AND

8    THEY NOTE IN THAT E-MAIL THOSE NEW PEOPLE WERE HIRED TO BUILD

9    OUT DIGITAL ASSET MANAGEMENT.

10        THAT'S CONSISTENT WITH WHAT MR. GORBANSKY TESTIFIED TO

11   REGARDING ORGANIZATIONAL CHANGES.  AND HE TOLD YOU, OF COURSE,

12   THE GOVERNMENT'S WITNESS, THERE WERE NO PROMISES, NO SHORTCUTS,

13   ALL OF THE ADVISORS TO DOCURATED GOT STOCK OPTIONS.  THEY HAD

14   OTHER CUSTOMERS WHAT WERE ADVISORS.  THE OPTIONS WERE IN

15   COMPENSATION FOR THE ADVISORY SERVICES.

16        OF COURSE, IN THE CASE OF DOCURATED, AS YOU HEARD,

17   MR. KAIL LOST MONEY.  HE EXERCISED $5800, BUT NOT ALL OPTIONS

18   CAN BE VALUABLE, EVEN WHEN AN ACQUISITION OCCURS.  SO IN THIS

19   CASE, HE LOST MONEY.

20        NUMERIFY IS COUNTS EIGHTEEN AND NINETEEN PERTAINING TO AN

21   ADVISOR AGREEMENT AND MASTER SERVICES AGREEMENT.

22        THIS PRODUCT WAS PERFECT FOR ASHLEY SPRAGUE'S HELP DESK

23   TEAM, WHICH IS PROBABLY WHY ASHLEY SPRAGUE RENEWED THE CONTRACT

24   WITH NUMERIFY AFTER MR. KAIL WAS NO LONGER AT NETFLIX AND SPOKE

25   AT ONE OF THEIR CONFERENCES.

1          IF ASHI SHETH THOUGHT THAT IT WAS SUCH A BAD FIT FOR

2     NETFLIX, WHY DID HE DO A VIDEO AND A TESTIMONIAL IN FAVOR OF

3     NUMERIFY AFTER MR. KAIL WASN'T EVEN AT NETFLIX?

4          THIS IS, AGAIN, AN ATTEMPT TO REWRITE HISTORY TO FIT A

5     NARRATIVE, A FALSE NARRATIVE.

6          AND AS YOU HEARD, IN LARGE ORGANIZATION'S, DECISIONS OF

7     PRODUCTS ARE RARELY UNILATERAL, AND IN THE CASE OF NETFLIX,

8     EVERY SINGLE EMPLOYEE AGREED THAT MR. KAIL NEVER PUSHED THEM TO

9     USE ANYTHING AND ALWAYS LED WITH CONTEXT, NOT CONTROL.

10         NUMERIFY WAS NO DIFFERENT.  MR. KAIL TOLD YOU THAT HE TOLD

11    THOSE TEAMS, COME ON, LET'S DO THIS.  HE'S CONSTANTLY

12    PRESSURING THEM.  HE'S GOT, WHAT, THREE YEARS TO TAKE HIS

13    ENTIRE DEPARTMENT TO THE CLOUD.  THAT'S AN ENORMOUS

14    UNDERTAKING.  HE IS UNDER THE GUN.  THINK HOW MUCH HE MUST HAVE

15    BEEN WORKING AT THAT TIME, BECAUSE HE DID IT, 80 PERCENT, HE

16    SAID.

17         THAT WAS NOT DISPUTED BY ANYBODY.

18         WHAT DID THE EVIDENCE SHOW ABOUT NUMERIFY?  MR. REWARI

19    SAID, WAS THERE ANY GUARANTEE THAT REGARDLESS OF THAT 12 WEEK

20    PERIOD, YOU WERE GETTING A CONTRACT?

21         NO.

22         IS IT TRUE THAT YOU GOT POSITIVE FEEDBACK?

23         YES.

24         HOW DID YOU EARN YOUR BUSINESS?

25         THEY HAD A VERY DEMANDING SET OF REQUIREMENTS, VERY

1      TECHNICALLY SATISFACTORY CUSTOMERS, IT WAS A GRUELLING

2      EVALUATION PERIOD THAT INVOLVES TENS OF FOLKS ON BOTH SIDES,

3      HUNDREDS IF NOT THOUSANDS OF INTERNAL TECHNICAL COMMUNICATIONS.

4      WE KNEW THAT WE HAD TO MEET THOSE REQUIREMENTS THAT INCLUDED

5      ALL OF THESE CAPABILITIES.  THAT WAS ONE REASON.

6           WERE YOU BRINGING HIM IN AS AN ADVISOR TO JUST GET THE

7      BUSINESS WITH NETFLIX, ALL THAT WORK NOT JUST TO GET THE

8      BUSINESS?

9           YES.

10          YOU UNDERSTOOD THAT THOSE WERE INDEPENDENT PATHS BECAUSE

11     THE NETFLIX BUSINESS HAD TO BE EARNED BY THE FEEDBACK FROM THE

12     ENGINEERS?

13          YES.

14          INDEPENDENT PATHS.  HE'S ALLOWED TO HAVE A LIFE OUTSIDE OF

15     NETFLIX.

16          SUMO LOGIC IS COUNT TWELVE.  SAME ELEMENTS.  SAME

17     CONSIDERATIONS:  SCHEME, BRIBE, INTENT TO DECEIVE, AND TO

18     CHEAT.  NOT INTENT TO DECEIVE ALONE.  LYING TO YOUR EMPLOYER IS

19     NOT A FEDERAL CRIME.  DECEIVE AND CHEAT OUT OF MONEY AND

20     PROPERTY.

21          SUMO LOGIC HAD A CUSTOMER ADVISORY BOARD.  THAT IMPLIES

22     THERE ARE CUSTOMERS ON THE ADVISORY BOARD.  AND ONCE AGAIN,

23     THESE AGREEMENTS ARE NOT ILLEGAL.  I DON'T KNOW, WAS THE

24     GOVERNMENT CLAIMING THAT ALL CUSTOMER ADVISORY BOARDS ARE

25     ILLEGAL?

1          BECAUSE THE CUSTOMER ADVISORY BOARD LANGUAGE OF WHAT THEY

2     EXPECT WAS STANDARD.  THAT WASN'T WRITTEN JUST FOR MR. KAIL.

3     THEY HAD OTHER CUSTOMER ADVISORS AS WELL.

4          BUT THE GOVERNMENT ALLEGES YET AGAIN WITH RESPECT TO SUMO,

5     FAILURE TO DISCLOSE.  AND I KEEP REPEATING THIS BECAUSE FAILURE

6     TO DISCLOSE, IF IT'S NOT CONNECTED TO A SCHEME, A SCHEME TO

7     DEFRAUD NETFLIX, IT'S NOT A CRIME.

8          AND WHY DIDN'T MR. KAIL?  WAS IT IN AN EFFORT TO FURTHER

9     THE SCHEME?

10          WELL, FIRST OF ALL, WHY ON EARTH WOULD ANYONE MAKE IT

11     PUBLICLY KNOWN THAT THEY WERE ENGAGED IN BRIBES?  THAT'S LIKE

12     PUBLISHING A HEADLINE, I ACCEPTED A BRIBE TODAY, COMMENTS

13     WELCOME.

14          HE WAS SO PUBLIC, SO VOCAL, SO OUTSPOKEN, LIKE BEN WERTHER

15     SAID, IT WAS OBVIOUS HE WAS GETTING STOCK OPTIONS.  EVERYONE

16     HAS SAID STOCK OPTIONS, IN FORMAL ADVISORY AGREEMENTS, ARE THE

17     NORM.

18          IT NEVER OCCURRED TO MR. KAIL THAT SOMEONE WOULD ASSUME

19     THAT FOR ALL OF THESE COMPANIES, HE WAS JUST A NICE VOLUNTEER.

20          AND MOREOVER, IF HIS MISTAKE WAS IN GOOD FAITH, IF HE

21     ERRED IN DETERMINING WHAT NETFLIX WOULD NEED TO BE TOLD

22     EXPLICITLY, THAT IS A COMPLETE DEFENSE.  THAT'S THE SLIDE I

23     SHOWED YOU ABOUT A GOOD FAITH DEFENSE AND NOT A SPECIFIC INTENT

24     TO DEFRAUD.

25          YOU CAN'T DECEIVE AND CHEAT IF YOU HAVE AN HONESTLY

1    MISTAKEN BELIEF.  THE LAW SAYS THAT.

2         AND MR. KAIL KEPT HIS ADVISORY AND BUSINESS SEPARATE.  HE

3    WROTE THAT.  HE SAID THAT.  HE UNDERSTOOD HE COULDN'T PRESSURE

4    HIS TEAMS.  HE WAS COGNIZANT OF THAT.

5         AND WITH SUMO LOGIC, MR. LOISELLE TOLD YOU, EVEN THOUGH

6    MR. KAIL WAS INTERFACING AT AN EXECUTIVE LEVEL, IT WAS THE

7    ENGINEERS WHO HAD TO PROVE THE POC.

8         MARK MUSSELMAN TESTIFIED, YOU HAD TO EARN THE CONTRACT AT

9    NETFLIX?  LIKE EVERYONE ELSE?

10        YES.

11        WAS THERE AN UNDERSTANDING THAT BECAUSE MR. KAIL WAS AN

12   ADVISOR, THAT YOU WOULD BE GUARANTEED ANYTHING AT NETFLIX?

13        NO.

14        SO THE GOVERNMENT IS GOING TO GET UP HERE AND TELL YOU

15   THAT THE 30 PEOPLE THAT TOOK THE STAND ARE ALL LIARS?  IS THAT

16   THEIR THEORY?

17        THESE PEOPLE TOOK AN OATH.  THEY TOLD THE TRUTH.

18        AND MR. MUSSELMAN TESTIFIED THAT IT WASN'T THE TITLE AT

19   NETFLIX THAT MADE MR. KAIL A VALUABLE ADVISOR.  IF HE HAD BEEN

20   QUIET AND NOT PUBLIC ABOUT HIS VIEWS AND PLAYED A PRETTY LOW

21   PROFILE OR MAYBE HE WAS LAZY BUT HE STILL HAD THAT TITLE, THAT

22   WOULD NOT MAKE HIM A GOOD ADVISOR.

23        IT WAS HIS EXPERIENCE, HIS VISION, HIS DEDICATION AND

24   PASSION FOR CLOUD TECHNOLOGY THAT DREW PEOPLE TO HIM.

25        AND SUMO LOGIC'S PRODUCT WAS TREMENDOUSLY HELPFUL TO A

1    PERSON IN MR. KAIL'S POSITION.  HE COULD GET REAL TIME ALERTS

2    FOR SECURITY BREACHES.

3         MR. LOISELLE TOLD YOU, IN THE SUMO PRODUCT, IT COULD GIVE

4    HIM VISUALIZATION OF WHAT WAS HAPPENING IN THE NETFLIX

5    ENVIRONMENT SO HE COULD MAKE SURE IT WAS RUNNING AT A HEALTHY

6    LEVEL.

7         HE SAID SUMO COULD PROACTIVELY SEE ISSUES BEFORE THEY

8    WOULD OCCUR.  IT WOULD ALLOW HIM AND OTHERS TO DO THEIR JOBS

9    MORE EFFICIENTLY.  GUESS WHAT?  ULTIMATELY SAVING NETFLIX MONEY

10   AND PROGRESSING THEM AHEAD OF THE COMPETITION.

11        AND WHY DID SUMO'S CONTRACT COSTS INCREASE?  BECAUSE THE

12   NETFLIX ENVIRONMENT WANTED MORE.  THEY WANTED THEM TO QUERY

13   MORE, MORE DATA, MORE DEMANDS.

14        AND SUMO, AS YOU HEARD, WAS WORKING IN OVERDRIVE TO

15   DELIVER WHAT NETFLIX WANTED.

16        THESE ARE NEW TECHNOLOGIES, REMEMBER?  IT'S NOT LIKE A

17   LAWNMOWER OUT OF THE BOX, HERE YOU GO.  THE GOVERNMENT KEEPS

18   ASKING QUESTIONS.  OH, THERE'S A PROBLEM, THERE'S A GLITCH,

19   THERE'S A COMPLAINT.  CAN YOU IMAGINE A SOFTWARE DEVELOPER WHO

20   CAN GUARANTEE NO PROBLEMS WITH A NEW TECHNOLOGY?

21        IF THAT HAPPENED, WELL, THE GOVERNMENT WOULD BE ARGUING

22   THAT THEY WERE SELLING SNAKE OIL AND IT REALLY WAS A SCAM.

23        MR. LOISELLE SAID THAT THEY WERE WORKING SO HARD ON THE

