**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>    v.<br><br>MICHAEL KAIL,<br><br>            Defendant. | Case No.  18-cr-00172-BLF-1<br><br>**ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR NEW TRIAL** |

Defendant Michael Kail moves this Court for a post-verdict judgment of acquittal or, in the alternate, a new trial. Mot., ECF 250. Because the trial evidence was sufficient to permit a reasonable juror to find the essential elements of the underlying counts of conviction, and because the interests of justice do not necessitate a new trial, Kail's motion is DENIED.

## I.    BACKGROUND

A grand jury charged Kail with nineteen counts of pecuniary wire fraud and honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, three counts of pecuniary mail and honest services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346, and seven counts of money laundering, in violation of 18 U.S.C. § 1957. Indictment, ECF 1. Kail was charged with 29 counts total. The charges flowed from an alleged scheme in which Kail used his position as a Vice President at Netflix, Inc. ("Netflix") to approve contracts with third-party vendors in exchange for kickbacks in the form of commission fees and lucrative advisor agreements. *Id*. ¶¶ 16-24.[1] This scheme was

---

[1] The government charged Kail for conduct implicating nine Netflix vendors. Counts One, Two, and Three charged Kail with wire fraud related to his dealings with NetSkope, Inc. ("NetSkope"). Jury

allegedly carried out in two ways: by depriving Netflix of money or property and by depriving Netflix of Defendant's honest services. *Id*. ¶ 21.

At trial, the government's case-in-chief spanned nine days, during which time the jury heard testimony from 29 witnesses and viewed hundreds of exhibits. *See generally* Tr. Vols. 2-10. As to each fraud count, the jury was asked to specify the theory of liability under which it convicted Kail—money-or-property fraud, honest services fraud, or both. *See United States v. Pelisamen*, 641 F.3d 399, 406 (9th Cir. 2011). After deliberating for four days, the jury delivered a split verdict, finding Kail guilty of 28 counts. Jury Verdict, ECF 230. This motion followed.

## II.    DISCUSSION

### A.  Rule 29

Rule 29 of the Federal Rules of Criminal Procedure requires the Court, on a defendant's motion, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

The Court's review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307 (1979), which requires a court to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable

---

Verdict. Counts Four and Twenty charged Kail with mail or wire fraud related to his dealings with Maginatics, Inc. ("Maginatics"). *Id*. Counts Five, Six, Seven, Eight, and Twenty-One charged Kail with mail or wire fraud related to his dealings with Docurated, Inc. ("Docurated"). *Id*. Counts Nine, Ten, and Eleven charged Kail with wire fraud related to his dealings with ElasticBox, Inc. ("ElasticBox"). *Id*. Count Twelve charged Kail with wire fraud related to his dealings with Sumo Logic, Inc. ("Sumo Logic"). *Id*. Counts Thirteen, Fourteen, and Fifteen charged Kail with wire fraud related to his dealings with Platfora, Inc. ("Platfora"). *Id*. Count Sixteen charged Kail with wire fraud related to an email he sent to Netflix CEO Reed Hastings on March 25, 2014. *Id*. Count Seventeen charged Kail with wire fraud related to his dealings with VistaraIT, LLC. ("Vistara"). *Id*. Counts Eighteen and Nineteen charged Kail with wire fraud related to his dealings with Numerify, Inc. ("Numerify"). *Id*. Count Twenty-Two charged Kail with mail fraud related to his dealings with Vistara and NetEnrich, Inc. ("NetEnrich"). *Id*.

United States District Court
Northern District of California

doubt." *Id.* at 319 (emphasis original); se*e also McDaniel v. Brown*, 558 U.S. 120 (2010) (reaffirming this standard); *accord United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir.2010) (en banc). This rule establishes a two-step inquiry:

> First, a ... court must consider the evidence presented at trial in the light most favorable to the prosecution.... [And s]econd, after viewing the evidence in the light most favorable to the prosecution, the ... court must determine whether this evidence, so viewed, is adequate to allow "*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." This second step protects against rare occasions in which "a properly instructed jury may ... convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt[.]"

*Nevils*, 598 F.3d at 1164 (quoting *Jackson*, at 319) (emphasis in original).

Pursuant to Rule 29, Kail argues that the government failed to adduce sufficient evidence (1) that Kail defrauded Netflix of property, (2) of a quid pro quo, and (3) of Kail's specific intent to deceive and cheat. Mot. at 3-21. He also argues that he must be acquitted for the seven counts of money laundering because the government did not prove the underlying criminal conduct. Mot. at 21-22. The government disagrees, and directs the Court to evidence supporting the jury verdict. *See generally* Opp., ECF 251.

### 1. *Pecuniary Fraud: Scheme to Defraud Netflix of Property*

The money-or-property fraud charged in Counts 1 through 22 required proof that Kail knowingly devised a scheme or plan for obtaining money or property by means of false or fraudulent representations or omissions; that the statements made or omitted were material; that he acted with the specific intent to deceive and cheat; and that wires or mails were used. Jury Instr. Nos. 42A, 43A, ECF 226; 18 U.S.C. §§ 1341, 1343; 9th Cir. Model Jury Instrs. §§ 8.121, 8.124; *United States v. Woods*, 335 F.3d 993 (9th Cir. 2003); *United States v. Miller*, 953 F.3d 1095, 1101-03 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1085 (2021). Kail now argues that he must be acquitted on all pecuniary fraud counts because the government failed to prove a scheme to defraud Netflix of money or property. Mot. at 3-10.

