Julia M. Jayne, State Bar No. 202753
Jayne Law Group, P.C.
803 Hearst Ave.
Berkeley, CA 94710
Telephone: 415-623-3600
Facsimile: 415-623-3605
julia@jaynelawgroup.com

Attorneys for Defendant
MICHAEL KAIL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  vs.<br><br>MICHAEL KAIL,<br><br>  Defendant. | Case No. 18 CR 172 BLF<br><br>**MICHAEL KAIL'S SENTENCING MEMORANDUM**<br><br>Date:  October 19, 2021<br>Time:  9:00 a.m.<br>Judge:  Hon. Beth Labson Freeman |

# TABLE OF CONTENTS

I.    INDIVIDUAL BEFORE THE COURT................................................................3

      A.    Personal Background.....................................................................3

            1.    Personal Relationships and Character.............................3

            2.    Career at Netflix..........................................................4

      B.    The Offense Conduct .....................................................................5

II.   OBJECTIONS TO PRESENTENCE REPORT AND GUIDELINES
      CALCULATIONS ....................................................................................6

      A.    Outstanding Factual Disputes in PSR .........................................7

      B.    Calculation of Loss Under § 2B1.1 ...........................................10

            1.    Salary.........................................................................10

            2.    The Government Must Prove Loss by Clear and Convincing Evidence ........11

            3.    The Government Must Prove Loss as to Each Vendor ................14

            4.    When Determining Loss Under § 2B1.1, District Courts Must Credit
                  any Value Obtained by the Victim, Even Amid Fraudulent Conduct...........15

            5.    Netflix Suffered No Net Financial Loss................................17

                  i.      Platfora .............................................................19

                  ii.     Vistara ..............................................................21

                  iii.    Netenrich ...........................................................22

                  iv.     Docurated ..........................................................22

                  v.      Netskope ...........................................................23

                  vi.     Numerify............................................................23

                  vii.    Sumologic ..........................................................24

                  viii.   Maginatics .........................................................24

                  ix.     Elasticbox .........................................................24

      C.    Use of Gain as An Alternative Measure of Loss In this Case Is Improper...............25

            1.    If Used, Gain Must Have a Logical Relationship To Loss ................25

            2.    Even if Applied, the Proposed Gain Calculation is Inaccurate ................26

                     **i.** *Stock Options Dependent on Market Volatility Are Not An Appropriate Measure of Gain* ........................................................................................27

    **D.**    **The Fraud Guidelines Are Not Based on Empirical Data and Therefore, Courts Enjoy Broad Discretion to Disagree with Recommended Sentences** ............29

    **E.**    **The Sentencing Guidelines Calculation Supported by the Trial Evidence** ...............32

          **1.**    <u>Enhancement of Base Offense Level (PSR ¶ 26)</u> ...............................32

          **2.**    <u>Enhancement for Sophisticated Means (PSR ¶ 27)</u> ........................33

          **3.**    <u>Enhancement for Abuse of Public or Private Trust (PSR ¶ 18, 30)</u> ...............34

          **4.**    <u>Enhancement for Obstruction of Justice (PSR ¶ 21, 31)</u> ...................34

**III.**    **LEGAL STANDARD** .........................................................................................36

**IV.**    **18 U.S.C. § 3553(A) FACTORS AND SENTENCING RECOMMENDATION** ...............36

    **A.**    **The Court Should Consider General Deterrence in Combination with Other Factors** ........................................................................................37

    **B.**    **Mr. Kail's Conviction is Inconsistent with a Lifetime of Honorable Conduct** ..........38

    **C.**    **Sending Mr. Kail to Prison "Isn't A Very Effective Way to Deter Crime."** ...............40

    **D.**    **A Period of Home Confinement Satisfies the Need for Just Punishment in Light of Seriousness of the Offense** .........................................................42

          **1.**    <u>Courts Impose Shorter Sentences as Conditions Get More Harsh</u> ...............42

          **2.**    <u>Section 3553 Instructs the Court to Consider Non-Custodial Sentences.</u> ........43

          **3.**    <u>The Collateral Consequences of Mr. Kail's Criminal Conviction Are Significant</u> ...................................................................................44

**V.**    **FORFEITURE AND RESTITUTION** ...................................................................44

    **A.**    **Forfeiture** ...................................................................................44

    **B.**    **Restitution** ..................................................................................44

1

## **TABLE OF AUTHORITIES**

2 **Cases**

3 *Kann v. United States*, 323 U.S. 88, 95 (1944) ................................................................15

4 *Kimbrough v. United States*, 552 U.S. 85, 110 (2007 ......................................................30

5 *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019) ..........................................................................25

6 *Koon v. United States*, 518 U.S. 81, 113 (2008) ............................................................37

7 *Pereira v. United States*, 347 U.S. 1, 8 (1954) ..............................................................15

8 *Badders v. United States*, 240 U.S. 391, 394 (1916).......................................................15

9 *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) .................................................15

10 *Spears v. United States*, 129 S. Ct. 840 (2009) ..............................................................32

11 *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) .....................................30

12 *United States v. Armstrong*, 2020 WL 4366015 (S.D. Cal. July 30, 2020) .......................43

13 *United States v. Aunspaugh*, 792 F.3d 1302, 1309 (11th Cir. 2015) .................................29

14 *United States v. Bae*, 250 F.3d 774, 776 (D.C. Cir. 2001) ..............................................26

15 *United States v. Barnes*, 125 F.3d 1287, 1291 (9th Cir. 1997) ........................................15

16 *United States v. Berger*, 587 F.3d 1038, 1047-49 (9th Cir. 2009) ...................................12

17 *United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir. 1998) ...........................................15

18 *United States v. Brandon*, 595 Fed. Appx. 676 (9th Cir. 2014) .......................................33

19 *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) .............................................36

20 *United States v. Castro-Ponce*, 770 F.3d 819, 822 (9thCir. 2014) ...................................35

21 *United States v. Chorney*, 63 F.3d 78 (1st Cir. 1995) .....................................................27

22 *United States v. Corsey*, 723 F.3d 366, 377, 380 (2d Cir. 2013) ......................................31

23 *United States v. Crandall*, 525 F.3d 907, 912 (9th Cir. 2008) .........................................15

24 *United States v. DeRusse*, 859 F.3d 1232, 1237 (10th Cir. 2017) ....................................38

25 *United States v. Dickler*, 64 F.3d 818, 825-26 (3d Cir. 1995) .........................................26

26 *United States v. Dunnigan*, 507 U.S. 87, 95 (1993) .......................................................35

27 *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) ......................................37

28 *United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) ..............................30

1    *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017)...................................12

2    *United States v. Flowers*, 55 F.3d 218 (6th Cir. 1995) ......................................27

3    *United States v. Ford*, 21 F.3d 759, 765 (7th Cir. 1994) ...................................34

4    *United States v. Gallant*, 537 F.3d 1202, 1240 (10th Cir. 2008) ........................26

5    *United States v. Garro*, 517 F.3d 1163, 1171(9thCir. 2008) .............................35

6    *United States v. Ghertler*, 605 F.3d 1256 (2010)...............................................33

7    *United States v. Gordon*, 393 F.3d 1044, 1053 (9th Cir. 2004) .........................26

8    *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) .................32

9    *United States v. Hart*, 273 F.3d 363, 374 (3d Cir. 2001)...................................27

10   *United States v. Hussain*, Case No. 16-cr-00462-CRB, (N.D. Cal. May. 6, 2019, Dkt. 537) ...................10

11   *United States v. Jordan*, 256 F.3d 922, 929 (9th Cir. 2001)...............................12

12   *United States v. Klein*, 543 F.3d 206, 214-15 (5th Cir. 2006) ............................15

13   *United States v. Lofton*, 905 F.2d 1315 (9thCir. 1993).....................................35

14   *United States v. Martin*, 796 F.3d 1101 (9th Cir. 2015) ....................................16

15   *United States v. Mateo*, 299 F. Supp. 2d 201 (S.D.N.Y. 2004).........................44

16   *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994) ......................13

17   *United States v. Mooney*, 425 F.3d 1093, 1107 (8th Cir. 2005) .........................27

18   *United States v. Muresanu*, 951 F.3d 833 (7th Cir. 2020) .................................33

19   *United States v. Musgrave*, 647 Fed. App'x 529, 530, 538 (6th Cir. 2016) .................31

20   *United States v. Nacchio*, 573 F.3d 1062, 1080 (10th Cir. 2009) .......................27

21   *United States v. O'Brien*, 130 S.Ct. 2169 (2010).................................................6

22   *United States v. Parker*, 2020 WL 2572525 (C.D. Cal. May 21, 2020)..............44

23   *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008)..................31

24   *United States v. Randock,* 330 F. App'x 628, 629–30 (9th Cir. 2009) ................25

25   *United States v. Redemann*, 295 F. Supp. 2d 887, 898, 901 (E.D. Wis. 2003)........31

26   *United States v. Ressam*, 593 F.3d 1095, 1117-18 (9th Cir. 2010)......................36

27   *United States v. Robles*, 2021 WL 3524067, at *6 (S.D.N.Y. Aug. 10, 2021)..............43

28   *United States v. Rodriguez*, 2020 WL 5810161 (S.D.N.Y. Sept. 30, 2020).........43

*United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014)..................................................45

*United States v. Schneider*, 930 F.2d 555, 558 (7th Cir. 1991) ...........................................26

*United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) ...................................................12

*United States v. Showalter*, 569 F.3d 1150, 1159 (9th Cir. 2009). .......................................11

*United States v. Suarez-Reyes*, No. 8:12-cr-67, 2012 (D. Neb. Dec. 18, 2012) ...................31

*United States v. Swanquist*, 161 F.3d 1064 (7th Cir. 1998)..................................................27

*United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir.) ................................................13

*United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010) ..........................................12

*United States v. Wang*, 2015 U.S. Dist. LEXIS 56311 (C.D. Cal. Apr. 29, 2015)...............27

*United States v. Watt*, 707 F. Supp. 2d 149, 151 (D. Mass. 2010) ......................................31

*United States v. Whitman*, No. 12 Cr. 125 (JSR) (S.D.N.Y. Jan. 24, 2013)...........................42

*United States v. Yates*, 2021 WL 4699251 at *5 (9th Cir. Oct. 8, 2021)...............................45

*United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007)....................................................12

*United States. v. Spano*, 476 F.3d 476 (7th Cir. 2007) ......................................................43

*Williams v. New York*, 337 U.S. 241, 247 (1949) ...............................................................37

**Statutes**

18 U.S.C. § 3551..................................................................................................................44

18 U.S.C. § 3661....................................................................................................................6

18 U.S.C. § 3663A ...............................................................................................................45

18 U.S.C. § 3664(6)(e)..........................................................................................................45

28 U.S.C. § 994(j)..................................................................................................................44

**Other Authorities**

§ 2B1.1(b)(10)(C) ................................................................................................................33

https://about.netflix.com/en/news/completing-the-netflix-cloud-migration ............................19

https://digital.hbs.edu/platform-rctom/submission/netflix-behind-the-scenes/;
https://www.channelasia.tech/article/646530/ten-years-how-netflix-completed-historic-cloud-migration-aws/ ..............................................................................................................19

https://www.computerworld.com/article/2492351/netflix-guts-data-center-in-shift-to-cloud.html..........19

*See* Michael Rothfeld, *In Gupta Sentencing, A Judgment Call,* The Wall ..............................38

U.S.S.G. App. C, Vol. II at 180 ................................................................................................26

**<u>Treatises</u>**

Craig Haney, *The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment* 4 (2001)........................................................................................................................................41

Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S (2011)........................................................................................................40

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) .........................30

Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571 (February 2005) ...................................41

U.S. Dep't of Justice, National Institute of Justice, *Five Things About Deterrence* (July 2014)..............40

**SENTENCING MEMORANDUM**

Defendant Michael Kail, through his counsel, Julia M. Jayne, submits this Sentencing Memorandum in support of his request for a sentence of 12 months of home confinement, 500 hours of targeted community service, and three years of supervised release.

**INTRODUCTION**

*"Mike is not a man of temptations or shortcuts*. Rather, Mike is the type who meets every challenge head-on and succeeds despite harsh countervailing forces through hard work and perseverance.*"*

-Mark J. Sarno, CEO Vision Clinical Research LLC

Few people can claim a reputation of respect, admiration and benevolence in their profession and community. Mr. Kail can. Nearly everyone who knows Mike Kail can attest that he is deeply committed to his family and extremely generous with his time. His reputation for helping others take the spotlight and succeed extends beyond Silicon Valley.

Having grown up on a farm in Iowa, Mr. Kail moved to California in search of a life where he could cultivate his affinity for technology. Indeed, he rose in the ranks of his profession, met the love of his life, and they are raising two healthy boys. It is thus with a heavy heart that Mr. Kail will stand before this Court for sentencing.

As recognized by countless friends and colleagues (see exhibits), Mr. Kail never intended to harm any person and certainly not Netflix, a company he admired and loved working at. He made mistakes along the way in his role, as people are oft to do, but being accused of defrauding his employer, friends, and colleagues has been devastating from the start and entirely contrary to Mr. Kail's moral character. Regrettable flaws in communication and transparency are what led Mr. Kail to this point in his life -- errors he is sincerely remorseful for. But at the end of the day, Netflix suffered absolutely no loss.

Though Mr. Kail asserted his innocence at trial and maintains that the vendors were good recommendations to Netflix at the time, he respects the decision of the jury and only asks this Court for mercy and time for appellate court review (bail pending appeal). If the Ninth Circuit upholds Mr. Kail's convictions, then he will face the consequences, which he respectfully requests be a sentence of one year of home confinement, community service/public speaking, and supervised release – requested in part

because he is the sole breadwinner in his family (with many financial obligations), no loss to Netflix, overwhelming mitigation, and because of the continual risk of COVID in the world and particularly, in prisons. Sending Mr. Kail to prison will destroy many lives, not just his, which is why modern research and statistics on over-incarceration in this country are a reminder that sentencing reform is underway and should be utilized. Nothing will be gained by sending Mr. Kail to prison for any length of time; rather, incarceration would undoubtedly put him and his family at risk of financial distress, extreme trauma, depression, and illness. Moreover, present-day incarceration, riddled with quarantines and isolation, makes any prison term far more difficult to serve than ever before.

