1  STEPHANIE M. HINDS (CABN 154284)
   Acting United States Attorney
2
3  HALLIE HOFFMAN (CABN 210020)
   Chief, Criminal Division
4
5  COLIN SAMPSON (CABN 249784)
   CHRISTOPHER KALTSAS (NYBN 5460902)
6  Assistant United States Attorneys

7       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
8       Telephone: (415) 436-7020
        FAX: (415) 436-7009
9       Colin.Sampson@usdoj.gov

10 Attorneys for the United States of America

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                       SAN JOSE DIVISION

14

15 UNITED STATES OF AMERICA,          )    CASE NO. CR 18-172 BLF
                                      )
16         Plaintiff,                 )
                                      )    GOVERNMENT'S SENTENCING
17      v.                            )    MEMORANDUM
                                      )
18                                    )
   MICHAEL KAIL,                      )
19                                    )
           Defendant.                 )
20                                    )

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

I.   INTRODUCTION ..................................................................................................1

II.  CHARGES AND CONVICTION ..........................................................................2

    A.   Indictment and Trial...................................................................................2

III. THE PRESENTENCE INVESTIGATION REPORT ("PSIR") .........................3

    A.   Legal Objections to the PSIR.....................................................................3

    B.   Factual Objections to the PSIR ..................................................................3

IV.  UNITED STATES SENTENCING GUIDELINES PROVISIONS .......................5

    A.   Fraud Loss...................................................................................................5

    B.   The Court Should Apply The Sophisticated Means or Abuse of Position of
         Trust Enhancement, but Not Both. ............................................................5

    C.   Money Laundering Enhancement ...............................................................6

    D.   Obstruction of Justice Enhancement..........................................................6

    E.   Aberrant Behavior......................................................................................8

    F.   Restitution:  The Government's and Netflix's Restitution Calculations ....9

    G.   Forfeiture..................................................................................................10

    H.   The Fine ...................................................................................................12

    I.   The Applicable Sentencing Range............................................................12

V.   18 U.S.C. § 3553(a) ............................................................................................13

    A.   Seriousness of the Offense........................................................................13

    B.   Defendant's History and Characteristics ..................................................14

    C.   General and Specific Deterrence – Respect for the Law ..........................14

    D.   Avoidance of Sentencing Disparities.......................................................15

VI.  CONCLUSION.....................................................................................................16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

*United States v. Bahel*,
    662 F.3d 610 (2nd Cir. 2011) .......................................................................................... 4

*United States v. Crawley*,
    533 F.3d 349 (5th Cir.2008) ........................................................................................... 4

*United States v. Dunnigan*,
    507 U.S. 87 (1993) ............................................................................................. 7, 9, 13, 14

*United States v. Jiminez-Ortega*,
    472 F.3d 1102 (9th Cir. 2007) ........................................................................................ 7

*United States v. Pugh*,
    515 F.3d 1179 (11th Cir. 2008) ...................................................................................... 15

*United States v. Sapoznik*,
    161 F.3d 1117 (7th Cir.1998) ...................................................................................... 4, 5

*United States v. Ture*,
    450 F.3d 352, 358 (8th Cir. 2006) .................................................................................. 13

## STATUTES

18 U.S.C. § 982(a)(1) ............................................................................................................ 3

18 U.S.C. § 1346 .................................................................................................................... 5

18 U.S.C. § 1957 ................................................................................................................. 2, 6

18 U.S.C. § 3553(a) ............................................................................................................... 13

18 U.S.C. § 3663A(a) ............................................................................................................ 9

18 U.S.C. § 3663A(c) ............................................................................................................ 9

18 U.S.C. § 981(a)(1)(C) ....................................................................................................... 3

18 U.S.C. §§ 1341 .............................................................................................................. 2, 9

18 U.S.C. §§ 1343 .................................................................................................................. 2

28 U.S.C. § 2461(c) ............................................................................................................... 3

U.S.C. § 3553(a)(1) ............................................................................................................... 16

## RULES

U.S.S.G. § 2S1.1(b)(2)(A) ............................................................................................ 6

U.S.S.G. § 3B1.3 ...................................................................................................... 5, 6

U.S.S.G. § 3C1.1 .......................................................................................................... 7

U.S.S.G. § 5K2.20 ................................................................................................... 8, 14

U.S.S.G. § 5k2.20(b) .................................................................................................... 8

U.S.S.G. §§ 2B1.1(a)(1) ............................................................................................... 5

## I. INTRODUCTION

The only things that Michael Kail and the government appear to agree on are: (1) he worked at Netflix, Inc. ("Netflix"); and (2) he accepts no responsibility for his crimes. [1]  Instead of taking responsibility for the extensive fraud for which he was convicted, he tries to take credit for Netflix's massive growth from 2011 to 2014, which, in Defendant's mind, was attributable to him and not the thousands of other employees or creative content the company offered.  Defendant claims his work and Netflix's explosive growth during this time somehow zeroes out any loss caused by his bribe scheme and attempts to shield himself with the self-serving claims of praise from his superiors and underlings as Vice President of IT at Netflix.  But this praise and purported good will underscores the pernicious nature of Kail's crimes, and many white-collar crimes generally: the people committing these frauds are largely seen as successful, generous, good neighbors precisely because those frauds are hidden in private agreements or funneled through LLCs. Those coworkers and neighbors never saw Defendant using the proceeds of his fraud on Netflix to pay for houses in expensive neighborhoods and other luxuries.  The truth is, Defendant felt that his choices of certain technologies for Netflix's use created, in his words, a "one way street", and he wanted to benefit from any upside the companies he selected obtained from a pilot or contract from one of the best-known technology companies in Silicon Valley.  His motive was simple—getting rich faster than what his already stupendous salary allowed, with a diverse portfolio of nearly free startup stock options and connections to Silicon Valley Venture Capitalists ("VCs").  His coworkers at Netflix did not know that version of Michael Kail.

