JULIA M. JAYNE, State Bar No. 202753
Jayne Law Group, P.C.
803 Hearst Ave.
Berkeley, CA 94710
Telephone: 415-623-3600
Facsimile: 415-623-3605
julia@jaynelawgroup.com

Attorney for Defendant MICHAEL KAIL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>MICHAEL KAIL,<br><br>　　　　Defendant. | Case No. 18 CR 172 BLF<br><br>**DEFENDANT MICHAEL KAIL'S REPLY TO GOVERNMENT'S SENTENCING MEMO**<br><br>Hearing Date:　　TBD<br>Time:　　　　　　TBD<br>Dept:　　　　　　Courtroom 3, 5th Floor<br>Judge:　　　　　Hon. Beth Labson Freeman |

　　　This reply memorandum is intended to address and clarify a few of the government's allegations in its Sentencing Memo (Dkt. 270) and to clarify Mr. Kail's assets. To the extent it is relevant, Mr. Kail did make disclosures to Yahoo! and never violated any of their policies.

　　**A.  Mr. Kail Made Disclosures to Yahoo!**

　　　The government alleges that Mr. Kail engaged in a "pattern of fraud and deceit" because he failed to notify Yahoo! of relevant advisory positions. This is not correct. First, Mr. Kail did not accept a position at Yahoo! before resigning from Netflix. *See* Dkt. 270 at p. 8:18-19. He resigned from Netflix on July 16, 2014. His last day at Netflix was August 1, 2014. Mr. Kail believed he was going to go work for Fanatics. He then unexpectedly interviewed with Yahoo! on August 2, 2014. Two days later, on August 4, 2014, Mr. Kail accepted the Yahoo! offer.

　　　Second, after he filled out the initial paperwork (August 5), he later submitted a supplemental

1 disclosure outlining his advisory positions, although, it is clear from the documents that only "activity
2 related to or potentially related to Yahoo's business" needed disclosure. *See* Gov. Exh. 1. Dkt. 270-1, p.
3 28 ("Generally, outside employment with a Yahoo competitor is not permitted"). In other words, Mr.
4 Kail was obligated to disclose employment that was potentially competitive to Yahoo!'s business. In any
5 event, Mr. Kail, after the flurry of a quick offer and acceptance, did go back and amend the paperwork,
6 which he does not currently have, but believes it should be in the possession of Yahoo!.

7     Not only that, Mr. Kail regularly made disclosures to Yahoo! as advisory or board positions
8 arose. Attached Exh. A-1 is a representative example of such disclosures.

9     Finally, when Mr. Kail was terminated from Yahoo! – due to Netflix's allegations – they
10 completed a full audit of Mr. Kail's employment and positions. They found no wrongdoing and provided
11 him with full severance.

12     Therefore, the government's fixation on Yahoo! is unjustified and appears to be nothing more
13 than an effort to distract from the Section 3553(a) factors weighing in his favor.

14     **B.  Mr. Kail's Assets are Overstated in the PSR**

15     The Government alleges that Mr. Kail used the proceeds of his fraud to buy "houses in expensive
16 neighborhoods and other luxuries." *See* Dkt. 270 at p. 1. What houses? What luxuries? As reported in the
17 PSR, Mr. Kail and his family live in a 2,185 square foot house and share one vehicle. PSR ¶ 51. His
18 children attend public school. Any home in the Bay Area is pricey, and as noted by the government, Mr.
19 Kail took out an interest-only loan to purchase a home near Netflix. The government's effort to paint Mr.
20 Kail as someone who engaged in fraud as evidenced by an extravagant lifestyle falls flat.

21     Additionally, the PSR overstates his assets by over $2 million. The Charles Schwab "securities"
22 which the PSR lists as totaling $2,233,730.59 is *duplicative* of the Charles Schwab ("savings type
23 account) listed as totaling $2,120,273.89. These line items are the *same thing*. When Mr. Kail reported
24 his bank accounts (Section A of the PSR packet), he included his Charles Schwab investment account.
25 He was then asked to *specify* his securities in Section B of the PSR packet. Thus, he then listed all of the
26 securities held in that *same* Charles Schwab account. The approximate $2 million is one investment
27 account in Charles Schwab, consisting of five different stocks. Therefore, his overall assets must be
28 reduced by at least $2 million.

Further, since Mr. Kail submitted the value of his stock holdings (held in a Charles Schwab account), the number has fallen: Sumologic, Beachbody and Peloton stock are down significantly, and all continue to fluctuate. His retirement holdings are also subject to fluctuation and of course, if withdrawn prior to age 59 ½ will be taxed at 10 percent, plus income tax. And finally, the SVB Savings account should reflect a balance of $619,607 *less* due to a tax payment by Mr. Kail this month.

His family is living off their (not exorbitant) savings.

**CONCLUSION**

This Court should consider Yahoo! only to the extent that it shows Mr. Kail took measures to ensure that Yahoo! was fully informed of his advisory and board positions. Unlike Netflix, Yahoo! had a very clear process of documenting possible conflicts of interest, which Mr. Kail not only submitted, but also made sure to clear with his superiors, colleagues, and the ethics and compliance department.

This Court should not enhance Mr. Kail's sentence because of the government's hyperbole as to the harm Mr. Kail purportedly caused and should disregard the government's exaggeration of his net worth and expenditures.

Dated: October 15, 2021               Respectfully submitted,

                                      /s/
                                      Julia Jayne
                                      Attorney for MICHAEL KAIL