STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

COLIN SAMPSON (CABN 249784)
CHRISTOPHER KALTSAS (NYBN 5460902)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7020
    FAX: (415) 436-7009
    Colin.Sampson@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 18-172 BLF |
| Plaintiff, | GOVERNMENT'S SENTENCING RESPONSE |
| v. | |
| MICHAEL KAIL, | |
| Defendant. | |

## I.    INTRODUCTION

Mr. Kail's sentencing memorandum underscores the need for a significant prison sentence to address specific deterrence and the other factors enumerated in 18 U.S.C. § 3553(a). For three weeks in April 2021, the jury heard from the honest, hard-working employees of Netflix about the companies that Mr. Kail onboarded, and then the jury heard about the money and shares and his lies and half-truths, before hearing Defendant's own self-serving testimony over two days. After that, he was convicted, and the

GOVERNMENT'S SENTENCING RESPONSE,
CR-18-00172 BLF

jury found that his residence was also forfeitable from Defendant's fraud scheme. Despite this, Defendant has filed a 53-page paean to his own ego in which he calls his former coworkers liars, extols his own virtues, and maintains that his only error was not being "clearer" with people. But the unvarnished truth is that Mr. Kail spend years deceiving his employer and hiding his profits, using his privileged position as an access point for vendors to Netflix in order to enrich himself at the cost of his employer. Defendant has a self-serving claim for every lie, every bribe, and every dollar Netflix lost while he was signing contracts that benefitted him personally because he was irrevocably conflicted. Defendant's sentencing brief is notable for its utter failure to recognize that the claimed universal praise and admiration of his colleagues for being a visionary cloud trailblazer would have been vastly diminished if only his colleagues had known he was taking hundreds of thousands of dollars on the side from companies he was doing business with, in flagrant (but secret) disregard of the conditions and policies governing his employment.

Defendant's greatest flourish his request to be "sentenced" to go on a speaking tour to "tell his story" and talk about "what is honest services fraud, best practices for taking advisory positions, the acceptance of stock options in the workplace, etc." What story will that be, given his claim that the jury has convicted an innocent man? What kind of sentence is it to give someone exactly what they wanted from trial: another platform to advertise himself and his greatness to anyone who will listen? For someone that is personally claiming his tenure at Netflix and not "Orange Is the New Black" that doubled the company's subscribers, going around and telling his story a reward and not a punishment.

Defendant's demand for a non-sentence, including his citations to studies of the lack of prison's effect, actually underscore that Mr. Kail, and convicted persons like him, may be the demographic most deterred by the thought of a prison sentence, and likely undeterred by the thought of a home confinement term. The Court should enter a sentence commensurate with Defendant's fraud scheme, one that will make him - and others - think twice before they lie to benefit themselves over the companies that pay them handsomely for their unconflicted services.

//

## II. BURDEN OF PROOF AT SENTENCING

Defendant claims the government must prove the fraud loss figures by clear and convincing evidence. It has. However, clear and convincing evidence is not the standard, and defendant may not manufacture a disproportionality by making meritless loss arguments. In determining whether the government has established the applicability of the Guidelines enhancements set forth above, this Court should apply a preponderance-of-the-evidence standard. The Ninth Circuit has held that factual findings underlying sentencing enhancements generally must be supported by a preponderance of the evidence. *See, e.g.*, *United States v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008). It is true that due process may require trial courts to apply the clear-and-convincing-evidence standard of proof when "the combined impact of the contested sentencing enhancements is disproportionate relative to the offense of conviction." *United States v. Riley*, 335 F.3d 919, 925 (9th Cir. 2003). In *Riley*, however, the Ninth Circuit held that where enhancements are based on the extent of the fraud to which the defendant was convicted, the court need only apply the preponderance standard. *Id.* at 926; *see also id.* ("The fact that an enhancement is based on the extent of a conspiracy for which the defendant was convicted weighs heavily against the application of the clear and convincing evidence standard of proof."); *see also United States v. Johansson*, 249 F.3d 848, 857 (9th Cir. 2001) (holding that district court did not err in applying preponderance standard where defendant's "offense level was increased because of the nature and extent of the offense to which he pled guilty, rather than for acquitted or uncharged crimes").

Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Ninth Circuit has affirmed the validity of this line of cases calling for application of the preponderance standard under such circumstances. *See United States v. Berger*, 587 F.3d 1038, 1047–49 (9th Cir. 2009) (holding that it was not error for district court to apply preponderance standard in determining amount of loss because enhancement was "based entirely on the extent of the fraud conspiracy for which Berger was convicted") (citing *Armstead*, *Riley*, and *United States v. Garro*, 517 F.3d 1163 (9th Cir. 2008)). As argued below, because the facts underlying the government's loss guidelines calculations were, in fact, based entirely on the extent of the fraud scheme that led to Defendant's conviction, and not unproven relevant conduct, for example, the preponderance standard applies, whether or not the government has proven a loss to a higher standard.