24   POC, GETTING NETFLIX TO A POINT WHERE THEY COULD SOLVE THE

25   PROBLEM THEY WERE HAVING WITH SPLUNK, WHICH WAS NOT A NEW

1       PRODUCT, AND THAT THE ADVISOR ROLE WAS A SEPARATE, PARALLEL

2       SITUATION.

3           STOCK OPTIONS NOT TIED TO A CONTRACT.  STOCK OPTIONS NOT

4       SPECIFYING YOU HAVE TO GET US THAT POC OR THE LOGO.

5           THAT, THEY WERE NOT TIED TOGETHER, AND, THEREFORE, IT'S

6       NOT QUID PRO QUO.

7           MR. KAIL NEVER SAID, AH, I PROMISE, I'LL DO ANYTHING, I'LL

8       BE AN INTERNAL CHAMPION TO THE END OF THE DAY.

9           NO.  THOSE ARE THE GOVERNMENT'S WORDS.

10          HE GOT MORE OPTIONS AT SUMO LOGIC BECAUSE OF THE

11      INTRODUCTIONS HE WAS MAKING.  WHAT A GREAT ADVISOR.  HE WASN'T

12      PHONING IT IN.  HE WAS ACTUALLY EARNING STOCK OPTIONS FOR WORK

13      OUTSIDE OF NETFLIX.

14          BUT THE GOVERNMENT STILL WANTS YOU TO BELIEVE THAT THESE

15      EXECUTIVES, ALL THESE PEOPLE ARE LURKING IN THE SHADOWS,

16      SECRETLY EXCHANGING BRIBES.  IF THAT WERE THE CASE, WHERE IS

17      THE EVIDENCE?  OUT OF THE HUNDREDS OR THOUSANDS OF E-MAILS YOU

18      HEARD ABOUT, DID YOU SEE A SINGLE MESSAGE ABOUT QUID PRO QUO?

19          I'M NOT TALKING ABOUT THE CYNICAL SPIN THE GOVERNMENT

20      GIVES EVERY TIME MR. KAIL SAYS THE WORD "HELPFUL."  BUT WHERE

21      ARE THE E-MAILS SUGGESTING THAT SUMO OR ANYONE ELSE GETS A

22      SHORTCUT?  WHERE IS THE TESTIMONY, WE GOT TO CUT IN LINE, IF

23      THERE WAS A LINE.  WE GOT A SHORTCUT?  WINK, WINK, HE

24      GUARANTEED US THE CONTRACT.

25          NEVER.

1        WHERE IS THE E-MAIL OR WITNESS THAT SUGGESTS SUCCESSFUL

2    POC'S WERE A SHAM?  THAT THE ENGINEERS WERE PRESSURED TO GO IN

3    A CERTAIN DIRECTION?

4        YOU CAN'T SPECULATE WAS HE HOLDING A GUN TO THEIR HEAD AND

5    EVERYONE IS AFRAID TO SAY ANYTHING?

6        THAT IS NOT TRUE.  THAT'S A FABRICATION.

7        THAT'S WHY, FOR EVERY SINGLE COUNT THE GOVERNMENT'S CASE

8    FAILS.

9        THE SUMO ADVISOR CONTRACT SPELLED OUT WHAT WAS EXPECTED IN

10   CONSIDERATION, THOSE ARE THE WORDS, FOR THE STOCK OPTIONS.  AND

11   THAT WORD, CONSIDERATION, A FANCY WORD FOR IN EXCHANGE, DO YOU

12   SEE ANYTHING ABOUT NETFLIX?  GET US THE CONTRACT?  GET US THE

13   LOGO?

14       THESE ARE LEGAL CONTRACTS.  NO.

15       MAGINATICS, STARTED OFF AS A SMALL -- COUNT FOUR, GAVE

16   NETFLIX A CHANCE TO SEE HOW IT OPERATED IN A PARTICULAR USE

17   CASE.

18       KEVIN O'KEEFE TESTIFIED THAT NO ONE WAS ACTING AS A SALES

19   PERSON INSIDE NETFLIX TRYING TO SCORE A SALE INTERNALLY.

20   MR. O'KEEFE, THE GOVERNMENT'S WITNESS, PERHAPS STATED IT BEST

21   IN TERMS OF HOW ADVISORY AND BUSINESS WERE SEPARATE.

22       MIKE HAD TWO ROLES WITH MAGINATICS.  ONE WAS THE

23   RELATIONSHIP THAT I HAD WITH MIKE, WHICH WAS MIKE WAS A

24   CUSTOMER, OKAY?  SO MY COMMUNICATION WITH MIKE RESOLVED -- I

25   THINK THAT'S RESOLVED AROUND HIM AS A CUSTOMER AND ALL THE

1        DIMENSIONS THAT GO WITH THAT.

2             MIKE HAD A RELATIONSHIP WITH THE COMPANY AS AN ADVISOR,

3        WHICH IS ABOVE AND BEYOND MY FUNCTION AT THE COMPANY.

4             OF COURSE, HE'S THE SALES PERSON.

5             SO MIKE HAD A RELATIONSHIP WITH ME AS A CUSTOMER; AND HE

6        HAD A RELATIONSHIP WITH AMARJIT AND JAY AS AN ADVISOR.

7             HE JUST SAID MR. KAIL KEEPS IT REAL.

8             THIS STATEMENT, LADIES AND GENTLEMEN, ALONE IS WHY

9        MR. KAIL CANNOT BE FOUND GUILTY.  THIS SENTIMENT REGARDING

10       MAGINATICS WAS CONSISTENT AND TRUE FOR ALL OF THE EVIDENCE, ALL

11       OF THE VENDORS.

12            CUSTOMER RELATIONSHIP WAS ONE THING.  THE ADVISOR

13       RELATIONSHIP IS SOMETHING ELSE.  THE GOVERNMENT CAN TELL YOU

14       DISREGARD THIS, CLAIMING THEIR WITNESSES ARE HIDING WHAT'S

15       GOING ON.  THAT MR. KAIL HAD A MASTER PLAN TO DECEIVE AND CHEAT

16       NETFLIX FOR SOME POTENTIAL STOCK OPTIONS AT THE RISK OF HIS

17       REPUTATION, HIS JOB STABILITY, AND THE 100 SOMETHING PEOPLE

18       THAT RELIED ON HIM.  THEY CAN JUST KEEP REPEATING THE STORY,

19       BUT WITHOUT EVIDENCE, IT DOESN'T MAKE IT TRUE.

20            BECAUSE NOBODY TESTIFIED THAT MR. KAIL WORKED AGAINST HIS

21       EMPLOYER'S BEST INTERESTS.  NO ONE TESTIFIED HE WASTED THEIR

22       TIME IN USELESS TECHNOLOGY.  LOOK AT THOSE 360 REVIEWS,

23       EXHIBIT 9.

24            THE ONLY COMPLAINT OVER ALL OF THOSE YEARS WAS THE ONE

25       FROM MR. HASTEER, AND, OF COURSE, THAT WAS CENTERED AROUND HIS

1     VERY MINIMAL, IF AT ALL, EXPOSURE TO PLATFORA.

2         AS TO MR. AMARJIT GILL, CLEARLY A VERY SAVVY BUSINESS

3     PERSON, UNDERSTOOD THAT THE DECISION OF WHETHER OR NOT TO USE

4     MAGINATICS WAS NOT MR. KAIL'S.  IT WAS, IN HIS WORDS, THE

5     TECHNICAL TEAM'S DECISION.

6         HERE'S ANOTHER QUOTE FROM MR. GILL THAT DEMONSTRATES THE

7     LACK OF QUID PRO QUO, THE LACK OF ANY KIND OF SCHEME TO

8     DEFRAUD.

9         WAS IT YOUR HOPE THAT MR. KAIL WOULD ALSO BE ABLE TO HELP

10    YOU WITHIN NETFLIX?

11        NO.  WE WANTED TO EARN IT ON OUR OWN.  WE WERE WINNING

12    BECAUSE WE HAVE GOOD TECHNOLOGY, THAT'S WHY.

13        DID YOU UNDERSTAND THAT THE ADVISORY POSITION WAS

14    INDEPENDENT OF WHATEVER CONTRACT YOU MIGHT GET AT NETFLIX?

15        ABSOLUTELY.  WE DON'T DO THIS, YOU KNOW, EXPECTING

16    SOMETHING BECAUSE WE WANT TO TAP INTO THEIR KNOWLEDGE.

17        MR. GILL WAS ASKED WHETHER HE WOULD KEEP MR. KAIL AS AN

18    ADVISOR IF HE LOST HIS JOB AT NETFLIX, AND HE ANSWERED, I

19    COULDN'T CHANGE ANYTHING.  HE HAD GREAT CONTACTS IN THE

20    INDUSTRY.  HIS INSIGHTS AND KNOWLEDGE WERE NOT TIED TO NETFLIX.

21        WELL, THE GOVERNMENT MAY SAY, BUT MR. KAIL, HE ASKED FOR

22    COMPENSATION IN THAT ONE E-MAIL.

23        THOUGH YOU HEARD, IT WASN'T EXACTLY CLEAR WHICH COMPANY

24    WAS BEING REFERENCED BECAUSE HE WAS ADVISING SEVERAL COMPANIES

25    THAT MR. GILL, THE ONE WITH MAGINATICS, WAS ALREADY SET, THAT

1    ADVISORY AGREEMENT.  BUT HE WAS HELPING OTHER COMPANIES, AS HE

2    TESTIFIED TO, AND REGARDLESS, THEY WERE NOT TIED TO NETFLIX.

3         DOES THAT SHOW THAT, REGARDLESS, LET'S SAY HE WAS ASKING,

4    HEY, CAN I GET SOME EXTRA CASH FLOW?  CAN I DO SOME OF THESE

5    ADVISORY POSITIONS?  AND HE WORKED FOR CASH INSTEAD OF OPTIONS.

6         IS IT A CRIME TO EARN, TO WANT TO EARN EXTRA MONEY?  DOES

7    THE FOUNDER OF THE LARGEST STREAMING COMPANY IN THE WORLD NEED

8    TO MAKE EXTRA INCOME SITTING ON THE BOARDS OF MICROSOFT AND

9    FACEBOOK?

10        DOES DAVID WELLS VOLUNTEER FOR HIS BOARD POSITIONS?

11        MAKING MONEY, WANTING TO MAKE MONEY, ESPECIALLY IN THE

12   EXPENSIVE BAY AREA, THAT'S THE CRITICISM HERE?

13        HE WAS GREEDY, SAYS THE GOVERNMENT.

14        BUT DID HE COMMIT ANY CRIME?

15        YOU HEARD HE BOUGHT A HOUSE WITH A MORTGAGE.  OKAY.  IS HE

16   LIVING BEYOND HIS MEANS?

17        IT DOESN'T MATTER.  HIS INTENTIONS WERE NOT TO DEFRAUD.

18   HIS INTENTIONS WERE TO MAKE A LIVING HONESTLY INSTEAD OF, LIKE

19   YOU HEARD, JUST COLLECTING STOCK OPTIONS AND DOING NOTHING.  HE

20   WAS AN HONESTLY HARD WORKER.  HE WORKED FOR EVERYTHING HE HAS.

21   HE STARTED ON A FARM.  NOTHING WAS HANDED TO HIM.  AND HE

22   DIDN'T STEAL FROM ANYBODY.

23        NETSKOPE, COUNTS ONE TO THREE.

24        NETSKOPE WAS AKIN TO A CONSULTING JOB.  THEY CALLED IT

25   ADVISOR CONSULTANT, BUT UNLIKE MANY STARTUPS, THEY WERE ON TO

1      SOMETHING BECAUSE YOU HEARD THAT THEY HAD FUNDS, THEY HAD A LOT

2      OF CAPITAL FROM DAY ONE, THEY HAD FUNDS TO PAY MR. KAIL

3      DIRECTLY FOR HIS EXPERIENCE TO HELP THEM BUILD IT.

4           THEY WERE IN STEALTH MODE.  THERE WAS NO CUSTOMERS.  THE

5      OUTSIDE WORLD DIDN'T EVEN KNOW THEY EXISTED.

6           AND MR. KAIL HELPED GIVE TECHNICAL FEEDBACK.

7           THE GOVERNMENT WANTS YOU TO BELIEVE THAT THAT TECHNICAL

8      FEEDBACK WAS ACTUALLY IN EXCHANGE FOR A CONTRACT A YEAR DOWN