United States District Court
Northern District of California

"Wire fraud requires the intent to deceive and cheat — in other words, to deprive the victim of money or property by means of deception." *Miller*, 953 F.3d at 1103; *see also Shaw v. United States*, 137 S. Ct. 462, 469 (2016) (holding that the bank fraud statute requires that the alleged scheme to defraud deceive and deprive the victim of something of value). The jury instructions defined a property interest as "an economic interest" and property as "money or another form of property with economic value." Jury Instr. Nos. 42A, 43A.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that Kail's scheme defrauded Netflix of property. *See Jackson v. Virginia*, 443 U.S. at 319. Throughout trial, the government offered evidence that Kail entered into contracts that ran afoul of Netflix's standards and were otherwise unfavorable to Netflix. The scheme to deprive Netflix often manifested as Kail entering into contracts for technology his team considered subpar. For example, Kail introduced the vendor Netskope to Netflix. Tr. Vol 5 at 1143:15-17. Rob Fry, who worked in Netflix's I.T. Department and reported to Kail, evaluated Netskope's technology and made an internal recommendation that Netflix should not "move towards production." *Id.* at 1144:1-15. According to Fry, Netskope "never, for us, achieved that scale that it needed for us to fully deploy it." *Id.* at 1143:23-25. Kail himself acknowledged flaws with Netskope's product, telling the company in an email that it's "probably good that it was me and not something else" just days before signing a $112,500 contract with the company in July 2014. Exhibit 462 (July 5 email from Kail to Netskope); Exhibit 464 (contracted signed by Kail on July 9).

Similarly, Fry testified that after Kail brought Vistara into Netflix, Fry "started to take a look at [the technology]." Tr. Vol. 5 at 1140:10-12. Fry ultimately determined that "it was going to take a while to get [Vistara] to where we needed them to be to replace the existing tools that we already had implemented" and that there was not a "broad rollout . . . because we never trusted it or got it to the point or trusted it enough to replace the existing tools." Tr. Vol. 5, 1141:2-25. Fry testified that he did not believe Vistara made it past a proof of concept and that the technology never was in

4

United States District Court
Northern District of California

"production" at Netflix. Tr. Vol. 5, 1142:1-14. Ashi Sheth, a Senior Systems Engineering Manager in Netflix's IT Operations group, corroborated Fry's testimony, stating that Vistara was the "wrong solution" for IT equipment tracking, given Netflix's headquarters-based environment. Tr. Vol. 8 at 1647:11-20. Sheth communicated this to Bobby Meneses, who reported directly to Kail. *Id*. at 1648:12-18. Ashley Sprague, who reported to Kail at the time, determined after testing Vistara's product that "[Netflix] had other technology that was doing a better job, so it was not a good fit," and reported this negative evaluation back to Kail. Tr. Vol. 9 at 1822:20-24. Sprague—who headed Netflix's I.T. Department after Kail left the company in 2014—further testified that Vistara software was never "in production" at Netflix and was "not even in limited use." *Id*. at 1826:3-6; *see also* Exhibit 235 (email from Sprague to Vistara). Despite this feedback, Kail approved monthly billings for 2,000 Vistara devices in June 2012. Tr. Vol. 4 at 911:7-14; Tr. Vol. 9 at 1830:4-13; Exhibit 209 (technology proposal signed by Kail). Sprague was "surprised" when she ultimately learned that Netflix was paying Vistara for its software. Tr. Vol. 9 at 1828:11-12. This evidence supports a finding by the jury that Kail economically harmed Netflix by signing contracts for inferior technology. *See United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017).

The government also introduced evidence that Kail approved a payment of $155,000 to Platfora at the demand of Platfora's CEO and CFO outside of the terms of the contract. Exhibit 327 (Platfora contract); Exhibit 1110 (email between Platfora employees discussing that the company needed $155,000 from Netflix to avoid de-booking); Exhibit 351 (email from Sundholm to Kail stating "Were you expecting the final Platfora invoice to be $155K? . . . from my calculations we should owe $80k to date; we have paid $60K so far."); Tr. Vol. 11 at 2325:11-12, 22-24. This payment was prompted after Netflix's Yingkuan Liu cancelled the Platfora contract in April 2014, just two months into its first phase. Exhibit 629 (email from Liu to Platfora). Viewing this evidence in a light most favorable to the prosecution, a juror could have concluded that Netflix made an unnecessary payment and suffered financial detriment by virtue of the kickbacks and commissions

Kail received. *See United States v. Osser*, 864 F.2d 1056, 1063 (3rd Cir. 1988) (upholding a pecuniary mail fraud conviction where "the jury . . . was charged explicitly that it could find financial detriment to the [victim] as a result of the kickbacks and commissions received by [the Defendant].").

While some of the evidence before the Court is circumstantial, it nonetheless supports a reasonable inference that Kail's scheme defrauded Netflix of money or property by enabling vendors to enjoy more favorable contracts with Netflix than they otherwise would have been able to attain. A rational juror could have inferred that had Kail not been paid kickbacks by the third-party companies, Netflix would have paid less for said contracts—or would not have entered them at all. The prosecution introduced evidence that Kail received sizable commission fees for entering into contracts with Vistara and NetEnrich. Exhibit 107 (referral agreement); Tr. Vol 4 at 819:23-820:7. This testimony alone would support such an inference; but the government further introduced evidence that when Netflix procurement employee Sylvia Sundholm reviewed an invoice for Vistara and NetEnrich contractors, she reached out to Kail because it was "unclear what was being delivered" and the hourly rate for the contractors was "higher than agreed." Exhibit 229; Tr. Vol 4 at 942:23-943:24.

This evidence satisfies the scheme to deprive element as to all twenty-two counts of pecuniary fraud. *See* Jury Instr. Nos. 42A, 43A; 18 U.S.C. §§ 1341, 1343. Kail suggests that the government was required to offer evidence that Kail deprived Netflix of economic value as to each and every count of wire or mail fraud, *see* Reply at 8, but the law does not require this particularization. Kail is charged with two schemes to defraud—one of which deprived Netflix of money or property and one of which deprived Netflix of Kail's honest services. *See* Indictment ¶ 21. The government need not prove twenty-two individual schemes to defraud Netflix of money or property, but rather that a common scheme to defraud existed and that Kail used wires or mails in furtherance of the scheme. *See United States v. Lo*, 839 F.3d 777, 793 (9th Cir. 2016); *United States*

*v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013); *Woods*, 335 F.3d at 997. This principle is well-settled. Indeed, it is this logic that blunts the effect of Fed. R. Evid. 404(b) and allows for the introduction of uncharged transactions to prove the existence of a scheme to defraud. *See, e.g.*, *United States v. Loftis*, 843 F.3d 1173, 1177 (9th Cir. 2016) ("The uncharged transactions, therefore, are part of the charged offense—the fraudulent scheme as a whole—not 'other' crimes or 'other' acts evidence."). And it is this logic that allows the government to charge Kail with wire fraud for sending an email to Netflix CEO Reed Hastings in which he denied that he was formally helping Platfora and implied that he was assisting them on a solely volunteer basis. Exhibit 13; *see* Mot. at 20. While Kail's email to Hastings did not in and of itself deprive Netflix of money or property, it allowed him to conceal and further the scheme as a whole.