Considering Mr. Kail as an individual who sought to live a law-abiding life and who made amends for his mistakes by quickly paying Netflix for the sum he received in commissions means a lengthy custodial sentence would have unintended and disproportionately severe consequences.

**PROCEDURAL BACKGROUND**

Mr. Kail was charged with wire fraud, mail fraud, honest services fraud and money laundering on April 26, 2018. After a three-week trial starting on April 7, 2021, Mr. Kail was found guilty on Counts 1-4, 6-19, Count 20 (honest services fraud only) and Counts 21-29 of the Indictment. On October 19, 2021, he will stand before this Court for sentencing. He hopes this Court will learn more about who he is in this sentencing memorandum and from the many letters written by family and friends.

The guidelines in this case are heavily disputed. Per the defense calculation, Mr. Kail faces an advisory Offense Level 9 (4-10 months), while the government asserts an inflated position of Offense Level 32 (121-151 months). The U.S. Probation Officer recommends a sentence of 60 months. Presentence Investigation Report (PSR), Recommendation, p. 26. This variance reflects some of the Section 3553 factors discussed below, but does not account for others, including the fact that not a single witness testified there was a sum of money Netflix was deprived or defrauded of because of Mr. Kail.

For the reasons set forth below, it is respectfully submitted that the Court sentence Mr. Kail to an alternative-custodial term of twelve months to be served on electronic monitoring, 500 hours of community service, and three years of supervised release. The proposed sentence would be sufficient but not greater than necessary to fully satisfy the sentencing objectives this Court must consider pursuant to 18 U.S.C. § 3553(a).

**DISCUSSION**

I.     **INDIVIDUAL BEFORE THE COURT**

   A.  **Personal Background**

   Mr. Kail was raised in Farnhamville, Iowa, in a town that to this day only has about 400 residents. His father, a decorated Vietnam veteran, was a farmer, and his mother worked in a tiny school district where Mr. Kail gradated in a class of about 20 students. As recounted by his wife, Raegan Kail:

> He did not have an easy childhood, he did not come from privilege. He spent his summers baling hay, raising pigs, detasseling corn, cleaning up the slaughterhouse, and re-roofing homes. He was raised by devout, tough, but loving people who set the example of hard work for their sons. Even his younger brother, who was born deaf in this remote corner of the world, would overcome his disability to become a restaurant chef.
>
> When his family was able to purchase their first computer in the early 80s, Mike fell in love and knew that computer science, not farming, would be his future.

*See* Exh. A (family letters).

   Mr. Kail moved to California in pursuit of a career in the technology industry. He not only achieved his goal, but more importantly, met his wife, Raegan. Together, they've been raising two boys and as his wife reports, he has always been a supportive husband and devoted father. *Id.*

   Mr. Kail's career and professional reputation continued to grow over the years – countless times, he has been named one of Silicon Valley's top global technology executives, top CIO, global power leader, top dev ops influencer and a thought-leader. Exh. C (accomplishments). Mr. Kail earned his reputation by working hard, studying, learning, and forming long-lasting relationships with colleagues above and below him. Many of those people have continued to stand by his side.

   1.  <u>Personal Relationships and Character</u>

   Had audience members been permitted into the courtroom for trial, this Court would have noticed numerous supporters in the gallery on a daily basis. Mr. Kail's friends, family, and colleagues wanted to appear to show their love and support for a man they respect. Even after trial, those who know Mr. Kail best have stood by his side, submitting numerous letters of support. *See* Exh. B (letters from colleagues).

   His work and running friends write glowingly of Mr. Kail's integrity, strong moral compass and humbleness. Exh. B. Countless people describe their respect and gratitude for Mr. Kail's guidance and friendship over the years. The letters of support are not from casual observers – they are people who have

known Mr. Kail for many years. They have witnessed his upstanding character and his unwavering

dedication to his family and his field. They have been guided by his leadership, relied on him during

personally challenging times, and seen him act with honesty and integrity. Many people write how

thankful and grateful they are to have Mr. Kail in their lives and how he continues to inspire them.

Even Mr. Kail's former coworkers at Netflix found him to be an inspirational leader and an

honest person. *See* 360 Reviews (Trial Exh. 9). Expected to be honest in their reviews, numerous

employees who worked with him on a daily basis and who had firsthand knowledge of what he was

doing at Netflix wrote positively about his character traits and his leadership. Their words are not erased

by the conviction.

Indeed, the level of respect and support that Mr. Kail has in his community, even after his

conviction, is commendable and not easily earned. Friend after friend wrote in, hoping for their voice to

be heard with this Court. This Court is urged to read each letter to learn more about Mr. Kail's qualities

throughout his life and the number of people who have benefited from his advice and relationships.

2.   Career at Netflix

Mr. Kail began working for Netflix in June 2011. He was promoted to VP of the IT Department

four months later. In August 2014, after receiving an offer from Yahoo!, he resigned from Netflix.

During Mr. Kail's time at Netflix, he was reviewed by his peers, colleagues and superiors. Those

reviews included the following comments:

- "A leader who forces outside our comfort zone, to challenge norms, and remind us of all the innovation that is going on in our space outside of Netflix." - Bobby Meneses

- "In my 6 years at Netflix and through numerous org changes, this is the best leadership I've seen in our IT Ops Org.  You are forward thinking and are consistently seeking out and giving us visibility into cutting edge technologies" – Jose Izquierdo

- "I have not worked for a better IT leader. You have been truly inspirational and have a great vision. I have gotten the opportunity to work on as much, if not more, cool and cutting edge technology in the two years that I have been here at Netflix, as I did my entire pre-Netflix career. I like the fact that you are very open and direct with your opinion." - Preetam Kothapally

- "... this past year has been extremely refreshing to have someone that not only understands the work that my team does, but also the challenges and excitement of it all. I believe you give great direction, with passion and honestly, which makes you a great leader." - **Ashley Sprague**

- "You've brought an empowering change to IT Ops at Netflix with your drive for change and new technology that will enable the employees we support and our staff as well." - **Ashley Sprague**

4

- "You do [an] amazing job at staying current and in-touch with both the technology and potential leaders in this space, fostering new ideas." - Bill Burns

- "You're one of the hardest-working people at Netflix. You're on top of everything and seemingly-always available. You've had a HUGE impact on the Netflix infrastructure in a very short amount of time." - Chris Fregly

- "... It has been a real pleasure working in your organization... and it is great to be in the presence of someone that is blazing trails like you. I love how connected you are into the tech world. The companies and products that you introduce us [t] are cutting edge, and it took me a little bit to really get it, but I know you **don't expect every company** you introduce us to have a role at Netflix. **I never feel pressured** to force something to work that myself or my team doesn't believe in, and I know that you like to see creative solutions for complex problems." - Justin Slaten (emphasis added).

- "Mike has made great progress this year in shifting his team from systems to apps.... Keep driving the big picture of HW/network commoditization/consumerization and shifting the big value source of Employee Tech to be great software." - **Reed Hastings**

*See* Trial Exh. 9. Countless more flattering comments were included in his 360 reviews. No one could deny that Mr. Kail was an inspirational leader who introduced new technology to Netflix that was exciting to the employees and that forever changed Netflix's IT infrastructure for the better.

### B.  The Offense Conduct

While the PSR covers a great deal of material, this Court having presided over the trial and post-trial litigation has the best information as to the offense conduct. Mr. Kail will not belabor the facts of the case here, but does object to certain inaccurate or incomplete portions of the PSR, as described in the Objections section of the final draft, at pages 24-25, and throughout the defense comments in the PSR.

Mr. Kail's conduct in this case is perhaps best described by his own words:

> I deeply regret losing Reed Hastings' and many former employees' trust. I realize that had I been fully transparent with him regarding my advisor positions and compensation, I likely would not have ended up in my present situation. I made incorrect assumptions about what was expected.

PSR ¶ 22. Indeed, had Mr. Kail communicated better, he may not have found himself convicted of multiple felonies. Unfortunately, his assumptions and errors in judgment failed to reveal his unwavering best intentions for Netflix and for that, he is terribly sorry.

While the Court is well aware of the government's perspective on the offense conduct, Mr. Kail maintained his innocence and challenged the assertion that his intention was to defraud his employer or his friends and colleagues. In the words of Alex Gorbansky, who testified at trial: "[Mike] never asked for anything. We offered him equity because of the incredible value he brought to our team and

5

1   organization not because of any requests he made. Mike had a stellar reputation as one of the best

2   technologists and advisors in Silicon Valley." Exh. B (Gorbanksy).

3         This conforms to Mr. Kail's perspective. Mr. Kail believed he was fulfilling Reed Hastings'

4   directive by working as efficiently as possible to take the IT department to the cloud within an

5   impossibly aggressive deadline. He never sought to put his own interests first, as that would go against

6   his very nature and upbringing, as attested to by countless individuals who know him well.

7         While no doubt Mr. Kail should have been completely transparent about the compensation he

8   received, the fact remains, at the end of the day, that Netflix benefited from the startups he introduced to

9   his teams. The IT Department succeeded in moving to the cloud at a time when it was groundbreaking.

10  Netflix was forward-thinking and willing to experiment with, among others, the novel technology

11  developed by the various companies who were introduced at trial. From advertising technology, to

12  security, to the swift identification of technological failures (which ultimately affected the end-customer),

13  Mr. Kail's implementation of his vision for Netflix help lead it to the successful company it is today.

14        Importantly, there was a time when the Netflix employees felt fortunate to be able to try out

15  innovative technology. Netflix engineers were inspired to stay at Netflix – especially when working for

16  Mr. Kail – because of the unique opportunities they were given to test out and integrate the type of cloud

17  technology that is commonplace today. During this time, nobody claimed that Mr. Kail acted against

18  Netflix's best interests. Not once.

19  **II.     OBJECTIONS TO PRESENTENCE REPORT AND GUIDELINES CALCULATIONS**

20        While the rules of evidence do not apply at sentencing, certain sentencing factors can be proved

21  to a judge by a preponderance of the evidence. *United States v. O'Brien*, 130 S.Ct. 2169 (2010). And

22  while 18 U.S.C. § 3661 places no limitation concerning the background, character and conduct of a

23  person, this Court ought to rely on the totality of the facts presented at trial, rather than partial testimony.

24  To the extent it was not introduced at trial or conflicts with trial testimony/evidence, this Court should

25  disregard that information in the PSR. Moreover, the PSR is intended to be a neutral document,

26  presenting information from the totality of the evidence and not just a recitation of the government's

27  theory.

28        With respect to disagreements of facts or unresolved issues, the Probation Officer included some,

but not all, of defendant's comments and objections, which of course this Court is asked to consider. The outstanding disputes are noted in the PSR Addendum at pages 24-25 and below.

**A.  Outstanding Factual Disputes in PSR**

Mr. Kail timely objected to various paragraphs in the Offense Conduct portion of the PSR. The following remain in dispute:

*Paragraph 2*

The PSR should note that Mr. Kail was found not guilty of mail fraud (pecuniary fraud) on Count 20, pertaining to Maginatics.

*Paragraph 7*

The PSR states that Mr. Kail used his position "to direct Netflix business to startup companies that were willing to pay him…" This is not correct. Mr. Kail introduced startup companies to his teams – including companies that he was *not* advising or receiving any sort of compensation from. He introduced many startups to his teams, as that was part of his job. Further, the defendant opposes the inclusion of the uncharged companies, as the government did not present evidence that Mr. Kail was "involved in" the contracts of those companies.

For example, the PSR states that Mr. Kail was an advisor to **OpenDNS** when they did business with Netflix. This is not correct. A different employee was the one who was an advisor to OpenDNS, signed the Netflix contract with OpenDNS, and received stock options from them. Mr. Kail was <u>never</u> an advisor to OpenDNS.

RelateIQ is another company where evidence is lacking. The government never demonstrated that Mr. Kail had any involvement in the RelateIQ contract with Netflix. Thus, it should not be included.

*Paragraph 8*

It should be clarified that the CFO did not "complain" of a revenue recognition issue as the reason for the $155,000 payment and certainly not to Mr. Kail. Mike Asher emailed Ben Werther regarding the $155,000 for the "remaining 5 months . . . per the letter of the contract. . ." Exh. 1110. Mike Asher testified that they could have held Netflix liable for the entire balance of the contract, but that they compromised on $155,000. (R.T. Vol. 3, p. 517).

*Paragraph 9*

Mr. Kail holds Sumologic stock in a joint spousal account, but those have not been sold. The value is speculative unless and until Mr. Kail sells the shares. Therefore, he has not "profited" any amount to date.

Further, though Mr. Kail complained of problems with Sumologic (as one would see with any new startup), the product itself was "useful," according to Ashi Sheth. (R.T. Vol. 8, p. 1670-71). As described below, at the time, Sumologic saved Netflix from paying for a far more expensive and inferior product called Splunk.

*Paragraph 10*

The PSR notes that Mr. Kail did not list his role at VistaraIT or Netenrich "because of his receipt of any referral fees for business with a Netflix vendor would have revealed the fraud scheme." First, Mr. Kail testified that he could not recall exactly which companies were listed on his LinkedIn profile. Second, he would not have disclosed any compensation on LinkedIn for any company, including Vistara and Netenrich, not because he was hiding anything, but because it is completely inappropriate include compensation on LinkedIn. Moreover, it would be a violation of the terms of any contract. Also, the government never produced a copy of Mr. Kail's LinkedIn profile although Rob Fry testified that he was aware of Mr. Kail's advisory positions because of his LinkedIn updates. (R.T. Vol. 5, p. 1139).

*Paragraph 11*

The sentence that Mr. Kail "made it clear that companies looking to do business with Netflix's IT operations had to do business with him as well," is not supported by the trial evidence. Countless vendors testified that they approached Mr. Kail, not the other way around, to serve as an advisor. No company that actually did business with Netflix held the belief that they "had to" make him an advisor or employ him in any capacity. In each instance, it was the vendor's suggestion to make Mr. Kail an advisor.

The comment in footnote six is correct – Unix did refer other clients to Vistara and therefore, was able to earn commissions on those referrals. The text message referred to that other business. The trial evidence confirmed that Vistara paid Unix commissions on those non-Netflix referrals.