As an initial matter, Defendant was compensated—quite generously—by Netflix for his work during this time period, and any value he did, in fact, provide to the company is clearly reflected in the executive salary Netflix paid him, unaware of his scheme.  On top of this, Michael Kail concocted a near-perfect white collar crime scheme,[2] quietly pocketing cash and valuable stock options as an

---

[1] Defendant made clear in his Objections to the Draft Presentence Report ("PSIR") that he disputes the testimony of numerous witnesses and many reasonable inferences made from the admitted exhibits.  The government anticipates that its forthcoming Opposition to the government's sentencing memorandum may be largely devoted to trial record cites that rebut Defendant's denials, however, this Memorandum does not.

[2] The government assumes that the Court is readily familiar with the facts developed at trial, and as recited by the Court recently in its Order Denying Motion for Judgment of Acquittal and Motion for New Trial, Dkt. No. 265.

"advisor" that was hopelessly conflicted by the companies whose contracts he signed and whose technologies he pushed his teams to use.  While he gained cash and contacts, as discussed below, Netflix most certainly lost: money, esteem, employee time, and trust.  There may not be a better candidate for a strong white-collar sentence than this one, both as deterrence—specific and general—and as a warning to the purchasing officials and executives in Silicon Valley quietly siphoning cash and stock from the vendors their employers pay them to select.  A sentence of incarceration for a period of no fewer than **84 months** and a $250,000 fine is sufficient, but not greater than necessary, to deter Defendant and other would-be bribe takers and to reflect the seriousness of the offenses he committed.

## II.    CHARGES AND CONVICTION

### A.    Indictment and Trial

In April 2018, a grand jury sitting in the Northern District of California returned a twenty-nine-count Indictment against Defendant Michael Kail.  See ECF No. 1.  Counts One through Nineteen charged Defendant with Wire Fraud and Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346, and Counts Twenty through Twenty-Two charged Mail Fraud and Honest Services Mail Fraud, in violation of 18 U.S.C. §§ 1341 and 1346.  The Wire and Mail Fraud counts all related to Defendant's scheme to defraud Netflix of money and property and his scheme to defraud Netflix of its intangible right to his honest services by accepting bribes from nine companies whose business he approved as Netflix's Vice President of IT Operations.  Counts Twenty-Three to Twenty-Nine of the Indictment charged Defendant with engaging in financial transactions with the proceeds of the wire and mail fraud scheme, in violation of 18 U.S.C. § 1957, through his use of a single-member LLC called "Unix Mercenary" to receive cash commissions from three of the companies for which he provided "advisory services."

Defendant proceeded to trial in April 2021, which involved twenty-nine live witnesses, one deposition, and approximately 400 exhibits over eight trial days of the government's case-in-chief.  Defendant called three witnesses, including Defendant himself, who provided two days of testimony.  Defendant was convicted of all counts except for one Wire Fraud/Honest Services Wire Fraud count (Count 5).  Notably, the jury found that each of the nine companies named in the Indictment had paid bribes to Defendant.  Defendant demanded that the jury deliberate on whether his purchase of his

$2,175,000 Los Gatos residence was derived from and had a nexus to his fraud scheme, and the jury found that it did.

## III.    THE PRESENTENCE INVESTIGATION REPORT ("PSIR")

### A.    Legal Objections to the PSIR

The United States observes the following legal objections to certain findings in the PSIR:

¶¶ 27, 30:    For the reasons explained below, while the Court may find that a Combined Adjusted Offense Level of 30 is applicable based on the applicability of an abuse of position of trust enhancement and sophisticated means, the government will argue for a total Combined Adjusted Offense Level of 28 based on the abuse of position of trust enhancement and not sophisticated means.

¶¶ 93-94:    Although the PSIR provides that criminal forfeiture is appropriate with respect to the residence, it does not make a specific recommendation with respect to the forfeitability of Defendant's stock in Sumo Logic, Inc., and Netskope, Inc., as personal property involved in the offenses pursuant to 18 U.S.C. § 982(a)(1), or as the proceeds of specified unlawful activities, to wit, mail and wire fraud pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

### B.    Factual Objections to the PSIR

#### (i)    Fraud Loss

¶¶ 20, 26:    The government's evidence established the following quantifiable losses to Netflix:

| Payee | Defendant Signed Contract or Approved Payments? | Amount Paid | Government's Loss Calculation |
|---|---|---|---|
| Docurated, Inc. | 564 | $120,000 | $120,000 |
| Numerify, Inc. | 405 | $85,000 | $85,000 |
| Netenrich, Inc. | *See, e.g.,* Exh. 129,3 130, 1374 | $2,251,440 (Exh. 115) | $275,068.80 |
| Platfora, Inc. | 326, 327 | $225,000 ($75,000 + $155,000) | $155,000 |
| VistaraIT, LLC | 209, p. 7 | $1,385,000 (Exh. 234) | $1,385,000 |
| **Total:** | | | **$2,020,068.80** |

---

3 While a member of Netflix's purchasing department signed the Statement of Work for Netenrich, Defendant approved the contractors, and told Varma Kunaparaju "I have expedited (pre)approval of both the forward-looking Vistara invoice and the current Netenrich invoice." Exh. 129.