### III. DEFENDANT'S GUIDELINES CALCULATION

#### a. Fraud Loss

Defendant asserts a fraud loss of nothing to his former employer. The Court should reject this claim. The government's fraud loss arguments are conservative, and are wholly based on the trial record and counts of conviction by the jury under a reasonable doubt standard. The government presented overwhelming evidence- rebutted only by Defendant's self-serving testimony (and in a few cases the self-serving testimony of the executives of companies that paid Defendant), that he purchased goods and services that the IT Operations department did not need, and otherwise financially favored himself and the outside vendors that paid him. While the government does not intend to rehash the trial evidence and Rule 29 briefing, the evidence firmly supports the government's calculations. VistataIT, LLC's remote monitoring service was brought to Netflix by Defendant. *See* Trial Trans., Vol. 5, 1140:10-12 (Rob Fry). Fry was asked to test Vistara- he was not told the company was already being paid tens of thousands of dollars per month- but it never got out of the proof-of-concept phase because "we never trusted it or got it to the point where we trusted it enough to replace the existing tools." 1141:17-22, 1142:1-2 (Fry). Ashley Sprague, who Defendant's attorney absurdly claimed committed perjury at trial, recalled the Vistara proof of concept and that "we had other technology that was doing a better job, so it was not a good fit." Trial Trans., Vol. 9, 1822:20-22 (Sprague). Beyond Defendant's 15% cut of the fees as a referral partner, the Vistara product was only tested and not deployed- even Vistara knew this. *See* Exhibit 235; *see also* Trial Trans., Vol. 9, 1826:2-6 (Vistara was "not even in limited use.") (Sprague). The $1,385,000[1] paid by Netflix to Vistara is a loss to the company caused by Defendant's fraud scheme.

The $155,000 final payment to Platfora, which Defendant authorized by overruling Sylvia Sundholm's observation that it was not required, may even be an understatement of the loss. In Mr.

---

[1] Similarly, the Court should reject Defendant's claim that the 12% commissions he received from each of the Netenrich engineers that worked in his department at Netflix should not be included in the fraud loss calculation because the commission had to go to someone. This is untrue. Both the Referral Partner contract stated (and witness Varma Kunaparaju confirmed) that the sales representative agreement "in no way limit[ed] Netenrich's right to sell directly or indirectly any product or service to any current or prospective customer." *See* Exhibit 107; *see also* Trial Trans., Vol. 4, 819:2-7 (Kunaparaju). Defendant's claim that the commission had to go to someone is meritless, and the $275,068.80 paid to him is a fraud loss to Netflix.

Kail's own words, before he was given options and later awarded Platfora a 3-year, $600,000 contract, "[t]he team needs to make Tony [Ralph] see the value in $100k/year as he and the team, to be completely candid, don't." Exhibit 321. In the same email, Platfora CFO Michael Asher assures the Defendant that "[i]f we did not deliver the functionality – you would opt out." *Id.* An email from Netflix employee Kurt Brown to Defendant asserted that Platfora had "limited to no usage" at Netflix. Exh. 343. But when Yingkuan Liu, a Netflix engineer, cancelled the contract asserting that the product did not deliver on its "roadmap", Defendant engaged in a tense exchange with Asher and CEO Ben Werther about what Netflix should pay, which the jury correctly understood as a threat to Defendant to out his advisory role after the Netflix contract was cancelled before annual subscription fees kicked in. Defendant authorized payment for 2,000 devices, while Sprague believed Vistara was an unpaid proof of concept and "didn't expect it to be even one" paid device. Trial Trans., Vol. 9, 1830:10 (Sprague). The $155,000 Defendant authorized was a fraudulent payoff Platfora to cover up his own conflict of interest, one which Defendant had already lied to CEO Hastings about.

The claim that Ashley Sprague- who replaced Defendant's role when he left Netflix- signed another Numerify contract because it was useful for the company is overstated, and those amounts are not attributed to the fraud loss asserted by the government. Numerify's CEO, Guarav Rewari, testified that Sprague's involvement was not "a new order" as Defendant's counsel suggested, but "was the second year of the same" contact Mr. Kail had signed. Trial Trans., Vol. 7, 1290:1-3 (Rewari). Ashi Sheth, a former Netflix employee, was involved in testing Numerify and that it was "[n]ot for Netflix because of choices that we made around how to crate [IT] tickets." Trial Trans., Vol. 8, 1655:2-4. Defendant's purchase of the $85,000, 1-year Numerify contract should be attributed to the fraud loss.

Michael Kail introduced Docurated to Netflix. *See* Trial Trans., Vol. 9, 1833:1-4 (Sprague). Sprague testified that she tried out Docurated but, "[i]n the end, we did not" see value in the product. *Id.*, 1832:22. Ashi Sheth, a former Netflix engineer, was involved in building a custom replacement for Docurated that they called "Q-sensei". Trial Trans., Vol. 8, 1697:21-25, 1652:17-19 (Sheth). The Court's findings summarizing key trial evidence is found in the Court's Order, Dkt. No. 264, pp. 14-15. The $120,000 contract that Defendant authorized should be counted toward the fraud loss to Netflix.