9      THE ROAD.  HE'S PLOTTING AWAY ALREADY.

10          NETSKOPE, LIKE SO MANY COMPANIES, WAS VERY PUBLIC ABOUT

11     MR. KAIL BEING AN ADVISOR.  IT ADVERTISED ALL OF THEIR ADVISORS

12     FOR ANYONE WHO CARED TO LOOK, THE INFORMATION WAS THERE, ANYONE

13     WHO EVEN KNEW HOW TO USE LINKEDIN, THE INFORMATION WAS THERE.

14          NOBODY WHO HAS WALKED THROUGH THIS COURTROOM HAS SAID THAT

15     A FORMAL ADVISORY AGREEMENT, NOT LIKE A RANDOM CUSTOMER REVIEW

16     MEETING THAT MEETS ONCE A QUARTER, JUST A BUNCH OF PEOPLE,

17     WOULD NOT INCLUDE STOCK OPTIONS.

18          INFORMAL ADVICE GIVERS DON'T END UP ON WEBSITES.

19     APPARENTLY EVERYONE IN THIS INDUSTRY UNDERSTANDS THAT.

20          BUT WITH A TECHNOLOGY STARTUP THAT'S SEEKING PROFESSIONAL

21     ADVICE, IT WOULD BE UNUSUAL TO JUST DO IT AS A VOLUNTEER.  DO

22     YOU WANT A REAL DOCTOR OR DO YOU WANT A VOLUNTEER DOCTOR?

23          THE GOVERNMENT ALLEGES THAT MR. KAIL MADE THESE

24     INTRODUCTIONS.  OKAY.

25          BUT THEN IT'S UP TO THE TEAMS TO DECIDE, ONE, WHETHER THEY

1    WANT TO TRY IT OUT, AND NO ONE PRESSURED THEM TO DO IT; SECOND,

2    THERE WAS, AGAIN, NO EVIDENCE WITH RESPECT TO NETSKOPE THAT IT

3    WAS IN EXCHANGE FOR A POC OR A CONTRACT.

4         THERE'S AN UNDERSTANDING THAT IT BENEFITED NETFLIX, AND

5    YOU HEARD THIS EVEN FROM DAVID WELLS, TO GET WHAT THEY REALLY

6    WANTED.  AND OF COURSE, SURE, THERE'S A BENEFIT TO THE STARTUP

7    TO GET A BETTER PRODUCT.  BUT NOT QUID PRO QUO.

8         AS I SAID IN OPENING STATEMENT, THERE'S A LIMIT TO

9    GOVERNMENT POWER.  THE ADVISORY WORLD IS NOT A CRIMINAL

10   ENTERPRISE, PERIOD.

11        AS FOR NETSKOPE, THE SECURITY TEAM, JUST THEY LOVED IT.

12   THEY DEALT ALMOST EXCLUSIVELY WITH BILL BURNS, AND HE LOVED IT.

13   DID HE CRITICIZE SOME OF IT?  SURE.  THAT TEAM LOVED THE

14   PRODUCT.

15        SANJAY BERI TESTIFIED THAT THE INTRODUCTION TO THE

16   SECURITY GROUP WAS A SEPARATE PIECE WHERE WE HAD TO WIN THEM

17   OVER.

18        THEY HAD TO WIN OVER THE SECURITY TEAM.  NOTHING WAS BEING

19   HANDED TO THEM.  THEY DEALT WITH THE SECURITY TEAM, AND THE

20   ONLY REASON IT PROCEEDED TO CONTRACT WAS BECAUSE BILL BURNS AND

21   HIS TEAM LIKED THE PRODUCT SO MUCH THAT THEY KEPT ASKING FOR

22   MORE FEATURES.

23        THE SECOND CONTRACT, THERE WERE JUST SO MANY USERS.  WHAT,

24   NETSKOPE DOESN'T GET TO CHARGE MORE WHEN THE DEMAND IS SO HIGH?

25        IT WAS REQUESTED BY BILL BURNS.  SO WHAT IF MR. KAIL

1    SIGNED THE CONTRACT?

2         AND, AGAIN, AT WORST HERE, THAT CONSULTING, THE SIDE JOB,

3    WAS NOT DISCLOSED.  OKAY.

4         AGAIN, UNDISCLOSED SELF-DEALING, AND YOU KNOW WHAT I'M

5    GOING TO SAY, UNDISCLOSED SELF-DEALING BY ITSELF IS NOT A

6    CRIME.

7         AND THE GOVERNMENT MADE THE POINT, REMEMBER THAT E-MAIL,

8    NETFLIX WAS THEIR SECOND LIVE CUSTOMER.  ONE, IT DOESN'T EVEN

9    MATTER.

10        BUT TO BE FACTUALLY ACCURATE, SANJAY BERI, AFTER HE SAW

11   THE CONTRACT WITH NETFLIX, WHAT, TEN MONTHS AFTER THAT E-MAIL,

12   ACKNOWLEDGED, HEY, THAT COULDN'T HAVE BEEN THE SECOND LIVE

13   CUSTOMER WAY BACK THEN BECAUSE THEY WEREN'T A CUSTOMER WHEN

14   THAT E-MAIL WAS SENT.

15        AND MR. BERI TESTIFIED THAT CONFLICT OF INTEREST LANGUAGE

16   SUGGESTED THAT MR. KAIL WAS ALLOWED TO HAVE SIDE JOBS, THAT IT

17   WASN'T PROHIBITED.

18        AND WE KNOW FROM HIS EMPLOYMENT AGREEMENT THAT NETFLIX

19   EXPLICITLY SAID IN THAT AGREEMENT, "WHAT YOU DO ON YOUR OWN

20   TIME IS YOUR BUSINESS.  WE DON'T CARE."

21        IN FACT, THE PART OF THE EMPLOYMENT AGREEMENT SHOWN IN THE

22   GOVERNMENT'S OPENING STATEMENT SAID, IF YOU HAVE ANY DOUBT IF

23   YOUR WORK WITH ANOTHER ENTITY MAY CONFLICT, THE EMPLOYMENT

24   AGREEMENT PRESUMES YOU MAY HAVE WORK WITH ANOTHER ENTITY.

25        MR. KAIL TOLD YOU HE DIDN'T PERCEIVE IT AS A FINANCIAL

1    CONFLICT OF INTEREST.  BUT THEY'RE TELLING HIM, IF YOU WORK

2    WITH ANOTHER ENTITY, DON'T WORK WITH HULU, DON'T WORK WITH HBO.

3    THAT WAS HIS UNDERSTANDING.

4         AND MOREOVER, THE GOVERNMENT'S ATTEMPTING TO EVEN COUNT --

5    THIS IS QUITE A THING -- THE CRIMINAL PROCEEDS, THE MONEY HE

6    MADE FROM NETSKOPE WHEN HE WASN'T EVEN WORKING AT NETFLIX

7    ANYMORE.  JUST IMAGINE WHAT THIS MEANS.  THEY'RE SAYING HE'S

8    DEFRAUDING NETFLIX OF MONEY OR PROPERTY WHEN HE DOESN'T EVEN

9    WORK THERE, WHEN HE DOESN'T EVEN HAVE A RELATIONSHIP.  HE CAN'T

10   EVEN WORK ANYWHERE WHEN HE'S DONE WITH NETFLIX, BECAUSE THAT'S

11   STILL SPECIFIED UNLAWFUL ACTIVITY.  THEY COUNTED THAT MONEY.

12   SHAME ON THEM.

13        THIS IS A PERFECT EXAMPLE OF THE OVERREACH OF THIS CASE.

14   LOOK AT THE CHARTS.  YOU WILL SEE NETSKOPE FUNDS MONTHS AFTER

15   MR. KAIL LEFT NETFLIX.  HOW CAN THEY ARGUE WITH A STRAIGHT FACE

16   FUNDS BELONGED IN MS. KIKUGAWA'S, THOSE CHARTS AND GRAPHS?

17        ELASTICBOX.

18        THANK YOU FOR BEARING WITH ME.

19        RAVI SRIVATSAV -- THIS IS COUNTS NINE THROUGH ELEVEN HERE.

20        HE DID A PRETTY GOOD JOB EXPLAINING HOW MUCH MONEY A

21   PRODUCT LIKE THAT SAVES, HOW MUCH TIME AND COST OF MULTIPLE

22   ENGINEERS WORKING WHEN THE PRODUCT COULD DO -- HOW MUCH TIME

23   AND COST OF MULTIPLE ENGINEERS WORKING WHEN THE PRODUCT CAN DO

24   SOMETHING IN A MATTER OF DAYS OR MONTHS.  A MATTER -- A MATTER

25   OF DAYS INSTEAD OF MONTHS, OR EVEN MINUTES, HE SAID.

1          WHY DID MR. SRIVATSAV INVITE MR. KAIL TO BE ON THE

2     ADVISORY BOARD?  BECAUSE HE SAW HOW PUBLIC HE WAS ABOUT PUSHING

3     THE ENVELOPE ON TECHNOLOGY TO THE WHOLE INDUSTRY.  THE CURRENCY

4     FOR HIS STARTUP TO GET INSIGHTS INTO THE INDUSTRY AND THE BEST

5     COMMUNICATION STRATEGIES, HE CALLED IT, WAS STOCK OPTIONS.  AND

6     THOSE STOCK OPTIONS HAVE VERY CLEAR EXCHANGE, FOR THE ADVISOR

7     ROLES AND THOSE RESPONSIBILITIES, NOT FOR THE NETFLIX CONTRACT.

8          HE WAS ASKED, IS THE POINT OF AN ADVISOR TO LAND A

9     PARTICULAR CLIENT?

10         HE SAID, NO, THAT'S NEVER THE POINT.

11         WELL, CAN IT HELP YOU LAND A CLIENT?

12         HIS ANSWER, NO.

13         LIKE EVERY OTHER VENDOR, ELASTICBOX HAD TO EARN ITS PLACE.

14    NONE OF THESE PEOPLE ARE CHEATING, FOR GOODNESS SAKES, NONE OF

15    THEM.

16         HE EXPLAINED HOW THERE WERE MULTIPLE MEETINGS EVEN BEFORE

17    THE POC TO DETERMINE WHAT NETFLIX'S PAIN POINTS WERE AND HOW

18    ELASTICBOX COULD POSSIBLY ALLEVIATE IT.  THERE WERE NO

19    SHORTCUTS, NO TAKING SOMEONE ELSE'S SPOT, NO EXPECTATION THAT

20    THE POC WOULD LEAD TO CONTRACT.

21         LIKE HARD WORKING AMERICANS, THEY HAD TO EARN IT.

22         AND TO NETFLIX'S BENEFIT, THEY GOT THE PRODUCT THEY WANTED

23    FROM THE POC.  THEY GAINED.

24         MR. SRIVATSAV SAID EARLY CUSTOMERS CAN INFLUENCE A PRODUCT

25    IN A DIRECTION THAT WOULD BENEFIT THEM.  THAT TWO-WAY STREET.

1          AND, OF COURSE, ELASTICBOX'S PRICING AND CONTRACT --

2     PRICING NEGOTIATION AND CONTRACT OCCURRED NOT JUST WITH

3     MR. KAIL.  THAT ONE WAS WITH MR. SLATEN AS YOU HEARD AND SEE IN

4     EXHIBIT 1065 AND 1064.

5          THIS DOESN'T FIT THE GOVERNMENT'S NARRATIVE.

6     JUSTIN SLATEN EDITING THE MASTER SERVICES AGREEMENT.  SORRY

7     ABOUT ALL THE RED.

8          THIS -- LOOK AT THIS E-MAIL.  MR. KAIL ISN'T EVEN ON IT.

9          JUSTIN SLATEN IS INTERESTED.  JUSTIN SLATEN GIVES

10    FEEDBACK.

11         DOES IT ULTIMATELY GO TO THE TOP OF THE ORGANIZATION TO DO

12    A FINAL REVIEW, TO GET IT TO LEGAL, TO GET IT TO OTHER

13    DEPARTMENTS?

14         YES.

15         BUT OTHERS ARE INVOLVED.  THIS IS NEVER A UNILATERAL

16    DECISION.

17         AND THEN THERE'S A REQUEST FROM MR. SRIVASTAVA, WHAT DO WE

18    NEED TO DO TO GET NETFLIX LEGAL TO APPROVE THE LOGO?  AND

19    THEY'LL DO WHAT THEY'LL DO.  MAYBE THEY'LL APPROVE IT, MAYBE

20    THEY WON'T.  WHO KNOWS.

21         BUT WE KNOW IT WENT TO MR. SLATEN FOR APPROVAL, AND