To escape this conclusion, Kail cites to caselaw he believes suggests that the evidence the government proffered at trial does not fall within the definition of property. None of these cases carry the day. *Kelly v. United States* involved wire fraud on the Port Authority arising from a scheme by public officials to impose traffic gridlock on Fort Lee, New Jersey. 140 S.Ct. 1565, 1568 (2020). The public officials limited Fort Lee's access lanes to the George Washington Bridge—an entryway into Manhattan—to punish the Fort Lee mayor for refusing to endorse New Jersey Governor Chris Christie in his reelection bid. *Id*. Kail argues that the Supreme Court's opinion in *Kelly* "reiterates the 'economic loss' requirement and confirms that property fraud requires conversion: a 'taking of property' from the victim and converting it to another's benefit." Mot. at 4 (quoting *Kelly*, 140 S. Ct. at 1573). The Court does not disagree. But the Supreme Court's holding in *Kelly* was guided by the fact that the object of the public officials' scheme was to reallocate the bridge's access lanes— a regulatory power—and that any corresponding loss of property—the time and labor expended by Port Authority employees—was a mere "implemental cost[]" of the scheme. *Kelly*, 140 S. Ct. at 1573-1574. Such reasoning cannot extend here, where the loss to the victim was far more than an "incidental byproduct of the scheme." *Id*. Indeed, as the Court discussed above, there is evidence

that Kail directly contemplated that the contracts he signed deprived his employer of economic value.

Nor does *Skilling v. United States* provide Kail an escape hatch. Defendant cites to this case for the proposition that a schemer's gain must "mirror" a victim's loss. Mot. at 4 (citing *Skilling*, 561 U.S. 358, 400 (2010)). According to Kail, this means "schemes to steer a contract to someone who would not have gotten it honestly are not property fraud unless they also contemplate causing economic harm –**causing the victim to give up more, or receive less, economic value** than it otherwise would have." *Id.* (citing *McNally v. United States*, 483 U.S. 350, 360 (1987)) (emphasis in original). Kail persists: "[t]he government's theory was that the scheme deprived Netflix of its interest in conflict-of-interest-free employees signing contracts and the ability to make business decisions based on truthful information. But that interest is not 'property' within the meaning of the mail and wire fraud statutes, as described above." *Id.* at 4-5.

*Skilling* involved a challenge to the honest services wire fraud statute—not the money-or-property wire fraud statute underpinning the convictions at issue here. *Skilling*, 561 U.S. at 399. Nonetheless, the Supreme Court in *Skilling* highlighted that, in contrast to honest services fraud, pecuniary fraud requires that "the victim's loss of money or property supplied the defendant's gain." *Id.* at 400. This guidance is in accord with other Supreme Court and Ninth Circuit precedent, which is clear that pecuniary fraud schemes must contemplate the deprivation of a financial or property interest. *Shaw*, 137 S. Ct. at 469 (2016) (a "scheme [to defraud] must be one to deceive the [victim] and deprive it of something of value."); *Miller*, 953 F.3d at 1103 ("[W]ire fraud requires the intent to deceive and cheat—in other words, to deprive the victim of money or property by means of deception."); *see also United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970) ("the government can[not] escape the burden of showing that some actual harm or injury [to the victim's money or property] was contemplated by the schemer."); *United States v. Walters*, 997 F.2d 1219, 1227 (7th Cir. 1993) ("A deprivation is a necessary but not a sufficient condition of mail

fraud. Losses that occur as byproducts of a deceitful scheme do not satisfy the statutory requirement."). To sustain a pecuniary fraud conviction, however, the government need not proffer evidence that the scheme was successful, *i.e.*, that it, in fact, resulted in economic or property loss to the victim. *Lindsey v. United States*, 332 F.2d 688 (9th Cir. 1964) ("[t]here is no requirement (for a conviction under 18 U.S.C. 1343) that the victim be actually deceived, but only that there be a scheme to defraud."), *cert. den*. 371 U.S. 922; *United States v. Pollack*, 534 F.2d 964, 971 (D.C. Cir. 1976) ("The fraud statutes speak alternatively of devising or intending to devise a scheme to defraud and do not require that the deception bear fruit for the wrongdoer or cause injury to the intended victim as a prerequisite to successful prosecution . . . [S]uccess of the scheme and loss by a defrauded person are not essential elements of the crime under 18 U.S.C. §§ 1341, 1343 . . . "), *cert. denied*, 429 U.S. 924 (1976).

The Court agrees with Defendant that the instant case and *Skilling* both involve undisclosed conflicts of interest. *See* Mot. at 4-5; *Skilling*, 561 U.S. at 413. But the similarities end there. Even ignoring that *Skilling* concerned honest services fraud, the government introduced evidence at trial that Kail's scheme anticipated depriving Netflix of property by entering into unfavorable contracts or contracts that provided Netflix with inferior products. *See Finazzo*, 850 F.3d at 111 (2d Cir. 2017) ("This economic harm can be manifested directly—indirectly—such as by providing the victim with lower-quality goods than it otherwise could have received."). Kail insists that the government was required to introduce evidence that "comparative[ly] lower-priced or higher-quality vendors for the same product . . . 'lost out' on a contract as a result of Mr. Kail's actions." Mot. at 5. But this directive is too granular; the government was free to prove that Kail intended to deprive Netflix of property in other ways as well. And, indeed, it did so.