*Paragraph 12*

To complete the commentary on Frank Slootman, shortly after meeting Mr. Kail, they had a

pleasant email exchange about typical stock grants after Mr. Kail noted that he referred them to a different potential client, USPS. (Exh. 680). Mr. Slootman – not the other way around – asked Mr. Kail what equity consideration he received from other companies. Thereafter, there was no more discussion of it and the ServiceNow contract was unaffected at Netflix. And in a meeting with Mr. Rewari after the alleged dinner, Mr. Slootman never said anything negative about Mr. Kail. (R.T. Vol. 7, p. 35).

*Paragraph 13*

The summary in this paragraph should reflect the complete testimony at trial, not just the government's spin. To complete the discussion regarding the products, the PSR should include evidence from trial confirming that Numerify was in fact a *great fit* for Netflix. For example:

- The contract was renewed by Ashley Sprague for the same $85,000 as the original contract after Mr. Kail left Netflix.
- Ashley Sprague was a promotional speaker on behalf of Numerify.
- Ashi Sheth gave a testimonial in favor of Numerify.
- Ashi Sheth was featured in a Numerify video.

As for Docurated, it was *not* replaced by a custom-built tool and the PSR should reflect evidence from the whole trial, not just a single witness who was mistaken. Ashi Sheth, who testified that Docurated was intended for the *legal department* was 100% *incorrect* and was impeached by other witnesses who understood Docurated was never at or intended for the legal department. There is zero corroboration for his statement that Docurated was a product used or replaced by the legal division. In fact, the product used and possibly replaced in the legal department was called Sherlock, *not* Docurated. (R.T. Vol. 11, p. 2385) (Kail). This is because Docurated was a SaaS product (something Mr. Sheth was unaware of) and was used by FP&A and marketing teams.

Vistara was not duplicative of any product in use at Netflix. Rob Fry "recommended in favor of going with Vistara." (R.T. Vol. 5, p. 1141). He verified that they would have gone into *full production* with Vistara (had it not been terminated due to the allegations). *Id.* at 1142. If it was "duplicative" of other products, he would not have held this opinion. He also recognized that rollouts take significant time and that a given product is not necessarily applicable to every single department at Netflix.

Fraud loss, enhancements and restitution are addressed below.

**B. Calculation of Loss Under § 2B1.1**

Mr. Kail objects to the United States Sentencing Guidelines ("USSG") calculation in the PSR and the anticipated calculation by the government.

The government urges this Court to impose an 18-level enhancement based on an alleged loss or gain figure of over $3.5 million. The probation department estimates a 16-level enhancement for loss.

Mr. Kail submits that Netflix suffered no loss. With no loss amount, gain becomes an irrelevant inquiry. *See* Section II(C) *infra*. As explained below Mr. Kail's adjusted offense level should be Level 9 with a sentencing range of 4-10 months.

### 1. Salary

Though the probation officer disagrees that salary should be included (PSR Addendum, p. 23), the government may assert that Mr. Kail's salary for the years 2012 to 2014 should be included in the loss and/or gain calculation (gain only if there was a loss but the loss amount cannot be reasonably determined). Under either theory, Mr. Kail's salary cannot be included. *United States v. Hussain*, Case No. 16-cr-00462-CRB, (N.D. Cal. May. 6, 2019, Dkt. 537), *aff'd sub nom.* 818 F. App'x 765 (9th Cir. 2020). In *Hussain*, the defendant was found guilty of conspiracy to commit wire fraud, fourteen counts of wire fraud, and one count of securities fraud "in the run-up to Autonomy's acquisition by Hewlett-Packard ('HP')." *Id.* at *2. At sentencing, the government argued (in part) that "the Court should calculate the gain that resulted from the offense by considering Hussain's salary, bonuses, and equity compensation . . . " *Id.* at *12. The court rejected this argument. After concluding that loss could not be reasonably determined, the court noted it should "look to the gain that indisputably and solely resulted from the fraud," and including compensation would be overbroad. *Id.* at *13.

The court reasoned that "[s]ince Hussain's salary, bonuses, and equity compensation are, at least in part, the result of legitimate work, his salary, bonuses, and equity compensation cannot be said to have 'resulted from the offense.' *See* U.S.S.G. § 2B1.1 cmt. n.3(b). And the Government offers no mechanism—nor does the Court see any—to disentangle what portion of Hussain's income … was attributable to his legitimate work and what portion was attributable to the fraud for which he was convicted." *Id.* at *12-13.

Much like the prosecutors in *Hussain*, the government is expected to argue for an improper

application of § 2B1.1 cmt. n.3 because it includes Mr. Kail's salary in its § 2B1.1 calculations. Yet Mr. Kail's salary and benefits are not attributable to the fraud: regardless of the charges, Netflix would have paid Mr. Kail's salary, as he worked on a number of projects extending far beyond the nine vendors at issue in the trial. Further, the government "offers no mechanism… to disentangle what portion" of Mr. Kail's salary is properly attributable to the fraud.

For example, Mr. Hastings explained that being an advisor was not the problem with Mr. Kail's conduct; the problem was *not* having full knowledge of the stock options (R.T. Vol. 3, p. 665-666). Mr. Hastings knew Mr. Kail was an advisor from LinkedIn and press releases. *Id.* at 629-630. Further, Mr. Hastings sought to keep Mr. Kail at Netflix when he announced he was leaving for Yahoo!; he never opined that Mr. Kail introduced a bunch of useless technology to Netflix and he never believed Mr. Kail was making "bad decisions" for Netflix. *Id.* at 652, 681-682. David Wells similarly didn't have a problem with employees earning money on the side (as he and Reed Hastings did from sitting on boards of companies who did business with Netflix); the problem was he didn't know about it. (R.T. Vol. 9, p. 1914-1915). Mr. Wells believed Mr. Kail was a strong leader and was working to improve Netflix. *Id.*

Mr. Kail revolutionized the IT Department and not a single person would dispute this. No one at Netflix testified that they lost a single dollar as a result of Mr. Kail's advisory compensation with vendors. Accordingly, there is absolutely no basis to include his salary as a measure of loss or gain and it would contravene the holding in *Hussain.*

Furthermore, to clarify, in 2013, Mr. Kail's actual salary was $550,000. In January and July 2013, he sold Netflix stock that he had purchased through their program. The stock option purchases came out of Mr. Kail's paycheck. He allocated a percentage of his salary to the Netflix stock purchase on the open market. Over time, those stock holdings grew, so that when he cashed out in 2013, the stock had increased in value. This is reflected in the 2013 W2.

## 2. The Government Must Prove Loss by Clear and Convincing Evidence

The government bears the burden of proving the facts necessary to enhance a defendant's offense level under the Guidelines. *United States v. Showalter*, 569 F.3d 1150, 1159 (9th Cir. 2009). Here, the government is expected to argue for an 18-level enhancement under USSG § 2B1.1(b)(1)(J). Since the requested 18-level enhancement would have a disproportionate effect on the sentence Mr. Kail would

otherwise receive, the government must prove loss by clear and convincing evidence, not the typical preponderance of the evidence standard. *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007); *United States v. Berger*, 587 F.3d 1038, 1047 (9th Cir. 2009); *United States v. Jordan*, 256 F.3d 922, 929 (9th Cir. 2001).

Further, to apply any enhancement based upon losses actually caused by Mr. Kail, the government must prove the existence of a loss, the loss amount, and the causal nexus between the loss and Mr. Kail's conduct. *United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010); *Berger*, 587 F.3d at 1047-49. "Actual loss" is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." USSG § 2B1.1, cmt. n. 2(A)(i). "Pecuniary harm" is "harm that is monetary or that otherwise is **readily measured in money**" and does "not include emotional distress, harm to reputation, or other non-economic harm." *Id.*, cmt. n. 2 (A)(iii) (emphasis added). "This economic harm can be manifested directly—such as by increasing the price the victim paid for a good—or indirectly—such as by providing the victim with lower-quality goods than it otherwise could have received." *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017) (finding loss to the victim "is not a *necessary* consequence of all the kickbacks" defendant received).

This Court's Rule 29 decision does not, on its face, disagree with this formulation of the law. *See* Order Denying Mot. for Judgment of Acquittal and Motion for New Trial, Doc. 264 (August 25, 2021) ("Order"). But the Court's conclusion that the government had introduced sufficient evidence of economic harm to Netflix (at least as to some vendors) was inconsistent with that applicable law.

In its Order, the Court concluded that there was evidence that either the contract terms were unfavorable or the contracted-for technologies themselves were lacking, purportedly causing harm to Netflix. However, as a matter of law, the Second Circuit has held that "schemes that do no more than cause their victims to enter into transactions they would otherwise avoid . . . do not violate the mail or wire fraud statutes" unless they "depend for their completion on a misrepresentation of an essential element of the bargain." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007). "[L]ack of information that might have an impact on the decision regarding where . . . money is spent, without more, is not a tangible harm and therefore does not constitute a deprivation of section [1343] 'property.'" *Finazzo*, 850 F.3d at 109 (quoting *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994)).

1    The Eleventh Circuit's approach is in accord with the Second Circuit's, holding that a jury cannot

2    convict a defendant of wire fraud based on misrepresentations amounting only to deceit: "Thus, even if a

3    defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in

4    an acquittal if the jury nevertheless believes that the alleged victims 'received exactly what they paid

5    for.'" *United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir.), *as revised* (Oct. 3, 2016), *opinion*

6    *modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016).

7    In this case, even *assuming* that evidence introduced at trial showed unfavorable contract terms or

8    lackluster technologies, there would not have been any tangible harm to Netflix (or risk of harm) because

9    in each case, Netflix received the full benefit of its bargain and Mr. Kail did not make misrepresentations

10   about any essential element of the bargain. For this reason, the probation officer's assessment that the

11   "loss in this case is the amounts Netflix paid to these vendors as the services were not honestly

12   rendered," is an incorrect statement of the law. PSR Addendum, p. 24, para 11. Netflix's right to full

13   disclosure does not amount to pecuniary harm "readily measurable in money." USSG § 2B1.1, cmt. n.

14   2(A)(i).

15   This Court further opined that "the government offered evidence supporting an inference that

16   Netflix would have entered into more favorable contracts with vendors absent Kail's scheme." Order 10.

17   In reaching this conclusion, the district court relied on evidence purporting to show that Mr. Kail's

18   actions led to "contracts for technology his team considered subpar," Order 4, specifically discussing

19   contracts with Netskope and Vistara. But the evidence in fact shows that these products would take time

20   to be successful, which is normal—indeed, expected—for start-ups. **That evidence does not indicate**

21   **that Netflix got less than it bargained for** or that it would not have entered into the contracts absent the

22   alleged fraud. And this begs the question: what is the dollar amount of a vendor contract absent the fraud

23   (*i.e.* how is "more favorable" quantified)? In fact, regarding Netskope, Rob Fry later testified that

24   Netskope ultimately got to a "stable version that would run on our systems. And so they've done a good

25   job with it." (R.T. Vol. 5, p. 1177). And as to Vistara, Rob Fry recommended "in favor of going with

26   Vistara," (R.T. Vol. 5, p. 1141), said they continued working with Vistara "because they continued to

27   show progress," (R.T. Vol. 5, p. 1174), and believed that it would have gone into "production" if the

28   contract had not been terminated, (R.T. Vol. 5, p. 1142).

13

Because it is normal industry practice for such products to take time to get to an error-free state, Netflix would have *anticipated as much* when it entered into these contracts. For much the same reason, evidence that certain products were not immediately market-ready does not show that Mr. Kail's actions were capable of causing or actually did cause Netflix tangible economic harm.

The government could have taken an alternative route to showing harm by establishing that Netflix lost out on contracts from lower-priced or higher-quality vendors due to Mr. Kail's actions. The government itself had initially presented this as its theory of harm. In its opening, the government asserted that the evidence would show that the vendors at issue "cut in line" and that there were "two companies [] competing for the prize of a Netflix contract." *Id.* (quoting R.T. Vol 2, p. 198, Kaleba Opening). But it did not adduce such evidence at trial. As such, the Court should be skeptical of whether the government can prove its proposed loss amount.

In fact, under neither the clear and convincing standard nor the preponderance standard, the government can't prove its guesstimate *du jour* as to loss. In the Indictment, it alleged that Netflix suffered a loss of $716,000. Post-trial, that loss figure has increased nearly fivefold. At trial, the government never argued that Netflix lost a specific sum of money. Keker & Van Nest, meanwhile, proposes an equally dubious number in support of Netflix's restitution request. Yet neither the government nor Netflix's outside counsel have any support for their positions of *actual loss*. The government provides no citations to the trial record as to any witness who claimed Netflix overpaid for a product, expected its money back, or that Netflix would have never purchased the software at issue. Instead, the government simply throws the kitchen sink into its analysis and posits that every single contract resulted in a financial loss to Netflix, evidence be damned. The law certainly requires more: if these numbers are to form the basis of a guideline calculation, they must be supported with evidence, must be certain, and must be reliable. They are not.

### 3.   The Government Must Prove Loss as to Each Vendor

To establish pecuniary or honest services fraud, the government must have proven the communications supporting those counts were "used . . . to carry out or attempt to carry out an essential part of the scheme." *See* 9th Cir. Model Jury Instrs. § 8.121, 8.124; Jury Instr. Nos. 42, 42A, 43, 43A. The government, in seeking the full contract amounts as loss, fails to show how the charged

1   communication (the mail or wires) as to a distinct vendor was used to carry out an essential part of the

2   scheme to defraud – the *fourth* element of pecuniary fraud ("defendant used, or cause to be used, an

3   interstate wire communication to carry out or attempt to carry out an essential part of the scheme."). *Id.*

4   The requirement of a mailing or use of the wires that furthers the alleged scheme is central to the

5   offense. "The federal mail fraud statute does not purport to reach all frauds, but only those limited

6   instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be

7   dealt with by appropriate state law." *Kann v. United States*, 323 U.S. 88, 95 (1944). To be part of the

8   execution of the fraud, each charged mailing must be "incident to an essential part of the scheme,"

9   *Pereira v. United States*, 347 U.S. 1, 8 (1954), or "a step in [the] plot," *Badders v. United States*, 240

10  U.S. 391, 394 (1916). *See also Schmuck v. United States*, 489 U.S. 705, 710-11 (1989).

11  As such, the government was obligated to show that each of the charged communications was

12  "part of the execution of the scheme as conceived by the perpetrator at the time." *Schmuck*, 489 U.S. at

13  715. Yet at trial, there was *no linkage* between the individual vendors and the charged communications

14  (the mails/wires). In other words, the government was obligated to, but did not, show that each as to each

15  vendor, Mr. Kail's actions were intended to permit the negotiation of "more favorable contracts" with

16  Netflix through the deceptive acts, and that the mails/wires furthered that deception. Without proof that

17  *each* individual communication was used to carry out that scheme, the government's purported loss

18  figures hold even less weight.