4 Defendant responded "Approved" when he was sent invoices from Netenrich. Defendant denied at trial, however, that he was involved in approving Netenrich contractor invoices.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Notably, the government disagrees with the loss calculation provided in Paragraphs 20 and 26 to the extent that they do not include the amount of Defendant's 12% commissions from Netenrich, Inc., which totaled $275,068.80 and should be added to the total fraud loss.  Although Defendant settled a civil matter with Netflix and paid this amount back in 2015, it should be included in the loss figures for sentencing purposes. The bases of these claims were established at trial and litigated in posttrial motions.  These asserted losses, however, understate the pecuniary losses to Netflix, as they do not include amounts authorized by Defendant to other vendors that were paying Defendant in stock or cash, including Netskope, Maginatics, Sumo Logic.

The pecuniary loss to Netflix, Inc., is further not simply limited to the funds the government proved would not have been spent but for Defendant's fraud scheme.  The wages paid to the employee defrauding his employer of its intangible right to his honest services should be considered for purposes of the Guidelines calculation.  When the employee deprives an employer of his honest services, "[t]here is no question that a portion of an individual's salary can be subject to forfeiture where, as here, an employer pays for honest services but receives something less."  *United States v. Bahel*, 662 F.3d 610, 648–49 (2nd Cir. 2011), *citing United States v. Crawley*, 533 F.3d 349, 359 (5th Cir.2008) (salary and pension procured through fraud is "within the ... statutory language" of Section 3663A(b)(1)); *United States v. Sapoznik*, 161 F.3d 1117, 1121 (7th Cir.1998) ("We may assume that [the employer] would not have hired [the defendant] had it known of his intentions, and in that event it would not have paid him four years' salary.... [W]hat [the employer] lost ... [was] the difference in the value of the services that [the defendant] rendered ... and the value of the services that an honest [employee] would have rendered.").  As a result of the above, the government respectfully asserts that the loss for guidelines purposes may also include a reasonable percentage of Defendant's salary resulting from the fraudulent conduct, although the government concedes that this amount would not exceed the $1.48M in additional loss that would make a difference in the applicable loss Guideline.

### (ii)    Ability to Pay Fine

The PSIR does not specifically find that Defendant lacks the resources to pay a fine, indeed, it specifically finds that "he is able to pay a fine." PSIR, p. 28.  Rather, it recommends a bottom-of-

Guidelines $50,000 fine, reasoning that such a fine "consider[s] the needs of defendant's dependents." *Id.* But Defendant's family net worth is $8,200,000 even excluding the undisclosed Netskope stock (which may be worth close to $3,000,000), including enough liquid personal savings to pay off his mortgage and fund his current monthly living expenses through a Guidelines prison sentence. Money was the reason Defendant embarked on his fraud scheme. A top-of-Guidelines fine of $250,000 is the minimum the Court should set from a deterrence perspective.

## IV.   UNITED STATES SENTENCING GUIDELINES PROVISIONS

### A.   Fraud Loss

The government respectfully asserts that the fraud loss, to the extent that it is calculable, is at least **$2,020,068.80**. As argued above, at least this amount is attributable to funds Defendant committed to various companies for contracts that Netflix did not need, or that Netflix was already receiving through another contract (such as Netflix's contract with Tableau). Defendant further authorized payments beyond what the contracts required. This argument does not include money that Netflix could have saved by using its engineers to build a custom solution to the problems Defendant claims these other companies were trying to solve, which several witnesses testified about. Pursuant to U.S.S.G. §§ 2B1.1(a)(1) and (b)(1)(i), the offense level for Defendant's wire and mail fraud convictions with a loss above $1,500,000 and under $3,500,000, is **23**.

### B.   The Court Should Apply the Sophisticated Means or Abuse of Position of Trust Enhancement, but Not Both.

#### 1.   Abuse of Position of Trust Enhancement

Pursuant to U.S.S.G. § 3B1.3, a defendant may receive an enhancement of two points where they "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." Here, the jury convicted defendant of two schemes: a scheme to defraud Netflix of money and property by agreeing to contracts for goods and services beyond what the company needed or would have paid for, and a scheme to defraud Netflix of its intangible right to his honest services. While the Court may ultimately agree that the 18 U.S.C. § 1346 offense "is included in the base offense level or specific offense characteristic" for that crime, the Court should find that this enhancement is applicable to Defendant's wire and mail fraud convictions.