GOVERNMENT'S SENTENCING RESPONSE,
CR-18-00172 BLF                                     3

The government's asserted fraud loss was proven at trial by documents and witnesses that satisfy either the preponderance standard or the clear and convincing standard, and conservatively totals $2,020,068.80.  This equates to a loss-based enhancement of 16 points.

### b. Obstruction of Justice

Defendant claims that he testified honestly, largely based on his admission that his denial to his Chief Executive Officer about Platfora.  The government disagrees, and provided an example related to a Netenrich employee that Defendant began to deal with relating to his referral commissions.  Defendant asked Mr. Kunaparaju if Hemanth Penmetsa knew the context of his arrangement with Netenrich.  Mr. Penmetsa's location is important given that he was in India, making it harder to have a wink-and-nod kickback arrangement with him.  Yet another example is Defendant's claim that he used an unnamed colleague's login to find out the prices Platfora's competitors (Microstrategy and Tableau) were charging generally, rather than admit that his "digging" was in Netflix's billing information and the "us" was Netflix, reflecting his disclosure of competitor pricing to a company that was paying him in stock and that expected him to sign a valuable contract with.  Defendant further testified that he often left it up to his team to enter into the contracts he signed (*see* Trial Trans., Vol. 10, p. 2225:5-7), despite many of his colleagues who testified at the trial stated that they didn't know Vistara, Docurated, Platfora, and other companies were being paid during what they thought were testing.  Defendant's false testimony and false denials render him eligible for the obstruction enhancement.

## IV.    OTHER NON-SENTENCING ARGUMENTS

### a. This is Not the Forum to Relitigate the Motion for Judgment of Acquittal.

Defendant devotes numerous pages to challenging the convictions, and even advances new (but incorrect) legal arguments about the wire fraud counts.  These arguments have no place in the sentencing brief, and should be rejected by the Court.

### b. Defendant Asserts Numerous Facts Without Any Support

Defendant claims that he received referral fees from Vistara which were improperly included in the government's fraud loss calculations.  This is untrue.  Defendant failed to name this other company that he supposedly brought to Vistara.  Each Moreover, as the financial schedules prepared by FBI

GOVERNMENT'S SENTENCING RESPONSE,
CR-18-00172 BLF                                          4

Financial Analyst Carlene Kikugawa demonstrate, the deposits to the Unix Mercenary accounts from Vistara all match Unix invoices related to Netflix billings. Defendant's bald claims lack merit.

Defendant claims that Netskope was incredibly useful to Netflix. Not according to former employee Rob Fry: "it never, for us, achieved the scale that it needed for us to fully deploy it." Trial Trans., Vol. 5, 1143:23-25 (Fry). Defendant further claims that Unix Mercenary existed for years before the offense conduct. But the government introduced evidence that Defendant registered it two days after he signed the contract with Netenrich as a referral partner, and it did not have bank accounts until months later. *See* Exhibit 801. Although Defendant may have had a website for Unix Mercenary, he created the entity during the fraud scheme.

Defendant's claims that he saved Netflix money in engaging some of these companies is based on the self-serving testimony of Defendant and the vendors' executives, and further does not offset losses caused by his fraud scheme. Nor should the credit Defendant heaps upon himself for the company's success offset the losses caused by the fraud which benefitted himself personally and secretly.

## V. CONCLUSION

Defendant still sees this case as "a life-altering lesson in considering all the angles of a situation before acting." Not that he lied and lied to get money and stock and to keep from getting fired for his conflicts of interest. He also claims that "in this case, Mr. Kail did not act with greed," but that is clearly his motivation. Despite defendant's claims that he signed many of these contracts because his team wanted the product and he was just the boss, not once did Mr. Kail say to anyone "hey, maybe I shouldn't sign this, because they're paying me." Not once did he alert anyone at Netflix to his conflicts or his compensation. Indeed, he hid them and, when confronted directly, lied. Defendant's sentence should be mid-range sentence for an Offense Level 28, which the government respectfully suggest is 84 months, restitution of $1,272,000, a $250,000 fine, and forfeiture.

//

//

|   |   |   |
|---|---|---|
| 1 |  | Respectfully submitted, |
| 2 |  | STEPHANIE M. HINDS<br>Acting United States Attorney |
| 3 |  |  |
| 4 | Dated: October 15, 2021. | */s/ Colin Sampson*<br>COLIN SAMPSON |
| 5 |  | CHRISTOPHER KALTSAS<br>Assistant United States Attorneys |

GOVERNMENT'S SENTENCING RESPONSE,
CR-18-00172 BLF                                6