22    ULTIMATELY MR. KAIL, BEING PROBABLY THE GOOD NEGOTIATOR THAT HE

23    IS, DROVE DOWN THE PRICE BY $50,000.  YOU SEE THAT IN E-MAILS.

24    ANOTHER EXAMPLE OF MR. KAIL WORKING IN NETFLIX'S BEST INTEREST.

25         THE SUNSHINE E-MAIL, COUNT SIXTEEN.

1          WAS THAT SENT AS A RESULT OF A SCHEME OR PLAN TO DEFRAUD

2     NETFLIX OR WAS THERE ANOTHER PURPOSE?  WAS IT A MISTAKE?

3          WAS IT PART OF A BRIBERY AND KICKBACK SCHEME WHERE HE WAS

4     EXCHANGING CONTRACTS FOR COMPENSATION?  DID HE HAVE A SPECIFIC

5     INTENT TO DEFRAUD NETFLIX?  WAS THE ACT MATERIAL IN USE OF THE

6     WIRES?

7          THE E-MAIL REGARDING THAT E-MAIL PLATFORA WHEN MR. KAIL

8     SAID HE WASN'T FORMALLY HELPING THEM WAS NO DOUBT AN EMOTIONAL,

9     IMMEDIATE, AND INCORRECT RESPONSE.  HE'S OWNED UP TO THAT.  HE

10    ADMITTED HE MADE THAT MISTAKE.

11         HE WAS UPSET BY WHAT HE PERCEIVED AS MR. HASTEER'S

12    INCORRECT EVALUATION OF PLATFORA, AND HE TOLD YOU HE WANTED TO

13    DIFFUSE THE SITUATION.

14         HE WASN'T THINKING ABOUT DEFRAUDING NETFLIX.  HE WASN'T

15    THINKING, OH, NO, ALL MY ADVISORY POSITIONS ARE NOW GOING TO BE

16    UNCOVERED SO I BETTER HIDE THEM ALL.

17         TO THE CONTRARY.  HE STAYED ON OTHER ADVISORY BOARDS.  HE

18    DIDN'T TRY TO CLEAR OUT HIS E-MAILS, AND IT WAS ONLY BECAUSE

19    THE RELATIONSHIP WITH PLATFORA HAD SOURED THAT HE LEFT THE

20    BOARD.  HE WAS HAVING PERSONAL ISSUES, AND, OF COURSE, THEY'RE

21    TALKING POTENTIAL LITIGATION, NOT EXACTLY THE BEST

22    RELATIONSHIP.

23         SO WHAT IS QUID PRO QUO IN THE CONTEXT OF THIS CASE?  IS

24    IT AN EXCHANGE OF COMPENSATION FOR GETTING A CONTRACT AT

25    NETFLIX?

1           AND, AGAIN, LET'S SAY YOU, THE JURY, DECIDE YOU JUST DON'T

2      LIKE IT, YOU DON'T LIKE IT, YOU THINK IT WAS UNETHICAL, YOU

3      THINK HE VIOLATED HIS EMPLOYMENT AGREEMENT, MAYBE YOU EVEN

4      THINK, I KIND OF THINK THAT WAS A CONFLICT OF INTEREST.

5           OKAY.  YOU CAN HAVE THAT OPINION.

6           BUT THAT'S NOT THE QUESTION YOU HAVE TO ANSWER.  YOU'RE

7      NOT BEING ASKED TO DECIDE ON ETHICS OR MORALITY OR EVEN WHETHER

8      HE BREACHED A DUTY TO HIS EMPLOYER.

9           YOU HAVE TO DETERMINE WHETHER HE SPECIFICALLY INTENDED TO

10     DEFRAUD NETFLIX BY ENGAGING IN A SCHEME OF BRIBES AND

11     KICKBACKS.

12          LIKE THE PLUMBER EXAMPLE, IF YOU THINK, WELL, HE SHOULD

13     HAVE TOLD HIS EMPLOYER OR MAYBE JUST NOT EVEN WORKED ON THE

14     SIDE, OKAY, YOU CAN HAVE THAT OPINION.

15          BUT LIKE THE PLUMBER WHO WOULDN'T HAVE COMMITTED A CRIME

16     BY TAKING SIDE JOBS, MR. KAIL DID NOT COMMIT A CRIME BY

17     ACCEPTING SECRET PAYMENTS FOR UNDISCLOSED SELF-DEALING.

18          AND THE INTRODUCTIONS THEMSELVES, THERE WERE NO

19     EXPECTATIONS OF ANYTHING OTHER THAN CHECK IT OUT.  SUDDENLY

20     THAT'S CRIMINAL TO THE GOVERNMENT.

21          I URGE YOU, THEREFORE, TO DECIDE YOUR VERDICT BASED ON THE

22     LAW.  NO EMOTION, NOT MORALITY.  YOU CAN ONLY CONVICT IF YOU

23     ARE CONVINCED BEYOND A REASONABLE DOUBT THAT THE STOCK OPTIONS

24     WERE COMPENSATION FOR THIS FOR THAT ARRANGEMENT.  AND IT CAN'T

25     BE BASED ON SPECULATION.  YOU CAN'T LOOK FOR WINKS OR NODS THAT

1    DON'T EXIST THAT WERE NEVER PRESENTED THAT WERE A BIASED

2    NARRATIVE CREATED BY THE GOVERNMENT.  THEY TRIED TO PLUCK WORDS

3    OUT OF CONTEXT AND SAY, AH-HAH, HE WAS HELPFUL.  THEY ASKED TO

4    READ A COLLECTIVE INTO EVIDENCE THAT DOESN'T EXIST.

5         BUT YOU HAVE TO LOOK AT THE ACTUAL EVIDENCE.  AND AS I

6    SAID, EVERY VENDOR WENT THROUGH A TESTING PERIOD, EVERY VENDOR

7    TOLD YOU THE STOCK OPTIONS WERE FOR THE ADVISORY WORK AND

8    TOTALLY INDEPENDENT OF NETFLIX.

9         JUST LIKE DAVID WELLS AND REED HASTINGS COULD HAVE INCOME

10   ON THE SIDE WITHOUT IT BEING A CRIME, MR. KAIL COULD HAVE EXTRA

11   INCOME ON THE SIDE WITHOUT IT BEING A CRIME.

12        THE ONLY DIFFERENCE BETWEEN MR. KAIL AND REED HASTINGS IS

13   THAT APPARENTLY REED HASTINGS BELIEVED MR. KAIL WAS A VOLUNTEER

14   ADVISOR TO COUNTLESS COMPANIES.  THAT'S THE ONLY DIFFERENCE.

15        AND, OF COURSE, EVERYONE ELSE IN THE INDUSTRY UNDERSTOOD,

16   PERSON AFTER PERSON, ADVISORS GET COMP.  STANDARD PRACTICE.

17        AND IF YOU DETERMINE THAT, INDEED, THIS IS THE CASE, THEN

18   YOU MUST FIND HIM NOT GUILTY.

19        IF YOU FIND THAT STOCK OPTIONS ARE A COMMON, EVERY DAY

20   PART OF ANY FORMAL ADVISORY AGREEMENT, AS LITERALLY ALMOST

21   EVERYONE OTHER THAN THE NETFLIX WITNESSES TOLD YOU, YOU MUST

22   FIND HIM NOT GUILTY.

23        AS YOU HEARD JUST BRIEFLY ON UNIX MERCENARY, YOU HEARD

24   THAT IT EXISTED IN THE EARLY 2000'S.  MR. KAIL USED IT FOR

25   CONSULTING SERVICES IN SAN DIEGO.  HE HAD AN E-MAIL, A WEBSITE,

1   AND EVEN E-MAILED REED HASTINGS FROM THE UNIX ACCOUNT.

2        SO TO ANSWER THE QUESTION OF WHETHER IT WAS CREATED FOR AN

3   ILLICIT PURPOSE, ABSOLUTELY NOT.

4        AND THE BANK ACCOUNT AND TAX I.D. WERE REQUIRED BY VISTARA

5   AND NETENRICH, AS YOU HEARD.  THEY ASKED HIM TO GET ALL THAT

6   BECAUSE THEY REQUIRED PAYMENT TO A COMPANY, NOT AN INDIVIDUAL.

7   SO HE FORMALIZED IT AS AN LLC.

8        ONCE HE HAD THAT ACCOUNT, HE COULD USE IT AS HE SAW FIT.

9   THE COMMISSION PAYMENTS WENT THERE, ALONG WITH INCOME FROM

10  OTHER SOURCES.  HE OPENED THE BANK ACCOUNT WITH A DESCRIPTION

11  RIGHT THERE IN THE ACCOUNT OF CONSULTING SERVICES AND ADVISORY

12  INCOME.

13       IT WAS WRITTEN RIGHT THERE ON A PUBLIC DOCUMENT.  THAT

14  ACCOUNT WAS FOR ADVISORY INCOME AND CONSULTING.

15       AND, YET, THE CYNICISM OF THE GOVERNMENT IS THAT UNIX IS

16  BASICALLY A SHELL CORPORATION INTENDED TO SMUGGLE THE PROCEEDS

17  OF A CRIME.  THAT'S THE STORY THAT THEY'VE TOLD.

18       THEY ASK YOU TO CONVICT MR. KAIL OF MONEY LAUNDERING IN

19  ALL THESE COUNTS BASICALLY BECAUSE HE DEPOSITED MONEY IN A

20  LEGITIMATE BANK ACCOUNT.  I MEAN, THAT'S ALL IT IS.  AND COULD

21  HE MOVE MONEY FROM ONE ACCOUNT TO ANOTHER?  IT'S HIS MONEY.

22  WHY NOT?

23       BUT, YOU KNOW, THEY HAVE TO PROVE BEYOND A REASONABLE

24  DOUBT THAT HE KNEW THE PROCEEDS WERE CRIMINAL, CRIMINAL

25  PROCEEDS, LIKE YOU HEARD WHEN A DRUG DEALER GETS MONEY FROM A

1    DRUG SALE AND MOVES IT AROUND IN VARIOUS BANK ACCOUNTS, THAT'S

2    KIND OF WHAT THE GOVERNMENT HAS TO PROVE BEYOND A REASONABLE

3    DOUBT, THAT HE KNEW THOSE COMMISSIONS WERE THE PROCEEDS OF

4    CRIME, NOT THE PROCEEDS OF CONFLICT, THE PROCEEDS OF CRIME.

5         THE ELEMENTS OF MONEY LAUNDERING, HE ENGAGED IN A MONETARY

6    TRANSACTION, AND HE KNEW IT INVOLVED CRIMINALLY DERIVED

7    PROCEEDS AND WAS, IN FACT, DERIVED FROM MAIL AND WIRE FRAUD.

8         IF HE BELIEVED THAT THEY WERE THE RESULT OF A LEGAL

9    REFERRAL PARTNER AGREEMENT, THAT IS NOT MONEY LAUNDERING AND

10   WOULD NEGATE CRIMINAL INTENT.

11        SO LET'S SAY YOU BELIEVE HE KNEW THE COMMISSIONS WERE NOT

12   ALLOWED BY NETFLIX.  LET'S SAY YOU EVEN THINK IT WOULD VIOLATE

13   THE EMPLOYMENT AGREEMENT.

14        VIOLATING THE EMPLOYMENT AGREEMENT AND KEEPING SECRETS

15   FROM YOUR BOSS IS NOT THE SAME THING AS KNOWING THE MONEY IS

16   THE PROCEEDS OF A CRIMINAL DURATION.  THIS IS A VERY IMPORTANT

17   DISTINCTION.

18        FOR EXAMPLE, IF DAVID WELLS DIDN'T TELL HIS EMPLOYER HE

19   WAS MAKING AN ANNUAL SALARY FROM TRADEDESK AND PUT THAT MONEY

20   IN A BANK ACCOUNT, THAT WOULDN'T BE A CRIME.  HE WOULDN'T THINK

21   THAT'S CRIMINAL EVEN IF NETFLIX DIDN'T KNOW ABOUT IT.

22        SAME HERE.  NETFLIX NOT KNOWING IS NOT WHAT MAKES IT

23   CRIMINALLY DERIVED PROPERTY.  WHAT MAKES THIS CRIMINALLY

24   DERIVED IF HE'S ENGAGED IN A MASSIVE SCHEME TO DEFRAUD AND IT'S

25   THE RESULT OF QUID PRO QUO.

1        AND IF YOU FIND MR. KAIL NOT GUILTY OF WIRE FRAUD OR MAIL

2   FRAUD, THEN YOU CAN'T FIND HIM GUILTY OF MONEY LAUNDERING

3   BECAUSE IF HE DIDN'T COMMIT THOSE UNDERLYING FRAUD CRIMES, THEN