It is this evidence that undermines Defendant's reliance on *McNally v. United States*, 483 U.S. 350, 356 (1987), *United States v. Bruchhausen*, 977 F.2d 464, 468 (9th Cir. 1992) and *United States v. Zauber*, 857 F.2d 137 (3rd Cir. 1988). Mot. at 5-7. In each of these cases, the reviewing

United States District Court
Northern District of California

court highlighted the absence of any evidence of economic loss in the fraud scheme. *McNally* was a kickback case; as a condition of winning a contract to insure the state of Kentucky, an insurance agency promised to funnel a portion of its commissions to other agencies for the defendants' benefit. 483 U.S. at 352-53. The indictment alleged a scheme to deprive Kentucky of its "right to have [its] business and its affairs conducted honestly" and "free from … dishonesty [and] deceit." *Id*. at 354 n.4. Reviewing the record for proof that the scheme deprived Kentucky of "property," the Court found none—because "[i]t was not charged that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance." *Id*. at 360 (emphasis added). Here, the indictment clearly alleges and the government offered evidence supporting an inference that Netflix would have entered into more favorable contracts with vendors absent Kail's scheme. *See* Indictment ¶ 21.

In *Bruchhausen*, the defendant was convicted of wire fraud for scheming to smuggle American technology to Soviet Bloc countries. 977 F.2d at 466. The Ninth Circuit reversed the convictions, finding that the technology manufacturers received "full sale price for their products" and that the government's potential forfeiture interest in the technology was too "ethereal" to be considered a property interest. *Id*. at 467. Here, the government offered the jury ample evidence to support a finding that the contracts Kail entered into on behalf of Netflix left money on the table. Kail's insistence that *Bruchhausen* required the government to present evidence of "comparative lower-priced or higher-quality vendors for the same product" is thus inapt. Mot. at 5.

In *Zauber*, the administrators of an employee pension fund were charged with money-or-property fraud for causing the fund to invest money in an entity whose principals then paid kickbacks to the fund administrators. 857 F.2d at 140–41. In support of its indictment, the government argued that the pension fund suffered an actual loss of money or property because the pension fund was deprived of control over its money. The Third Circuit, focusing on a footnote in *McNally*, reasoned that said footnote "suggests ... that such a theory is too amorphous to constitute

a violation of the mail fraud statute as it is currently written." *Id*. at 147. In a subsequent decision, the appellate court cabined the reach of its decision in *Zauber*:

> *Zauber* must be read carefully. In that case, the indictment and the charge to the jury were focused solely on the deprivation of the employee's honest services by the receipt of kickbacks. *There was no evidence of property loss nor was the jury asked to consider whether the taking of kickbacks constituted a monetary loss to the victimized pension fund.* Indeed, the trial court instructed the jury that 'it is absolutely irrelevant whether or not there was any loss in pension benefits, as well as whether or not the pension fund is presently financially strong.'"

*Osser*, 864 F.2d at 1063 (emphasis added) (quoting *Zauber*, 857 F.2d at 145). In other words, the holding in *Zauber* was motivated by the *complete* absence of any evidence of financial loss. The court in *Osser* went on to uphold a pecuniary mail fraud conviction where "the jury . . . was charged explicitly that it could find financial detriment to the [victim] as a result of the kickbacks and commissions received by [the Defendant]." *Id*. at 1063.

At bottom, the jury was presented with ample evidence from which to conclude that Defendant intended to defraud his employer of property by paying for products the company did not need at all or far beyond what was needed, paying for products after the company stopped using them, and paying amounts beyond Netflix's contractual obligation. The pecuniary fraud convictions stand.

### 2.  *Honest Services Fraud: Quid Pro Quo*

The honest services fraud charged in Counts 1 through 22 required proof that Kail knowingly devised a scheme to deprive Netflix of its right of honest services money or property; that the scheme consisted of exchanging bribes or kickbacks for Kail's services (the quid pro quo); that Kail acted with the specific intent to defraud; that Kail's act was material; and that wires or mails were used. Jury Instr. Nos. 42, 43; *see also* 18 U.S.C. §§ 1341, 1343, 1346; 9th Cir. Model Jury Instr. §§ 8.123, 8.124; *Skilling v. United States*, 561 U.S. at 413; *United States v. Milovanovic*, 678 F.3d 713, 722, 727 (9th Cir. 2012) (en banc); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 941-943 (9th Cir.

2009). The instruction further stated that "[b]ribery and kickbacks involve the exchange of things or things of value for services by a fiduciary, in other words, a quid pro quo (a Latin phrase meaning 'this for that' or 'these for those.'" Jury Instr. Nos. 42, 43. Kail now asks the Court to acquit him on all honest services fraud counts, arguing that there was no proof of quid pro quo between himself and any third-party vendor. Mot. at 10-20. According to Kail, "the most that the jury could have found from the testimony of witnesses was undisclosed conflicts of interest, secret payments, or undisclosed self-dealing." *Id*. at 10.

The Court disagrees. There can be no dispute that honest services fraud requires something more than undisclosed conflicts of interest. *Skilling*, 561 U.S. at 413. In *United States v. Skilling*, the Supreme Court considered the case of Enron Corporation officer Jeffrey Skilling, who was indicted for allegedly engaging in a scheme to deceive investors about Enron's financial status by manipulating Enron's financial data and making false and misleading statements to investors and the Securities and Exchange Commission. *Id.* at 368-369. Skilling was charged with conspiracy to commit honest-services wire fraud, in violation of 18 U.S.C. §§ 371, 1343, and 1346 by depriving Enron and its shareholders of the intangible rights of his honest services. *Id.* The Supreme Court overturned his convictions under these charges, holding that "§ 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law," *id.* at 409 (emphasis in original), and that Skilling's conduct did not fall within § 1346's proscription "[b]ecause [his] alleged misconduct entailed no bribe or kickback," *id.* at 368. In so holding, the high court emphasized that "[t]he 'vast majority' of the honest-services cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." *Id.* at 2930 (emphasis added) (citation omitted); *see also Milovanovic*, 678 F.3d at 726 (holding that a breach of a trust relationship not arising to a formal fiduciary duty suffices for purposes of honest services fraud under 18 U.S.C. §§ 1341 and 1346). The Court did not explicitly define the meaning of a kickback under 18 U.S.C. § 1346; it did, however, cite to other statues defining kickbacks from which the honest services fraud statute draws.

12

*Id.* at 412-413. For example, the Supreme Court looked to 41 U.S.C. § 52(2), which defines the "term 'kickback' means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to [enumerated persons] for the purpose of improperly obtaining or rewarding favorable treatment in connection with [enumerated circumstances]." *Id.* (alterations in original).