19          4.  <u>When Determining Loss Under § 2B1.1, District Courts Must Credit any Value
20              Obtained by the Victim, Even Amid Fraudulent Conduct.</u>

21  It is well-settled that district courts should "take a realistic, economic approach to determine what

22  losses the defendant truly caused or intended to cause rather than the use of some approach which does

23  not reflect the monetary loss." *United States v. Crandall*, 525 F.3d 907, 912 (9th Cir. 2008) (quotation

24  omitted). In doing so, district courts must "give credit for any legitimate services rendered to the victims"

25  by the defendant (or in this case, by the vendors). *United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir.

26  1998); *United States v. Barnes*, 125 F.3d 1287, 1291 (9th Cir. 1997) (value of unlicensed attorney's

27  services to his clients should be credit towards any loss); *United States v. Klein*, 543 F.3d 206, 214-15

28  (5th Cir. 2006) (holding that defendant was entitled to credit for the value of drugs his patients self-

1   administered and thus, actual loss should be reduced by the value of those drugs dispensed); §2B1.1 cmt.

2   n.3(E)(i) ("loss" is reduced by "the fair market value of the property returned and the services rendered,

3   by the defendant … to the victim before the offense was detected.").

4        Indeed, the Ninth Circuit has recognized that "[i]n light of the extensive precedent acknowledging

5   value may be rendered even amid fraudulent conduct," in situations where the victim "**received the**

6   **services for which he bargained**, despite the fact that he received them from a person who was not

7   legally authorized to offer them," "the victim has sustained no loss." *United States v. Barnes*, 125 F.3d at

8   1291 (internal quotations omitted) (emphasis added). Unequivocally, per note 3(E)(i) of § 2B1.1, the

9   "credits against lost" must be calculated. In other words, any loss amount "shall be reduced" in this case,

10  by the software delivered to and used by the victim. Thereafter, it is the government's burden to prove

11  the fair market value of the deliverables was *less than* Netflix paid for them -  if it can do so.

12       Consistent with this principle, *United States v. Martin*, 796 F.3d 1101 (9th Cir. 2015) makes clear

13  that courts should adopt a **net loss** approach when calculating loss for purposes of § 2B1.1 (for pecuniary

14  or honest services fraud). In *Martin*, the defendant fraudulently obtained government contracts by

15  misrepresenting her company's assets to qualify for government programs designed to aid disadvantaged

16  businesses. *Id.* at 1103-04. Martin fully performed on the contracts and received about $22 million from

17  the government. *Id.* at 1104.  In endorsing a net loss calculation, rather than a gross loss calculation, the

18  Ninth Circuit found that the government "had offered no persuasive reason to impose a rule whereby the

19  entire value of the contract would be deemed losses for the government, with no credit given for the

20  value of the services returned." *Id.* at 1110. Instead, the court held that "[b]y fully performing all of the

21  contracts, Martin gave the government considerable value"; therefore, "[i]t would be unjust to set the loss

22  resulting from her fraud as the entire value of the contracts." *Id.* "Paying a premium" for falsely-

23  promised DBE compliance is "actual loss," *Martin* explains – and the government must prove that "there

24  was any such price difference" and quantify it. *Id.* at 1111. If the government cannot prove there was a

25  price difference at all, then there is no loss and shifting to gain is inappropriate. *Id.*

26       This very issue was addressed recently in this district in *United States v. Bhikha*, 19-CR-00115

27  CRB (Dkt. 141) (N.D. Cal., August 3, 2021). While working as a Senior Director at Cisco Systems, Inc.,

28  Mr. Bhikha had accepted kickbacks from a third party in exchange for facilitating Cisco's business

1    relationship with that company. *Id.* He also awarded Cisco business to overseas companies that he

2    secretly owned. *Id.* Citing *Crandall* and *Martin*, the Hon. Judge Breyer opined that the realistic,

3    economic approach to determine loss "reflects a commonsense understanding that a defendant who

4    makes off with all of a victim's money while providing nothing in return should receive a harsher

5    criminal punishment than a defendant who, though guilty of fraud, provides the victim with some

6    valuable service." *Id.* at 5. He further concluded that, "[c]onsistent with the rule that the defendant should

7    receive credit only for the 'fair market value' of the services, there could still be a loss if the government

8    presented evidence that it had 'paid a premium contract price above what it would pay for other contracts

9    under normal competitive bidding procedures." *Id.* (citations omitted).

10       In that case, when evaluating loss for sentencing purposes, Judge Breyer ultimately offset the

11    government's alleged "loss" of $10 million (the contract amount defendant's companies received from

12    Cisco) with the estimated value of the services those companies provided (even though Cisco submitted a

13    victim restitution statement claiming $10 million in losses). *Id.* at Dkt. 126-7. The Court concluded that

14    the "fair market value of Bhikha's services at least equaled the amount that Cisco paid to Bhikha's

15    companies because those services resulted in tens of millions in profits for Cisco . . . [ ] any argument

16    that Bhikha's companies charged more than fair market value is pure conjecture." *Id.* at 6. The Court

17    resolved that the defendant was entitled to a credit at least equaling the victim's payments to his

18    companies with no increase to the guidelines on this point.

19                        5.  Netflix Suffered No Net Financial Loss

20       Contrary to its opening theme, the government did not actually present evidence that the vendor

21    contracts were "more favorable" than they otherwise would have been or that Netflix somehow overpaid

22    because Mr. Kail was involved. As such, the Court must engage in a net loss analysis, as was done in

23    *Bhikha* and *Martin*.

24       The Court will see from the trial record that not a single witness ever testified that the vendors'

25    prices were unreasonable for the technology delivered, that Netflix would otherwise have paid less for

26    the same products and services (had they existed), or that the products did not align with Netflix's IT

27    goals at the time. Rather, the evidence showed Mr. Kail negotiated prices downwards and the vendors'

28    contracts responded directly to the needs and demands of *numerous* Netflix engineers.

1       No one complained that the contracts were "bad deals" for Netflix and no witness alleged that the

2  contracts – other than nondisclosure – ran afoul of any of Netflix's standards. While the technology

3  sometimes glitched or required repairs because it was in a developing state, it was never deemed subpar,

4  particularly when there was no direct competitor to the trial vendors' products. Their technology worked

5  but similar to fully developed software, it was prone to errors (and history shows all found widespread

6  success). The trial testimony was consistent that new software was not expected in a perfected state.

7       Aside from no evidence of pecuniary loss, Netflix received valuable services despite Mr. Kail's

8  receipt of stock options and/or commissions from the vendors. All of the vendors performed what their

9  contracts and scope of work promised. Startup technology, by its very nature, will have bugs and will

10 need to be tweaked to fit the customer's needs and should not be measured in the same manner as a fully

11 developed piece of equipment. As Rob Fry testified, the companies "[Mike Kail] brought forward for the

12 challenges that we had made sense." (R.T. Vol. 5, p. 1162). In other words: Mr. Kail did *not* introduce

13 any unsuitable vendors. Rob Fry further explained that when one is assessing a startup:

14         Today it's not why you're keeping them around. It's typically about trying to solve the problem --
15         - it's not about the problem you're trying to solve today, it's about, you know, as a startup, they
           don't have a lot of capability and you're looking at their roadmap of what they're going to do for
16         you in the future and you're constantly assessing them.

17 (R.T. Vol. 5, p. 1161). As such, new technology will inevitably be prone to errors; that does not render it

18 worthless or subpar. As noted by Mr. Fry, the customer and the vendor are in a partnership to move

19 things forward in a mutually beneficial way. And that is exactly what he was doing with several vendors.

20      Without a doubt, Netflix benefitted from the technologies the vendors provided because it gave

21 Netflix a competitive edge – and Mr. Kail was a major force in moving the IT department to the cloud, as

22 directed by Mr. Hastings. That cloud presence catapulted Netflix's success. During the time Mr. Kail was

23 at Netflix, it grew from 25 million streaming subscribers to *over 80 million*. (R.T. Vol. 10, p. 2127)

24 (Kail). This was not by coincidence.

25      And it was not simply interesting content and programs that brought Netflix success. Behind the

26 scenes, Mr. Kail and his teams propelled Netflix to greatness because of their use of cutting-edge

27 technology. Netflix would not be where it is today without the cloud-forward approach the company took

28 when cloud was still a novel concept. The use of startup technology – including the vendors at issue –

18

1 helped the IT department transition to the cloud in record-breaking time, which ultimately contributed to

2 Netflix's steep subscriber growth. Mr. Kail's 360 reviews corroborate this conclusion.

3       Each of these vendors, with their own unique contributions, advanced Netflix forward in the field

4 of security, digital asset management, data compilation, service repairs and more. Countless articles have

5 been written on Netflix's "infrastructure systems," "third party facilities," "engineering teams," "a chaos

6 engineering culture," and how it reduced its "data center footprint." *See*  https://digital.hbs.edu/platform-

7 rctom/submission/netflix-behind-the-scenes/; https://www.channelasia.tech/article/646530/ten-years-

8 how-netflix-completed-historic-cloud-migration-aws/;

9 https://www.computerworld.com/article/2492351/netflix-guts-data-center-in-shift-to-cloud.html

10 Thanks to its technological advancements, particularly, moving to the cloud, its subscriber count grew

11 eightfold from 2008 to 2016, according to Netflix. *See* https://about.netflix.com/en/news/completing-the-

12 netflix-cloud-migration (also noting that moving to the cloud saved costs and that failures "are

13 unavoidable in any large scale distributed system, including a cloud-based one").

14       It took a compilation of all of the technologies at issue – and many more – to achieve the goal of

15 100% IT in the Cloud. It would be grossly dishonest of Netflix to attribute anything other than wildly

16 successful gains to Mr. Kail's work. This is why every single employee, for every year Mr. Kail worked

17 at Netflix, complimented Mr. Kail on his leadership, his introduction of new technology, and his

18 efficiency in accomplishing the task at hand. That, ten years later**,** Netflix's outside counsel claims that

19 Netflix "would not have paid" these businesses is not only pure conjecture but is not corroborated

20 anywhere in the trial record. PSR ¶ 19.

21       Below is a brief analysis each vendor's contribution to Netflix, thus demonstrating not only no

22 pecuniary loss at all, but also, credit for value delivered.

23                i.   *Platfora*

24       The $155,000 payment to Platfora (not to Mr. Kail) was unequivocally the result of Netflix's

25 early termination of the contract. This was documented. More importantly, as promised, Platfora

26 delivered its "Digital Ad Performance" in a single platform. Even Gagan Hasteer admitted that Platfora

27 provided a "solution that would provide visibility insights and metrics into how various digital ad

28 campaigns were performing." (R.T. Vol. 3, p. 579). Mike Asher explained that Platfora "takes enormous

quantities of data and makes it digestible to visualize . . . companies are dealing with more and more data and the only tools that they used don't really work anymore." (R.T. Vol. 3, p. 490). He further explained that when a company, such as Netflix, was buying online ads, the Platfora product produced data on whether the online clicking was having a return on investment. *Id.* Platfora provided a single tool that told Netflix whether its ads were worth the money being spent and if the ads weren't successful, Netflix would *save hundreds of thousands of dollars* in advertising revenue. *Id.* at 491. After all, Netflix was spending "over a billion dollars in paid advertising." (R.T. Vol. 2, p. 319) (Ralph). In the context of a billion dollar spend, the $155,000 is miniscule in comparison to the relative savings Platfora was providing to the marketing team. In total, Netflix saved far more than it spent on Platfora.

Indeed, no other product at the time delivered everything that Platfora did. (R.T. Vol. 2, p. 361) (Liu). Mr. Kail testified that Platfora was "solving a very specific problem that we had a great deal of pain in, and that was being able to do analysis on large datasets and also do the visualization required. And that was specific to the advertising technology charter that Reed Hastings had given me." (R.T. Vol. 10, p. 2210). Mr. Kail explained how the Chief Marketing Officer ("CMO") could optimize their digital ad spending because "that improves Netflix's profit margin." *Id.* at 2211. The CMO indeed benefited from the "data visualized by Platfora." *Id.* at 2219. This was not refuted by anyone at trial.

Further, the "Streaming Division" employees used the data provided by Platfora to determine what targeted ad buys were and weren't working, and would adjust the RealTime Bidding platform, AppNexus, to save money and optimize buying decisions. They used the Platfora tool from late 2013 until they transitioned to Google DoubleClick in April 2014, which is one of the reasons Platfora was cancelled. *Id.* at 2218.

In sum, Mr. Kail witnessed a "lowering of the customer acquisition costs" as a result of the software Platfora delivered. *Id.* at 2216. This too was not rebutted at trial. There was no evidence that Netflix had "paid a premium contract price above what it would pay for other contracts." *Martin*, 796 F.3d at 1110. At the end of the day, the government has not met its burden of showing that Netflix lost – rather than saved – money while the software was in use. The advertising dollar savings is realistically in the hundreds of thousands of dollars. (If loss cannot be reasonably determined, then the measurement would be gain; Mr. Kail gained nothing from Platfora.) Accordingly, since Platfora delivered a product to

Netflix that its employees used and benefited from, it would be "unjust to set the loss resulting from [the] fraud as the entire value of the contracts." *Id.* at 1111.

Finally, none of the Platfora emails, contracts or trial testimony directly connect to the wire transmissions of Counts 13-15. Here, there was no linkage between the $155,000 paid to Platfora and the charged wire fraud.

        ii.    *Vistara*

The Network Operations Center (NOC) used Vistara extensively. Rob Fry expanded its use and worked on it (along with Vistara engineers) for years. Rob Fry recommended "in favor of going with Vistara" but understood it would take time to be successful, which was normal for a startup. (R.T. Vol. 5, p. 1141).