1    Defendant's autonomy and authority to enter into contracts nearly unquestioned as the VP of IT (though

2    he denied this at trial) is precisely what allowed him to ensure that he provided value to companies that

3    compensated him as an advisor, specifically through contracts he signed.  For the companies, a contract

4    with Netflix, and an endorsement from someone like Mr. Kail, was extremely valuable and worth the

5    stock options they awarded him.  Defendant's position of "managerial discretion" that was "subject to

6    significantly less supervision than employees wholse responsibilities are primarily non-discretionary in

7    nature" is precisely what this enhancement was meant to cover.  *See* U.S.S.G. § 3B1.3, *Comment* N. 1.

8    Out of an abundance of caution, the government argues that the abuse of position of trust enhancement

9    is applicable, but that Defendant's use of Unix Mercenary to receive the fraud proceeds may not be

10   appliable under "sophisticated means."

11          **C.      Money Laundering Enhancement**

12          As a result of Defendant's money laundering convictions as to Counts Twenty-Three through

13   Twenty-Nine in violation of 18 U.S.C. § 1957, a one-point enhancement to Defendant's Offense Level

14   is required pursuant to U.S.S.G. § 2S1.1(b)(2)(A).  As described above, Defendant directed kickbacks to

15   an account he opened in early 2012 in the name of the single-member LLC, Unix Mercenary, that he

16   also created in early 2012.  He then moved the funds to his IRA, to the escrow account for the purchase

17   of his Los Gatos residence in 2013, and to accounts he controlled in his own name.  Several of those

18   transfers were over $10,000 and were charged as violations of 18 U.S.C. § 1957.  FBI Forensic

19   Accountant Carlene Kikugawa testified at trial that, for each of those seven charged transfers, over

20   $10,000 was derived from the bribes and kickbacks from Netenrich and VistaraIT pursuant to her lowest

21   intermediate balance analysis.[5]

22          **D.      Obstruction of Justice Enhancement**

23          Defendant should be held to the obstruction enhancement for two reasons:  he lied during his

24   testimony and he has lied to conceal and keep his multimillion-dollar Netskope stock from forfeiture.

25   The commentary to U.S.S.G. § 3C1.1 provides several examples of conduct covered by this

26

27          [5] Defendant deposited several other payments into the Unix Mercenary account after he opened
28   it, however, the vast majority of funds into the account came from Netenrich and VistaraIT. The $5,000
     monthly Netskope payments were deposited into Defendant's personal accounts.

enhancement, including "providing materially false information to a judge" and "providing materially false information to a probation officer in respect to a presentence or other investigation for the court." *See United States v. Rojas*, 5:10-CR-00931-LHK (applying obstruction enhancement in honest services case based on Defendant's trial testimony); *see also United States v. Jiminez-Ortega*, 472 F.3d 1102, 1103 (9th Cir. 2007) ("Before it may adjust defendant's sentence for obstruction of justice, the district court must find that: 1) defendant gave false testimony; 2) the testimony was on a material matter; and 3) defendant had 'willful intent' to provide false testimony") (*citing United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).  Here, like in *Rojas*, Defendant employed a legal strategy of claiming that he thought his listing of his advisory roles on LinkedIn6 satisfied the Netflix policies regarding disclosure of potential conflicts of interest, and denying a quid pro quo relative to his signing contracts with numerous Netflix vendors that were paying him (in cash or stock) as an advisor.  Defendant's testimony was not the product of confusion, mistake, or faulty memory, and the jury largely rejected Defendant's self-serving testimony. Defendant's testimony was much more than his lack of recollection when the government cross-examined him.  For example, Defendant claimed that the contracts were approved by his underlings, despite voluminous evidence that he approved and signed them.  He was further obstructive:

> Q.    SO HEMANTH, DO YOU KNOW WHERE HE WAS AT THE TIME?
> A.    LOCATION-WISE, I HAD NO IDEA.

Trial Transcript, 2296:8-11.  But when asked by his own attorney moments later when discussing the same exhibit:

> Q.    WHO WAS -- THIS REFERENCES A HEMANTH. WHO WAS HEMANTH, IF YOU KNOW?
> A.    HEMANTH PENMETSA WAS AN OVERALL PROJECT MANAGER, NOT -- I DON'T BELIEVE HE WAS INVOLVED IN ACCOUNTING.
> Q.    AND DO YOU KNOW WHERE HE WAS LOCATED?
> A.    I BELIEVE HE WAS IN HYDERABAD, INDIA.

---

[6] Although Defendant argued strenuously that there is no logical reason to disclose payment on LinkedIn, he admitted on cross examination that he never listed his advisory relationship with Netenrich or his referral partner relationship with Netenrich or VistaraIT on his LinkedIn page.  Clearly, this is because his referral partner arrangement, if disclosed, would likely have immediately triggered questions of a conflict of interest by those that knew Netenrich and Vistara were vendors to Netflix's IT Operations department.

Trans., 2365:15-20.  Defendant's memory of the money he made from other companies he advised while they did business with his department was further striking, despite the existence of those payments in his financial records (including his making tens of thousands of dollars on the IPO of RelateIQ, for example).  Finally, Defendant appears to be attempting to hide his valuable Netskope stock, both by failing to disclose it to Probation, and later in refusing to disclose it and making spurious and unsupported arguments about restrictions on the stock when confronted by the government during the PSIR preparation phase.