4   NATURALLY HE WOULDN'T BELIEVE HIS EARNINGS ARE THE PROCEEDS OF

5   CRIMINAL ACTIVITY.

6        THAT MEANS IF YOU VOTE NOT GUILTY FOR COUNTS ONE TO

7   TWENTY-TWO, THEN COUNTS TWENTY-THREE TO TWENTY-NINE ARE

8   EASY:  NOT GUILTY.

9        I PROMISE YOU WON'T COVER EACH ONE OF THESE, BUT I LIKE TO

10  JUST DO A LITTLE OVERVIEW OF THE VARIOUS BURDENS OF PROOF IN

11  OUR COUNTRY.

12       FROM NO EVIDENCE TO REASONABLE SUSPICION, GETTING STOPPED

13  BY THE COPS TO TALK;

14       PROBABLE CAUSE, THAT'S WHAT IT TAKES FOR SOMEONE TO SEARCH

15  YOUR HOUSE;

16       PREPONDERANCE OF THE EVIDENCE, CIVIL CASE;

17       CLEAR AND CONVINCING IS LIKE HAVING YOUR CHILDREN TAKEN

18  FROM YOUR HOME;

19       AND THIS IS REASONABLE DOUBT, THE HIGHEST LEGAL STANDARD

20  IN THIS COUNTRY.

21       IF YOU ARE CONVINCED BY A PREPONDERANCE OF THE EVIDENCE

22  THAT THE GOVERNMENT PROVED THEIR CASE:  NOT GUILTY.

23       IF YOU ARE CONVINCED SOMEWHAT:  NOT GUILTY.

24       YOU HAVE TO BELIEVE THAT THEY PROVED THEIR CASE TO THE

25  HIGHEST STANDARD IN OUR COUNTRY AND NOT JUST AS TO ONE ELEMENT,

1     NOT TWO, EVERY SINGLE ELEMENT, PROOF BEYOND A REASONABLE DOUBT.

2     THIS IS THE STANDARD.  THIS IS IN THE JURY INSTRUCTIONS.  AND

3     WE WOULDN'T WANT IT ANY OTHER WAY.

4          WHERE'S THE REASONABLE DOUBT?  IT'S NOT IMAGINARY DOUBT,

5     REASONABLE DOUBT.

6          REASONABLE DOUBT, THIS IS A SHORT LIST.  I CAN GO ON.

7          WHEN NO WITNESS TESTIFIED AS TO QUID PRO QUO, THAT'S

8     REASONABLE DOUBT.

9          WHEN MR. KAIL BELIEVED HE DIDN'T NEED PERMISSION, THAT'S

10    REASONABLE DOUBT.

11         WHEN HE WAS PUBLIC AND OPEN, REASONABLE DOUBT.

12         HONEST BELIEF HE WASN'T DEFRAUDING NETFLIX, REASONABLE

13    DOUBT.

14         WHEN NETFLIX WAS NOT DEFRAUDED OUT OF MONEY OR PROPERTY,

15    REASONABLE DOUBT.

16         WHEN HE ACTED IN NETFLIX'S BEST INTERESTS IN ALL MATTERS

17    ACCORDING TO LITERALLY EVERYBODY, REASONABLE DOUBT.

18         WHEN THE VENDORS HAD TO EARN THE CONTRACTS AND WEREN'T

19    GIVEN SHORTCUTS, REASONABLE DOUBT.

20         WHEN HE DIDN'T PRESSURE A SINGLE EMPLOYEE TO WORK ON

21    ANYTHING, REASONABLE DOUBT.

22         THROUGHOUT THIS CASE YOU ARE BEING ASKED TO DISREGARD THE

23    INCONVENIENCE TRUTHS.  ALL OF THE REASONABLE DOUBT POINTS TO

24    INNOCENCE.

25         AND, LADIES AND GENTLEMEN, IT'S UP TO YOU, NOT THE U.S.

1    ATTORNEYS, NOT EVEN THE JUDGE, WHO WILL BE DECIDING WHETHER

2    MR. KAIL IS GUILTY OR NOT GUILTY.

3         AND NOW THAT THE CASE IS LAID BEFORE YOU WITH LITERALLY

4    ZERO EVIDENCE OF QUID PRO QUO AND ZERO EVIDENCE OF ACTUAL

5    FRAUD, I'M ENTITLED TO CLAIM ON MR. KAIL BEHALF A VERDICT OF

6    NOT GUILTY.

7         MEMBERS OF THE JURY, IN REACHING YOUR VERDICT, YOU WILL

8    VINDICATE THIS PRINCIPLE OF LAW THAT PEOPLE ARE NOT TRIED BY

9    THE PRESS OR THE INTERNET, THEY'RE NOT TRIED BY RUMORS OR

10   INNUENDOS, NOT BY INDICTMENTS, NOT BY HEARSAY, NOT BY THE WHIMS

11   AND DESIRES OF PROSECUTORS OR LAW ENFORCEMENT AGENTS, BUT UPON

12   JURORS LIKE YOU ARE WHO ARE CALLED UPON TO DO JUSTICE.

13        WHEN YOU HAVE DOUBTS, YOU MUST ACT UPON THEM AND FIND

14   MR. KAIL NOT GUILTY.

15        WHERE YOU HAVE SEEN EVIDENCE AND TESTIMONY THAT CHALLENGES

16   THE GOVERNMENT'S THEORY, YOU MUST ACT UPON IT EARNESTLY AND

17   THAT MEANS FINDING MR. KAIL NOT GUILTY.

18        WHEN YOU'RE BEING ASKED TO SPECULATE, THAT'S NOT PROOF

19   BEYOND A REASONABLE DOUBT.

20        WHEN YOU DON'T TAKE SHORTCUTS AND SAY, WELL, HOW ABOUT

21   JUST CONVICTING HIM OF THIS CHARGE, BUT NOT THAT ONE, THIS

22   EXPRESSION SPLITTING THE BABY, LET'S JUST CALL IT A TIE, WHY

23   NOT?

24        THAT IS NOT FAIR.  EACH CHARGE MUST BE PROVED BEYOND A

25   REASONABLE DOUBT, EVERY SINGLE ONE.

1       IF YOU'RE NOT COMPLETELY SURE, NOT CONVINCED BEYOND A

2   REASONABLE DOUBT THAT HE HAD THE VERY SPECIFIC INTENT TO

3   DEFRAUD NETFLIX, YOU ABSOLUTELY MUST DO THE RIGHT THING AND

4   VOTE NOT GUILTY.

5       IF YOU FEEL THE EVIDENCE DOESN'T ADD UP, IT DIDN'T MEET

6   THAT VERY HIGH AND SERIOUS BURDEN, I ASK YOU TO DO THAT, TO

7   REACH THE CORRECT AND ONLY VERDICT THAT JUSTICE IN THIS CASE

8   PERMITS, AND LADIES AND GENTLEMEN, I ASK YOU TO FIND MR. KAIL

9   NOT GUILTY OF ALL OF THE CHARGES.

10      THANK YOU FOR YOUR TIME.

11          THE COURT:  MR. SAMPSON, WOULD YOU LIKE TO GIVE

12   YOUR -- OR MR. KALEBA, YOUR FINAL CLOSING ARGUMENT?

13          **(MR. KALEBA GAVE HIS REBUTTAL CLOSING ARGUMENT ON BEHALF**

14   **OF THE GOVERNMENT.)**

15          MR. KALEBA:  THANK YOU, YOUR HONOR.

16      THE CONSTITUTION, THE PRESUMPTION OF INNOCENCE IS NOT A

17   BRICK WALL.  IT'S AN IDEA.  IT'S A PROMISE.

18      IF WE HAD NOT CARRIED OUR BURDEN OF PROOF, YOU HAVE AN

19   OBLIGATION TO ACQUIT THE DEFENDANT.

20      BUT IF WE HAVE CARRIED OUR BURDEN, IT'S YOUR DUTY TO

21   CONVICT.  AND I'M ONLY GOING TO ASK YOU TO DECIDE THIS CASE

22   BASED UPON THE EVIDENCE, BASED UPON THE REASONABLE INFERENCES

23   THAT CAN BE DRAWN FROM THE EVIDENCE.

24      EXHIBIT 975-2, PLEASE.

25      UNCONTROVERTED EVIDENCE HAS BEEN SUBMITTED TO YOU THAT

1    NETFLIX HAS ENTERED INTO CONTRACTS WITH VISTARA, NETSKOPE,

2    NETENRICH, SUMO LOGIC, ELASTICBOX, PLATFORA, DOCURATED,

3    NUMERIFY, AND MAGINATICS, UNCONTROVERTED EVIDENCE HAS BEEN

4    SUBMITTED THAT MICHAEL KAIL SIGNED THOSE CONTRACTS.  HE

5    AUTHORIZED THOSE CONTRACTS.

6         ASK YOURSELF THIS QUESTION:  TODAY, WHY IS MICHAEL KAIL

7    TRYING TO PUT SO MUCH DISTANCE BETWEEN HIMSELF AND THOSE

8    CONTRACTS?

9         TODAY, WHY IS MICHAEL KAIL EMPHASIZING COLLABORATIVE

10   DECISIONMAKING?

11        WHY IS HE EMPHASIZING THAT HE WAS NEVER IN A POSITION TO

12   MAKE A UNILATERAL DECISION?

13        AND DOES THE EVIDENCE THAT'S BEEN SUBMITTED TODAY SUPPORT

14   THAT CLAIM?

15        WHAT EVIDENCE IN THE RECORD SHOWS THAT MR. KAIL WAS

16   COLLABORATIVE?

17        WHAT EVIDENCE IN THE RECORD SHOWS THAT HE WAS NOT JUST

18   RECEIVING INPUT, BUT THAT HE WAS LISTENING TO PEOPLE?

19        EXHIBIT 9, PLEASE, PAGE 6.

20        THIS IS THE 360 REVIEW IN MARCH OF 2014 THAT REALLY KICKS

21   OFF THE DOWNWARD SPIRAL FOR MR. KAIL IN HIS WORK AT NETFLIX.

22        THE HOUSE OF CARDS THAT HE CONSTRUCTED IS STARTING TO

23   UNRAVEL -- IS STARTING TO FALL DOWN.  HIS PEOPLE ARE GETTING

24   WISE TO HIS DEALS.

25        WHAT'S THE ISSUE, THOUGH, THAT GAGAN HASTEER IS RAISING

 1    WITH MR. KAIL IN THE 360 REVIEW?  IT'S THE FACT THAT HE'S NOT

 2    COLLABORATIVE, HE'S NOT EXPLAINING HIMSELF.

 3         MIKE, TWO ENGINEERS FROM MY TEAM CONCLUDED TABLEAU WAS

 4    BETTER THAN PLATFORA.

 5         I, GAGAN, I ALSO COMMUNICATED THAT TO YOU IN OUR

 6    ONE ON ONE.

 7         THAT HAPPENED BACK IN OCTOBER WHEN PEOPLE WERE COMPLAINING

 8    ABOUT PLATFORA USING THE LOGO.

 9         I'M SURE TONY DID THE SAME.

10         OF COURSE HE DID.  TONY TESTIFIED ABOUT THAT.

11         NOBODY KNEW WHY THEY WERE USING THIS THING.

12         THE ENGINEERS WERE DISAPPOINTED WHEN YOU PURCHASED

13    PLATFORA, WHEN YOU PURCHASED PLATFORA.  THEY DID NOT UNDERSTAND

14    THE REASONING BEHIND IT.

15         DOES THAT SOUND COLLABORATIVE?  DOES THAT SOUND LIKE HE'S

16    SOLICITING INPUT?

17         NO.  THAT SOUNDS LIKE A UNILATERAL DECISIONMAKER.

18         EXHIBIT NUMBER 355, PLEASE.  YOU SEE AT THE BOTTOM, THIS

19    IS A JULY 31ST E-MAIL, IT'S FROM KAUSHIK TO MR. KAIL.  HE'S

20    GIVING HIS FEEDBACK AS HE WAS ASKED TO DO BY MR. KAIL DURING

21    THE PILOT, WHAT SHOULD WE DO WITH PLATFORA?

22         HE ESSENTIALLY SAYS, LET'S NOT USE IT.

23         KAUSHIK AND PRIYANK, WHO WORKED WITH GAGAN, SAY LET'S NOT

24    GO WITH PLATFORA.  THAT'S THEIR RECOMMENDATION.  YOU ASKED US

25    TO TEST IT OUT, WE TESTED IT OUT.

1          THANK YOU.

2          WHAT'S THE DATE?  THIS IS IN THE MORNING OF JULY 31ST,

3     2013.