Kail's conduct implicates far more than the undisclosed conflicts of interest at issue in *Skilling.* The record, viewed in a light most favorable to the prosecution, supports a finding by a rational trier of fact that Kail accepted or solicited compensation from vendors in exchange for landing those vendors Netflix contracts. *Jackson*, 443 U.S. at 319. The existence of a quid pro quo was never so clear as when the government introduced evidence concerning Netflix vendor Platfora. The government introduced evidence that Platfora CEO Ben Werther, after meeting with Kail, stated that "the strong suggestion was if we [grant Defendant a quarter point of equity in Platfora], and remain responsive like we have been, we'd be able to get a $600k[2] 3 year deal [with Netflix] done by Labor Day." Exhibit 309; *see also* Werther Deposition, Vol. 1 at 150-151 ("[Kail] likes to have that advisory relationship because it means that he's got an ability to influence and make sure that the products are going to end up being the products that Netflix ultimately needs.") Platfora employee Michael Rossi agreed with Werther that Kail was "working the grey area between [Customer Advisory Board] and leveraging the Netflix logo for personal advantage." *Id.*; *see also* Exhibit 333 (email from Werther to Rossi stating "[t]here is clearly some pay-to-play there").  Yet another Platfora employee, Theresa Vu, signaled the existence of a quid pro quo between Platfora and Kail, stating in an email with Werther that "Kail has equity now so he owes us more than a normal customer" and that the compensation meant that Kail "would have at least tried a little harder

---

[2] That Platfora employee Mike Rossi originally proposed a $800k-900k deal with Netflix, Exhibit 317, does not blunt the other evidence supporting an inference that Kail accepted compensation from Platfora in exchange for signing a vendor contract with Netflix.

United States District Court
Northern District of California

with his [public relations] team" on a testimonial. Tr. Vol. 4 at 781:2-21; *see also* Exhibit 330. Kail himself acknowledged that Platfora was not worth $100,00 per year and that Netflix could "do more, faster, with our HIVE database, Pig, and Tableau," which were existing tools at Netflix. Exhibit 321; Tr. Vol. 3 at 454:9-17.

This type of evidence permeated trial. Shortly after Defendant was offered a compensated advisory position at Sumo Logic, he told the CEO of Sumo Logic "I believe that Sumo Logic will be a great success at Netflix as well as a myriad of other customers. I greatly look forward to assisting with both." Exhibit 603 (June 21, 2012 email); Exhibit 623 (stock option grant). Defendant kept Sumo Logic employees abreast of his efforts for them at Netflix: "I'm pushing my teams to use the tool, but the performance issues are problematic," Exhibit 614 (March 21, 2013 email), and "I am rapidly losing internal 'champions' and general feedback is 'Sumo is unusable,'" Exhibit 628 (March 10, 2014 email); *see also* Exhibit 627. In August 2014, upon finding out that Kail was leaving Netflix, a Sumo Logic executive thanked Kail for "making sure the Year 2 of our last deal went through." Exhibit 631. After initially denying a meeting with ElasticBox, Exhibit 651 (February 2013 email from Kail telling ElasticBox that "I don't have any compelling use cases for ElasticBox at this time"), Defendant was offered a compensated advisory position and within one minute agreed to "work on the intro to the internal [Netflix] team," Exhibit 652 (March 2013 email from Kail telling ElasticBox "will work on the intro to the internal team"). During an off-campus meeting between Kail and Docurated's CEO and CTO that occurred at the end of a Docurated pilot, Kail "mentioned that" he works "closely with some start-ups and venture firms" and was offered "a[ ]way to formalize things" by way of an advisory position. Exhibit 555 (email from Docurated summarizing in-person meeting). Kail signed a paid contract with Docurated on May 30, 2013. Exhibit 553. Less than a week later, Kail became a Docurated advisor and was granted stock options. Exhibit 556. When Kail informed Docurated that he was leaving Netflix, a Docurated executive asked him what the "best way forward" was, to which Kail replied "[b]est to try to leverage Sabry."

14

Exhibit 563.

While some of this aforementioned evidence indicates the existence of an implicit quid pro quo, *see United States v. Andrews*, 681 F.3d 509, 527 (3d Cir. 2012), the government also introduced evidence of explicit quid pro quo. Frank Slootman, CEO of Netflix vendor ServiceNow, Inc., testified that Kail solicited stock warrants from him during a dinner meeting. Tr. Vol. 5 at 1190:3-7, 1192:1-21, 1198:2-3. Slootman considered Netflix "a crowning customer because of the Netflix brand" and considered Kail "the top I.T. executive at Netflix . . . [h]e was our customer in that capacity." *Id*. at 1190:18-1191:8. At the dinner, the two discussed "what we could do to the product, make the product better, the kind of feedback that a customer would provide." *Id*. at 1193:9-11. When Slootman asked Kail if there was "anything else that [ServiceNow, Inc.] could do better," Kail responded: "there is an elephant in the room here. . . you're getting a lot of value out of this relationship. But, you know, it's not a two-way street." *Id*. at 1193:12-22. Slootman testified that he was "taken aback" by "being propositioned," but was concerned that a failure to grant warrants to Kail "might sour the relationship." *Id*. at 1194:9-11, 1195:13-15. Kail told Slootman that his standard equity ask was via an advisory agreement, "1/5th of a percent to 1 half of a percent, 2 year vesting." *Id*. at 1198:2-3; *see also* Exhibit 680. The exchange was unusual to Slootman, who explained that in his experience "people are negotiating for their employers and that's more normal. But people negotiating for their own account is unusual in our experience." Tr. Vol. 5 at 1199:2-4. As another example, NetEnrich co-founder Varma Kunaparaju pointed out to NetEnrich Vice President Rhagu Kamath that "since Mike works for Netflix and there could be all sorts of conflicts of interest, kickback implications" in signing Kail on as a referral partner. Exhibit 118; *see also* Tr. Vol. 5 at 1086:9-17 (describing company meeting in which NetEnrich decided to "move past" the conflict of interest with Kail and to "treat Unix Mercenary just like how we would treat any other referral partner.)