Rob Fry had no knowledge – or interest – in whether Vistara was paid or not ("I didn't give it a second thought." R.T. Vol. 5, p. 1168). He never opined that he believed Netflix was using Vistara *for free* for multiple years, but rather, said that it wasn't within his job purview to look into the financial terms. *Id.* Rob Fry said they continued working with Vistara "because they continued to show progress," *Id.* at 1174, and he and Ashley Sprague wanted to expand its use cases. Exh. 221. That the product was going to take time to get to an error-free state, as this Court heard repeatedly, was absolutely normal for the industry. His testimony thus undermines the notion that the Netflix suffered a financial loss and received no value from the Vistara contract.

Meanwhile, Ashi Sheth's opinion on Vistara was based on his limited perception that the product was a walk-up "help desk" (like a "genius Bar"), which it was <u>not</u>, according to everyone else's testimony on the subject. (R.T. Vol. 8, p. 1647-48). Importantly, Ashi Sheth had no knowledge of Rob Fry's engagement with Vistara for *years*. *Id.* at 1691. Therefore, his testimony, when combined with the totality of the trial evidence, fails to support a reasonable inference that Netflix suffered economic harm as a result of a Vistara contract, particularly when the product was so widely used in the data center.

Further, Mr. Kunaparaju testified that the commissions to sales referral partners such as Unix **did not** increase the price to the customer. (R.T. Vol. 4, p. 896). Vistara even occasionally undercharged Netflix for number of devices. *Id.* at 914. Additionally, the single pane of glass technology that Vistara provided was reducing Netflix's data center footprint and the teams found the product useful. *Id.* at 903,

910. Moreover, it was Rob Fry and Ashley Sprague, <u>not</u> Michael Kail, who wanted to expand Vistara's use cases to include asset/inventory. *Id.* at 929; Exh. 221. Vistara was implemented on *thousands* of "devices." *Id.* at 912-914; Exh. 1080. The Vistara records corroborate the number of virtual machines. The Vistara agent then ran and gave reports to the Netflix NOC. *Id.* at 916.

Thus, the amount that Netflix paid to Vistara was driven by employees' demand. No one testified that Vistara should have never been paid or was a waste of money. And on counterbalance, Netflix received the *benefits* of the product delivered – no security breaches occurred thanks to the Vistara deployment and monitoring/management of the Netflix data center resources, including the credit card vault, which was a set of virtual machines that stored the credit card numbers of all Netflix subscribers. In sum, Vistara delivered on its contract and Netflix benefited from it. It is noteworthy that Netflix never sued Vistara (or any other vendor) for purported failure to deliver. Its restitution request is disingenuous.

### iii.   *Netenrich*

Netflix contracted with Netenrich to pay engineers $120/hour. That is what they paid (or less, in some instances). The Netenrich engineers not only delivered, but were asked to do additional work, more bodies were requested, and some were hired permanently – all independent of Mr. Kail. Netflix received exactly what it paid for and therefore, the services delivered for the rates paid offset the contract fee, which was never considered an unnecessary or unreasonable payment. In fact, Netflix set that hourly contractor rate. As such, Netenrich did not inflate its rate because of the Unix commissions. And their commission model ensured a fixed price (they relied on referral partners instead of having a sales team).

### iv.   *Docurated*

Alex Gorbansky testified that the first contract was for 30 users (for FP&A team), whereas the subsequent contract was for an unlimited number of users for the marketing team to migrate their content from Box into a digital asset management system. (R.T. Vol. 5, p. 1022-23). The Docurated platform (a Tech Crunch finalist) was then used to curate the digital assets for the marketing department. *Id.* at 1007. The second contract was sent to both Mike Kail and Sabry Tozin at Netflix on March 20, 2014: evidence that Mr. Kail was not the only person to review, edit and approve the contract. *See* Exh. 1060. The FP&A and creative marketing teams were excited about Docurated and requested its expansion. Thus, Netflix received what it paid for and benefited from the product, which fit into its cloud-first model. It was *never*

intended or used in the legal department, as falsely claimed (or misremembered) by Ashi Sheth. This is easily verified by the Terms of Agreement and meeting reports. Trial Exhs. 564, 1003. It was not replaced with an in-house legal product. The product was utilized extensively by at least two divisions at Netflix, thus dispelling the notion that Netflix paid for nothing received.  (R.T. Vol. 5, p. 1007; 1022-23).

> v.   *Netskope*

Netskope (along with Sumologic) was critical to IT's mission of "zero trust security." Netflix was on the cutting edge of implementing this, whereas now, even the federal government has recognized its value. https://zerotrust.cyber.gov/federal-zero-trust-strategy/. Netskope had a very desirable product even in its early days when it was extremely well-funded. (R.T. Vol. 8, p. 1595). Rob Fry recognized the value of Netskope early on, when he opined that the product looked great, "no further enhancements" were required, and **he** wanted to push it out to 100 users. Exh. 1092, 1093.

Netskope's use at Netflix was driven almost exclusively by Bill Burns in the security team. He made the decisions on which products to use to solve specific business problems the security team had. (R.T. Vol. 10, p. 2070). Indeed, Paul Oshan testified that Mr. Kail played **no role** in the security team's decision to move forward with a Netskope contract. (R.T. Vol. 10, p. 2073).

So if the security team evaluated, consulted, and made the decision to implement and use Netskope's product, there is no basis to conclude Netflix suffered a loss. There was no allegation that Bill Burns and the security team didn't know what they were doing and were duped by everyone involved. Netflix achieved zero trust security, in part thanks to Netskope's product.

> vi.   *Numerify*

Numerify's product was so appealing to Netflix that Ashi Sheth gave a testimonial and was featured in a promotional video about Numerify. (R.T. Vol 7, p. 1281). Ashley Sprague was also a speaker for Numerify. (R.T. Vol. 7, p. 1290; Vol. 9, p. 1860). She renewed the Numerify contract *after Mr. Kail no longer worked at Netflix.* (R.T. Vol. 9, p. 1861); Exh. 1098. If the product was so useless, Netflix would not have continued using it and other employees would not have lauded its benefits. It is inconceivable how Netflix's lawyers now claim they want their money back. The government certainly hasn't met its burden of showing Netflix suffered a financial loss from the contract.

1
vii.   *Sumologic*

2   Sumologic too delivered what it promised. There is nothing showing Netflix took a financial loss

3   on Sumologic's product. Ashi Sheth found it useful, and in the time it was implemented, its "shadow IT"

4   protected Netflix from attacks. Not only that, Sumologic replaced a very expensive Splunk data center

5   license and hardware with a cloud logging solution, so the savings greatly outweighed the costs of the

6   product. (R.T. Vol. 7, p. 1366). This too was in line with Mr. Hastings' directive to get away from

7   hardware and transition to the cloud. Moreover, the product cost was congruent to Netflix's usage – in

8   other words, the more Netflix used and needed, the higher the cost. Thus, the amount paid by Netflix to

9   Sumologic was driven by **demand**, not by Mr. Kail (not to mention, Sumologic took a loss on the Netflix

10   contract). (R.T. Vol. 7, p. 1384-85) (Loiselle).

11
viii.   *Maginatics*

12   The savings Maginatics brought to Netflix was that their "cloud file system allowed you to

13   securely store data in files that were typically done on premises in expensive hardware, they could store

14   that in the cloud and be accessible from anywhere." (R.T. Vol. 10, p. 2203) (Kail). The product was a

15   perfect fit for Netflix as they were in the process of moving their operations to the cloud. And it was up

16   to Netflix engineers, not Mr. Kail, to make the decision on whether to use Maginatics' cloud filing

17   system. (R.T. Vol. 7, p. 1441) (Gill). Like others, Maginatics' pricing and product was never up against a

18   competitive product. (R.T. Vol. 7, p. 1425) (O'Keefe). No one contested that Maginatics brought a

19   valuable product to Netflix; certainly no one claimed at trial that it was a waste of money.

20
ix.   *Elasticbox*

21   The savings Elasticbox brought to Netflix is quantifiable. Without Elasticbox, an organization

22   would employ "four or five developers, two or three operations engineers, a period of six to eight

23   months" at "a million bucks a year or a half million bucks a year" whereas *with* Elasticbox, they could do

24   it "within a matter of days as opposed to months, or in some cases, minutes," according to Mr. Srivastav.

25   (R.T. Vol. 8, p. 1743-44). Additionally, by using Elasticbox, Netflix saved a great deal of money by

26   moving away from VMWare, an annual license which was far more expensive. (R.T. Vol. 11, p. 2372)

27   (Kail). Moreover, while the first draft Elasticbox contract was negotiated with Justin Slaten, it was Mr.

28   Kail who secured an even more favorable price for Netflix. Exh. 1064, 1065, 1066. The contract was

then expanded to include SaaS because of <u>Justin Slaten's request to do so,</u> and the contract was sent to

Justin Slaten, Rob Fry, and Dang Nguyen for review. (R.T. Vol. 8, p. 1792); Exh. 1067, 1068. Ashi

Sheth also testified that his team used Elasticbox. (R.T. Vol. 8, p. 1670).

Here again, it is simply not credible that Netflix suffered any loss from the high demand that

Netflix engineers had for the product. Further, the contract price was offset by the usage and savings.

**C. Use of Gain as An Alternative Measure of Loss In this Case Is Improper**

Unsure of its loss position, the government turns to "gain," where it fares no better. Ignoring

established case law, the government includes Mr. Kail's salary and the current market value of realized

and unrealized stock options as a measure of gain.

Importantly, neither Netflix in its Victim Impact Statement dated September 20, 2021 nor the

government in its letters to the Probation Officer, nor the Probation Officer, have claimed that the loss

amount reasonably *cannot* be determined. Indeed, they affirmatively claim loss can be determined and

they each recommend their own version of what the loss is. But they cannot use gain as a backstop

against a possible failure to prove that amount.

The Guidelines instruct that the court shall use the gain that resulted from the offense as an

alternative measure of loss **only if** there is a loss but it reasonably cannot be determined. USSG § 2B1.1

cmt, n. 3(B). In other words, measuring gain is appropriate only if the Court concludes that the alleged

scheme to defraud based on kickbacks in exchange for awarding contracts resulted in an economic loss,

but there is no reasonable means to calculate the loss based on the scheme, e.g., it is not possible to

calculate the delta between the contract price that would have been awarded to Vendor A absent the

scheme versus the contract price that was awarded to Vendor A with the scheme. *See United States v.*

*Randock,* 330 F. App'x 628, 629–30 (9th Cir. 2009) (where the loss to victims in a fraudulent academic

credential scheme could not reasonably be determined, gain was a reasonable alternative).

1.   <u>If Used, Gain Must Have a Logical Relationship To Loss</u>

Section 2B1.1 unambiguously requires sentencing courts to calculate the victim's loss."

Therefore, relying on Sentencing Commission commentary—that is, Application Note §2B1.1 cmt.

n.3(B)—to expand § 2B1.1 to encompass "gain" *untethered to loss* would violate the limitations on

administrative deference prescribed in *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019). In other words, when the

Guideline itself says "loss," it is not appropriate to read the commentary to mean something different (and less favorable).

Moreover, using gain that has no "logical relationship" to economic loss is improper. *United States v. Dickler*, 64 F.3d 818, 825-26 (3d Cir. 1995). Accordingly, gain must be reduced by any amount that "could not be a component of the victim's loss." *Id.* at 830. The Sentencing Commission actually rejected the option of permitting courts to use gain, unrelated to loss, to determine the offense level— because it reflects factors unrelated to culpability. U.S.S.G. App. C, Vol. II at 180; *see* §2B1.1 cmt. n.21. Clearly, using gain to measure culpability is improper. *E.g.*, *United States v. Gallant*, 537 F.3d 1202, 1240 (10th Cir. 2008).

Indeed, the gain provision (U.S.S.G. §2B1.1 cmt. n.3(B)) does not permit a court to do indirectly what it cannot do directly: sentence on "gain" *instead of* "loss." Nor are profits a "reasonable estimate of loss" under Note 3(C). U.S.S.G. §2B1.1 cmt. n.3(C).  *E.g., United States v. Schneider*, 930 F.2d 555, 558 (7th Cir. 1991) ("profit" to defendant is not "loss" to victim).

As discussed above, at most, the offset for the product usage and savings results in <u>no loss</u> to Netflix. It would therefore be improper to use gain as an alternative measure of loss.

2.   <u>Even if Applied, the Proposed Gain Calculation is Inaccurate</u>

Even if gain were the appropriate measure of loss, for the reasons discussed above, salary could not be included. *Hussain*, 16-cr-00462-CRB. Further, the government is expected to argue that gain should be calculated to include **stock options or shares.** The government may argue that Mr. Kail's gain should be calculated according to market conditions far removed from the date stock options were awarded or exercised. This is inappropriate for a multitude of reasons. First, loss is calculated on the fraud date, the date the fraud ceased, or the date the fraud was discovered. For example, when loss may fluctuate, the determination of "fair market value" should apply on the date the fraud ceased. *See United States v. Gordon*, 393 F.3d 1044, 1053 (9th Cir. 2004) ("there is little logic in increasing or decreasing a defendant's sentence as a result of unpredictable fluctuating values for misappropriated items in the punitive context."). Other federal courts have approved this rule, too. *See, e.g.*, *United States v. Bae*, 250 F.3d 774, 776 (D.C. Cir. 2001) ("the loss associated with their fraudulent procurement is equal to the value of the goods at the time of the offense"); *United States v. Swanquist*, 161 F.3d 1064 (7th Cir. 1998)

1   (holding that an offense is discovered for loss calculation purposes when the victim or the proper

2   authorities discover the fraud, whichever comes first); *United States v. Chorney*, 63 F.3d 78 (1st Cir.

3   1995) (upholding loss by looking at value of assets at time of seizure and not at sentencing).

4         Alternatively, the loss can be calculated at the point the fraud was discovered. See, e.g., *United*

5   *States v. Flowers*, 55 F.3d 218 (6th Cir. 1995) ("The relevant point in time for determining the amount of

6   loss in a fraud case is at the time the crime was detected, rather than at sentencing.") (citations omitted).

7   *See also United States v. Hart*, 273 F.3d 363, 374 (3d Cir. 2001) (upholding decision to calculate loss

8   when fraud ceased).