**E.      Aberrant Behavior**

The government disputes the "there is no evidence that the defendant's behavior in the instant offense is part of a pattern of fraud and deceit" such that a variance under U.S.S.G. § 5K2.20 for aberrant behavior for two independent reasons. PSIR ¶ 99. First, Defendant's conduct involved numerous and repeated incidents and charges of honest services fraud and money laundering.  *See* U.S.S.G. § 5K2.20, Cmt. n.2 ("a fraud scheme generally would not meet such requirements because such a scheme usually involves repetitive acts, rather than a single occurrence or single criminal transaction, and significant planning").  Defendant's conduct does not meet the Guidelines policy statement because his conduct involved significant planning, bribes from at least nine companies, and a duration of approximately 30 months from early 2012 through July 2014.  *See* U.S.S.G. § 5k2.20(b). Defendant's onboarding paperwork for his position as Chief Information Officer of Yahoo!, which he accepted before leaving his position at Netflix, affirmed that he was "not party to any current agreement with any person or entity the terms of which may conflict with the terms of this Agreement."  The agreement further provided that Defendant did "not have any relationship with or commitment to any other person or entity" and was required to list any ownership of or involvement in business activities. *See* Exhibit 1.[7]  Although Defendant listed one company (not relevant to Netflix) as part of his disclosures to Yahoo!, and stated that we was part of the "Board of Directors [. . . ] November 2013 – Present", the Yahoo! questionnaire specifically required disclosure of "advisory boards" and "any outside investments in a privately held company that is a competitor, supplier, partner or vender of

---

[7] The government has attached employment documents obtained during the investigation from Yahoo! As Exhibit 1, comprising document stamped YHO0000-1-22 and YHO000071-83.

1   Yahoo."  Defendant's offer of employment, which he signed August 5, 2014, stated that "[a]ny outside

2   activities must be in compliance with and approved if required by Yahoo!'s Code of Ethics."  *Id.*

3   Defendant affirmed that he read and understood Yahoo!'s Code of Ethics, and on the same document,

4   Defendant certified that he had "no positions, employment or affiliation with any outside for-profit

5   company related to or potentially related to Yahoo!'s business (including as a consultant, employee,

6   officer, director, trustee or technical advisory board member)" and that he had "no investments in any

7   Yahoo! customer, competitor, supplier or partner."  Similar to Netflix's Code of Ethics, Yahoo!'s

8   policies defined a conflict of interest as "when direct or indirect personal interests interfere or may

9   reasonably be perceived as interfering with the best interests of Yahoo."  *Id.*, YHO000074.  Defendant

10  did not disclose his advisory positions or options in Sumo Logic, Inc., Docurated, Inc., and Maginatics,

11  Inc., his consulting income from Netenrich, Inc., VistaraIT, LLC, and Netskope, Inc., or his advisory

12  options in Netskope, Inc., Numerify, Inc., ElasticBox, Inc., Platfora, Inc., and Netenrich, Inc.  Indeed,

13  Defendant did not name any companies that he had contractual relationships with.

14      Defendant, having failed to disclose his advisory relationship with Numerify, testified that, at

15  Yahoo!, he "introduced Numerify to some team members." Vol. 11, 2329:9-2330:20; *see also* Exh. 421.

16  While CIO of Yahoo!, Defendant told the CEO of Numerify to "[l]et me know how I can be most

17  helpful on the Y! front"  Exh. 416, NUMSUB000517.  As a result, Defendant's receipt of kickbacks and

18  bribes from nine companies over 30 months, and his concealment of conflicts of interest from his next

19  employer, undermine the applicability of a reduction for aberrant behavior.

20      **F.      Restitution:  The Government's and Netflix's Restitution Calculations**

21      Defendant was found guilty of violating 18 U.S.C. §§ 1341, 1343, 1346, and 1957, which are

22  covered by the Mandatory Victim Restitution Act of 1996, 18 U.S.C. §§ 3663A(b)(1)(B)(ii). This statute

23  provides that restitution is mandatory when a defendant has been convicted of certain enumerated

24  offenses.  18 U.S.C. § 3663A(a).  The enumerated offenses include any Title 18 offense against

25  property, including any offense committed by fraud or deceit.  18 U.S.C. § 3663A(c).  Defendant's wire,

26  mail, and honest services fraud convictions are Title 18 offenses against property, and were committed

27  by fraud or deceit.

28

1   The government supports Netflix's restitution calculation of **$1,272,000**.  As an initial matter, the

2   fraud loss differs from the restitution calculation due to the late 2015 civil settlement between Defendant

3   and Netflix and his payment of several hundred thousand dollars relating to the Unix Mercenary

4   commissions paid by Netenrich and VistaraIT.  However, the government proved at trial beyond a

5   reasonable doubt, and here by a preponderance of the evidence, that VistaraIT was not used at Netflix,

6   despite Defendant's approval of numerous monthly invoices (frequently $35,000 per month, 15% of

7   which was kicked back to Defendant) for monitoring 2000 devices at the company.  As a result, the

8   Court should find that Defendant is responsible for restitution to Netflix for the remaining 85% of the

9   $1,385,000 in billings to Netflix between 2012 and 2014, or $912,000.  Defendant used his high level of

10  financial decision-making authority at Netflix to spend nearly $7 to ensure he received his $1.