4          WHAT HAPPENED IN THE EVENING ON JULY 31ST, 2013?

5          WHISKEY TASTING, ALEXANDER'S, MIKE KAIL, BEN WERTHER.

6          EXHIBIT 309, PLEASE.

7          MIKE GETS THE FEEDBACK FROM THE ENGINEERS, THIS THING

8     ISN'T GOOD.

9          MIKE MEETS WITH THE CEO AT ALEXANDER'S FOR WHISKEY.  WHAT

10    DO THEY DISCUSS?  TWO THINGS.

11         GO TO THE MIDDLE, PLEASE.

12         THIS IS AN E-MAIL FROM THE NEXT DAY, BEN IS SUMMARIZING

13    HIS DRINKS WITH MR. KAIL.

14         HE SAYS, HIS VALUE AS AN ADVISOR.  MR. KAIL PROPOSES TO

15    MR. WERTHER, I TAKE A QUARTER POINT.

16         REMEMBER WHEN MR. KAIL TESTIFIED HE COULDN'T REMEMBER

17    THIS?  REMEMBER WHEN HE TESTIFIED HE COULDN'T REMEMBER WHAT HIS

18    RATE WAS?  REMEMBER WHEN HE TESTIFIED, HE COULDN'T REMEMBER OR

19    RECALL THAT HE ACTUALLY HAD A GOING RATE?

20         HERE'S E-MAIL EVIDENCE THAT'S DIRECTLY CONTRADICTORY TO

21    THAT.  MR. KAIL IS THE ONE WHO PITCHES HIS VALUE.  MR. KAIL IS

22    THE ONE WHO SETS HIS FEE.

23         WHAT ELSE DID THEY DISCUSS?

24         THEY DISCUSSED THE CONTRACT, $600,000, 3 YEARS.

25         IF MR. KAIL IS LISTENING TO HIS FEEDBACK OF HIS ENGINEERS,

1     WHY IS HE PROPOSING A $600,000 CONTRACT?  WHY?

2         WHAT ABOUT MR. WERTHER'S STATEMENT BACK IN 2013, "THE

3     STRONG SUGGESTION WAS THAT IF WE DO THAT," IF WE PAY MR. KAIL,

4     WE'LL GET A CONTRACT.

5         YOU HEARD MR. WERTHER TESTIFY, THROUGH HIS VIDEO

6     DEPOSITION, AND HE SAID DURING THAT VIDEO TESTIMONY, NO, NO,

7     THERE WAS NO QUID PRO QUO.

8         WHAT DID HE SAY IN PRIVATE TO HIS TEAM MEMBERS?  IF WE PAY

9     HIM, WE GET A CONTRACT.

10        WHICH BEN WERTHER DO YOU WANT TO BELIEVE?  BEN WERTHER

11    WHO'S SURROUNDED BY LAWYERS IN A DEPOSITION?  OR THE

12    BEN WERTHER WHO'S TALKING PRIVATELY TO HIS TEAM, WE'RE ABOUT TO

13    GET THIS DEAL?

14        YOU ARE THE FINDER OF FACT.  YOU GET TO RESOLVE THESE

15    CONFLICTS.  YOU DETERMINE CREDIBILITY OF WITNESSES.

16        WHEN YOU HAVE INCONSISTENCIES, LIKE THIS E-MAIL AND

17    MR. WERTHER'S TESTIMONY, YOU MAKE THE FINAL -- YOU DECIDE WHICH

18    ONE TO BELIEVE.  I SUBMIT TO YOU, THIS IS THE VERSION OF

19    BEN WERTHER YOU SHOULD BELIEVE.

20        IS THIS A QUID PRO QUO?  ASK YOURSELF.  WHAT ARE THEY

21    PAYING FOR?  IT'S OBVIOUS.  THEY'RE PAYING FOR ACCESS TO

22    NETFLIX.  THEY'RE PAYING FOR THE NETFLIX CONTRACT.  THEY'RE

23    PAYING FOR THE NETFLIX LOGO.  THEY'RE PAYING FOR THE NETFLIX

24    ENGINEERS.  THEY WANT A REFERENCE.

25        HOW DO YOU KNOW THAT WAS THE EXPECTATION OF PEOPLE AT

1    PLATFORA?  BECAUSE THEY TELL US THAT IN THEIR PRIVATE

2    COMMUNICATIONS.

3         EXHIBIT 330, PLEASE.  THE ONE AT 11:35 A.M.

4         THIS IS THERESA VU AND BEN WERTHER TRYING TO GET MR. KAIL

5    TO DO SOME PRESS FOR THEM.  MR. KAIL IS BEING A LITTLE

6    RELUCTANT.

7         WHAT DOES MS. VU WRITE?  "MY VIEW IS THAT KAIL HAS EQUITY

8    NOW," MEANING HE HAS THE QUARTER PERCENTAGE IN THE COMPANY, "SO

9    HE OWES US MORE THAN A NORMAL CUSTOMER."

10        HE OWES THEM.  THEY PAID FOR SOMETHING.  THEY PAID FOR

11   THIS CUSTOMER REFERENCE.

12        WHAT IS MR. WERTHER'S RESPONSE AT THE TOP?  "AGREED."

13        EXHIBIT 333, PLEASE.  MR. WERTHER'S E-MAIL WHEN THEY'RE

14   DISCUSSING WHETHER OR NOT THEY SHOULD PAY ANOTHER CUSTOMER,

15   THIS PERSON AT DISNEY, AND MR. WERTHER, IN HIS OWN WORDS IN A

16   PRIVATE COMMUNICATION WITH MR. ASHER AND MR. ROSSI, HE PUT,

17   WHAT IS THE SITUATION WITH MR. KAIL EXACTLY?  IS IT A QUID PRO

18   QUO?

19        DON'T TAKE OUR WORD FOR IT.  TAKE BEN WERTHER'S WORD FOR

20   IT.  "THERE IS CLEARLY SOME PAY-TO-PLAY THERE."  HE'S TALKING

21   ABOUT THE NETFLIX CONTRACT.  HE'S TALKING ABOUT THE ADVISOR

22   RELATIONSHIP.

23        BACK TO 355, PLEASE.

24        SO MR. HASTEER TALKED ABOUT THIS, HIS ENGINEERS SAW IN

25   OCTOBER THAT NETFLIX WAS USING -- THE NETFLIX LOGO WAS BEING

1    USED BY PLATFORA AND PEOPLE INSIDE NETFLIX WERE UPSET ABOUT IT,

2    AND MR. HASTEER RECEIVED THIS E-MAIL FROM HIS TEAM, AND HE

3    SAID, OKAY, I'LL GET TO THE BOTTOM OF IT, AND HE APPROACHES

4    MR. KAIL.  AND HE TESTIFIED ABOUT THAT.  THIS IS BACK IN

5    OCTOBER.

6          MR. KAIL TOLD MR. HASTEER, I'M NOT FORMALLY HELPING THEM.

7          EXHIBIT 10, PLEASE.

8          MR. HASTEER ALSO TESTIFIED ABOUT HIS SECOND INTERACTION

9    WITH MR. KAIL AFTER HE PUT THE COMMENT IN THE 360 REVIEW.

10          WHAT'S MR. KAIL'S RESPONSE?  "I AM NOT FORMALLY HELPING

11   THEM."

12          THIS IS AN UNAMBIGUOUSLY FALSE STATEMENT.

13          AND WHEN YOU ASSESS THE CREDIBILITY OF MR. KAIL WHEN HE

14   TESTIFIED, IT'S FAIR FOR TO YOU CONSIDER THIS.  THIS IS A FALSE

15   STATEMENT, PROVABLY FALSE, UNAMBIGUOUS.

16          EXHIBIT 327, PAGE 2.

17          THIS IS THE PLATFORA ORDER FORM SIGNED BY MR. KAIL BACK IN

18   SEPTEMBER.  HE WAS ALREADY AN ADVISOR AT THIS TIME IN AUGUST.

19          PLATFORA WAS USING THE LOGO OF NETFLIX BECAUSE MR. KAIL

20   SAID IT WAS OKAY.

21          PARAGRAPH 5, PLEASE.

22          USE OF THE NAME AND LOGO ON MARKETING MATERIALS.  CUSTOMER

23   REFERRAL, TESTIMONIAL VIDEOS.

24          PLATFORA WAS USING THE LOGO BECAUSE MR. KAIL WAS THE ONE

25   WHO SAID IT WAS OKAY.

1        YET HE TESTIFIED THAT HE COULDN'T DO THAT, THAT HAD TO GO

2   THROUGH BRANDING.

3        THAT'S INCONSISTENT WITH WHAT HE DID AND THAT'S

4   INCONSISTENT WITH WHAT HAPPENED.

5        BACK IN SEPTEMBER OF 2013, HE GREEN LIGHTED THE USE OF THE

6   LOGO.

7        AND THEN HE ACTED ALL SURPRISED WHEN PEOPLE INSIDE NETFLIX

8   WERE ASKING, WHAT'S GOING ON?

9        YOU HEARD THE TESTIMONY OF MR. ROSSI, MR. ASHER, EVEN THE

10  VIDEO OF MR. WERTHER, ALL OF WHOM DENIED THE QUID PRO QUO.

11       NOT ONE OF THEM ADMITTED TO IT.

12       I HOPE YOU AREN'T SURPRISED BY THAT BECAUSE WE WEREN'T,

13  EITHER.

14       THE COURT GAVE YOU AN INSTRUCTION ABOUT THE CREDIBILITY OF

15  WITNESSES.  PAY ATTENTION TO THAT WHEN YOU'RE BACK IN THE JURY

16  ROOM.  THERE'S A FEW THINGS THAT ARE -- THAT STAND OUT.  WHEN

17  YOU'RE EVALUATING THE CREDIBILITY OF A WITNESS, YOU SHOULD

18  CONSIDER THAT WITNESS'S INTEREST IN THE OUTCOME OF THE CASE.

19  WHAT WITNESS HAS MORE INTEREST IN THE OUTCOME OF THIS CASE THAN

20  MR. KAIL?

21       YOU SHOULD CONSIDER THE WITNESS'S BIAS OR PREJUDICE.  YOU

22  SHOULD CONSIDER WHETHER OTHER EVIDENCE CONTRADICTS THE

23  WITNESS'S TESTIMONY.  YOU SHOULD CONSIDER THE REASONABLENESS OF

24  THAT TESTIMONY IN THE LIGHT OF ALL THE OTHER EVIDENCE.

25       NOT EVERYBODY PAID MR. KAIL A BRIBE.  RECALL THE TESTIMONY

1    OF FRANK SLOOTMAN.  HE WAS THE CEO OF SERVICENOW.  REMEMBER THE

2    PRIVATE DINNER THAT HE WAS DESCRIBING THAT HE HAD WITH A

3    COLLEAGUE AND MR. KAIL?  TOWARDS THE END OF THE EVENING,

4    MR. SLOOTMAN ASKED THE DEFENDANT WHETHER THERE WAS ANYTHING

5    ELSE THAT SERVICENOW COULD DO, THAT THEY COULD DO BETTER FOR

6    NETFLIX.  THIS WAS AN IMPORTANT ACCOUNT FOR SERVICENOW.

7         WHAT DID MR. SLOOTMAN SAY?  HE SAID, WELL, THE DEFENDANT

8    ASKED ME -- THERE'S THIS ELEPHANT IN THE ROOM.  MR. SLOOTMAN

9    DISTINCTLY REMEMBERED THAT PHRASE, THERE'S AN ELEPHANT IN THE

10   ROOM.

11        AND THE DEFENDANT SAID TO MR. SLOOTMAN, ACCORDING TO

12   MR. SLOOTMAN, YOU, MEANING YOUR COMPANY, IS GETTING A LOT OF

13   VALUE OUT OF THE NETFLIX RELATIONSHIP.  BUT IT'S NOT A TWO-WAY

14   STREET.

15        MR. SLOOTMAN DESCRIBED HOW HE WAS TAKEN ABACK.  HE DID NOT

16   IMMEDIATELY KNOW WHAT THE DEFENDANT MEANT BY THIS.  HE SAID IT

17   TOOK HIM 30 SECONDS OR SO TO REALIZE WHAT WAS GOING ON.

18        IN THE WORDS OF MR. SLOOTMAN, HE WAS NOT ACCUSTOMED TO

19   BEING PROPOSITIONED LIKE THIS.

20        MR. KAIL WANTED SOMETHING FROM MR. SLOOTMAN.  MR. KAIL

21   WANTED A PIECE OF THE UPSIDE OF SERVICENOW.

22        HE ASKED FOR STOCK WARRANTS.

23        THE DEFENDANT FELT LIKE SERVICENOW WAS BENEFITING FROM THE

24   RELATIONSHIP WITH NETFLIX.  OF COURSE IT WAS.  IT WAS A GOOD

25   ACCOUNT.

1        BUT MR. KAIL FELT LIKE IT WAS UNFAIR THAT HE WASN'T

2    GETTING A PIECE.

3        HE KNEW HE WAS IN A POSITION TO INFLUENCE THE SERVICENOW

4    ACCOUNT.  HE KNEW HE WAS IN A POSITION TO INFLUENCE THE

5    RELATIONSHIP WITH NETFLIX.  SO HE LET THE ELEPHANT -- SO HE LET

6    THE CEO KNOW THERE WAS AN ELEPHANT IN THE ROOM.