Kail raises a laundry list of objections to this conclusion. For example, he contends that

15

"[t]he payments and stock options . . . were compensation for his independent work as an advisor." Mot. at 11. This reasoning mirrors the testimony Kail offered when he took the stand. *See, e.g.*, Tr. Vol. 10 at 2153:22-24, 2159:7-2160:8. But a rational juror could have chosen to reject this explanation and to credit the evidence of quid pro quo introduced throughout trial. *See United States v. Gillock*, 886 F.2d 220, 222 (9th Cir. 1989) ("We 'must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict.'" (quoting *United States v. Ramos*, 558 F.2d 545, 546 (9th Cir.1977)). Elsewhere, Kail insists that "not a single witness testified to a specific expectation of a benefit" and that "[i]n fact, the vendors testified they did not grant stock options or make any payments to Mr. Kail with the expectation of anything at all with respect to Netflix." Mot. at 12. While witnesses implicated in the scheme unsurprisingly distanced themselves from the bribes and kickbacks during live testimony, there was ample contemporaneous documentary evidence that illustrated a quid pro quo scheme. *See, e.g.*, Exhibit 309. Finally, Kail argues that the jury's first note—inquiring "For there to be a bribe or a kickback does the giver have to know it's in for exchange [sic] for services beyond lawful services?" ECF 227-1—indicates that "the jury was contemplating the fact that no vendor testified to any *knowledge* of bribery, kickback, or an expectation of action on Mr. Kail's part with respect to Netflix." Mot. at 13 (emphasis in original). But this Court has already concluded that there was ample evidence of a quid pro quo scheme. And Kail does not challenge the underlying jury instructions, which the Court directed the jury to review in response to the note.

In sum, evidence demonstrates a kickback scheme, in which Kail bartered his power to sign Netflix vendor contracts for referral commissions and plum advisor agreements in which he earned stock options or warrants. *See* Jury Instr. Nos. 42, 43 (Bribery and kickbacks involve the exchange of things or things of value for services by a fiduciary, in other words, a quid pro quo (a Latin phrase meaning 'this for that' or 'these for those.'")).

### 3. *Specific Intent*

Kail next argues that the government failed to prove that he had the specific intent to deceive and cheat Netflix. Mot. at 21. The government bore the burden of proving Kail's intent beyond a reasonable doubt. Jury Instr. No. 44; *see United States v. Sayakhom*, 186 F.3d 928, 940 (9th Cir. 1999), *amended*, 197 F.3d 959 (9th Cir. 1999). "Good faith is a complete defense to charges of wire fraud, honest services wire fraud, mail fraud, and honest services mail fraud." *Id*. An "honestly held opinion or an honestly formed belief cannot provide fraudulent intent – even if the opinion or belief is mistaken." *Id*.; *see Sayakhom*, 186 F.3d at 940 ("One who expresses an opinion honestly held by her or belief honestly entertained by her is not chargeable with fraudulent intent even though her opinion is erroneous or her belief is mistaken. And similarly, evidence which establishes only that a person made a mistake in judgment or an error in management or was careless does not establish fraudulent intent.").

Kail argues that his intent to deceive and cheat was "undermined by the good faith instruction because [he] testified that he did not believe he was required to inform Netflix of his stock options." Mot. at 12. But Kail's testimony cannot shoulder the heavy burden this argument demands. The government introduced ample evidence that Kail was aware that Netflix required employees to disclose financial conflicts. Netflix's Code of Ethics required "conduct free from fraud or deception" and "ethical handling of actual or apparent conflicts of interest between personal or professional relationships." Exhibit 3. The Code of Ethics further defined a conflict of interest "where the interests or benefits of one person or entity conflict or appear to conflict with the interests or benefits of [Netflix]," and required disclosure of such conflicts. *Id*. Annual emails to all Netflix employees contained a summary of these policies. *See, e.g*., Exhibit 5; *see also* Exhibit 1 (Netflix Culture Deck); Exhibit 14 (Hastings' memorialization of discussion about financial conflict avoidance with Kail). Documentary evidence of Kail's dealings paint a picture of deception. Kail took steps to conceal his kickbacks, directing checks to his personal residence and communications to his

17

personal Gmail address. Exhibit 146; Exhibit 147. He cut his team members out of discussions with vendors from which he received kickbacks. Exhibit 114; Exhibit 328; Exhibit 555. He lied to his boss, Netflix CEO Reed Hastings. Exhibit 147. It was more than reasonable, in light of this substantial evidence, for the jury to discount Kail's own self-serving testimony and find that he did not act in good faith.

### 4. Money Laundering

To establish a violation of 18 U.S.C. § 1957, the government must have proven the following elements beyond a reasonable doubt: (1) Mr. Kail knowing engaged or attempted to engage in a monetary transaction; (2) Mr. Kail knew that the transaction involved criminally derived property; (3) the property had a value of over $10,000; and (4) the property was derived from wire or mail fraud and occurred in the United States. Jury Instr. No. 45; *see also* 18 U.S. § 1957; 9th Cir. Model Jury Instr. § 8.150. Kail now argues that "the money laundering counts cannot stand if the mail and wire fraud counts are overturned" is inconsistent with the Court's obligation to view the evidence in the light most favorable to the verdict. Mot. at 23. Kail's argument is moot. This Court has already concluded that evidence supported Kail's mail and wire fraud convictions. The money laundering convictions stand.

***

Defendant's motion for acquittal is DENIED.

## B. Rule 33

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Ninth Circuit described the standard for granting a new trial in *United States v. Alston*, 974 F.2d 1206 (9th Cir. 1992), which it reaffirmed in *United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000):

> [A] district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal. The court is not obliged to view the evidence in the light most

> favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses . . . If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*Kellington*, 217 F.3d at 1097 (internal quotation marks and citations omitted). The court may also consider evidentiary and procedural errors in weighing the motion for new trial. *See, e.g., United States v. Tory*, 52 F.3d 207, 211 (9th Cir. 1995) (new trial granted in light of four erroneous evidentiary rulings).

Kail bases his Rule 33 motion on the sufficiency of the evidence, as raised in his Rule 29 motion; on the introduction of "other act" evidence; on the introduction of his exact salary; and on the speculation of the jurors about start-up culture. Mot. at 22-25. Whether considered individually or in the aggregate, none of these bases provide Kail with a successful basis for relief.