9         i. *Stock Options Dependent on Market Volatility Are Not An Appropriate Measure of Gain*

10        Although courts do consider stock options or shares as a measure of gain, district courts retain

11  significant latitude on how to calculate gain (as a measure of loss) based on the facts of each case. *See*

12  U.S.S.G §2B1.1 cmt. n.3(C). Assuming loss is incalculable, the question then becomes how to calculate

13  gain as its logical proxy. *United States v. Wang* is instructive. 2015 U.S. Dist. LEXIS 56311 (C.D. Cal.

14  Apr. 29, 2015). There, a C.D. Cal. district court sentenced a defendant for insider trading where the

15  defendant acquired Qualcomm stock based on material, non-public information and held onto the stock

16  after the non-public information became public, selling it sometime later at a greater profit than he would

17  have made had he executed the sell trade shortly after the announcement. *Id.* at *15-23. The government

18  (and the PSR) calculated the gain at the *time of sale*, but the defendant asserted that the proper calculation

19  should be the difference between the purchase price and the value of the stock after the insider

20  information was made public. *Id.* The court rejected the government's approach for two reasons. First,

21  "[c]ourts seek to limit 'the gain figure resulting from the offense [to] exclude[] to the extent possible

22  within the institutional constraints of criminal sentencing, factors unrelated to the defendant's criminally

23  culpable conduct'" *Id.* at *20 (quoting *United States v. Nacchio*, 573 F.3d 1062, 1080 (10th Cir.

24  2009)). Second, "courts seek to avoid application of the Guidelines 'in a way that leads to [] disparate

25  sentences for similarly situated defendants whose real conduct was identical.'" *Id.* (quoting *United States*

26  *v. Mooney*, 425 F.3d 1093, 1107 (8th Cir. 2005) (Bright, J. dissenting)). Instead, applying U.S.S.G.

27  2B1.4 (which cross references the 2B1.1 table), the *Wang* court sustained the defendant's objection to the

28  government's gain calculation, finding that the government's attempt to include gain from "holding the

1   stock after the insider information . . . would result in different sentences for the same violation of law

2   based solely upon the market conditions during the period prior to sale contrary to the goals of the

3   Sentencing Guidelines." *Id.* at *20.

4         Here, Mr. Kail's acquisition of various companies' options and his execution of those options

5   were valued less at the time they were acquired as compared to the time they were sold or presently held.

6   Thus, per *Wang*, any gain should be limited to the value of the options at the time they were acquired or

7   exercised, if the acquisition or exercise was during and related to the Netflix contracts. The fact-specific

8   nature of this analysis and the various approaches courts can adopt and have adopted in making the

9   calculation where the loss or gain is not entirely clear means that the details regarding the alleged loss or

10  gain as to each specific vendor matters.

11        For example, if the Court is unable to determine a loss amount for **Maginatics,** then the following

12  facts become relevant: the stock options were granted at a price of $.15 per share. Mr. Kail exercised his

13  options in May 2013 for that price. Independently, Maginatics was acquired by EMC in October 2014,

14  after Mr. Kail left Netflix. At the time of the acquisition, the stock had split, so Mr. Kail's shares, at that

15  time, were valued at $1.65/share, resulting in payment in 2014 and 2016. Had the EMC acquisition

16  occurred for less (or not at all), then the amount received by Mr. Kail would have been less. This is

17  precisely what *Wang* warns against – disparate outcomes due solely to market conditions.[1]

18        Similarly, as to **Netskope**, Mr. Kail was granted stock when he began consulting for Sanjay Beri.

19  This was nearly two years prior to any Netflix contract. Trial Exh. 451. The vesting start date was

20  November 15, 2012. The vesting schedule was for two years. Per the grant, the strike price is based on

21  IRS Section 409(a) that exists at the time. This valuation determines the cost to purchase a share. The

22  strike price at that time was $0.33. Mr. Kail exercised his options in Netskope in January 2015 for $8,798

23  (the original grant went through two splits of 2:1, resulting in 106,000 options). Accordingly, the value of

24  the stock at the time of the exercise was the strike price – 33 cents. Until there is an IPO or acquisition

25  offer, the 409(a) valuation (and price) is speculative. What dollar amount, *if anything*, common

26  shareholders such as Mr. Kail would receive at an unknown date in the future cannot be the measure of

27

28  [1] Also, Mr. Kail was acquitted on Count 20 – pecuniary fraud as to Maginatics.

gain. For example, when Docurated was acquired, Mr. Kail got nothing and lost money on the exercise.

As for the Netskope consulting fees of $5,000 per month, this was a consulting contract between Mr. Kail and Netskope starting in November 2012. Mr. Kail was helping build the Netskope product and his engineering tasks were outlined in his independent contractor/consulting agreement. Trial Exh. 451. The Netflix contract did not occur until July 9, 2014 (Count 2), nearly *two years later*. Clearly, the funds Mr. Kail earned working independently for Netskope cannot be a measure of gain. *See United States v. Aunspaugh*, 792 F.3d 1302, 1309 (11th Cir. 2015) (payments to defendant that are compensation for actual work performed on a project do not constitute kickbacks).

The same analysis applies to **Sumologic**. Mr. Kail received stock options in 2012 and 2013 at a strike price of $.048 and $.094, respectively. Mr. Kail was an advisor until July 2, 2015 – in other words, a year after he had resigned from Netflix. After that, he had 90 days to exercise his options, which is customary even for employees. Therefore, on August 21, 2015, Mr. Kail spent $33,200 to exercise his Sumologic options at the strike price. Sumologic went public in 2021. Those shares remain unliquidated and are held in a joint spousal investment account. Moreover, the stock options were provided in exchange for the significant time and effort Mr. Kail spent working *on the side* for Sumologic. In fact, Mr. Kail continued advising Sumologic *after* he no longer worked at Netflix.

In sum, present day market conditions cannot dictate the "gain" to Mr. Kail. Otherwise, the gain calculation could fluctuate from day to day, as much as Sumologic's stock price has fluctuated over the past year. The only relevant and measurable value of the Sumologic shares is the strike price.

As for other startups, such as RelateIQ, Onelogin, or Cloudmeter, the first consideration is that the government did not establish at trial that Mr. Kail was "involved in" the contracts or that they were vendors to Netflix. Second, relying on a volatile, constantly changing market to determine gain for an offense that ended years before sentencing is improper and should not be used for calculation purposes.

### D. The Fraud Guidelines Are Not Based on Empirical Data and Therefore, Courts Enjoy Broad Discretion to Disagree with Recommended Sentences.

The Sentencing Commission "fills an important institutional role" because "[i]t has the capacity… to base its determinations on empirical data..." *Kimbrough v. United States*, 552 U.S. 85, 110 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic

institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes…" *Id*. at 96.

One example of this failure is § 2B1.1's loss calculations. The Guidelines place an "inordinate emphasis" on "putatively measurable quantities, such as… the amount of financial loss in fraud cases," but they have failed to "explain[] why it is appropriate to accord such huge weight to such factors." *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006). In adopting this "arithmetic approach," the Commission "has never explained the rationale underlying *any* of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic." *Id*. at 510 (quoting Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)). As a result, loss amount "is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004).

In fact, since their inception, the Guidelines' fraud offense recommendations have increased significantly, even though empirical evidence shows that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).

A concern about the mechanical application of the fraud guidelines is shared by District Court judges. *See* e.g.: *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*; Hon. Mark W. Bennett, Justin D. Levinson & Koichi Hioki, *Iowa Law Review*: Vol 102:939 (2017); available at *https://ilr.law.uiowa.edu/assets/Uploads/ILR-102-3-Bennett.pdf*. Indeed, because of the arbitrariness and the disproportionately severe sentences it often recommends, courts routinely conclude that these Guidelines do not serve as a reliably proxy for culpability and issue sentences below the Guideline range. *See e.g United States v. Musgrave*, 647 Fed. App'x 529, 530, 538 (6th Cir. 2016) (affirming downward variance for defendant with offense level of 25 and a $1.7 million loss to a sentence of one day of imprisonment, reasoning that "because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances"); *United States v. Suarez-Reyes*, 2012 WL 6597814 (D. Neb. Dec. 18, 2012) at

1   * 8 (finding that the application of a 14-point loss enhancement would "exaggerate [defendant's]

2   culpability and would not be an accurate measure of his blameworthiness," varying downward to

3   sentence of one day imprisonment for defendant with $693,000 loss); *United States v. Redemann*, 295 F.

4   Supp. 2d 887, 898, 901 (E.D. Wis. 2003) (issuing sentence of 12 months to defendant in $2.5 million

5   fraud involving false and inflated invoices, concluding that the amount of loss "under the guidelines

6   substantially exceeded any fair measure of [defendant's] culpability"). The significant national trend of

7   substantial downward variances under Section 2B1.1 underscores the degree to which this particular

8   Guideline section has **lost judicial confidence**. *See* USSG COMM'N, 2019 SOURCEBOOK OF

9   FEDERAL SENTENCING STATISTICS, tbl. 31 (2015).

10       Furthermore, as one of the leading experts on federal sentencing, Professor Douglas Berman, has

11   pointed out, "[t]he federal fraud guidelines have long had many critics among judges and commentators."

12   Douglas A. Berman, *Fiddling with the Fraud Guidelines as* Booker *Burns*, 27 FED. SENT'G REP. 267,

13   267 (2015). Indeed, the consistent harshening of white-collar sentencing guidelines has caused

14   significant pushback, noted in numerous judicial opinions throughout the country. Federal judges have

15   referred to the fraud guidelines as "a black stain on common sense" (*United States v. Parris*, 573 F.

16   Supp. 2d 744, 754 (E.D.N.Y. 2008)); "patently unreasonable" and "so run amok that they are patently

17   absurd on their face" (*Adelson*, 441 F. Supp. 2d at 506); "of no help" (*United States v. Watt*, 707 F. Supp.

18   2d 149, 151 (D. Mass. 2010); and both "fundamentally flawed" and "valueless." *United States v. Corsey*,

19   723 F.3d 366, 377, 380 (2d Cir. 2013) (Underhill, J., concurring).

20       Judge Jed S. Rakoff of the Southern District of New York, who has handled perhaps more

21   security fraud cases than any of his contemporaries, and is a leading expert on the fraud guidelines,

22   commented several years ago in a high profile securities fraud sentencing opinion that "the numbers

23   assigned by the Sentencing Commission to various sentencing factors appear to be more the product of

24   speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing

25   the risk of injustice." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (24-month

26   sentence to defendant in case involving $5 million gain). Judge Rakoff went on to observe that the

27   current guideline calculations in white-collar fraud cases "are no longer tied to the mean of what federal

28   judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to

1  white-collar crime, unsupported by any empirical data." *Id.*

2  For example, in *Gupta,* Judge Rakoff explained that while a typical fraud case in 1987 would

3  produce a guideline range of 30 to 37 months, by 2003, that identical fraud case was boosted up to 151 to

4  188 months, a staggering increase of more than 500%. *Id* at 351. Judge Rakoff queried: "Was such a

5  crime really 500% worse in 2003 than it was in 1987?" *Id.* Of course not.

6  Indeed, the government and probation department's recommended sentences in this case stem

7  from §2B1.1's loss calculations. However, because the Commission did not rely on empirical data or

8  national experience in promulgating or amending § 2B1.1, they failed their institutional role. This Court

9  is therefore free to disagree, on reasoned policy grounds, with the resulting recommendation. *See Spears*

10  *v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. 101–02, 109–10. Consequently, this

11  Court should look to all of the §3553(a) factors, as well as the empirical evidence not considered by the

12  Commission, when fashioning a sentence "sufficient, but not greater than necessary" to fulfill the

13  purposes of sentencing.

14  **E.  The Sentencing Guidelines Calculation Supported by the Trial Evidence**

15  Mr. Kail submits that the loss to Netflix was zero, as discussed extensively above. Therefore, the

16  calculation of the guidelines would be as follows:

17  Base Offense Level =   7

18  Money laundering =   +1

19  Total Offense Level:   **9**

20  Criminal History Computation:   Category I

21  Guideline Imprisonment Range:   4-10 Months

22  At the defendant's estimated guideline range, the U.S.S.G. range for a <u>fine</u> is $2,000 - $20,000. § 5E1.2.

23  1.  <u>Enhancement of Base Offense Level (PSR ¶ 26)</u>

24  The Probation Officer recommends a 16-level enhancement pursuant to USSG § 2B1.1(a)(1), and

25  the government, 18 levels. As described herein, this figure comes from an unsupported conclusion that

26  every vendor contract with Netflix was a loss to Netflix, with no credit for product usage or cost savings.

27  The government cannot meet its burden of proving such loss. As such, if Netflix suffered no proven

28  financial loss, §2B1.1 results in no additional offense levels.

32

2.  Enhancement for Sophisticated Means (PSR ¶ 27)

The Probation Officer and the government recommend an enhancement pursuant to USSG § 2B1.1(b)(10)(C) for "sophisticated means." This enhancement requires more than just committing wire fraud, which by its nature requires deception and misrepresentations. The justification by the government is that Mr. Kail used a single-member LLC as the referral partner and to receive funds. PSR ¶ 27.

The sophisticated means enhancement is typically applied in cases where defendants engage in complicated and coordinated deceptive conduct. *See United States v. Ghertler*, 605 F.3d 1256, 1267 (2010) (defendant conducted extensive research to identify his targets, used unwitting couriers to deliver the proceeds of his fraud, forged company documents and had funds transferred to third parties); *United States v. Brandon*, 595 Fed. Appx. 676 (9th Cir. 2014) (defendant created false identities, engineered simultaneous loan closings and funneled proceeds through a shell company); *United States v. Muresanu*, 951 F.3d 833 (7th Cir. 2020) (defendant used his skills to install ATM skimmers and pinhole cameras, changed his appearance to conceal his identity and received counterfeit bank cards).

Here, on the other hand, the government alleges that Mr. Kail simply used a pre-existing company to receive funds. As this Court heard, Unix Mercenary was created long before Netflix. It was a legitimate single-member LLC that received income since 2004 from various companies. But Vistara and Netenrich insisted on paying commissions to a company, rather than an individual, so it was at that time that Mr. Kail applied for a FEIN. He received payments to Unix instead of himself at their behest and to align with their accounting requirements. Further, the transactions were in the open with no evidence of concealment. Unix bank accounts showed *numerous entities* making deposits, since Mr. Kail had income from sources other than Netflix, for various purposes wholly unrelated to Netflix. In short, Unix was never intended as a shell corporation, a fictitious entity, or a repository to hide funds.