11  Moreover, the jury found that the Numerify, Docurated, and Platfora contracts were all parts of

12  Defendant's fraud scheme.  Numerify's product was not useful at Netflix based on the way Netflix

13  managed IT for the company.  The $120,000 Docurated contract was similarly not useful at Netflix.

14  Finally, Defendant committed to paying $155,000 to Platfora as the deal soured, despite his direct

15  report's assertion that the company never met its milestones with Platfora and Netflix could have exited

16  the contract without a financial commitment. Indeed, a former Netflix purchasing manager, Sylvia

17  Sundholm, confronted Defendant about the payment to Platfora at the termination of the contract, and

18  which point Defendant lied to her and forced Netflix to pay out $155,000, the exact amount that Platfora

19  had booked from the contract for that year.  Defendant did not do so to further Netflix's interest, but to

20  avoid a confrontation that might reveal his false denial of conflict of interest with Platfora.

21  Other payments made by Netflix for technology it did not need or use are difficult to quantify,

22  and therefore both Netflix and the government respectfully assert that the above restitution, totaling at

23  least $1,272,000, is appropriate in light of the circumstances and the quantifiable economic harm caused

24  by Defendant.

25  **G.    Forfeiture**

26  Defendant exercised his right to have the jury consider the government's forfeiture allegation,

27  and the jury found that the residence at 234 Almendra Drive was involved in Defendant's money

28  laundering activities.  $70,000 was wired directly from Defendant's Unix Mercenary account to the

1   escrow for the purchase of the residence.  As the Government established at trial, and as the jury found,

2   the $70,000 was the proceeds of Defendant's specified unlawful activity. Defendant deposited the

3   money he received from Netenrich, Inc., VistaraIT, LLC, and Netskope, Inc. into the Unix Mercenary

4   accounts, and moved large amounts of those funds to his personal checking accounts (comprising

5   Counts Twenty-Five through Twenty-Nine).  Moreover, that Defendant purchased the residence with an

6   interest-only mortgage (and likely still has an interest-only mortgage, given his current loan balance)

7   only further underscores the importance of the $70,000 down payment derived from criminal-sourced

8   proceeds in purchasing the residence.  A separate Motion for Preliminary Order of Forfeiture (Dkt. No.

9   265) has been filed and addresses the government's arguments in support of forfeiture of the residence

10  in greater detail.

11          Defendant must also forfeit his 106,000 shares of Netskope, Inc., which may be worth over

12  $2,700,000[8] today (and which Defendant has refused to disclose to Probation in a blatant attempt to

13  keep them), and 50,000 shares of Sumo Logic, Inc., which is publicly traded and worth approximately

14  $800,000 today at $15.83 per share. *See* MarketWatch, https://www.marketwatch.com/investing/

15  stock/sumo (last accessed Oct. 8, 2021).  Defendant's signed advisory services agreements with both

16  Netskope, Inc. and Sumo Logic, Inc. while he was VP of IT at Netflix, and exercised the shares shortly

17  after leaving his employment at Netflix.  Only when Defendant testified on April 21, 2021, did the

18  government discover that Defendant still held these shares.  *See* Vol. 10, 2226:9-17; Vol. 11, 2330:21-

19  2331:3, 2351:10-12.  A report dated July 7, 2021, reports Netskope's share value at $20.45 at a $5.9

20  Billion valuation.  *See* Prime Unicorn White Paper on Netskope, https://www.vcexperts.com/

21  prime_unicorn_companies/d4a2898f-6223-4ee6-b248-717b5dc5373c.pdf (last accessed Oct. 10, 2021).

22  At that valuation, Defendant's Netskope stock may be worth $2,167,700, however, recent valuation

23  estimates of Netskope have placed its valuation 25% higher, at $7.5 billion.  *See*

24  https://techcrunch.com/2021/07/09/cloud-security-platform-netskope-boosts-valuation-to-7-5b-

25  following-300m-raise (last accessed Oct. 10, 2021); *see also* Craft, https://craft.co/netskope/metrics

26  (accessed Sept 16, 2021). As a result, Defendant's net worth may be underreported by nearly

27  _____

28      [8] Defendant's net worth is accordingly understated by at least this amount, potentially impacting
    this Court's consideration of his ability to pay a fine.

$3,000,000, or 30%.

Defendant disclosed the Sumo Logic stock when asked about assets by the Probation Office, likely because the shares are publicly traded or in a brokerage account he controlled.  However, his 106,000 shares of Netskope, which are not publicly traded, were omitted from his financial disclosures.  When the government called attention to the missing stock from Defendant's disclosures, counsel for Defendant claimed (without providing any documents or substantiation) that Defendant has certain restrictions that encumber the stock, none of which appeared in his advisory agreement.  Moreover, Defendant's counsel claimed that the value of the stock was "speculative".  Defendant should not profit from his frauds, but profit he will if he is allowed to conceal and keep this stock.  Whatever they are worth, these stocks must be forfeited, save his small basis[9] in them, or a forfeiture money judgment must be entered for their value.

**H.    The Fine**

A high-Guidelines fine is appropriate for the profitable, greed-based offense the government proved at trial.  $250,000, which is both the statutory maximum for a single count of conviction and the high-end of the Guidelines fine for offense level 28, is appropriate for all the reasons argued in this memorandum.