7        THE DEFENDANT SAW A TWO-WAY STREET FROM THE POINT OF VIEW

8    OF MR. SLOOTMAN, THOUGH, SERVICENOW IS ON ONE SIDE OF THE

9    STREET AND NETFLIX WAS ON THE OTHER.  ONE SIDE IS PAYING A FAIR

10   PRICE, THE OTHER SIDE IS DELIVERING A FAIR AND HONEST SERVICE.

11       AND THAT'S HOW WE EXPECT BUSINESS TO BE DONE.  THAT'S THE

12   TWO-WAY STREET WE'VE BEEN TALKING ABOUT FROM THE BEGINNING OF

13   THIS CASE.

14       WE DON'T EXPECT A SHAKEDOWN FROM A CRIME BOSS.

15       MR. SLOOTMAN HAD NEVER BEEN PROPOSITIONED LIKE THIS BEFORE

16   AND NEVER AFTER.

17       HE TESTIFIED THAT HE WAS WORRIED HE WOULD LOSE THE

18   ACCOUNT.  HE WAS WORRIED IT WOULD SOUR THE RELATIONSHIP.

19       NOW, CONSIDER THIS:  AT THE TIME OF THIS HAPPENING,

20   MR. SLOOTMAN WAS THE CEO OF A MULTIBILLION DOLLAR PUBLIC

21   COMPANY.  HE HAD POWER, HE HAD WEALTH, HE HAD STATURE, HE HAD

22   INFLUENCE.

23       BUT THE DEFENDANT HAD POWER OVER HIM BY VIRTUE OF HIS ROLE

24   AT NETFLIX.  SO HE SOLICITED A BRIBE FROM MR. KAIL.  AND EVEN

25   SOMEONE AS POWERFUL AS MR. SLOOTMAN HAD TO THINK ABOUT IT.

1              EXHIBIT 680.

2                   THE COURT:  MR. KALEBA, I BELIEVE YOUR TIME IS UP.

3                   MR. KALEBA:  OKAY.  THANK YOU, YOUR HONOR.  THIS IS

4         MY LAST ONE.

5                   THE COURT:  YOU CAN HAVE 30 SECONDS.

6                   MR. KALEBA:  MR. KAIL SENT TO MR. SLOOTMAN, THIS IS

7         THE PERCENTAGE, THIS IS WHAT I WANT.  I WANT A HALF PERCENT OF

8         YOUR COMPANY'S OUTSTANDING STOCK.

9              HE TESTIFIED IT WAS A $2 BILLION COMPANY.  THIS WOULD HAVE

10        BEEN $10 MILLION WORTH OF STOCK.

11             IT'S UNDERSTANDABLE WHY SUMO LOGIC, ELASTICBOX, DOCURATED,

12        MAGINATICS PAID THE BRIBE.  MR. KAIL SET THE TERMS OF THE

13        ENGAGEMENT.  IT WAS NOT A LEVEL PLAYING FIELD.  IT'S

14        UNDERSTANDABLE, BUT IT'S NOT LAWFUL.

15             WE EXPECT MORE FROM CEO'S.  WE EXPECT THAT THEY'RE NOT

16        GOING TO BUY THEIR WAY INTO A CONTRACT.  WE EXPECT MORE FROM

17        THE V.P.'S OF I.T., THAT THEY'RE NOT GOING TO CHARGE A FEE TO

18        GET INTO A COMPANY, AND THAT'S WHAT THIS CASE IS ABOUT.

19                  AND THAT'S WHY WE ASK YOU TO RETURN A VERDICT OF GUILTY.

20        THANK YOU.

21                  THE COURT:  THANK YOU, MR. KALEBA.

22             I KNOW IT'S 5:00 O'CLOCK.  I'M GOING TO ASK YOUR

23        INDULGENCE FOR ANOTHER FEW MINUTES BECAUSE I WANT TO REDUCE THE

24        BURDEN ON SOME OF OUR JURORS ON MONDAY MORNING.

25             I'M GOING TO READ THE FINAL JURY INSTRUCTIONS.  THEY'RE

1    RELATIVELY SHORT, AND THEN I'LL GIVE YOU INSTRUCTIONS FOR

2    MONDAY.

3         WHEN YOU BEGIN YOUR DELIBERATIONS, ELECT ONE MEMBER OF THE

4    JURY AS YOUR PRESIDING JUROR WHO WILL PRESIDE OVER THE

5    DELIBERATIONS AND SPEAK FOR YOU HERE IN COURT.

6         YOU WILL THEN DISCUSS THE CASE WITH YOUR FELLOW JURORS TO

7    REACH AGREEMENT IF YOU CAN DO SO.  YOUR VERDICT, WHETHER GUILTY

8    OR NOT GUILTY, MUST BE UNANIMOUS.

9         EACH OF YOU MUST DECIDE THE CASE FOR YOURS, BUT YOU SHOULD

10   DO SO ONLY AFTER CONSIDERED ALL THE EVIDENCE, DISCUSSED IT

11   FULLY WITH THE OTHER JURORS, AND LISTENED TO THE VIEWS OF YOUR

12   FELLOW JURORS.

13        DO NOT BE AFRAID TO CHANGE YOUR OPINION IF THE DISCUSSION

14   PERSUADES YOU THAT YOU SHOULD DO SO, BUT DO NOT COME TO A

15   DECISION SIMPLY BECAUSE OTHER JURORS THINK IT IS RIGHT.

16        IT IS IMPORTANT THAT YOU ATTEMPT TO REACH A UNANIMOUS

17   VERDICT, BUT, OF COURSE, ONLY IF EACH OF YOU CAN DO SO AFTER

18   HAVING MADE UP YOUR OWN CONSCIENTIOUS DECISION.  DO NOT CHANGE

19   AN HONEST BELIEF ABOUT THE WEIGHT AND EFFECT OF THE EVIDENCE

20   SIMPLY TO REACH A VERDICT.

21        PERFORM THESE DUTIES FAIRLY AND IMPARTIALLY.  DO NOT ALLOW

22   PERSONAL LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, OR

23   PUBLIC OPINION TO INFLUENCE YOU.  YOU SHOULD ALSO NOT BE

24   INFLUENCED BY ANY PERSON'S RACE, COLOR, RELIGIOUS BELIEFS,

25   NATIONAL ANCESTRY, SEXUAL ORIENTATION, GENDER IDENTITY, GENDER

1   OR ECONOMIC CIRCUMSTANCES.

2       ALSO, DO NOT ALLOW YOURSELF TO BE INFLUENCED BY PERSONAL

3   LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, PUBLIC OPINION,

4   OR BIASES, INCLUDING UNCONSCIOUS BIASES.  UNCONSCIOUS BIASES

5   ARE STEREOTYPES, ATTITUDES, OR PREFERENCES THAT PEOPLE MAY

6   CONSCIOUSLY REJECT, BUT MAY BE EXPRESSED WITHOUT CONSCIOUS

7   AWARENESS, CONTROL, OR INTENTION.

8       IT IS YOUR DUTY AS JURORS TO CONSULT WITH ONE ANOTHER AND

9   TO DELIBERATE WITH ONE ANOTHER WITH A VIEW TOWARD REACHING AN

10  AGREEMENT IF YOU CAN DO SO.

11      DURING YOUR DELIBERATIONS, YOU SHOULD NOT HESITATE TO

12  RE-EXAMINE YOUR OWN VIEWS AND CHANGE YOUR OPINION IF YOU BECOME

13  PERSUADED THAT IT IS WRONG.

14      YOU HAVE BEEN INSTRUCTED THAT YOUR VERDICT, WHETHER IT IS

15  GUILTY OR NOT GUILTY, MUST BE UNANIMOUS.  THE FOLLOWING

16  INSTRUCTION APPLIES TO THE UNANIMITY REQUIREMENT OF COUNT ONE

17  TO TWENTY-TWO.

18      COUNTS ONE TO NINETEEN ACCUSE MR. KAIL OF COMMITTING THE

19  CRIME OF WIRE FRAUD IN TWO DIFFERENT WAYS.  THE FIRST IS THAT

20  MR. KAIL ENGAGED IN A SCHEME OF HONEST SERVICES WIRE FRAUD AS

21  DEFINED IN INSTRUCTION 42 INVOLVING THE LOSS OF HONEST

22  SERVICES.

23      THE SECOND WAY IS THAT MR. KAIL ENGAGED IN A SCHEME TO

24  COMMIT WIRE FRAUD AS DESCRIBED IN SECTION 42 A INVOLVING THE

25  LOSS OF MONEY OR PROPERTY.

1    COUNTS TWENTY TO TWENTY-TWO ACCUSE MR. KAIL OF COMMITTING

2    THE CRIME OF MAIL FRAUD IN TWO DIFFERENT WAYS.  THE FIRST IS

3    THAT MR. KAIL ENGAGED IN A SCHEME TO COMMIT HONEST SERVICES

4    MAIL FRAUD AS DEFINED IN INSTRUCTION 43 INVOLVING THE LOSS OF

5    HONEST SERVICES.

6    THE SECOND WAY IS THAT MR. KAIL COMMITTED MAIL FRAUD AS

7    DEFINED IN INSTRUCTION 43(A), INVOLVING THE LOSS OF MONEY OR

8    PROPERTY.

9    THE GOVERNMENT DOES NOT HAVE TO PROVE ALL OF THESE FOR YOU

10   TO RETURN A GUILTY VERDICT ON THESE CHARGES.  PROOF BEYOND A

11   REASONABLE DOUBT ON ONE THEORY IS ENOUGH TO CONVICT ON A

12   SPECIFIC COUNT.  BUT IN ORDER FOR YOU TO RETURN A VERDICT, ALL

13   OF YOU MUST AGREE THAT THE SAME CRIMINAL VIOLATION HAS BEEN

14   PROVED.

15   AS TO EACH SPECIFIC COUNT IN COUNTS ONE THROUGH NINETEEN,

16   ALL OF YOU MUST AGREE THAT THE GOVERNMENT PROVED BEYOND A

17   REASONABLE DOUBT THAT MR. KAIL COMMITTED WIRE FRAUD OR ALL OF

18   YOU MUST AGREE THAT THE GOVERNMENT PROVED BEYOND A REASONABLE

19   DOUBT THAT MR. KAIL COMMITTED HONEST SERVICES FRAUD; OR YOU MAY

20   FIND BOTH.

21   SIMILARLY, TO CONVICT ON EACH COUNT OF MAIL FRAUD IN

22   COUNTS TWENTY TO TWENTY-TWO, ALL OF YOU MUST AGREE THAT THE

23   GOVERNMENT PROVED BEYOND A REASONABLE DOUBT THAT MR. KAIL

24   COMMITTED MAIL FRAUD; OR ALL OF YOU MUST AGREE THAT THE

25   GOVERNMENT PROVED BEYOND A REASONABLE DOUBT THAT MR. KAIL

1    COMMITTED HONEST SERVICES MAIL FRAUD; OR YOU MAY FIND BOTH.

2         IN OTHER WORDS, YOU CAN ONLY RETURN A VERDICT OF GUILTY ON

3    A PARTICULAR COUNT IF YOU ALL AGREE ON THE WAY IN WHICH

4    MR. KAIL COMMITTED MAIL OR WIRE FRAUD.

5         BECAUSE YOU MUST BASE YOUR VERDICT ONLY ON THE EVIDENCE

6    RECEIVED IN THE CASE AND ON THESE INSTRUCTIONS, I REMIND YOU

7    THAT YOU MUST NOT BE EXPOSED TO ANY OTHER INFORMATION ABOUT THE

8    CASE OR ISSUES IT INVOLVES.  EXCEPT FOR DISCUSSING THE CASE

9    WITH YOUR FELLOW JURORS DURING DELIBERATIONS:  DO NOT

10   COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET ANYONE ELSE

11   COMMUNICATE WITH YOU ABOUT THE MERITS OF THE CASE OR ANYTHING

12   TO DO WITH IT.

13        THIS RESTRICTION INCLUDES DISCUSSING THE CASE IN PERSON,

14   IN WRITING, BY PHONE OR ELECTRONIC MEANS, VIA E-MAIL OR TEXT

15   MESSAGING, OR ANY INTERNET CHAT ROOM, BLOG, WEBSITE, OR ANY

16   OTHER FORMS OF SOCIAL MEDIA.  THIS RESTRICTION APPLIES TO

17   COMMUNICATING WITH YOUR FAMILY MEMBERS, YOUR EMPLOYER, THE

18   MEDIA OR PRESS, AND THE PEOPLE INVOLVED IN THE TRIAL.  IF YOU

19   ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR JURY SERVICE OR

20   ANYTHING ABOUT THIS CASE, YOU MUST RESPOND THAT YOU HAVE BEEN

21   ORDERED NOT TO DISCUSS THE MATTER AND TO REPORT THE CONTACT TO

22   THE COURT.

23        DO NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA

24   ACCOUNTS OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH

25   IT; DO NOT DO ANY RESEARCH, CONSULT AS CONSULTING DICTIONARIES,

1    SEARCHING THE INTERNET, OR USING OTHER REFERENCE MATERIALS; AND

2    DO NOT MAKE ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN

3    ABOUT THE CASE ON YOUR OWN.

4         THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THAT THE

5    PARTIES HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH

6    PARTY HAS HAD AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES

7    THESE RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THE PROCEEDINGS.

8    IF ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE

9    NOTIFY THE COURT IMMEDIATELY.

10        SOME OF YOU HAVE TAKEN NOTES DURING TRIAL.  WHETHER OR NOT

11   YOU TOOK NOTES, YOU SHOULD RELY ON YOUR OWN MEMORY OF WHAT WAS

12   SAID.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.  YOU SHOULD NOT BE

13   OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF YOUR FELLOW JURORS.

14        THE PUNISHMENT PROVIDED BY LAW FOR THESE CRIMES IS FOR THE

15   COURT TO DECIDE.  YOU MAY NOT CONSIDER PUNISHMENT IN DECIDING

16   WHETHER THE GOVERNMENT HAS PROVED ITS CASE AGAINST MR. KAIL

17   BEYOND A REASONABLE DOUBT.

18        A VERDICT FORM HAS BEEN PREPARED FOR YOU.  AFTER YOU HAVE

19   REACHED UNANIMOUS AGREEMENT ON A VERDICT, YOUR FOREPERSON

20   SHOULD COMPLETE THE VERDICT FORM ACCORDING TO YOUR

21   DELIBERATIONS, SIGN AND DATE IT, AND ADVISE THE CLERK THAT YOU

22   ARE READY TO RETURN TO THE COURTROOM.

23        IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO

24   COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH THE CLERK,

25   SIGNED BY ANY ONE OR MORE OF YOU.  NO MEMBER OF THE JURY SHOULD

1    EVER ATTEMPT TO COMMUNICATE WITH ME EXCEPT BY A SIGNED WRITING,

2    AND I WILL RESPOND TO THE JURY CONCERNING THE CASE ONLY IN

3    WRITING OR HERE IN OPEN COURT.

4         IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

5    LAWYERS BEFORE ANSWERING IT, WHICH MAY TAKE SOME TIME.  YOU MAY

6    CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR THE ANSWER TO ANY

7    QUESTION.

8         REMEMBER THAT YOU ARE NOT TO TELL ANYONE -- INCLUDING

9    ME -- HOW THE JURY STANDS, NUMERICALLY OR OTHERWISE, ON ANY

10   QUESTION SUBMITTED TO YOU, INCLUDING THE QUESTION OF THE GUILT

11   OF MR. KAIL, UNTIL AFTER YOU HAVE REACHED A UNANIMOUS VERDICT

12   OR HAVE BEEN DISCHARGED.

13        NOW, LET ME TELL YOU A FEW THINGS.

14        I'M GOING TO HAVE -- WE HAVE FOUR ALTERNATES HERE, AND LET

15   ME JUST MAKE SURE THAT YOU KNOW WHO YOU ARE, AND THAT IS

16   MS. FERNANDEZ, MS. BUTLER-SCHWANK, MR. ARTHUR JOHNSON, AND

17   MR. ERIC JOHNSON.  I KNOW SOME OF YOU LIVE A LITTLE BIT OF A

18   DISTANCE FROM THE COURTHOUSE, AND I DIDN'T WANT YOU TO HAVE TO

19   COME IN MONDAY MORNING FOR TEN MORE MINUTES OF INSTRUCTIONS.

20   THAT'S WHY WE'RE STAYING THIS EXTRA TEN MINUTES.  SO I KNOW

21   EVERYONE IS GLAD TO EXTEND THAT COURTESY TO YOU.

22        HOWEVER, YOU REMAIN ALTERNATE JURORS IN THE CASE.  I'M NOT

23   GOING TO REQUIRE YOU TO COME IN ON MONDAY, BUT YOU NEED TO

24   LEAVE A TELEPHONE NUMBER WITH MS. SALINAS-HARWELL.  I PREFER A

25   CELL PHONE IF YOU USE ONE THAT YOU WILL CARRY WITH YOU SO THAT

1    WE CAN CONTACT YOU IMMEDIATELY IF WE NEED TO SUBSTITUTE YOU FOR

2    A SITTING JUROR, AND YOU WILL THEN COME TO THE COURTHOUSE, BE

3    SWORN IN AS A JUROR, AND THEN THE JURY WILL BEGIN ITS

4    DELIBERATIONS ALL OVER AGAIN IF YOU JOIN THEM.

5         I'M GOING TO ASK THAT YOU NOT BE FARTHER THAN AN HOUR FROM

6    THE COURTHOUSE.  IF YOUR HOME HAPPENS TO BE MORE THAN AN HOUR

7    AWAY, OF COURSE YOU SHOULD BE AT YOUR HOME.  AND YOU CAN JUST

8    LET TIFFANY KNOW THAT BEFORE YOU LEAVE, THAT YOUR HOME IS A

9    LITTLE BIT FARTHER THAN AN HOUR.  LUCKILY THERE'S BEEN NO

10   TRAFFIC JAMS THESE DAYS, SO HOPEFULLY YOU'RE NOT QUITE THAT FAR

11   AWAY.  BUT YOU CAN LET US KNOW THAT.

12        IF A JUROR IS UNABLE TO COMPLETE THEIR JURY SERVICE, THEN

13   I WILL SUBSTITUTE ONE OF YOU, OR MORE, INTO THE JURY.

14        WHILE YOU ARE WAITING FOR THE JURY TO BE -- TO COMPLETE

15   ITS JOB AND BE DISCHARGED, YOU MAY NOT TALK ABOUT THE CASE TO

16   ANYONE, INCLUDING THE SITTING JURORS.  THE SITTING JURORS MAY

17   NOT COMMUNICATE WITH YOU AND TELL YOU HOW THINGS ARE GOING.

18   YOU CAN HAVE NO COMMUNICATION, NOT AMONG YOURSELVES, THE FOUR

19   ALTERNATES, OR WITH THE SITTING JURORS.  IN FACT, THE SITTING

20   JURORS CAN'T HAVE COMMUNICATIONS WITH EACH OTHER EXCEPT WHEN

21   ALL 12 OF YOU ARE IN THE JURY ROOM DURING DELIBERATIONS.  YOU

22   CAN'T TALK IN THE HALLWAYS, YOU CAN'T TALK OUTSIDE ON THE

23   STREET, YOU CAN'T TALK AT NIGHT.  YOU CAN ONLY TALK WHILE

24   YOU'RE DELIBERATING.  I KNOW IT'S A LITTLE HARD TO BE IN THAT

25   WAITING PATTERN, ESPECIALLY FOR THE ALTERNATES, BUT ALL 12 WILL

1    BE GOING HOME OVER THE WEEKEND, SO YOU KNOW THE DRILL, YOU'RE

2    NOT GOING TO TALK TO ANYONE ABOUT THE CASE, YOU'RE NOT GOING TO

3    TALK TO EACH OTHER.

4         WHEN YOU RETURN ON MONDAY MORNING, I'M GOING TO ASK THAT

5    YOU RETURN AT 9:00 O'CLOCK.  I ACTUALLY -- ALTHOUGH I READ TO

6    YOU ALL OF THE FORMAL INSTRUCTIONS, I HAVE ABOUT TEN MINUTES OF

7    INFORMAL DISCUSSION TO DESCRIBE THE LOGISTICS OF WHAT YOU DO

8    THAT I'D LIKE TO DO, AND I'M NOT GOING TO KEEP YOU NOW BECAUSE

9    IF I SUBSTITUTE IN AN ALTERNATE, BECAUSE IT'S INFORMAL, I CAN

10   CATCH UP ON THAT WITH EVERYBODY BACK IN THE COURTROOM.

11        SO -- BUT I WANTED TO READ ALL THE FORMAL INSTRUCTIONS

12   BEFORE OUR ALTERNATES LEFT.

13        AND SO, COUNSEL, IS THERE ANY REASON I CAN'T LET THE JURY

14   GO HOME NOW FOR THE WEEKEND?

15             MR. SAMPSON:  NOT AT ALL, YOUR HONOR.

16             THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THANK

17   YOU TO OUR ALTERNATES.  I DON'T KNOW IF I'LL SEE YOU AGAIN.

18   BUT WE WILL LET YOU KNOW IMMEDIATELY WHEN YOU'RE EXCUSED.  BUT

19   TO OUR 12 JURORS, EVERYONE, LEAVE ME YOUR NOTEBOOKS AND BADGES

20   ON YOUR CHAIRS.  I READ THE INSTRUCTION ON NOT TALKING TO

21   ANYONE.  I WON'T BORE YOU WITH THAT AGAIN BECAUSE I JUST READ

22   IT.  AND I WILL SEE YOU RIGHT HERE IN THE COURTROOM AT 9:00

23   O'CLOCK MONDAY MORNING.

24             (JURY OUT AT 5:11 P.M.)

25             THE COURT:  ALL RIGHT.  ALL OF OUR JURORS HAVE

1    DEPARTED.

2         THANK YOU ALL.  WE CERTAINLY GOT A LOT DONE TODAY.  I'M

3    SURE IT IS A RELIEF TO YOU TO KNOW THAT YOUR EXTRAORDINARY

4    EFFORTS HAVE COME TO THIS STAGE.  I KNOW THE WEEKEND IS HARD

5    AND NEXT WEEK WILL EVEN BE HARDER.

6         WE WILL -- WE'LL ALL BE IN THE COURTROOM AT 9:00 O'CLOCK

7    ON MONDAY MORNING, AND JUST SO THAT YOU CAN MAKE YOUR PLANS, I

8    DO REQUIRE YOU TO BE NO FARTHER THAN TEN MINUTES FROM THE

9    COURTHOUSE, FROM THE COURTROOM, THROUGHOUT DELIBERATIONS.

10        YOU ALREADY KNOW THE ATTORNEY LOUNGE, AND I -- I DON'T

11   EVEN KNOW THAT THE U.S. ATTORNEY'S OFFICE IS CLOSE ENOUGH FOR

12   YOU TO -- I THINK THAT'S A LITTLE BIT TIGHT, SO I THINK YOU'RE

13   GOING TO BE JOINING US HERE AS WELL DURING THE DELIBERATIONS.

14        AND I WILL -- SO I WILL SEE YOU MONDAY MORNING.  I THINK

15   WE LEAVE NOTHING TO BE DONE BETWEEN NOW AND THEN.  IS THAT

16   CORRECT?

17             MS. JAYNE:  CORRECT.  I'LL BE PROVIDING

18    MS. SALINAS-HARWELL WITH MY CELL PHONE.

19             THE COURT:  YES.  TIFFANY WILL NEED PHONE NUMBERS

20    FROM YOU SO THAT SHE CAN REACH YOU.

21        AND, TIFFANY, YOU WERE ABLE TO GET NUMBERS FOR THE

22    ALTERNATES?

23             THE CLERK:  YES, YOUR HONOR, I HAVE THEM.

24             THE COURT:  WONDERFUL.

25             MS. JAYNE:  YOUR HONOR, CAN WE CONTINUE TO LEAVE

1    ITEMS HERE?

2            THE COURT:  YES.  YES, YOU MAY.

3            MS. JAYNE:  THANK YOU.

4            THE COURT:  ALL RIGHT.  WELL, I CAN ONLY HOPE THAT

5    ALL OF YOU GET A LITTLE BIT OF SLEEP THIS WEEKEND, BECAUSE I'M

6    SURE YOU HAVE A TREMENDOUS DEFICIT AND THERE'S NO GOOD

7    MEDICATION TO BE READY FOR DELIBERATIONS.

8        OKAY.  I WILL SEE YOU ALL MONDAY MORNING.

9            THE CLERK:  COURT IS ADJOURNED.

10       (THE EVENING RECESS WAS TAKEN AT 5:13 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16        IRENE RODRIGUEZ, CSR, CRR
          CERTIFICATE NUMBER 8076

17

18

19        LEE-ANNE SHORTRIDGE, CSR, CRR
          CERTIFICATE NUMBER 9595

20

21        DATED:  APRIL 23, 2021

22

23

24

25