First, for the reasons discussed while analyzing Kail's Rule 29 motion, the Court declines to grant a new trial based on the insufficiency of the evidence. While Rule 33 permits the district court to review the evidence at trial more holistically, see *Alston*, 974 F.2d at 1211, such a review does not lead this Court to conclude that the evidence "'preponderates sufficiently heavily against the verdict.'" *Id*. (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir.1980)). A complete review of the record here does not leave the Court with "a strong doubt as to the defendant's guilt." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999).

Kail's suggestion that his conviction can be traced to juror speculation, as opposed to the sufficiency of the evidence offered by the government, fails for similar reasons. Kail insists that the

> evidence showed a very common web of relationships among Silicon Valley companies where many startups – to gain visibility, prestige, introductions in a very crowded field – offered compensation in the form of stock options to various reputable and technically-savvy people in the industry on a regular basis. This was a culture not of corruption, but of nurturing visibility, credibility and product development in a way that is relatively costless to the small

19

startup (in terms of stock options).

Mot. at 23. He further argues that the jury's four-day deliberation evinces that this was "a very close case where a culture of 'paid' assistance – unfamiliar to them – may have led some jurors to convict based on facts that do not actually constitute guilt. Hence, it appears that speculation played a large role in their verdict." Mot. at 23. The Court cannot agree. The jury's deliberations were hardly lengthy in light of the fact that the verdict form required that they reach a decision on 53 charges. To the extent that a jury *could* have reached a decision with more expediency, the lengthy deliberations suggest only that the jurors took their constitutional responsibility seriously. This conclusion is buttressed by the sufficiency of the evidence to support each element of each charge. The Court has made extensive findings on this issue when discussing Rule 29 and sees no reason to rehash those findings again and instead concludes, based on those findings, that the jury need not have engaged in bald speculation to reach its verdict.

Nor will the Court grant Defendant relief based on the introduction of Kail's salary at trial. In response to Defendant's Motion *in Limine* No. 3, the Court held that "Kail's precise salary is not relevant because the scheme alleged does not implicate Kail's salary." ECF 125 at 15. The Court cautioned that should the defense open the door to this topic, the "[g]overnment may walk through it." *Id*. During direct examination, Kail testified that "I never viewed my role at Netflix or any other company as a 9:00 to 5:00 job. It was always on, especially in I.T. and it was about—it's not about hours worked, it's about delivering results and being available and delivering leadership and direction." Tr. Vol. 10 at 2160:19-23. In response to the question "Did you believe you could carry out your responsibilities at Netflix while also having extra work on the side?", Kail responded "I believe I could and I believe I did." *Id*. at 2160:24-2161:2. He also testified that he did not believe there was any prohibition at Netflix in taking on side work, and that the side work he took on did not interfere with his work at Netflix. *Id*. at 2192:9-15. During cross examination, the government asked Defendant what his salary was at Netflix. Tr. Vol. 10 at 2231:12-2232:17. Over objection of

United States District Court
Northern District of California

defense counsel, the Court permitted Kail to respond. *Id*. The Court later made the following record:

> I do believe the door was opened based upon the testimony of Mr. Kail, and in considering the context of this case, the amount of the income and the sophistication of a Silicon Valley jury, I don't believe that there will be any prejudicial effect to the admission of that information. I think that it -- Mr. Kail earned a generous and comfortable income, but he was not a billionaire on that salary. And the jury has seen a number of billionaires come through our courtroom, so I think in light of the case, the sophistication of people living in Silicon Valley, which is what our jury is, that there is no prejudicial effect. The probative value is modest, I will say, but I still believe the door was opened and I believe there was no prejudice.

Tr. Vol. 11 at 2276:5-19. Defendant maintains that such testimony was in contravention to Rule 403 and his Motion *in Limine* No. 3. Mot. at 25. He argues that "[i]t is thus reasonable to conclude that the prejudicial effect of his salary – coupled with the jury's reliance on speculation rather than actual trial testimony – improperly influenced the jury's verdict." *Id*. Reviewing the government's questioning and Defendant's testimony anew, the Court finds that Kail's testimony opened the door to the line of questioning, thus rendering Kail's salary probative as to Kail's intent to defraud. Kail's salary, in light of his testimony regarding his work hours and Netflix's expectations of him, served to undermine his testimony that he did not believe he was forbidden from engaging in paid side work with Netflix vendors. This probative value, while "modest," outweighed any prejudicial effect. *See* Fed. R. Evid. 403. Indeed, Kail earned a salary on par with other high-level executives at technology companies in Silicon Valley.

Finally, the Court turns to consider the government's introduction of uncharged scheme conduct. In Defendant's Motion *in Limine* No. 4, Kail moved "to exclude evidence of Mr. Kail doing business with unnamed companies other than the nine [outlined in the indictment]." ECF 125 at 16 (alteration in original) (quotation marks omitted). The Court found that

> [t]he uncharged scheme conduct described in . . . Defendant's fourth motion *in limine* is admissible because it is part of the charged conduct and does not constitute "other crimes" evidence under Rule 404(b). Wire and mail fraud require that a defendant formed or

1
2
3
4

> intended to form a scheme to defraud. 18 U.S.C. §§1341, 1343.
> [Evidence that Defendant received shares or share options from
> other companies that did business or sought to do business with
> Netflix] speak[s] directly to whether Kail formed a scheme to
> defraud—a necessary element of the charged conduct. The
> uncharged acts are thus part and parcel of the charged conduct –the
> fraudulent scheme as a whole.

5
6
7

*Id*. at 18; *see also id*. at 18-19 (discussing *Loftis*, 843 F.3d at 1176). To reduce potential prejudice

8

to Defendant, the Court limited the government to introducing this evidence "where (1) the

9

company was a Netflix vendor; (2) Kail was involved in the contract between Netflix and the

10

vendor; and (3) Kail received something of value from the vendor." *Id*. at 20. During the

11

government's cross-examination of Kail, it asked Kail about his dealings with eleven companies

12

not mentioned in the Indictment: RelateIQ, Pure Storage, Onelogin, Cyphort, Snaplogic, BlueBox,

13

Cloudmeter, Box, Plivo, Tidemark, and Workday. Tr. Vol. 10 at 2233:5-2242:17. According to

14

Kail, the government failed to establish the three parameters as to nine of the companies. Mot. at

15

24.