The probation officer also notes that funds were transferred in and out of the Unix bank account, thus suggesting sophistication. *Id.* But moving funds from business to personal constitutes the most *basic*, and least sophisticated, banking activity. How else can a business owner realize income? Using Unix and doing basic banking does not rise to the level of "sophisticated means."

Not only that, but the movement of funds also constitutes the activity underlying the money laundering counts. It would therefore be impermissible double-counting to include the movement of

1    funds as *both* money-laundering activity *and* sophisticated means.

2       3.   Enhancement for Abuse of Public or Private Trust (PSR ¶ 18, 30)

3       An adjustment for abusing a position of public or private trust, or use of a special skill, is not

4    warranted. First, the enhancement "may not be employed if an abuse of trust or skill is included in the

5    base offense level or specific offense characteristic." § 3B1.3. The enhancement should "not be applied

6    when the offense itself entails an abuse of trust." *United States v. Ford*, 21 F.3d 759, 765 (7th Cir. 1994).

7    Because the jury instructions for wire fraud, mail fraud and most importantly, honest services fraud,

8    required proof of a "fiduciary" and "trust" relationship, including the two-level enhancement would

9    constitute impermissible double-counting. *See United States v. Bracciale*, 374 F.3d 998, fn 9 ("We also

10    assume, solely for the purposes of this appeal, that conduct that breaches a fiduciary duty also constitutes

11    an abuse of a position of private trust."). In other words, the offense itself includes an abuse of trust.

12       Further, the commentary to the Guidelines Manual, Section 3B1.3, Application Note 1, provides

13    that: "the position of trust must have contributed in some substantial way to facilitating the crime and not

14    merely have provided an opportunity that could as easily have been afforded to other persons."

15       In this case, on the subject of opportunity to sign contracts, nearly every Netflix employee was

16    empowered with that ability. (R.T. Vol. 5, p. 1127) (Fry); (R.T. Vol. 2, p. 297-98) (Ralph) ("People

17    being able to sign contracts is broad."); (R.T. Vol. 9, p. 1872) (Wells). Therefore, although Mr. Kail

18    signed the contracts at issue in this case, the ability to sign contracts was indeed "afforded to other

19    persons." If the enhancement is viewed as applying to advisor positions, as Rob Fry testified, he also had

20    opportunities to serve as an advisor, and did so for at least 60 companies. (R.T. Vol. 5, p. 1153-54). Rob

21    Fry testified that a "lot of people [were advisors] in Silicon Valley." (R.T. Vol. 5, p. 1139.

22       4.   Enhancement for Obstruction of Justice (PSR ¶ 21, 31)

23       The government and the Probation Officer recommend an enhancement pursuant to USSG §

24    3C1.1 for obstruction of justice. Before this enhancement for perjury may be applied, an express finding

25    must be made by the Court of three factors: (1) defendant gave false testimony, (2) on a material matter,

26    (3) with willful intent. *United States v. Castro-Ponce*, 770 F.3d 819, 822 (9th Cir. 2014) (enhancement

27    not warranted where defendant lied on the stand, but testimony was not willful or material). "Not every

28    accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for

1  committing perjury." *United States v. Dunnigan*, 507 U.S. 87, 95 (1993) (trial testimony included

2  "numerous witnesses who contradicted" the defendant regarding "so many facts on which she could not

3  have been mistaken."). The Application Notes to § 3C1.1 indeed specifies that the provision is "not

4  intended to punish a defendant for the exercise of a constitutional right." The probation officer is thus

5  incorrect relying on a conviction to justify an obstruction enhancement based on perjury. PSR ¶ 31.

6          Here, at least 16 witnesses testified consistently with Mr. Kail's testimony regarding the lack

7  of quid pro quo and other facts regarding the advisory positions. Additionally, the term "willfully" within

8  the meaning of the enhancement limits the scope of the enhancement to those who willfully obstruct the

9  administration of justice and requires that the defendant consciously act with the purpose of obstructing

10  justice. *United States v. Lofton*, 905 F.2d 1315 (9th Cir. 1993). Mr. Kail did not give false testimony; to

11  the contrary, he admitted when he was untruthful to his boss. And he never testified that listing his

12  advisory roles on LinkedIn satisfied Netflix's conflict of interest policy; rather, he admitted he did not

13  advertise his stock holdings on his LinkedIn page. (R.T. Vol. 10, p. 2246). In any event, an

14  opinion regarding LinkedIn would not be material.

15          Further, Mr. Kail did not testify contrary to documents or prior statements and affidavits. *See*

16  *United States v. Garro*, 517 F.3d 1163, 1171(9th Cir. 2008) (enhancement warranted when defendant

17  testified expressly contradictory to documents that he had prepared and sworn affidavits he had made and

18  tried to mislead evidence regarding a tape). Here, witnesses testified that Mr. Kail did not openly disclose

19  his stock options to his superiors at Netflix. Mr. Kail did not deny that fact. Witnesses testified they were

20  aware of Mr. Kail's advisory roles because of his LinkedIn profile. Witnesses testified that Mr. Kail

21  never pressured them to work on anything and Mr. Kail corroborated this fact. *See* Exh. 9.

22          Countless vendor witnesses testified that they had to earn the contracts at Netflix. Witnesses

23  testified that Mr. Kail was not truthful in an email to Reed Hastings in March 2014; Mr. Kail

24  admitted this fact. Mr. Kail maintained (and maintains) his innocence that he did not engage in quid pro

25  quo, as corroborated by every single vendor witness. Mr. Kail intends to appeal the verdict, which

26  he has argued was not supported by the evidence at trial. Maintaining one's innocence is not the standard

27  for a finding of willful and materially false testimony. Mr. Kail may not be penalized for exercising his

28  constitutional right to go to trial and testify in his own defense.

## III. LEGAL STANDARD

A sentencing court must impose a sentence that takes account of the factors enumerated in 18 U.S.C. § 3553(a). In particular, a court must fashion a sentence that is "sufficient, but not greater than necessary," to serve the purposes of sentencing set forth in the statute. 18 U.S.C. § 3553(a)(2); *see Kimbrough*, 522 U.S. at 111. As the Supreme Court explained, "[t]he overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (citing 18 U.S.C. § 3553(a)).

The Sentencing Guidelines are just one factor among many a court must consider at sentencing, *United States v. Ressam*, 593 F.3d 1095, 1117-18 (9th Cir. 2010), and the Court "may not presume that the Guidelines range is reasonable." *Carty*, 520 F.3d at 991. The Court must make an individualized assessment and fashion a sentence that reflects the particulars of the offense and the unique characteristics of the offender. *Ressam*, 593 F.3d at 1117-18.

## IV. 18 U.S.C. § 3553(a) FACTORS AND SENTENCING RECOMMENDATION

Whatever level the Court determines is the appropriate guideline range, the appropriate and measured sentence for Mr. Kail should be an alternative-custodial term of twelve months to be served on electronic monitoring, plus 500 hours of community service, which the defense proposes should include a very targeted approach. More important than incarceration – if the goal is to reduce crime, educate the public, and send a message – there is no better way to do it than to have someone who has gone through it tell his story. As part of his community service, Mr. Kail should be required to speak to the public (especially, to those working in tech and startups) about what is honest services fraud, best practices for taking advisory positions, the acceptance of stock options in the workplace, etc. His experience, including the shame of being fired and the reputational damage, would serve as an important warning and learning lesson, particularly to those practicing on the edge. His community service should also be tailored to a meaningful audience, which will have far greater positive societal impact than the government paying for another person to languish in a prison cell.

### A. The Court Should Consider General Deterrence in Combination with Other Factors

There is no question that this Court will consider general deterrence as a goal of sentencing – and Mr. Kail acknowledges that the Court will do so pursuant to § 3553(a). By the same token, deterrence is just one of many factors the Court must consider under § 3553(a) – and, as a matter of law, no one factor is primary. *See Carty*, 520 F.3d at 991. A sentence imposed solely or mainly to make an example of a defendant violates the Supreme Court's directive that sentencing must be individualized to a particular defendant. *See Musgrave*, 647 Fed. Appx. at 533 ("'[T]here is no justice in imposing a sentence merely to make an example out of a defendant.' Other § 3553(a) factors must be considered, including the particular circumstances of the defendant and crime, because '[t]he punishment should fit the offender and not merely the crime.'") (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)); *accord Koon v. United States*, 518 U.S. 81, 113 (2008) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue.").

Moreover, a court need not impose a custodial term to achieve a deterrent effect. "Section 3553(a), for instance, does not require the goal of general deterrence be met through a period of incarceration." *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010)). Nor does the pertinent legislative history, which reflects Congress's view that "[i]t may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose." *Id.* at 1016 n.9 (quoting S. Rep. No. 98-225, at 92). The Supreme Court has confirmed that felony probation is a weighty sanction that subjects an offender to "several standard conditions that substantially restrict their liberty." *Gall*, 552 U.S. at 48. On top of these standard conditions, the Court can layer additional restrictions, including home confinement, that further punish and constrain a defendant. *See United States v. Walker*, 918 F.3d 1134, 1150 (10th Cir. 2019) ("[I]mposition of the two years of home confinement certainly increased the severity of Mr. Walker's punishment; home confinement itself functions as an alternative to a period of incarceration in prison."); *Musgrave*, 647 Fed. Appx. At 533 (Sixth Circuit noted that the district court had "adequately addressed how supervised release joined with home

confinement and a severe financial penalty, though not imprisonment, nevertheless afforded adequate general deterrence in this context.").

Other circuits, including the Ninth, have likewise confirmed that when the need for deterrence is substantially counterbalanced by other sentencing considerations, a noncustodial sentence is a lawful and appropriate result. *See Edwards*, 595 F.3d at 1016 & n.9 (rejecting argument that incarceration was necessary to achieve general deterrence); *Walker*, 918 F.3d at 1149 (requirement that district court consider general deterrence on remand did not require court to impose a term of imprisonment).

Here, there are several reasons the Court should conclude that a noncustodial sentence is sufficient to achieve, among other purposes, the goal of general deterrence. These reasons are presented below.

**B. Mr. Kail's Conviction is Inconsistent with a Lifetime of Honorable Conduct**

Judge Jed Rakoff of the United States District Court for the Southern District of New York has explained that he tries at sentencing to ascertain the "essential character" of a defendant; that is, "Are they fundamentally a greedy person?" or "Are they a good person who departed from his/her better impulses?" *See* Michael Rothfeld, *In Gupta Sentencing, A Judgment Call,* The Wall Street Journal, Oct. 10, 2012, at C1. Indeed, § 3553(a)'s directive that a district court consider the "history and characteristics" of the defendant often comes down to that: does the current offense reflect the essence of the person who committed it, or is it an aberrant deviation from an otherwise virtuous life? *See*, *e.g.*, *United States v. DeRusse*, 859 F.3d 1232, 1237 (10th Cir. 2017) (approving of variance based on "the extent to which the criminal conduct was out of character"); *Gupta*, 904 F. Supp. at 353 (granting large downward variance where the defendant's "personal history and characteristics starkly contrast with the nature and circumstances of his crimes").

Here, there is no question that Mr. Kail's conviction, even on its face, represents an aberration from his lifetime of honorable conduct. Dozens of letters attest to his character and integrity. Those who know him best affirm that Mr. Kail has led a commendable life, having a profound and positive impact on the lives of his family, his coworkers, colleagues, and his community. The letters of support attached to this memorandum paint a striking picture of someone with a great capacity for generosity, honesty, and selflessness and someone who strives to spotlight those around him.

Mr. Kail's family members describe him as "honest," "hardworking," "caring" and a wonderful son, son-in-law, husband, father and good citizen. Exh. A (family letters). His wife Raegan writes passionately about how her husband loved working at Netflix, how he always helped others on their paths to success, how much he cared about his employees, and how he would never have done anything to disrespect or deceive them. *Id.* Raegan is brutally honest in writing that if she had the slightest belief that her husband had "jeopardized his career and his reputation, ergo his family, by engaging in criminal activity," then she would have packed her bags and the children and left. *Id.*

His mother relays how Mr. Kail supported his deaf brother, his grandmother at a time of need, and even an unrelated person who didn't have the means to purchase a home. *Id.*

What is most striking are the letters from friends and colleagues who have continued to stand by his side even after learning about the allegations, the trial evidence, and the verdict. These include his former work colleagues, his running friends, and others who have come to know him over the years. For example, Stephen MacLellan, a cyber security expert, describes how Mr. Kail's work in cyber security was instrumental to software development that would be used to secure government data and ward off criminal cyber security attacks. Exh. B (letters from colleagues). Carl Malamud, who runs a nonprofit, relays how Mr. Kail has always done the right thing, even working for free when they were short on funds. *Id.* Gregory King, a longtime friend and running partner of Mr. Kail, writes that despite being a tireless technology professional and dedicated runner, he has always put his family first. *Id.*

A friend and former work associate, Ernesto DiGiambattista, recalls how Mr. Kail always acted in the best interest of the company they both worked for, how he earned the respect of his colleagues, and how he opened his home to him. *Id.* Another longtime friend, Mark Sarno, a scientist and attorney, describes how Mr. Kail coached and helped him for many years, without asking for anything in return. *Id.* Mr. Sarno listened to the trial testimony and maintains his view of Mr. Kail as an outstanding citizen, and thus pleads for the Court's leniency.

A common thread in the letters is how Mr. Kail always strives to make those around him more successful:

- "I think one of the things that drew me to Mike in the first place was the selfless nature of his contribution to the industry by helping those around him be more successful." Exh. B. (Thiele)

- "He never turned down an opportunity to help me during the course of our friendship. It is very rare for a c-level executive like Mike to befriend a salesperson." *Id.* (Lee)

- "He has demonstrated a willingness to of himself to help others, and to make introductions to help further someone else's goal, without expectation of reward." *Id.* (Witteman)

- "Michael has gone out of his way to help me when there was no financial gain to be cleaned from our interactions." *Id.* (Burnham)

As the Court will read, many others share these same sentiments. This in and of itself is unusual. After all, Mr. Kail has been stigmatized for life by his arrest, prosecution, trial, and conviction. He was terminated from his job at Yahoo! and after the verdict, from the job he held. His family suffered the judgement and ridicule of others when this case was reported in the press.