**I.    The Applicable Sentencing Range**

At **Offense Level 28**, the applicable range for incarceration is **78 to 97 months**.  As argued above, there is no basis for a departure or variance in this case, and nothing that should put Defendant's conduct at the low end of the Guidelines range.  Defendant is and at all times was an intelligent, affluent, high powered technology expert who used his position of power to enrich himself despite working for a high paying, high-growth silicon valley company. Defendant's crimes are squarely within the heartland the Guidelines ranges were designed to address.  Defendant has enough wealth that he can likely write a check for the restitution and fine, surrender his stock, and still have enough cash to provide for his family and children through their college years.  Defendant's crime was extensive and well-hidden until

[9] Defendant paid of $8,798 on January 12, 2015 ($.083 per share) to acquire 26,500 shares of Netskope, Inc., which later split twice to 106,000 shares.  *See* Trial Exhibits 473, 479.

1    his successors had to determine why the company was paying for products they didn't recognize.  This

2    conduct calls for a sentence in the middle of the Guidelines.

3    **V.      18 U.S.C. § 3553(a)**

4            Section 3553(a)'s factors also strongly support the government's recommended sentence of 84

5    months' imprisonment because Defendant committed his crimes over two and a half years, causing

6    losses of over $2,000,000 and millions of dollars of gain for himself.

7            District courts are to impose a sentence sufficient, but not greater than necessary, to comply with

8    the purposes set forth in the Sentencing Reform Act.  *See* 18 U.S.C. § 3553(a).  In so doing, the courts

9    are to consider, among other things: (1) the nature and circumstances of the offense and the history and

10   characteristics of the defendant; (2) the need for the sentence imposed (A) to reflect the seriousness of

11   the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford

12   adequate deterrence to criminal conduct, (C) to protect the public from further crimes of the defendant,

13   and (D) to provide the defendant with needed educational or vocational training, medical care, or other

14   correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of

15   sentence and the sentencing range established by the Guidelines; (5) any pertinent policy statement; and

16   (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have

17   been found guilty of similar conduct.  *Id.*  While all of the Section 3553(a) factors should be considered,

18   the government highlights a few that are particularly important in this case.

19           **A.      Seriousness of the Offense**

20           The offenses at issue here are serious.  Defendant leveraged his status as a leader of the IT

21   community in Silicon Valley to subvert the trust of Netflix and others to profit at their expense.

22   Defendant's pattern of fraud reached not one, but *nine* separate companies, all of which were startups

23   looking for a significant contract (sometimes their first) that would boost their visibility and corporate

24   image.  Defendant used his authority to extract cash or discounted advisory shares from these fledgling

25   companies, all with the promise to assist with the growth of both the companies' work portfolios and the

26   growth of his financial portfolio. During this time, Defendant damaged Netflix's standing as an entity that

27   approached business with ethical clarity—embodied in its no-conflicts policies and its Culture Deck.

28   The startups that paid to play, and possibly many others, believed this was how Netflix did business. The

1  seriousness of the offense is also visible through the extent of Defendant's gain from his fraud.

2  Notwithstanding a generous executive salary, Defendant used his position of authority to purchase a

3  home in a wealthy area, all while his employer paid out unnecessary expenses that benefitted Defendant

4  personally.

5      Moreover, financial crimes are difficult to investigate and are costly and difficult to prosecute. A

6  significant amount of time and resources of the FBI and IRS were necessary for the investigation and

7  prosecution of this case as it was a particularly brazen fraud with levels of complexity. These agents

8  spent years and monumental effort obtaining and analyzing the records of numerous bank accounts,

9  seeking and executing email and physical search warrants, reviewing evidence obtained through those

10  warrants as well as Grand Jury subpoenas and other process, interviewing dozens of witnesses,

11  preparing for trial, and assisting the victim, among other things, just to bring Defendant to justice. The

12  sentence imposed upon Defendant should reflect the seriousness of the crime as reflected through loss to

13  Netflix, gain to Defendant, and the resources the government used to investigate Defendant's criminal

14  activities.

15      **B.    Defendant's History and Characteristics**

16      The government respectfully disagrees with the PSIR to the extent that it recommends a below-

17  guidelines sentence based on Defendant's "lack of a pattern of fraud and deceit" and that the crimes

18  "can be viewed as aberrant." PSIR, ¶ 99; *see* U.S.S.G. §5K2.20. The reduction for aberrant behavior is

19  not appropriate here, as it applies where "the defendant committed a single criminal occurrence or single

20  criminal transaction." Here, Defendant's scheme lasted two and a half years, involved at least nine

21  separate companies. Further, the "aberrant behavior" departure only applies where the offense was

22  committed "without significant planning." *Id.* Defendant's creation of an LLC to keep his bribes,

23  creation of a trust to hold title to his house and some of his stock (such as Docurated), all required

24  significant planning and took place over multiple years. Defendant further failed to disclose many of

25  these advisory roles to his next employer, Yahoo!, and sought to direct business to at least one company

26  (Numerify). Finally, Defendant obstructed justice at his trial seven years after the actions in question.