16

A review of Kail's testimony reveals that the government made good on their promise—in

17

part. *See*, *e.g.*, Tr. Vol. 10 at 2233:5-2234:8 (testifying that he introduced RelateIQ to his team and

18

made money from RelateIQ advisory shares); *id*. at 2239:14-2240:4 (testifying that he was a

19

compensated advisor to Pure Storage and that a Netflix team working under Defendant had business

20

with Pure Storage); *id*. at 2236:6-2237:2 (testifying that he introduced Snaplogic into Netflix and

21

received advisory options from Snaplogic); *id. at* 2241:1-17, Tr. Vol. 11 at 2357:10-20 (testifying

22

that he was an advisor to BlueBox, which had a paid proof of concept at Netflix). But this promise

23

was incomplete. *See*, *e.g*., Tr. Vol. 10 at 2234:10-2235:10 (testifying that he had advisory options

24

from Onelogin, a Netflix vendor); *id*. at 2140:12, 2242:2-12 (testifying that Netflix "moved to

25

Workday financials" and Defendant took part in a "friends and family program" to buy its stock at

26

its initial public offering); *id*. at 2238:9-2239:2 (testifying that he was on an uncompensated

27

"informal customer council," but did not recall asking for compensation from the CEO).

28

While the Court is displeased by this failure by the government, it cannot find that the error merits a new trial. Kail's argument is styled as an objection to the admission of evidence about Netflix vendors unnamed in the indictment. Mot. at 23 ("Admission of Other Companies Undermined the Validity of the Verdicts").  But what Kail ultimately objects to is not the admission of evidence about other vendors, but the government's line of questioning—which is not evidence. In response to this questioning, Kail equivocated, denied knowledge or memory, or provided a benign response. It is not clear to the Court, in the context of this generally self-serving testimony, what admitted *evidence* Kail believes violates Fed. R. Evid. 403. *See* Mot. at 24 (arguing the government violated Fed. R. Evid. 403 without identifying prejudicial evidence). An independent review of Kail's testimony does not reveal any statement prejudicial or adverse to his case.

In reply, Kail reframes his motion as an attack on the government's line of questioning itself. Reply at 14-15 (citing *United States v. Davenport*, 753 F.2d 1460, 1463 (9th Cir. 1985) and *United States v. Meserve*, 271 F.3d 314, 326 (1st Cir. 2001)). The Court acknowledges that certain questions may in and of themselves be prejudicial. *Davenport*, 753 F.2d at 1463 ("The prejudice to the defendant was, thus, created by the question itself rather than by the testimony given in response."); *Meserve*, 271 F.3d at 326 (rejecting argument by the government that "[n]o answer to the challenged question having been given, no evidence was admitted, and thus there is no error to correct."). But neither case Kail cites is analogous to the circumstances before the Court here. In *United States v. Meserve*, the First Circuit considered the government's cross-examination of a defense witness. 271 F.3d at 323. During the questioning, the government asked the witness about disorderly person and assault convictions and asked if he was a "tough guy" since he had been in a lot of fights in his day. *Id*. Defendant argued that the witnesses' convictions were not permissible subjects of cross-examination under Fed. R. Evid. 609(a) and that the questions about the witness being a "tough guy" were improper character evidence under Fed. R. Evid. 608. *Id*. The appellate court agreed, although ultimately found such errors harmless. *Id*. at 331. Unlike the testimony

elicited from the witness in *Meserve*, the testimony elicited from Kail about vendors unnamed in the indictment does not run afoul to any evidentiary rule.

In *United States v. Davenport*, the defendant was convicted of robbing the Olympics Saving & Loan Bank in San Francisco. 753 F.2d at 1461-1462. During trial, an employee of Wells Fargo Bank testified that she was with the defendant at his apartment during the robbery. *Id*. at 1462. The Ninth Circuit considered whether a new trial was merited where the government asked this alibi witness "Did you ever tell Mary Mabes that the defendant had told you he wanted you to help him rob the Wells Fargo Bank?" *Id*. at 1463. The court found that it did, explaining:

> The question arguably was probative of the witness' possible bias and self-interest, and her credibility was therefore in issue. *See* Fed.R.Evid. 608(b). If the witness denied the question, the jury could believe or disbelieve her answer. Her denial would, however, leave uncontraverted the insinuation that the defendant had planned to engage in additional bank robberies. The prejudice to the defendant was, thus, created by the question itself rather than by the testimony given in response.

*Id*. The government's question, according to the Ninth Circuit, created a "danger" because it allowed the government to "waft an unwarranted innuendo into the jury box, knowing that the witness' denial will only serve to defend her credibility, while leaving uncontradicted the reference to the defendant's prior bad conduct." *Id*. Such a danger was particularly "acute" given "the insinuation [involved] inadmissible propensity evidence." *Id*.

Kail points to no situation in which the government "rel[ied] upon the mere putting of the question (not caring that it is answered negatively) to convey their covert insinuation." *Id*. (citing Wigmore, Evidence (3rd ed. 1940) § 988). The government's questioning here was straightforward and was not intertwined with impermissible testimony. *See, e.g*., 2239:6 ("Were you an advisor to Plivo?"), 8 (You had an advisor agreement with Plivo?"). Kail was able to deny any question without leaving any insinuations unaddressed. Unlike the questioning in *Davenport*, the government's questioning here did not in and of itself implicate propensity evidence forbidden by Fed. R. Evid.

404. As the Court explained at length in its Order on Motions *in Limine*, Kail's uncharged dealings with the third-party vendors were "part of the charged offense – the fraudulent scheme as a whole – and the government was permitted to introduce evidence of uncharged transactions to prove the first element of wire fraud – the existence of a scheme to defraud." ECF 125 at 19 (discussing *Loftis*, 843 F.3d at 1176). Given the extensive evidence about Kail's dealings with the vendors charged in the indictment, the Court cannot find that the questions, with what little facts Kail could recall, were so prejudicial such that denying a new trial would result in a miscarriage of justice.

***

At bottom, the evidence does not preponderate so heavily against the verdict that a miscarriage of justice has occurred. Defendant's motion for a new trial is DENIED.

**IT IS SO ORDERED.**

Dated: August 25, 2021

_____
BETH LABSON FREEMAN
United States District Judge