With all of this, it would be natural to expect few letters of support. Yet we see just the opposite: the letters show people from his community sharing stories about his helpfulness, his ethics, his concern for others' success, his commitment to his family and the many people who continue to stand by his side.

In his probation interview, Mr. Kail admitted fault for his errors in judgment and his regret for his lack of transparency regarding compensation, and he hopes this Court will recognize his sincerity: he never intended to harm anyone, and he has tried his entire life to do right by others. This was a difficult and life-altering lesson in considering all angles of a situation before acting.

But for purposes of sentencing, the history and characteristics of Mr. Kail – his efforts and his contributions – are substantial mitigating factors for the Court to consider. His family members, friends, and former work colleagues describe him without artifice and with great sincerity as a good person. The existence of "the history and characteristics of the defendant" is a cornerstone of the sentencing factors. It means that Mr. Kail's conduct outside of this case also <u>counts</u>.

**C.  Sending Mr. Kail to Prison "Isn't A Very Effective Way to Deter Crime."**

As discussed, Section 3553(a)(1)(B) "does not require the goal of general deterrence be met through a period of incarceration." *Edwards*, 595 F.3d at 1016 (not unreasonable for district court to reject prison sentence to promote general deterrence; defendant sentenced to five years' probation with seven months home confinement on Guidelines of 27-33 months); *see also* S. Rep. No. 98-225, at 92 ("It may very often be that release on probation under conditions designed to fit the particular situation will

1  adequately satisfy any appropriate deterrent or punitive purpose.") (footnote omitted) (legislative history

2  of Sentencing Reform Act).

3       In fact, even the Department of Justice admits that "[s]ending an individual convicted of a crime

4  to prison isn't a very effective way to deter crime." U.S. Dep't of Justice, National Institute of Justice,

5  *Five Things About Deterrence* (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf. According to

6  "the best available evidence … prisons do not reduce recidivism more than non custodial sanctions."

7  Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91

8  Prison J. 48S, 50S-51S (2011). In sum, there is no empirical evidence that a custodial sentence will serve

9  a deterrent effect.

10       Further, first-time offenders are less likely to re-offend while also being more impacted by prison.

11  Mr. Kail is a first-time offender: *before* these allegations were made, he was never arrested, incarcerated,

12  or convicted of a crime in his entire life.[2] Unfortunately, incarceration "creates habits of thinking and

13  acting that can be dysfunctional in periods of post-prison adjustment." Craig Haney, *The Psychological*

14  *Impact of Incarceration: Implications for Post-Prison Adjustment* 4 (2001),

15  http://aspe.hhs.gov/hsp/prison2home02/haney.pdf. These psychological consequences "may represent

16  significant impediments to post-prison adjustment. They may interfere with the transition from prison to

17  home, [and] impede ... successful reintegration into a social network…." *Id.*

18       Intuitively stated by his wife: "[a] harsh sentence would have absolutely zero benefit to society,

19  and would only serve to take a father away from two young boys just when they will need him most."

20  Exh. A (Raegan Kail). And from a colleague: "My hope is that Mr. Kail will continue to advocate for

21  doing the right thing in cyber security and help protect our country through his hard work." Exh. B

22  (MacLellan).

23       Incarceration would also mean that Mr. Kail would not be able to earn income – income for his

24  family, the rent that he pays for his mother-in-law, the money he puts into his deaf brother's business,

25  and the multitude of support – financial and moral – that he provides to countless people in his extended

26  family and community.

27

28  [2] Unfortunately, his DUI occurred at a very low point: Mr. Kail had lost his job at Yahoo! and was in the middle of the lawsuit by Netflix.

### D.  A Period of Home Confinement Satisfies the Need for Just Punishment in Light of Seriousness of the Offense

The need for retribution is measured by the degree of "blameworthiness," and "in particular, his degree of intent (mens rea), motives, (and) roles in the offense...." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005). In this case, Mr. Kail did not act with greed or malice. Instead, as noted by many individuals, Mr. Kail:

- "… never asked for anything." – Alex Gorbansky

- "…was in a position to ask for compensation [ ] and did not." – Hugh Burnham

- ". . . coached me for several years …. And yet asked for nothing in the process." – Mark Sarno

- ". . . he could have asked for percentages of my company . . . but he demonstrated his good moral compass." – Robert Reid

- "And, he has never asked for anything from us in return for all his help." – Ken Hausman

*See* Exh. B.

Other courts have recognized this blameworthiness factor when evaluating an appropriate sentence. For example, in *United States v. Whitman*, the court distinguished between "grasping, evil, crooked, despicable human being[s]" and people who are "basically … good … but ha[ve] made some intentional mistakes." Sentencing Transcript at 5, *United States v. Whitman*, No. 12 Cr. 125 (JSR) (S.D.N.Y. Jan. 24, 2013). As trial testimony and letters make clear, Mr. Kail has always tried to act with "integrity, honesty and respect." Exh. A, B. Although this does not absolve Mr. Kail from the verdict, it does contextualize it.

#### 1.   Courts Impose Shorter Sentences as Conditions Get More Harsh

Prison sentences have two dimensions: length and harshness. As conditions get harsher, sentences should get shorter. *See, e.g.*, *United States. v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007) (finding merit to the argument that "the harsher the conditions the shorter the sentence should be."). In this case, if Mr. Kail is sentenced to prison, it will be in a legal environment that has not imposed prison sentences for similarly situated defendants. As one court explained, "defendants committing similar offenses now, in the time of COVID-19, are receiving vastly lower sentencing recommendations, because their time in

1   custody is harsher." *United States v. Armstrong*, 2020 WL 4366015, at *4 (S.D. Cal. July 30, 2020).

2   Indeed, many months after vaccines became widely available to inmates and Bureau of Prisons

3   employees, courts have recognized that "the pandemic has subjected all inmates to far more restrictive

4   conditions of confinement than normal incarceration." *United States v. Robles*, 2021 WL 3524067, at *6

5   (S.D.N.Y. Aug. 10, 2021). *Robles,* a decision issued this summer, states that, "in pending cases, the

6   Court, in imposing sentence, has, based on the impact of COVID-19 on the defendant's conditions of

7   incarceration, imposed materially lower sentences than it otherwise would have." Id. at *7.

8         Therefore, the Court should not sentence Mr. Kail to a period of imprisonment. Doing so would,

9   in effect, lead to sentencing disparities.

10        In addition, if Mr. Kail is sentenced to prison, he will not simply be in a minimum-security camp,

11  as once may have been the case. "This is because the federal prisons, as 'prime candidates' for the spread

12  of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of

13  prisoners far harsher than normal." *United States v. Rodriguez*, 2020 WL 5810161, at *3 (S.D.N.Y. Sept.

14  30, 2020) (internal quotations and citations omitted). This means that the actual <u>severity</u> of his sentence

15  is far greater than those envisioned by the Guidelines or Probation.

16        2.   <u>Section 3553 Instructs the Court to Consider Non-Custodial Sentences.</u>

17        This Court must consider all of the "kinds of sentences available" by statute, § 3553(a)(3), even if

18  the "kinds of sentence . . . established [by] the guidelines" recommend only a lengthy prison term. *Gall*,

19  552 U.S. at 59 & n.11. Congress directed the Commission to ensure "that the guidelines reflect the

20  general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant

21  is a first offender who has not been convicted of a crime of violence or an otherwise serious offense,"

22  and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of

23  violence that results in serious bodily injury." 28 U.S.C. § 994(j).

24        Congress issued this directive in the belief that "sentencing decisions should be designed to

25  ensure that prison resources are, first and foremost, reserved for those violent and serious criminal

26  offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and

27  nonserious offenders, the interests of society as a whole as well as individual victims of crime can

28  continue to be served through the imposition of alternative sentences, such as restitution and community

1    service." Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).

2    Moreover, a non-custodial sentence still serves as a punishment. After all, "[n]oncustodial sentences also

3    curtail prized liberty interests and the Defendant always faces the harsh consequences that wait if he

4    violates the conditions attached to such a sentence." *United States v. Parker*, 2020 WL 2572525, at *13

5    (C.D. Cal. May 21, 2020). Ultimately, Mr. Kail is plainly not a "violent and serious offender" who

6    "pose[s] the most dangerous threat to society." Therefore, this Court has the authority and discretion to

7    impose an alternative sentence, as contemplated by Congress.

8                    3.   The Collateral Consequences of Mr. Kail's Criminal Conviction Are Significant

9           As this Court knows, Mr. Kail is a respected and active member of the IT community, he is an

10   extremely engaged father and husband, and he provides financial assistance to other family members.

11   The Indictment, trial, and sentencing has already had a profound and deep impact on him and his family.

12   In other words, his conviction triggers more than the "actual deprivation of liberty." *United States v.*

13   *Mateo*, 299 F. Supp. 2d 201, 210 (S.D.N.Y. 2004). A host of other penalties and burdens always attend

14   criminal conviction," including "losses of family life, of socioeconomic status, …; diminution of certain

15   civil rights and entitlements; and countless humiliations and indignities commonly associated with living

16   in confinement." *Id*. With the allegations, and then the conviction, Mr. Kail lost his job and certain

17   opportunities will always be limited by the money laundering conviction, since he works in a field where

18   "anti money-laundering" is one of the core tenets. These attendant consequences last far beyond that of a

19   prison sentence or term of probation and therefore, should be considered when sentencing Mr. Kail.

20   **V.  FORFEITURE AND RESTITUTION**

21       **A.  Forfeiture**

22          Mr. Kail opposed the government's proposed order of forfeiture. *See* Dkt. 266. Forfeiture of the

23   home and the stocks would violate the excessive fines clause (any current market value bears no relation

24   to the charged offense conduct). As noted in the Opposition, the stock in Netskope and Sumologic was

25   "property" subject to a jury finding. *See also* Section II(B)((1)(i) above regarding market volatility.

26       **B.  Restitution**

27          First, any award of restitution requires actual pecuniary harm resulting from the offense; that is,

28   proof of both economic loss and loss causation. 18 U.S.C. § 3663A. The burden of demonstrating the

amount of loss sustained by the victim as a result of the offense shall be on the government to prove by a preponderance of the evidence. 18 U.S.C. § 3664(6)(e). *See Finazzo*, 850 F.3d at 118 (requiring a "direct correlation" between a defendant's gain and a victim's loss in order for restitution to be measured according to that gain; it was unsound methodology for district court to merely assume kickbacks were *solely* justified by inflated prices).

Keker & Van Nest, on behalf of Netflix, requests $1,385,000 in restitution. Its arbitrary request is inconsistent with the evidence at trial. Indeed, they provide no support for their conclusions and no citations to the trial record as to any witness who claimed Netflix suffered this loss. Ten years later, it seems any amount can be requested, irrespective of the trial evidence or the opinions of Netflix's management. Neither Reed Hastings nor David Wells claimed Netflix shouldn't have paid the vendor contracts or that the products were never used; nor could they deny that the vendors' technologies helped Netflix's growth. Accordingly, the random restitution request would give Netflix a windfall. The government similarly guesstimates as to alleged loss/restitution. The indictment alleges that the victim suffered losses in the amount of $716,000. Now that figure has suddenly doubled, according to Netflix.

As noted above, the Vistara product was used by Netflix, was expanded by Netflix engineers and was running on *thousands* of virtual machines. Netflix received the benefit of the Vistara agent to its Network Operations Center. Netflix can't both take and use the product and then claim it has buyer's remorse. That Netflix wanted conflict-free contracts is different from spending money and receiving nothing in return. As recognized by the Ninth Circuit, among other courts: "There is no cognizable property interest in 'the ethereal right to accurate information.'" *United States v. Yates*, 2021 WL 4699251 at *5 (9th Cir. Oct. 8, 2021), *citing United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014).

Netflix also seeks $155,00 in alleged loss from the Platfora contract. As discussed above, this was a negotiated contract settlement. Netflix could have owed the entire sum since the contract was cancelled.

Netflix seeks $85,000 in the Numerify contract. Once again, Numerify was used and even renewed by Netflix. No witness ever claimed the Numerify contract was a waste and that Netflix paid money when it should not have. There is no evidence that Netflix received nothing in exchange for the money it paid to Numerify. If that were the case, its own employees would not have lauded its benefits or renewed the contract.

Netflix seeks $120,000 for the Docurated contract. This too makes little sense when numerous Netflix employees requested the contract expansion and used the product. Mr. Kail reviewed the contract along with his colleagues at Netflix. Thus, Netflix cannot both benefit from the technology (at the relevant time period) and then claim it wants its money back.

While Mr. Kail may have been convicted of honest services fraud, this does not indicate that Netflix would not have entered into the contracts absent Mr. Kail's undisclosed advisory benefits. All of the companies were similarly postured – the products were used by Netflix. It makes little sense and there is no support in the record for an after-the-fact demand for reimbursement as to some of the companies. This demonstrates Netflix's haphazard appeal for a windfall.

## CONCLUSION

Any amount of time in prison will have a significant and detrimental impact on Mr. Kail: he has and will continue to bear the impact of his mistakes profoundly. Alternatively, even a sentence of home confinement is a proper and just punishment that serves the interests of deterrence, retribution, and rehabilitation in this instance. Despite the various disputed guidelines the government proposes be stacked on Mr. Kail, the question comes down to what is appropriate for the actual harm and loss to the victim, Netflix, who has received payment from Mr. Kail and whose management and employees never claimed that Mr. Kail caused them economic harm. Moreover, this Court likely knows as well as anyone that Mr. Kail is not a recidivist and would continue to dedicate the balance of his life to continued positive community and professional involvement if given the opportunity to do so.

Thus, the Government and Probation would be hard-pressed to argue that Mr. Kail's proposed sentence is insufficient to meet the goals of § 3553(a). For someone like Mr. Kail, the proposed sentence is a heavy burden that he will carry for the rest of his life.

Dated: October 12, 2021                    Respectfully submitted,

                                           _____/s/_____
                                           Julia Jayne
                                           Attorney for MICHAEL KAIL