27      **C.    General and Specific Deterrence – Respect for the Law**

28      The government's recommended sentence of 84 months' imprisonment is necessary to afford

1    adequate specific deterrence against future crimes to Defendant and general deterrence to the

2    community.  General deterrence is one of the prescribed goals of every sentencing, *United States v.*

3    *Pugh*, 515 F.3d 1179, 1194 (11th Cir. 2008), but it occupies an especially important role in sentencing

4    for fraud offenses, because prosecutions of high-level executives are rare and are afforded great

5    attention by others in positions of power. Nowhere is that need higher than in Silicon Valley, where the

6    opportunity to abuse power with the promise of assistance to startup companies is a constant, temptation

7    for executives looking to line their pockets with kickbacks and bribes. A sentence of 84 months'

8    imprisonment would be sufficient, but not more than necessary to accomplish this goal. Industry

9    executives and venture capitalists, who pay attention to cases like these, are likely to have an appropriate

10   respect for the law with such a sentence, and would help underscore that the potential losses in such

11   cases would far outweigh the gains.

12       A below-Guidelines sentence for Defendant's crimes could send the wrong public message and

13   certainly would not fulfill the need for deterrence.  Instead, it would foster a belief that certain white-

14   collar crimes are not serious, and when caught are not punished like other crimes. The admonition of the

15   Court of Appeals in *United States v. Ture* applies aptly: "the goal of deterrence rings hollow if a prison

16   sentence is not imposed in this case."  450 F.3d 352, 358 (8th Cir. 2006).  Along those lines, there is a

17   public perception in cases like this of defendants being charged and getting away with probation or a

18   sentence significantly below the Guidelines, while other defendants in different sorts of cases are not so

19   fortunate. That should not be the case here, especially in a case with such serious and pervasive criminal

20   activity. This case is not unusual in any way that warrants a downward departure from the Guidelines.

21       This case is not unusual in any way that warrants a downward departure from the Guidelines.

22   In addition to serving as adequate general deterrence, a sentence of 84 months' imprisonment also

23   affords sufficient specific deterrence.  Without a significant sentence of imprisonment, Defendant may

24   make a calculated decision in the future that the risks of being caught again by his employer or by law

25   enforcement and punished are outweighed by the substantial financial rewards of cheating.

26   Accordingly, a Guidelines sentence is warranted to adequately deter Defendant from future criminal

27   conduct.

28                 **D.    Avoidance of Sentencing Disparities**

GOVERNMENT'S SENTENCING MEMORANDUM,
CR-18-00172 BLF                          15

1    The Court should enter a deterrent, mid-range (based on an Adjusted Offense Level of 28)

2    sentence of imprisonment of **84 months**.  Title 18, U.S.C. § 3553(a)(1), requires that "the nature and

3    circumstances of the offense" be considered in sentencing.  As detailed above, the nature and

4    circumstances of Defendant's offenses demonstrate that his scheme to defraud his employer was not out

5    of financial distress but purely to get rich faster.  The scheme further involved numerous separate

6    instances and manners of deceit.  Section 3553(a) requires that the sentence imposed provide "adequate

7    deterrence." *Id.*  The United States asserts that, should the Court enter a below-Guidelines sentence in

8    this case, which is squarely within the heartland of cases the Guidelines were written to address for

9    uniformity in sentencings, it will be insufficient and thus inadequate to provide specific deterrence to

10    Mr. Kail and general deterrence to those individuals vested with fiduciary authority to bind their

11    companies' funds and reputation in contracts while secretly lining their pockets with bribes and

12    kickbacks. The best way to ensure that Defendant's sentence is not disparate from those convicted of

13    similar fraud crimes throughout the country is to sentence him to a period of incarceration within the

14    Guidelines range.  To that end, the government recommends that the Court sentence Defendant to 84

15    months' imprisonment.

16    **VI.    CONCLUSION**

17    For two and a half years as Vice President of IT at Netflix, Defendant cheated his employer by

18    accepting undisclosed bribes from startups whose valuable contracts he signed, costing Netflix over

19    $2,000,000 in unnecessary expenses and enriching Defendant with cash and stock options that he still

20    holds and are worth well over $3,000,000 today.  Defendant almost certainly is not the only high-level

21    tech executive that used his position to line his pockets with undisclosed bribes, but he is the only one

22    before this Court for sentencing.  The best message the Court can send to corrupt executives and

23    purchasing officials is a deterrent prison sentence.  An 84-month term of incarceration followed by three

24    years of supervised release, full restitution to Netflix, Inc. of $1,272,000, with a deterrent, top-of-

25    Guidelines fine of $250,000 pursuant to U.S.S.G. § 5E1.2 (2014)[10], forfeiture of the proceeds that went

26    into the purchase of Defendant's residence, and forfeiture of Defendant's ill-gotten stock in Netskope,

27

28    _____
       [10] For his 28 counts of conviction, Defendant will also be responsible for the mandatory Special
       Assessment of $2,800.

1    Inc. and Sumo Logic, Inc., is sufficient but no greater than necessary to address the conduct and comply

2    with the sentencing goals laid out in Title 18.

3                                              Respectfully submitted,

4                                              STEPHANIE M. HINDS
                                               Acting United States Attorney
5
6    Dated: October 12, 2021.                  */s/ Colin Sampson*_____
                                               COLIN SAMPSON
7                                              CHRISTOPHER KALTSAS
                                               Assistant United States Attorneys
8